**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

SPRINT COMMUNICATIONS, INC.,

     Plaintiff,

v.

STEPHEN CALABRESE, as an individual,
NEXTEL, INC. d/b/a NEXTEL
WORLDWIDE, RETROBRANDS USA
LLC, and JEFFREY KAPLAN, as an
individual,

     Defendants.

Case No. _____

Jury Trial Demanded

## COMPLAINT

Plaintiff Sprint Communications, Inc., by counsel, hereby alleges as follows for its

Complaint against Defendants Stephen Calabrese, in his individual capacity; Nextel, Inc. d/b/a

Nextel Worldwide; Retrobrands USA LLC; and Jeffrey Kaplan, in his individual capacity:

### INTRODUCTION

1.     Sprint Communications, Inc. (together with its predecessors in interest,

affiliates, and authorized licensees, "Sprint"), as the successor in interest to Nextel

Communications, Inc., owns the intellectual property rights associated with the famous

NEXTEL telecommunications brand, including the famous NEXTEL trademark.

2.     As a result of decades of use of the NEXTEL brand throughout the United

States, Mexico, Canada and Latin America, the NEXTEL brand is a household name that the

general consuming public immediately associates with Sprint, and among other things, the

NEXTEL brand's innovative "push-to-talk" or "instantaneous two-way radio communication" technology, wireless products, and related wireless services.

3.     NEXTEL brand wireless products and services gained widespread fame and acceptance as the go-to, best-in-class method for "push-to-talk" or "instantaneous two-way radio" communication for businesses small to large, the trades, local and federal government, and particularly in the first responders industry, including but not limited to law enforcement, firefighters, paramedics, hospitals, utilities, transportation, logistics management, and resource support. The NEXTEL brand's push-to-talk features addressed first responders' particular need for a way to instantaneously and reliably communicate in real-time, and the NEXTEL brand is known for offering  rugged wireless products that can withstand the type of field conditions in which first responders and other emergency personnel work and are certified to meet (1) military specification form factors, (2) Military Standard 810G for dust, shock, vibration, blowing rain and are (3) IP68 certified as dust proof and capable of withstanding immersion up to 2 (6.5') meters for 30 minutes.

4.     The famous NEXTEL trademark therefore embodies the significant goodwill stemming from decades of focus on business, government, and similar high-value consumers and organizations that purposefully chose to purchase wireless products and related wireless services sold in connection with the NEXTEL brand because of the brand's positive reputation for reliability and durability as well as the unique functionality and features of the wireless products and services sold in connection with the NEXTEL brand.  The NEXTEL trademark also immediately conveys to consumers, as well as business and government decision makers, who are purchasing wireless services, that the products and services promoted and sold in

connection with the famous NEXTEL trademark are unique, reliable, and can, for example, be trusted to operate in situations where rapid communication is paramount, such as the life-and-death situations faced by first responders.

5.       Historically, the NEXTEL brand was also closely associated with the iDEN (Intergrated Digital Enhanced Network) protocol, which used a time division multiple access technology.  For eight years following the 2005 purchase of Nextel, Sprint operated the Nextel iDEN network, and thus consumers came to associate Sprint with the NEXTEL brand and network.  Though Sprint shut down the iDEN Nextel network in 2013, existing Nextel customers were transitioned to Sprint's CDMA (Code Division Multiple Access) network and to Sprint Direct Connect, which offers push-to-talk capabilities, including offering certain devices with genuine instantaneous, two-way radio technology .  Sprint continues to own the NEXTEL brand, continues to use the NEXTEL brand in connection with certain wireless products targeting the traditional NEXTEL subscriber base, and consumers continue to associate Sprint with the famous NEXTEL brand and network.

6.       Despite Sprint's continued use of and association with the NEXTEL brand, Defendants Stephen Calabrese and Nextel, Inc. d/b/a Nextel Worldwide (together, "NW Entity") as well as Defendants Retrobrands USA LLC and Jeffrey Kaplan (together, "Retrobrands," and with NW Entity, "Defendants") decided to treat Sprint's announcement of the shutdown of the iDEN network alone as creating a business opportunity.  By deception and mischaracterization of the shutdown of the iDEN network, Defendants have adopted and begun using a counterfeit NEXTEL trademark and other components of Sprint's prior branding (as discussed below) in order to promote Defendants' own wireless handset products and related

3

services.  Upon information and belief, Defendants were well aware of Sprint's prior rights in the NEXTEL brand, and hoped to capitalize and profit on the fame of the NEXTEL brand to promote their own substandard products.

7.      In other words, rather than going through the time and expense to create their own business model, mark, and branding, Defendants simply took the preexisting, widely known, and widely accepted NEXTEL trademark and accompanying branding and are affixing it to Defendants' purported wireless products, and are using it to advertise wireless communication services in a scheme to mislead consumers.

8.      As a result of Defendants' conduct, Sprint's customers and potential customers have been confused and misled by Defendants as to Sprint's association with Defendant's counterfeit "Nextel" products, and as to whether Defendants' products and services are genuine high-quality NEXTEL products and services.  Upon information and belief, Defendants' entire purpose in using the NEXTEL trademark and associated branding was to deceive consumers – i.e. with the hope that consumers would purchase Defendants' goods and services based on the mistaken belief that they were genuine NEXTEL goods and services, not realizing they are in fact purchasing a new, untested, and unknown counterfeit brand.

9.      Despite the unquestionable illegality of Defendants' conduct, they make no effort to conceal it, instead trying to justify their willful and intentional violation of Sprint's thirty-year old intellectual property rights by falsely claiming that Sprint no longer uses the famous NEXTEL trademark.  Based on this false representation, Defendants claim they are permitted to adopt the Mark and misappropriate its associated goodwill.  In fact, when asked about the plan to steal the famous NEXTEL trademark, Defendant Jeffrey Kaplan recently

4

stated that he expected "Sprint to fight me on this" but that he "hope[s] they do not have any interest." *See* **Exhibit A.**

10.     Accordingly, Sprint brings this case against Defendants, seeking monetary and injunctive relief as redress for Defendants' federal, state, and common law trademark infringement; federal dilution; federal and common law unfair competition and false designation of origin; violation of the Florida Deceptive and Unfair Trade Practices Act; and violation of the Anticybersquatting Consumer Protection Act.

