# EXHIBIT 1

2                    IN THE UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
3                        FORT LAUDERDALE DIVISION
4               CASE No. 0:18-CV-60788-MARTINEZ/SNOW
5

SPRINT COMMUNICATIONS, INC.,
6
        Plaintiff and Counterclaim-Defendant,
7
    -vs-
8

STEPHEN CALABRESE, as an individual,
9   NEXTEL, INC. d/b/a NEXTEL WORLDWIDE,
    RETROBRANDS USA LLC, and JEFFREY KAPLAN,
10  as an individual,
11       Defendants and Counterclaimants.
    _____/

12
13
14              **CONTAINS CONFIDENTIAL PORTIONS**
15              (Pages 82-92, 158-173, 208-279)
16        VIDEOTAPED DEPOSITION OF STEPHEN CALABRESE
17
18

                   Wednesday, December 5, 2018
19                    9:14 a.m. - 6:38 p.m.
                        5550 Glades Road
20                  Boca Raton, Florida 33431
21
22
23

Stenographically Reported By
24  Pamela J. Pelino, RPR, FPR
    Notary Public, State of Florida
25  Job No. 150629

```
 1                        S. CALABRESE
 2   APPEARANCES:
 3   On behalf of the Plaintiff:
 4        LUCY WHEATLEY, ESQUIRE
          McGUIREWOODS
 5        Gateway Plaza
          800 East Canal Street
 6        Richmond, Virginia 23219
 7
 8
 9

     On behalf of the Defendants Stephen Calabrese,
10        Nextel Inc., Nextel Worldwide:
          JAMES KERNELL, ESQUIRE
11        ERICKSON KERNELL
          8900 State Line Road
12        Leawood, Kansas 66206
13
14
15
16   On behalf of Nextel and Jeffrey Kaplan:
          WAYNE SCHWARTZ, ESQUIRE
17        LEE & AMTZIS
          5550 Glades Road
18        Boca Raton, Florida 33431
19
20
21

     Present:
22
          JEFFREY KAPLAN
23
24   Also Present:
25        JEFFREY MENTON, VIDEOGRAPHER
```

Page 3

```
 1                         S. CALABRESE
 2                           -   -   -
 3                         I N D E X
 4                           -   -   -
 5     STEPHEN CALABRESE      DIRECT      CROSS      REDIRECT
 6     BY MS. WHEATLY            9
 7
 8                           -   -   -
            E X H I B I T S    M A R K E D
 9                           -   -   -
       DESCRIPTION                                      PAGE
10
       Plaintiff's Exhibit 1                             19
11        (Declaration of Stephen Calabrese)
12     Plaintiff's Exhibit 2                             27
          (Notice of 30(b)(6) Deposition of Nextel, Inc.)
13
       Plaintiff's Exhibit 3                             63
14        (Emails, Joint Motion to Suspend Opposition
           Proceeding Pending Outcome of Civil Action,
15         Complaint, NEXTEL 1163-1255)
16     Plaintiff's Exhibit 4                             66
          (Sunbiz Corporate History for Nextel, Inc.,
17         Electronic Articles of Incorporation, Filing,
           Cover Letter and Associated Documents,
18         SPR0000034-44)
19     Plaintiff's Exhibit 5                             81
          (Merchandising License Agreement -
20         Highly Confidential, AEO - NEXTEL 1029-47)
21     Plaintiff's Exhibit 6                            111
          (Google Search pages for Nextel Communications,
22         Wikipedia, etc., )
23     Plaintiff's Exhibit 7                            127
          (Trademark/Service Mark Application, Principal
24         Register, SPR0000045-50)
25
```

