**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO.  18-cv-60788-JEM**

**SPRINT COMMUNICATIONS, INC.,**

    Plaintiff/Counterclaim Defendant,

    vs.

                           Miami, Florida
                           April 11, 2022
**STEPHEN CALABRESE,** as an individual,   Pages 1-74
**NEXTEL, INC.,** d/b/a **NEXTEL WORLDWIDE,**   12:30 p.m. - 1:00 p.m.
**RETROBRANDS USA LLC,**   2:00 p.m. - 4:00 p.m.
**JEFFREY KAPLAN,** as an individual, and
**NEXTEL WORLDWIDE MOBILE, INC.,**

    Defendants/Counterclaimants.

---

**TRANSCRIPT OF JURY TRIAL**
**VOLUME 1**
**BEFORE THE HONORABLE JOSE E. MARTINEZ**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:**
                    *McGuireWoods, LLP*
                    BY:  **BRIAN C. RIOPELLE, ESQ.**
                    BY:  **LUCY J. WHEATLEY, ESQ.**
                    BY:  **AMANDA L. DeFORD, ESQ.**
                    800 East Canal Street
                    Richmond, Virginia 23219

**FOR THE DEFENDANTS/COUNTERCLAIMANTS:**
                    *Erickson Kernell IP*
                    BY:  **JAMES J. KERNELL, ESQ.**
                    8900 State Line Road
                    Suite 500
                    Leawood, Kansas 66206

                    *Lee & Amtzis, PL*
                    BY:  **WAYNE SCHWARTZ, ESQ.**
                    5550 Glades Road
                    Boca Raton, Florida 33431