## PARTIES

11.     Plaintiff Sprint Communications, Inc. is a Kansas corporation with a place of business at 6200 Sprint Parkway, Overland Park, KS 66251.

12.     Upon information and belief, Defendant Stephen Calabrese is an individual domiciled in Florida who resides at 604 Boca Marina Court, Boca Raton, Florida 33487.

13.     Upon information and belief, Defendant Nextel, Inc. d/b/a Nextel Worldwide is a Florida corporation with a place of business at 6191 Orange Drive, Suite 4466 in Davie, Florida.  Nextel, Inc. d/b/a Nextel Worldwide has no relationship with or connection to the Nextel, Inc. that is the predecessor-in-interest to Plaintiff Sprint Communications, Inc.

14.     Upon information and belief, Defendant Retrobrands USA LLC is a Florida limited liability company with a place of business at 1771 Blount Road, Suite 203, Pompano Beach, Florida 33069.

15.     Upon information and belief, Defendant Jeffrey Kaplan is domiciled in Florida and resides at 1771 Blount Road, Suite 203, Pompano Beach, Florida 33069.

5

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over the subject matter of this lawsuit under 15 U.S.C. §§ 1121 and 1125 and under 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over the state and common law claims under 28 U.S.C. § 1367.

17.     Defendants are subject to the personal jurisdiction of this Court because they are residents of Florida.  Defendants are further subject to the personal jurisdiction of this Court because they have conducted, engaged in, and carried out business ventures, and committed tortious acts and other wrongdoings within Florida and this judicial district.

18.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because the majority, if not all, of the Defendants are subject to personal jurisdiction in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

**GENERAL ALLEGATIONS**

**A.     The Merger of Nextel and Sprint**

19.     Sprint Nextel Corporation changed its name to Sprint Communications, Inc. in 2013 and is the direct and indirect parent company for all of the Sprint and Nextel operating entities.  In 2018, the entity Nextel Communications, Inc. merged into Sprint Communications, Inc.—a wholly owned subsidiary of Sprint Corporation—and the Nextel entities under Sprint Communications, Inc. remain direct or indirect wholly owned subsidiaries of Sprint Communications, Inc.

20.     As noted above, Sprint Communications, Inc. and its predecessors-in-interest, including but not limited to Nextel Communications, Inc., shall be referred to as "Sprint" throughout the Complaint.

**B.     Sprint and the Famous NEXTEL Brand**

21.     The NEXTEL brand rose to national prominence in the 1990s and 2000s due in large part to the  innovative "push-to-talk" products or "instantaneous two-way radio communications" promoted and sold in connection with the NEXTEL trademark that allow consumers to connect through the "push of a button" to other consumers that went well-beyond the old radio technology.

22.     Utilizing unique technology that set it apart from the competition, the Nextel brand was the first to offer advanced push-to-talk functionality and features, and the NEXTEL brand obtained a strong foothold in an otherwise highly competitive market, resulting in the NEXTEL brand being primarily associated with the best and most advanced push-to-talk functionality, setting itself apart from all other carriers in the market.

23.     As the popularity of the NEXTEL brand's reliable push-to-talk technology grew, and the technology advanced, offering new services that were simply not available from other carriers, such as a nationwide push-to-talk functionality, the NEXTEL brand became ingrained in the minds of consumers as indicating high-quality and dependable wireless products and services originating exclusively from Sprint.

24.     Wireless products and services sold in connection with the NEXTEL trademark and brand were particularly well-known and popular in the first responder industry, as the push-to-talk capabilities as well as the rugged design of those products met first responders'

significant need to be able to communicate rapidly in an unfolding crisis or emergency situation and to know that they could depend on both the device and the network it operated on to work.

25.    Embodying the significant value of the famous NEXTEL brand, Sprint owns and maintains federal registrations for the NEXTEL trademark, including but not limited to the following registrations issued by the U.S. Patent and Trademark Office ("USPTO"):

| Mark | Reg. No. & Date of First Use | Goods and Services |
|---|---|---|
| NEXTEL | 1,637,139<br><br>November 1988 | Cl. 38:  Telecommunications services |
| NEXTEL | 1,884,244<br><br>August 1993 | Cl. 9:  Equipment used in providing telecommunication services; namely, mobile radios; namely, two-way radios, mobile telephones, dispatch radios, pagers and mobile data transceivers |

26.    Each of the above identified registrations (hereinafter "NEXTEL Mark") is valid and subsisting on the Principal Register and has been since their respective registration dates.  Moreover, each of the aforementioned registrations are incontestable under the Lanham Act, 15 U.S.C. § 1065.  True and accurate copies of the certificates of registration and TSDR information for the NEXTEL Mark are attached as **Exhibit B** to the Complaint.

27.    Sprint has continuously used the famous NEXTEL Mark for nearly the last thirty years in connection with the sale of wireless products and related wireless services.  Currently, the famous NEXTEL Mark is used with Sprint branding to sell and offer to sell a line-up of "rugged" wireless products primarily focused on the business, government, and first responder market segments.  These products are thoroughly tested to ensure that they can

withstand the hazardous conditions encountered by first responders, and are certified by third parties for compliance with various quality and safety standards, such as MIL-STD certification under the 810G for resistance to dust, shock, salt, fog, vibration, extreme temperatures, humidity and more and IP68 waterproof/dustproof standards.  An example of Sprint's current use of the famous NEXTEL Mark can be found in **Exhibit C** to the Complaint.

28.     As of the filing of this Complaint, Sprint sells "rugged" Sonim XP Strike and Sonim XP Strike IS products in connection with the NEXTEL Mark nationwide.

29.     As noted above and demonstrated below, the NEXTEL Mark has become so ingrained in the minds of consumers throughout the United States that the NEXTEL Mark is famous.  The NEXTEL Mark is used in connection with Sprint branding in the sale of certain rugged products that are primarily focused on the business, government, and first responder's market segments.  Purchasers of wireless products and services in the business, government, and first responder market segments are especially likely to view products sold in connection with the NEXTEL Mark as high-quality and dependable and to believe that those products originate from, are related to, are sponsored by, or in some other way affiliated with Sprint.

30.     The NEXTEL Mark became famous long before Defendants began engaging in the conduct complained of in this Complaint.