Page 4

```
 1                        S. CALABRESE
 2                         -    -    -
             E X H I B I T S    M A R K E D
 3                         -    -    -
 4                       (CONTINUED)
 5   DESCRIPTION                                    PAGE
 6   Plaintiff's Exhibit 8                           137
        (Video played during deposition)
 7

     Plaintiff's Exhibit 9                           139
 8      (Photographs of Box, SPR0000347-352)
 9   Plaintiff's Exhibit 10                          158
        (Excel Pricing Document - Highly
10      Confidential, AEO - NEXTEL 1048-51)
11   Plaintiff's Exhibit 11                          172
        (Features & Specifications for various Radios
12      and Devices, SPR0000097-110)
13   Plaintiff's Exhibit 12                          182
        ("Iconic Nextel Communications Brand..."
14      Press Release, SPR0000247-248))
15   Plaintiff's Exhibit 13                          187
        (Nextel Website Pages, SPR0000072-96)
16

     Plaintiff's Exhibit 14                          191
17      (Facebook Pages, SPR0003264-65)
18   Plaintiff's Exhibit 15                          193
        (Tell Communications Website Pages, SPR0000182-85)
19

     Plaintiff's Exhibit 16                          184
20      (Northeast Two Way Radio Corp./Nextel Website
        Page, SPR0003267)
21

     Plaintiff's Exhibit 17                          197
22      (Photographs, SPR000605-603, 255, 256, 258, 259)
23   Plaintiff's Exhibit 18                          199
        (March 27, 2017 Letter to Nextel, Inc.,
24      Stephen Calabrese from E. Leonard Rubin,
        SPR0000577)
25
```

Page 5

1                          S. CALABRESE

2                           -   -   -

3              E X H I B I T S   M A R K E D

                            -   -   -

4                         (CONTINUED)

5    DESCRIPTION                                    PAGE

6    Plaintiff's Exhibit 19                          208
        (Nextel Dealer Application - Highly
7        Confidential - AEO, NEXTEL 1102-04)

8    Plaintiff's Exhibit 20                          210
        (Listing of Dealers - Highly Confidential,
9        AEO - NEXTEL 1020)

10   Plaintiff's Exhibit 21                          213
        (1/5/17 Letter to C. Mathis from S. Calabrese -
11       Highly Confidential, AEO - NEXTEL 1055)

12   Plaintiff's Exhibit 22                          218
        (Nextel, Inc. Dealer Agreement - Highly
13       Confidential, AEO - NEXTEL 1052-54)

14   Plaintiff's Exhibit 23                          221
        (Exclusive Distributor/Master Dealer Agreement
15       with Nextel Northwest - Highly Confidential,
         AEO - NEXTEL 1056-60)

16

     Plaintiff's Exhibit 24                          227
17      (Exclusive Distributor/Master Dealer Agreement
         with Chicago Equipment Company, Inc. -
18       Highly Confidential, AEO - NEXTEL 1062-67)

19   Plaintiff's Exhibit 25                          231
        (Sales Order - Highly Confidential, AEO -
20       NEXTEL 1021)

21   Plaintiff's Exhibit 26                          237
        (Nextel Worldwide Balance Sheet and Income
22       Statements - Highly Confidential, AEO -
         NEXTEL 1022-28)

23

     Plaintiff's Exhibit 27                          278
24      (4/26/17 Letter to S. Calabrese from Sprint
         with Attachments, SPR0000114-119)

25

```
                                                          Page 6
 1                         S. CALABRESE
 2                         -Continued-
 3                          -   -   -
              E X H I B I T S   M A R K E D
 4                          -   -   -
                          (CONTINUED)
 5    DESCRIPTION                                    PAGE
 6    Plaintiff's Exhibit 28                         279
         (Emails, SPR0006597-601)
 7
      Plaintiff's Exhibit 29                         285
 8       (Emails, SPR0006631-33)
 9    Plaintiff's Exhibit 30                         286
         (10/26/17 Email from E.L. Rubin to S. Calabrese,
10       J. Cotter, SPR0000257)
11    Plaintiff's Exhibit 31                         292
         (2/8/18 Email from E.L. Rubin to J. Cotter,
12       SPR0000186)
13    Plaintiff's Exhibit 32                         293
         (Emails, NEXTEL 1258-59)
14
      Plaintiff's Exhibit 33                         297
15       (1/15/18 Email from S. Calabrese to E.L. Rubin,
         NEXTEL 1267)
16
      Plaintiff's Exhibit 34                         296
17       (Emails, NEXTEL 1290-91)
18    Plaintiff's Exhibit 35                         298
         (Emails, NEXTEL 1287-89)
19
      Plaintiff's Exhibit 36                         306
20       (First Amended Complaint)
21
22              ATTORNEYS EYES ONLY TESTIMONY
23                     Pages 82 - 92
24                     Pages 158 -173
25                     Pages 208 - 279
```

1                          S. CALABRESE

2                  P R O C E E D I N G S

3                          -  -  -

4        Deposition taken before Pamela J. Pelino,

5   Registered Professional Court Reporter and Notary Public

6   in and for the State of Florida at Large, in the above

7   cause.