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1    REPORTED BY:        DAWN M. SAVINO, R.P.R., C.R.R.
                          Official Federal Court Stenographer
 2                        400 N. Miami Avenue, 10S03
                          Miami, Florida  33128
 3                        Telephone:  305-523-5598
```

12:29:27   4             (Jury out at 12:29 p.m.)

12:29:52   5             THE COURT:  Wait until the door closes.  Have a seat.

12:29:56   6  Wait a few minutes so they can clear the floor, but we can talk

12:29:59   7  about whatever we need to talk about now so we can come back at

12:29:59   8  2:00.

12:30:09   9             All right.  Who wants to talk about what?  Evidence?

12:30:11  10  Exhibits?

12:30:18  11             MR. RIOPELLE:  Just one second, Your Honor.  So last

12:30:25  12  night -- turn this towards you.  Last night we submitted --

12:30:28  13             THE COURT:  Excuse me.  There's a switch on there that

12:30:32  14  raises or lowers it if you need to be higher.

12:30:34  15             MR. RIOPELLE:  I like this better, I can see you

12:30:35  16  better.

12:30:36  17             THE COURT:  It's fine, but sometimes you want to get

12:30:37  18  the microphone closer.

12:30:38  19             MR. RIOPELLE:  Do you want it closer?

12:30:40  20             THE COURT:  No, I can hear you fine.

12:30:45  21             MR. RIOPELLE:  They've objected to six exhibits last

12:30:51  22  night.  They objected to six exhibits which I intend to either

12:30:56  23  use or reference in my opening statement and so I wanted to --

12:30:57  24             THE COURT:  All right.  Tell me which ones.

12:31:01  25             MR. RIOPELLE:  First one is 41A.

| 12:31:23 | 1 | THE COURT:  Okay. |
| 12:31:26 | 2 | MR. SCHWARTZ:  Your Honor, I've never seen this. |
| 12:31:31 | 3 | THE COURT:  Okay. |

12:31:34    4    MR. RIOPELLE:  This is a banner that says -- you can

12:31:37    5    see, Your Honor, says Sprint together with Nextel.  They've

12:31:41    6    objected that it's not tied to Nextel.  I don't know, it says

12:31:45    7    Nextel on it.  They say that there's no underlying data to

12:31:48    8    support it.  I have to confess I don't understand that

12:31:57    9    objection.  And they say that it's not authenticated.  I can

12:32:00    10    represent to the Court that this banner and the use of this

12:32:04    11    banner will be authenticated by a witness we put on the stand.

12:32:07    12    THE COURT:  Okay.  What's the objection?

12:32:11    13    MR. SCHWARTZ:  The objection, Your Honor, is it

12:32:16    14    misleads the jury.  That's not trademark use, one.  Two, that

12:32:21    15    slogan is part of a trademark slogan for Nextel that was

12:32:27    16    abandoned in June of 2007.  So this is some old banner that was

12:32:33    17    lying around, and for that reason we don't think it should be

12:32:36    18    shown at this stage to the jury before we get into issues where

12:32:38    19    it's going to be discussed.

12:32:41    20    THE COURT:  If they don't tie it in, they got egg on

12:32:45    21    their face, it's their problem.  If they're going to show it on

12:32:48    22    the basis that they expect it's admissible and that they will

12:32:53    23    tie it is it in, I'll permit them to.  I don't think it's that

12:32:57    24    prejudicial that it's going to shock the jury into returning a

12:32:59    25    verdict for them because they saw it in opening statements and

4

12:33:03  1   if it doesn't come in, I suspect you will mention that.

12:33:07  2          MR. RIOPELLE:  I suspect so too, Your Honor.

12:33:09  3          THE COURT:  I'm not sure, but I think so.  So I'll

12:33:12  4   overrule your objection, I'll permit it.

12:33:13  5          What else you got?

12:33:15  6          MR. RIOPELLE:  The next one is Exhibit 47, Your Honor,

12:33:19  7   it's an example of an online use of the Sprint chirp mark, and I

12:33:22  8   have a copy if you would like to see 47.

12:33:25  9          THE COURT:  How can you see it?  I thought it was a

12:33:26  10  sound?

12:33:30  11         MR. RIOPELLE:  The mark itself is a sound, but this is

12:33:34  12  evidence that we are using the chirp.  And they are, of course,

12:33:37  13  arguing that we've abandoned it, and so this is evidence that

12:33:42  14  we're using it.  And their objection is that it's not trademark

12:33:48  15  usage which Your Honor dealt with in your rulings in the motion

12:33:50  16  in limine.

12:33:53  17         THE COURT:  All right.  Let me let them articulate

12:33:53  18  their objection.

12:33:57  19         MR. SCHWARTZ:  Yes, Your Honor.  First off, as the

12:34:00  20  Court pointed out, the issue about the sound mark has to do with

12:34:05  21  sound.  This is an answer and question page from Sprint,

12:34:10  22  unauthenticated, and what they've done here is on Page 2 it says

12:34:14  23  to some question, I guess if you click on it it says yes, it

12:34:19  24  says -- the question is will the Nextel push-to-talk chirp still

12:34:24  25  be used when placing a Sprint Direct Connect plus call.  And the

5

12:34:25   1   answer I guess, which is what they typed into their own system

12:34:30   2   says yes the familiar Nextel chirp will still be used.  And

12:34:34   3   again, that misleads the jury.  It's not a Nextel chirp, that's

12:34:38   4   not how it's described in the registrar, it's just a sound mark.

12:34:44   5          So for those particular reasons, it should not be shown

12:34:45   6   during opening.

12:34:47   7          THE COURT:  What is this?

12:34:54   8          MR. RIOPELLE:  It's from our website in 2018.  They

12:34:58   9   are, of course, alleging that we've abandoned use of the Nextel

12:35:03  10   chirp mark.  This is evidence that would go to show that the

12:35:08  11   fact the Nextel chirp mark was being used and Mister --

12:35:10  12          THE COURT:  How does that prove that?

12:35:13  13          MR. RIOPELLE:  Mr. Kaplan is going to testify that --

12:35:16  14   and he testified in his deposition that he did an investigation

12:35:20  15   to see if the chirp mark had been abandoned.  If he had gone out

12:35:24  16   to our website and looked at this, and it says -- and their

12:35:27  17   argument, by the way, is because we went from Nextel to then

12:35:31  18   Sprint.  This directly answers that.  Will the Nextel

12:35:35  19   push-to-talk chirp still be used when placing a Sprint Direct

12:35:39  20   Connect plus call.  If he searched this in 2018, he would have

12:35:43  21   seen yes, the familiar Nextel chirp will still be used.  It's

12:35:46  22   evidence that it's being used which is directly what they're

12:35:47  23   challenging through abandonment they're saying.

12:35:49  24          THE COURT:  Well, it's evidence that you say it's being

12:35:52  25   used, I don't know that it's evidence that it's being used.  How

12:35:55  1   does that show that it was used?  It just shows on your website

12:35:57  2   you say it's going to be used.

12:36:00  3           MR. RIOPELLE:  Right.  And we will also put in evidence

12:36:06  4   of it being used on devices.  But this is further evidence --

12:36:10  5   well it's two things.  It's further evidence that we were using

12:36:15  6   it, that we intended to use it because remember, abandonment is

12:36:20  7   stopped using with no intent to use.  This shows intent to use.

12:36:23  8   So it goes directly to one of the factors on abandonment.

12:36:24  9           THE COURT:  I'll permit it.  I understand your

12:36:28 10   objection, but I'll permit it.  If they don't tie it up, I think

12:36:32 11   it's more damaging than helpful, but I'll permit it.

12:36:33 12           Go ahead.  Next.

12:36:38 13           MR. RIOPELLE:  Next one, Your Honor, is Exhibit 107.

12:36:40 14           THE COURT:  That's too many exhibits.  We got to cut

12:36:41 15   that.

12:36:43 16           MR. RIOPELLE:  Excuse me?  I'm sorry?

12:36:44 17           THE COURT:  Too many exhibits.

12:36:48 18           MR. RIOPELLE:  Exhibit 107, it is a Facebook page by

12:36:56 19   Nextel Communications which is related to them, and it's put up

12:37:01 20   and it says -- it's infringement.  It says on the top of it

12:37:03 21   "Nextel is back", and it has a lot of stuff about using our

12:37:06 22   Nextel trademark on it.

12:37:08 23           THE COURT:  Why not?

12:37:10 24           MR. SCHWARTZ:  Because Nextel Communications is not any

12:37:13 25   of the Defendants, Your Honor.  It's not us, it's

12:37:14   1    unauthenticated and it was

12:37:17   2              THE COURT:  Whose Nextel Communications Facebook?

12:37:19   3              MR. RIOPELLE:  Your Honor, we will tie it.  We have

12:37:24   4    press releases issued by Mr. Kaplan in which it says Mr. Kaplan,

12:37:26   5    and below it it says Nextel Communications.

12:37:29   6              MR. SCHWARTZ:  One additional point, Your Honor.  Undue

12:37:34   7    delay.  This was just produced January of this year, way past

12:37:38   8    the discovery cut-off.  So even if any of the other arguments,

12:37:40   9    it's way too late.

12:37:42  10              MR. RIOPELLE:  It was produced past the discovery

12:37:46  11    cut-off because it didn't exist during discovery.  Obviously

12:37:50  12    we've been in a two and a half year hiatus and they're

12:37:57  13    continuing to infringe it, it's evidence of infringement, as

12:37:59  14    soon as we found it we produced it.

12:38:00  15              THE COURT:  I'll permit it over objection.

12:38:02  16              Next.  What else you got?

12:38:03  17              MR. RIOPELLE:  The next two, Your Honor, we can

12:38:11  18    probably deal with together.  It's Exhibits 110 and 111.

12:38:16  19              Exhibit 110 is an e-mail from Mr. Calabrese's lawyer to

12:38:21  20    the Sprint in-house lawyer saying that they were going to stop

12:38:24  21    using the Nextel mark.

12:38:30  22              Exhibit 111 is from Mr. Calabrese's lawyer to a Sprint

12:38:34  23    outside lawyer saying that they're going to stop -- saying they

12:38:39  24    have stopped using the mark and that they will -- we can close

12:38:40  25    our file on this matter.

12:38:43   1          I will note before they note their objections, that on

12:38:48   2     the final pretrial order, which was the deadline for putting in

12:38:53   3     objections, they did not put any objections, list any objections

12:38:56   4     to it.  In addition, these two exhibits are on their exhibit

12:38:58   5     list.

12:39:00   6          THE COURT:  All right.  Explain your objection.

12:39:03   7          MR. SCHWARTZ:  Well, the reason going backwards, Your

12:39:06   8     Honor, is that it wasn't put as an objection because it was part

12:39:11   9     of our advice of counsel argument that after the submissions the

12:39:17  10     Court ruled that we weren't entitled to put on that particular

12:39:22  11     argument.  Also, these e-mails are part of a chain with Sprint's

12:39:30  12     employees that is cloaked with Rule 48 settlement

12:39:34  13     communications.  On Sprint's e-mails they actually state that,

12:39:38  14     that that's what the communications were about.  So this series,

12:39:41  15     these two e-mails are a series of settlement communications, and

12:39:45  16     if they're going to address or let -- if the Court is going to

12:39:49  17     let this in, then it should revisit the issue on advice of

12:39:51  18     counsel.  And if they're going to open the door on what

12:39:55  19     Mr. Rubin said, all the things he said, clearly they had more

12:39:57  20     than just that fuzzy letter.

12:40:00  21          THE COURT:  This is an e-mail from the counsel to the

12:40:04  22     Plaintiff, correct?

12:40:05  23          MR. RIOPELLE:  Yes, Your Honor.

12:40:07  24          MR. SCHWARTZ:  Yes, Your Honor, in response to a back

12:40:12  25     and forth between their representative which we can show you the

| | | |
|---|---|---|
| 12:40:22 | 1 | exhibits for those are -- |
| 12:40:30 | 2 | THE COURT:  How is a letter to them advice of counsel? |
| 12:40:36 | 3 | MR. SCHWARTZ:  Well, this was Mr. Calabrese's lawyer. |
| 12:40:37 | 4 | THE COURT:  Yeah. |
| 12:40:39 | 5 | MR. SCHWARTZ:  And it all had to do with -- |
| 12:40:42 | 6 | THE COURT:  No, I mean, I can understand how he can -- |
| 12:40:50 | 7 | comments to Mr. Calabrese are privileged in some way or -- but I |
| 12:40:57 | 8 | don't understand how -- I don't understand how this is -- how do |
| 12:40:59 | 9 | you tie it in?  What is it from? |
| 12:41:00 | 10 | MR. RIOPELLE:  I'm sorry sir. |
| 12:41:03 | 11 | THE COURT:  It's from Mr. Lawyer to? |
| 12:41:05 | 12 | MR. RIOPELLE:  The first one, Number 110 is from |
| 12:41:10 | 13 | Mr. Lawyer to our in-house counsel.  Number 111 is from |
| 12:41:16 | 14 | Mr. Lawyer to our outside counsel.  They are not -- Your Honor, |
| 12:41:18 | 15 | they're not advice of counsel because obviously they can't be |
| 12:41:22 | 16 | advice of counsel between opposing counsel. |
| 12:41:24 | 17 | THE COURT:  Okay.  I'm looking at them now so give me |
| 12:41:32 | 18 | second. |
| 12:41:33 | 19 | MR. SCHWARTZ:  If Your Honor would refer to Exhibit 109 |
| 12:41:37 | 20 | which is the one that precedes from Sprint. |
| 12:41:59 | 21 | THE COURT:  All right.  Give me 109 please.  109 is a |
| 12:42:05 | 22 | multi-page exhibit.  So give me a second. |
| 12:42:51 | 23 | (In-place recess) |
| 12:42:54 | 24 | THE COURT:  What are you referring me to 109?  For what |
| 12:42:56 | 25 | purpose? |

| | | |
|---|---|---|
| 12:42:57 | 1 | MR. SCHWARTZ:  Well, to show the Court, Your Honor, |
| 12:43:00 | 2 | that this chain of e-mails back and forth, they've isolated out |
| 12:43:06 | 3 | Mr. Rubin's e-mail where you can see the very first page of this |
| 12:43:11 | 4 | October 20, 2017 e-mail from Ms. Jobe who is counsel right on |
| 12:43:15 | 5 | the top there, it's confidential for settlement purposes only. |
| 12:43:21 | 6 | Rule FRE 408 and the whole chain for several weeks was all |
| 12:43:26 | 7 | settlement communications between Sprint and Mr. Calabrese. |
| 12:43:32 | 8 | They've isolated out just Mr. Rubin's one e-mail or two e-mails. |
| 12:43:36 | 9 | I think it's unduly prejudicial to do it that way. |
| 12:43:55 | 10 | THE COURT:  Okay.  I can see why 109 is not admissible, |
| 12:43:59 | 11 | but that's not what we're talking about.  Tell me why 109 makes |
| 12:44:02 | 12 | 110 not admissible? |
| 12:44:04 | 13 | MR. RIOPELLE:  Because we have just put those two on |
| 12:44:08 | 14 | there.  First of all, they're not advice of counsel.  Secondly, |
| 12:44:13 | 15 | they are not 408 communications.  Under Rule 408 -- |
| 12:44:15 | 16 | THE COURT:  No, no.  I'm asking him to tell me why 109 |
| 12:44:20 | 17 | makes 110 inadmissible? |
| 12:44:21 | 18 | MR. SCHWARTZ:  Inadmissible, Your Honor? |
| 12:44:23 | 19 | THE COURT:  Yeah.  You're telling me that this is not |
| 12:44:27 | 20 | going to come in because of 109.  I've reviewed 109, I think 109 |
| 12:44:32 | 21 | is not admissible, but I don't know why 110 would be. |
| 12:44:34 | 22 | MR. SCHWARTZ:  They were all part of the same chain of |
| 12:44:38 | 23 | back and forth between Mr. Rubin as counsel, Sprint's counsel |
| 12:44:42 | 24 | back and forth.  They've just isolated it out.  Mr. Rubin simply |
| 12:44:46 | 25 | just didn't -- I mean, he just didn't -- the way he responded, I |

12:44:51  1   wasn't there, but he was responding to Ms. Jobe's

12:44:53  2   communications.

12:45:22  3           THE COURT:  I presume that you're going to show that

12:45:25  4   after October or February 9, 2018 they continued.

12:45:27  5           MR. RIOPELLE:  Yes, Your Honor.

12:45:30  6           THE COURT:  I'll permit it.

12:45:34  7           MR. RIOPELLE:  And the last exhibit, Your Honor, which

12:45:42  8   you don't have a copy of, is Exhibit Number 125.  It is a --

12:45:48  9   what's called a CAT 2022, I have it in a box here.

12:45:55 10           THE COURT:  Incidently, I have a box that Judge Lurana

12:46:01 11   Snow gave me, a sealed envelope with something, some sort of

12:46:05 12   phone that apparently was used during the preliminary injunction

12:46:10 13   hearing.  I have no idea why it is, I don't think I can use it

12:46:13 14   any longer, so I don't know what I'm supposed to do with it, but

12:46:15 15   I have --

12:46:18 16           MR. RIOPELLE:  Was it a box that we submitted, Your

12:46:18 17   Honor?

12:46:19 18           THE COURT:  I don't know.

12:46:20 19           MR. RIOPELLE:  Okay.

12:46:22 20           THE COURT:  I don't know who submitted it.  I wasn't

12:46:27 21   there.  It is some sort of phone that's in a box that's in an

12:46:30 22   envelope that is sealed.  And it's sitting on my desk and I have

12:46:34 23   no idea what it is or what I'm supposed to do with it.

12:46:36 24           MR. RIOPELLE:  If you would like us to look at it?

12:46:38 25           THE COURT:  Yeah.  I'll tell you what, during the

12:46:43  1   afternoon break I'll bring it in here.  I don't know, maybe one
12:46:45  2   of the other law clerks, if they're in there, could bring it to
12:46:49  3   me.  Bring it in and let them open it together and see what it
12:46:52  4   is and see what they want me to do with it.  I don't have a
12:46:59  5   large jar of Vaseline, but I don't think I need it.
12:47:02  6            MR. RIOPELLE:  So this is Exhibit 125.  It is a --
12:47:09  7   what's known as a CAT.  CAT is the manufacturer S22 flip phone.
12:47:13  8   It is one of the devices we are going to use to show that the
12:47:19  9   chirp is on the phone and being used.  Their objection is that
12:47:24  10  it was not produced during discovery.  It did not exist during
12:47:28  11  discovery.  As soon as this phone was released, and was starting
12:47:34  12  to be sold by Sprint and using Nextel, we produced it to them on
12:47:36  13  February 4th.
12:47:41  14           And the reason we're using this -- we had told them we
12:47:44  15  were going to use CAT phones back in 2019.  The reason we're
12:47:48  16  using this one to show that the chirp is still being used is
12:47:53  17  because we can't activate the phones back from 2019, we can only
12:47:56  18  activate the new phones.  So that's why it's being used.
12:47:59  19           THE COURT:  Is that that 4G, 5G thing, or is that
12:48:01  20  something else?
12:48:03  21           MR. RIOPELLE:  Mr. Shaughnessy may be able to tell you.
12:48:05  22           MR. SHAUGHNESSY:  That's something else.
12:48:08  23           THE COURT:  Good, because I don't understand 4G, 5G.
12:48:09  24  Your objection to that?
12:48:12  25           MR. SCHWARTZ:  Undue delay, Your Honor.  This came --

12:48:13  1          THE COURT:  Set it right there.  Yeah.

12:48:16  2          MR. SCHWARTZ:  The explanation doesn't sound credible

12:48:20  3     to me.  We only -- they only produced this to us a month or so

12:48:25  4     ago, and they didn't even tell us it was a physical box.  They

12:48:29  5     sent us pictures of this item.  We would have substantial harm

12:48:34  6     in the fact that we didn't have the chance to conduct any

12:48:39  7     discovery related to this particular phone model, it's not a

12:48:45  8     Nextel phone, it's a CAT phone.  You know, this is no different

12:48:49  9     than excluding two of our late witnesses, Your Honor, it's no

12:48:55 10     different.  This was long after the discovery closed.

12:48:59 11          THE COURT:  According to them it didn't exist when

12:49:00 12     discovery closed.

12:49:02 13          MR. SCHWARTZ:  Did they just produce the phone last

12:49:05 14     month?  That doesn't make any sense to me.

12:49:07 15          MR. RIOPELLE:  The phone, it did not exist during

12:49:11 16     discovery, the phone was just released.  In fact, that's why

12:49:15 17     they're calling it -- I think why they're calling it 22.  And we

12:49:19 18     -- as soon as we got it and we produced it to them, and we did

12:49:21 19     tell them it was a physical exhibit.

12:49:23 20          MR. SCHWARTZ:  Your Honor, this is no different than in

12:49:26 21     the middle of the case they decided to just print stickers with

12:49:29 22     "Nextel" written on them and slap them on boxes and then say

12:49:34 23     these are now Nextel-inspired phones.  This is no different.

12:49:39 24     The substantial harm that they could have just decided a month

12:49:43 25     ago to make a -- this isn't even a Nextel phone, this is just

| | | |
|---|---|---|
| 12:49:49 | 1 | some other phone made by Caterpillar.  I just think that the |
| 12:49:53 | 2 | substantial harm outweighs having them -- |
| 12:49:55 | 3 | THE COURT:  Don't use it in your opening. |
| 12:49:56 | 4 | MR. RIOPELLE:  Don't? |
| 12:49:58 | 5 | THE COURT:  Don't use it in your opening.  We'll talk |
| 12:50:00 | 6 | about whether it's admissible during the case itself. |
| 12:50:02 | 7 | MR. RIOPELLE:  Okay.  One thing for clarification so |
| 12:50:10 | 8 | the Court knows though, Nextel, Sprint, Verizon, AT&T, the |
| 12:50:12 | 9 | carriers don't make phones. |
| 12:50:14 | 10 | THE COURT:  I know that, they buy them. |
| 12:50:17 | 11 | MR. RIOPELLE:  Like iPhone, like Moto, like CAT, |
| 12:50:19 | 12 | because it's a heavy duty phone. |
| 12:50:23 | 13 | THE COURT:  Is that supposed to be like Caterpillar? |
| 12:50:27 | 14 | MR. RIOPELLE:  I believe so, and a witness is going to |
| 12:50:27 | 15 | -- |
| 12:50:30 | 16 | THE COURT:  Well then, let them do it.  But at this |
| 12:50:32 | 17 | point I'm not saying it's not admissible, I'm saying don't use |
| 12:50:37 | 18 | it in your opening.  Dance around it.  Okay? |
| 12:50:43 | 19 | That envelope that I gave you, should be opened by both |
| 12:50:43 | 20 | sides. |
| 12:50:44 | 21 | MR. RIOPELLE:  Yes. |
| 12:50:46 | 22 | THE COURT:  Open it now so you can see.  I don't know |
| 12:50:46 | 23 | what it is. |
| 12:50:48 | 24 | MR. RIOPELLE:  Do you want us to open it in front of |
| 12:50:49 | 25 | you? |

| | | |
|---|---|---|
| 12:50:50 | 1 | THE COURT:  Yeah. |
| 12:50:50 | 2 | MR. RIOPELLE:  Okay. |
| 12:50:52 | 3 | MR. SCHWARTZ:  Could be anthrax. |
| 12:50:55 | 4 | THE COURT:  It could be, but it isn't.  If it is, it's |
| 12:51:00 | 5 | far enough away from me that I'm okay. |
| 12:51:40 | 6 | (Counsel conferring). |
| 12:52:02 | 7 | THE COURT:  Whose phone is it? |
| 12:52:06 | 8 | MR. RIOPELLE:  It was a phone submitted by Sprint. |
| 12:52:09 | 9 | THE COURT:  So it's Sprint's phone back again.  You can |
| 12:52:12 | 10 | have it back, but I wanted them to know that it was in the |
| 12:52:16 | 11 | Court's custody until just now. |
| 12:52:18 | 12 | MR. RIOPELLE:  And we're happy to take it off your |
| 12:52:18 | 13 | hands. |
| 12:52:21 | 14 | THE COURT:  All right.  I was going to give it to my |
| 12:52:23 | 15 | grandson so he could make believe he had a phone.  I'm just |
| 12:52:27 | 16 | teasing.  I'm just kidding.  No.  I'm just kidding. |
| 12:52:30 | 17 | MR. RIOPELLE:  I had a case, Your Honor, when I was a |
| 12:52:35 | 18 | law clerk 100 years ago where Atari was suing Nintendo when they |
| 12:52:40 | 19 | came out with the very first Game Boy back in 1989, and they |
| 12:52:45 | 20 | couldn't submit to the courthouse -- couldn't get it through |
| 12:52:48 | 21 | security of the clerk's office actually at that point, there was |
| 12:52:50 | 22 | no security at the courthouse.  The Game Boys.  And the judge |
| 12:52:53 | 23 | said do you think we should get them?  Oh, yes.  Yes, we should. |
| 12:52:58 | 24 | My co-clerk and I sat around playing on the Game Boy. |
| 12:52:59 | 25 | THE COURT:  Of course.  That's it.  So they know that |

| | | |
|---|---|---|
| 12:53:02 | 1 | you got it and for whatever it's worth. |
| 12:53:06 | 2 | Okay.  Are we done then? |
| 12:53:09 | 3 | MR. RIOPELLE:  We are done.  I'll need to make some |
| 12:53:11 | 4 | adjustments to my -- |
| 12:53:13 | 5 | THE COURT:  You got an hour.  Hour and ten minutes. |
| 12:53:17 | 6 | Have a good one. |
| 12:53:18 | 7 | MR. RIOPELLE:  Thank you. |
| 12:53:26 | 8 | THE COURT:  We'll be in recess until 2 p.m.  We don't |
| 12:53:31 | 9 | need to meet before then do we? |
| 12:53:31 | 10 | (Lunch recess) |
| 2:06:20 | 11 | (Jury in at 2:06 p.m.) |
| 2:07:50 | 12 | (Court called to order) |
| 2:07:53 | 13 | THE COURT:  As I told you before, the statements that |
| 2:07:58 | 14 | the lawyers now make, as well as the arguments they present at |
| 2:08:03 | 15 | the end of the trial, are not to be considered by you either as |
| 2:08:06 | 16 | evidence in the case or your instructions on the law. |
| 2:08:09 | 17 | Nevertheless, these statements or arguments are intended to help |
| 2:08:12 | 18 | you understand the issues in the case and the evidence as it |
| 2:08:15 | 19 | comes in, as well as the positions taken by both sides. |
| 2:08:18 | 20 | So I now ask that you give the lawyers your close |
| 2:08:21 | 21 | attention as I recognize them for purposes of opening |
| 2:08:22 | 22 | statements. |
| 2:08:24 | 23 | Plaintiff, you may proceed. |
| 2:08:25 | 24 | MR. RIOPELLE:  Thank you, Your Honor. |
| 2:08:28 | 25 | THE COURT:  Just so you're aware, the minutes will be |

2:08:35  1    -- there's a bar right there.  Can see when it starts, green

2:08:41  2    light will come on.  And you see the green light there in front

2:08:44  3    of the jury?

2:08:48  4               MR. RIOPELLE:  You haven't started my time yet?

2:08:51  5               THE COURT:  I get mixed up so I have to look it up each

2:08:57  6    time.  When there's two minutes to go, the green light starts

2:09:00  7    flashing.  When there's one minute to go, the yellow light comes

2:09:03  8    on.  When the red light comes on, you turn into a pumpkin.

2:09:04  9    That's it.

2:09:06  10              All right?  You may proceed, sir.

2:09:10  11              MR. RIOPELLE:  May we put the screens -- turn on the

2:09:12  12   juror screens?

2:09:17  13              THE COURT:  Yes, just tell them what you need.

2:09:19  14              MR. RIOPELLE:  Because I don't have it up here.

2:09:25  15              THE COURT:  Okay.  You're supposed to, but I can't be

2:09:33  16   responsible for IT.  I don't know how that works.  Isn't that