**C.      Defendants' Willful Violation of Sprint's Rights in the Famous NEXTEL Mark**

31.     Defendant Nextel, Inc. d/b/a Nextel Worldwide is a purported telecommunications company that advertises and sells wireless products and related services to consumers in the United States, including but not limited to wireless products with push-to-

talk capabilities.  Upon information and belief, Defendant Stephen Calabrese ("Calabrese") is the CEO, principal, and/or owner of Nextel, Inc. d/b/a Nextel Worldwide.

32.     Upon information and belief, Calabrese was, and currently is, a moving, active, and conscious force behind the conduct giving rise to the claims in this case and was, and currently is, personally involved in and directed the actions leading to and comprising the infringement and other violations of Sprint's intellectual property rights.

33.     As noted above, Defendants Nextel, Inc. d/b/a Nextel Worldwide and Calabrese will be referred to throughout as the "NW Entity."

34.     Sprint has never authorized the NW Entity to market, sell, promote, or resell any products or services using the famous NEXTEL Mark or any other component of the NEXTEL brand.

35.     Yet the NW Entity has executed a conscious plan designed to usurp Sprint's nearly three-decade-old rights in the famous NEXTEL Mark and to adopt Sprint's NEXTEL branding for use in connection with the NW Entity's wireless handset and related services business.

36.     Specifically, the NW Entity:

    a.  formally incorporated and registered a company named Nextel, Inc., now operated as Nextel Worldwide, with Florida's Division of Corporations in late 2016;

    b.  filed an application to register the mark with the USPTO in connection with "[t]elecommunication access services; [t]elecommunication gateway services; [and t]ransfer of data by telecommunication," including as

10

part of the claimed mark, the distinct all-caps black lettering with the X and T run together and set against a yellow backdrop, U.S. Appl. Ser. No. 87/220,918;

c. upon information and belief, registered the domain <nextelworldwide.com> (the "Domain"), which incorporates the famous NEXTEL Mark, and as discussed below, is being used to host a series of webpages offering wireless products and related services under a counterfeit NEXTEL Mark (the "NW Entity Website");

d. adopted branding, including a black and yellow color scheme with all-caps and the X and T that run together, that mimics the branding associated with the famous NEXTEL Mark (the "NEXTEL Branding"); and

e. upon information and belief, began marketing, promoting, selling, and/or offering to sell wireless products and related services to consumers using a counterfeit NEXTEL Mark and the NEXTEL Branding in early 2017.

37. By March 2017, the NW Entity began attending telecommunication industry trade shows to promote and market its products and related services using the counterfeit NEXTEL Mark and NEXTEL Branding.

38. Specifically, the NW Entity attended the International Wireless Communications Expo ("IWCE") trade show in Las Vegas, Nevada, which was held from March 27, 2017 to March 31, 2017, and which is heavily attended by public sector and first responder organizations.

39. As shown in the pictures below, the NW Entity actively promoted its wireless products and related services at IWCE using a counterfeit NEXTEL Mark on (i) a large yellow

11

banner; (ii) employee uniforms; (iii) sample products that were described as NEXTEL products; and (iv) brochures and marketing materials for alleged NEXTEL products:

 

The NW Entity's efforts to mimic the NEXTEL Branding were also readily apparent, in that everything, from the yellow and black color scheme, to the all-caps and font of the counterfeit NEXTEL Mark and the running together of the X and T, is identical to how Sprint has branded and used the famous NEXTEL Mark over the years. A side-by-side comparison of the NW Entity's counterfeit NEXTEL Mark and one example of how Sprint has used the famous NEXTEL Mark is pictured below:

              

(Sprint's NEXTEL Mark)                (NW Entity's counterfeit NEXTEL Mark)

40.    Around the same time that it attended IWCE 2017, the NW Entity also began recruiting third-party wireless dealers to sell the NW Entity's counterfeit NEXTEL products, falsely representing that the NW Entity was either an authorized dealer of genuine NEXTEL products or that the NW Entity had purchased the famous NEXTEL Mark from Sprint. Included among these third-party dealers are Northeast Two-Way Radio Corp. and Tell Communications, both of which continue to market and promote the NW Entity's counterfeit NEXTEL Mark and products, despite full knowledge that doing so violates Sprint's intellectual property rights.

41.    Also around the same time it attended IWCE 2017, the NW Entity began offering to sell its wireless products (including but not limited to push-to-talk products) and related services using the counterfeit NEXTEL Mark and the NEXTEL Branding at the NW Entity Website.

42.    For example, the NW Entity Website conspicuously displays a counterfeit NEXTEL Mark, again using all-caps in a black font where the X and T run together and over top a yellow background, as pictured below:



43.    The NW Entity also improperly affixes the "®" symbol to its counterfeit NEXTEL Mark on at least the NW Entity Website (as well as, upon information and belief, on the NW Entity's wireless products) despite knowing it does not own a federal registration for the counterfeit NEXTEL Mark.  Upon information and belief, the NW Entity is purposefully using the "®" symbol to further mislead consumers into believing that the NW Entity and its counterfeit NEXTEL wireless products and related services are genuine NEXTEL products, when in fact they are not.

44.    The NW Entity's attempt to create a false connection between the NW Entity and the famous NEXTEL brand does not end with the NW Entity's adoption of the counterfeit NEXTEL Mark and the NEXTEL Branding.  The NW Entity also repeatedly describes the NW Entity's wireless products and related services in a manner that is designed cause consumers to associate those products and services with the genuine NEXTEL brand, including by using marketing slogans associated with the NEXTEL brand, such as: "How Business Gets Done."

45.    The NW Entity has also adopted a method for naming its wireless products that is virtually identical to how Sprint has named its NEXTEL wireless products, including but not necessarily limited to using the combination of 'i' plus a series of three numerals (*i.e.*, the NEXTEL i450 from the NW Entity versus the NEXTEL i570 from Sprint).

46.    The NW Entity also heavily advertises the push-to-talk feature of its wireless products, which as discussed above, is a functionality that rose to fame under the NEXTEL brand and is inescapably linked with the NEXTEL brand in the minds of consumers.  Upon information and belief, the NW Entity's products do not include the type of built-in instantaneous, two-way radio technology associated with genuine NEXTEL products, but

14

instead employ an app on a smartphone that mimics certain features, but does not duplicate all features or the quality or reliability of the actual instantaneous, two-way radio technology sold by Sprint.