8                          -   -   -

9            THE VIDEOGRAPHER:  We are on the video

10       record.  The time is approximately 9:14 a.m.  Today

11       is December the 5th, 2018.  This is the start of

12       video media disk 1 of the video deposition of

13       Steve Calabrese.  Please note the microphones are

14       very sensitive.  Be aware that they can pick up

15       whispering and conversations not intended for the

16       record.  Additionally, please turn off your cell

17       phones or place them away from the microphones as

18       they can interfere.

19            This is the matter of Sprint Communications,

20       Inc., plaintiff and counterclaim-defendant versus

21       Steve Calabrese, as an individual, et al.,

22       defendants and counter-claimants in the United

23       States District Court, Southern District of

24       Florida, Fort Lauderdale Division.  This is case

25       number 0:18-CV-60788.

1                          S. CALABRESE

2              This deposition is being held at the offices

3        of Lee & Amtzis, P.L., at 5550 Glades Road,

4        Boca Raton, Florida.  My name is Jeff Menton.  I am

5        the certified legal video specialist from

6        TSG Reporting headquartered at 747 3rd Avenue,

7        New York.  The court reporter is Pamela Pelino,

8        also in association with TSG.

9              Would counsel please introduce yourselves and

10       state whom you represent, starting with the

11       noticing attorney, and then would the court

12       reporter please swear the witness in.

13             MS. WHEATLEY:  I am Lucy Jewett Wheatley,

14       representing plaintiff Sprint Communications, Inc.

15             MR. KERNELL:  I'm Jim Kernell with Erickson

16       Kernell, representing Stephen Calabrese and Nextel,

17       Inc.

18             MR. SCHWARTZ:  Wayne Schwartz, co-counsel for

19       the defendants.

20   Thereupon,

21                     STEPHEN CALABRESE,

22   having been first duly sworn or affirmed, was examined

23   and testified as follows:

24             THE WITNESS:  Yes.

25

Page 32

                              S. CALABRESE

1

2    Q.    Other than the people you mentioned you met

3    with, did you contact anyone to prepare for this

4    deposition?

5    A.    No.

6    Q.    Did you discuss this deposition with anyone

7    else --

8    A.    No.

9    Q.    -- at all?

10         Who owns NW, Mr. Calabrese?

11   A.    It's a -- me, myself, a 50/50 partnership,

12   myself and another gentleman.  So myself and another

13   gentleman, 50/50.  It's pretty much a public record, you

14   know, the corporate secretary.  You can look it up.

15   Q.    And who is your co-owner of NW?

16   A.    Mr. -- Mr. Rivera.

17   Q.    And how did you meet Mr. Rivera?

18   A.    I don't really recall.  I met him.  I mean, I

19   just know him through the telecommunications business.

20   Q.    And I should back up.

21         Is his name Jose Rivera?

22   A.    Yes.

23   Q.    And can you explain to me:  How did you

24   become co-owners of NW with Mr. Rivera?

25   A.    I just asked him if he wanted -- if he liked

Page 33

S. CALABRESE

1
2   Nextel and wanted to work with me on bringing the brand
3   back that was abandoned.
4       Q.    And when did you ask him that?
5       A.    I don't -- like, I don't recall the exact
6   date, but it was probably like November of 2016.
7       Q.    And what is Mr. Rivera's role at NW?
8       A.    We don't really have roles.  I mean, we
9   just -- he helps me with, you know, taking care of
10  business.
11      Q.    Are you -- do you have equal say in all
12  business decisions?
13      A.    As far as -- yes.  We both have an equal
14  amount of the company, equal voting, I believe, yes.
15      Q.    Well, are you the president, or is Mr. Rivera
16  the president?
17      A.    I think I'm the president.  Yeah.  I haven't
18  reviewed -- I don't know.  I'm not really a businessman.
19  I know that most -- you know, I just know that we are
20  partners, and we're 50/50.
21      Q.    But it was your idea to use Nextel; correct?
22      A.    Yes.  I mean, I -- I -- yes.
23      Q.    And you said you knew Mr. Rivera from the
24  telecommunications industry; is that correct?
25      A.    Yes.