2:09:42  17   supposed to be on, Dawn?  Not on yet?  Recycle it.

2:09:44  18              MR. RIOPELLE:  I'm going to turn it off, and turning it

2:09:45  19   back on again.

2:09:50  20              THE COURT:  I got to say, I'm so tired of the IT people

2:09:55  21   coming up here.  I like them, but I only see them when we're in

2:10:02  22   trouble.  Is it on this one here?  Is it on this one here?

2:10:04  23              MR. RIOPELLE:  It is on this one here.

2:10:06  24              THE COURT:  Okay.  Well, take a look at that one.  You

2:10:06  25   should be able to at least tell that it's on.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2:10:06   1          MR. RIOPELLE:  That's going to require me to put my

2:10:06   2    glasses on.

2:10:08   3          THE COURT:  Well, I would suspect that those are

2:10:09   4    reading glasses, aren't they?

2:10:14   5          MR. RIOPELLE:  No, no.  These are bifocals.

2:10:16   6          THE COURT:  I wish I could help you, but --

2:10:18   7          MR. RIOPELLE:  That's all right.  I do as best as I

2:10:18   8    can.

2:10:20   9          THE COURT:  Or have them turn one of those around so

2:10:26   10   you have that close.  Are those on?

2:10:36   11          MR. RIOPELLE:  With your permission since I don't have

2:10:39   12   it here, if I want to read off the screen may I walk over here

2:10:42   13   and use this microphone?

2:10:45   14          THE COURT:  Yes.

2:10:51   15          MR. RIOPELLE:  All right, Your Honor.  Are you ready?

2:10:53   16          THE COURT:  You may proceed.

2:11:01   17          MR. RIOPELLE:  So why are we here.  You know for over

2:11:06   18   30 years, up to and including today, Sprint and the companies

2:11:13   19   that came before it have been using the Nextel name, brand and

2:11:16   20   trademark to sell products and services in the

2:11:22   21   telecommunications industry, and people came to associate Nextel

2:11:27   22   with those products and services, especially with the

2:11:32   23   push-to-talk service for nationwide walkie-talkie service.  As

2:11:37   24   you'll hear in the evidence, Nextel became the gold standard for

2:11:42   25   push-to-talk communications.  Then several years ago,

2:11:46   1   Mr. Calabrese and Mr. Kaplan decided to start selling

2:11:56   2   push-to-talk services using the same Nextel name.  They did this

2:12:01   3   to confuse consumers into thinking that the products came and

2:12:05   4   were associated with Nextel that has been selling them for over

2:12:10   5   30 years, and is still selling them today.  Mr. Kaplan and

2:12:15   6   Mr. Calabrese are trying to confuse people.  They're trying to

2:12:22   7   steal the Nextel brand.  They're infringing the trademark.

2:12:27   8   That's wrong.  And that's why we're here.  Because this is the

2:12:31   9   only way we can get them to stop.  We're here so you can tell

2:12:37   10   them that it's wrong and you can tell them to stop.  But I do

2:12:42   11   want to make one thing clear, they can sell push-to-talk phones,

2:12:49   12   they can compete in the market, they just can't call themselves

2:12:50   13   Nextel.

2:12:55   14        Now, as the Court explained in the preliminary

2:12:59   15   instructions, this is a case about trademark infringement,

2:13:06   16   counterfeiting and unfair competent competition.  So what is a

2:13:10   17   trademark.  So a trademark is a word like Coca-Cola like the

2:13:14   18   Court used, or a symbol, you know, like the Nike swoosh, and it

2:13:18   19   can even be a color or a sound that identifies products and

2:13:22   20   services from a particular source and distinguishes those

2:13:28   21   products and services from another source.  So for example,

2:13:33   22   Coca-Cola is a particular brand of soda, and when you buy a

2:13:37   23   Coca-Cola, you know what you're getting and you know what the

2:13:40   24   quality of that product's going to be.  So how do you infringe

2:13:44   25   that?  So if another person, another person or company can

2:13:49  1   infringe Coca-Cola by selling a soda, putting the Coca-Cola name

2:13:55  2   on it, that misleads consumers into thinking that they're buying

2:14:02  3   a Coca-Cola when they're not.  A person can counterfeit the

2:14:07  4   Coca-Cola brand and mark by making the soda look exactly like a

2:14:13  5   Coca-Cola that you're used to buying.  And a person can unfairly

2:14:19  6   compete with Coca-Cola by leading consumers to believe that the

2:14:23  7   product, be it a soda or frankly something else, is somehow

2:14:27  8   associated with or sponsored by Coca-Cola.  So that's how you

2:14:31  9   can infringe, that's how you can unfairly compete, that's how

2:14:36  10  you counterfeit.  That's what's happening in this case.

2:14:42  11  Defendants are using Nextel and using the Nextel sound mark,

2:14:47  12  which is called the "chirp", they're using the Nextel chirp, and

2:14:51  13  those are Sprint's trademarks, to try to sell the same types of

2:14:56  14  products to the same types of consumers that Sprint sells to.

2:15:04  15          So let me introduce the trademarks.  What I have in my

2:15:10  16  hand here is the certified original copy of the Nextel trademark

2:15:14  17  registration, and I've put on the screen for you to see the

2:15:19  18  first two pages of it.  And you can see on the first page it

2:15:26  19  says the attached US Trademark Registration 1884244 is certified

2:15:34  20  to be a true copy which is in full force and effect.  You'll see

2:15:42  21  on the second page that it was first used in 1993, and the

2:15:46  22  trademark application was granted by the United States Patent

2:15:53  23  and Trademark Office in 1995.  You can also see on the cover

2:16:00  24  that this trademark was renewed in March of 2015.  To renew a

2:16:04  25  trademark, you have to -- the owner has to send in examples of

2:16:09  1   the actual use being made of that trademark.  And the United

2:16:12  2   States Patent and Trademark Office will review those samples and

2:16:17  3   if it finds those samples to show sufficient use, it will renew

2:16:24  4   the trademark.  Finally, you can see on here Sprint owns this

2:16:29  5   trademark.  This trademark is for the word "Nextel".  It's not

2:16:34  6   for putting Nextel in any specific manner, so you can use it in

2:16:39  7   any color, use it with any font, use it in all capital letters

2:16:44  8   or not capital letters, what this trademark protects is from

2:16:50  9   other people using the word "Nextel".  And this trademark has

2:16:55  10  been in use since 1993, and as evidenced by this document, it is

2:17:00  11  still a registered and valid trademark and has never lapsed in

2:17:03  12  any manner.

2:17:09  13       Let me introduce you to the second trademark.  This is

2:17:14  14  a certified original copy of the Nextel chirp mark registration,

2:17:19  15  and it has the same language on the front which is in full force

2:17:24  16  and effect.  But this mark is a little bit different because

2:17:29  17  this is a sound mark.  The Nextel chirp is a sound that Nextel

2:17:34  18  devices use when you're receiving or sending one of those

2:17:38  19  push-to-talk calls.  And this iconic sound is actually famous,

2:17:45  20  and people using these devices say things like "chirp me" or "I

2:17:49  21  received a chirp".  And this trademark was first used in 1997,

2:17:55  22  and Nextel filed a trademark application for it in 2005 and as

2:17:59  23  you can see on the cover, Sprint owns this trademark, and this

2:18:05  24  trademark has been used since 1997, and is evidenced by this

2:18:10  25  document it is still a registered and valid trademark and has

2:18:13   1    never lapsed in any manner.

2:18:16   2         Now, I'm going to go through some of the evidence that

2:18:20   3    I expect you to see, but I thought what might be helpful is to

2:18:25   4    also put this on a time line so you can see what's going on.  So

2:18:30   5    this is the first two entries in the time line, and you can see

2:18:37   6    the first entry is 1993 when the Nextel mark was first used and

2:18:45   7    the next one is 1997 when the Nextel chirp was first used.

2:18:49   8         Now, I'd like to tell you a little about Nextel and

2:18:54   9    Sprint.  So Nextel traces its origins to a company called Fleet

2:19:00   10   Call which started in 1987.  Then in 1993 they changed their

2:19:04   11   name to Nextel, and Nextel, as some of you probably know,

2:19:09   12   provided digital and wireless communication services, but it

2:19:13   13   originally focused on businesses that had multiple vehicles or

2:19:18   14   multiple people out in the field.  Businesses like trucking

2:19:27   15   companies and police officers and firefighters.  And it was this

2:19:30   16   focus that led Nextel to developing the push-to-talk service on

2:19:35   17   these devices.  Some of you may know this, but the push-to-talk

2:19:40   18   feature allows you to use your phone like a walkie-talkie.  So

2:19:43   19   instead of having to dial a number each time you want to

2:19:44   20   communicate with somebody, you can just highlight their name and

2:19:48   21   do the push-to-talk, and you can talk to them just like you're

2:19:55   22   using a walkie-talkie.  Now, not only was this service great for

2:19:58   23   consumers that had lots of vehicles out there, but it became

2:20:03   24   popular, and in fact, essential for first responders and

2:20:08   25   emergency workers.  So say there's a hurricane here in South

2:20:12  1   Florida, and first responders like police and firefighters have

2:20:16  2   to come in to rescue people.  Having the ability to instantly

2:20:20  3   communicate as opposed to having to keep dialing people is

2:20:20  4   essential.

2:20:25  5         And there's another benefit to this service as offered

2:20:30  6   by Nextel and Sprint.  Because Nextel and then Sprint own their

2:20:36  7   own networks like the towers and all the communication

2:20:39  8   equipment, and they can prioritize the first responders service

2:20:43  9   in an emergency making sure they are getting the service and the

2:20:49  10  quality they need.  So as another example, let's say there's an

2:20:52  11  incident at the University of Miami football game.  Well, all

2:20:56  12  90,000 fans are going to be on their phones, and they're going

2:21:00  13  to be jamming up that cell and jamming up the network.  Because

2:21:05  14  Sprint owns its own network, Sprint can make quick changes so

2:21:08  15  the communications of the first responders are prioritized over

2:21:14  16  other people's, so that the first responders can communicate and

2:21:18  17  deal with that incident.  Like I said, the push-to-talk service

2:21:23  18  became associated with Nextel and it's what Nextel became known

2:21:27  19  for.  And again, while some other providers later offered this

2:21:33  20  same service, Nextel became known as the gold standard, and

2:21:39  21  Sprint and Nextel have spent significant money and time to make

2:21:41  22  these famous marks.

2:21:45  23        In fact, what I'd like to show you now is a commercial

2:21:53  24  that Nextel ran in 2002 during the Super Bowl.

2:21:59  25        (Video playing in open court)

|          |    |
|----------|----|
| 2:22:27  | 1  |            MR. RIOPELLE:  Now, some of you may remember that
| 2:22:30  | 2  | commercial.  I mean, not only is that commercial funny, and I'm
| 2:22:34  | 3  | going to have "baby baby" stuck in my head the rest of the day,
| 2:22:39  | 4  | but it used the Nextel trademark and it used the Nextel chirp.
| 2:22:43  | 5  |            And just in case you missed the chirp because it goes
| 2:22:47  | 6  | really quick, here it is again.
| 2:22:53  | 7  |            *(Chirp)*
| 2:23:06  | 8  |            MR. RIOPELLE:  That's the Nextel chirp.  Do I have
| 2:23:10  | 9  | control again?  There we go.
| 2:23:18  | 10 |            So, next point on the time line, in 2005 Sprint and
| 2:23:24  | 11 | Nextel decided to merge.  And one of the issues posed by the
| 2:23:29  | 12 | merger is that Sprint and Nextel each had their own network.  So
| 2:23:34  | 13 | Sprint had a network that uses technology called CDMA, and
| 2:23:38  | 14 | Nextel had a different network, they had a network that was
| 2:23:43  | 15 | actually developed by Motorola and used a technology called
| 2:23:50  | 16 | iDEN.  And in around 2010, Sprint and Nextel realized it was
| 2:23:53  | 17 | uneconomic to try to run two different networks, and so they
| 2:24:01  | 18 | made the decision to shut down the Motorola iDEN network.  And
| 2:24:04  | 19 | as you'll hear, they made the decision to shut down the Motorola
| 2:24:09  | 20 | iDEN network because that network was not designed to support
| 2:24:13  | 21 | data applications.  And if you'll recall back in 2007 when the
| 2:24:16  | 22 | iPhone was first introduced and people started getting
| 2:24:20  | 23 | smartphones, they wanted to use data applications like e-mail
| 2:24:25  | 24 | and apps.  And so since iDEN didn't support all that data,
| 2:24:28  | 25 | that's why they made the decision to shut that one down.

2:24:31   1        Now, shutting down a network is not something you can
2:24:34   2    just do overnight.  I mean, there's a lot of equipment that
2:24:37   3    needs to be taken care of, but more importantly, you have to
2:24:45   4    give consumers time to change to a different network.  And at
2:24:50   5    the time Nextel decided to shut down that network, Nextel had 20
2:24:56   6    million consumers.  So Nextel and Sprint planned the shutdown of
2:25:03   7    that network for three years and finally, on June 30, 2013, they
2:25:05   8    shut down the Motorola iDEN network.
2:25:10   9        But here's a critical point for this case.  As the
2:25:15   10   evidence will show, at the time of the iDEN network shutdown in
2:25:24   11   2013, Sprint and Nextel had no intention of stopping to use the
2:25:28   12   Nextel brand and mark.  And you're going to hear from several
2:25:33   13   witnesses who are going to talk about how Sprint used the Nextel
2:25:37   14   brand after the shutdown of the iDEN network and, in fact, is
2:25:41   15   still using it today.  One of those witnesses is a gentleman
2:25:46   16   named Brent Kohman.  Mr. Kohman used to work for Sprint and
2:25:49   17   Nextel, but now he works for Motorola so he's not a Sprint
2:25:52   18   employee, but he's going to come and he's going to tell you
2:25:55   19   about the Nextel brand.  He's going to tell you how Sprint
2:25:59   20   planned to use it after 2013 and how he has seen it been used
2:26:01   21   since 2013.
2:26:07   22        Now, I showed you the Super Bowl ad, but one thing did
2:26:10   23   change about the Nextel brand after the shutdown of the iDEN
2:26:14   24   network in 2013.  See, before the shutdown and especially before
2:26:20   25   the merger with Sprint in 2005, Nextel was competing with Sprint

2:26:27  1   and Verizon and AT&T to get consumers, competing for consumers

2:26:34  2   like you and me.  But after the merger, it became evident that

2:26:39  3   Nextel and its push-to-talk to services was most appropriate for

2:26:43  4   certain types of businesses and first responders.  So Sprint and

2:26:46  5   Nextel made the logical decision that it didn't make sense to

2:26:51  6   run big advertisements like the Super Bowl ad because that was

2:26:55  7   not the market Nextel was strongest in.  So instead, Nextel and

2:26:59  8   Sprint started concentrating on the focus business market and

2:27:03  9   first responders.  And since 2013, Sprint salespeople and

2:27:08  10  Sprint's professional people have continued to use the Nextel

2:27:13  11  and the chirp to benefit from the fame of those trademarks.

2:27:16  12  They use the trademarks at trade shows, they use it on

2:27:22  13  packaging, and Sprint and now T-Mobile, have plans to use those

2:27:22  14  marks in the future.

2:27:27  15       Let me take one step aside for a second because I just

2:27:31  16  mentioned T-Mobile.  You may have heard that T-Mobile and Sprint

2:27:36  17  recently merged, but just so there's no confusion Sprint, as a

2:27:40  18  company, still exists and Sprint still owns these trademarks.

2:27:47  19       Now, I talked about trade shows.  So you can see at the

2:27:55  20  bottom there I just put on it says 2017 to 2019 IWCE trade

2:28:03  21  shows.  IWCE stands for International Wireless Communications

2:28:10  22  Expo.  And it's a trade show that focuses on law enforcement and

2:28:16  23  other industries where they really use this push-to-talk.  In

2:28:23  24  fact, here's a picture of Sprint's booth at the 2018 IWCE trade

2:28:27  25  show.  You look in the back, you see in the back of that picture

2:28:32  1   there's a black banner hanging down but it's kind of hard to

2:28:39  2   read?  We have it here.  We brought it.  It's too big for me to

2:28:45  3   hold up too much, but here's the banner.  You can see it says

2:28:50  4   Sprint together with Nextel.  That's what Sprint and Nextel were

2:28:55  5   doing at the 2018 IWCE trade show.

2:29:01  6            You're also going to see during this case that Nextel

2:29:04  7   appears on a lot of devices and on the packaging for those

2:29:08  8   devices, and certain witnesses will come and they will show you

2:29:14  9   that.  You're also going to hear evidence and see evidence of

2:29:19  10  Sprint's sales using the Nextel trademark.  You'll see that

2:29:27  11  every year since 2013, Sprint has made sales of push-to-talk

2:29:31  12  devices that were sold using the Nextel trademark and using the

2:29:35  13  Nextel chirp, and that's represented by that yellow line going

2:29:38  14  across the top there of the time line.

2:29:44  15           Now, I'm going to turn -- so you know where I'm going,

2:29:46  16  I'm going to turn to the activities of the Defendants.  It

2:29:51  17  starts with a gentleman named Mr. Calabrese.  Mr. Calabrese, who

2:29:55  18  is not in the courtroom today, he is the founder and president

2:30:00  19  of a company he is calling Nextel, Inc. which is doing business

2:30:07  20  as Nextel Worldwide.  And in 2016, Mr. Calabrese decides that he

2:30:12  21  wants to sell push-to-talk devices, and he decides he's going to

2:30:20  22  use the brand name Nextel to do so.  So in 2016, he registers

2:30:30  23  Nextel as a corporation and then on October 21, 2016,

2:30:38  24  Mr. Calabrese files an application for the Nextel trademark.

2:30:41  25  And you will see that the United States Patent and Trademark

| | | |
|---|---|---|
| 2:30:44 | 1 | Office, and you probably know this is the federal agency just |
| 2:30:48 | 2 | outside of Washington, DC that's responsible for handling |
| 2:30:54 | 3 | trademarks in this country, rejected Mr. Calabrese's |
| 2:31:00 | 4 | application.  Why did they reject it?  Because the United States |
| 2:31:08 | 5 | Patent and Trademark Office recognized that Sprint owned the |
| 2:31:12 | 6 | trademarks.  See what it says here, applicant's mark Nextel is |
| 2:31:18 | 7 | confusingly similar to registrant's marks Nextel.  Registrant is |
| 2:31:20 | 8 | Sprint. |
| 2:31:22 | 9 | THE COURT:  Excuse me, counsel.  I'm sorry to interrupt |
| 2:31:25 | 10 | you, but do you think you can talk from here for a few minutes |
| 2:31:29 | 11 | while my IT guy goes under and tries to figure out what you did |
| 2:31:32 | 12 | to break my machine? |
| 2:31:33 | 13 | MR. RIOPELLE:  I can try. |
| 2:31:36 | 14 | THE COURT:  I always like to blame somebody else, it's |
| 2:31:39 | 15 | much better that way.  There's a microphone here and the thing |
| 2:31:44 | 16 | is fine.  So if you can do that, go see -- see what you can do. |
| 2:31:45 | 17 | MR. RIOPELLE:  I will see what I can do. |
| 2:31:48 | 18 | THE COURT:  If you need to go back there, feel free, |
| 2:31:52 | 19 | he'll move away.  He's here now, so I thought I might take |
| 2:31:53 | 20 | advantage. |
| 2:31:57 | 21 | MR. RIOPELLE:  Thank you.  So they reject -- he tried |
| 2:32:00 | 22 | to get the Nextel trademark and the United States Patent and |
| 2:32:05 | 23 | Trademark Office rejected it.  And the United States -- you can |
| 2:32:11 | 24 | see here that they saw that it was register's marks, Sprint, and |
| 2:32:14 | 25 | they said it's confusingly similar. |

| | | |
|---|---|---|
| 2:32:16 | 1 | But despite the trademark office rejecting |
| 2:32:21 | 2 | Mr. Calabrese's application, the evidence will show that he |
| 2:32:26 | 3 | still started to sell products using the Nextel mark anyway in |
| 2:32:36 | 4 | 2017.  And in fact, in March of 2017, Mr. Calabrese goes to the |
| 2:32:41 | 5 | IWCE trade show, the same trade show that Sprint's going to. |
| 2:32:46 | 6 | And here's a picture of Mr. Calabrese's booth at the IWCE trade |
| 2:32:51 | 7 | show.  You can see what he's done is he's gotten a banner, |
| 2:32:54 | 8 | Nextel, and he's just flipped it over the top of there so they |
| 2:32:55 | 9 | can have the booth there. |
| 2:32:58 | 10 | THE COURT:  You can mark that screen if you wish to. |
| 2:33:00 | 11 | Circle something with your finger. |
| 2:33:02 | 12 | MR. RIOPELLE:  That would be way too dangerous, Your |
| 2:33:02 | 13 | Honor. |
| 2:33:05 | 14 | THE COURT:  It would not hurt your finger, I promise. |
| 2:33:08 | 15 | And I can erase it, so don't worry. |
| 2:33:11 | 16 | MR. RIOPELLE:  It was at this trade show when they saw |
| 2:33:15 | 17 | the booth, this is where Sprint became aware of them in March of |
| 2:33:21 | 18 | 2017.  In fact, this photo was taken by one of the witnesses |
| 2:33:24 | 19 | you're going to hear from.  And you're going to hear from |
| 2:33:27 | 20 | several witnesses that are going to talk about the IWCE trade |
| 2:33:31 | 21 | show.  One is named Scott Wiley and the other one is Mr. Tom |
| 2:33:34 | 22 | Shaughnessy, who is sitting over there at the table right now. |
| 2:33:39 | 23 | And they're going to tell you that they were surprised, in fact |
| 2:33:44 | 24 | confused that somebody had a booth that was claiming themselves |
| 2:33:49 | 25 | to be Nextel that wasn't associated with Sprint. |

2:33:53  1          THE COURT:  You can go back, it's fixed.

2:33:56  2          MR. RIOPELLE:  Did I break it?

2:33:58  3          THE COURT:  No.  Probably somebody moving the lectern

2:33:59  4   did.

2:34:01  5          MR. RIOPELLE:  I probably did break it.

2:34:03  6          THE COURT:  Yeah, that's the lectern, not a podium.

2:34:08  7   I've read in the New York Times you stand on a podium, you stand

2:34:10  8   behind a lectern.  Since it was in the New York Times, it

2:34:14  9   obviously was true.

2:34:21  10         MR. RIOPELLE:  So this trade show where he first shows

2:34:27  11  up using Nextel was in March of 2017.  So Sprint learns about

2:34:32  12  it.  So in April of 2017, Sprint sends Mr. Calabrese a letter

2:34:39  13  and they inform him that the Nextel brand and the Nextel

2:34:42  14  trademark are Sprint's property, and they ask him to stop using

2:34:47  15  it.  You can see they say the misrepresentation and unauthorized

2:34:52  16  use of our trademarks are likely to confuse the public and

2:34:56  17  injure valuable rights to the trademarks because it implies that

2:35:00  18  a business relationship exists between Sprint or Nextel and your

2:35:04  19  company.  Nextel here demands that you, your company and all

2:35:09  20  agents cease this activity immediately.  And you see the

2:35:13  21  registration number there that I've highlighted at the bottom?

2:35:20  22  That is this trademark right here, 1884244, and we told him that

2:35:23  23  he was infringing that trademark.

2:35:30  24         Now, Mr. Calabrese responds by hiring a lawyer.  And

2:35:33  25  Sprint receives an e-mail from the lawyer claiming that Sprint

|            |    |                                                                  |
|------------|----|------------------------------------------------------------------|
| 2:35:39    | 1  | no longer uses the Nextel trademark.  In October of 2017, Sprint |
| 2:35:42    | 2  | responds and says yes, in fact we are using the trademark and    |
| 2:35:49    | 3  | here are examples of us using it.  So then in response, in       |
| 2:35:54    | 4  | October of 2017, Mr. Calabrese's lawyer sends us an e-mail        |
| 2:35:58    | 5  | sending saying that they're going to stop using it.              |
| 2:36:03    | 6  | Mr. Calabrese has also advised me that pursuant to your recent   |
| 2:36:07    | 7  | demand, he has ceased using the mark on any products or services |
| 2:36:10    | 8  | over which he has any sort of controlling interest and has       |
| 2:36:15    | 9  | ceased all offers for sale of telecommunication services and     |
| 2:36:20    | 10 | equipment using the Nextel mark.  In fact, several months later  |
| 2:36:25    | 11 | in February of 2018, Mr. Calabrese's lawyer follows up and he    |
| 2:36:29    | 12 | says my client has stopped using the mark.  This should allow    |
| 2:36:37    | 13 | you to close your file on this matter.  But unfortunately as the |
| 2:36:39    | 14 | evidence is going to show, and the fact that we're here today,   |
| 2:36:46    | 15 | Sprint could not close this file, because unbeknownst to Sprint, |
| 2:36:50    | 16 | Mr. Calabrese had contacted Mr. Kaplan.                          |
| 2:36:55    | 17 | Now, Mr. Kaplan is the owner of a company that he                |
| 2:36:59    | 18 | started called RetroBrands.  It's not a big company, in fact     |
| 2:37:02    | 19 | he's the only one that works there, and he says that company,    |
| 2:37:06    | 20 | what they do is they bring back old brands.  So Mr. Kaplan talks |
| 2:37:10    | 21 | to Mr. Calabrese.  He knows that Sprint has asked Mr. Calabrese  |
| 2:37:15    | 22 | to stop using the Nextel trademark.  But despite knowing this,   |
| 2:37:20    | 23 | Mr. Kaplan decides he'll team up with Mr. Calabrese and start    |
| 2:37:32    | 24 | using Nextel.  And in fact, in January of 2018, they enter into  |
| 2:37:37    | 25 | a license agreement and this agreement shows you what their plan |