47.     The NW Entity also advertises its counterfeit NEXTEL products as "rugged," like Sprint, but upon information and belief, the NW Entity's products do not meet the same government durability standards, such as the MIL-STD certification under the 810G for resistance to dust, shock, salt, fog, vibration, extreme temperatures, humidity and more and IP68 waterproof/dustproof standards that rugged products sold by Sprint meet.

48.     Moreover, despite knowing that it has no affiliation with Sprint, upon information and belief, the NW Entity represented to its distributors and/or intended distributors of the counterfeit NEXTEL wireless products that the NW Entity was an authorized seller of genuine NEXTEL products, and/or that it had purchased the rights to the NEXTEL name from Sprint.  Upon information and belief, the NW Entity made these false statements to induce its distributors to purchase and resell the NW Entity's counterfeit NEXTEL goods and services.

49.     Upon information and belief, the NW Entity has even gone so far as to cut-and-paste the counterfeit NEXTEL Mark on stock images of handheld radios and other telecommunications equipment.  Below is an example of this conduct, taken from downloadable brochures available at the Domain:



50.     The NW Entity engaged, and is engaging, in the above conduct with full knowledge of the famous NEXTEL Mark and Sprint's well-established rights in that Mark.  In fact, when the NW Entity applied for a federal registration for the trademark **NEXTEL**, the USPTO refused registration for the mark based on a likelihood of confusion with Sprint's NEXTEL Mark.

51.     Therefore, and upon information and belief, the NW Entity adopted and registered its trade name, applied to register the **NEXTEL** mark, registered the Domain, and began using a counterfeit NEXTEL Mark with full knowledge of Sprint's senior rights and the likelihood that the NW Entity's conduct would cause, and already has caused, confusion among consumers throughout the United States and in the State of Florida.

52.     Upon information and belief, the NW Entity adopted and is using the counterfeit NEXTEL Mark in the manner described in this Complaint with the intention of creating and taking advantage of consumer confusion for financial gain.

53.     The NW Entity's willful violation of Sprint's rights in the famous NEXTEL Mark is also demonstrated by the fact that, upon information and belief, the NW Entity is acting in concert with Defendants Retrobrands USA LLC and Jeffrey Kaplan, who (as discussed below) have publicly announced that their use and adoption of a counterfeit NEXTEL Mark is not an attempt to create a non-counterfeit NEXTEL brand, but is in fact an effort to take the famous NEXTEL Mark, NEXTEL Branding, and all associated goodwill away from Sprint.

54.     Finally, the willful nature of the NW Entity's conduct has been confirmed by its actions in the last few months. Specifically, after learning about the NW Entity's use of the counterfeit NEXTEL Mark and NEXTEL Branding in or around March 2017, Sprint contacted the NW Entity and demanded that the NW Entity cease and desist its infringing conduct. Proof of Sprint's current and ongoing use of the famous NEXTEL Marks was then provided to the NW Entity in October 2017.

55.     Through its attorney, the NW Entity not only indicated that it would comply with, but that it had complied with, Sprint's demands. In seeming compliance, the NW Entity website hosted at the Domain was temporarily taken down. As recently as February 2018, an attorney for the NW Entity confirmed that the NW Entity had ceased using the NEXTEL Mark. Sprint therefore believed the matter was resolved.

56.     However, contemporaneous with its attorney's statement to Sprint that the NW Entity had ceased using NEXTEL, upon information and belief, the NW Entity was working in concert with Defendants Retrobrands USA LLC and Jeffrey Kaplan to actually expand its grip on the NEXTEL brand. Specifically, in early February 2018 the NW Entity Website was reactivated, and Kaplan told The Kansas City Star newspaper about his plan to take the

17

NEXTEL Mark from Sprint, and (through Retrobrands USA LLC) license it to the NW Entity. *See* **Exhibit A**.   Retrobrands USA LLC also issued a press release around the same time, discussing the alleged "relaunch" of the famous NEXTEL brand and providing the NW Entity personnel's contact information.  *See* **Exhibit D**.

57.   Then in March 2018, the NW Entity attended the 2018 ICWE trade show in Orlando, Florida.  The NW Entity again conspicuously displayed the counterfeit NEXTEL Mark on a banner hung above its booth as well as on brochures, product boxes, and business cards on the table, as shown below:



58.   Ultimately, there is no industry convention, functional reason, or legitimate commercial explanation for the NW Entity to adopt the counterfeit NEXTEL Mark or so many elements of the NEXTEL Branding.  The NEXTEL Mark and NEXTEL Branding were developed specifically to stand out and be distinctive in the wireless handset and wireless

network industry.  The NW Entity's subsequent adoption of exactly the same branding, trademarks, and the Domain can have no other purpose than to trade on the goodwill that Sprint has developed over the last approximately thirty years with consumers and to capitalize on the fame of the NEXTEL Mark.  This conduct constitutes counterfeiting, willful infringement, dilution, unfair competition, false designation of origin, deceptive trade practices, and cybersquatting that is likely to cause confusion among consumers.

59.     In fact, instances of actual confusion have already occurred.  For example, several current or former Sprint customers at IWCE 2017 and IWCE 2018 expressed confusion as to why the "Nextel" booth – i.e., the NW Entity's booth – was not near the Sprint booth. Other individuals at IWCE similarly conveyed their understanding that the NW Entity's booth and the goods and services advertised at the booth originated from, or were affiliated with Sprint.

60.     In sum, upon information and belief, the NW Entity adopted the counterfeit NEXTEL Mark with the sole intention of using that famous Mark to gain customer acceptance of the NW Entity's products overnight by leading consumers to the mistaken assumption that those wireless products and related services are genuine NEXTEL products and services and/or authorized by or affiliated with Sprint, when they are, upon information and belief, vastly inferior products.

61.     Upon information and belief, NW Entity's counterfeit NEXTEL products are made from low-quality materials and products do not use genuine instantaneous, two-way radio technology.

62.     Upon information and belief, the NW Entity will continue to commit the acts complained of unless enjoined.

**D.     Retrobrands' Use and Infringement of the Famous NEXTEL Mark**

63.     As noted above, Defendants Retrobrands USA LLC and Defendant Jeffrey Kaplan are referred to as "Retrobrands" throughout.

64.     Upon information and belief, Defendant Retrobrands USA LLC is a limited liability company organized and operated by Defendant Jeffrey Kaplan.  Upon information and belief, Kaplan was, and currently is, a moving, active, and conscious force behind the conduct giving rise to the claims in this case and was, and currently is, personally involved in and directed the actions leading to and comprising of the infringement and other violations of Sprint's intellectual property rights.