Page 34

S. CALABRESE

1

2       Q.    What had -- how did you meet Mr. Rivera

3  through the telecommunications industry?

4       A.    I don't really recall exactly how I met him.

5  You know, he -- he bought -- he had bought products from

6  my Critical RF company before.

7       Q.    And had he brought -- bought products from

8  Critical RF as a consumer, or did he have his own

9  company, or how did that --

10      A.    He had his own company.

11      Q.    His -- what was his company?

12      A.    I think it's reliable something, Reliable

13 Communications.

14      Q.    And does he still have that company?

15      A.    Yes.

16      Q.    And did you ask Mr. Rivera to invest in NW?

17      A.    No.

18      Q.    Has he invested any money in NW?

19      A.    No.

20      Q.    And does Mr. Rivera work for NW?

21            Well, first, is Mr. Rivera an employee of NW?

22      A.    I'm not sure what you mean by "employee."

23      Q.    Does he receive a salary from NW?

24      A.    No.

25      Q.    So you do not consider him an employee of NW?

Page 35

S. CALABRESE

1

2      A.      No.  I consider him a 50/50 owner with me.

3      Q.      Does he do any work for NW?

4      A.      Yeah.  I mean, he helps me.  So, I mean, it's

5  maybe work if you define it like that.  I mean, he just

6  does what needs to be done.  So it could be work, you

7  know.

8      Q.      I'm trying to understand.  Is Mr. Rivera

9  compensated for any work he does for NW?

10     A.      No.  No.  Neither of us are, no.

11     Q.      So neither you nor Mr. Rivera receive any

12 sort of salary?

13     A.      No.

14     Q.      But do you split profits from NW 50/50?

15     A.      When we have a profit, we will.  Not at this

16 time.

17     Q.      And when you say Mr. Rivera helps you, what

18 help has he put into NW?

19     A.      I mean, like, right now he's answering my

20 phone today.  So that's the kind of stuff -- like, if I

21 need help -- well, it could be anything.  Just depends

22 on what it is at -- at the time that requires help.

23 There's not really a, you know...

24     Q.      When you say he's answering your phone,

25 just -- do you mean -- is there a business line for NW

Page 36

                              S. CALABRESE

 1

 2   that he's manning?

 3       A.    Just my phone.

 4       Q.    Is that your personal cell phone?

 5       A.    Yeah.

 6       Q.    And about how much time a week would you say

 7   Mr. Rivera devotes to NW?

 8       A.    I mean, I'm not really sure how much time

 9   exactly.  It varies probably.

10       Q.    Does Mr. Rivera have a separate full-time

11   job?

12       A.    Yes.

13       Q.    So he -- does he do any work for NW in his

14   spare time?

15       A.    It's all his spare time, both of us.

16       Q.    Can you give me some examples of some

17   assistance Mr. Rivera has provided to NW?

18       A.    Today he is answering my phone.  Maybe

19   shipping something, helping me go to the post office and

20   ship something.

21       Q.    Has he done any more substantive work for NW,

22   or is it mostly tasks like that?  Answering a phone?

23   Shipping something?

24       A.    Stuff like that.  That's it.

25       Q.    And when exactly was NW founded?

1                         S. Calabrese

2     I mean, I -- it doesn't appear to me that I -- I can

3     recall it, you know.  It just seems like a lot of stuff

4     that I don't know anything about.  You know what I mean?

5          Q.    Okay.  You can set that aside.

6               Mr. Calabrese, are you familiar with the

7     Nextel Chirp?

8          A.    No.

9          Q.    Do you know what I mean when I say "Nextel

10    Chirp"?

11         A.    What do you mean when you say "Nextel Chirp"?

12         Q.    Did you say that you have no idea what I'm

13    talking about when I say Nextel Chirp?