2:37:40  1     is.  This is part of an agreement between Mr. Calabrese and Mr.

2:37:45  2     Kaplan.  It says here licensee, that's Mr. Calabrese, hereby

2:37:50  3     agrees to cooperate with the owner in regards to any future

2:37:56  4     possible mergers and/or partnerships with potential angel

2:38:02  5     investors and strategic partners who can assist us in achieving

2:38:05  6     our goal which is to sell the company for tens of millions of

2:38:08  7     dollars or possibly hundreds of millions of dollars within the

2:38:12  8     next five years.  They're basing that on using, as they say, the

2:38:16  9     famous and iconic trademark Nextel.

2:38:25  10          And so at the very same time late January 2018, early

2:38:33  11    February 2018, Mr. Calabrese's lawyer is sending Sprint e-mails

2:38:37  12    saying we've stopped using this, you can close your files, Mr.

2:38:42  13    Kaplan and Mr. Calabrese are actually working together to

2:38:49  14    continue using the Nextel mark.  In fact, just two days, two

2:38:54  15    days before Mr. Calabrese's lawyer tells us that we can close

2:39:00  16    our file, Mr. Kaplan issues a press release saying that the

2:39:04  17    iconic Nextel Communications brand has been relaunched across

2:39:05  18    America.

2:39:10  19          Now, Mr. Kaplan claims that he does research to make

2:39:15  20    sure that he can use a brand.  The evidence is going to show

2:39:19  21    that he didn't do his research very well or he didn't do it very

2:39:24  22    hard.  So for example, Mr. Kaplan says he looked at Sprint

2:39:30  23    websites.  Well, here's a Sprint website from November of 2018,

2:39:35  24    the same year that he was doing the research.  And if he looked

2:39:38  25    at it there's a question and answer, you know, those frequently

2:39:42  1    asked questions kind of things you see, and it says will the

2:39:46  2    Nextel push-to-talk chirp still be used when placing a Sprint

2:39:53  3    Direct Connect Plus call?  Yes, the familiar Nextel chirp will

2:39:55  4    still be used.

2:39:57  5         He also went and looked at the United States Patent and

2:39:59  6    Trademark Office database which you can get off their website

2:40:04  7    and he searched for Nextel trademarks.  And this would be an

2:40:07  8    obvious place to go.  If you're going to go and sell something

2:40:09  9    using a brand, you want to make sure that nobody else is using

2:40:14  10   that brand so you're not infringing their trademark.  Well, if

2:40:18  11   Mr. Kaplan had paid attention to it, he would have seen that

2:40:26  12   these two trademarks are listed on that database as alive and

2:40:32  13   valid and still functioning.  And we know that he talked to

2:40:38  14   Mr. -- Mr. Kaplan talked to Mr. Calabrese.  Mr. Calabrese has

2:40:42  15   seen Sprint using the Nextel trademark at the IWCE trade show,

2:40:47  16   so they knew it was still being used.

2:40:54  17        But despite all this, Mr. Kaplan tried to do the same

2:40:58  18   thing that Mr. Calabrese did, he filed a trademark application

2:41:02  19   with the United States Patent and Trademark Office to try to get

2:41:11  20   the Nextel trademark.  He did this on January 29, 2018, about a

2:41:15  21   week before Mr. Calabrese's lawyer told us we could close our

2:41:23  22   file.  Not surprisingly, the trademark office rejected Mr.

2:41:28  23   Kaplan's Nextel application.  They said in the present case,

2:41:33  24   applicant's mark is Nextel and registrant's mark is Nextel.  The

2:41:36  25   registrant there is Sprint.  These marks are identical in

| | |
|---|---|
| 2:41:40  1 | appearance, sound and meaning and have the potential to be used |
| 2:41:50  2 | in exactly the same manner.  Now, so they rejected his |
| 2:41:52  3 | application for Nextel. |
| 2:41:57  4 | Undeterred, Mr. Kaplan also filed an application for |
| 2:42:05  5 | the chirp sound in July of 2018.  And again, not surprising, the |
| 2:42:08  6 | United States Patent and Trademark Office rejected his |
| 2:42:15  7 | application for the chirp sound.  It says the registration of |
| 2:42:18  8 | the applied-for mark is refused because of a likelihood of |
| 2:42:28  9 | confusion with the mark in US Registration 5047282.  This is 50 |
| 2:42:37  10 | -- this, sorry, is 5047282.  And it says -- goes on, and it says |
| 2:42:41  11 | the Trademark Act Section 2(d) bars registration of an |
| 2:42:46  12 | applied-for mark that is so similar to the registered mark that |
| 2:42:52  13 | it is likely consumers would be confused, mistaken or deceived |
| 2:42:57  14 | as to the commercial source of the service of the parties. In |
| 2:43:03  15 | addition, the evidence is going to show that when Mr. Kaplan |
| 2:43:10  16 | filed the registration for the chirp, all he did was copy the |
| 2:43:17  17 | Sprint registration and put that in there.  And the evidence |
| 2:43:18  18 | will show that. |
| 2:43:22  19 | Now, despite these rejections from the United States |
| 2:43:26  20 | Trademark Office, Mr. Kaplan and Mr. Calabrese proceeded to |
| 2:43:29  21 | infringe the Nextel trademark.  Let me just show you quickly a |
| 2:43:34  22 | couple of examples of the infringement you're going to see. |
| 2:43:39  23 | This is Defendant Nextel, Inc.'s website.  This is |
| 2:43:43  24 | Mr. Calabrese's website.  You can see that it's using Nextel |
| 2:43:47  25 | right across the top.  The other interesting thing about this is |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
| 2:43:51 | 1  | it's using Nextel with the R in the circle.  Do you see that? |
| 2:43:55 | 2  | The R in the circle means that you have a registered trademark. |
| 2:43:59 | 3  | Mr. Calabrese didn't have a registered trademark.  In fact, the |
| 2:44:02 | 4  | application that he had filed had been rejected by the United |
| 2:44:05 | 5  | States Patent and Trademark Office. |
| 2:44:11 | 6  | Here's a letter in January of 2017 before we even knew |
| 2:44:15 | 7  | about them, letter from Calabrese to one of the dealers he was |
| 2:44:19 | 8  | trying to sign up.  It says you may be familiar with our brand |
| 2:44:24 | 9  | name, and we believe it is key in consumer residual goodwill, as |
| 2:44:29 | 10 | well as telegraphing to dealer and end users our business in one |
| 2:44:34 | 11 | single word.  The residual goodwill that he's talking about |
| 2:44:39 | 12 | there is not goodwill that he could have built up, he hadn't |
| 2:44:44 | 13 | started selling products until March 2017.  It's the goodwill |
| 2:44:47 | 14 | built up my by clients, Nextel and Sprint over the 30 years that |
| 2:44:50 | 15 | they are using Nextel. |
| 2:44:54 | 16 | Here's another example.  This is Defendant Nextel |
| 2:44:58 | 17 | Mobile Worldwide's website.  This is Mr. Kaplan's website and |
| 2:45:04 | 18 | again, you can see it's using Nextel up there in the very top. |
| 2:45:11 | 19 | Also, if you go into it, inside this here's a picture of a |
| 2:45:14 | 20 | Nextel building that Mr. Kaplan put on there.  The evidence is |
| 2:45:20 | 21 | going to show that that building is not associated with any of |
| 2:45:24 | 22 | the Defendants.  It's not RetroBrand's building, it's not Nextel |
| 2:45:30 | 23 | Mobile Worldwide's building, it's not Nextel, Inc.'s building, |
| 2:45:33 | 24 | that is a picture that Mr. Kaplan found on the internet and just |
| 2:45:37 | 25 | put on his website to make people think that was his building. |

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
| 2:45:42    | 1  | You'll also see in his same website that they're             |
| 2:45:47    | 2  | advertising or promoting that they're using the chirp.  You'll |
| 2:45:52    | 3  | also see in their website that they're putting on their website |
| 2:45:56    | 4  | the ads that we made.  And in fact, in the upper left-hand    |
| 2:46:00    | 5  | corner, that's the ad I just showed you a couple of minutes ago. |
| 2:46:05    | 6  | But they're putting them in their website to promote their    |
| 2:46:06    | 7  | products.                                                     |
| 2:46:13    | 8  | This is Nextel Communications' Facebook page.  Nextel        |
| 2:46:16    | 9  | Communications is a company tied to Mr. Kaplan.  And you can  |
| 2:46:21    | 10 | again see it says "Nextel is back", and you can see they're   |
| 2:46:29    | 11 | offering devices that say Nextel on them.  Here's a side-by-side |
| 2:46:32    | 12 | comparison.  On the right side -- sorry.  On the left side is |
| 2:46:39    | 13 | some of Sprint's marketing materials for Nextel, "it all started |
| 2:46:42    | 14 | with a chirp", and you can see it says "Nextel from Sprint".  On |
| 2:46:45    | 15 | the right side is Defendants' marketing materials.  You can see |
| 2:46:50    | 16 | they're using Nextel, they're using the same color, same --   |
| 2:46:53    | 17 | almost the same font, the same black line coming down there, and |
| 2:46:56    | 18 | they're holding up devices that talk about -- and they have    |
| 2:46:58    | 19 | Nextel on them.                                                |
| 2:47:05    | 20 | You'll also see that there are domain names that are          |
| 2:47:09    | 21 | all used by Defendants, and we highlighted the Nextel in there. |
| 2:47:13    | 22 | This is what's known as cybersquatting.  When you use somebody |
| 2:47:18    | 23 | else's trademark in your domain name, that's known as         |
| 2:47:19    | 24 | cybersquatting.                                                |
| 2:47:26    | 25 | And finally, you'll see that the Defendants made sales        |

| | |
|---|---|
| 2:47:31 | 1 |
| 2:47:37 | 2 |
| 2:47:40 | 3 |
| 2:47:43 | 4 |
| 2:47:47 | 5 |
| 2:47:53 | 6 |
| 2:47:59 | 7 |
| 2:48:03 | 8 |
| 2:48:06 | 9 |
| 2:48:12 | 10 |
| 2:48:20 | 11 |
| 2:48:24 | 12 |
| 2:48:27 | 13 |
| 2:48:31 | 14 |
| 2:48:34 | 15 |
| 2:48:39 | 16 |
| 2:48:41 | 17 |
| 2:48:46 | 18 |
| 2:48:50 | 19 |
| 2:48:56 | 20 |
| 2:49:01 | 21 |
| 2:49:05 | 22 |
| 2:49:10 | 23 |
| 2:49:14 | 24 |
| 2:49:17 | 25 |

1  and infringed the trademark from 2017 to the present.

2          Now, what is Defense's response going to be to the
3  clear evidence that they are using Sprint's Nextel and chirp
4  marks, and they're trying to benefit from the goodwill and
5  reputation that Sprint built up in the Nextel trademarks?
6  Defendants' primary argument is going to be that Sprint somehow
7  abandoned Nextel and the chirp marks.  Now, as the Court is
8  going to instruct you at the end of the case, to prove
9  abandonment, the Defendants have to prove that Sprint stopped
10  using the Nextel trademark and had no intention of resuming use
11  of the Nextel trademark.  As I've already shown you, Sprint has
12  not abandoned the Nextel trademark and the Nextel chirp.  In
13  fact, the evidence is going to show that the reality is in fact
14  the exact opposite.  Sprint has continued to use the Nextel
15  trademark and the chirp up until today, and you'll hear evidence
16  that Sprint and T-Mobile have plans to continue to use the
17  Nextel trademark.

18          Now something you need to watch for.  Defendants may
19  raise other Nextel marks that have been abandoned or cancelled,
20  but you need to pay close attention if they do this.  Because as
21  I told you earlier, Nextel evolved from being a company that was
22  branding towards consumers to being a brand that was going
23  toward businesses and first responders.  And so as the focus
24  changed, they got rid of some of the trademarks and stuff they
25  didn't need to use.  But more importantly, if they show you

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
| 2:49:22  | 1  | other trademarks, that's irrelevant and it's a red herring.              |
| 2:49:27  | 2  | They are not these two marks that are at issue in this case.             |
| 2:49:31  | 3  | This case is about whether Defendants are infringing these two           |
| 2:49:34  | 4  | marks.                                                                   |
| 2:49:37  | 5  |        Here's another thing you may hear.  In an effort to               |
| 2:49:41  | 6  | avoid the obvious fact that Sprint has registered trademarks             |
| 2:49:45  | 7  | that it is asserting in this case, Defendants will also argue            |
| 2:49:48  | 8  | that Sprint somehow committed fraud on the Patent and Trademark          |
| 2:49:54  | 9  | Office.  They have a heavy burden to try to prove this.  But the         |
| 2:49:58  | 10 | answer is an obvious one.  The experts at the trademark office           |
| 2:50:03  | 11 | reviewed and accepted Sprint's evidence, and you'll see that             |
| 2:50:09  | 12 | evidence that Sprint was still using Nextel.                             |
| 2:50:13  | 13 |        Finally, Defendants are going to claim to you that                |
| 2:50:18  | 14 | they've been harmed; that in fact Sprint owes them money because         |
| 2:50:22  | 15 | Sprint is trying to enforce its trademarks.  But trademarks are          |
| 2:50:26  | 16 | property.  I mean, they're just like any physical property you          |
| 2:50:30  | 17 | own.  So for example, say you owned a house that's real close to         |
| 2:50:33  | 18 | a restaurant, and that people go into that restaurant keep               |
| 2:50:37  | 19 | driving across your front lawn to get to that restaurant.  Well,         |
| 2:50:41  | 20 | that's your property.  So you put up a sign that says no driving         |
| 2:50:46  | 21 | on this property, violators will be prosecuted.  The restaurant          |
| 2:50:49  | 22 | can't come and sue you because it's lost consumers because you           |
| 2:50:53  | 23 | won't let them drive across your property.  Well, that's the             |
| 2:50:57  | 24 | same thing that's going on here.  Defendants can't claim they've         |
| 2:51:02  | 25 | lost business because Sprint is trying to protect its property.          |

2:51:05  1        One last topic I want to talk to you before I sit down.

2:51:11  2  Damages.  Sprint will be seeking damages in this case.  Again, I

2:51:13  3  want to reiterate --

2:51:15  4        THE COURT:  I'm going to give you an extra five minutes

2:51:18  5  because we interrupted you during your opening.

2:51:20  6        MR. RIOPELLE:  I should be done in three.

2:51:23  7        THE COURT:  Well, you got 4:30 left, so you have an

2:51:26  8  extra five if you need it.

2:51:30  9        MR. RIOPELLE:  One point I want to reiterate.

2:51:34  10  Defendants can sell push-to-talk phones.  They can compete.

2:51:40  11  They just can't call themselves Nextel.  So in this case, Sprint

2:51:46  12  is seeking something that the law calls statutory damages.

2:51:50  13  Statutory damages are essentially a fine set forth in the

2:51:54  14  federal trademark law.  Congress has decided that counterfeiting

2:51:59  15  and trademark infringement are serious violations that carry a

2:52:03  16  fine.  And why are there fines?  Well, because counterfeiting

2:52:06  17  and trademark infringement not only harm the company whose

2:52:11  18  property is being stolen, but it can harm consumers who pay for

2:52:16  19  one thing but get something else.  And here, Sprint has no

2:52:20  20  ability to control the quality of the products being sold by the

2:52:24  21  Defendants.  And in this case, those consumers who may get

2:52:30  22  something else are first responders and others who rely on

2:52:35  23  reliable communications.  Sprint has no way to verify that these

2:52:38  24  first responders are actually getting the reliable

2:52:43  25  communications and services that have come to be associated and

2:52:49  1    known by the Nextel brand.  So that's why Sprint is seeking

2:52:55  2    statutory damages.  It's to deter Defendants from passing off

2:53:01  3    their products as Sprint's Nextel products and to protect the

2:53:06  4    consumers from being confused and buying counterfeit products.

2:53:09  5          So after you've heard all the evidence, we're going to

2:53:15  6    ask you that find that Defendants have infringed, have

2:53:20  7    counterfeited, unfairly competed by using the Nextel trademark

2:53:23  8    and the Nextel chirp, and we'll also ask you to find that

2:53:27  9    Defendants are liable for cybersquatting because they're using

2:53:31  10   the Nextel trademark in their domain names.  And by finding

2:53:36  11   Defendants liable, you'll be able to tell them what they're

2:53:40  12   doing is wrong, and you'll be able to tell them that they should

2:53:43  13   stop using Sprint's property.

2:53:47  14         So on behalf of Sprint, I want to thank you for your

2:53:52  15   time and your service in this important case.

2:54:05  16         THE COURT:  Thank you, sir.

2:54:07  17         MR. RIOPELLE:  Thank you, Your Honor.

2:54:10  18         THE COURT:  You may proceed, sir.

2:54:39  19         MR. SCHWARTZ:  Good afternoon, everyone.  Ladies and

2:54:44  20   gentlemen, my name is Wayne Schwartz and with me is Jim Kernell

2:54:47  21   and my associate Dorey Solomon, and we represent the Defendants.

2:54:52  22   You heard a little bit in the jury selection about the

2:54:54  23   Defendants and I'm going to just describe a little bit about

2:54:55  24   them.

2:55:05  25         Mr. Kaplan, to my right, he owns RetroBrands USA LLC

2:55:12  1    and he started that business in 2012.  He also has a company

2:55:17  2    called Nextel Mobile Worldwide, Incorporated, and he formed that

2:55:23  3    in April of 2018, and he did that by changing his prior company

2:55:29  4    called Global Beverage to Nextel Mobile Worldwide.  And you'll

2:55:33  5    hear Mr. Kaplan talk about his background and his other

2:55:37  6    businesses, including the beverage company and some others.

2:55:44  7         He's lived here in South Florida for 45 years.  He had

2:55:48  8    some schooling in Broward Community College, didn't finish.

2:55:53  9    He's basically an entrepreneur.  He's worn a lot of hats.  He's

2:55:56  10   ran video stores, he's ran -- he had his beverage company, he's

2:55:59  11   done a lot of different things.  And you're going to hear from

2:56:05  12   Mr. Kaplan about how he got into reviving nostalgic brands.

2:56:08  13        This is not foreign, or it shouldn't be foreign to

2:56:13  14   anyone if you're a baby boomer or older, and you grew up on

2:56:18  15   certain brands and then they disappear, and then you wonder

2:56:22  16   where did these brands go.  Then sometimes they do come back and

2:56:25  17   you think well, maybe it's the original company but no, it's not

2:56:30  18   always the original company, because trademarks and brands, they

2:56:33  19   either get abandoned or they're cancelled or people just give up

2:56:37  20   on them, and there's plenty of examples out there.

2:56:44  21        We also represent Nextel, Inc., and Jose Rivera is a

2:56:49  22   50-50 owner with Mr. Calabrese.  You only heard Mr. Riopelle

2:56:53  23   discuss Mr. Calabrese.  But since 2016 when Mr. Rivera and

2:56:58  24   Mr. Calabrese decided, after investigating the issues, they were

2:57:02  25   going to form their company Nextel, Inc.  And unfortunately,

| | | |
|---|---|---|
| 2:57:07 | 1 | Mr. Calabrese cannot be here today at the trial.  However, |
| 2:57:11 | 2 | there's issues when a party or a witness can't be at a trial and |
| 2:57:15 | 3 | if they have been deposed in a case, there's transcripts.  The |
| 2:57:18 | 4 | lawyers have taken their depositions in advance, and you're |
| 2:57:22 | 5 | going to probably hear parts of those transcripts being read and |
| 2:57:26 | 6 | you can consider that as part of the evidence in the case. |
| 2:57:33 | 7 | Mr. Rivera also has been and lived in South Florida for |
| 2:57:39 | 8 | 30 years.  He also grew up here and has done a variety of jobs, |
| 2:57:45 | 9 | and then decided to focus his attention in 2016 on this new |
| 2:57:48 | 10 | venture, Nextel, Inc. |
| 2:57:54 | 11 | Over to my left over here is the Plaintiff, their name |
| 2:58:01 | 12 | now is Sprint Communications LLC.  When the lawsuit was filed in |
| 2:58:06 | 13 | April of 2018, they were Sprint Communications, Incorporated. |
| 2:58:11 | 14 | And so they've recently decided only a few months ago that they |
| 2:58:15 | 15 | were going to change to an LLC which is a limited liability |
| 2:58:20 | 16 | company.  It's out of Kansas.  It has no shareholders.  A |
| 2:58:25 | 17 | limited liability company has members, its only member is Sprint |
| 2:58:35 | 18 | LLC and it's 100% owned by that entity.  Sprint LLC was an |
| 2:58:40 | 19 | entity that was once called Sprint Corporation.  They have since |
| 2:58:41 | 20 | changed their name. |
| 2:58:47 | 21 | You heard about T-Mobile.  T-Mobile USA, Incorporated |
| 2:58:52 | 22 | is -- let me strike that.  Sprint -- let me step back. |
| 2:58:56 | 23 | Sprint LLC is a subsidiary of T-Mobile USA, |
| 2:59:06 | 24 | Incorporated.  And then T-Mobile USA, Inc. is a subsidiary of |
| 2:59:15 | 25 | T-Mobile US, Incorporated.  There is no Nextel Communications, |

2:59:19  1   there is no Nextel company, that's why there's two sides to

2:59:20  2   every story.

2:59:23  3       You heard Mr. Riopelle.  He showed you this time line,

2:59:32  4   except he leaped from the Super Bowl ad in 2004 all the way to

2:59:36  5   2016 and 2017, and he just skipped over the whole middle.  The

2:59:40  6   whole middle of the story.  The middle of the story is that

2:59:44  7   Sprint decided in 2005 that they were going to acquire Nextel

3:00:09  8   Communications.  Once they acquired Nextel, they merged, if you

3:00:12  9   can follow all of this moving around, all this corporate name

3:00:17  10  changing, all the different things that are going on here, what

3:00:23  11  we have is T-Mobile is sitting here hiding behind this cloak of

3:00:27  12  oh, we're just Sprint, we're just Nextel.  No, that's not the

3:00:32  13  case.  This is a giant conglomerate that has decided that for

3:00:38  14  some reason they don't have to abide by the different rules, the

3:00:38  15  trademark rules.

3:00:42  16      And part of that gap that Mr. Riopelle skipped was the

3:00:48  17  issues about what they did when the trademark came up for

3:00:51  18  renewal.  And you're going to see the evidence in this case

3:00:55  19  where they lied to the trademark office in order to keep the

3:01:01  20  renewal of the name Nextel.

3:01:14  21      Mr. Riopelle talked about trademarks, most businesses

3:01:18  22  have trademarks.  If you're a business owner, you're probably

3:01:22  23  going to have a trademark.  They're designed to help identify a

3:01:25  24  corporation or a product like Coca-Cola which was mentioned and

3:01:33  25  its famous logos, and the McDonald's and its arches, and Google

3:01:36   1   with its rainbow letters, they're all trademarks or design

3:01:38   2   marks, and you're going to hear issues about these particular

3:01:45   3   marks.  But what's interesting, even in Miami, the famous Miami

3:01:51   4   Sound Machine, which I'm sure everyone knows Gloria Estefan and

3:01:55   5   her music, they too had that trademark, Miami Sound Machine.  But

3:01:58   6   if you look it up now, the mark has been abandoned and

3:02:04   7   cancelled.  So even something like as iconic as that for Miami

3:02:08   8   if anyone wants that, it's up for grabs.  You can go and file an

3:02:12   9   application, and if you want to use that particular name, it's

3:02:13   10  fair game.

3:02:23   11          From 1987 to 2005, Nextel had a cellular service type

3:02:43   12  company as Mr. Riopelle said.  It started out as a -- if we want

3:02:47   13  to switch -- Dawn?

3:02:51   14          So you saw this earlier.  This is the original register

3:02:57   15  for the principal trademark we're going to be talking about

3:03:05   16  here, and this is we call it the 244.  It's easier, you can see.

3:03:09   17  And the only thing that is registered here is the name Nextel.

3:03:14   18  You can see it.  All caps, black.  And you can see down here a

3:03:18   19  little bit lower that the original company was called Fleet

3:03:25   20  Call, Inc. and then they changed their name in 1993.  And at its

3:03:29   21  peak, Nextel had about 20 million subscribers and they sold the

3:03:35   22  walkie-talkie, you heard on Mr. Riopelle's opening, the

3:03:39   23  walkie-talkie radio.  Again, what he failed to sort of tell you

3:03:45   24  as part of the story is that the smartphone explosion basically

3:03:50   25  left the walkie-talkies in the dust.  My children used to use

3:04:00   1   the walkie-talkies and with Apple and AT&T and Verizon and even

3:04:03   2   now T-Mobile, the walkie-talkie sort of had its day.

3:04:11   3        And in 2005 after the merger, when the merger took

3:04:21   4   place, Sprint acquired Nextel and its iDEN network which was 2G.

3:04:26   5   So if you think about we're now on 5G, back then it was 2G and

3:04:29   6   that was developed by Motorola, the phones were developed by

3:04:32   7   Motorola.  And what's interesting is that the one thing you

3:04:37   8   didn't hear counsel say is about the name Nextel and the sale of

3:04:42   9   their phones, you're not going to see any evidence where they

3:04:50   10  have phones that have the famous yellow and black trademark on

3:04:51   11  them.

3:05:00   12       Nextel came into that merger with about 55 trademarks

3:05:04   13  with Nextel, all kinds of slogans and logos and designs, and

3:05:09   14  those were all transferred to Sprint, including this one which I

3:05:15   15  think most people remember.  And in the opening Mr. Riopelle

3:05:20   16  showed you a couple screenshots that had this, but what he

3:05:26   17  forgot to tell you is that in October of 2014 this trademark was

3:05:32   18  abandoned, cancelled, it's gone.  Not only this one, and I

3:05:42   19  mentioned they had 55, they gave up about 52.  So Sprint took

3:05:48   20  over Nextel, and they just slowly let all these trademarks be

3:05:52   21  abandoned and cancelled.  They had no reason to do anything with

3:05:54   22  them.

3:06:04   23       The case, when it was filed, they filed for

3:06:08   24  infringement against this particular trademark that's on the

3:06:14   25  screen, the 244.  This relates to equipment.  There also was a