65.     Retrobrands advertises that it adopts and "relaunches" famous brands that have allegedly been abandoned by their former owners.  *See* **Exhibit E.**  Retrobrands' entire business model, as described on its website, is in fact designed to capitalize on consumer confusion.  As a matter of law, a trademark is inseparable from the goodwill associated therewith.  Thus "reviving" an "abandoned" brand without purchasing the associated goodwill is an attempt to fraudulently induce consumers to purchase a new and unrelated product based on the false impression that it is a well-known product that is once again available.  Simply put, Retrobrands' entire business model is to profit off of consumer confusion and deception.

66.     Sprint has never authorized Retrobrands to market, sell, promote, or resell any products or services using the famous NEXTEL Mark, and Sprint's registered NEXTEL Mark is a matter of public record.  Nonetheless, in early 2018, Retrobrands filed a trademark

application with the USPTO, seeking to register the mark NEXTEL for "[t]elecommunication access services" based on an alleged first use date occurring in January 2018, U.S. Appl. Ser. No. 87/774,826 (the "Retrobrands Application").

67.      Upon information and belief, Retrobrands filed the Retrobrands Application with the intention of licensing the resulting registered mark to, or otherwise working in conjunction with, the NW Entity.

68.      In support of the Retrobrands Application, Retrobrands submitted the following specimen of use in commerce, described as "LABEL ON WALKIE TALKIE":



69.      Retrobrands' specimen contains the exact same counterfeit NEXTEL Mark that is, and has been, in use by the NW Entity (right down to the improper use of the "®" symbol), as well as the exact same NEXTEL Branding.  The specimen is also similar in appearance to the purported product images that the NW Entity includes on the downloadable advertising material found at the Domain.

70.      The day after filing the Retrobrands Application, Retrobrands filed a Petition for Cancellation before the TTAB (No. 92067840) to cancel Sprint's registrations for the

21

NEXTEL Marks (the "Cancellation Proceeding"), basing its standing to do so on the Retrobrands Application to register what Retrobrands admits is an "identical or nearly identical" NEXTEL trademark.

71. Upon information and belief, Retrobrands' motivation for filing the Retrobrands Application was to profit from consumer confusion as to the association between the goods and services of the NW Entity and the famous NEXTEL Mark.

72. Upon information and belief, Retrobrands will continue to commit the acts complained of unless enjoined.

**E.     Defendants' Unlawful Conduct Is Causing Irreparable Harm to Sprint**

73. To increase sales of their counterfeit NEXTEL products and related services, Defendants have deliberately copied the famous NEXTEL Mark and the NEXTEL Branding and are using them in connection with wireless products and related services online, in marketing materials, and at trade shows with the sole purpose of gaining a competitive advantage and increasing their sales by trading off the goodwill embodied in the famous NEXTEL Mark and capitalizing on the consumer confusion Defendants' conduct creates.

74. Sprint has suffered, and will continue to suffer, reputational harm as a result of Defendants' use of the counterfeit NEXTEL Mark and NEXTEL Branding.  As noted above, consumers immediately associate the famous NEXTEL Mark with Sprint and therefore will immediately ascribe to Sprint any faults, defects, or other issues and disappointments with Defendants' counterfeit NEXTEL branded products, which as noted above, are low-quality knock-offs that do not meet the quality standards Sprint requires for rugged products and in fact do not even operate using a genuine instantaneous, two-way radio technology.

22

75. Moreover, upon information and belief, Defendants' unlawful conduct has likely caused, and will likely continue to cause, Sprint to lose potential customers and sales of genuine NEXTEL products and/or it is likely that sales have been diverted, and will continue to be diverted, to Defendants that Sprint likely would have otherwise made to the public. This loss includes not only the loss of wireless device sales but also the loss of network services sales because customers that are lured by the NEXTEL brand into purchasing a counterfeit NEXTEL product are then encouraged by NW Entity to use T-Mobile, AT&T, or Verizon for the cellular network service.

76. Defendants' use of the counterfeit NEXTEL Mark also dilutes, either by blurring or tarnishing the famous NEXTEL Mark, thereby jeopardizing Sprint's goodwill and investment in that Mark.

77. Defendants' use of the Domain also misdirects customers looking for the genuine NEXTEL brand on the Internet, and likely prevents a significant number of consumers from locating Sprint's products.

78. Defendants' use of the counterfeit NEXTEL Mark and NEXTEL Branding also interferes with consumer choice by deceiving consumers—including possibly U.S. or state government agencies—into purchasing low-quality products that do not employ actual instantaneous,two-way radio technology and that are unproven while thinking they are buying genuine NEXTEL products that come with a thirty-year track record of reliability and durability.

79. Defendants' use of the counterfeit NEXTEL Mark and NEXTEL Branding also creates a serious public safety concern. As noted above, the NEXTEL brand is well-known in

the first responder community as providing a dependable method for real-time communication during a crisis.  The NEXTEL brand's reputation for excellence allows first responders to rest assured that products and services sold in connection with the NEXTEL Mark are reliable. Upon information and belief, Defendants' counterfeit NEXTEL products do not have the same level of reliability as Sprint's products, creating a potentially life-threatening scenario where first responders have purchased the counterfeit NEXTEL products believing they are dependable, when in fact they are not.

80.     Sprint is and will continue to be irreparably harmed by Defendants' misconduct as set forth above unless Defendants are enjoined by this Court.

## COUNT I
### Counterfeiting
### 15 U.S.C. §§ 1114, 1116

81.     Paragraphs 1 through 80 are incorporated into and made a part of this Count.

82.     Defendants are using a counterfeit NEXTEL Mark, which is identical with, or substantially indistinguishable from, Sprint's federally registered and famous NEXTEL Mark, in commerce in connection with the sale, offering for sale, distribution, and/or advertising of goods and services that do not originate with, and are not sponsored by or affiliated with Sprint.

83.     Defendants are applying the counterfeit NEXTEL Mark, which is identical with, or substantially indistinguishable from, Sprint's federally registered and famous NEXTEL Mark, in advertising intended to be used in commerce in connection with the sale, offering for sale, distribution, or advertising of goods and services that do not originate with, and are not sponsored by or affiliated with Sprint.