14         A.    I mean, that's really something that

15    Retrobrands would -- they would have more information

16    about.  I know what the -- the talk permit tone is

17    that -- that radio equipment by -- Motorola gives off.

18    I mean, chirp to me is a slang term.  So it could mean a

19    lot of things.  Like Tweet.  You know what I mean?  So,

20    no, I don't know -- I don't know anything about that

21    term or phrase.  We don't have any connection with it.

22    Our company doesn't use it.  So, no, I don't.

23         Q.    Okay.  So NW doesn't use a Nextel Chirp?

24         A.    No.

25         Q.    Okay.  All right.  And if you heard -- well,

Page 131

1              S. Calabrese

2   I'm assuming the answer to this is no since you said you

3   don't know what Nextel Chirp is, but I'm assuming if you

4   heard a Nextel Chirp, you couldn't identify it?

5          A.    I wouldn't call it a Nextel Chirp.  I would

6   call it a Motorola talk permit tone.

7          Q.    Well, I'm -- I'm confused, Mr. Calabrese,

8   because I believe you had testified that you don't know

9   what I'm talking about when I say Nextel Chirp.

10  Is -- or do you know what I'm talking about when I say

11  Nextel Chirp?

12         A.    No, I don't.

13         Q.    Okay.

14         A.    I -- I -- I -- I know -- I know that

15  Retrobrands had filed for something called Nextel Chirp

16  that has an intellectual property of their own, but it

17  has nothing do with our company.  Now, I know that

18  there's a slang term called "chirp" not necessarily

19  related to Nextel or anybody else but, I mean,

20  that's -- that's really all I know.

21         Q.    Okay.  Do you know -- do NW's devices use any

22  particular tone when their turn -- when their -- when

23  the push to talk is activated?

24         A.    Yes.

25         Q.    What tone is that?

1                          S. Calabrese

2       A.     Just a simple beep, a roger beep.

3       Q.     Roger beep.  And does -- is their -- when you

4    say a roger beep, is there -- does a -- a roger beep

5    just mean any beep that is used to signal that you are

6    starting to talk or done talking?

7       A.     Yes, that's how I understand it.

8       Q.     So it's not a particular sound?

9       A.     No.  No.  The one sound that -- that the old

10   Nextel operator made was a -- a sound that was a

11   Motorola, you know, tone because it was a -- Motorola

12   manufactured equipment.

13      Q.     When you say -- why do you think --

14      A.     Because all Motorola --

15             MR. KERNELL:  Wait.  Wait.

16   BY MS. WHEATLEY:

17      Q.     Yeah.  Let me ask the question.

18             MR. KERNELL:  Let her finish the question.

19             THE WITNESS:  Sure.

20             MR. KERNELL:  And I just want to remind you.

21      Let her finish the question before you start

22      talking.  One, it gives me an opportunity to object

23      if I need to; second, the court reporter has a much

24      better time.

25             THE WITNESS:  Sure.  Sorry.

Page 133

1                          S. Calabrese

2            MR. KERNELL:  And it makes the record

3       clearer.

4            THE WITNESS:  Absolutely.

5            MR. KERNELL:  Just, you know, slow down a

6       little.

7            THE WITNESS:  No problem.  No problem.

8            MR. KERNELL:  Sorry.

9   BY MS. WHEATLEY:

10       Q.    Did -- when you -- did Motorola equipment use

11  a particular chirp sound that was distinct from other

12  chirp sounds used by other manufacturers on the market?

13       A.    I wouldn't call it a chirp sound.  I'd call

14  it a talk permit tone.  That's a slang term.  There's

15  no -- in the technical world, we don't call it a chirp

16  tone.  That's a -- that's some type of marketing phrase.

17       Q.    Okay.  Well, whatever you call it, is there

18  one that's distinct to Motorola that you know of?

19       A.    Correct.  Yes.

20       Q.    Do you know who owns that tone?

21       A.    No, I don't.

22       Q.    Do you know if it's a trademark?

23       A.    I'm -- I'm not -- I -- I don't recall, and I

24  don't know.  I mean, it's not really -- I'm not in the

25  trademark business.  It would be something you should

Page 134

                              S. Calabrese

1

2    ask Retrobrands and...