```
3:06:19   1    trademark that they claimed that we infringed for Nextel with
3:06:23   2    telecommunication services.  So not just a trademark on
3:06:27   3    equipment, but you need to have the trademark if you're going to
3:06:33   4    sell cell service, right, and?  We call that the 139 Mark.  And
3:06:37   5    you're going to see evidence describing that particular mark.
3:06:44   6    And remarkably, in the middle of this lawsuit, T-Mobile, Sprint
3:06:49   7    whatever they are, they let that mark go abandoned.
3:06:56   8              We hear, we hear Mr. Riopelle claim that they care so
3:07:02   9    much about this iconic Nextel trademark, we're seeing the most
3:07:07  10    iconic, this is the one that was on the NASCAR abandoned.  They
3:07:11  11    can't sell phones for Nextel and connect them to the service
3:07:16  12    without having the trademark, which is gone.  It doesn't -- it
3:07:20  13    doesn't -- the logic doesn't make sense there.
3:07:25  14              Finally, there's a sound mark.  Mr. Riopelle likes to
3:07:31  15    call it the Nextel chirp sound mark, but that's not what it is.
3:07:35  16    It's just a sound mark.  They're calling it the Nextel chirp
3:07:41  17    mark, I don't know why.  But it's -- and it's a three beeps,
3:07:45  18    it's -- you're going to hear issues.  You heard him play the
3:07:48  19    beep.  But what the evidence in this case is going to show is
3:07:52  20    that we're not selling any phones with that sound, that iconic
3:07:56  21    beep with the three beeps.  We're not selling any services
3:08:01  22    related to the sound.  And I think you'll be surprised too that
3:08:03  23    there's no issues with regard to our activities and this
3:08:08  24    particular sound mark.
3:08:22  25              In 2010, Sprint -- oh, by the way, when they merged,
```

3:08:26   1    they changed their name once again.  How many times they're

3:08:31   2    going to change their name.  Their name became Sprint Nextel

3:08:41   3    Corporation.  That was going to be the new combination, but by

3:08:45   4    2010 they realized that this new iDEN network was weighing them

3:08:48   5    down, bogging them down, costing them billions of dollars, and

3:08:53   6    they made a decision at Sprint that they made a mistake.  I

3:08:56   7    guess they got some subscribers out of it, but they basically

3:09:01   8    said this isn't working for us, we're losing so much money.  And

3:09:06   9    then by 2012, I mean, you're going to see the evidence of this,

3:09:14   10   in Sprint's own writings, own announcements to the public, they

3:09:18   11   put forth public announcements for the world to see that they

3:09:23   12   were done with Nextel.  They were shuttering it, they were

3:09:26   13   decommissioning the whole network, they were shutting down the

3:09:31   14   network.  People were up in arms and they told their consumers

3:09:35   15   sorry, we're just shutting it down, we're going to pull the plug

3:09:38   16   and you can either join Sprint, get a Sprint phone and Sprint

3:09:41   17   service, or just go somewhere else.  That was their business

3:09:45   18   model.  That was their decision that they decided to make in

3:09:50   19   2012.  That part of the story was left out, we wanted to leap

3:09:53   20   right over there, I don't know how we could leap over that

3:09:54   21   point.

3:09:58   22          In 2013, June, the middle of the year in 2013, they

3:10:05   23   said June 30th, and on June 30th you could still make a Nextel

3:10:10   24   call.  On July 1st, that was it.  No more Nextel service, no

3:10:16   25   more call.  Your phone, your service, done.  Dead.  Off.