84.     Defendants are intentionally using the counterfeit NEXTEL Mark in connection with the promotion, advertisement, sale, and offering for sale of their wireless goods and related services, despite knowing that their NEXTEL Mark is a counterfeit.

85.     Defendants' actions are likely to cause confusion, mistake, or deception as to the affiliation, connection, or sponsorship of services offered by Defendants in that customers and potential customers are likely to believe that the goods and services offered by Defendants in connection with the counterfeit NEXTEL Mark are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Sprint.

86.     In fact, Defendants' actions have already caused actual confusion, mistake, or deception as to the affiliation, connection, or sponsorship of the goods and services offered by Defendants among at least individuals attending the IWCE trade show, and upon information and belief, Defendants distributors, who believed that the goods and services offered by Defendants in connection with the counterfeit NEXTEL Mark were provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Sprint and the NEXTEL brand.

87.     Upon information and belief, Defendants have engaged in this conduct for the sole purpose of misleading consumers into believing that Defendants are the owners of the famous and iconic NEXTEL brand that Sprint has owned and used for the last thirty years and the black and yellow NEXTEL Mark since 2003.

88.     As a result, Defendants' use of the counterfeit NEXTEL Mark that is identical with, or substantially indistinguishable from, Sprint Communications' famous NEXTEL Mark is and was intentional and willful.

89.     The likely confusion, mistake, or deception caused by Defendants violates the Lanham Act, 15 U.S.C. §§ 1114, 1116.

90.     As a direct and proximate result of the likely confusion, mistake, or deception, Sprint has suffered and will continue to suffer irreparable harm if Defendants' conduct is not enjoined.

91.     Defendants' willful and intentional use of the counterfeit NEXTEL Mark subjects Defendants to treble damages or statutory damages up to $2,000,000 per counterfeit mark per type of good or services sold, offered for sale, or distributed pursuant to the Lanham Act, 15 U.S.C. § 1117(c)(1)-(2).

## COUNT II
### Federal Trademark Infringement
### 15 U.S.C. § 1114

92.     Paragraphs 1 through 80 are incorporated into and made a part of this Count.

93.     Defendants are using a counterfeit NEXTEL Mark, which is a reproduction, counterfeit, copy, or colorable imitation of Sprint's federally registered and famous NEXTEL Mark, in commerce in connection with the sale, offering for sale, distribution, and/or advertising of goods and services that do not originate with, and are not sponsored by or affiliated with Sprint.

94.     Defendants are applying reproductions, counterfeits, copies, or colorable imitations of Sprint's federally registered and famous NEXTEL Mark in advertising, intended

to be used in commerce in connection with the sale, offering for sale, distribution, or advertising of goods and services that do not originate with, and are not sponsored by or affiliated with Sprint.

95.     Defendants' actions are likely to cause confusion, mistake, or deception as to the affiliation, connection, or sponsorship of services offered by Defendants in that customers and potential customers are likely to believe that the goods and services offered by Defendants in connection with reproductions, counterfeits, copies, or colorable imitations of Sprint's famous NEXTEL Mark are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Sprint.

96.     In fact, Defendants' actions have already caused actual confusion, mistake, or deception as to the affiliation, connection, or sponsorship of the goods and services offered by Defendants among at least individuals attending the IWCE trade show, and upon information and belief, Defendants distributors, who believed that the goods and services offered by Defendants in connection with reproductions, counterfeits, copies, or colorable imitations of Sprint's famous NEXTEL Mark were provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Sprint and the NEXTEL brand.

97.     Upon information and belief, Defendants have engaged in this conduct for the sole purpose of misleading consumers into believing that Defendants are the owners of the famous and iconic NEXTEL brand that Sprint has owned and used for the last thirty years.

98.     As a result, Defendants' use of reproductions, counterfeits, copies, or colorable imitations of Sprint's federally registered and famous NEXTEL Mark is and was intentional and willful.

99.     The likely confusion, mistake, or deception caused by Defendants violates Section 32 of the Lanham Act, 15 U.S.C. § 1114.

100.    As a direct and proximate result of the likely confusion, mistake, or deception, Sprint has suffered and will continue to suffer irreparable harm if Defendants' conduct is not enjoined.

## COUNT III
### Federal Unfair Competition and False Designation of Origin
### 15 U.S.C. § 1125

101.    Paragraphs 1 through 80 are incorporated into and made a part of this Count.

102.    Defendants are using the counterfeit NEXTEL Mark, which is identical with, or substantially indistinguishable from, Sprint's famous NEXTEL Mark.  This constitutes use of terms, names, colors, symbols, products, and combinations thereof, including use of a false designation of origin, all of which has caused and is likely to cause confusion, mistake, or deception as to the source of origin of the goods and services provided by Defendants, in that customers and potential customers are likely to believe that such goods and services are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Sprint.

103.    Defendants are also using the NEXTEL Branding in connection with the counterfeit NEXTEL Mark.  Upon information and belief, Defendants adopted the NEXTEL Branding to increase the likelihood that consumers encountering Defendants' counterfeit

28

NEXTEL goods and services will mistakenly believe that those goods and services are genuine NEXTEL products.

104.    Defendants are also using the "®" symbol in connection with the counterfeit NEXTEL Mark, even though Defendants know they do not own the famous NEXTEL Mark, let alone a registration for the famous NEXTEL Mark.   Upon information and belief, Defendants are intentionally using the "®" symbol to mislead consumers into believing that Defendants own the famous NEXTEL Mark or are that Defendants are authorized NEXTEL dealers, such that Defendants' counterfeit NEXTEL goods and services are genuine NEXTEL products.

105.    Defendants' use of the counterfeit NEXTEL Mark is likely to cause confusion, mistake, or deception, in that customers and potential customers are likely to believe there is sponsorship, approval, licensing, affiliation, association, or some legitimate connection between the goods and services provided by Defendants, on the one hand, and the goods and services provided by Sprint, on the other, when there is not.

106.    In fact, Defendants' actions have already caused confusion, mistake, or deception as to the affiliation, connection, or sponsorship of the goods and services offered by Defendants among at least individuals attending the IWCE trade show, and upon information and belief, Defendants' distributors, who believed that the goods and services offered by Defendants in connection with reproductions, counterfeits, copies, or colorable imitations of Sprint's famous NEXTEL Mark were provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Sprint and the famous NEXTEL brand.