3        Q.    Okay.  But your NW's devices do not use what

4    you're referring to as the Motorola tone; correct?

5        A.    No, they're not made by Motorola.

6        Q.    Okay.  And have you ever used a Motorola tone

7    in advertising NW's services or devices?

8        A.    No.

9        Q.    Do you know if Sprint has ever owned a

10   particular sound trademark?

11       A.    No.

12       Q.    All right.  Give me just a -- all right.  I

13   would like to play a video for you, Mr. Calabrese.

14       A.    Sure.

15       Q.    And I want you to listen.  There's a tone in

16   the video, and I just want you to tell me if that's

17   what you're referring to as the Motorola tone.

18       A.    Sure.

19             THE VIDEOGRAPHER:  Do you want me to record

20       this?

21             MS. WHEATLEY:  Yes, please.

22             (Discussion held off the record.)

23             MR. KERNELL:  Because this doesn't say or it

24       doesn't record a track; right?  Each of these?

25             THE VIDEOGRAPHER:  Is it recorded on a

Page 135

1                          S. Calabrese

2       separate track?  No.

3              MR. KERNELL:  Okay.  So it will be general

4       recording.  Okay.

5                  (Discussion held off the record.)

6                  (Video played on counsel's computer and

7       videotaped.)

8              THE WITNESS:  What was the question again?

9              MR. KERNELL:  There's no question.  Just

10      watch the video and then, you know, wait for --

11             MS. WHEATLEY:  Yes.  If you could watch

12      the -- sorry.

13                  (Reporter clarifies.)

14             MS. WHEATLEY:  You could -- can you see the

15      screen?

16             THE WITNESS:  Yes.

17                  (Video played from counsel's computer.)

18             THE WITNESS:  Well, I like that.  That was

19      actually -- who made -- Jeff made that?

20      BY MS. WHEATLEY:

21         Q.    Mr. Kaplan had -- the video I just showed

22      you, had you ever seen that before?

23         A.    Me?

24         Q.    Yes.

25         A.    No.

Page 136

S. Calabrese

1

2     Q.     I'm sorry.  Mr. Calabrese.

3     A.     Yes, yes.  No, I've never seen it before, and

4  I did like -- yeah, I mean.

5     Q.     And the tone that kept sounding throughout

6  the video, when you were discussing a Motorola sound

7  earlier, was that the Motorola sound you were referring

8  to?

9     A.     It sounds like it.  I can't say if it's

10  exactly the same, you know, pitch but very -- you know,

11  very similar to it, yes.

12     Q.     Okay.  And that sound is not on devices sold

13  by NW; is that correct?

14     A.     Correct.

15     Q.     And that sound is not used in connection with

16  any services offered by NW; is that correct?

17     A.     That's correct.

18     Q.     And that sound is not used with any

19  advertising done by NW; is that correct?

20     A.     That's correct.

21     Q.     So it's fair to say NW does not use that

22  sound in any way whatsoever?

23     A.     That's correct.

24     Q.     Okay.  And does NW have any knowledge as to

25  the ownership of that sound?

Page 137

S. Calabrese

1

2      A.    As to the formal -- I mean, what -- what I

3   think, or what is -- I mean, I -- no.  I mean, all I

4   know is the Motorola talk permit tone from my own

5   experience as a telecommunications person.

6      Q.    And the video you just saw, did you

7   participate in creating that video?

8      A.    No.

9      Q.    And are we able to mark that video as an

10  exhibit?

11           (Discussion held off the record.)

12           MR. KERNELL:  Can you just -- can you, like,

13      put it on a -- either, like, a CD or DVD or jump

14      drive, and we'll just label that as, you know,

15      whatever -- or whatever the next Bates number is

16      or -- well, no.  Exhibit -- for an exhibit for

17      this, yeah.

18           (Plaintiff's Exhibit 8 was marked for

19  identification.)

20           (Discussion held off the record.)

21           THE WITNESS:  Can I ask Mr. Kernell something

22      or that's not allowed?

23           MS. WHEATLEY:  Well --

24           MR. KERNELL:  If we want to go off the record

25      and --