```
3:10:26   1              Of course what does Sprint do next?  They drop the name
3:10:30   2      Nextel from their name.  They go back to Sprint Corp.
3:10:34   3      Flip-flopping, flip-flopping.  This is all that's been going on
3:10:39   4      here.  Changing their names.  Why?  Subterfuge, I'm not sure.
3:10:44   5      They're one name one day, a name the next day.  You have to ask
3:10:48   6      yourself, and when you see the evidence, you'll challenge the
3:10:51   7      credibility, you'll challenge the things Mr. Riopelle said and
3:10:55   8      what he tried to show you, the smoke and mirrors about --
3:10:57   9              THE COURT:  Opening statement, not argument.
3:10:59  10              MR. SCHWARTZ:  I'm sorry, Your Honor.  The bottom line
3:11:05  11      is 53 Nextel trademarks were abandoned, and the only ones
3:11:09  12      remaining was this particular one, the 244, the
3:11:13  13      telecommunications which I described that has now since been
3:11:17  14      abandoned, and the sound mark and that's it.  And you're going
3:11:20  15      to see a list in evidence of all of these different trademarks
3:11:24  16      that they just said they had nothing more to do with.
3:11:27  17              The issue with trademarks, if I think you can probably
3:11:33  18      imagine by now, is that you either use it or you lose it.  And
3:11:42  19      the way the trademark office sets this up for people so that --
3:11:47  20      like Mr. Kaplan or Mr. Rivera so they understand what they can
3:11:50  21      and cannot do, they say if you don't use your trademark for
3:11:57  22      three years without the intent to reuse it, it can be deemed
3:12:02  23      abandoned or cancelled.  And he showed you, you know, he waved
3:12:07  24      around the certificate, Mr. Riopelle.  Only if someone comes
3:12:12  25      forward like a Mr. Kaplan or a Mr. Rivera and files something to
```

3:12:17  1   challenge it and that's a big task, taking on a company like

3:12:20  2   T-Mobile.  Of course the registration is still going to be there

3:12:23  3   that you can wave around, but that's not what really is

3:12:24  4   happening here.

3:12:27  5        What's happening here is they sued us, and we sued

3:12:31  6   them.  And it's important to note that while they're named the

3:12:34  7   Plaintiffs, we're the counter-Plaintiffs.  We have claims as to

3:12:37  8   the things that they have done wrong, and the evidence that

3:12:40  9   we're going to present to you is going to show all the things

3:12:43  10  that they have done wrong to harm us.

3:12:53  11       They say we infringe their marks, that we somehow are

3:12:59  12  confusing the public and that we're going to dilute their Nextel

3:13:03  13  mark.  The mark that they said into the world we don't want

3:13:07  14  anything to do with.  They wrote-down -- it's a financial term

3:13:14  15  -- they wrote-down a $30 billion goodwill write-off, Nextel.

3:13:20  16  That's how much it cost.  Sprint, and I guess, T-Mobile decided

3:13:23  17  that they would acquire Sprint, and I'll get to that in a

3:13:24  18  second.

3:13:27  19       They take issue with our domain names.  The domain

3:13:31  20  names goes hand-in-hand with, you know, our particular business.

3:13:35  21  If they're not using Nextel, then we can have a domain name that

3:13:39  22  has the name Nextel in it.

3:13:43  23       You heard the Court talk about the burden of proof,

3:13:50  24  preponderance of the evidence, the 50%.  You just need to tip

3:13:56  25  the scales, that is basically how your job is.  You're going to

3:13:59  1    see the evidence.

3:14:02  2            There's certain defenses.  You'll hear and be

3:14:08  3    instructed on all of these different things, and you'll see when

3:14:12  4    the time comes with the evidence how that is going to enlighten

3:14:18  5    you to what really took place here and the situation concerning

3:14:21  6    the Defendants and their particular actions.

3:14:29  7            It's also important to note here that because they

3:14:35  8    decided to sue individuals and corporations, that there's

3:14:40  9    different claims and counterclaims.  Not everyone over here did

3:14:45  10   all the things they're accusing us of, and not everyone over

3:14:50  11   here thinks that they did anything to them.  Mr. Kaplan, he's

3:14:54  12   just an individual.  It's his company that is bringing the

3:14:56  13   counterclaim.

3:15:04  14           There's going to be evidence presented during the

3:15:08  15   trial, you heard Mr. Riopelle talk about this, some forms, live

3:15:12  16   witnesses, Mr. Kaplan, Mr. Rivera, they'll take the stand.

3:15:16  17   They'll describe all the efforts they have made since -- well,

3:15:18  18   with Mr. Rivera, 2016.

3:15:26  19           We have this issue where Mr. Kaplan meets Mr. Calabrese

3:15:33  20   in 2018.  Mr. Calabrese, you saw the license agreement between

3:15:38  21   -- it's a license agreement between RetroBrands and Nextel, Inc.

3:15:42  22   It's not between RetroBrands and Mr. Calabrese individually,

3:15:49  23   these -- it's a business.  It's a business agreement.

3:15:53  24           You'll hear Mr. Kaplan describe his business

3:15:58  25   background.  You'll hear how he's invented some things.  He has.

3:16:01  1    He holds a patent or two.  Because, you know, he's trying to

3:16:05  2    make things better for maybe himself, maybe for others, and

3:16:13  3    that's his entrepreneurial spirit.  He made his family -- in

3:16:18  4    Puerto Rico, they like a drink called Mauby.  It's very hard to

3:16:20  5    find at the time in South Florida.  So what did he do?  He

3:16:24  6    figured out the formula and he made it himself and he sold it

3:16:27  7    here.  That's the type of person you're going to hear about Mr.

3:16:31  8    Kaplan, and what he's done and when he formed RetroBrands in

3:16:31  9    2012.

3:16:36  10           We talked a little bit about nostalgic brands and they

3:16:40  11   want to paint a picture that we're swooping in to steal their

3:16:45  12   famous iconic brand.  Well, there is a market for nostalgia,

3:16:49  13   bringing back old brands.  This wasn't a one-off thing.  Mr.

3:16:55  14   Kaplan, he investigates, he looks at online articles, newspaper,

3:16:59  15   financial reports, all the things that Sprint said to the public

3:17:09  16   in all their corporate filings under oath.  He's revived at

3:17:13  17   least ten brands since starting his business like Chipwich,

3:17:16  18   Tender Vittles, Tegrin, Di-Gel, Ken-L Ration if you have pets,

3:17:22  19   Sani-Flush, Victrola the record player, and Puss'n Boots.

3:17:27  20   These, at one point in time, were iconic brands, well known to

3:17:29  21   the public for a variety of different reasons, products and

3:17:34  22   services, and all of them were either abandoned, let go or

3:17:37  23   cancelled, no one was using them.  And he decided, as part of

3:17:41  24   his business, he would file applications with the trademark

3:17:46  25   office.  Sometimes there's challenges, sometimes there aren't.

3:17:49   1          In this particular case, what Mr. Riopelle left out of

3:17:55   2   the equation is he filed his application in 2018, and then they

3:17:58   3   immediately filed the lawsuit and then asked the trademark

3:18:04   4   office to suspend.  So it's not like oh, what's been going on

3:18:08   5   for four years.  Nextel has been operating for four years while

3:18:12   6   this lawsuit has been pending.  That's a little bit different

3:18:17   7   than oh, we filed an application and then secretly we're still

3:18:21   8   building and operating a business and trying to sell phones

3:18:26   9   under the Nextel brand.  And we too, Nextel has also invested

3:18:30   10  money, going to trade shows, building up a distribution network,

3:18:32   11  making these phones.

3:18:37   12         They have the right to compete with a T-Mobile.  That's

3:18:42   13  the whole point here.  If we allow big companies like this to

3:18:46   14  try to squash the little guy, then the little guy will never

3:18:51   15  have a chance.  There's a sense of fairness that if you don't do

3:18:55   16  things right, if you don't want something, if you told everyone

3:19:00   17  that you don't want Nextel anymore, then when someone comes and

3:19:04   18  asks for it, you shouldn't be surprised.  And that's the bottom

3:19:04   19  line here.

3:19:07   20         You're going to hear the testimony from Mr. Kaplan as

3:19:13   21  to how much research he does, his investigations.  He didn't

3:19:15   22  look to pick a fight with Sprint.  He did his homework

3:19:20   23  beforehand.  He looked at everything that they had said, things

3:19:25   24  -- they put out their own press releases, their own information,

3:19:31   25  and then he decided to seek an application to use the Nextel

3:19:33   1    brand.

3:19:37   2              You're going to hear, as part of our counterclaims, how

3:19:41   3    Sprint and T-Mobile, they've interfered with our business.

3:19:46   4    They've cost us money.  They've tortiously interfered with our

3:19:51   5    network of distributors that we've been trying to build up.

3:19:54   6              You'll hear from Mr. Rivera and his efforts and what he

3:19:58   7    does for the company, the different hats he wears.  It's a small

3:20:02   8    company, it only has a few employees.  He's been building the

3:20:06   9    business for four years, and he's ready to move forward.

3:20:10   10             Mr. Riopelle keeps suggesting that oh well, we can sell

3:20:14   11   phones, just not under Nextel.  But why not under Nextel?

3:20:20   12   They're not using it.  There's no Nextel.  We'll ask, at the end

3:20:26   13   of our case, for you to award us damages for what they've done.

3:20:35   14             The issue about the renewal to the trademark office,

3:20:39   15   this is an important part of our case in the sense that we're

3:20:43   16   going to show you the evidence how they duped the trademark

3:20:48   17   office, they lied to them, they put forth information, they

3:20:51   18   pulled information out of a warehouse with pictures of old boxes

3:20:57   19   and old phones.  You have to show continual use.  You have to be

3:21:02   20   selling the products in commerce.  You can't just pull a picture

3:21:06   21   of some old phone off the shelf that no one is using and then

3:21:12   22   hope that nobody notices, because that's basically what they

3:21:16   23   did.  And we'll show you the evidence, and you'll decide the

3:21:19   24   credibility of their documents and what they've submitted.

3:21:27   25             The evidence is going to be such that you're going to

| | |
|---|---|
| 3:21:31  1 | see that they basically didn't use this brand for three years or |
| 3:21:37  2 | even longer, and they've only scrambled to try to come up with |
| 3:21:41  3 | -- they showed you this banner.  The slogan on that banner is |
| 3:21:48  4 | from 2007, and it's been since abandon.  This is an old banner |
| 3:21:51  5 | that somebody pulled out of, probably a broom closet, and |
| 3:21:54  6 | brought to it the trade show.  Together it says Sprint together |
| 3:22:00  7 | with Nextel.  Abandoned.  That was part of a slogan from 15 |
| 3:22:04  8 | years ago. |
| 3:22:13  9 |         Mr. Riopelle showed you a slide of their website |
| 3:22:22 10 | suggesting that their FAQ page where if you type in can I get |
| 3:22:25 11 | the chirp sound, I don't know if he pointed out to you, but the |
| 3:22:30 12 | date on the bottom of that document was November 2018.  That was |
| 3:22:37 13 | seven months after they filed the lawsuit.  You click on it and |
| 3:22:41 14 | it just so happens to say Nextel chirp on it?  You'll question |
| 3:22:44 15 | the credibility when you see all the evidence. |
| 3:22:57 16 |         We've got the sound mark, you heard him play it. |
| 3:22:59 17 | They're not going to be able to show you any of our phones |
| 3:23:04 18 | making that noise.  So you'll ask yourself again, why are they |
| 3:23:08 19 | just, you know, suing us for the sake of suing us on that |
| 3:23:16 20 | particular issue?  I don't think they're going to be able to, |
| 3:23:21 21 | we'll see with the evidence, an actual Nextel phone?  Ask |
| 3:23:26 22 | yourself are they going to show us a Nextel phone that makes |
| 3:23:31 23 | that sound?  No.  The evidence is not going to show you that. |
| 3:23:37 24 | They don't use -- that beep is affiliated and associated with |
| 3:23:42 25 | Nextel, the company that they said we don't want any part of in |

3:23:47   1   their documents you're going to see, they listed all their

3:23:52   2   brands.  One year they had Nextel listed, the next year Nextel

3:23:55   3   is gone.

3:24:03   4        Besides live witnesses, you may see a box or two, you

3:24:09   5   may hear things, it's all evidence to the extent it gets

3:24:10   6   admitted to you to review.

3:24:12   7        There's also going to be deposition transcripts, I

3:24:18   8   mentioned it in the beginning.  These were previously taken

3:24:22   9   proceedings and there will be bits and pieces of the transcripts

3:24:25   10   read to you.  There will be someone sitting over there

3:24:33   11   pretending to read it, someone will be here reading it, and

3:24:35   12   that's the nature of submitting transcripts.

3:24:40   13        And you're going to read parts of the deposition of a

3:24:44   14   woman by the name of Melissa Jobe.  She's a senior counsel in

3:24:48   15   charge of the trademarks for Sprint.  She's the one who signed

3:24:53   16   off on the declarations for the renewal, the fraud on the

3:24:57   17   trademark court.  You're going to see her name all over the

3:25:01   18   place.  She's actually the woman at Sprint who could tell us all

3:25:13   19   about trademarks, but she's not here.  She's not going to be

3:25:13   20   appearing.

3:25:25   21        Finally as we get to the real story, 2020, April,

3:25:30   22   T-Mobile acquired Sprint, and what did they do?  The exact same

3:25:36   23   thing that Sprint did to Nextel.  They announced to the world

3:25:42   24   sorry Sprint, and all your subscribers, you're Number 4.  You

3:25:47   25   can't compete with Verizon, AT&T and T-Mobile, so we are done

3:25:50  1   with Sprint.  We're going to shutter it.  And all their

3:25:53  2   trademarks, everything, they've given up on it.

3:25:59  3        So ask yourself this pattern; Sprint, Nextel, sucks up

3:26:04  4   all the subscribers then tosses it to the wayside.  Now

3:26:08  5   T-Mobile, another billion dollar company, acquires Sprint, sucks

3:26:11  6   up all the subscribers.  That's the only way you can compete

3:26:14  7   with the monsters of AT&T and Verizon.  With this team of

3:26:18  8   lawyers over here and staff, you would think this case was

3:26:21  9   T-Mobile versus Verizon, but it's not.  It's a David versus

3:26:27  10  Goliath.  It's T-Mobile versus two guys just trying to, you

3:26:30  11  know, make a living, revive an old brand, and mind their own

3:26:36  12  business, and try to, you know, get this thing off the ground.

3:26:52  13       You heard, I heard it, Mr. Riopelle at the end of his

3:26:56  14  opening say that well, at the end of this case, after all the

3:27:00  15  evidence, they're going to ask you for statutory damages.  And

3:27:04  16  why did he say that?  He's asking for statutory damages?

3:27:09  17  Because they don't have any actual damages.  That's the reason.

3:27:17  18  And ask yourself, when you see all the evidence, why he brought

3:27:24  19  that up in his opening.  There just simply isn't any validity to

3:27:25  20  any of their claims.

3:27:29  21       And after you see the evidence, you'll see that some

3:27:34  22  businesses, they start from a new idea, fresh, the ground up

3:27:40  23  like Uber.  And sometimes there's businesses that build a better

3:27:47  24  mouse trap like Tesla.  And then on occasion, you have a company

3:27:50  25  that rises out of the ashes of some old company that's been

| | | |
|---|---|---|
| 3:27:56 | 1 | tossed to the curb and it's reborn, and that's what Nextel is |
| 3:28:00 | 2 | trying to -- that's what they're trying to accomplish, only |
| 3:28:04 | 3 | T-Mobile is trying to stand in their way, stifle competition, |
| 3:28:07 | 4 | squash this little guy because they're what, nervous about Mr. |
| 3:28:12 | 5 | Kaplan and Mr. Rivera?  I mean, that's what this is all about. |
| 3:28:15 | 6 | And thank you. |
| 3:28:25 | 7 | THE COURT:  All right.  Call your first witness please. |
| 3:28:26 | 8 | MR. RIOPELLE:  All right, Your Honor.  We'll call |
| 3:28:29 | 9 | Mr. Jeffrey Kaplan. |
| 3:28:35 | 10 | THE COURT:  Watch your step.  There's a little ramp |
| 3:28:44 | 11 | there.  Up here, please.  Please remain standing and raise your |
| 3:28:45 | 12 | right hand. |
| 3:28:50 | 13 | JEFFREY KAPLAN, PLAINTIFF WITNESS, SWORN. |
| 3:28:55 | 14 | THE COURT:  Please be seated.  Get as close to the |
| 3:28:58 | 15 | microphone as you can, while you're behind the plexiglass, you |
| 3:29:02 | 16 | may remove your mask, tell us your name and spell it please. |
| 3:29:06 | 17 | THE WITNESS:  Jeffrey Kaplan.  K-A-P-L-A-N.  First name |
| 3:29:10 | 18 | Jeffrey, J-E-F-F-R-E-Y. |
| 3:29:11 | 19 | THE COURT:  You may proceed, sir. |
| 3:29:12 | 20 | MR. RIOPELLE:  Thank you, Your Honor. |
| 3:29:12 | 21 | DIRECT EXAMINATION |
| 3:29:12 | 22 | BY MR. RIOPELLE: |
| 3:29:28 | 23 | Q.  Now Mr. Kaplan, you're the owner of RetroBrands, correct? |
| 3:29:29 | 24 | A.  Yes. |
| 3:29:41 | 25 | Q.  And RetroBrands has no employees. |

3:29:44  1          THE COURT:  Remember what happened the last time you

3:29:44  2     did that.

3:29:45  3          MR. RIOPELLE:  I do.

3:29:47  4          THE COURT:  Be careful.

3:29:47  5     BY MR. RIOPELLE:

3:29:50  6     Q.  RetroBrands has no employees except you, right?

3:29:51  7     A.  Correct.

3:29:55  8     Q.  And no other shareholders besides you, right?

3:29:56  9     A.  Correct.

3:29:59  10    Q.  And so I guess we just established it's just you at

3:30:00  11    RetroBrands?

3:30:01  12    A.  Yes.

3:30:05  13    Q.  And as you say, I think it's on your website, RetroBrands is

3:30:11  14    in the business of reviving abandoned consumer iconic brands and

3:30:14  15    to bring them back to the marketplace; is that right?

3:30:15  16    A.  Correct.

3:30:21  17    Q.  Now, in 2018 you founded a company called Nextel Mobile

3:30:22  18    Worldwide.

3:30:23  19    A.  Correct.

3:30:27  20    Q.  And that's another Defendant in this case, right?

3:30:28  21    A.  Yes.

3:30:31  22    Q.  And you're the only shareholder of that, correct?

3:30:32  23    A.  Correct.

3:30:36  24    Q.  And Nextel Mobile Worldwide doesn't have any employees, does

3:30:37  25    it?

3:30:40  1   A.  No, correct.

3:30:47  2   Q.  Now, I think you've said in a declaration in this case that

3:30:52  3   as part of your RetroBrands business, you conduct research to

3:30:57  4   ensure that brands are abandoned before using the brands, right?

3:30:59  5   A.  Yes, I've been doing that for about 20 years.

3:31:03  6   Q.  And you do all that research yourself, right?

3:31:03  7   A.  Yes.

3:31:06  8   Q.  In fact, you don't use any lawyers or anything, do you?

3:31:07  9   A.  No.

3:31:10  10  Q.  Well, let's look at some of the things you researched.

3:31:15  11          MR. RIOPELLE:  Can we call up Exhibit 34 please?

3:31:22  12          THE COURT:  Is it in evidence?  Is it agreed to be in

3:31:25  13  evidence?  Because it's going to be shown to the jury.  If it

3:31:28  14  isn't in evidence, we want to keep it away from the jury until

3:31:32  15  it's in evidence.

3:31:39  16          MR. RIOPELLE:  Do you have an objection?

3:31:43  17          MR. SCHWARTZ:  I'm sorry.  What was the number?

3:31:45  18          MR. RIOPELLE:  34.

3:32:11  19          THE COURT:  You can put it on there now and it will

3:32:16  20  show to him so he doesn't have to look it up.

3:32:18  21          MR. SCHWARTZ:  We're getting there.  Give us a second.

3:32:22  22          THE COURT:  It's on the screen right in front of you.

3:32:25  23          MR. RIOPELLE:  There it is.

3:32:34  24          MR. SCHWARTZ:  We have a continuing objection to this

3:32:35  25  Exhibit 34.