107.     Upon information and belief, Defendants have engaged in this conduct for the sole purpose of misleading consumers into believing that Defendants are the owners of the famous and iconic NEXTEL brand that Sprint has owned and used for the last thirty years.

108.     The likely confusion, mistake, or deception caused by Defendants violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

109.     Defendants' violation of Section 43(a) of the Lanham Act is and was intentional and willful.

110.     As a direct and proximate result of the likely confusion, mistake, or deception, Sprint has suffered and will continue to suffer irreparable harm if Defendants' conduct is not enjoined.

## COUNT IV
### Federal Trademark Dilution
### 15 U.S.C. § 1125(c)

111.     Paragraphs 1 through 80 are incorporated into and made a part of this Count.

112.     The NEXTEL Mark is distinctive and famous within the meaning of 15 U.S.C. § 1125(c) and became famous before Defendants began using the NEXTEL Mark and the Domain.  The famous NEXTEL Mark has been advertised and used  throughout the United States, and it is highly recognizable in the industry and by the consuming public.  Further, Sprint actively polices the use of the famous NEXTEL Mark by third parties.

113.     Defendants are engaged in a commercial use of the NEXTEL Mark and the Domain.

114.     Defendants' actions are disparaging and damaging, and they are likely to cause dilution of the famous NEXTEL Mark through, at the very least, blurring and tarnishing.

30

115.    Defendants' actions are likely to dilute by blurring or by impairing the distinctiveness of the famous NEXTEL Mark.

116.    Defendants' actions are likely to dilute by tarnishing the famous NEXTEL Mark by, at least, using the counterfeit NEXTEL Mark generally and with the NEXTEL Branding, as well as using the Domain to advertise and sell goods and services that do not live up to the high standards set for goods and services offered under the famous NEXTEL Mark.

117.    As a result of Defendants' dilution, Sprint has suffered, and will continue to suffer, irreparable injury and substantial damages, while Defendants have been, and will continue to be, unjustly enriched, unless Defendants' conduct is enjoined.

118.    Defendants' dilution of the famous NEXTEL Mark is and was intentional and willful.

119.    The dilution of the famous NEXTEL Mark caused by Defendants violates Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

## COUNT V
### Cybersquatting
### 15 U.S.C. § 1125(d)

120.    Paragraphs 1 through 80 are incorporated into and made a part of this Count.

121.    Upon information and belief, the NW Entity registered, has used, and is continuing to use the Domain, <nextelworldwide.com>, which is confusingly similar to, and dilutive of, the famous NEXTEL Mark, with a bad faith intent to profit from the goodwill, reputation, and fame of the NEXTEL Mark.

122.    The famous NEXTEL Mark was distinctive and famous at the time of the NW Entity's registration of the Domain.

123. The NW Entity was fully aware of Sprint's rights in the famous NEXTEL Mark prior to, and at the time of, its registration of the Domain.

124. The NW Entity uses the Domain to host a series of webpages offering goods and services using the counterfeit NEXTEL Mark that are identical or closely related to, or within the zone of natural expansion of, those offered by Sprint under the famous NEXTEL Mark.

125. The NW Entity's registration and use of the Domain violates the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and was and is done willfully, in bad faith, and without any legitimate business purpose.

126. NW Entity's willful and intentional violation of the Anitcybersquatting Consumer Protection Act entitles Sprint to statutory damages of up to $100,000 pursuant to the Lanham Act, 15 U.S.C. § 1117(d).

127. As a direct and proximate result of the likely confusion, mistake, or deception, Sprint has suffered and will continue to suffer irreparable harm if Defendants' conduct is not enjoined.

## COUNT VI
### Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. § 501.211

128. Paragraphs 1 through 80 are incorporated into and made a part of this Count.

129. Defendants have engaged, and are engaging, in unfair and deceptive trade practices in the course of their businesses by using and attempting to register the counterfeit NEXTEL Mark and using the NEXTEL Branding in connection with their goods and services and in a manner that causes a likelihood that consumers in the State of Florida will be confused

about and/or misunderstand the source, sponsorship, approval, or certification of Defendants' goods and services; the affiliation, connection, or association with or certification by Sprint of Defendants and/or Defendants' goods or services; and/or that Defendants' goods or services have sponsorship or approval by Sprint, which Defendants' goods or services do not have.

130.    Defendants have also engaged, and are engaging, in unfair and deceptive trade practices by deliberately spreading the false rumor to the general public and Sprint's competitors, both nationally and within the State of Florida, that Sprint has abandoned the NEXTEL brand.

131.    Defendants have also engaged, and are engaging, in unfair and deceptive trade practices by deliberately using the NEXTEL Branding in connection with the counterfeit NEXTEL Mark.  Upon information and belief, Defendants adopted the NEXTEL Branding to increase the likelihood that consumers encountering Defendants' counterfeit NEXTEL goods and services will mistakenly believe that those goods and services are genuine NEXTEL products.

132.    Defendants have also engaged, and are engaging, in unfair and deceptive trade practices by using the "®" symbol in connection with the counterfeit NEXTEL Mark, even though Defendants know they do not own the famous NEXTEL Mark, let alone a registration for the famous NEXTEL Mark.  Upon information and belief, Defendants are intentionally using the "®" symbol to mislead consumers into believing that Defendants own the famous NEXTEL Mark or are that Defendants are authorized NEXTEL dealers, such that Defendants' counterfeit NEXTEL goods and services are genuine NEXTEL products.

133.    Defendants willfully, deliberately, and/or intentionally engaged, and are engaging, in a deceptive and unfair trade practices in the State of Florida by engaging in the conduct described above with full knowledge of Sprint's superior rights and prior and continued use of the famous NEXTEL Mark.

134.    As a direct and proximate result of Defendants' willful, deliberate, and/or intentional deceptive and unfair trade practices, Sprint has suffered, and will continue to suffer, irreparable harm if Defendants' conduct is not enjoined.

135.    Defendants' intentional, willful, and deliberate deceptive and unfair trade practices violate Section 501.211 of the Florida Deceptive and Unfair Trade Practices Act.

**COUNT VII**
**Common Law False Designation of Origin and Unfair Competition**

136.    Paragraphs 1 through 80 are incorporated into and made a part of this Count.

137.    The famous NEXTEL Mark is a distinctive trademark that is eligible for protection under Florida common law.

138.    Sprint has used the famous NEXTEL Mark in commerce long before Defendants began using the counterfeit NEXTEL Mark in commerce.