```
3:32:38   1            THE COURT:  What's your objection?

3:32:40   2            MR. SCHWARTZ:  Lacks authentication.

3:32:43   3            THE COURT:  Okay.  Authenticate it.

3:32:43   4       BY MR. RIOPELLE:

3:32:45   5   Q.  Mr. Calabrese -- I'm sorry, Mr. Kaplan.

3:32:51   6            Mr. Kaplan, you looked at Sprint websites when you were

3:32:52   7   doing your investigation, right?

3:32:53   8   A.  Yes.

3:32:58   9   Q.  And is this -- this is a copy of the Sprint website, right?

3:33:02  10   A.  No, I believe that's an internal -- an internal area of the

3:33:08  11   website that the public cannot get to.

3:33:14  12   Q.  This is a -- do you see up in the top corner where it says

3:33:16  13   January of 2017?

3:33:20  14   A.  Yes.  I think you used the Wayback Machine archive.

3:33:24  15   Q.  We did use the Wayback Machine archive.  We did it so we

3:33:27  16   could do it at the time you were doing the investigation.  Is

3:33:27  17   this --

3:33:33  18   A.  No, I did my investigation in 2018.  This is dated 2017.

3:33:39  19   Q.  So you didn't go back and see this page back in -- actually

3:33:52  20   if we can go to Page 7, Carl?  See the top in this page says

3:33:54  21   April 2018?

3:33:54  22   A.  Okay.

3:33:57  23   Q.  That's about the time that you did your investigation,

3:33:58  24   correct?

3:34:01  25   A.  See, January, February, March, yeah approximately.  But
```

3:34:06   1   again, that's an internal website that the public cannot get to.

3:34:15   2   I don't see www.Sprint.com anywhere on it.

3:34:17   3   Q.   Because you're seeing it from the Wayback.

3:34:23   4   A.   Again, it says shop2-sprint.  It's an internal website that

3:34:26   5   you went back and printed out.  This is not something where you

3:34:30   6   go to Sprint.com and hit search and put in Nextel --

3:34:33   7                MR. RIOPELLE:  Your Honor, I have a declaration.

3:34:37   8                THE WITNESS:  -- which is what I did.

3:34:39   9                THE COURT:  Tell you what.  Why don't we get the jury

3:34:42   10   -- jurors, why don't you go into the jury room while we talk

3:34:45   11   about this so I don't have to whisper.

3:34:46   12                COURT SECURITY OFFICER:  All rise for the jury.

3:34:50   13                (Jury out at 3:34 p.m.)

3:35:19   14                THE COURT:  You may be seated.  Wait until the door

3:35:19   15   closes.

3:35:27   16                Okay.  Now, just so that we don't have any

3:35:31   17   misunderstandings, if you have an objection to a document --

3:35:36   18   first of all, I want you to have given documents to each other,

3:35:40   19   then I want you to have looked at the documents beforehand so

3:35:45   20   that when somebody says I'm offering 34, that we don't have to

3:35:50   21   call it up and show it to everybody and stand there while the

3:35:53   22   jury is sitting there twiddling their thumbs.

3:35:57   23                Now, I don't know what this is because it's not my

3:36:03   24   business to know what it is, but I find it improbable that

3:36:07   25   counsel would make it up, so I would assume that somebody can

| | | |
|---|---|---|
| 3:36:16 | 1 | figure out what it is and what it's supposed to have been. |
| 3:36:20 | 2 | MR. RIOPELLE:  Your Honor, this is a picture, this is |
| 3:36:25 | 3 | the website as it appeared in April of 2018.  It was captured on |
| 3:36:29 | 4 | the Wayback Machine.  Wayback Machine is a service that goes and |
| 3:36:33 | 5 | captures web that's available to the public at that time.  We |
| 3:36:39 | 6 | have for submission a declaration from the Wayback company |
| 3:36:42 | 7 | admissible under Federal Rule of Evidence 90 -- |
| 3:36:45 | 8 | THE COURT:  Show counsel and -- show counsel and let's |
| 3:36:48 | 9 | see what we can come up with. |
| 3:36:51 | 10 | MR. RIOPELLE:  We sent it to them.  They've had it. |
| 3:36:53 | 11 | THE COURT:  Well, show it to them again. |
| 3:36:55 | 12 | MR. SCHWARTZ:  They sent it to us last night, Your |
| 3:36:56 | 13 | Honor.  They're trying to use a declaration -- |
| 3:36:59 | 14 | THE COURT:  That's when I want them to give it to you |
| 3:37:01 | 15 | is the night before when they know they're going to bring it up. |
| 3:37:04 | 16 | Now the question is, is that something that you've seen and if |
| 3:37:08 | 17 | so, can we agree that this is something that they could bring in |
| 3:37:14 | 18 | that way.  If they can, then let's go forward, not diddle around |
| 3:37:19 | 19 | with it.  Take a look at it and see if you can agree to it.  If |
| 3:37:22 | 20 | you can't, you can't and we'll have it proved up and then we'll |
| 3:37:27 | 21 | come back and we'll do it the long way.  That's fine. |
| 3:37:34 | 22 | MR. KERNELL:  Your Honor, we just saw this declaration |
| 3:37:37 | 23 | for the first time in this case last night that they're trying |
| 3:37:41 | 24 | to authenticate this page through some individual we've never |
| 3:37:44 | 25 | heard before, they've never disclosed, they're trying to use him |

|         |    |
|---------|----|
| 3:37:47 | 1  |
| 3:37:50 | 2  |
| 3:37:53 | 3  |
| 3:37:58 | 4  |
| 3:38:04 | 5  |
| 3:38:06 | 6  |
| 3:38:08 | 7  |
| 3:38:14 | 8  |
| 3:38:18 | 9  |
| 3:38:21 | 10 |
| 3:38:31 | 11 |
| 3:38:36 | 12 |
| 3:38:39 | 13 |
| 3:38:44 | 14 |
| 3:38:48 | 15 |
| 3:38:53 | 16 |
| 3:38:56 | 17 |
| 3:39:00 | 18 |
| 3:39:03 | 19 |
| 3:39:04 | 20 |
| 3:39:07 | 21 |
| 3:39:12 | 22 |
| 3:39:18 | 23 |
| 3:39:22 | 24 |
| 3:39:26 | 25 |

as an expert to bring this in.  This is an inadmissible hearsay, it's from -- you know, that they've had this -- some of these pages in this case for a while, but they haven't had anybody to even say who even pulled these pages from the Wayback Machine. We don't know what they're trying to show.  And so again --

THE COURT:  Okay.  Call your expert first.

MR. RIOPELLE:  Your Honor, it doesn't require an expert.  Under Rule 902.11, you can get -- and would you like a copy of the declaration, Your Honor?  I have one for you.

THE COURT:  Less than anything in the world.  I can read as well as anybody though.  As soon as I find my rules, I'll look at them.  I got every other rule except the evidence.

MR. KERNELL:  Your Honor, this exhibit was printed on January 18, 2019.  They've had it in their possession for three years, yet on the eve of trial we get this declaration from someone that we can't -- there's no way that we can figure out who this guy is.

THE COURT:  I don't really understand the objection, that they've had it for a long time and gave it to you the night before?

MR. KERNELL:  They've had this web page, this printout of the web page, since January 18, 2019.  All of a sudden on the eve of trial they try and bring it in to authenticate it by a declaration of some individual that's not named on their witness list, they're bringing it trying to authenticate it.

3:39:30   1          THE COURT:  How is it not 902.11?  Is that what you

3:39:32   2     said?  902.11?

3:39:33   3          MR. RIOPELLE:  Yes, Your Honor.

3:39:39   4          THE COURT:  How is it not 902.11?  It looks like it.

3:39:46   5          MR. KERNELL:  This was not an original copy of a

3:39:52   6     domestic record that -- it was in Sprint's --

3:39:54   7          THE COURT:  Let me see the copy that you're talking

3:39:58   8     about.  Is it a certified copy?  Give it to the court security

3:40:42   9     officer.  Sure looks like 902.11 to me.  Your objection, please

3:40:43  10     articulate it.

3:40:46  11          MR. KERNELL:  We were not given reasonable written

3:40:49  12     notice of intent to offer it to record and must be done and make

3:40:52  13     the record and certification available for inspection so that

3:40:55  14     the party has a fair opportunity to challenge it.  We have no

3:41:00  15     opportunity to challenge the individual who claimed that this is

3:41:04  16     a certified copy of this.  What's shown in the certified copy

3:41:07  17     does not even have the same -- I don't believe it has the same

3:41:13  18     website address at the bottom of the page that this does, that

3:41:16  19     is shown in Exhibit 34.

3:41:18  20          THE COURT:  I don't, even see a certification at the

3:41:35  21     bottom of the page.  I mean --

3:41:38  22          (Counsel conferring)

3:41:50  23          MR. KERNELL:  Yes, Your Honor.  If you look at the

3:41:54  24     certified copy, it actually does not match the copy of Exhibit

3:41:55  25     34.