139.    Defendants' use of the counterfeit NEXTEL Mark in connection with the offering of Defendants' goods and services has caused and is likely to cause confusion with the famous NEXTEL Mark, and it constitutes unfair competition and false designation of in violation of Sprint's rights.

140.    Defendants are also deliberately using the NEXTEL Branding in connection with the counterfeit NEXTEL Mark.  Upon information and belief, Defendants adopted the NEXTEL Branding to increase the likelihood that consumers encountering Defendants'

34

counterfeit NEXTEL goods and services will mistakenly believe that those goods and services are genuine NEXTEL products.

141.   Defendants are also intentionally using the "®" symbol in connection with the counterfeit NEXTEL Mark, even though Defendants know they do not own the famous NEXTEL Mark, let alone a registration for the famous NEXTEL Mark.  Upon information and belief, Defendants are intentionally using the "®" symbol to mislead consumers into believing that Defendants own the famous NEXTEL Mark or are that Defendants are authorized NEXTEL dealers, such that Defendants' counterfeit NEXTEL goods and services are genuine NEXTEL products.

142.   Upon information and belief, Defendants have engaged in the conduct described above for the sole purpose of misleading consumers into believing that Defendants are the owners of the famous and iconic NEXTEL brand that Sprint has owned and used for the last thirty years.

143.   As a direct and proximate result of Defendants' conduct, unfair competition, and false designation of origin, Sprint has suffered substantial damage and irreparable harm, for which Sprint has no adequate remedy at law.

144.   Unless and until Defendants' unfair competition and false designation of origin is enjoined, Sprint will continue to suffer irreparable harm and damages.

145.   Defendants' acts were taken in willful, deliberate, and/or intentional disregard of Sprint's rights.

**JURY DEMAND**

Sprint respectfully requests a jury trial for this matter.

## PRAYER FOR RELIEF

**WHEREFORE**, Sprint prays for judgment against Defendant as follows:

A.      Preliminarily and permanently enjoining and restraining Defendants, their directors, members, officers, agents, servants, employees, parents, subsidiaries, affiliates, dealers, distributors, and all persons in active concert or participation with, or under any of them in perpetuity:

1.      from committing any acts of infringement, dilution, counterfeiting, cybsersquatting, unfair competition, or deceptive trade practices concerning the NEXTEL Mark, the NEXTEL Branding, or NEXTEL brand, and from implying a false designation of origin or a false description or representation with respect to the NEXTEL Mark, the NEXTEL Branding, or NEXTEL brand;

2.      from applying to register, registering, or maintaining a registration for the NEXTEL Mark or any mark confusingly similar to the NEXTEL Mark;

3.      from using in any manner packaging, labels, signs, literature, display cards, Internet websites, domain names, social media accounts, hashtags, or other packaging, advertising, or promotional materials, or other materials, including without limitation Defendants' machinery, buildings, equipment, or vehicles, related to or referencing Defendants' goods or services, bearing the NEXTEL Mark or any other mark, word, or name that is confusingly similar to the NEXTEL Mark;

4.      from making any statements on promotional materials or in advertising for Defendants' goods or services that are false or misleading as to source or origin

36

or affiliation with, sponsorship by, or connection to Sprint or the NEXTEL brand; and

5.      from making any false statements regarding Sprint's use and/or alleged abandonment of the famous NEXTEL Mark.

B.      Requiring that Defendants deliver up to Sprint any and all goods, containers, signs, packaging materials, printing plates, and advertising or promotional materials and any materials used in the preparation thereof, which in any way unlawfully use or make reference to the NEXTEL Mark or the NEXTEL brand, and that Defendants immediately and permanently remove any such materials, uses, and references from any of Defendants' trucks, vans, machinery, employee uniforms, and buildings.

C.      Requiring that the NW Entity transfer the <nextelworldwide.com> domain name and any other domain name using any formation of the NEXTEL Mark or formation that is confusingly similar to the NEXTEL Mark to Sprint, or alternatively, requiring that the domain name registrar(s) for <nextelworldwide.com> and any other domain name using any formation of the NEXTEL Mark or formation that is confusingly similar to the NEXTEL Mark to immediately assist in changing the registrar of record for the those domain names to a holding account with a registrar of Sprint's choosing, and in the event the registrars do not assist in changing the registrars of record for the domains under their respective control within one business day of receipt of the Court's order, requiring the top-level domain (TLD) registries for the domains or their administrators, including backend registry operators or administrators, within five business days of receipt of this Order, to change, or assist in

changing, the registrar of record for the domains to a holding account with the registrar of Sprint's choice.

D.      Requiring that Defendants, within thirty (30) days after service of notice of entry of judgment or issuance of an injunction pursuant thereto, file with the Court and serve upon Sprint's counsel a written report under oath setting forth details of the manner in which Defendants have complied with the Court's order pursuant to paragraphs A, B, and C above.

E.      Requiring Defendants to account and pay over to Sprint all damages sustained by Sprint; Defendants' profits; any statutory damages available due to Defendants' infringement, counterfeiting, unfair competition, false designation of origin, dilution, cybersquatting, and/or violation of the Florida Deceptive Trade Practices Act; any punitive damages available; and Sprint's attorneys' fees and costs, and Ordering that the amount of damages awarded to Sprint be increased three times the amount thereof, all pursuant to 15 U.S.C. §§ 1117 and 1125 and Fla. Stat. § 501.211 and any other applicable laws.

F.      Awarding Sprint such further relief as this Court deems just and proper.

Dated: April 11, 2018                         **MCGUIREWOODS LLP**

                                               */s/ Emily Y. Rottmann*
                                              Sara F. Holladay-Tobias
                                              Fla. Bar No. 26225
                                              Emily Y. Rottmann
                                              Fla. Bar No. 93154
                                              stobias@mcguirewoods.com
                                              erottmann@mcguirewoods.com
                                              flservice@mcguirewoods.com
                                              50 North Laura Street, Suite 3300
                                              Jacksonville, Florida  32202
                                              Tel:   (904) 798-3200
                                              Fax:   (904) 798-3207

                                              *Attorneys and Trial Counsel for Plaintiff Sprint*
                                              *Communications, Inc.*