```
3:41:59   1            THE COURT:  What's the difference?

3:42:01   2            MR. KERNELL:  There's a web address at the bottom of

3:42:07   3    the pages of Exhibit 34, and there's nothing that ties that same

3:42:16   4    web address to what's being certified here.  I mean, this is

3:42:19   5    just going through -- this as a cursory because again, we're

3:42:22   6    just getting this.

3:42:26   7            THE COURT:  Okay.  We'll recess for the day.  Take a

3:42:31   8    look at it, show them all what you're going to give them.

3:42:32   9            MR. RIOPELLE:  This is the only one, Your Honor.  I

3:42:36  10    would just say when you use the Wayback Machine, this is the

3:42:38  11    normal way that you do it.  It's done through these sort of

3:42:43  12    declarations, 902.11.  I would note they've got things that I

3:42:43  13    don't believe they've certified because they've not given us

3:42:45  14    Wayback certifications, but this is the way you normally do it.

3:42:52  15    And they've had the exhibit --

3:42:53  16            THE COURT:  34.

3:42:55  17            MR. RIOPELLE:  They've had the exhibit for a long time.

3:42:58  18    But as we knew we were going to use it, we gave them the

3:43:01  19    declaration last night.  I did not realize that it was going to

3:43:01  20    be --

3:43:02  21            THE COURT:  What is the difference between 34 and this

3:43:07  22    one?  You told me that there's a website cited somewhere.  No,

3:43:13  23    he said there was a difference.  What's the difference?

3:43:15  24            MR. KERNELL:  Do you have 34 up there?  Do you have a

3:43:17  25    copy of the certification?
```

| | | |
|---|---|---|
| 3:43:20 | 1 | MR. RIOPELLE:  I just gave it to you.  That's what you |
| 3:43:22 | 2 | have in your hand. |
| 3:43:23 | 3 | MR. KERNELL:  I'm asking Your Honor. |
| 3:43:24 | 4 | THE COURT:  Yes, I do. |
| 3:43:26 | 5 | MR. KERNELL:  If you look at the bottom of the page -- |
| 3:43:39 | 6 | well, the first page -- |
| 3:43:42 | 7 | THE COURT:  Are you talking about Exhibit A? |
| 3:43:44 | 8 | MR. KERNELL:  Yes, if you look at the first page of |
| 3:43:47 | 9 | Exhibit 34. |
| 3:43:52 | 10 | THE COURT:  I don't have Exhibit 34. |
| 3:43:53 | 11 | MR. KERNELL:  The first page of Exhibit A to the |
| 3:43:58 | 12 | examination, this says January 12, 2017 at the top of Exhibit |
| 3:43:59 | 13 | 34. |
| 3:44:01 | 14 | THE COURT:  Wait.  You told me to look at the bottom. |
| 3:44:05 | 15 | Now you're telling me to look at the top? |
| 3:44:07 | 16 | MR. KERNELL:  If you look at the top along the banner |
| 3:44:09 | 17 | for Wayback Machine. |
| 3:44:11 | 18 | THE COURT:  For the Wayback Machine, I see it. |
| 3:44:13 | 19 | MR. KERNELL:  It says -- it has the highlighted as July |
| 3:44:16 | 20 | 15, 2017.  Do you see that? |
| 3:44:17 | 21 | THE COURT:  Correct.  I see that. |
| 3:44:21 | 22 | MR. KERNELL:  If you look then at Exhibit 34, |
| 3:44:25 | 23 | THE COURT:  Well apparently I don't have Exhibit 34. |
| 3:44:27 | 24 | MR. KERNELL:  It's Plaintiff's Exhibit 34. |
| 3:44:30 | 25 | THE COURT:  I know it's Plaintiff's Exhibit 34.  I |

3:44:33  1    don't have Plaintiff's Exhibit 34.

3:44:35  2            MR. KERNELL:  It's on the monitor.  It was scrolled

3:44:37  3    down to the first page.

3:44:48  4            MR. RIOPELLE:  This is the page we're using though,

3:44:51  5    right?

3:44:54  6            MR. KERNELL:  Can we see the first page of Exhibit 34

3:44:57  7    on the monitor?  Yes.  So now on the first page of Exhibit 34

3:45:07  8    which should be the first page of the exhibit, it shows at the

3:45:15  9    top the highlighted date is January 12, 2017.  The certified

3:45:21  10   exhibit that is supposed to be certifying Exhibit 34, the date

3:45:29  11   is July 15, 2017.  It doesn't match.  At the bottom of -- if you

3:45:35  12   look at the bottom of what's marked as Plaintiff's Exhibit 34 --

3:45:37  13           MR. RIOPELLE:  Just to address that, Your Honor, the

3:45:41  14   January 12, 2017 page is the second to last one on the copy that

3:45:44  15   we just handed up.

3:45:58  16           THE COURT:  Yeah, I see it.  It's identical.

3:46:01  17           MR. KERNELL:  Your Honor, then if we go to the January

3:46:06  18   12, 2017 page, the second to the last page, if you look just

3:46:12  19   before -- below the Sprint logo on the left, on Exhibit 34 it

3:46:18  20   says Nextel Direct Connect circle R.  There is no such Nextel

3:46:28  21   Direct Connect on this page.  It does not have it in that --

3:46:31  22   right there.  No, it's not the same as what's shown on the

3:46:36  23   exhibit.  There are many inconsistencies between these two

3:46:42  24   exhibits and again, we just got this last night.  They've had it

3:46:48  25   for three years and yet, we couldn't have brought that up, we

3:46:51   1   couldn't have called this person, we couldn't find out why are

3:46:53   2   these two exhibits different.

3:46:56   3        THE COURT:  I don't think the rule contemplates calling

3:47:02   4   the person.  I think the rule contemplates that a registered

3:47:03   5   custodian --

3:47:05   6        MR. KERNELL:  The other objection here with this

3:47:08   7   exhibit is this is inadmissible hearsay.

3:47:15   8        THE COURT:  I thought that 902.11 takes it out of

3:47:20   9   hearsay.  Evidence that is self-authenticating.

3:47:23  10        MR. KERNELL:  But the documents do not match.

3:47:27  11        THE COURT:  This is the document that they're offering.

3:47:31  12   It doesn't have to match anything.

3:47:35  13        MR. RIOPELLE:  May I also note, Your Honor, that this

3:47:38  14   authenticity objection is not an objection that they put on the

3:47:42  15   exhibit list at the time that we served on the final pretrial

3:47:46  16   order.  So this is -- we did this just because we were doing

3:47:50  17   belts and suspenders.  Now they're making it -- I think they're

3:47:53  18   making it an issue because we did give them the belt and the

3:47:55  19   suspenders.

3:47:59  20        THE COURT:  Okay.  Tell you what I'm going to do.  I'm

3:48:02  21   going to send the jury home, I'm going to let you show them

3:48:05  22   whatever the heck you got, and I'm going to let them look at

3:48:08  23   whatever you've got and tomorrow, I want you to give me cogent

3:48:12  24   arguments as to why something is either admissible or

3:48:16  25   inadmissible and I will rule.  But I don't want to hear about --

3:48:19  1   show them whatever you're going to be showing in evidence, give

3:48:22  2   them everything so that I don't want to hear tomorrow that, or

3:48:27  3   the next day, that gee, we've only had this since last night.  I

3:48:30  4   just remember having been a trial lawyer, many late nights that

3:48:34  5   I spent looking at exhibits that I was given the night before.

3:48:38  6   That goes with the territory.  Deal with it.  The bottom line is

3:48:42  7   I don't want the jury to be sitting around twiddling their

3:48:49  8   thumbs.  This is starting to look like the official review in an

3:48:53  9   NBA basketball game where if you go to the emergency room you

3:48:56  10  can always say call the NBA, they owe me at least another month

3:49:01  11  of life that I have wasted sitting around for people to argue

3:49:04  12  about the same thing, and then at the end they come to the same

3:49:05  13  conclusion.

3:49:14  14          Looks to me like 902.11 says that the original or copy

3:49:21  15  that meets Rule 803(6) A to C requirements as shown by

3:49:26  16  certification of custodian.  Now, I suspect that they could get

3:49:30  17  in the 34 through another mean, but I don't really want to get

3:49:32  18  into that, and I certainly don't want to be sitting here letting

3:49:38  19  the jury mess around the whole time.  I will be ready to argue

3:49:43  20  this tomorrow morning at 9:30 and I'll ask the jury to come back

3:49:50  21  at 10.  But we've already shot half a day and that doesn't make

3:49:51  22  any sense.

3:49:55  23          Call the jury back in.  I'm going to send them home.

3:50:03  24          (Jury in at 3:49 p.m.)

3:51:19  25          THE COURT:  You all can be seated please.  All right.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 3:51:22 | 1 | Ladies and gentlemen, we've come up with an evidentiary |
| 3:51:27 | 2 | question that requires a little bit of research.  There's one |
| 3:51:29 | 3 | thing that I really do not like is having you hang around just |
| 3:51:33 | 4 | waiting.  Doesn't make any sense.  You probably have much better |
| 3:51:36 | 5 | things to do than sit in the jury room and talk to each other. |
| 3:51:41 | 6 | So I'm going to send you home for the day, and tomorrow morning |
| 3:51:44 | 7 | we're going to have our legal argument at 9:30 which means that |
| 3:51:48 | 8 | you can come back at 10:00.  We'll have it resolved by then.  So |
| 3:51:52 | 9 | I need you to come back and be here at 10:00 in the jury room. |
| 3:51:55 | 10 | And remember that if you're late, everybody else is going to |
| 3:52:01 | 11 | have 40 people waiting on you.  Okay?  It's not as simple.  Now, |
| 3:52:06 | 12 | if it rains that means all the New Yorkers are going to go |
| 3:52:09 | 13 | crazy, and I know it will take you a while.  But if you wake up |
| 3:52:12 | 14 | and it's raining, leave early because otherwise we have come to |
| 3:52:16 | 15 | the conclusion that Florida drivers cannot drive in the rain. |
| 3:52:21 | 16 | Just like Washington, DC in the very light snow.  So I ask you |
| 3:52:26 | 17 | to please go home, rest up, come back at 10:00 ready to go. |
| 3:52:29 | 18 | We're going to try to push it tomorrow and get more done. |
| 3:52:31 | 19 | Because this is not great. |
| 3:52:37 | 20 | And let me just explain to you that when you leave, in |
| 3:52:41 | 21 | the courthouse please wear your juror badges because that's |
| 3:52:44 | 22 | important.  The lawyers will see it and recognize it.  When you |
| 3:52:46 | 23 | walk out the door, sorry to report to you there's all sorts of |
| 3:52:50 | 24 | weirdoes walking around downtown so take it off, because |
| 3:52:53 | 25 | otherwise somebody is liable to start explaining to you |

3:52:56  1    something that you have absolutely no interest in and has

3:53:00  2    nothing to do with this case because they see that you're a

3:53:03  3    juror.  So take it off and put it in your pocket until you come

3:53:06  4    back in the morning and put it on when you come in the door.

3:53:06  5    All right?

3:53:11  6          Now, I just read this to you so I'm not going to read

3:53:14  7    it all to you again, but you're reminded that you're not to

3:53:16  8    discuss the case with anyone or permit anyone to discuss it with

3:53:19  9    you.  Don't read or listen to anything touching on the case.

3:53:21  10   Don't do any research or make any investigation on your own.

3:53:26  11   Don't have any contact with the attorneys, parties or witnesses.

3:53:28  12   Don't form any opinion about this case until all the evidence is

3:53:30  13   in.

3:53:32  14         We'll see you tomorrow morning, thank you very much,

3:53:35  15   good night.

3:53:37  16              COURT SECURITY OFFICER:  All rise for the jury.

3:53:41  17              (Jury out at 3:53 p.m.)

3:53:47  18              THE COURT:  You may go.  There are no reserved seats.

3:53:52  19   Whoever gets in first should go to the last seat so you're not

3:53:56  20   bumping into each other.

3:54:04  21         All right, sir.  Since you're on the stand, you're not

3:54:07  22   permitted to discuss your testimony with anyone, even the

3:54:10  23   lawyers.  So we'll be in recess until tomorrow morning at 10

3:54:11  24   a.m.

3:54:14  25         Yes, sir.  I mean 9:30 for us.  Yes, sir.

| 3:54:17 | 1 | MR. RIOPELLE:  Just so we are doing exactly what the |

3:54:17   1        MR. RIOPELLE:  Just so we are doing exactly what the
3:54:21   2   Court wants us to do, you want us to make sure -- so we have
3:54:28   3   obviously the list of objections that they made so we know what
3:54:31   4   we're going to use for various witnesses tomorrow.  I assume we
3:54:36   5   should send them tonight.  These are the exhibits that we plan
3:54:39   6   to use tomorrow to which you have an objection, let's see if we
3:54:40   7   can work this out.
3:54:42   8        THE COURT:  And here's why your objection is no good,
3:54:45   9   and here's why we think it's admissible and then let them be
3:54:49  10   ready to make the objection, and I will rule on the objections
3:54:49  11   tomorrow.
3:54:52  12        MR. RIOPELLE:  Right.  So that's for anybody we think
3:54:55  13   we're going to put on tomorrow, not just Mr. Kaplan obviously.
3:54:56  14        THE COURT:  Right.
3:54:57  15        MR. RIOPELLE:  We'll take care of that.
3:54:59  16        THE COURT:  Any exhibits that you believe are going to
3:55:02  17   be admitted tomorrow, that you're going to offer for admission
3:55:05  18   tomorrow, then tomorrow afternoon when we quit, give them the
3:55:09  19   stuff for the next day.  All right?
3:55:11  20        MR. RIOPELLE:  We did some of this last night so we've
3:55:15  21   got a procedure and we'll continue to do it.
3:55:17  22        THE COURT:  And talk about this one, see if you can
3:55:20  23   work it out.  If you can't that's all right, I'll deal with it.
3:55:21  24   Okay?
3:55:24  25        We'll be in recess until tomorrow.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

3:55:25 1          MR. RIOPELLE:  I'm sorry.  One other issue just to

3:55:30 2   raise so we can address it tomorrow is that they have now

3:55:39 3   several times represented to this Court and to the jury that

3:55:43 4   Mr. Rivera is going to be testifying.  Mr. Rivera has never been

3:55:47 5   identified as a witness on any witness list, on any initial

3:55:49 6   disclosures.  The first time they told us Mr. Rivera was going

3:55:53 7   to be a witness was Friday at the meet and confer after the

3:55:57 8   calendar call.  I just want to raise this because I think we

3:56:01 9   should -- I should raise it so they can think about it tonight

3:56:03 10  and we can argue it tomorrow.

3:56:04 11         THE COURT:  We can deal with it tomorrow.

3:56:06 12         MR. RIOPELLE:  Okay.  I just want to let you know that

3:56:07 13  it was on.

3:56:11 14         THE COURT:  Apparently Mr. Rivera is not going to be a

3:56:13 15  willing participant in this.  Okay?  We'll work on it.  We'll

3:56:17 16  work it out.  All right?  Good night.

3:56:20 17         MR. SCHWARTZ:  Good night, Your Honor.

3:56:20 18         (See Volume 2 dated 4-12-2022 for continuation)

3:56:20 19

3:56:20 20         **C E R T I F I C A T E**

3:56:20 21  I certify that the foregoing is a correct transcript from the
            record of proceedings in the above-entitled matter.

3:56:20 22  4/11/2022_____        /s/ Dawn M. Savino, R.P.R., C.R.R.
            Date                    DAWN M. SAVINO, R.P.R., C.R.R.

3:56:20 23

3:56:20 24

3:56:20 25         **I N D E X**

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
3:56:20   1                        WITNESSES

3:56:20   2    ALL WITNESSES:                                PAGE:

3:56:20   3    For Plaintiff:

3:56:20   4       Jeffrey Kaplan:
                    Direct Examination by Mr. Riopelle        57:21
3:56:20   5                         EXHIBITS

3:56:20   6    None

3:56:20   7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**