**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO.  18-cv-60788-JEM**

**SPRINT COMMUNICATIONS, INC.,**

    Plaintiff/Counterclaim Defendant,

    vs.

                                Miami, Florida
                                April 12, 2022
**STEPHEN CALABRESE,** as an individual,   Pages 1-203
**NEXTEL, INC.,** d/b/a **NEXTEL WORLDWIDE,**  9:49 a.m. - 12:00 p.m.
**RETROBRANDS USA LLC,**                 1:15 p.m. - 4:45 p.m.
**JEFFREY KAPLAN,** as an individual, and
**NEXTEL WORLDWIDE MOBILE, INC.,**

    Defendants/Counterclaimants.

_____

**TRANSCRIPT OF JURY TRIAL**
**VOLUME 2**
**BEFORE THE HONORABLE JOSE E. MARTINEZ**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:**
                *McGuireWoods, LLP*
                BY:  **BRIAN C. RIOPELLE, ESQ.**
                BY:  **LUCY J. WHEATLEY, ESQ.**
                BY:  **AMANDA L. DeFORD, ESQ.**
                800 East Canal Street
                Richmond, Virginia 23219

**FOR THE DEFENDANTS/COUNTERCLAIMANTS:**
                *Erickson Kernell IP*
                BY:  **JAMES J. KERNELL, ESQ.**
                8900 State Line Road
                Suite 500
                Leawood, Kansas 66206

                *Lee & Amtzis, PL*
                BY:  **WAYNE SCHWARTZ, ESQ.**
                5550 Glades Road
                Boca Raton, Florida 33431

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

REPORTED BY:        DAWN M. SAVINO, R.P.R., C.R.R.
1                   Official Federal Court Stenographer
2                   400 N. Miami Avenue, 10S03
                    Miami, Florida  33128
3                   Telephone:  305-523-5598

4

9:49:14   5              THE COURT:  I apologize.  I just got here and got

9:49:15   6    changed.  All parties are present?  Okay.  Let's talk then.

9:49:19   7    Have you been able to resolve the evidentiary issues?  If not,

9:49:20   8    tell me what the issues are.

9:49:24   9              MR. RIOPELLE:  We made actually progress last night,

9:49:25  10    but we have two exhibit issues.

9:49:27  11              THE COURT:  Okay.  Tell me.

9:49:29  12              MR. RIOPELLE:  The first one is the one we were

9:49:32  13    discussing yesterday, when we left yesterday, Exhibit 34 which

9:49:36  14    has the authentication, and we have not been able to reach

9:49:37  15    agreement on that one.

9:49:38  16              THE COURT:  Now, tell me what the difference is between

9:49:42  17    the 34 that you gave them and the exhibit that you're offering

9:49:42  18    into evidence right now.

9:49:44  19              MR. RIOPELLE:  I don't believe there's any difference,

9:49:45  20    Your Honor.

9:49:46  21              THE COURT:  When you showed me there was something that

9:49:52  22    showed Nextel, looked like either a stamp or something in the

9:49:55  23    upper left-hand corner of one of the pages.

9:50:00  24              MR. RIOPELLE:  I'll say if it makes it easier for the

9:50:03  25    Court, we're happy to use what's attached to the declaration.

| 9:50:06 | 1 | THE COURT:  Okay. |
| 9:50:08 | 2 | MR. SCHWARTZ:  I'll make it simpler, Your Honor. |
| 9:50:11 | 3 | There's two pages that do not match and there's a page, the last |
| 9:50:14 | 4 | page is not in the declaration exhibit at all, it should |
| 9:50:18 | 5 | probably just come out.  That's the last page.  The issue is not |
| 9:50:22 | 6 | over the document.  We're happy to let the Wayback document in, |
| 9:50:25 | 7 | but the Defendants have a Wayback document.  We simply ask |
| 9:50:30 | 8 | counsel because it's going to probably be used today, just if |
| 9:50:34 | 9 | you have any objection to our Wayback document.  He says he has |
| 9:50:38 | 10 | an objection to our Wayback document. |
| 9:50:41 | 11 | THE COURT:  There's no quid pro quo kind of thing, you |
| 9:50:45 | 12 | can object to one of them and not the other.  You know, there's |
| 9:50:49 | 13 | no holding another exhibit hostage.  We have to deal with each |
| 9:50:56 | 14 | of them as they go.  Let's just deal with this one as it is. |
| 9:51:02 | 15 | Whatever it is, it is.  Tell me what the pages are that you're |
| 9:51:03 | 16 | questioning and why. |
| 9:51:05 | 17 | MR. SCHWARTZ:  Your Honor, we'll withdraw the objection |
| 9:51:06 | 18 | on 34. |
| 9:51:09 | 19 | THE COURT:  Okay.  So the 34 that they are offering |
| 9:51:14 | 20 | which is the one with the declaration of Nathaniel E. Frank |
| 9:51:14 | 21 | White. |
| 9:51:16 | 22 | MR. SCHWARTZ:  It's the actually 34 that's been |
| 9:51:23 | 23 | submitted in their book can be shifted over to a nonobjectional |
| 9:51:24 | 24 | exhibit. |
| 9:51:28 | 25 | THE COURT:  Okay.  Let me see which document you're |

```
9:51:32   1    talking about.  Show it to him and then show it to me.
9:51:37   2            MR. RIOPELLE:  Can you call up Exhibit 34, Carl?  We
9:51:39   3    have it on the screen.
9:51:41   4            THE COURT:  Yeah, I can see it.
9:51:42   5            MR. SCHWARTZ:  That's the one, Your Honor.
9:51:45   6            MR. RIOPELLE:  I'll be honest, Your Honor, I'm only
9:51:50   7    going ask him, I believe it's on Page 7.
9:51:52   8            THE COURT:  All right.  This is the one you're
9:51:53   9    withdrawing the objection to?
9:51:53  10            MR. SCHWARTZ:  Yes, Your Honor.
9:51:55  11            THE COURT:  Okay.  Then it's going to be admitted.
9:51:55  12            (Plaintiff's Exhibit 34 in evidence)
9:51:57  13            THE COURT:  What else do we have that's going to be
9:52:00  14    coming up today, exhibits, so that we can deal with them without
9:52:04  15    the jury sitting around twiddling their thumbs?
9:52:06  16            MR. RIOPELLE:  Exhibit 95, Your Honor.
9:52:08  17            THE COURT:  All right.  I'm going to be writing them
9:52:11  18    down.  So 34, 95.
9:52:16  19            What is the objection to 95, if there is any?
9:52:20  20            Wait.  I'm waiting for -- is there an objection to 95.
9:52:22  21            MR. SCHWARTZ:  There is, Your Honor.  The way they want
9:52:23  22    to present it.
9:52:27  23            THE COURT:  Okay.  What do you mean by that?
9:52:28  24            MR. KERNELL:  Your Honor, Exhibit 95, it's an e-mail
9:52:34  25    from Mr. Mancuso to someone at Sprint and it refers -- there are
```

9:52:40   1   three attachments, image attachments to Exhibit 95 and that's

9:52:51   2   the way it was produced.  And counsel for Sprint wants to remove

9:52:57   3   two of the images that were part of Exhibit 95.  We believe that

9:53:02   4   it is improper to remove those.  If you're going the use this

9:53:06   5   e-mail as an exhibit, it needs to be in its entirety, including

9:53:07   6   the attachments.

9:53:12   7          Now, the issue there is that the two images that they

9:53:18   8   want to remove refer to a letter, the letter from Mr. Rubin to

9:53:24   9   Mr. Calabrese regarding whether or not he is authorized or

9:53:29  10   should be authorized to use the Nextel trademark.

9:53:48  11          THE COURT:  The 95 that I have only has two pages.  The

9:53:54  12   one page has about ten lines of print on it, it's from

9:54:01  13   Green-Kerr Kimberly to Mike Allen, and then it has redacted

9:54:05  14   something, and then it has original message from Brian Mancuso

9:54:13  15   to Amy Rintamaki, and then the next page is an upside down

9:54:15  16   illustration of something.

9:54:17  17          MR. RIOPELLE:  Your Honor, I have a copy for you of the

9:54:22  18   original that has the attachments that we have removed and their

9:54:23  19   objection to us removing them.

9:54:54  20          THE COURT:  Okay.  Okay.  I presume they'll be shown

9:55:20  21   right-side up.  And this is the stuff that was allegedly shown

9:55:24  22   to the representative of Sprint when they went over to question

9:55:26  23   the booth; is that correct?

9:55:28  24          MR. RIOPELLE:  Yes, he took a picture of it, Your

9:55:29  25   Honor.

6

| | | |
|---|---|---|
| 9:55:31 | 1 | THE COURT:  That's his thumb in it? |
| 9:55:32 | 2 | MR. RIOPELLE:  What's that? |
| 9:55:34 | 3 | THE COURT:  That is his thumb in the picture? |
| 9:55:34 | 4 | MR. RIOPELLE:  Probably. |
| 9:55:35 | 5 | THE COURT:  Yes.  Okay. |
| 9:55:37 | 6 | MR. RIOPELLE:  The reason we removed it, Your Honor, |
| 9:55:40 | 7 | just so you know is because this was the subject of a motion in |
| 9:55:44 | 8 | limine, and you ruled that was inadmissible.  And so we took |
| 9:55:47 | 9 | those out pursuant to your motion in limine and are only doing |
| 9:55:52 | 10 | the cover e-mail.  And the other -- |
| 9:55:54 | 11 | THE COURT:  Yeah, I mean you want those in now?  Is |
| 9:55:56 | 12 | that what you're saying? |
| 9:55:57 | 13 | MR. RIOPELLE:  Do I want them? |
| 9:56:00 | 14 | THE COURT:  No, do they want them in now? |
| 9:56:02 | 15 | MR. KERNELL:  Your Honor, that was our defense. |
| 9:56:07 | 16 | They're using this as a sword, this is their exhibit.  If they |
| 9:56:11 | 17 | want their exhibit in, that is part of their exhibit, that is |
| 9:56:14 | 18 | part of the e-mails.  They can't pick and choose. |
| 9:56:17 | 19 | THE COURT:  To the contrary, you can't pick and choose. |
| 9:56:19 | 20 | You can't say that's advice of counsel therefore it's |
| 9:56:22 | 21 | inadmissible, and now you're saying that you want it to be |
| 9:56:27 | 22 | included because it obviously has language that's good for you |
| 9:56:30 | 23 | saying it's okay to use this Nextel thing.  No.  I think they |
| 9:56:32 | 24 | can delete that. |
| 9:56:33 | 25 | MR. KERNELL:  Your Honor, if I may, this is their |

| | | |
|---|---|---|
| 9:56:38 | 1 | exhibit, not our exhibit.  This is Plaintiff's Exhibit. |
| 9:56:39 | 2 | THE COURT:  I understand that. |
| 9:56:41 | 3 | MR. KERNELL:  We're not trying to offer this exhibit. |
| 9:56:45 | 4 | This is their exhibit, it's incomplete.  If they get to choose |
| 9:56:46 | 5 | what attachments -- |
| 9:56:49 | 6 | THE COURT:  No.  You guys objected under advice of |
| 9:56:52 | 7 | counsel that this was something that should not be included. |
| 9:56:55 | 8 | MR. SCHWARTZ:  No, that's the Plaintiff, Your Honor. |
| 9:56:57 | 9 | MR. KERNELL:  Plaintiff did.  Not defense. |
| 9:56:59 | 10 | THE COURT:  Okay.  You objected to advice of counsel? |
| 9:57:01 | 11 | MR. KERNELL:  They objected to advice of counsel. |
| 9:57:05 | 12 | Plaintiff objected to advice of counsel in the actual letter |
| 9:57:09 | 13 | that we submitted which is -- we have a very clean copy of that |
| 9:57:14 | 14 | same letter and they said no, you cannot use that as an exhibit. |
| 9:57:14 | 15 | THE COURT:  Okay. |
| 9:57:18 | 16 | MR. KERNELL:  They have designated this exhibit for |
| 9:57:22 | 17 | their own case, yet they want to remove certain pages out of it |
| 9:57:27 | 18 | that Mr. Mancuso's thumb is on and that he submitted to |
| 9:57:32 | 19 | Plaintiff.  So this is Plaintiff's Exhibit, but they want to not |
| 9:57:37 | 20 | use all the story of that exhibit. |
| 9:57:40 | 21 | THE COURT:  Well, I can understand why they would not |
| 9:57:48 | 22 | want to use a letter from your lawyer addressing one of the main |
| 9:57:50 | 23 | issues in this case.  And I don't know that they need to do |
| 9:57:54 | 24 | that.  I don't think that that makes it inadmissible.  I think |
| 9:58:00 | 25 | that -- what is it you want to introduce, the first page? |

9:58:02  1          MR. RIOPELLE:  The first page, and we were going to

9:58:07  2     introduce that the other image but we can take that image off.

9:58:10  3          THE COURT:  The other image which is the upside down

9:58:19  4     picture of this image.  Notify in the upper right-hand corner.

9:58:22  5          MR. RIOPELLE:  Yes, we can take that.

9:58:26  6          THE COURT:  M370 mobile radio, features and

9:58:28  7     specifications?

9:58:31  8          MR. RIOPELLE:  Yes, we can take that off.  The reason

9:58:35  9     we're putting it in is for the e-mail in the first page.  Like I

9:58:37  10    said, we removed the other two pages pursuant to this Court's

9:58:41  11    ruling on the motion in limine.

9:58:44  12         THE COURT:  Okay.  I'll overrule the objection as to

9:58:50  13    95.  It is admissible, it will be admitted as 95.

9:58:50  14         (Plaintiff's Exhibit 95 in evidence)

9:58:51  15         THE COURT:  What else we got?

9:58:53  16         MR. RIOPELLE:  The next issue, Your Honor, has to do

9:58:59  17    with playing the excerpts from the deposition of Mr. Calabrese

9:59:03  18    which we would expect to do late this morning.

9:59:04  19         THE COURT:  Okay.

9:59:08  20         MR. RIOPELLE:  We are ready to go.  They are objecting

9:59:12  21    -- I understand they're objecting to it because we will not play

9:59:20  22    their part, their affirmative designations in it.  They're not

9:59:23  23    counters, they didn't submit them to us as counters, they

9:59:26  24    submitted them to us as affirmative designations.  I take the

9:59:30  25    Court's admonishment on Friday to try to get this down.  We have

9:59:37  1  cut that -- our tape to it's about 15 minutes.  What they've

9:59:41  2  given us as affirmative designations would make it a little over

9:59:46  3  an hour, we believe, we have not cut that.  I am -- I understand

9:59:49  4  they're dealing with a problem because Mr. Calabrese is not

9:59:53  5  here.  I believe the rules provide that they cannot play

9:59:58  6  Mr. Calabrese's deposition because a party has made himself

10:00:04  7  unavailable.  I am willing to compromise.  If they want to play

10:00:09  8  Mr. Calabrese's deposition in their case, they can do that, but

10:00:13  9  they can't do it in my case when they haven't given me counters.

10:00:16  10          THE COURT:  If it is a counter-designation, I will rule

10:00:21  11  on whether it is in fact a proper counter-designation.  If it is

10:00:24  12  a designation of your own, then you have to present it during

10:00:27  13  your case, not at this point.

10:00:29  14          MR. RIOPELLE:  And if you would like to see --

10:00:30  15          THE COURT:  I guess I'll have to see.

10:00:32  16          MR. RIOPELLE:  I just want to show you how they

10:00:38  17  submitted it to us.  As Your Honor probably knows, on your

10:00:41  18  pretrial order you have a form attached that shows how you're

10:00:44  19  supposed to do them.  This is what they sent us.  They listed

10:00:45  20  them as designations.

10:00:50  21          THE COURT:  Show it to -- give to the court security

10:00:56  22  officer so he can show me.  Yeah, don't give him stuff

10:01:01  23  commenting on the quality of the judge.  That's not good.

10:01:32  24          Okay.  Here you go, Jose.  Those appear to be

10:01:35  25  designations which means you play them in your case.  They are

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:01:41 | 1  | not counter-designations or designations that are added to these |
| 10:01:45 | 2  | -- okay?  You play them in your case.                        |
| 10:01:47 | 3  | MR. KERNELL:  Your Honor, in fact every designation we       |
| 10:01:51 | 4  | made was a counter-designation to -- we didn't plan on       |
| 10:01:57 | 5  | Mr. Calabrese not being here.  We didn't do designations at all |
| 10:02:02 | 6  | to begin with.  It was because Sprint did designations, then we |
| 10:02:06 | 7  | did our counter-designations.  Whether or not they're in the |
| 10:02:09 | 8  | right column or not, we did them as counter-designations.    |
| 10:02:13 | 9  | Mr. Calabrese didn't choose not to be here, he's not here    |
| 10:02:20 | 10 | because he is checked into a mental health facility.  So it  |
| 10:02:22 | 11 | wasn't that he --                                            |
| 10:02:25 | 12 | THE COURT:  I have no idea what his mental health is, I      |
| 10:02:30 | 13 | have no idea why he is in whatever he facility he's in, and  |
| 10:02:35 | 14 | frankly it's of little moment to me.  But what concerns me is |
| 10:02:42 | 15 | he's not here and, you know, I'm kind of used to it in criminal |
| 10:02:46 | 16 | cases people showing up for sentencing in wheelchairs because |
| 10:02:51 | 17 | all of a sudden they've gotten really, really sick.  I've been |
| 10:02:56 | 18 | familiar in civil cases where people get sick when it's time for |
| 10:03:02 | 19 | the trial.  I don't know why he's there, I don't know anything |
| 10:03:05 | 20 | about it and I don't really feel like I got time to look into |
| 10:03:11 | 21 | all of that.  All I'm saying is he's not here, his deposition is |
| 10:03:17 | 22 | legally to be entered into.  The Plaintiff has designated, you |
| 10:03:21 | 23 | have designated, you can designate and introduce it.  I'm not |
| 10:03:25 | 24 | sure under what rule, but I believe -- you know, they've      |
| 10:03:28 | 25 | offered, they said they don't care if you designate it in your |

10:03:32  1    case.  So that's when it will come in.  All right?  Move on.

10:03:34  2         What else we got?

10:03:35  3         MR. RIOPELLE:  One follow-up issue on Mr. Calabrese.

10:03:42  4    This Court had ruled that we could inform the jury after he has

10:03:46  5    testified that he is a felon.  I don't know how the Court wants

10:03:46  6    us to do that.

10:03:49  7         THE COURT:  Well if you're designating, you want -- you

10:03:54  8    know, you want to offer some of his testimony, the intent of my

10:03:59  9    ruling was that if there is some reason for the jury to

10:04:02  10   disregard some of his testimony or to consider it cautiously

10:04:06  11   because he is a convicted felon, you can do that.  But I don't

10:04:11  12   think you can prop him up and then say by the way, he's a

10:04:14  13   convicted felon, because that then gets into the area where

10:04:19  14   we're talking about, you know, he did -- he did some bad things

10:04:24  15   once, therefore he probably did bad things other times.  That's

10:04:27  16   not admissible.  The purpose of showing that he's a convicted

10:04:31  17   felon is to cast doubt on his testimony.  If you're offering his

10:04:35  18   testimony, I don't really see that as a possibility.

10:04:38  19        Now, on the other hand if they offer his testimony,

10:04:41  20   then you can introduce the fact that he's is a convicted felon

10:04:46  21   and say you don't have to believe what he says because he is a

10:04:49  22   convicted felon.  That's the purpose of the convicted felon.  So

10:04:52  23   I don't think you can introduce it after you offer the

10:04:53  24   testimony.

10:04:56  25        MR. RIOPELLE:  That's fine.  So why -- we'll revisit it

10:04:57   1   if and when --

10:04:59   2          THE COURT:  If they offer his testimony, then I think

10:05:03   3   you can -- you can offer it.

10:05:05   4          MR. RIOPELLE:  So the last issue that we have this

10:05:11   5   morning, and I will tell you Your Honor because I know we've got

10:05:12   6   a jury waiting.

10:05:14   7          THE COURT:  Maybe.  I haven't looked.

10:05:16   8          MR. RIOPELLE:  This may not be an issue that has to be

10:05:20   9   decided this morning, but it's the issue whether -- they've now

10:05:24   10  told us that Mr. Rivera is going to be a witness.  We have

10:05:28   11  submitted a bench memo this morning to Your Honor.  I can go

10:05:31   12  through the argument why he should not be allowed to be a

10:05:33   13  witness, but I don't know if you want to decide that now or not.

10:05:36   14         THE COURT:  No, because I haven't even seen your bench

10:05:40   15  memo yet.  I was undergoing torture on the table at the time

10:05:42   16  that you submitted your bench memo.

10:05:45   17         MR. RIOPELLE:  But you said it made you feel better

10:05:45   18  though.

10:05:48   19         THE COURT:  In a couple of days it will.  Not right

10:05:48   20  now.

10:05:58   21         Okay.  All right.  Can we see if the jurors are all

10:06:01   22  here, Diane?  Can you come tell me please?  They have

10:06:19   23  microphones in there.  Allie or Cristina, can you please go

10:06:37   24  check on the jury and see what the status is?  They're going to

10:06:47   25  check.  It would not be unusual at 10:04 for somebody to not be

```
10:06:49    1    here yet.
10:06:50    2            COURT SECURITY OFFICER:  Your Honor, everybody is here.
10:06:53    3            THE COURT:  All right.  Please bring in the jury.
10:06:54    4            COURT SECURITY OFFICER:  All rise for the jury.
10:07:00    5            THE COURT:  And the gentleman that was on the stand,
10:07:05    6    please come back to take the stand.  Just hold him up while
10:07:07    7    they're coming in though.
10:07:09    8            COURT SECURITY OFFICER:  Yes, sir.
10:07:16    9            (Jury in at 10:07 a.m.)
10:07:41   10            THE COURT:  You all can be seated please.
10:07:58   11            You're reminded, sir, that you're still under oath.
10:07:59   12            THE WITNESS:  Yes, sir.
10:07:59   13                        CONTINUED DIRECT EXAMINATION
10:07:59   14        BY MR. RIOPELLE:
10:08:05   15    Q.  Carl, can you call up Exhibit 34 please?  And could you go
10:08:15   16    to Page 7?  And just so to get everybody back on the same page,
10:08:19   17    Mr. Kaplan, this was the document we were looking at yesterday
10:08:20   18    before we recessed?
10:08:22   19    A.  Correct.
10:08:27   20    Q.  And you had agreed that the date of this was approximately
10:08:32   21    the time that you were investigating the Nextel brand?
10:08:37   22    A.  No, that's incorrect.  I was investigating in January 2018.
10:08:41   23    This is dated April 262,018.
10:08:47   24    Q.  We'll let it the record -- have what the jury remembers and
10:08:51   25    what the record shows, but yesterday I believe you did agree to
```

| | | |
|---|---|---|
| 10:08:52 | 1 | it actually.  Do you see here on the top of this page -- you |
| 10:08:55 | 2 | agree, right, that this is a Sprint website. |
| 10:09:00 | 3 | A.  It may be.  It says Sprint, but it hasn't been |
| 10:09:03 | 4 | authenticated. |
| 10:09:05 | 5 | Q.  Mr. Kaplan -- |
| 10:09:06 | 6 | A.  Yes. |
| 10:09:08 | 7 | Q.  -- you know it's been authenticated, you were sitting in |
| 10:09:11 | 8 | this courtroom just a couple minutes ago. |
| 10:09:16 | 9 | A.  Again, this is dated April 26, 2018.  My investigation was |
| 10:09:19 | 10 | in January 2018. |
| 10:09:22 | 11 | Q.  Like I said, we'll let the jury remember what you said |
| 10:09:22 | 12 | yesterday. |
| 10:09:27 | 13 | Do you see that it says at the top of this Nextel |
| 10:09:27 | 14 | Direct Connect? |
| 10:09:29 | 15 | A.  Yes. |
| 10:09:36 | 16 | Q.  And Carl, if you could page down a bit?  No, sorry, same |
| 10:09:37 | 17 | page, Carl, just further down. |
| 10:09:41 | 18 | Do you see in the descriptions that, for example, it |
| 10:09:45 | 19 | says "direct send", at the very bottom there Carl, if you could |
| 10:09:48 | 20 | highlight that for Mr. Kaplan? |
| 10:09:49 | 21 | A.  Okay.  I see that. |
| 10:09:52 | 22 | Q.  You see it says "use Nextel phones". |
| 10:09:53 | 23 | A.  Yes, I see that. |
| 10:09:56 | 24 | Q.  All right.  So you see that Nextel is being used on a Sprint |
| 10:09:58 | 25 | website in April of 2018, right? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:10:03   1    A.  Again, it appears to be.  It may be, but I'm not 100% sure

10:10:06   2    because I didn't look at it in this time frame.

10:10:07   3    Q.  And that's the point, isn't it?  You were doing

10:10:10   4    investigation but you didn't look at the website, did you?

10:10:15   5    A.  I did in January -- Nextel.com was shut down.  My

10:10:19   6    investigation was in January 2018 before I filed my petition to

10:10:22   7    cancel and before I filed my application.

10:10:27   8    Q.  Okay.  Can we go to Exhibit 47, Carl?

10:10:30   9            MR. RIOPELLE:  Oh Your Honor, this is unobjected to so

10:10:31  10    we move it into evidence.

10:10:34  11            THE COURT:  All right.  Exhibit 47 is admitted in

10:10:36  12    evidence without objection.

10:10:39  13            MR. RIOPELLE:  As well as Exhibit 34.

10:10:47  14            THE COURT:  34, 47 and 97 are admitted in evidence.

10:10:47  15            (Plaintiff's Exhibit 34, 47 & 97 in evidence)

10:10:48  16            MR. RIOPELLE:  Thank you, Your Honor.

10:10:48  17        BY MR. RIOPELLE:

10:10:52  18    Q.  You see I've put up another part of a Sprint website, do you

10:10:52  19    see this?

10:10:53  20    A.  Yes, I see it.

10:10:56  21    Q.  Do you see in the bottom right-hand corner that this page

10:10:58  22    was printed in November of 2018?

10:11:03  23    A.  Correct.  That was seven, eight months after I did my

10:11:06  24    investigation in January 2018.

10:11:07  25            THE COURT:  Okay.  I know that there are certain things

10:11:10  1    you want to say.  Your lawyers will have an opportunity to ask
10:11:10  2    you questions.
10:11:11  3              THE WITNESS:  Yes, sir.
10:11:13  4              THE COURT:  And you can answer all that then.  But at
10:11:16  5    this point try to answer the questions, because I really do have
10:11:18  6    plans for Christmas.
10:11:20  7              THE WITNESS:  Okay.  Sorry, sir.
10:11:22  8              MR. RIOPELLE:  And Carl, if you could go to the second
10:11:24  9    page, please.
10:11:24  10         BY MR. RIOPELLE:
10:11:28  11   Q.   And do you see, Mr. Kaplan, on this page where there's a
10:11:33  12   question "will the Nextel push-to-talk chirp still be used when
10:11:36  13   placing a Sprint Direct Connect Plus call"?
10:11:37  14   A.   Yes, I see it.
10:11:41  15   Q.   And you see the answer is "yes, the familiar Nextel chirp
10:11:42  16   will still be used"?
10:11:44  17   A.   According to this image, yes.
10:11:46  18             MR. RIOPELLE:  And you can take that down now, Carl.
10:11:46  19         BY MR. RIOPELLE:
10:11:50  20   Q.   You also, I believe, searched the United States Patent and
10:11:53  21   Trademark Office website, correct?
10:11:54  22   A.   Correct.
10:11:59  23   Q.   And obviously you searched to see if there were any live
10:12:01  24   Nextel trademarks, right?
10:12:05  25   A.   Also correct.  I also looked up Direct Connect as well.

10:12:07  1   Q.  And you did this research in 2018?

10:12:08  2   A.  Correct.

10:12:13  3   Q.  And you saw, right, that there were live Nextel trademarks.

10:12:15  4   A.  Correct.

10:12:20  5   Q.  And one of those live marks was for the registration

10:12:24  6   1,884,244.  Right?

10:12:26  7   A.  Do you have an image of it?

10:12:41  8   Q.  We could.  I believe it is 165.  If you'd like to go to the

10:12:45  9   second page, Carl, so Mr. Kaplan can see it.

10:12:50  10  A.  Yes.  I did review this.  This states for two-way radios,

10:12:57  11  mobile telephones, dispatch radios, pagers and mobile data

10:12:59  12  receivers.  So I did see this, correct.

10:13:02  13  Q.  And this is one of the trademarks that's at issue in this

10:13:03  14  case right now, right?

10:13:05  15  A.  Yes, I claim it's abandoned.

10:13:08  16  Q.  And you went and looked at the maintenance filings, right?

10:13:09  17  A.  Yes.

10:13:12  18  Q.  And you saw that this registration, in fact, had been

10:13:14  19  renewed in 2015, right?

10:13:17  20  A.  Yes.  And that's where I discovered that fraudulent specimen

10:13:19  21  was attached.

10:13:24  22  Q.  And well, you know that Sprint sent in a picture of a box to

10:13:26  23  renew the registration, right?

10:13:27  24  A.  Yes, without a phone.

10:13:29  25  Q.  And you know that the United States Patent and Trademark

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:13:36  1   Office reviewed and accepted that as a proper example of how

10:13:38  2   Sprint was using the Nextel mark, right?

10:13:41  3   A.   Incorrect.   The examiners --

10:13:45  4   Q.   I'm not asking you what your opinion is.   I'm asking you you

10:13:48  5   know, because they renewed it, that the United States Patent and

10:13:52  6   Trademark Office accepted it and allowed the renewal of the

10:13:54  7   mark.

10:13:55  8   A.   Yes.

10:13:55  9   Q.   Correct?

10:13:56  10  A.   Correct.

10:14:00  11  Q.   And as part of your investigation, right, you talked with

10:14:03  12  Mr. Calabrese.

10:14:06  13  A.   Part of my investigation?   No.

10:14:11  14  Q.   Okay.   Well, you know that -- let's go back.

10:14:13  15      You did talk to Mr. Calabrese, right, in January of

10:14:14  16  2018?

10:14:17  17  A.   Prior to my investigation, correct.

10:14:21  18  Q.   Okay.   But you knew that Sprint had asked him to stop using

10:14:24  19  Nextel.

10:14:27  20  A.   Again, that's more complicated that you're mentioning.   They

10:14:31  21  sent him a cease and desist based on his use of a different

10:14:31  22  trademark.

10:14:34  23  Q.   Right.   You knew that they had asked him to stop using

10:14:36  24  Nextel.

10:14:41  25  A.   Right, but it was based on a color image of an abandoned

10:14:42   1   Nextel.

10:14:44   2   Q.  Well, you were in the courtroom yesterday, weren't you, when

10:14:46   3   I did my opening statement?

10:14:46   4   A.  Yes.

10:14:50   5   Q.  And you saw that that letter referenced the very trademark

10:14:55   6   we were just looking at 1,888,244, right?

10:14:58   7   A.  Again, I don't recall the exact letter.  It was the one

10:14:59   8   cease and desist.

10:15:02   9   Q.  Yes.

10:15:04   10   A.  I don't remember seeing that, I know you showed it, but I

10:15:05   11   didn't review it.

10:15:07   12   Q.  Well you saw, you did see the cease and desist letter,

10:15:08   13   correct?

10:15:10   14   A.  Yes, when I met him in January.

10:15:16   15   Q.  And you also knew that he had suspended his website.

10:15:23   16   A.  In January 2018?  He had suspended after I spoke to him to

10:15:23   17   suspend it.

10:15:26   18   Q.  And you knew he had a lawyer, right?

10:15:30   19   A.  I knew he had a lawyer, but I wasn't sure he was fully

10:15:32   20   retained by him.

10:15:34   21   Q.  But in fact you spoke with Mr. Calabrese's lawyer, didn't

10:15:35   22   you?

10:15:37   23   A.  Yes.

10:15:43   24   Q.  And you were aware, right, that the lawyer had told Sprint

10:15:46   25   Mr. Calabrese would stop using the Nextel mark?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:15:48  1     A.  Well, first the lawyer said that he could use the mark

10:15:51  2     because it was abandoned.  He told Mr. Calabrese that he can use

10:15:53  3     the mark, it's abandoned.

10:15:59  4     Q.  But you knew that the lawyer had told Sprint that

10:16:03  5     Mr. Calabrese would stop using the mark.

10:16:07  6     A.  Correct.  But he filed under individual, he didn't file it

10:16:11  7     under Nextel, Inc.  He filed it under his own personal name and

10:16:17  8     he did stop using it.  I told Mr. Calabrese to file and withdraw

10:16:21  9     of application, to remove his application from the USPTO because

10:16:26  10    he had agreed individually to remove that application which he

10:16:28  11    did.

10:16:30  12           THE COURT:  I repeat, please answer the question that

10:16:31  13    is asked of you.

10:16:32  14           THE WITNESS:  Yes, sir.

10:16:33  15           THE COURT:  Do not make speeches.

10:16:34  16           THE WITNESS:  I'm sorry.

10:16:34  17        BY MR. RIOPELLE:

10:16:39  18    Q.  All right.  So let's try one more time just so we get a

10:16:39  19    clear answer.

10:16:43  20           You know that Mr. Calabrese's lawyer had told Sprint

10:16:48  21    that Mr. Calabrese would stop using the Nextel mark.

10:16:50  22    A.  Correct.

10:16:59  23    Q.  Now, despite seeing the Nextel trademark being renewed in

10:17:03  24    2015, and despite seeing the letters from Sprint, you decided to

10:17:06  25    go ahead and file an application for the Nextel trademark,

| | | |
|---|---|---|
| 10:17:07 | 1 | didn't you? |
| 10:17:10 | 2 | A.  I did that after I did my investigation, correct. |
| 10:17:12 | 3 | MR. RIOPELLE:  Can we call up Exhibit 77?  There's no |
| 10:17:16 | 4 | objection to this Exhibit, your Honor. |
| 10:17:20 | 5 | THE COURT:  77?  77 without objection, is admitted in |
| 10:17:23 | 6 | evidence.  If there is no objection. |
| 10:17:23 | 7 | (Plaintiff's Exhibit 77 in evidence) |
| 10:17:23 | 8 | BY MR. RIOPELLE: |
| 10:17:27 | 9 | Q.  You recognize this as a copy of your application? |
| 10:17:30 | 10 | A.  Yes, that's correct. |
| 10:17:34 | 11 | Q.  And you see that the mark that you're registering for is |
| 10:17:37 | 12 | Nextel there on the second line? |
| 10:17:38 | 13 | A.  Yes, sir. |
| 10:17:40 | 14 | THE COURT:  Can I stop you for just a second?  Ladies |
| 10:17:41 | 15 | and gentlemen of the jury, I hate to ask you this quickly |
| 10:17:45 | 16 | because you haven't even warmed up the seats, but could you go |
| 10:17:48 | 17 | back in the jury room?  There's a matter I need to discuss with |
| 10:17:49 | 18 | the lawyers.  Okay? |
| 10:17:53 | 19 | COURT SECURITY OFFICER:  All rise for the jury. |
| 10:18:00 | 20 | (Jury out at 10:17 a.m.) |
| 10:18:23 | 21 | THE COURT:  Be seated, please. |
| 10:18:25 | 22 | MR. RIOPELLE:  Do you want me to stay here, do you want |
| 10:18:26 | 23 | me to sit down? |
| 10:18:27 | 24 | THE COURT:  Up to you.  Won't be long. |
| 10:18:36 | 25 | All right.  There was a ruling in my motion, in the |

10:18:43  1   motion -- motion in limine and I ruled that the letter and the

10:18:51  2   discussion, the -- there was a matter that was excluded by my

10:18:54  3   order on the Plaintiff's motion in limine.  The question that

10:18:58  4   was asked had absolutely nothing to do with that letter.  The

10:19:02  5   witness gratuitously offered an opinion as to that letter that I

10:19:07  6   had ruled was not admissible.  You can't open the door that way

10:19:12  7   and it's not going to happen.  Please ask the witness to answer

10:19:17  8   the question and not make offers.  Your lawyers will have an

10:19:22  9   opportunity to ask questions.  You cannot just keep blabbing and

10:19:26 10   talking about other things because you want the jury to hear it.

10:19:30 11   Your lawyers will have an opportunity to ask you questions.  If

10:19:34 12   you continue to do it, I'm going to have to tell the jury I

10:19:38 13   don't know what, but I'll think of something and I'll tell the

10:19:41 14   jury to tell them that you're saying something that's improper.

10:19:46 15   The motion in limine was granted and that is -- the advice of

10:19:50 16   counsel is not a defense in this case and consequently, I'm

10:19:52 17   really getting annoyed.

10:19:55 18        You know, I've been a judge now for 20 years, I've used

10:20:00 19   my gavel twice in 20 years.  I was very close to using my gavel.

10:20:05 20   I don't know what else to say.  I've told him more than once

10:20:11 21   answer the question, do not volunteer information, your lawyers

10:20:15 22   will have an opportunity on redirect examination, cross, I guess

10:20:19 23   to ask you questions and then we can determine it.  But if you

10:20:23 24   answer a question and then keep going and going and going, there

10:20:28 25   is no opportunity for anybody to object to it.  I don't know

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:20:31  1    what's coming, counsel doesn't know what's coming. Actually I

10:20:35  2    think he probably has a pretty good idea, but the bottom line is

10:20:37  3    it's wrong.  Do not do it.

10:20:39  4            Yes, sir.  You have something to say.

10:20:42  5            MR. SCHWARTZ:  Just simply, Your Honor, Mr. Riopelle is

10:20:45  6    asking the witness direct questions about this lawyer and

10:20:47  7    conversations.  I'm not sure that the witness --

10:20:49  8            THE COURT:  Absolutely not.  He did not open the door.

10:20:55  9    He did not ask anything that in any way even again determined

10:20:58  10   that answer.  The answer came out spontaneously.  Bubbled up

10:21:01  11   like a septic tank.

10:21:05  12           Okay?  Please bring the jury back in, and Mr. Witness

10:21:10  13   you are warned, not just counsel are advised, you're warned not

10:21:12  14   to do that.

10:21:13  15           THE WITNESS:  Yes, Your Honor.  I apologize.

10:21:18  16           COURTROOM DEPUTY:  All rise for the jury.

10:21:22  17           (Jury in at 10:21 a.m.)

10:21:24  18           THE COURT:  Probably taking my advice and going to the

10:21:29  19   bathroom which means we'll see them in about five minutes.

10:22:06  20           You may be seated.  You notice I count you every time

10:22:10  21   because one time somebody followed the jury down the hall and we

10:22:15  22   had an extra juror, we couldn't figure out where he came from so

10:22:16  23   I always count.

10:22:17  24           You may proceed, sir.

10:22:18  25           MR. RIOPELLE:  Thank you, Your Honor.

10:22:24  1      Carl, can you call up Exhibit 77 again?

10:22:24  2      BY MR. RIOPELLE:

10:22:30  3   Q.  So just to re-orient everybody, Mr. Kaplan, this is your

10:22:31  4   trademark application, correct?

10:22:32  5   A.  Yes, sir.

10:22:35  6   Q.  And you're applying for the trademark Nextel, right?

10:22:36  7   A.  Yes, sir.

10:22:40  8   Q.  And Carl, if you could go down farther on this same page.

10:22:45  9   Do you see that your filing for it under the name of

10:22:46 10   RetroBrands?

10:22:47 11   A.  Yes, sir.

10:22:49 12   Q.  And that's your company, correct?

10:22:49 13   A.  Correct.

10:22:58 14   Q.  And if we could go to Page 2, Carl?  And you see at the

10:23:03 15   bottom that that's your, I guess technically, an electronic

10:23:04 16   signature and your name?

10:23:05 17   A.  Correct.

10:23:09 18   Q.  And Carl, if we can just go to the bottom of Page 4.

10:23:12 19   Right there.

10:23:17 20      You see at the very bottom it says "declaration"?

10:23:18 21   A.  Yes, sir.

10:23:23 22   Q.  And then now Carl if you could go over to Page 5.  And you

10:23:28 23   see this is a declaration that you signed, correct?

10:23:30 24   A.  Yes, sir.

10:23:33 25   Q.  If you could go back out there, Carl, so I could go to

10:23:34  1   something else.

10:23:39  2           You see where it says "and/or"?

10:23:42  3   A.  Yes, sir.

10:23:46  4   Q.  I'm just trying to orient you.  You see where it says

10:23:46  5   "and/or" there?

10:23:47  6   A.  Yes, sir.

10:23:51  7   Q.  Carl, if you could highlight the next paragraph, you see

10:23:55  8   where it says "to the best of the signatory's knowledge and

10:23:58  9   belief, no other persons", I'll skip some things, says "has the

10:24:01  10  right to use the mark in commerce."  Do you see that?

10:24:01  11  A.  Yes, sir.

10:24:05  12  Q.  And then if you could do -- highlight two paragraphs down,

10:24:07  13  Carl.

10:24:12  14          And you say "the signatory being warned that willful

10:24:16  15  false statements and the like are punishable by fine and

10:24:17  16  imprisonment."

10:24:17  17  A.  Yes, sir.

10:24:20  18  Q.  So you understand that you signed this essentially under

10:24:20  19  oath, correct?

10:24:23  20  A.  Correct.  Yes, sir.

10:24:28  21  Q.  Now, you filed this, I believe, on January 29th of 2018?

10:24:29  22  A.  I believe so.

10:24:33  23  Q.  And then a week later, you issued a press release about

10:24:36  24  re-launching the Nextel brand, right?

10:24:37  25  A.  Yes, sir.

|   |   |   |
|---|---|---|
| 10:24:40 | 1 | MR. RIOPELLE:  And if you could call up Exhibit 86, |
| 10:24:42 | 2 | there's no objection to this, Your Honor. |
| 10:24:46 | 3 | THE COURT:  All right.  86, admitted in evidence |
| 10:24:46 | 4 | without objection. |
| 10:24:46 | 5 | (Plaintiff's Exhibit 86 in evidence) |
| 10:24:46 | 6 | BY MR. RIOPELLE: |
| 10:24:51 | 7 | Q.  And this is the press release that you issued, right? |
| 10:24:54 | 8 | A.  Correct. |
| 10:24:57 | 9 | Q.  And you wrote this press release, right? |
| 10:24:58 | 10 | A.  Yes, sir. |
| 10:25:03 | 11 | Q.  And you didn't contact Sprint before you released this press |
| 10:25:04 | 12 | release, did you? |
| 10:25:06 | 13 | A.  No, I did not. |
| 10:25:09 | 14 | Q.  In fact, you didn't contact anybody at Sprint to ask about |
| 10:25:12 | 15 | sales using Nextel, did you? |
| 10:25:13 | 16 | A.  No, I did not. |
| 10:25:17 | 17 | Q.  And you didn't contact Sprint and ask them if you could use |
| 10:25:17 | 18 | Nextel, did you? |
| 10:25:20 | 19 | A.  I did not. |
| 10:25:26 | 20 | Q.  So this is -- you launched -- you issued this on February 6, |
| 10:25:30 | 21 | 2008, correct? |
| 10:25:31 | 22 | A.  2018.  Yes, sir. |
| 10:25:32 | 23 | Q.  2018.  I'm sorry. |
| 10:25:33 | 24 | A.  That's okay. |
| 10:25:38 | 25 | Q.  And you know that two days later, Mr. Calabrese's lawyer |

| | | |
|---|---|---|
| 10:25:43 | 1 | told Sprint that Sprint could close its file. |
| 10:25:44 | 2 | MR. SCHWARTZ:  Objection, Your Honor. |
| 10:25:45 | 3 | THE COURT:  What's the objection? |
| 10:25:47 | 4 | MR. SCHWARTZ:  Hearsay. |
| 10:25:51 | 5 | MR. RIOPELLE:  He's already testified that he knew |
| 10:25:52 | 6 | about it. |
| 10:25:58 | 7 | THE COURT:  It isn't -- you hear this term used on |
| 10:26:04 | 8 | television all the time, "hearsay."  Hearsay is an out-of-court |
| 10:26:10 | 9 | statement that's coming in for its truth.  I don't really see |
| 10:26:13 | 10 | what it's coming in for its truth.  I don't believe that it was |
| 10:26:16 | 11 | -- I don't know if it was true or wasn't true, but doesn't |
| 10:26:19 | 12 | matter if it was true or wasn't true, it was only for the fact |
| 10:26:20 | 13 | that it was stated. |
| 10:26:24 | 14 | I'll overrule the objection on the hearsay. |
| 10:26:27 | 15 | THE WITNESS:  What was the question again please? |
| 10:26:27 | 16 | BY MR. RIOPELLE: |
| 10:26:31 | 17 | Q.  Yes.  So just set it up -- you issued this press release on |
| 10:26:32 | 18 | February 6, 2018? |
| 10:26:33 | 19 | A.  Yes, sir. |
| 10:26:37 | 20 | Q.  And you know that two days later Mr. Calabrese's lawyer told |
| 10:26:42 | 21 | Sprint that Sprint could close its file on this dispute. |
| 10:26:43 | 22 | A.  Yes, sir. |
| 10:26:49 | 23 | Q.  And around this same time, correct, you entered into what |
| 10:26:52 | 24 | you call the license agreement with Mr. Calabrese, right? |
| 10:26:54 | 25 | A.  Yes, sir. |

10:26:58  1          MR. RIOPELLE:  Carl, could you call up Exhibit 117?

10:27:01  2          There's no objection to this either, Your Honor.

10:27:04  3          THE COURT:  117?

10:27:04  4          (Plaintiff's Exhibit 117 in evidence)

10:27:04  5      BY MR. RIOPELLE:

10:27:09  6  Q.  Mr. Kaplan, do you recognize this as the license agreement

10:27:12  7  you entered into with Mr. Calabrese?

10:27:13  8  A.  Yes, sir.

10:27:19  9  Q.  And Carl, if you could go to Paragraph 26 which I believe is

10:27:25 10  on -- I'm not even sure, I wasn't smart enough to write down

10:27:33 11  what page it was on.  Thank you.

10:27:40 12          And do you see in this paragraph of the agreement you

10:27:44 13  refer to the Nextel trademark as famous and iconic, right?

10:27:45 14  A.  Yes, sir.

10:27:49 15  Q.  But it wasn't famous and iconic because Mr. Calabrese had

10:27:52 16  made it so, was it?

10:27:55 17  A.  That's correct.

10:27:58 18  Q.  In fact, it was famous and iconic because my clients, Nextel

10:28:01 19  and Sprint, had made it famous and iconic, right?

10:28:03 20  A.  Correct.

10:28:09 21  Q.  And in fact, because Nextel and Sprint had spent hundreds of

10:28:12 22  millions of dollars to make it famous and iconic.

10:28:14 23  A.  That's correct.

10:28:18 24  Q.  But you say in the bottom here "your goal is to sell the

10:28:21 25  company for tens of millions of dollars or possibly hundreds of

10:28:24   1   millions of dollars within the next five years."

10:28:26   2   A.   That is correct.

10:28:35   3   Q.   Now, the application that you filed for Nextel, that was

10:28:38   4   rejected by the United States Patent and Trademark Office,

10:28:39   5   wasn't it?

10:28:41   6   A.   It was.

10:28:45   7        MR. RIOPELLE: If you could call up Exhibit 78, Carl?

10:28:48   8        Your Honor, there's no objection to this one either.

10:28:50   9        THE COURT:   78 is admitted in evidence then.

10:28:50  10        (Plaintiff's Exhibit 78 in evidence)

10:28:50  11   BY MR. RIOPELLE:

10:28:54  12   Q.   Do you recognize this as the rejection from the United

10:28:55  13   States Patent and Trademark Office?

10:28:57  14   A.   That is correct.

10:29:04  15   Q.   And if you could go to Page 2, Carl?  And Carl, under C, do

10:29:07  16   you see the section where it says Section 2(d) refusal, if you

10:29:11  17   could do the paragraph under that?  Great.  Thank you.

10:29:12  18        Do you see that it says "registration of the

10:29:16  19   applied-for mark is refused because of a likelihood of

10:29:18  20   confusion."  Do you see that?

10:29:20  21   A.   Yes, sir.

10:29:25  22   Q.   And you understand, right, that that was a confusion with

10:29:30  23   the Nextel marks owned by Sprint.

10:29:31  24   A.   Correct.

10:29:38  25   Q.   So despite Mr. Calabrese saying he was stopping, despite the

10:29:43   1   PTO rejecting your application, you still decided to go forward

10:29:46   2   and sell Nextel products, correct?

10:29:48   3   A.  Yes, sir.

10:29:54   4   Q.  Now, in July of 2018, even after they rejected this one, you

10:29:57   5   filed a trademark application for the chirp sound, correct?

10:29:59   6   A.  Correct.

10:30:03   7            MR. RIOPELLE:  If you could call up Exhibit 79, Carl.

10:30:06   8   This one no objection, Your Honor.

10:30:08   9            THE COURT:  79 is admitted in evidence then.

10:30:09   10           (Plaintiff's Exhibit 79 in evidence)

10:30:09   11       BY MR. RIOPELLE:

10:30:13   12   Q.  And do you recognize this as the application for the chirp

10:30:14   13   mark?

10:30:16   14   A.  Correct.

10:30:19   15   Q.  And if we could go to Page 2, Carl.

10:30:24   16           And do you see that that's your name there, Jeffrey

10:30:24   17   Kaplan?

10:30:26   18   A.  Yes, sir.

10:30:31   19   Q.  And again, it's on behalf of RetroBrands?

10:30:32   20   A.  Correct.

10:30:33   21   Q.  Which is your company?

10:30:34   22   A.  Yes, sir.

10:30:39   23   Q.  And if we could go to Page 6, Carl.

10:30:43   24           And this is the same declaration we just looked at in

10:30:46   25   the other application, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 10:30:49 | 1 | A.  Yes, sir. |
| 10:30:53 | 2 | Q.  But Mr. Kaplan, when you filed this registration -- when you |
| 10:30:58 | 3 | filed this application, all you did was copy Sprint's |
| 10:31:01 | 4 | registration for the Nextel chirp mark, isn't that right? |
| 10:31:04 | 5 | A.  You mean the goods and services? |
| 10:31:07 | 6 | Q.  Goods and services and the description of the mark. |
| 10:31:07 | 7 | A.  Yes, sir. |
| 10:31:09 | 8 | Q.  You just copied it, right? |
| 10:31:10 | 9 | A.  Correct. |
| 10:31:21 | 10 | Q.  And you agree, right, that the Nextel chirp is a distinct |
| 10:31:23 | 11 | sound. |
| 10:31:24 | 12 | A.  Yes. |
| 10:31:29 | 13 | Q.  And that that sound is associated with Nextel. |
| 10:31:30 | 14 | A.  Correct. |
| 10:31:35 | 15 | Q.  And then on August 1st of 2018, you registered |
| 10:31:41 | 16 | nextelmobileworldwide.com as a website, correct? |
| 10:31:41 | 17 | A.  Correct. |
| 10:31:43 | 18 | Q.  And as a domain name, correct? |
| 10:31:46 | 19 | A.  Yes, sir. |
| 10:31:49 | 20 | MR. RIOPELLE:  If you could call up Exhibit 94, Carl. |
| 10:31:52 | 21 | This Exhibit, Your Honor -- actually we don't need |
| 10:31:54 | 22 | this. |
| 10:31:54 | 23 | BY MR. RIOPELLE: |
| 10:31:58 | 24 | Q.  And on this, you put together the information on that |
| 10:31:59 | 25 | website, correct? |

10:32:01   1   A.  Yes, sir.

10:32:06   2   Q.  And you called it nextelmobileworldwide.com even though that

10:32:10   3   you knew that the Patent and Trademark Office had said that

10:32:11   4   Sprint owned the Nextel mark.

10:32:12   5   A.  Correct.

10:32:19   6         MR. RIOPELLE:  Now, if you could call up Exhibit 67

10:32:22   7   Carl.  This Exhibit has no objection, Your Honor.

10:32:23   8         THE COURT:  67 is admitted in evidence without

10:32:23   9   objection.

10:32:24   10         (Plaintiff's Exhibit 67 in evidence)

10:32:24   11   BY MR. RIOPELLE:

10:32:29   12   Q.  And do you recognize this, Mr. Kaplan, as the website or I

10:32:31   13   should say screenshot of the website of

10:32:34   14   nextelmobileworldwide.com?

10:32:35   15   A.  Yes, sir.

10:32:39   16   Q.  And you see that obviously it has Nextel in the upper

10:32:41   17   left-hand corner?

10:32:41   18   A.  Correct.

10:32:44   19   Q.  And it's using the same black and yellow colors that my

10:32:46   20   client Nextel and Sprint use?

10:32:48   21   A.  Correct.

10:32:55   22   Q.  And if you could go to Page 8, Carl?  So this is a coverage

10:32:56   23   map, correct?

10:32:57   24   A.  Yes, sir.

10:33:04   25   Q.  Advertising for Nextel Mobile Worldwide's coverage, correct?

10:33:07  1    A.  It would be our dealer's coverage.

10:33:11  2    Q.  Right.  That's the point.  That's not Nextel Mobile

10:33:13  3    Worldwide's coverage map, is it?

10:33:18  4    A.  Under the license I believe it was.

10:33:20  5    Q.  Under what license?

10:33:22  6    A.  The license agreement with Nextel, Inc.

10:33:26  7    Q.  But Nextel Inc. didn't own a network, did it?

10:33:27  8    A.  No.

10:33:31  9    Q.  No.  Information this coverage map, you just went out to the

10:33:35  10   internet and copied someone else's coverage map and put it on

10:33:36  11   your website, right?

10:33:37  12   A.  Correct.

10:33:41  13   Q.  Can we go to Page 17, Carl?

10:33:46  14        And you see this building here with Nextel on top of

10:33:46  15   it, correct?

10:33:47  16   A.  Yes, sir.

10:33:49  17   Q.  Now this isn't RetroBrands building, is it?

10:33:50  18   A.  No, it is not.

10:33:54  19   Q.  And it's not Nextel Mobile Worldwide's building, is it?

10:33:56  20   A.  No, it is not.

10:33:59  21   Q.  In fact, it's just a building that you copied off the

10:34:00  22   internet, right?

10:34:01  23   A.  Correct.

10:34:08  24   Q.  If we go to Page 23.  And here on your website, you're

10:34:10  25   advertising the Nextel chirp, right?

| | | |
|---|---|---|
| 10:34:11 | 1 | A.  Correct. |
| 10:34:15 | 2 | MR. RIOPELLE:  And if we could go to Exhibit 136? |
| 10:34:17 | 3 | No objection to this, Your Honor. |
| 10:34:19 | 4 | THE COURT:  What is the number please? |
| 10:34:21 | 5 | MR. RIOPELLE:  136. |
| 10:34:23 | 6 | THE COURT:  Without objection, 136 is admitted in |
| 10:34:24 | 7 | evidence. |
| 10:34:24 | 8 | (Plaintiff's Exhibit 136 in evidence) |
| 10:34:24 | 9 | BY MR. RIOPELLE: |
| 10:34:28 | 10 | Q.  This is another page from the Nextel Mobile Worldwide |
| 10:34:30 | 11 | website, right? |
| 10:34:30 | 12 | A.  Yes, sir. |
| 10:34:34 | 13 | Q.  In fact this is the ads -- these are the ads made and |
| 10:34:38 | 14 | produced by my clients Nextel and Sprint, right? |
| 10:34:40 | 15 | A.  Three of them are, yes sir. |
| 10:34:43 | 16 | Q.  And you've put them on our -- on your website. |
| 10:34:44 | 17 | A.  Correct. |
| 10:34:47 | 18 | Q.  And in fact, the one in the upper left-hand corner is the |
| 10:34:48 | 19 | one I played for the jury yesterday, right? |
| 10:34:49 | 20 | A.  Yes. |
| 10:34:56 | 21 | MR. RIOPELLE:  Could we go to Exhibit 107, Carl? |
| 10:34:58 | 22 | There's no objection to this, Your Honor. |
| 10:35:00 | 23 | THE COURT:  107 is admitted in evidence. |
| 10:35:00 | 24 | (Plaintiff's Exhibit 107 in evidence) |
| 10:35:00 | 25 | BY MR. RIOPELLE: |

```
10:35:04   1    Q.  And if we could go to Page 2.
10:35:08   2         Mr. Kaplan, you recognize this as Nextel Communications
10:35:11   3    Facebook page, right?
10:35:12   4    A.  Yes, sir.
10:35:15   5    Q.  And you're associated with Nextel Communications, right?
10:35:17   6    A.  They are a dealer.
10:35:19   7    Q.  But you're associated with them, right?
10:35:22   8    A.  Yes, they're a dealer.  So I'm associated with them,
10:35:24   9    correct.  Yes, sir.
10:35:30  10    Q.  And so you're -- again, you're saying Nextel is back, right?
10:35:37  11    A.  Yes, the dealer is saying Nextel is back.  Correct.
10:35:43  12    Q.  Well, let me -- just so we make sure, can we quickly go over
10:35:47  13    to Exhibit 160?
10:35:49  14         THE COURT:  160.
10:35:51  15         MR. RIOPELLE:  160.
10:35:53  16         THE COURT:  Is there any objection to 160?
10:35:54  17         MR. SCHWARTZ:  One second, Your Honor, please.
10:35:56  18         THE COURT:  Pardon me?
10:35:57  19         MR. RIOPELLE:  They asked for a second.
10:36:01  20         THE COURT:  Oh, okay.  I didn't hear you.
10:36:05  21         MR. SCHWARTZ:  Brian, you said 160?
10:36:08  22         THE COURT:  160.
10:36:10  23         MR. SCHWARTZ:  Is it in this particular book here?
10:36:14  24         MR. RIOPELLE:  I don't know.  Do you want me to get you
10:36:17  25    a copy?
```

| | | |
|---|---|---|
| 10:36:26 | 1 | MR. SCHWARTZ:  If you have one handy. |
| 10:36:46 | 2 | No objection Your Honor. |
| 10:36:50 | 3 | THE COURT:  160 is admitted in evidence without |
| 10:36:50 | 4 | objection. |
| 10:36:50 | 5 | (Plaintiff's Exhibit 160 in evidence) |
| 10:36:50 | 6 | BY MR. RIOPELLE: |
| 10:36:53 | 7 | Q.  You recognize this as a press release you issued, Mr. |
| 10:36:54 | 8 | Kaplan? |
| 10:36:55 | 9 | A.  Yes, sir. |
| 10:37:01 | 10 | Q.  And you see at the bottom -- you have to go to the next |
| 10:37:03 | 11 | page, Carl.  There you go. |
| 10:37:04 | 12 | Do you see your name Jeffrey Kaplan? |
| 10:37:05 | 13 | A.  Yes, sir. |
| 10:37:09 | 14 | Q.  It says contact via e-mail? |
| 10:37:10 | 15 | A.  Correct. |
| 10:37:13 | 16 | Q.  And it says www.nextelcommunications.com? |
| 10:37:14 | 17 | A.  Yes, sir. |
| 10:37:23 | 18 | Q.  Can we go back Carl to Exhibit 107. |
| 10:37:25 | 19 | So again, this is Nextel Communications Facebook page |
| 10:37:29 | 20 | that is advertising Nextel is back, correct? |
| 10:37:31 | 21 | A.  Yes, sir. |
| 10:37:36 | 22 | Q.  And Carl, if we can go to Page 4 of this.  Right there.  If |
| 10:37:40 | 23 | we go to the image there at the bottom, Carl. |
| 10:37:45 | 24 | Sir, you're promoting Nextel Communications and those |
| 10:37:51 | 25 | devices to first responders, aren't you? |

10:37:53  1    A.  Yes.

10:38:00  2    Q.  If we could go to Exhibit 108.

10:38:07  3            MR. RIOPELLE:  And there's no objection to 108, Your

10:38:07  4    Honor.

10:38:10  5            THE COURT:  Then without objection, 108 is admitted in

10:38:11  6    evidence.

10:38:11  7            (Plaintiff's Exhibit 108 in evidence)

10:38:14  8            MR. RIOPELLE:  If he could show just the first five

10:38:15  9    seconds.

10:38:20  10           (Plaintiff's Exhibit 108 playing in open court)

10:38:20  11       BY MR. RIOPELLE:

10:38:22  12   Q.  You recognize this ad, correct?

10:38:23  13   A.  Yes, sir.

10:38:25  14           MR. RIOPELLE:  Why don't you go ahead and play the

10:38:38  15   remainder of the ad please, Carl.

10:38:46  16           (Plaintiff's Exhibit 108 playing in open court).

10:38:46  17       BY MR. RIOPELLE:

10:39:08  18   Q.  So you agree this ad, you put this ad together, correct?

10:39:08  19   A.  No sir, I did not.

10:39:12  20   Q.  You had somebody put this ad together for you, correct?

10:39:15  21   A.  No, I was not involved in this ad at all.

10:39:19  22   Q.  You knew about this ad advertising your client's products or

10:39:23  23   your licensee's products Nextel, right?

10:39:25  24   A.  Yes, I knew about it, yes sir.

10:39:29  25   Q.  And it's linking it to my client, right?  Because it says

10:39:32  1    "it's back."

10:39:36  2    A.  It says "Nextel is back".  What's the question again?  I

10:39:36  3    apologize.

10:39:39  4    Q.  You're linking it to my clients because you're saying Nextel

10:39:41  5    is back, right?

10:39:42  6    A.  I disagree with that.

10:39:46  7    Q.  Okay.  What is coming back if it's not my client that has

10:39:48  8    been doing this for 30 years?

10:39:53  9    A.  Again, it's my belief that it was abandoned, so I don't feel

10:39:57  10   that it's -- it belongs to your client.

10:40:02  11   Q.  You said obviously that, and you heard it there it says it's

10:40:04  12   a nationwide network, right?

10:40:05  13   A.  Yes, sir.

10:40:09  14   Q.  But Nextel, Inc. or Nextel Mobile Worldwide, they don't have

10:40:12  15   a nationwide network, do they?

10:40:14  16   A.  They do not.

10:40:21  17   Q.  And in fact, for the phones that Nextel, Inc. sells, they

10:40:23  18   just use they put SIM cards in there?

10:40:24  19   A.  Yes, sir.

10:40:26  20   Q.  In fact, they go to Walmart and they buy those SIM cards and

10:40:28  21   put them in there, right?

10:40:30  22   A.  No, not Walmart.  I don't believe so.

10:40:33  23   Q.  So it's using somebody else's network, right?

10:40:34  24   A.  Yes, sir.

10:40:40  25   Q.  And Nextel Mobile Worldwide and Jeff Kaplan and Stephen

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:40:42   1   Calabrese and Nextel, Inc. don't have any control over that
10:40:43   2   network, do they?
10:40:44   3   A.   No, we don't.
10:40:47   4   Q.   So you can't prioritize traffic on that network, can you?
10:40:49   5   A.   No, sir.
10:40:53   6   Q.   Now, let's go back to talking about the chirp application.
10:40:58   7   United States Patent and Trademark Office rejected that
10:40:59   8   application, correct?
10:41:00   9   A.   Correct.
10:41:04  10        MR. RIOPELLE:  Can we call up Exhibit 80, Carl?
10:41:07  11        There's no objection to Exhibit 80, Your Honor.
10:41:08  12        THE COURT:  80?
10:41:09  13        MR. RIOPELLE:  Yes, sir.
10:41:11  14        THE COURT:  80 is admitted in evidence then.
10:41:11  15        (Plaintiff's Exhibit 80 in evidence)
10:41:11  16   BY MR. RIOPELLE:
10:41:15  17   Q.   And Mr. Kaplan, you recognize this as the rejection for the
10:41:15  18   chirp mark application?
10:41:17  19   A.   Correct.
10:41:22  20   Q.   And if you see down at the bottom, you see that there's it
10:41:24  21   was one of the reasons it was refused was likelihood of
10:41:25  22   confusion?
10:41:27  23   A.   Yes, sir.
10:41:41  24   Q.   And then, Carl, if you could go to Page 2.  And -- well I
10:41:48  25   should have been smarter -- oh.  You see in the second -- in the

10:41:52  1    paragraph that starts "in this case the services in the

10:41:55  2    application and the registrations are identical"?

10:41:56  3    A.  Yes, sir.

10:41:59  4    Q.  They're identical, right, because as you just said before,

10:42:02  5    you just copied Sprint's registration.

10:42:03  6    A.  Correct.

10:42:12  7    Q.  Now, you agree though that even though this was rejected,

10:42:17  8    you and the Defendants are using the Nextel chirp, right?

10:42:21  9    A.  We're using -- yes, we're using the Nextel chirp.

10:42:34  10   Q.  So despite both applications being rejected by the United

10:42:36  11   States Patent and Trademark Office, you and Mr. Calabrese went

10:42:40  12   ahead and sold products with the Nextel brand on them, right?

10:42:41  13   A.  Correct.

10:42:45  14   Q.  And you know that Mr. Calabrese is using Nextel on

10:42:47  15   walkie-talkie handsets, right?

10:42:47  16   A.  Correct.

10:42:50  17   Q.  And is using them on smartphones, right?

10:42:50  18   A.  Yes, sir.

10:42:54  19   Q.  And he's using them on land mobile radio devices, right?

10:42:55  20   A.  I believe so.

10:43:02  21   Q.  Now, Mr. Kaplan, you recently started a web page trying to

10:43:06  22   get people to invest in Nextel Mobile Worldwide, right?

10:43:07  23   A.  Correct.

10:43:10  24   Q.  And you created that page on a host that's called Start

10:43:11  25   Engine, I think?

| | | |
|---|---|---|
| 10:43:16 | 1 | A.  Yes, it's a crowd-funding portal called Start Engine. |
| 10:43:20 | 2 | Q.  And on that fundraising page, you describe your company as a |
| 10:43:24 | 3 | mobile virtual network operator, don't you? |
| 10:43:27 | 4 | A.  No, that's not correct. |
| 10:43:46 | 5 | MR. RIOPELLE:  Your Honor, this is not an admitted |
| 10:43:51 | 6 | exhibit.  I was going to hand it to him so he could see it. |
| 10:43:53 | 7 | THE COURT:  Go give to it the court security officer, |
| 10:43:56 | 8 | he'll hand it over. |
| 10:44:44 | 9 | (Witness perusing the exhibit) |
| 10:44:50 | 10 | MR. RIOPELLE:  Just let me know when you're finished |
| 10:44:53 | 11 | looking at it, Mr. Kaplan. |
| 10:45:18 | 12 | THE WITNESS:  Yes, sir.  Okay. |
| 10:45:18 | 13 | BY MR. RIOPELLE: |
| 10:45:24 | 14 | Q.  So do you recognize this as a screenshot printout of the |
| 10:45:27 | 15 | Start Engine page we were just talking about? |
| 10:45:28 | 16 | A.  Yes, sir. |
| 10:45:31 | 17 | Q.  And do you see on the first page it states as a "Mobile |
| 10:45:40 | 18 | Virtual Network Operator, MVNO, Nextel obtains bulk access to |
| 10:45:41 | 19 | network" then it goes on? |
| 10:45:42 | 20 | A.  Correct. |
| 10:45:46 | 21 | Q.  So you are referring to Nextel as an MVNO, correct? |
| 10:45:47 | 22 | A.  Correct. |
| 10:45:51 | 23 | Q.  But Nextel is not an MVNO, is it? |
| 10:45:54 | 24 | A.  It is not. |
| 10:45:58 | 25 | Q.  And on that same page, on the third line, do you see where |

10:46:06   1   it says "the most notable distinction from Nextel is the iconic

10:46:07   2   chirp sound."  Do you see that?

10:46:08   3   A.  Yes, sir.

10:46:11   4   Q.  And that's the same chirp sound that you applied for and was

10:46:13   5   rejected by the Patent and Trademark Office, right?

10:46:13   6   A.  Correct.

10:46:18   7   Q.  And if you could turn, Mr. Kaplan, to the third page of the

10:46:20   8   document I handed to you?

10:46:23   9   A.  Okay.

10:46:37   10  Q.  I've lost my place.  Well, do you see where it says on the

10:46:40   11  first full paragraph, it says "Nextel Mobile Worldwide, Inc. is

10:46:45   12  a holding company that owns the intellectual property rights to

10:46:49   13  Nextel and Nextel chirp trademarks", and then in parenthesis

10:46:54   14  says "trademarks" and has two numbers there.  Do you see that?

10:46:56   15  A.  I apologize.  What page is that on again?

10:47:01   16  Q.  It's on the third page of the document I just handed you.

10:47:09   17  A.  I apologize, I'm trying to find it.

10:47:11   18  Q.  Sure.  Would you like me to come up with the Court's

10:47:13   19  permission and point it out to you?

10:47:18   20  A.  Each page is a single page, not the back?  One, two, three.

10:47:27   21  How does it begin again, please?

10:47:32   22  Q.  Says "Nextel Mobile Worldwide, Inc. is a holding company."

10:47:34   23  A.  On top.  I found it.

10:47:37   24  Q.  Right.  So it says "Nextel Mobile Worldwide, Inc. is a

10:47:40   25  holding company that owns the intellectual property rights to

| | | |
|---|---|---|
| 10:47:42 | 1 | the Nextel and Nextel chirp trademarks."  Do you see that? |
| 10:47:43 | 2 | A.  Correct. |
| 10:47:47 | 3 | Q.  And then it has two numbers after that, right? |
| 10:47:49 | 4 | A.  Yes, those are the serial numbers, yes, correct. |
| 10:47:55 | 5 | Q.  But Mr. Kaplan, those aren't trademarks numbers, they're |
| 10:47:56 | 6 | application numbers, right? |
| 10:47:57 | 7 | A.  Correct. |
| 10:48:01 | 8 | Q.  And those were the applications that were rejected, right? |
| 10:48:02 | 9 | A.  Correct. |
| 10:48:07 | 10 | Q.  So that's not true, is it, that you own the rights to those |
| 10:48:10 | 11 | trademarks because they've already been rejected by the United |
| 10:48:11 | 12 | States Patent and Trademark Office. |
| 10:48:13 | 13 | A.  Correct. |
| 10:48:21 | 14 | Q.  And you can look through it if you want to, but in this |
| 10:48:28 | 15 | entire website in which you're trying to raise money for Nextel, |
| 10:48:32 | 16 | you never tell anyone about this lawsuit, do you? |
| 10:48:36 | 17 | A.  No, that's not true.  There is a section in the SEC filing |
| 10:48:41 | 18 | document, I think it's called Form C, it does talk about the |
| 10:48:41 | 19 | lawsuit. |
| 10:48:43 | 20 | Q.  Does this document -- |
| 10:48:44 | 21 | A.  Oh this document, no. |
| 10:48:47 | 22 | Q.  This website in which you're trying to raise money from |
| 10:48:52 | 23 | investors ever tell them that this lawsuit exists. |
| 10:48:57 | 24 | A.  This document, sir?  These four pages?  No. |
| 10:49:01 | 25 | Q.  So you don't tell them anywhere that Sprint actually owns |

10:49:06  1   the Nextel trademark and is challenging your right to use it.

10:49:10  2   A.   Again, it's in the SEC filing it does mention the lawsuit

10:49:12  3   about Sprint.  But not in this document.

10:49:13  4   Q.   In this document?

10:49:13  5   A.   Correct.

10:49:17  6   Q.   Which you're trying to get people to invest in your company,

10:49:21  7   you don't tell them that Sprint is challenging your right to use

10:49:22  8   these trademarks.

10:49:24  9   A.   Yes, sir.  That's correct.

10:49:35  10  Q.   And it's opinion, right, that the Nextel brand is worth a

10:49:37  11  minimum of $100 million.

10:49:38  12  A.   Conservatively, yes.

10:49:44  13  Q.   And you agree that the Nextel is a very strong, strong

10:49:45  14  trademark.

10:49:46  15  A.   Yes.

10:49:49  16  Q.   And in fact, you agree it's iconic.

10:49:50  17  A.   Correct.

10:49:53  18  Q.   And you agree that the chirp sound mark is a strong

10:49:54  19  trademark, right?

10:49:57  20  A.   Correct.

10:50:00  21       MR. RIOPELLE:  I have no further questions, Your Honor.

10:50:01  22       THE COURT:  Cross-examination.

10:50:31  23       MR. RIOPELLE:  Your Honor, I would offer this one that

10:50:36  24  I just presented as Exhibit 167 I believe is the next exhibit.

10:50:42  25  It was not produced during discovery because in fact it didn't

10:50:44  1    exist during discovery.

10:50:45  2              THE COURT:  167.

10:50:46  3              MR. RIOPELLE:  But I don't know if they're going to

10:50:49  4    object or not.

10:50:52  5              MR. SCHWARTZ:  No objection, Your Honor.

10:50:57  6              THE COURT:  Without objection is admitted in evidence.

10:50:57  7              (Plaintiff's Exhibit 167 in evidence)

10:50:58  8                          CROSS-EXAMINATION

10:50:58  9      BY MR. SCHWARTZ:

10:51:00  10    Q.  Mr. Kaplan.

10:51:01  11    A.  Good morning.

10:51:07  12    Q.  Good morning.  At the Patent and Trademark Office, the sound

10:51:11  13    mark is not called the Nextel chirp mark, correct?

10:51:12  14    A.  That is correct.

10:51:15  15    Q.  Where is that coming from, the Nextel chirp, where is that

10:51:16  16    coming from?

10:51:19  17    A.  I had filed an application for Nextel chirp.

10:51:20  18    Q.  That was something --

10:51:22  19    A.  With the USPTO.

10:51:24  20    Q.  That was something that you filed, correct?

10:51:26  21    A.  Correct.

10:51:32  22    Q.  In fact, when you look at the registration of the sound

10:51:35  23    mark, it only says sound mark, correct?

10:51:35  24    A.  Correct.

10:51:39  25    Q.  It doesn't say Nextel or Sprint, correct?

| | | |
|---|---|---|
| 10:51:40 | 1 | A.  That is correct. |
| 10:51:47 | 2 | Q.  And who actually filed for the registration of the sound |
| 10:51:49 | 3 | mark? |
| 10:51:52 | 4 | A.  Nextel -- I believe it was Nextel Mobile Worldwide.  You |
| 10:51:54 | 5 | mean my sound mark? |
| 10:51:57 | 6 | Q.  No, not your sound mark, the one we've been talking about. |
| 10:52:03 | 7 | The one that's -- that one that has the sound that they've been |
| 10:52:04 | 8 | playing. |
| 10:52:06 | 9 | A.  Oh, the original one? |
| 10:52:07 | 10 | Q.  Yeah, the original one. |
| 10:52:11 | 11 | A.  It was Motorola I believe, and then it was -- no, it was |
| 10:52:12 | 12 | Sprint, Sprint Communications. |
| 10:52:14 | 13 | Q.  It was not Nextel, correct? |
| 10:52:16 | 14 | A.  Right.  I apologize.  It was Sprint Communications had filed |
| 10:52:19 | 15 | for this trademark. |
| 10:52:36 | 16 | MR. RIOPELLE:  Carl, can you call up Exhibit 165 |
| 10:52:38 | 17 | please? |
| 10:52:49 | 18 | THE COURT:  165 is not in evidence. |
| 10:52:51 | 19 | MR. RIOPELLE:  There's no objection by either side. |
| 10:52:54 | 20 | THE COURT:  Okay.  165 is in evidence then. |
| 10:52:54 | 21 | (Plaintiff's Exhibit 165 in evidence) |
| 10:52:59 | 22 | MR. SCHWARTZ:  Would you mind going to Page 2? |
| 10:53:08 | 23 | THE WITNESS:  Okay.  That refreshes my memory. |
| 10:53:16 | 24 | (Counsel conferring) |
| 10:53:27 | 25 | MR. SCHWARTZ:  Page 2 if you don't mind, please? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
10:53:27   1        BY MR. SCHWARTZ:

10:53:29   2     Q.  Do you see this, Mr. Kaplan?

10:53:30   3     A.  Yes.

10:53:32   4     Q.  What is this in front of you?

10:53:39   5     A.  This is the registration certified issued to the applicant.

10:53:42   6     Q.  And do you see the registration date?

10:53:48   7     A.  2016.  September 27th.

10:53:55   8            THE COURT:  Is this an exhibit that's in evidence?

10:53:57   9            MR. RIOPELLE:  There's no objection from either side to

10:53:58  10     this one either, Your Honor.

10:54:00  11            THE COURT:  What is it?  What number?

10:54:02  12            MR. RIOPELLE:  This is the certified --

10:54:03  13            THE COURT:  What number is it.

10:54:05  14            MR. RIOPELLE:  166.

10:54:07  15            THE COURT:  Okay.  Well, I need to know that so I can

10:54:12  16     keep track.  166 is admitted in evidence without objection.

10:54:14  17            (Plaintiff's Exhibit 166 in evidence)

10:54:14  18        BY MR. SCHWARTZ:

10:54:20  19     Q.  And how does one know what the sound that the trademark

10:54:22  20     office is registering?

10:54:28  21     A.  There is a section of the registration which has the

10:54:33  22     megahertz of the sound.  The certain frequency.  And it's listed

10:54:35  23     on their certificate.

10:54:38  24     Q.  And does it also have the certain cadence?

10:54:42  25     A.  Yes.  That's the milliseconds, the timing of it.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:54:48   1    Q.  So is that the sound going on and off, on and off, on?

10:54:49   2    A.  Correct, correct.

10:54:54   3    Q.  When you were asked by Mr. Riopelle if -- he asked you if

10:54:57   4    you were using the sound.  RetroBrands is not using the sound,

10:54:58   5    correct?

10:54:59   6    A.  That is correct.

10:55:03   7    Q.  It's Nextel, Inc. that handles sales and service for the

10:55:03   8    phones, correct?

10:55:04   9    A.  Correct.

10:55:07  10    Q.  You're the licensor because you're the one handling the

10:55:09  11    trademark issues, correct?

10:55:11  12    A.  That is correct.

10:55:17  13    Q.  When Mr. Riopelle -- I think he asked you about the Nextel

10:55:20  14    chirp.  Was that the chirp that you filed for?

10:55:20  15    A.  Correct.

10:55:23  16    Q.  Is that a different sound than what's described in this

10:55:24  17    particular document?

10:55:26  18    A.  Yes.  We use a different sound.

10:55:30  19    Q.  Is that something called the roger beep?

10:55:33  20    A.  Yes, in the industry it's called the roger beep.

10:55:35  21    Q.  Would you just explain to the jury?

10:55:46  22    A.  Sure.  Many companies for example AT&T, Zello, Voxxer,

10:55:52  23    Motorola, they all have their own individual roger beep which

10:55:56  24    could be adjusted and changed.  They sound somewhat similar, but

10:56:00  25    they are different.

```
10:56:03   1              MR. SCHWARTZ:  Thank you, Mr. Kaplan.
10:56:08   2              Can I have the clerk switch to my screen?  Thank you,
10:56:11   3   Madame.
10:56:11   4         BY MR. SCHWARTZ:
10:56:17   5   Q.  Have you met with investors interested in investing in
10:56:19   6   Nextel Mobile Worldwide?
10:56:21   7   A.  Yes, quite a few.
10:56:24   8   Q.  And have you mentioned the lawsuit to any of those
10:56:24   9   investors?
10:56:27  10   A.  Every single one.
10:56:32  11   Q.  And what have those investors said to you?
10:56:33  12   A.  They don't want to invest --
10:56:34  13              MR. RIOPELLE:  Objection, calls for hearsay.
10:56:36  14              THE COURT:  Sustained.
10:56:40  15         BY MR. SCHWARTZ:
10:56:51  16   Q.  Are there any obstacles, Mr. Kaplan, with regard to getting
10:56:52  17   investors?
10:56:59  18   A.  Yes.  When I reveal that the lawsuit is in progress for the
10:57:03  19   last four years, I'm informed to reach out to them after the
10:57:04  20   lawsuit.
10:57:35  21              THE COURT:  Let's go.  Ask a question.
10:57:37  22              MR. SCHWARTZ:  I'm sorry, Your Honor.  I was just
10:57:39  23   getting a document up.
10:57:42  24              THE COURT:  Get a document up.
10:57:54  25              MR. SCHWARTZ:  I'll get her mouse in a second, Your
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:57:54   1     Honor.

10:57:57   2              THE COURT:  Not a problem.

10:57:57   3        BY MR. SCHWARTZ:

10:58:14   4     Q.  Do you see this document that you were shown earlier?

10:58:16   5     A.  Yes, sir.

10:58:20   6     Q.  What's the status of your application concerning the

10:58:25   7     trademark for equipment?

10:58:30   8     A.  The status with the USPTO is suspended until this legal

10:58:32   9     matter is resolved in federal court.

10:58:37   10    Q.  Was that done jointly with the Plaintiff?

10:58:43   11    A.  I'm not sure if they agree to it.  I recommended suspension

10:58:51   12    and the examiner agreed.  I believe it's once you file a federal

10:58:56   13    lawsuit, that overrides the trademark office and you have to go

10:58:59   14    through the lawsuit first.

10:59:02   15    Q.  So your application is still active and pending, correct?

10:59:06   16    A.  Yes, it hasn't been cancelled.  It's active.

10:59:23   17    Q.  You were shown your press release concerning Nextel is back,

10:59:24   18    correct?

10:59:25   19    A.  Yes, sir.

10:59:30   20    Q.  What did you do to investigate sales of Nextel phones?

10:59:39   21    A.  Starting back in January 2018, I did a lot of investigation.

10:59:44   22    I searched Google, all the history of Nextel, the background,

10:59:50   23    Wikipedia, everything you could imagine to try and find any type

10:59:55   24    of sales of Nextel devices and Nextel air time.  I went to

11:00:02   25    Nextel.com which was not working.  That was shut off around

| | | |
|---|---|---|
| 11:00:08 | 1 | 2013.  I went to the Sprint.com website, typed in Nextel, |
| 11:00:18 | 2 | nothing came up.  I went to the annual reports of Sprint prior |
| 11:00:27 | 3 | to 2013 and after 2013.  Prior to 2013, I discovered that the |
| 11:00:32 | 4 | Nextel brand was in all their documents that were filed with the |
| 11:00:33 | 5 | Securities and Exchange Commission, including subscription |
| 11:00:42 | 6 | money, revenue, but after 2013, my review of the annual reports |
| 11:00:46 | 7 | for Sprint had no mention of Nextel in any of the documents.  So |
| 11:00:52 | 8 | that's a short synopsis of some of -- a lot of the work that I |
| 11:00:55 | 9 | did before I filed my application. |
| 11:02:18 | 10 | Q.  Stop please.  Stop.  Little further down.  Keep going. |
| 11:02:24 | 11 | You were shown on your earlier examination Page 7 of |
| 11:02:28 | 12 | 34, it's the Sprint website page, right?  Do you recall being |
| 11:02:30 | 13 | shown that? |
| 11:02:30 | 14 | A.  Yes. |
| 11:02:35 | 15 | Q.  And I'll direct that this is the Page 7, we've scrolled it |
| 11:02:38 | 16 | further down so you can see the bottom of that particular page. |
| 11:02:40 | 17 | A.  Yes, sir. |
| 11:02:43 | 18 | Q.  Do you see the date on -- |
| 11:02:46 | 19 | A.  Yes, sir. |
| 11:02:47 | 20 | Q.  What's the date there? |
| 11:02:49 | 21 | A.  January 18, 2019. |
| 11:02:53 | 22 | Q.  And that was after the lawsuit was filed by Sprint in April |
| 11:02:54 | 23 | of 2018, correct? |
| 11:02:54 | 24 | A.  Yes. |
| 11:02:55 | 25 | Q.  So you didn't -- |

11:02:57  1          MR. RIOPELLE:  Objection, Your Honor.  It's been

11:03:00  2  authenticated as being from the date at the top.  He's trying to

11:03:03  3  confuse them.

11:03:07  4          THE COURT:  What is the objection?  That he's

11:03:09  5  misleading?  That's why you get redirect.

11:03:12  6          MR. RIOPELLE:  Okay.

11:03:14  7      BY MR. SCHWARTZ:

11:03:52  8  Q.  Do you recall being shown the FAQ page?  What is that the

11:03:53  9  FAQ?

11:03:54 10  A.  Frequently asked questions.

11:03:58 11  Q.  And this was created by Sprint, correct?

11:03:59 12  A.  I believe so.

11:04:01 13  Q.  They control the content of their own website, right?

11:04:02 14  A.  Yes, sir.

11:04:05 15  Q.  They can put anything they want on their website, right?

11:04:06 16  A.  Correct.

11:04:09 17  Q.  And you were asked about this sentence here, I guess if you

11:04:13 18  click on that particular question, they put this on there,

11:04:14 19  right?

11:04:14 20  A.  Yes.

11:04:19 21  Q.  And again, it's not -- there's no such thing as the Nextel

11:04:20 22  chirp, right?

11:04:21 23  A.  Correct.

11:04:24 24  Q.  And if you scroll --

11:04:26 25          MR. SCHWARTZ:  Would you mind scrolling down?  Stop

| | | |
|---|---|---|
| 11:04:47 | 1 | please.  Stop. |
| 11:04:47 | 2 |     BY MR. SCHWARTZ: |
| 11:04:50 | 3 | Q.  See at the bottom of this particular page? |
| 11:04:51 | 4 | A.  Yes, sir. |
| 11:04:53 | 5 | Q.  And you see the Bates stamp, that means it was produced by |
| 11:04:55 | 6 | Sprint? |
| 11:04:55 | 7 | A.  Correct. |
| 11:04:59 | 8 | Q.  So they were the ones who printed this page on the date that |
| 11:05:00 | 9 | question was answered, right? |
| 11:05:01 | 10 | A.  Yes. |
| 11:05:03 | 11 | Q.  And what was the date? |
| 11:05:05 | 12 | A.  November 27th. |
| 11:05:07 | 13 |     THE COURT:  The date it was printed.  The date it was |
| 11:05:10 | 14 | printed is what you're asking him, correct? |
| 11:05:13 | 15 |     MR. SCHWARTZ:  The date it was printed was the date on |
| 11:05:16 | 16 | here, November 27, 2018. |
| 11:05:17 | 17 |     THE COURT:  Okay. |
| 11:05:18 | 18 |     MR. SCHWARTZ:  On this particular document, that's when |
| 11:05:20 | 19 | this page was printed. |
| 11:05:20 | 20 |     THE WITNESS:  Yes, sir. |
| 11:05:20 | 21 |     BY MR. SCHWARTZ: |
| 11:05:24 | 22 | Q.  And this was well after the lawsuit was filed, right? |
| 11:05:25 | 23 | A.  Correct. |
| 11:05:28 | 24 | Q.  So Sprint could have put anything they wanted on the website |
| 11:05:31 | 25 | after the lawsuit was filed, right? |

| | | |
|---|---|---|
| 11:05:33 | 1 | A.  Exactly. |
| 11:05:52 | 2 | Q.  If you file an application with the trademark office and no |
| 11:05:55 | 3 | one puts in any opposition, then what happens? |
| 11:05:59 | 4 | MR. RIOPELLE:  Objection.  Calling for legal -- |
| 11:06:03 | 5 | THE COURT:  Speculation.  I'll sustain the objection. |
| 11:06:03 | 6 | BY MR. SCHWARTZ: |
| 11:06:05 | 7 | Q.  When you file applications, take the jury through the |
| 11:06:08 | 8 | process when you file an application. |
| 11:06:09 | 9 | A.  Sure. |
| 11:06:13 | 10 | MR. RIOPELLE:  Objection.  He's giving an opinion or |
| 11:06:16 | 11 | knowledge on law, administrative. |
| 11:06:18 | 12 | THE COURT:  I don't know, so I'll have to permit the |
| 11:06:19 | 13 | question. |
| 11:06:20 | 14 | MR. RIOPELLE:  Okay. |
| 11:06:23 | 15 | THE COURT:  See where the answer goes.  I don't know. |
| 11:06:24 | 16 | THE WITNESS:  Okay.  When I file an application, I go |
| 11:06:29 | 17 | to the US Patent and Trademark Office.  It's user friendly for |
| 11:06:33 | 18 | anyone to file an application.  You just follow each of the |
| 11:06:39 | 19 | steps, step one, step two.  You start with putting all your |
| 11:06:42 | 20 | information about your company or who it's going to be under. |
| 11:06:49 | 21 | You then have to determine whether you're going to use the |
| 11:06:57 | 22 | application for a mark that's being used now, or for a mark or |
| 11:07:03 | 23 | trademark which you have a bonafide intent to use later on. |
| 11:07:08 | 24 | After you do that, you put in the trademark that you want.  If |
| 11:07:12 | 25 | you're using the mark at the time you're doing the application, |

11:07:17  1    you would attach a specimen, which is a sample, of the item that

11:07:22  2    has the mark on it.  Then when you get to the end of it, you

11:07:27  3    have to certify that either you're using the mark or you have a

11:07:31  4    bonafide intent to use the mark, and then you just sign the oath

11:07:36  5    and submit it to the trademark office for them to examine it.

11:07:36  6         BY MR. SCHWARTZ:

11:07:44  7    Q.   As of January 2018, how many years of experience did you

11:07:47  8    have dealing with the trademark office?

11:07:50  9    A.   25.  25 years.

11:07:53  10   Q.   And when you met with Mr. Calabrese, what was your

11:07:55  11   understanding of his experience?

11:07:57  12   A.   Virtually none.

11:08:09  13   Q.   Did you have to provide Mr. Calabrese with some advice as to

11:08:12  14   what he should do with regard to his application that he had

11:08:13  15   filed earlier?

11:08:18  16   A.   Yes.  After we signed the license agreement, I recommended

11:08:22  17   to Mr. Calabrese, because he signed his application

11:08:27  18   individually, to abandon his application, to take it back,

11:08:32  19   expressively abandon and take it off the application list.  And

11:08:36  20   per the agreement, I would file for the mark under RetroBrands

11:08:41  21   and per the agreement, I would handle all the application and

11:08:46  22   legal matters.  And he would concentrate on selling Nextel

11:08:47  23   products.

11:08:50  24   Q.   When you file an application for a trademark that another

11:08:53  25   company was the previous registrant, they're going to get

11:08:55  1   notice, correct?

11:08:56  2   A.  Correct.

11:08:58  3   Q.  There's not going to be any surprise.  You didn't expect any

11:09:01  4   surprise to Sprint when you filed for your application, right?

11:09:02  5   A.  Correct.

11:09:06  6   Q.  There was no way to secretly provide that without them

11:09:07  7   finding out, right?

11:09:07  8   A.  Not at all.

11:09:10  9   Q.  So you were prepared that they were going to oppose it,

11:09:11  10  correct?

11:09:15  11  A.  If they were going to oppose it, I was prepared, yes.

11:09:46  12  Q.  Did it matter to you and RetroBrands as to what Mr. Rubin

11:09:50  13  and/or Mr. Calabrese was going to do with their particular

11:09:51  14  application?

11:09:54  15  A.  No.  As I mentioned, he had filed it individually for

11:10:00  16  himself, not for his company.  So him removing it was the best

11:10:06  17  thing for us.

11:10:17  18  Q.  Is RetroBrands a charitable organization?

11:10:20  19  A.  No, we're a for-profit.

11:10:23  20  Q.  So in the license agreement between RetroBrands and Nextel,

11:10:26  21  Inc. where there was the comment about what the goal was going

11:10:30  22  to be five years down the road, right, you saw that?

11:10:34  23  A.  Oh yes.  As part of our talks, I said to them for the good

11:10:37  24  work you're going to do, hope down the road, hopefully we'll be

11:10:42  25  able to sell the company and we can all do well with it.  It was

| | | |
|---|---|---|
| 11:10:44 | 1 | one simple paragraph. |
| 11:10:50 | 2 | Q.  And you've sold other nostalgic brands that you've revived |
| 11:10:50 | 3 | for money, right? |
| 11:10:54 | 4 | A.  Yes, I've licensed brands, I've sold brands, I've |
| 11:10:57 | 5 | re-launched brands for the last 20 years. |
| 11:11:11 | 6 | Q.  The purpose of your website, the Nextel Mobile Worldwide |
| 11:11:15 | 7 | website was not to cell phones, that was up to Nextel, Inc., |
| 11:11:16 | 8 | correct? |
| 11:11:21 | 9 | A.  Yes, my website was more of an informational website. |
| 11:11:23 | 10 | Q.  Did you have disclaimers on your website? |
| 11:11:28 | 11 | A.  All websites including our dealers, everyone has a |
| 11:11:31 | 12 | disclaimer that we're not authorized by Sprint, we're not |
| 11:11:33 | 13 | associated with Sprint, we did our best to keep ourselves |
| 11:11:38 | 14 | totally away from Sprint. |
| 11:11:39 | 15 | Q.  And why? |
| 11:11:43 | 16 | A.  In the industry, Sprint has one of the worst reputations. |
| 11:11:51 | 17 | The Nextel debacle where they shut down 20 million people, |
| 11:11:56 | 18 | they've been sued by countless companies.  When Nextel was |
| 11:12:01 | 19 | dissolved, when they shut down Nextel, shareholders sued them, |
| 11:12:05 | 20 | they just have a terrible reputation in the industry so we want |
| 11:12:09 | 21 | to make sure we're as far apart from them as possible.  We did |
| 11:12:13 | 22 | not want to be associated with Sprint whatsoever. |
| 11:12:18 | 23 | Q.  Do smaller cell service companies, maybe like Nextel, do |
| 11:12:26 | 24 | they have to use the larger networks like T-Mobile and AT&T in |
| 11:12:27 | 25 | order to set up? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 11:12:30 | 1 | A.  Oh yes, everybody in the industry uses four main companies. |
| 11:12:36 | 2 | They use Verizon, T-Mobile, and AT&T.  And they used to use |
| 11:12:41 | 3 | Sprint, but they're gone.  So companies like Metro, Boost, |
| 11:12:46 | 4 | Cricket, Xfinity, Mint Mobile, every one of those companies |
| 11:12:51 | 5 | don't have their own network.  They buy air time from the big |
| 11:12:55 | 6 | guys at a bulk rate and then they give the savings to the |
| 11:13:00 | 7 | consumer.  So even though you have a Cricket, you're really |
| 11:13:03 | 8 | using AT&T and so forth. |
| 11:13:25 | 9 | Q.  Before I finish up, I just want to make it perfectly clear |
| 11:13:31 | 10 | that the sound mark that they're arguing about is not on any of |
| 11:13:33 | 11 | the Nextel products, correct? |
| 11:13:39 | 12 | A.  No, their frequency is not being used at all. |
| 11:14:03 | 13 | MR. SCHWARTZ:  No further questions, Your Honor. |
| 11:14:07 | 14 | THE COURT:  Redirect. |
| 11:14:07 | 15 | REDIRECT EXAMINATION |
| 11:14:17 | 16 | BY MR. RIOPELLE: |
| 11:14:25 | 17 | Q.  Mr. Kaplan, you said that Nextel -- I believe you testified |
| 11:14:29 | 18 | that Nextel Mobile Worldwide, your company, is not using the |
| 11:14:30 | 19 | chirp, correct? |
| 11:14:32 | 20 | A.  Correct. |
| 11:14:36 | 21 | Q.  You're familiar with the "Nextel is back" video? |
| 11:14:38 | 22 | A.  The what, I'm sorry? |
| 11:14:41 | 23 | Q.  The "Nextel is back" video? |
| 11:14:45 | 24 | A.  There's quite a few videos.  I'm not sure which one you're |
| 11:14:47 | 25 | referring to. |

| | |
|---|---|
| 11:14:53 | 1 |
| 11:14:53 | 2 |
| 11:14:55 | 3 |
| 11:14:58 | 4 |
| 11:15:00 | 5 |
| 11:15:03 | 6 |
| 11:15:06 | 7 |
| 11:15:10 | 8 |
| 11:15:12 | 9 |
| 11:15:15 | 10 |
| 11:15:16 | 11 |
| 11:15:16 | 12 |
| 11:15:18 | 13 |
| 11:15:23 | 14 |
| 11:15:24 | 15 |
| 11:15:26 | 16 |
| 11:15:28 | 17 |
| 11:15:37 | 18 |
| 11:15:37 | 19 |
| 11:15:40 | 20 |
| 11:15:40 | 21 |
| 11:15:42 | 22 |
| 11:15:44 | 23 |
| 11:15:47 | 24 |
| 11:15:49 | 25 |

           MR. RIOPELLE:  Okay.  I'll call it up.  It's Exhibit
113 please.
           THE COURT:  Can we have an understanding that the court
reporter is not trying to follow a commercial while it's
playing, that if you have something that need to be in, you'll
either introduce the transcript or introduce the tape itself so
the appellate court will have an opportunity to read it or look
at it.  It's impossible for her to transcribe a commercial.
           MR. RIOPELLE:  Completely understood, and we submitted
it when we submitted the exhibits to you flash drives that have
them on them.
           THE COURT:  Okay.
           MR. RIOPELLE:  So it will be in the record.
           THE COURT:  All right. Defense you agree?
           MR. SCHWARTZ:  Yes.
           MR. RIOPELLE:  Can you just play the first six seconds,
Carl?
           (Plaintiff's Exhibit 113 playing in open court)
      BY MR. RIOPELLE:
Q.  Do you recognize this as the "Nextel is back" video?
A.  Yes, sir.
Q.  And this is a video you created, right?
A.  Yes, sir.
           MR. RIOPELLE:  Now, could you play like the first 20,
21 seconds?

| | | |
|---|---|---|
| 11:16:00 | 1 | (Plaintiff's Exhibit 113 playing in court) |
| 11:16:04 | 2 | MR. RIOPELLE:  That's good. |
| 11:16:04 | 3 | BY MR. RIOPELLE: |
| 11:16:06 | 4 | Q.  That's the Nextel chirp, isn't it? |
| 11:16:09 | 5 | A.  That is a chirp that I downloaded from the internet and it |
| 11:16:12 | 6 | was not a Nextel chirp. |
| 11:16:15 | 7 | Q.  You were playing that chirp in relation with Nextel, weren't |
| 11:16:16 | 8 | you? |
| 11:16:18 | 9 | A.  This chirp I am, correct. |
| 11:16:23 | 10 | Q.  Now, you also said that you were -- you did an |
| 11:16:30 | 11 | investigation, and as part of it you looked at the Sprint's |
| 11:16:32 | 12 | financial filings, correct? |
| 11:16:35 | 13 | A.  Yes, sir.  The 10-K annual reports. |
| 11:16:40 | 14 | Q.  And you said that -- you testified that after 2013, there |
| 11:16:48 | 15 | was no mention of Nextel as a brand in their financial reports, |
| 11:16:49 | 16 | correct? |
| 11:16:53 | 17 | A.  At this moment, I believe it was 2013, it might be '14 or |
| 11:16:56 | 18 | '15, but it was in that same time frame.  They removed |
| 11:16:58 | 19 | everything, correct. |
| 11:17:00 | 20 | MR. RIOPELLE:  Can we call up Exhibit 59?  There's no |
| 11:17:03 | 21 | objection to this Exhibit, Your Honor. |
| 11:17:06 | 22 | THE COURT:  59.  In evidence then. |
| 11:17:06 | 23 | (Plaintiff's Exhibit 59 in evidence) |
| 11:17:06 | 24 | BY MR. RIOPELLE: |
| 11:17:10 | 25 | Q.  Do you see on the first page towards the top, it says for |

|           |    |                                                              |
|-----------|----|--------------------------------------------------------------|
| 11:17:14  | 1  | the fiscal year ended March 31, 2015?                        |
| 11:17:15  | 2  | A.  Yes, that's correct.                                      |
| 11:17:19  | 3  | Q.  Sorry.  I just want -- so the record is clear, this is the |
| 11:17:21  | 4  | 2015 annual report.                                          |
| 11:17:22  | 5  | A.  Yes.                                                      |
| 11:17:32  | 6  | Q.  And if we could go to Page 10, please.  Sorry.  Page 10 of |
| 11:17:36  | 7  | the PDF.  So Page 10 of the report, so I guess it's probably  |
| 11:17:42  | 8  | Page 12 of the PDF.  You see the section that says "patents,  |
| 11:17:43  | 9  | trademarks and licenses"?                                    |
| 11:17:45  | 10 | A.  Yes.                                                      |
| 11:17:50  | 11 | Q.  Do you see that they disclose we own numerous patents,   |
| 11:17:52  | 12 | trademarks including Nextel?                                  |
| 11:17:56  | 13 | A.  Yes, you're correct.  In '15 it was still there.          |
| 11:17:58  | 14 | Q.  So what you said earlier was incorrect?                   |
| 11:18:00  | 15 | A.  Was misspoken (sic), correct.                            |
| 11:18:03  | 16 | THE COURT:  What's the difference between misspoken and       |
| 11:18:05  | 17 | incorrect?                                                   |
| 11:18:08  | 18 | THE WITNESS:  I basically guessed of the correct years.       |
| 11:18:10  | 19 | THE COURT:  Okay.                                            |
| 11:18:22  | 20 | MR. RIOPELLE:  Can we call up Exhibit 47 please, Carl.        |
| 11:18:22  | 21 | BY MR. RIOPELLE:                                              |
| 11:18:28  | 22 | Q.  You remember looking at this exhibit with your counsel?   |
| 11:18:29  | 23 | A.  Yes, sir.                                                 |
| 11:18:33  | 24 | Q.  And you were pointing out that it was printed in November of |
| 11:18:35  | 25 | 2018?                                                        |

11:18:37   1   A.  Yes, correct.

11:18:42   2   Q.  And counsel has, I think, said that this was eight months

11:18:46   3   after the complaint in this case was filed?

11:18:52   4   A.  The complaint was I believe April.  About six months.

11:18:58   5   Q.  Okay.  Do you recall that Sprint amended the complaint in

11:19:00   6   this case in August of 2018?

11:19:02   7   A.  I believe so.

11:19:07   8   Q.  And they amended it to add infringement of the Nextel chirp,

11:19:08   9   right?

11:19:09  10   A.  I believe so.

11:19:12  11   Q.  And they did it because you started using the Nextel chirp

11:19:16  12   in July of 2018.

11:19:23  13   A.  I started using the sound that we have, correct.

11:19:30  14   Q.  You testified also that you have 25 years of experience.

11:19:31  15   A.  Yes, sir.

11:19:34  16   Q.  Working with the Patent and Trademark Office, right?

11:19:35  17   A.  Yes, sir.

11:19:39  18   Q.  So based on 25 years of experience, working with the Patent

11:19:44  19   and Trademark Office, you would know, right, that you shouldn't

11:19:50  20   start using a brand someone is claiming until your application

11:19:53  21   has actually cleared, right?

11:19:55  22   A.  That is totally untrue.

11:19:57  23        MR. RIOPELLE:  Thank you, sir.

11:19:59  24        THE COURT:  Thank you, sir.  You're excused.

11:20:01  25        MR. SCHWARTZ:  Redirect, Your Honor?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 11:20:05 | 1 | THE COURT:  No.  You get direct, cross, redirect. |
| 11:20:08 | 2 | That's it.  You're excused, sir. |
| 11:20:09 | 3 | THE WITNESS:  Thank you, Your Honor. |
| 11:20:17 | 4 | THE COURT:  Please call your next witness. |
| 11:20:25 | 5 | MR. RIOPELLE:  At this point Your Honor, we would call |
| 11:20:31 | 6 | Mr. Calabrese.  However, he is not here so we are going to play |
| 11:20:32 | 7 | excerpts from his deposition. |
| 11:20:34 | 8 | THE COURT:  You have a video? |
| 11:20:34 | 9 | MR. RIOPELLE:  Video. |
| 11:20:36 | 10 | THE COURT:  All right.  And is there an understanding |
| 11:20:40 | 11 | that this will not be attempted to be recorded, that there will |
| 11:20:44 | 12 | be either a transcript or the document itself will be admitted |
| 11:20:48 | 13 | -- will be attached to the record so that the appellate court |
| 11:20:49 | 14 | can review that? |
| 11:20:52 | 15 | MR. RIOPELLE:  Yes.  We will submit a copy of the |
| 11:20:54 | 16 | transcript that is played. |
| 11:20:56 | 17 | THE COURT:  All right.  Good.  Everybody agree to that? |
| 11:21:00 | 18 | I don't want my court reporter to have a nervous breakdown. |
| 11:21:02 | 19 | Defense, do you agree to that? |
| 11:21:02 | 20 | MR. SCHWARTZ:  Yes, Your Honor. |
| 11:21:06 | 21 | THE COURT:  Okay.  Then go ahead and play.  Then we'll |
| 11:21:09 | 22 | play until about noon and then we'll break. |
| 11:21:11 | 23 | MR. SCHWARTZ:  Would the Court explain to the jury that |
| 11:21:17 | 24 | only parts of videos or transcripts are culled out?  The |
| 11:21:20 | 25 | explanation as to what the process is so -- because it's going |

| | |
|---|---|
| 11:21:23 | 1 |

to seem probably choppy and out of order.

11:21:25   2       THE COURT:  Yeah.  There are certain things that just

11:21:28   3  -- you don't need, like for, example objections.  If there are

11:21:33   4  objections and there are questions that are stricken, we're not

11:21:36   5  going to play all of that.  We're going to cut it to the point

11:21:40   6  that it is admissible, that I have ruled is admissible and

11:21:44   7  therefore, it might look a little bit chopped up.  Hopefully

11:21:50   8  they've edited it nicely so that it's not incomprehensible, but

11:21:53   9  there are parts that are deleted because they didn't want them

11:21:55  10  in and there are parts that are deleted because I said they

11:21:56  11  can't come in.

11:22:01  12       All right?  You may proceed.

11:22:08  13       (Video deposition of Stephen Calabrese playing in open

11:22:10  14  court).

11:37:36  15       MR. RIOPELLE:  I don't know if you wanted to break now.

11:37:41  16  I just wanted -- I need to move in some exhibits into evidence.

11:37:42  17       THE COURT:  Okay.

11:37:44  18       MR. SCHWARTZ:  Before that, Your Honor, would Your

11:37:48  19  Honor just advise the jury the date the deposition was taken?

11:37:50  20       THE COURT:  What was it?  I don't know the date that

11:37:54  21  the deposition was taken.  I'll be happy to let you advise them.

11:37:56  22       MR. SCHWARTZ:  That deposition that you just saw was

11:37:59  23  taken December 5, 2018.

11:38:05  24       THE COURT:  Okay.  Are you going to offer some exhibits

11:38:06  25  into evidence?  Go ahead.

| | | |
|---|---|---|
| 11:38:07 | 1 | MR. RIOPELLE:  Yes, Your Honor.  These are all |
| 11:38:09 | 2 | unobjected to. |
| 11:38:12 | 3 | THE COURT:  Wait.  Let me just read this to the jury. |
| 11:38:15 | 4 | A deposition is a witness's sworn testimony that is |
| 11:38:18 | 5 | taken before the trial.  During a deposition, the witness is |
| 11:38:21 | 6 | under oath and swears to tell the truth and the lawyers for each |
| 11:38:24 | 7 | party may ask questions.  A court reporter is present and |
| 11:38:29 | 8 | records the questions and answers.  The deposition of Stephen |
| 11:38:33 | 9 | Calabrese was taken on -- I guess I did know it -- December 5, |
| 11:38:37 | 10 | 2018, has been presented to you by a video.  Deposition |
| 11:38:40 | 11 | testimony is entitled to the same consideration as live |
| 11:38:43 | 12 | testimony, and you must judge it in the same way as if the |
| 11:38:46 | 13 | witness was testifying in court. |
| 11:38:48 | 14 | All right.  You may proceed, sir. |
| 11:38:51 | 15 | MR. RIOPELLE:  Your Honor, the trial exhibits that were |
| 11:38:59 | 16 | just moved in through that deposition are Exhibits 110 -- none |
| 11:39:01 | 17 | of these have objections. |
| 11:39:03 | 18 | THE COURT:  Okay. |
| 11:39:14 | 19 | MR. RIOPELLE:  111, 48, 62, 87 and 99. |
| 11:39:15 | 20 | THE COURT:  Okay.  So they will be considered in |
| 11:39:16 | 21 | evidence. |
| 11:39:16 | 22 | (Plaintiff's Exhibit 110, 111, 48, 62, 87 and 99 in |
| 11:39:16 | 23 | evidence) |
| 11:39:19 | 24 | MR. RIOPELLE:  Would you like us to call our next |
| 11:39:22 | 25 | witness or did you want to take a break? |

11:39:24  1           THE COURT:  You know, I thought we'd go until noon then

11:39:28  2    break for lunch since we're at 20 minutes of.  So call a

11:39:30  3    witness.  We'll take a break.

11:39:33  4           MR. RIOPELLE:  Plaintiffs would call Brent Kohman.

11:39:37  5           THE COURT:  Very well.

11:40:18  6           Yes, sir.  If you could remain standing here and raise

11:40:26  7    your right hand when you reach the chair.

11:40:26  8           BRENT KOHMAN, PLAINTIFF WITNESS, SWORN.

11:40:28  9           THE COURT:  Please be seated.  Get as close to the

11:40:31 10    microphone as you can, speak loudly, tell us your name and spell

11:40:38 11    it.  You may take your mask off while you're behind the

11:40:39 12    plexiglass.

11:40:44 13           THE WITNESS:  My name is Brent Kohman.  K-O-H-M-A-N.

11:40:46 14    First name B-R-E-N-T.

11:40:50 15           THE COURT:  Okay.  You may proceed.

11:40:50 16           MS. DeFORD:  Thank you, Your Honor.

11:40:50 17                          DIRECT EXAMINATION

11:40:50 18       BY MS. DeFORD:

11:40:53 19    Q.  Mr. Kohman, I understand before we start that you have a

11:40:56 20    medical condition that you just wanted to briefly share with the

11:40:58 21    jury.  Could you do that now please?

11:41:02 22    A.  Yes.  I was born with what they call a familial tremor.  So

11:41:06 23    if you see my head shaking a little bit, it's something that I

11:41:09 24    was born with, I'm not disagreeing with anyone.

11:41:09 25    Q.  Thank you, Mr. Kohman.

                   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                   TRANSCRIPT PRODUCED BY COMPUTER

| 11:41:13 | 1 | Could you tell the jury where you currently work? |

11:41:13   1           Could you tell the jury where you currently work?

11:41:15   2   A.   I work for Motorola Solutions.

11:41:18   3   Q.   And what's your current title?

11:41:20   4   A.   I'm senior manager of business operations.

11:41:24   5   Q.   At a high level, what are your job responsibilities?

11:41:31   6   A.   I help our Motorola sellers sell the Kodiak mission-critical

11:41:33   7   push-to-talk software.

11:41:36   8   Q.   I want to break that down a little bit.  I want to start

11:41:38   9   first what push-to-talk is.  Could you remind the jury what

11:41:39  10   push-to-talk is?

11:41:44  11   A.   Push-to-talk is a walkie-talkie feature, it's for group

11:41:48  12   communication generally used by public safety.  When you push

11:41:52  13   the button on the phone and you speak, everybody in your group

11:41:56  14   hears.  Hears you instantly.  You don't have to wait for ringing

11:41:59  15   or anything like that.  It's for critical communication.

11:42:02  16   Q.   And so you said mission critical before, and you just said

11:42:06  17   critical again.  What's the mission critical component of the

11:42:08  18   Kodiak software?

11:42:13  19   A.   The Kodiak software is designed to be integrated into a

11:42:18  20   carrier's network to provide the users of the software priority

11:42:21  21   service over other applications on the phone.

11:42:25  22   Q.   And so what is priority service, could you explain that a

11:42:26  23   little bit to the jury?

11:42:30  24   A.   Well, priority service is -- we all know you can get into

11:42:35  25   areas like stadiums or events where the networks are congested.

11:42:39  1   Priority services are designed to give mission critical users

11:42:44  2   first basically use of that network.  So when I push the button

11:42:48  3   and if I have priority service, my call is going to go through

11:42:51  4   when other people's may not.

11:42:55  5   Q.   And how did you end up working for Motorola, Mr. Kohman?

11:43:00  6   A.   Motorola purchased a company that I worked for called Kodiak

11:43:01  7   Networks.

11:43:03  8   Q.   And where did you work prior to Kodiak?

11:43:05  9   A.   I worked for Sprint Nextel.

11:43:07  10  Q.   What was your role when you were at Sprint?

11:43:10  11  A.   I was the manager of business base retention.

11:43:13  12  Q.   Did your position at Sprint involve push-to-talk as well?

11:43:15  13  A.   Yes, it did.

11:43:17  14  Q.   So over the course of your career, about how many years

11:43:20  15  would you say you've worked in the push-to-talk industry with

11:43:23  16  push-to-talk devices and services?

11:43:26  17  A.   I've worked in the telecommunication industry in

11:43:30  18  push-to-talk 30 years, but managing teams for push-to-talk

11:43:32  19  probably 17 years.

11:43:37  20  Q.   In about your 17 year experience and 30 years overall in

11:43:41  21  this industry, are there any brands or brand that are

11:43:43  22  particularly known for push-to-talk services?

11:43:47  23  A.   Nextel is known as the gold standard of push-to-talk for

11:43:55  24  cellular operators.  And then Motorola is also a brand as well

11:43:55  25  as Kodiak.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

11:44:00  1    Q.   And in your current role with Motorola, do you ever interact

11:44:02  2    with customers who are interested in buying push-to-talk?

11:44:04  3    A.   Every day.

11:44:08  4    Q.   Okay.  Do those customers ever bring up the Nextel name with

11:44:08  5    you?

11:44:09  6    A.   They do.

11:44:13  7    Q.   And when they do, what's your understanding of the company

11:44:17  8    that they understand offers the Nextel brand?

11:44:22  9    A.   Nextel is generally associated with Sprint Nextel.

11:44:25  10   Q.   So going back to your time when you were working at Sprint,

11:44:28  11   what kind of network did Sprint use?

11:44:32  12   A.   Sprint used the iDEN network.

11:44:36  13   Q.   So I understand there's a lot of technology that underlies

11:44:39  14   that, but could you just give the jury a very high-level

11:44:42  15   explanation of what the iDEN network was?

11:44:46  16   A.   The iDEN network was a narrow band network that was really

11:44:50  17   designed for push-to-talk fleets, and it evolved to become a

11:44:53  18   nationwide cellular network.

11:44:55  19   Q.   And when did you actually leave Sprint?

11:44:59  20   A.   I left Sprint in 2014.

11:45:03  21   Q.   When you left, was Sprint still using the iDEN network?

11:45:04  22   A.   No, they were not.

11:45:04  23   Q.   Why not?

11:45:07  24   A.   We had shut the network down.

11:45:11  25   Q.   And why did Sprint shut that network down?

11:45:16   1    A.   Most consumers in that day were starting to use data

11:45:20   2    networks, broadband networks for applications like e-mail and

11:45:25   3    web surfing, and the iDEN network was a narrow band network, it

11:45:26   4    wasn't designed to do that.

11:45:29   5    Q.   Did Sprint have another network that it had been using at

11:45:32   6    the same time as iDEN?

11:45:34   7    A.   Yes, it was the CDMA network.

11:45:38   8    Q.   So in your role as a business base retention manager at

11:45:42   9    Sprint, were you involved in migrating consumers from the iDEN

11:45:45   10   network over to the CDMA network?

11:45:50   11   A.   Yes, my team led the migration and retention of the Nextel

11:45:55   12   consumers from the iDEN network to the CDMA network.

11:45:57   13            THE COURT:  You're saying CDMA?

11:46:00   14            THE WITNESS:  Yes, CDMA.

11:46:00   15         BY MS. DeFORD:

11:46:03   16   Q.   When did Sprint start the processing of telling customers

11:46:05   17   that's the iDEN network was going to be shut down?

11:46:08   18   A.   It would have been a couple years, at least a couple years

11:46:12   19   prior to the shutdown.  The reason being most customers have a

11:46:16   20   two-year contract at that time with their phone, and we wanted

11:46:20   21   to at least announce that the network was going to be shut down

11:46:26   22   so that we could give the customers useful value of their phone

11:46:31   23   for at least two years after our announcement so that we could

11:46:35   24   migrate them over to the CDMA network.

11:46:38   25   Q.   As a manager of business retention, were you involved in

11:46:41  1    actually preparing and sending the communications to those

11:46:42  2    customers about that shutdown?

11:46:44  3    A.   Yes, I was.

11:46:48  4    Q.   Did any of those communications use the Nextel brand to help

11:46:50  5    entice customers to stay with Sprint?

11:46:54  6    A.   Yes, it did.  They did.

11:47:00  7    Q.   When Sprint turned off the iDEN network, Mr. Kohman, did it

11:47:02  8    stop using Nextel?

11:47:03  9    A.   No, they did not.

11:47:04 10    Q.   Why not?

11:47:09 11    A.   The Nextel name is a brand, it's not a network.  We shut

11:47:13 12    down the iDEN network, but we were going to continue to use

11:47:13 13    Nextel.

11:47:17 14    Q.   And why did Sprint want to keep using Nextel after the iDEN

11:47:18 15    network shut down?

11:47:21 16    A.   Because customers, again, related Nextel to push-to-talk,

11:47:27 17    and it was the gold standard in push-to-talk.  It had value.

11:47:30 18    Q.   At the time the iDEN network was shut down, was there a

11:47:34 19    particular type of customer that Nextel really resonated with?

11:47:38 20    A.   Definitely business and public safety.  Mostly public

11:47:40 21    safety, police and firefighters.

11:47:43 22    Q.   What about the average retail consumer?

11:47:46 23    A.   No, not really.  They weren't -- again they were

11:47:50 24    transitioning to Facebook apps, Twitter and text messaging, and

11:47:53 25    they weren't really interesting in push-to-talk.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

11:47:55  1    Q.  And were you personally involved in any discussions at

11:48:01  2    Sprint about what it would do with the Nextel brand after the

11:48:01  3    iDEN network shut down?

11:48:03  4    A.  Yes, I was.

11:48:04  5    Q.  What decisions were reached?

11:48:10  6    A.  We recommended that the name and decided that the name was

11:48:15  7    going to be used and assigned to specially push-to-talk devices,

11:48:20  8    specifically an intrinsically safe device.

11:48:23  9    Q.  What does an intrinsically safe device mean?

11:48:26  10   A.  A device that would not emit a spark when you're working

11:48:31  11   near gas.  Because you know if you're a firefighter, you're

11:48:36  12   going into a filling station and there's gas, you don't want to

11:48:39  13   use PTT and emit a spark and create a fire.

11:48:44  14   Q.  Why would Sprint want to use Nextel specifically with an

11:48:45  15   intrinsically safe device?

11:48:49  16   A.  These were generally the most rugged, they met the highest

11:48:52  17   standards and they're the most expensive.  So our customers --

11:48:57  18   we wanted to assign the gold standard brand to the gold standard

11:48:57  19   device.

11:49:01  20   Q.  Did the meetings you were involved in about how Sprint would

11:49:05  21   use Nextel after iDEN was shut down list any other ways or

11:49:08  22   discuss any other ways that Sprint would use the brand?

11:49:11  23   A.  Yes, we were going to continue to use the brand at trade

11:49:15  24   events that were specific to the market that was buying

11:49:20  25   push-to-talk which is public safety and fire.  We're also going

| | | |
|---|---|---|
| 11:49:24 | 1 | to use the brand in business direct presentations. |
| 11:49:27 | 2 | Q.  At any point in the planning meetings was there any |
| 11:49:31 | 3 | discussion or consideration by Sprint of stopping use of Nextel |
| 11:49:31 | 4 | altogether? |
| 11:49:34 | 5 | A.  No, there was not. |
| 11:49:34 | 6 | Q.  Why not? |
| 11:49:38 | 7 | A.  The brand had value and they were still using it. |
| 11:49:41 | 8 | Q.  And Mr. Kohman, since you've left Sprint, have you |
| 11:49:44 | 9 | personally seen Sprint use the Nextel brand? |
| 11:49:48 | 10 | A.  Yes, I have seen Sprint use the Nextel brand at trade events |
| 11:49:52 | 11 | and I've also seen them use the Nextel brand at presentations |
| 11:49:55 | 12 | with me. |
| 11:49:59 | 13 | Q.  While you were at Sprint, Mr. Kohman, did Sprint ever |
| 11:50:03 | 14 | receive any offers from anybody to buy the Nextel brand? |
| 11:50:07 | 15 | A.  Yes.  They received two offers.  One was from Morgan O'Brien |
| 11:50:11 | 16 | and the other one was from Nextel International. |
| 11:50:13 | 17 | Q.  Who is Mr. O'Brien? |
| 11:50:17 | 18 | A.  I believe he was a founder of Nextel, one of the original |
| 11:50:21 | 19 | people with the Nextel company. |
| 11:50:22 | 20 | Q.  And what is Nextel International? |
| 11:50:28 | 21 | A.  Nextel International is a South American cellular company |
| 11:50:34 | 22 | that operated networks in Colombia and Mexico, and they also |
| 11:50:41 | 23 | bought their iDEN equipment from Motorola, used iDEN devices and |
| 11:50:45 | 24 | used the Nextel name with Sprint's permission. |
| 11:50:49 | 25 | Q.  Do you recall around what year Mr. O'Brien and Nextel |

| | | |
|---|---|---|
| 11:50:51 | 1 | International made those offers? |
| 11:50:56 | 2 | A.  It would have been somewhere around 2012. |
| 11:50:58 | 3 | Q.  Was that at the time that Sprint was considering shutting |
| 11:51:01 | 4 | down the iDEN network? |
| 11:51:02 | 5 | A.  Yes. |
| 11:51:07 | 6 | Q.  And do you know how much either Mr. O'Brien or Nextel |
| 11:51:10 | 7 | International offered Sprint to buy the Nextel brand? |
| 11:51:13 | 8 | A.  I don't remember the specifics in amount, but it was in the |
| 11:51:15 | 9 | millions of dollars. |
| 11:51:17 | 10 | Q.  And do you know what Sprint did in response to those offers? |
| 11:51:19 | 11 | A.  They declined both of them. |
| 11:51:20 | 12 | Q.  Why? |
| 11:51:24 | 13 | A.  Because they were still using the brand and it had value. |
| 11:51:30 | 14 | Q.  Shifting gears a little bit, Mr. Kohman, how did you first |
| 11:51:32 | 15 | learn about the Defendants in this case? |
| 11:51:38 | 16 | A.  I learned about the Defendants at IWCE, which is a trade |
| 11:51:41 | 17 | event in 2017. |
| 11:51:44 | 18 | Q.  Okay.  Could you actually tell the jury a little more about |
| 11:51:48 | 19 | what IWCE is, what types of customers or vendors typically |
| 11:51:50 | 20 | attend that trade show? |
| 11:51:54 | 21 | A.  It's, you know, firefighters, business critical, police |
| 11:52:00 | 22 | officers, radio managers attend IWCE, and they're all the same |
| 11:52:03 | 23 | market that buys push-to-talk devices. |
| 11:52:07 | 24 | Q.  And who were you working for in 2017 when you were at that |
| 11:52:07 | 25 | trade show? |

11:52:10  1    A.  I was working for Kodiak Networks.

11:52:14  2    Q.  How did you come across the Defendants then?

11:52:20  3    A.  A few employees and coworkers came up to me and told me

11:52:23  4    about their booth at the event.

11:52:27  5    Q.  If you were working for Kodiak at that point, what's your

11:52:30  6    understanding about why your coworkers and these other

11:52:34  7    individuals would come up to you to talk about the Defendants

11:52:35  8    Nextel-branded booth?

11:52:39  9    A.  Well, they were confused.  Because, you know, Sprint was

11:52:43  10   there, they were using the Nextel brand and there was obviously

11:52:46  11   another company there, I believe that was using the Nextel brand

11:52:50  12   and you know, they didn't know if they were part of Sprint or

11:52:50  13   not.

11:52:53  14   Q.  And about how many people approached you to talk about that?

11:52:55  15   A.  Probably about three or four.

11:52:58  16   Q.  You mentioned that Sprint had a booth at IWCE in 2017?

11:52:59  17   A.  Yes.

11:53:02  18   Q.  And you mentioned that they were using the Nextel mark.  Do

11:53:05  19   you recall how they were using the Nextel mark?

11:53:12  20   A.  I believe it was on a screen at their -- in their booth.

11:53:14  21   Q.  Did you ever go look at the Defendants' booth?

11:53:15  22   A.  I did.

11:53:17  23   Q.  What did you see?

11:53:25  24   A.  I saw Nextel signage that was using the same color and font

11:53:32  25   of Nextel, that Nextel used prior and after the merger, and the

11:53:39  1   merger with Sprint.  And also I saw that they were using an iDEN

11:53:42  2   naming convention on their devices.

11:53:45  3   Q.  So I want to ask you a little bit more about each of those.

11:53:48  4   Let's talk about the colors first.  What about the colors drew

11:53:51  5   your attention, what about the colors the Defendants were using

11:53:53  6   drew your attention.

11:53:58  7   A.  Well, they were using yellow and black.  And in the

11:54:02  8   telecommunications industry, each of the carriers are basically

11:54:06  9   known by colors.  You know, T-Mobile is magenta now and AT&T is

11:54:12  10  blue, Verizon is red.  And at that time, you know, Sprint Nextel

11:54:14  11  is yellow.

11:54:19  12  Q.  And you also mentioned how they were naming the models of

11:54:22  13  their phones.  Could you explain a little more about what about

11:54:25  14  -- how the Defendants were naming the models of their phones

11:54:26  15  drew your attention?

11:54:31  16  A.  Yes.  It looked -- it was exactly like the, what I call --

11:54:35  17  it's called the iDEN naming convention.  Motorola manufactured

11:54:39  18  the iDEN devices.  Motorola branded the devices Motorola, and

11:54:45  19  they named them with the lower case "I" and three numbers like

11:54:52  20  i870, i580, i670.  They were all branded that way, it seemed to

11:54:56  21  me that they wanted people to think these were Motorola devices.

11:54:59  22  Q.  And when you say they wanted people to think they were

11:55:03  23  Motorola devices, who are you referring to?

11:55:07  24  A.  The Defendant.  Or -- yeah.

11:55:11  25  Q.  Before Sprint shut down the iDEN network, did it sell

11:55:15  1  Motorola-branded devices using the Nextel brand that had that

11:55:16  2  "I" naming convention?

11:55:19  3  A.  Excuse me.  Did you say before?

11:55:23  4  Q.  Before the iDEN network was shut down, did Sprint sell

11:55:28  5  Nextel-branded devices made by Motorola that used that "I"

11:55:30  6  naming convention that you just talked about?

11:55:30  7  A.  Yes, they did.

11:55:36  8  Q.  And forgive me if you said it Mr. Kohman, but what does that

11:55:37  9  "I" refer to?

11:55:40  10  A.  The lower case "I" refers to iDEN.

11:55:42  11  Q.  Is that something in your experience that's commonly known

11:55:44  12  to people who buy these products in the industry?

11:55:46  13  A.  Yes, to the people that buy these products, absolutely it's

11:55:48  14  commonly known.

11:55:51  15  Q.  And do the Defendants' services operate over the iDEN

11:55:51  16  network?

11:55:55  17  A.  No, they do not.

11:55:59  18  Q.  Did you look specifically at their devices, could you tell

11:56:01  19  whether they were Motorola made?

11:56:05  20  A.  They were not Motorola made.  I couldn't tell who made the

11:56:07  21  devices, but they were not made by Motorola.

11:56:11  22  Q.  What about them prevented you from being able to tell who

11:56:12  23  made them?

11:56:15  24  A.  There was no manufacturer name on the device.

11:56:18  25  Q.  Is that common in this industry to have devices that don't

11:56:21   1   have a manufacturer name on them?

11:56:24   2   A.   Not at all.  Generally the manufacturers, when they sell a

11:56:27   3   device, they want customers to be attached to their device and

11:56:31   4   buy another device if they like it the first time, and there was

11:56:34   5   no name on this these devices.

11:56:43   6   Q.   So we talked a little bit when you were at Sprint how

11:56:47   7   Sprint's push-to-talk services were offered over iDEN.  Do you

11:56:51   8   know how Sprint offers its push-to-talk services today?  What

11:56:52   9   platform it uses?

11:56:54   10  A.   The platform they use is the Kodiak platform.

11:56:58   11  Q.   And you touched upon this briefly, but could you remind the

11:57:00   12  jury specifically about what benefits Sprint's customers get

11:57:02   13  because of the Kodiak platform?

11:57:08   14  A.   The Kodiak software's mission critical push-to-talk software

11:57:12   15  designed to be integrated into the carriers network.

11:57:15   16  Q.   And that mission-critical software provides what ability to

11:57:19   17  Sprint or to those customers when they're making push-to-talk

11:57:19   18  calls?

11:57:25   19  A.   Again, it provides priority service so that in times where

11:57:30   20  there's a disaster or congestion, the police or firefighters

11:57:32   21  calls are going to go through.

11:57:35   22  Q.   Could you get the same benefit if you just bought a set of

11:57:39   23  SIM cards that operated on one of the carrier's works?

11:57:45   24  A.   No.  The software has to be integrated into the network so

11:57:50   25  if you just bought SIM cards and -- the service would operate

11:57:58  1    over the top, and if somebody was utilizing a data application

11:58:03  2    and the network was congested, the service wouldn't work.

11:58:09  3              MS. DeFORD:  Thank you, Mr. Kohman.  I appreciate your

11:58:10  4    time.  Thank you, Your Honor.

11:58:11  5              THE COURT:  Cross.

11:58:13  6              MR. SCHWARTZ:  Your Honor, if I might ask that we take

11:58:17  7    our break now?  I have -- I definitely have to go to the

11:58:22  8    restroom and if this would be a good time for lunch.

11:58:23  9              THE COURT:  Might as well.  Ladies and gentlemen, we're

11:58:27  10   going to break for lunch now.  As I told you yesterday -- not

11:58:31  11   yet.  As I told you yesterday, the 7th floor does have a

11:58:36  12   cafeteria.  It's edible.  On the other hand, one block that way

11:58:40  13   is Miami-Dade College downtown.  Where there's kids, there's

11:58:45  14   food.  Always around there there's places.  Go down on Flagler

11:58:49  15   there's every ethnic restaurant you ever thought of.  If you go

11:58:53  16   a block that way and a block north, there's a Publix that has a

11:58:56  17   very nice food area.  You have to pick it up and take it out,

11:58:59  18   but it's still -- there's no place to eat in there, is there?

11:59:06  19   No, but they have sandwiches and you can buy probably a whole

11:59:09  20   cow if you wanted to.  Anyway, what's the name of the coffee

11:59:12  21   place across the street?  There's a Starbucks across the street

11:59:16  22   and a Chick-Fil-A in the train station building.  And I promise

11:59:20  23   you that Brightline will not run you over if you're in their

11:59:24  24   train station because it ends right there.  So there's been no

11:59:30  25   accidents from the Brightline in the station.  Go and come back

                                                                              80

11:59:33   1    at let's say 1:15.

11:59:36   2         Again, I remind you you're not to discuss the case with

11:59:38   3    anyone or permit anyone to discuss the case with you.  You can

11:59:41   4    come back a little bit early and hang around in the jury room or

11:59:45   5    down the hallway, either way.  But please, don't read or listen

11:59:48   6    to anything about the case, don't do any research, don't have

11:59:52   7    any contact with the attorneys, parties or witnesses.  Don't

11:59:55   8    form any opinion about this case until all the evidence is in.

11:59:59   9    You're required to keep an open mind until you start your

12:00:01   10   deliberations at the end of the case.

12:00:03   11        Thank you, and we'll see you at 1:15.

12:00:05   12        COURT SECURITY OFFICER:  All rise for the jury.

12:00:08   13        (Jury out at 12 p.m.)

12:00:11   14        THE COURT:  Remember to leave your notes in the jury

12:00:15   15   room or in here, doesn't matter which.

12:00:28   16        All right.  We'll be in recess until 1:15.

12:00:30   17        Mr. Witness, while you're on the stand, you're not

12:00:32   18   permitted to discuss your testimony with anyone, even the

12:00:37   19   lawyers that called you.  We'll be in recess until 1:15.

12:00:37   20        MR. RIOPELLE:  Thank you, Your Honor.

12:00:39   21        THE COURT:  Please have him back on the stand and ready

12:00:42   22   to go at 1:15.

12:00:42   23        MS. DeFORD:  Thank you, Your Honor.

12:00:44   24        THE COURT:  Thank you.

12:00:44   25        (Lunch recess)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1:17:13   1              COURT SECURITY OFFICER:  All rise for the jury.
1:17:17   2              (Jury in at 1:17 p.m.).
1:20:00   3              (Court called to order)
1:20:03   4              THE COURT:  You may proceed.
1:20:03   5                             CROSS-EXAMINATION
1:20:03   6         BY MR. KERNELL:
1:20:31   7    Q.  Good afternoon, Mr. Kohman.  My name is Jim Kernell, I
1:20:33   8    represent the Defendants in this case.
1:20:43   9              Now, listening to your testimony earlier this morning
1:20:50   10   or just right before lunch, you identified the Kodiak software,
1:20:51   11   correct?
1:20:51   12   A.  Yes, I did.
1:20:56   13   Q.  And the Kodiak software is mission-critical software?
1:20:56   14   A.  Yes, it is.
1:21:04   15   Q.  And what are the target industries for this mission-critical
1:21:06   16   software?
1:21:13   17   A.  Public safety, firefighters, and there are commercial uses
1:21:14   18   as well.
1:21:20   19   Q.  So with the commercial uses, is it necessary to have the
1:21:25   20   mission-critical software in the device?
1:21:28   21   A.  No.
1:21:31   22   Q.  So I'm sorry, you said public safety?
1:21:33   23   A.  Firefighters.
1:21:35   24   Q.  Firefighters?
1:21:37   25   A.  Uh-huh.
```

1:21:44  1   Q.  Would a device with the Kodiak software, and that's a

1:21:54  2   Motorola product, would a device need the Kodiak software if

1:21:58  3   it's just for the hospital industry?

1:22:00  4   A.  No, not necessarily.

1:22:06  5   Q.  If it's just for, say, transportation where we've got truck

1:22:09  6   drivers you're trying to keep track of where your truck drivers

1:22:11  7   are, would you need it for that type of application?

1:22:14  8   A.  Not necessarily, no.

1:22:20  9   Q.  What about for like security at a concert.  Would you need

1:22:22  10  mission-critical software in that?

1:22:26  11  A.  You may want it because at a concert, network congestion is

1:22:31  12  there, so you would probably want the Kodiak software for the

1:22:32  13  priority services.

1:22:41  14  Q.  Okay.  So if -- now you were at Sprint.  Now, did you start

1:22:44  15  with Sprint in 2005 or were you with Nextel at the time?

1:22:48  16  A.  No, I started in Sprint in, I believe, '96.

1:22:49  17  Q.  In '96?

1:22:50  18  A.  Uh-huh.

1:22:56  19  Q.  And so you were with Sprint from '96 to 2014; is that

1:22:56  20  correct?

1:22:57  21  A.  Yes.

1:23:03  22  Q.  And so you were there when Nextel was merged into Sprint.

1:23:05  23  A.  Yes, I was.

1:23:16  24  Q.  So up until the time you left Sprint in 2014, were the

1:23:20  25  phones using Kodiak software?

1:23:21  1    A.  They were not.

1:23:25  2    Q.  So the phones, all the phones on the iDEN network were not

1:23:30  3    using this the Kodiak software.

1:23:36  4    A.  No.  The phones at that time were using iDEN and then

1:23:41  5    transitioned to CDMA on a QChat software.

1:23:47  6    Q.  And are those other mission-critical software platforms?

1:23:52  7    A.  QChat is, it no longer exists.

1:23:59  8    Q.  Was there a mission-critical software platform on the Nextel

1:24:00  9    network?

1:24:06  10   A.  The Nextel network was -- as I said, it was designed to be a

1:24:11  11   push-to-talk network, and it kind of, in its essence, was a

1:24:14  12   push-to-talk network that tried to be a cellular network at the

1:24:18  13   same time.  So it was really designed ground up to be

1:24:20  14   push-to-talk, the iDEN.

1:24:23  15   Q.  It was designed to be push-to-talk but not necessarily the

1:24:29  16   mission-critical software as the Kodiak software is today,

1:24:30  17   correct?

1:24:36  18   A.  I would say that it was pretty much mission critical, iDEN

1:24:38  19   was pretty much mission critical.

1:24:41  20   Q.  That was the 2G network, wasn't it?

1:24:42  21   A.  Right.  Right.

1:24:45  22   Q.  And it didn't work when you put more data on the network?

1:24:48  23   A.  That's right.  The reason it could be, it was very

1:24:54  24   voice-centric, push-to-talk-centric, but it wasn't data-centric.

1:25:03  25   Q.  So you said you in your 17-year experience, I think you said

1:25:11   1    that, and I believe that was from the time you worked at Sprint?

1:25:11   2    A.   Yeah.

1:25:15   3    Q.   You said that Nextel was known as the gold standard of

1:25:17   4    push-to-talk at that time.

1:25:19   5    A.   That's correct.

1:25:27   6    Q.   And but it was known as the gold standard at that time.

1:25:31   7    A.   I think it's still recognized as the gold standard today.

1:25:43   8    Q.   So can I go and buy a Nextel push-to-talk device today?

1:25:48   9    A.   You can buy devices, as I said, like the specialty devices.

1:25:52   10   I believe that Sprint sells that are branded Nextel devices.

1:25:54   11   Q.   And what are those devices?

1:25:59   12   A.   They're generally either intrinsically safe, at least they

1:26:03   13   were when I was there, intrinsically safe.  I'm not as familiar

1:26:06   14   on their portfolio today because I haven't been there since

1:26:06   15   2014.

1:26:11   16   Q.   So you don't know if they actually sell any devices today,

1:26:17   17   Sprint or now it's T-Mobile, that has Nextel on that twice.

1:26:23   18   A.   I have seen devices that have packaging and that has Nextel

1:26:24   19   on it, on their devices.

1:26:29   20   Q.   On the device itself?

1:26:32   21   A.   On the packaging.  Nextel on the packaging.

1:26:34   22   Q.   Are you talking about Nextel on a label?

1:26:35   23   A.   Yes.

1:26:39   24   Q.   And that's a label that's just printed and applied to a box.

1:26:41   25   A.   Yes.

| | | |
|---|---|---|
| 1:26:52 | 1 | Q. Now, you also said that Nextel was generally associated as |
| 1:26:58 | 2 | Sprint Nextel.  Do you recall that testimony? |
| 1:26:59 | 3 | A. Yes. |
| 1:27:07 | 4 | Q. And you were at -- you were working at Sprint Nextel? |
| 1:27:07 | 5 | A. Yes. |
| 1:27:11 | 6 | Q. At the time when Sprint dropped Nextel from its name, |
| 1:27:14 | 7 | correct? |
| 1:27:20 | 8 | A. I don't -- I think it had -- I don't recall when they |
| 1:27:23 | 9 | dropped from the company name, the Nextel.  I believe -- I don't |
| 1:27:26 | 10 | remember what that date was. |
| 1:27:30 | 11 | Q. So if I could show you that Sprint dropped the name Nextel |
| 1:27:38 | 12 | from its corporate name on December 31, 2012, would that help |
| 1:27:41 | 13 | refresh your memory? |
| 1:27:43 | 14 | A. Sounds about right. |
| 1:27:55 | 15 | Q. You spoke about the iDEN network and said it was designed |
| 1:27:57 | 16 | for push-to-talk. |
| 1:28:00 | 17 | A. Uh-huh. |
| 1:28:05 | 18 | Q. Right?  But then later when smartphones started coming in, |
| 1:28:11 | 19 | that there wasn't -- there was the customers that are coming in |
| 1:28:16 | 20 | that are using smartphones and not the push-to-talk anymore, |
| 1:28:16 | 21 | correct? |
| 1:28:18 | 22 | A. That's correct. |
| 1:28:23 | 23 | Q. And so most of the customers were using the smartphones, |
| 1:28:26 | 24 | correct? |
| 1:28:33 | 25 | A. Your consumer customers use smartphones, most do today. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1:28:37  1    Q.   So consumer customers are retail customers?

1:28:38  2    A.   Yes.

1:28:43  3    Q.   And the vast majority of the consuming public use just the

1:28:46  4    retail smartphones.  Correct?

1:28:48  5    A.   I would say that's correct.

1:28:56  6    Q.   And that the push-to-talk segment of the cellphone industry

1:29:01  7    is a very, very, very narrow band; is that correct?

1:29:05  8    A.   Yes, it's a smaller part of the market geared towards

1:29:07  9    business generally.

1:29:14  10    Q.   And it's specifically geared to firefighters, to those who

1:29:19  11    need immediate access with a walkie-talkie type device, correct?

1:29:20  12    A.   Yes.

1:29:26  13    Q.   But you can also download push-to-talk apps for a

1:29:26  14    smartphone, correct?

1:29:30  15    A.   Yes, you can download the Kodiak apps, that's correct.

1:29:35  16    Q.   And you can download third-party apps that don't use Kodiak,

1:29:35  17    correct?

1:29:36  18    A.   Yes, you can.

1:29:39  19    Q.   And what are some of the other software platforms that

1:29:45  20    implement mission-critical software for cellphones?

1:29:52  21    A.   I would say true mission critical would be Samsung, Ericsson

1:29:59  22    and Kodiak.

1:30:04  23    Q.   Let me ask you this, does Motorola sell the Kodiak software

1:30:09  24    to other carriers other than T-Mobile?

1:30:10  25    A.   Yes.

1:30:15  1    Q.  And what other carriers is Kodiak software available for?

1:30:27  2    A.  In the US, AT&T, Verizon.  In Canada, Bell Mobility and many

1:30:31  3    other providers across the world.

1:30:40  4    Q.  Do you have to -- so for T-Mobile or Sprint, and the

1:30:50  5    push-to-talk applications or devices, do you have to be a Sprint

1:30:55  6    subscriber to use the Kodiak software through a push-to-talk

1:30:55  7    device?

1:31:02  8    A.  Would you repeat that question?  Could you repeat that

1:31:02  9    question?

1:31:09  10    Q.  Sure.  To use the mission-critical software that Sprint has

1:31:18  11    licensed, I assume, from Motorola, the Kodiak, do you have to be

1:31:22  12    a Sprint subscriber with a phone in order to use that service

1:31:25  13    through Sprint?

1:31:30  14    A.  You can use -- yes, to use Sprint's service through Sprint,

1:31:36  15    you have to be a Sprint subscriber.  Some of the applications

1:31:42  16    like Wave, the Kodiak Wave that Motorola sells directly to its

1:31:46  17    customers is over-the-top or cross carrier.

1:31:48  18    Q.  And that can be used on a Sprint device?

1:31:52  19    A.  That can be used on a Sprint device, yes.

1:31:54  20    Q.  And that could be used on an AT&T device?

1:31:55  21    A.  Yes.

1:31:58  22    Q.  And it can be used on a Verizon device?

1:32:01  23    A.  Yes.

1:32:10  24    Q.  So you have a lot of experience in knowing what the customer

1:32:15  25    make-up was at Sprint at the time, and I realize this is eight

1:32:19   1   years ago when you worked there, but your focus was on

1:32:20   2   push-to-talk, correct?

1:32:22   3   A.   Yes, when I was there.

1:32:25   4   Q.   And so, I mean, everything around your world is

1:32:28   5   push-to-talk.  You're not worrying about customers out here that

1:32:34   6   are using just a regular cellphone plans, is that accurate?

1:32:41   7   A.   When I was manager of business base retention, we also sold

1:32:44   8   smartphones to the business base, so I was responsible for

1:32:52   9   retention of business, Android and iOS subscribers as well that

1:32:53   10  did not have push-to-talk.

1:32:57   11  Q.   But you weren't in charge of just the general consuming

1:32:58   12  public?

1:33:02   13  A.   No.

1:33:09   14  Q.   And then you also talked about devices that are

1:33:17   15  intrinsically safe devices.  And I believe in this case you

1:33:19   16  submitted a declaration, correct?

1:33:20   17  A.   Uh-huh.  Yes, sir.

1:33:23   18  Q.   Do you remember that?  And in your declaration, you

1:33:32   19  identified a mission-critical software or -- I'm sorry, an

1:33:34   20  intrinsically safe device.  Do you recall that?

1:33:35   21  A.   Yes.

1:33:40   22  Q.   And that was a Sonim XP Strike IS; is that correct?

1:33:44   23  A.   That's correct.

1:33:46   24          MR. KERNELL:  Your Honor, may I approach the witness?

1:33:48   25          THE COURT:  You may.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 1:34:08 | 1 | MR. KERNELL:  I have two devices I want to give. |
| 1:34:09 | 2 | MS. DeFORD:  Your Honor, I object to one exhibit as |
| 1:34:13 | 3 | coming in as an exhibit.  I've told counsel I have no issue with |
| 1:34:17 | 4 | it being a demonstrative.  I'm not sure if it was on their |
| 1:34:20 | 5 | exhibit list, he hasn't given me an exhibit number.  The other |
| 1:34:20 | 6 | one we have no objection to. |
| 1:34:23 | 7 | So Plaintiffs Exhibit 10 we have no objection to.  This |
| 1:34:26 | 8 | other box I don't have an issue with it being an demonstrative, |
| 1:34:29 | 9 | but I'm not sure if it was on their exhibit list. |
| 1:35:15 | 10 | THE COURT:  Okay.  What are we doing? |
| 1:35:15 | 11 | BY MR. KERNELL: |
| 1:35:29 | 12 | Q.  So Mr. Kohman, the box that's got a sticker on it it says |
| 1:35:33 | 13 | 108 on the box, do you see that? |
| 1:35:36 | 14 | A.  Yes, I do. |
| 1:35:39 | 15 | Q.  Do you recognize that device? |
| 1:35:46 | 16 | A.  Yes.  I mean, I see it.  Yes. |
| 1:35:51 | 17 | Q.  Well, is that a device that Sprint sold when you were at -- |
| 1:35:54 | 18 | A.  It looks very similar to the device that Sprint sold. |
| 1:35:56 | 19 | That's a long time ago but yes, it does. |
| 1:36:00 | 20 | Q.  And it has on that Sprint Direct Connect on the box. |
| 1:36:01 | 21 | Correct? |
| 1:36:03 | 22 | A.  Yes, it does. |
| 1:36:05 | 23 | Q.  Is there any reason -- is that one of the devices that |
| 1:36:10 | 24 | Sprint was selling when you worked for Sprint? |
| 1:36:12 | 25 | A.  It very could be. |

1:36:14  1    Q.  You don't recall if that was one or not?

1:36:15  2    A.  I do not.

1:36:21  3    Q.  In your declaration where you said that the mission-critical

1:36:32  4    device which was a Sonim XP IS, correct?

1:36:32  5    A.  Yeah.

1:36:36  6    Q.  And that is marked as Plaintiff's Exhibit 10, did you have

1:36:39  7    one of those devices in front of you when you made that

1:36:43  8    declaration in your declaration?

1:36:49  9    A.  No, I recalled the Sonim XP from when we were -- before it

1:36:54  10   was actually launched and we were discussing how the Nextel

1:36:58  11   brand would be utilized, and that's the device that I was told

1:37:03  12   by the device product management team that would have that

1:37:04  13   naming.

1:37:13  14   Q.  But that's the Sonim XP or Strike XP IS, correct?

1:37:23  15   A.  Yes, this is the Sonim XP strike IS, the Exhibit 40.

1:37:26  16   Q.  Right.  And that's the one that you were referring to as

1:37:30  17   being launched; is that correct?

1:37:31  18   A.  Yes.

1:37:41  19   Q.  And the one that is just the Sonim XP or the Strike XP, is

1:37:45  20   that the predecessor to the XP IS?

1:37:50  21   A.  I believe the IS means it's intrinsically safe, so it can be

1:37:56  22   the same device.  One can be intrinsically safe and one cannot.

1:37:59  23   I believe the IS stands for intrinsically safe.

1:38:02  24   Q.  Now, let me ask you, so you're familiar with the

1:38:05  25   intrinsically safe device, correct?

```
1:38:05   1    A.  Yes.

1:38:07   2    Q.  And does it have a SIM card?

1:38:14   3    A.  I don't know if it has a SIM, it has a SIM, it could be an

1:38:18   4    embedded SIM or -- there are different types of SIMs, so it has

1:38:22   5    some sort of SIM device in there to activate it.

1:38:29   6    Q.  Okay.  And so devices, you can have a device, an

1:38:36   7    intrinsically safe device that uses a AT&T SIM card, correct?

1:38:37   8    A.  Yes.

1:38:39   9    Q.  Or a T-Mobile SIM card?

1:38:41  10    A.  Yes, correct.

1:38:44  11    Q.  Or a Verizon SIM card.

1:38:44  12    A.  Yes.

1:38:48  13    Q.  And you can buy those SIM cards at Walmart, correct?

1:38:49  14    A.  You can.

1:38:56  15    Q.  And if I bought it at Walmart, an AT&T SIM card, or I bought

1:39:02  16    that AT&T SIM card from AT&T, those are the same SIM cards,

1:39:04  17    correct?

1:39:06  18          THE COURT:  Same SIM cards as what?

1:39:07  19          THE WITNESS:  Yes.

1:39:07  20       BY MR. KERNELL:

1:39:13  21    Q.  They're functionally the same card.  They are both AT&T SIM

1:39:17  22    cards whether it was purchased at a retail outlet like Walmart

1:39:23  23    or you bought it from an AT&T store, correct?

1:39:29  24    A.  That question depends.  I mean, a SIM card could be from

1:39:34  25    AT&T but not -- it's how the SIM card is provisioned that
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | |
|---|---|
| 1:39:34 | 1 |
| 1:39:35 | 2 |
| 1:39:40 | 3 |
| 1:39:45 | 4 |
| 1:39:51 | 5 |
| 1:39:55 | 6 |
| 1:39:59 | 7 |
| 1:40:01 | 8 |
| 1:40:05 | 9 |
| 1:40:06 | 10 |
| 1:40:07 | 11 |
| 1:40:11 | 12 |
| 1:40:13 | 13 |
| 1:40:19 | 14 |
| 1:40:24 | 15 |
| 1:40:29 | 16 |
| 1:40:41 | 17 |
| 1:40:45 | 18 |
| 1:40:49 | 19 |
| 1:40:52 | 20 |
| 1:40:54 | 21 |
| 1:40:58 | 22 |
| 1:41:22 | 23 |
| 1:41:24 | 24 |
| 1:41:25 | 25 |

matters.

Q.   And what does that mean?

A.   The SIM card is provisioned with certain billing codes and SoT codes that give it different capabilities.  So you can have one SIM card that is just for messaging capability and another SIM card that could be inserted that would have different capabilities based on what the network assigns to that ID of that SIM card.

Q.   Functionality-wise, do they operate the same way?  Does the phone operate the same with either of the --

A.   No.

Q.   And how would I know as a consumer whether there's a different function in that card?

A.   The best way is to buy -- the best way is to consult your network provider and to talk to your -- buy from the carrier and understand what capabilities are with the device.

Q.   So let me go back to the Sonim XP Strike IS.  Now, that is one of the devices that you were referring to in your declaration where you said this is how we are going to go forward with Nextel?

A.   Yes.

         MR. KERNELL:  May I approach the ELMO up here?

         THE COURT:  Certainly.  Is this in evidence already?

         MR. KERNELL:  The box that it's from is in evidence, this device is in evidence.

1:41:26  1          THE COURT:  This document that you're showing the jury

1:41:28  2   now in evidence?

1:41:31  3          MR. KERNELL:  Well, this is a demonstrative pointing

1:41:33  4   out things on that box.

1:41:35  5          THE COURT:  Okay.  That's a picture of the box?

1:41:36  6          MR. KERNELL:  Yes.

1:41:38  7          MS. DeFORD:  Your Honor, could I see it for a second?

1:41:39  8   I haven't seen it.

1:41:40  9          THE COURT:  You should be able to see it.  Write on

1:41:45  10  your screen because everybody in the else in the world can.

1:41:49  11         MS. DeFORD:  I'm fine looking at it on the screen.

1:41:51  12         THE COURT:  I think you need to straighten that arm out

1:41:55  13  on the ELMO.  No, the arm itself.  The arm that comes up from

1:42:05  14  the bottom.  Make sure it's straight.  And then it zooms.

1:42:05  15     BY MR. KERNELL:

1:42:17  16  Q.  So Mr. Kohman, I just want to verify that this photograph is

1:42:22  17  the same as from that box?

1:42:23  18  A.  Uh-huh.

1:42:29  19  Q.  Okay.  So let me first -- so you testified that this was the

1:42:37  20  Sonim XP Strike IS, was the device going forward after the

1:42:41  21  cancellation or shutdown of the Nextel network, correct?

1:42:44  22  A.  It was yes one of the devices, yes.

1:42:50  23  Q.  So if we look at the front of this exhibit, the box, we have

1:42:55  24  a number of trademarks prominently shown on this box, wouldn't

1:42:57  25  you agree?

| | | |
|---|---|---|
| 1:42:58 | 1 | A.  Yes. |
| 1:43:07 | 2 | Q.  We have Sprint, Sprint Direct Connect, Sprint, Sonim, the XP |
| 1:43:12 | 3 | Strike IS, Sonim, and Sonim.  Nowhere on the front of this box |
| 1:43:14 | 4 | is Nextel shown, is it? |
| 1:43:16 | 5 | A.  No, it's not. |
| 1:43:25 | 6 | Q.  Now, if you could turn over the box and look at the back, |
| 1:43:38 | 7 | again can you verify for the jury that this is indeed a picture |
| 1:43:42 | 8 | of the back that's been -- you know, with certain terms |
| 1:43:42 | 9 | identified? |
| 1:43:45 | 10 | A.  Yes. |
| 1:43:52 | 11 | Q.  So again, this is your first launch, Sprint's first launch |
| 1:44:01 | 12 | to pull customer forward from all customers whose devices |
| 1:44:08 | 13 | stopped working on June 30, 2013, all their iDEN devices shut |
| 1:44:16 | 14 | down, this was Sprint's effort to pull them over onto the CDMA |
| 1:44:17 | 15 | network, correct? |
| 1:44:19 | 16 | A.  This is one of them, yes. |
| 1:44:22 | 17 | Q.  And this is the one that you identified in your declaration. |
| 1:44:23 | 18 | A.  Yes. |
| 1:44:29 | 19 | Q.  So on -- this on the back of this box.  There's Sonim, Sonim |
| 1:44:37 | 20 | XP IS, there's the Sprint 3G network, Sprint network, Sprint |
| 1:44:45 | 21 | network, Sonim XP.  This Sprint device it's still identified as |
| 1:44:50 | 22 | a Sprint device, correct? |
| 1:44:52 | 23 | A.  Yes, it is. |
| 1:44:56 | 24 | Q.  There's Sprint, and in fact it says that this won't operate |
| 1:45:00 | 25 | on the iDEN or 4G networks? |

1:45:02  1    A.  That's correct.

1:45:05  2    Q.  And it's talking about Sprint services.

1:45:07  3    A.  Yes.

1:45:13  4    Q.  Down here it says it's 2013 which is in the time frame that

1:45:20  5    you described.  And it's -- again, it's Sprint, Sprint, Sprint

1:45:23  6    logo are trademarks of Sprint.  Do you see that?

1:45:25  7    A.  Yes, and I see Nextel.

1:45:32  8    Q.  Yes.  I'll get to that.  Then next it says Sonim and the

1:45:38  9    Sonim logo, XP Strike are trademarks of Sonim Technologies.  Do

1:45:38  10   you see that?

1:45:39  11   A.  Uh-huh.

1:45:44  12   Q.  Next it says the marks are the other -- or other marks are

1:45:54  13   the property of their respective owners.  Then the phrase Nextel

1:45:55  14   mobile phone.  Do you see that?

1:45:57  15   A.  I do.

1:46:02  16   Q.  That doesn't tie Nextel with Sprint in any way, does it?

1:46:08  17   A.  Not really, no.

1:46:21  18   Q.  Even on one of the sides of the box, again it identifies

1:46:22  19   Sprint, correct?

1:46:23  20   A.  Yes.

1:46:48  21   Q.  Now, I believe that, Mr. Kohman, you said that you learned

1:46:56  22   about Defendants through the 2017 IWCE trade show, correct?

1:46:57  23   A.  That's correct.

1:47:07  24   Q.  And that you were with Kodiak at the time.

1:47:07  25   A.  That's correct.

1:47:12   1    Q.   And Kodiak had a booth there at the show, trade show?

1:47:12   2    A.   Yes.

1:47:19   3    Q.   And so Sprint also had a booth at the trade show, correct?

1:47:20   4    A.   Yes.

1:47:26   5    Q.   Do you know if Sprint was selling any Nextel-branded devices

1:47:28   6    at that trade show?

1:47:31   7    A.   I wasn't -- I don't recall.

1:47:34   8    Q.   Do you know if they were offering any Nextel cellular plans

1:47:38   9    at that trade show?

1:47:39   10   A.   I don't recall.

1:47:43   11   Q.   Do you know if they were offering any Nextel cellular

1:47:46   12   services at that trade show?

1:47:52   13   A.   I don't recall, but I don't know.  I do know they were using

1:47:54   14   Nextel branding though.

1:48:16   15   Q.   Now you said -- let me ask you this, it's a little

1:48:17   16   straighter than it was the other day.

1:48:19   17            THE COURT:  Not much.

1:48:21   18            MR. KERNELL:  And I don't know, can you see that?

1:48:21   19            THE WITNESS:  Yes.

1:48:21   20       BY MR. KERNELL:

1:48:26   21   Q.   Now, is this one of the Nextel brands that you saw that

1:48:31   22   Sprint was using at the trade show?

1:48:36   23   A.   I don't know if that was the brand or if it was Together

1:48:40   24   with Nextel brand.  I don't recall.  That was years ago.

1:48:45   25   Q.   Do you know -- you said Together with Nextel brand.  Do you

| | | |
|---|---|---|
| 1:48:48 | 1 | know if that was ever registered as a trademark? |
| 1:48:49 | 2 | A.  No, I do not. |
| 1:48:58 | 3 | Q.  And then you said -- or in your declaration you referred to |
| 1:49:03 | 4 | Nextel or the Nextel trademark.  Do you recall that? |
| 1:49:04 | 5 | A.  Yes. |
| 1:49:06 | 6 | Q.  What trademark were you referring to? |
| 1:49:12 | 7 | A.  I was using the word trademark as trademark slash brand, I |
| 1:49:14 | 8 | was using it kind of generically. |
| 1:49:17 | 9 | Q.  So you weren't referring to any particular trademark? |
| 1:49:17 | 10 | A.  No. |
| 1:49:19 | 11 | Q.  Do you recall this? |
| 1:49:20 | 12 | A.  I do recall that. |
| 1:49:23 | 13 | Q.  As a trademark of Sprint? |
| 1:49:30 | 14 | A.  I recall that as a trademark of Nextel, for sure prior to |
| 1:49:36 | 15 | merger, I don't know if that's trademarked by Sprint or not. |
| 1:49:47 | 16 | Q.  Would you be surprised to learn that the application for |
| 1:49:53 | 17 | this trademark was cancelled in 2014. |
| 1:49:57 | 18 | MS. DeFORD:  Objection, Your Honor.  Foundation.  He's |
| 1:49:59 | 19 | testified he doesn't know. |
| 1:50:01 | 20 | THE COURT:  Yeah, I don't know whether he's surprised |
| 1:50:05 | 21 | or not.  How relevant is that?  If you want to prove that, |
| 1:50:07 | 22 | you're going to have to prove it through somebody that knows |
| 1:50:08 | 23 | about it. |
| 1:50:11 | 24 | MR. KERNELL:  Could we bring up Defendants' Exhibit |
| 1:50:29 | 25 | 5053? |

1:50:31  1          MS. DeFORD:  Your Honor, same objection to this.

1:50:31  2          THE COURT:  Sustained.

1:50:37  3          MS. DeFORD:  Thank you.

1:50:37  4       BY MR. KERNELL:

1:50:42  5  Q.  Mr. Kohman, do you recognize this Nextel trademark?

1:50:45  6          THE COURT:  I thought I sustained the objection.

1:50:47  7          MR. KERNELL:  I'm sorry?

1:50:49  8          THE COURT:  I sustained the objection.

1:50:52  9          MR. KERNELL:  May I bring in the foundation for this

1:50:52 10  trademark?

1:50:54 11          THE COURT:  Well, you can ask him if he knows anything

1:50:55 12  about it.

1:50:56 13          MR. KERNELL:  That's what I'm asking him, Your Honor.

1:50:58 14          THE COURT:  Well, that's really not what you asked him.

1:51:02 15  You asked him -- all right.  Go ahead.  We'll try, we'll see.

1:51:02 16       BY MR. KERNELL:

1:51:07 17  Q.  So Mr. Kohman, do you see the trademark in the upper

1:51:11 18  left-hand corner of this screen?

1:51:14 19  A.  I see a Nextel brand.

1:51:20 20  Q.  Yes.  And was that brand used at Sprint when you were an

1:51:24 21  employee at Sprint up through 2014?

1:51:32 22  A.  I don't know if it was used externally or not.  I recall

1:51:36 23  seeing it around that time frame, but brands change and

1:51:40 24  treatments of brands change over time.

1:51:47 25  Q.  What's shown on the board here in your declaration, you

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1:51:54  1  identified that Defendants were using the same yellow and black

1:52:01  2  Nextel trademark that Sprint and Nextel had used.  Do you recall

1:52:02  3  that?

1:52:02  4  A.  Yes.

1:52:05  5  Q.  And is that the same trademark?

1:52:08  6  A.  It's very similar.  I don't know if it's exactly the same,

1:52:09  7  but it was similar.

1:52:14  8  Q.  It's the black and yellow Nextel trademark, a trademark?

1:52:15  9  A.  A trademark, uh-huh.

1:52:19  10  Q.  And is that the same black and yellow Nextel trademark

1:52:28  11  that's shown in Exhibit 5053?

1:52:32  12  A.  Is this 5053 on here?

1:52:34  13  Q.  On the screen, yes.

1:52:37  14  A.  It seems to be similar.  I can't tell.  It's grainy and

1:52:40  15  small.

1:53:00  16  Q.  Now, at the trade show you also testified that Motorola made

1:53:08  17  radios or that the radios that Defendants were selling were not

1:53:12  18  Motorola made radios; is that correct?

1:53:14  19  A.  That's correct.

1:53:21  20  Q.  Were other vendors offering nonMotorola radios at the trade

1:53:23  21  show?

1:53:31  22  A.  Motorola -- define radios.  Because there are LMR radios and

1:53:36  23  there are cellular devices, right.  So LMR, Motorola Solutions

1:53:40  24  that I work for make radios and they were at the trade show.

1:53:46  25  Motorola was.  And -- but these were cellular devices, they

1:53:49  1    weren't land mobile radios.

1:53:55  2    Q.  So when you said that the radios that Defendants were

1:54:00  3    selling were not Motorola-made radios, did you mean cellular

1:54:02  4    radios?

1:54:08  5    A.  They were not Motorola iDEN devices and they were not

1:54:11  6    Motorola LMR radios.

1:54:14  7    Q.  And at this time this is in 2017, correct?

1:54:14  8    A.  That's correct.

1:54:19  9    Q.  And Nextel -- there was no Nextel iDEN?

1:54:21  10   A.  There was a Nextel, there was no iDEN.

1:54:25  11   Q.  There was no Nextel iDEN network at that time, correct?

1:54:30  12   A.  There was no iDEN network.  The Nextel is a brand, it's not

1:54:31  13   a network.

1:54:34  14   Q.  But Sprint has identified it as the Nextel platform,

1:54:35  15   correct?

1:54:40  16   A.  Sprint has identified the -- they have the Sprint Direct

1:54:44  17   Connect platform and they have Nextel devices that work on the

1:54:46  18   Sprint Direct Connect platform.

1:54:50  19   Q.  But they also had the Nextel iDEN platform.

1:54:50  20   A.  Yes.

1:54:59  21   Q.  Okay.  Did you operate any of Defendants devices at the --

1:55:00  22   A.  I did not.

1:55:00  23   Q.  -- 2017 show?

1:55:01  24   A.  I did not.

1:55:04  25   Q.  Did you purchase any of the devices that --

| | | |
|---|---|---|
| 1:55:07 | 1 | A.  I did not. |
| 1:55:16 | 2 | Q.  Now, going back to the Kodiak platform, do you know if |
| 1:55:20 | 3 | Defendants are licensees of the Kodiak platform? |
| 1:55:21 | 4 | A.  They are not. |
| 1:55:24 | 5 | Q.  Do you know if they could use the Kodiak platform through |
| 1:55:26 | 6 | another carrier? |
| 1:55:32 | 7 | A.  They couldn't resell the platform through another carrier, |
| 1:55:33 | 8 | no. |
| 1:55:37 | 9 | Q.  Could they use it through that carrier though? |
| 1:55:41 | 10 | A.  If they purchased a Sprint Direct Connect device or a |
| 1:55:48 | 11 | Verizon PTT Plus device or AT&T EPTT device, they could use it, |
| 1:55:48 | 12 | yes. |
| 1:55:51 | 13 | Q.  And they could re-brand it as Nextel? |
| 1:55:51 | 14 | A.  No. |
| 1:55:55 | 15 | Q.  They couldn't put their own label on it and say it's a |
| 1:55:55 | 16 | Nextel device? |
| 1:56:00 | 17 | A.  No.  Those AT&T, Verizon, that platform wouldn't support |
| 1:56:01 | 18 | that re-branding. |
| 1:56:04 | 19 | Q.  Do you work for AT&T or Verizon? |
| 1:56:08 | 20 | A.  I work with them.  I'm the offer manager for AT&T Kodiak, |
| 1:56:14 | 21 | AT&T Kodiak, Kodiak for Verizon and Kodiak for T-Mobile. |
| 1:56:16 | 22 | Q.  What about some of the other mission-critical software |
| 1:56:21 | 23 | platforms that you identified, could they offer theirs? |
| 1:56:25 | 24 | A.  Yes, they could. |
| 1:56:33 | 25 | Q.  Now, does Motorola use its own servers to offer the Kodiak |

| | | |
|---|---|---|
| 1:56:33 | 1 | platform? |
| 1:56:42 | 2 | A.   Motorola manages the servers, installs the servers and loads |
| 1:56:46 | 3 | the software on the servers, but the servers are not |
| 1:56:47 | 4 | manufactured by Motorola. |
| 1:56:52 | 5 | Q.   Right.  And I'm not asking if Motorola manufactures servers. |
| 1:56:58 | 6 | I'm asking does it use its own servers, servers that it owns. |
| 1:57:03 | 7 | Like I would buy a Dell server.  I don't make the Dell server, |
| 1:57:09 | 8 | but I own the Dell server.  So does the Kodiak -- does Motorola |
| 1:57:16 | 9 | use its own servers, servers that it owns, to offer the Kodiak |
| 1:57:16 | 10 | platform? |
| 1:57:21 | 11 | A.   Yes. |
| 1:57:30 | 12 | Q.   Now, can a phone that uses the push-to-talk service using or |
| 1:57:36 | 13 | through the Kodiak platform, can it be used to make regular |
| 1:57:37 | 14 | cellphone calls? |
| 1:57:41 | 15 | A.   Yes.  Some can.  Some can't. |
| 1:57:45 | 16 | Q.   And so some that can't are like the radios? |
| 1:57:51 | 17 | A.   Some of them are radios, and there are also devices that are |
| 1:57:59 | 18 | purpose-built just to be PTT that are operating on the same |
| 1:58:00 | 19 | Kodiak software. |
| 1:58:03 | 20 | Q.   And you said purpose felt? |
| 1:58:07 | 21 | A.   Purpose-built.  They're built for a specific purpose. |
| 1:58:12 | 22 | Q.   And that uses software to limit the functionality of that |
| 1:58:13 | 23 | device? |
| 1:58:19 | 24 | A.   No, it only utilizes a certain aspect of the network and |
| 1:58:23 | 25 | inherently limits the user to those aspects. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1:58:33    1    Q.  Do you know if the Nextel services offered by Defendants use
1:58:35    2    their own servers?
1:58:42    3    A.  I have -- I do not know who they use.
1:58:49    4    Q.  Do you know if the Nextel services and devices offered by
1:58:57    5    Defendant Nextel, do you know if they use their own software?
1:59:00    6    A.  I don't know whose software they use or if it's theirs or if
1:59:03    7    they buy it.
1:59:17    8    Q.  Now, do you know if Defendant Nextel offers any
1:59:19    9    intrinsically safe devices?
1:59:24   10    A.  I don't know that firsthand.
1:59:31   11    Q.  So they could.  They could be offering intrinsically safe
1:59:32   12    devices?
1:59:39   13    A.  Yes, they could buy an intrinsically safe device from a
1:59:42   14    manufacturer and offer them.
1:59:55   15            MR. KERNELL:  So Your Honor, I believe we have Exhibit
2:00:04   16    10 to offer into evidence.  I believe the other Exhibit we have
2:00:08   17    laid the foundation for that as a Sprint.
2:00:10   18            THE COURT:  You're offering Plaintiff's Exhibit 10 into
2:00:11   19    evidence?
2:00:12   20            MR. KERNELL:  Yes.
2:00:14   21            MS. DeFORD:  Your Honor, we have no objection to
2:00:17   22    Plaintiff's Exhibit 10, but we maintain our objection on the
2:00:20   23    exhibit that we don't believe is on their exhibit list.
2:00:24   24            THE COURT:  Right.  Well, we're only talking about 10.
2:00:28   25    Exhibit 10, without objection, is admitted in evidence.

2:00:28  1              (Plaintiff's Exhibit 10 in evidence).

2:01:04  2              MR. KERNELL:  No further questions, Your Honor.

2:01:06  3              THE COURT:  Redirect.

2:01:08  4              MS. DeFORD:  Very brief Your Honor.

2:01:08  5                          REDIRECT EXAMINATION

2:01:08  6       BY MS. DeFORD:

2:01:16  7   Q.  Mr. Kohman, at the beginning, do you remember when Mr.

2:01:21  8   Kernell was asking you about whether or not mission-critical

2:01:24  9   software is necessary for parties other than first responders.

2:01:25  10  Do you recall that?

2:01:26  11  A.  Yes.

2:01:30  12  Q.  The show that you first found out about the Defendants

2:01:34  13  Nextel brand at, can you remind the jury who that show is

2:01:36  14  specifically targeted towards?

2:01:38  15  A.  It was targeted towards public safety.

2:01:40  16  Q.  And public safety being first responders?

2:01:42  17  A.  Yes.

2:01:45  18  Q.  He asked you a little bit about the change in the Sprint

2:01:47  19  Nextel name.  Do you recall that?

2:01:48  20  A.  Yes.

2:01:51  21  Q.  When you were at Sprint, were you part of the decision about

2:01:54  22  what the corporate name of the company would be?

2:01:55  23  A.  No, I was not.

2:01:57  24  Q.  Were you involved in deciding what brands would be used

2:01:59  25  moving forward?

2:02:00  1    A.  No, I was not.

2:02:03  2    Q.  Were you involved in discussions about how to use the Nextel

2:02:04  3    brand moving forward?

2:02:05  4    A.  Yes, I was.

2:02:07  5    Q.  And could you remind the jury what decision was made about

2:02:09  6    the Nextel brand during that time?

2:02:12  7    A.  The Nextel brand was going to be assigned to a specialty

2:02:18  8    device category, it was going to be used as biz direct

2:02:21  9    presentations and at trade events.

2:02:26  10   Q.  He showed you that Sonim XP Strike IS box and he asked you a

2:02:32  11   question about whether there was anything to link Nextel to

2:02:36  12   Sprint.  Could you remind the jury who had the exclusive right

2:02:38  13   to sell the box with Nextel on it?

2:02:39  14   A.  Sprint did.

2:02:43  15   Q.  And he made a big deal about the statement that Sprint

2:02:47  16   identified itself as an owner of the Sprint mark.  Do you recall

2:02:48  17   that?

2:02:49  18   A.  Could you repeat the question please?

2:02:52  19   Q.  Sure.  So if you look at the box, he made a big deal about

2:02:57  20   the fact that the box on the fact that it says Sprint owns and

2:02:59  21   Sprint trademark?

2:03:00  22   A.  Right.

2:03:02  23   Q.  Are you aware, Mr. Kohman, that Sprint, as a lot of large

2:03:04  24   companies do, has a lot of different companies that hold their

2:03:05  25   intellectual property?

2:03:06   1    A.  Yes.

2:03:08   2    Q.  Are you aware at that time when that device was sold whether

2:03:13   3    it was Sprint or one of its subsidiaries that owned the Nextel

2:03:14   4    mark?

2:03:15   5    A.  I don't know.

2:03:20   6    Q.  He asked you quite a bit about the black and yellow Nextel.

2:03:24   7    Have you personally seen Sprint use Nextel and black and yellow

2:03:25   8    since 2013?

2:03:26   9    A.  Yes, I have.

2:03:29   10   Q.  Can you give the jury an example of one of the places you've

2:03:29   11   seen that?

2:03:33   12   A.  I've seen them use black and yellow Nextel at trade events

2:03:36   13   and in presentations they've given to me.

2:03:40   14   Q.  And lastly, he was asking you questions about whether or not

2:03:44   15   having your own network would be necessary for the Kodiak

2:03:48   16   application or similar applications to give mission critical

2:03:50   17   priority.  Do you remember that?

2:03:50   18   A.  Yes.

2:03:55   19   Q.  What is the difference between a SIM card bought at Walmart

2:03:58   20   that uses the Kodiak application versus a Kodiak application

2:04:03   21   that's been integrated into Sprint's network?

2:04:06   22   A.  Different SIM cards can have different plans with different

2:04:13   23   features.  And when Sprint sells a SIM card with a push-to-talk

2:04:18   24   device, they're giving it the correct features for that device.

2:04:22   25   Q.  And those features, what are the mission-critical features?

| | | |
|---|---|---|
| 2:04:25 | 1 | A.   Priority service, they can give priority service. |
| 2:04:31 | 2 | Q.   And so if I go to Walmart and I buy a SIM card to put in my |
| 2:04:35 | 3 | phone, say it's using AT&T service, is there any way for AT&T to |
| 2:04:39 | 4 | know that the device using that SIM card is going to need |
| 2:04:40 | 5 | priority services? |
| 2:04:44 | 6 | A.   No, that device is going to get the same -- is not going to |
| 2:04:48 | 7 | get priority service, they're not going to know. |
| 2:04:50 | 8 | MS. DeFORD:  Thank you, Mr. Kohman.  That's all I have. |
| 2:04:51 | 9 | THE COURT:  Thank you, sir.  You are excused. |
| 2:04:54 | 10 | Please call your next witness. |
| 2:04:56 | 11 | MS. DeFORD:  Your Honor, at this time we call Scott |
| 2:04:56 | 12 | Wiley. |
| 2:04:59 | 13 | THE COURT:  Very well. |
| 2:05:36 | 14 | Please come forward, watch your step there's a little |
| 2:05:39 | 15 | ramp as you get to the end of the jury box.  Come around, stand |
| 2:05:47 | 16 | near the chair and remain standing raise your right hand. |
| 2:05:47 | 17 | SCOTT WILEY, PLAINTIFF WITNESS, SWORN. |
| 2:05:49 | 18 | THE COURT:  Please be seated.  You may remove your mask |
| 2:05:54 | 19 | when you're behind the plastic, tell us your name and spell it. |
| 2:06:01 | 20 | THE WITNESS:  Scott Wiley, S-C-O-T-T, Wiley, W-I-L-E-Y. |
| 2:06:03 | 21 | THE COURT:  You may proceed. |
| 2:06:03 | 22 | MS. DeFORD:  Thank you, Your Honor. |
| 2:06:03 | 23 | DIRECT EXAMINATION |
| 2:06:03 | 24 | BY MS. DeFORD: |
| 2:06:07 | 25 | Q.   Good afternoon, Scott.  Could you please tell the jury where |

| | | |
|---|---|---|
| 2:06:08 | 1 | you currently work? |
| 2:06:08 | 2 | A.  T-Mobile. |
| 2:06:12 | 3 | Q.  And when did you become a T-Mobile employee? |
| 2:06:14 | 4 | A.  It's just about two years now. |
| 2:06:17 | 5 | Q.  How did you become a T-Mobile employee? |
| 2:06:23 | 6 | A.  T-Mobile merged with Sprint.  So that was how. |
| 2:06:26 | 7 | Q.  How did you or how long did you work for Sprint before you |
| 2:06:28 | 8 | became a T-Mobile employee? |
| 2:06:30 | 9 | A.  About 13 years. |
| 2:06:33 | 10 | Q.  And what was your role when you were at Sprint? |
| 2:06:37 | 11 | A.  So product development manager. |
| 2:06:40 | 12 | Q.  And are you still a product development manager today? |
| 2:06:41 | 13 | A.  Yes, I am. |
| 2:06:44 | 14 | Q.  Could you explain to the jury at a high level what your job |
| 2:06:47 | 15 | responsibilities as product development manager are? |
| 2:06:50 | 16 | A.  Yes.  So I manage. |
| 2:06:52 | 17 |          THE COURT:  What do you mean "at a high level"?  You |
| 2:06:55 | 18 | want him to talk very high voice? |
| 2:06:56 | 19 |          MS. DeFORD:  Thank you, Your Honor. |
| 2:06:58 | 20 |          THE COURT:  Stand on his chair? |
| 2:07:00 | 21 |          MS. DeFORD:  It's been a long day for the jury.  I'm |
| 2:07:05 | 22 | trying to help Mr. Wiley understand they don't need a very -- |
| 2:07:06 | 23 | I'm just trying to help the jury understand that they don't need |
| 2:07:09 | 24 | to hear everything he does, they just need a brief description. |
| 2:07:13 | 25 |          THE COURT:  Give us an overview of what your job was. |

2:07:16  1              THE WITNESS:  So I've managed a couple business

2:07:21  2     products over the years.  So, you know, there's consumers at,

2:07:23  3     you know, basically just to get phones.  But businesses will

2:07:31  4     usually get additional products.  And so I've managed a couple

2:07:34  5     of the products, and that really is kind of a, you know,

2:07:38  6     roadmap, sourcing the vendors, working to make sure that stuff

2:07:46  7     makes it to devices, really kind of owning the product cradle to

2:07:46  8     grave.

2:07:46  9              BY MS. DeFORD:

2:07:49  10    Q.  How did you end up working for Sprint, Mr. Wiley?

2:07:52  11    A.  I started at Nextel right out of college.

2:07:56  12    Q.  And when you say Nextel, what company are you referring to?

2:08:03  13    A.  Nextel Communications, Inc.  Started in about 1987 I

2:08:07  14    believe, and so I'd say the original Nextel.

2:08:09  15    Q.  Okay.  So when you say the original Nextel, just to be clear

2:08:13  16    for the jury, are you referring to the Defendants or are you

2:08:15  17    referring to Nextel that is associated with Sprint?

2:08:21  18    A.  I'm referring to the Nextel that's associated with Sprint.

2:08:24  19    Q.  When did you start at the original Nextel?

2:08:28  20    A.  In 2004.

2:08:32  21    Q.  Did you have any jobs prior to working for Nextel?

2:08:34  22    A.  That was my first job right out of college.

2:08:37  23    Q.  What made you want to work for Nextel?

2:08:41  24    A.  Well, I was an electrical engineering major and

2:08:45  25    telecommunications to me seemed like the right industry to go

| | | |
|---|---|---|
| 2:08:49 | 1 | into.  I'm very interested in technology and I actually had been |
| 2:08:56 | 2 | using Nextel products long before I got into college.  And so |
| 2:09:02 | 3 | that was a company I wanted to work for and be involved with the |
| 2:09:02 | 4 | push-to-talk. |
| 2:09:06 | 5 | Q.  When you went to work at Nextel in 2004, was the Nextel |
| 2:09:10 | 6 | brand known for a particular type of telecommunications service? |
| 2:09:17 | 7 | A.  Yeah, Nextel really created an industry of push-to-talk that |
| 2:09:20 | 8 | occurs over a cellphone. |
| 2:09:23 | 9 | Q.  And has what the Nextel brand is known for changed over |
| 2:09:24 | 10 | time? |
| 2:09:28 | 11 | A.  No.  To me, Nextel has always been synonymous with |
| 2:09:31 | 12 | push-to-talk. |
| 2:09:38 | 13 | Q.  What type of customers, in your experience, generally buy |
| 2:09:40 | 14 | push-to-talk devices and services? |
| 2:09:42 | 15 | A.  So push-to-talk is for instantaneous communications and that |
| 2:09:50 | 16 | is enterprises, logistics, government, and very strong following |
| 2:09:51 | 17 | from first responders. |
| 2:09:56 | 18 | Q.  And how are push-to-talk devices and services generally sold |
| 2:09:57 | 19 | then? |
| 2:10:03 | 20 | A.  So these services are really sold in business to business |
| 2:10:08 | 21 | meetings.  So our business people meet with large companies, |
| 2:10:13 | 22 | they come in and meet with the tel-com managers at these |
| 2:10:17 | 23 | companies, they pitch our service and any additional products |
| 2:10:21 | 24 | that a business might need to be added on.  We also, you know, |
| 2:10:26 | 25 | attend trade shows so that our products can be seen by lots of |

2:10:28  1    the same customers.

2:10:34  2    Q.   Does Sprint typically sell business push-to-talk services

2:10:36  3    and devices in retail stores?

2:10:39  4    A.   That's not our -- you can buy a device, but we're not

2:10:43  5    talking to customers about push-to-talk in a retail store.

2:10:48  6    Q.   What about on its website or through its website?

2:10:50  7    A.   Over the years we've had information about the products, but

2:10:57  8    the website really has an intake to get the customers to give

2:11:01  9    their name so that our business people can meet with them and

2:11:04  10   really help understand their communications needs.

2:11:09  11   Q.   As a product development manager, do you ever personally

2:11:14  12   attend trade shows or participate in business to business

2:11:15  13   customer meetings?

2:11:16  14   A.   Yes, I participate in both of those.

2:11:21  15   Q.   When you interact at trade shows, do you use the Nextel

2:11:24  16   brand to sell Sprint's push-to-talk devices and services?

2:11:25  17   A.   Yes, we do.

2:11:27  18   Q.   And when you raise the Nextel brand with customers, what is

2:11:31  19   your understanding of the company that they associate Nextel

2:11:32  20   with?

2:11:38  21   A.   Nextel is associated with Sprint, been a big part of

2:11:42  22   marketing, we say Sprint together with Nextel.

2:11:44  23   Q.   Why do you use Nextel at trade shows, Mr. Wiley?

2:11:51  24   A.   Well, you want to frame with the customer, the people that

2:11:55  25   are walking by who you are, the experience that you have.  You

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 2:11:59 | 1 | need to differentiate yourself from the other people that attend |
| 2:12:00 | 2 | trade shows. |
| 2:12:03 | 3 | Q.  Can you give the jury an example of a trade show at which |
| 2:12:06 | 4 | you used the Nextel brand? |
| 2:12:10 | 5 | A.  Yeah.  First time that I used it at a trade show was in IWCE |
| 2:12:14 | 6 | or at IWCE, and that was in 2017. |
| 2:12:17 | 7 | Q.  Why use Nextel at the IWCE trade show? |
| 2:12:24 | 8 | A.  Because of the people that attend that.  It's enterprises, |
| 2:12:27 | 9 | it's business, it's first responders, it's other companies in |
| 2:12:31 | 10 | the industry.  So you want people to know who they're talking |
| 2:12:36 | 11 | to, the experience that you have. |
| 2:12:41 | 12 | Q.  And was IWCE 2017 the only trade show at which you have used |
| 2:12:42 | 13 | Nextel? |
| 2:12:49 | 14 | A.  No, I've used it at -- when I attended in 2018, as well as |
| 2:12:51 | 15 | at the IWCE in 2019. |
| 2:12:54 | 16 | Q.  Did you attend any later versions of IWCE? |
| 2:12:59 | 17 | A.  I have not, but that's really because COVID. |
| 2:13:04 | 18 | Q.  Starting with IWCE in 2017, how were you using the Nextel |
| 2:13:07 | 19 | mark at that trade show, Mr. Wiley? |
| 2:13:14 | 20 | A.  Yeah, so we had a very elaborate booth.  There was a 42-inch |
| 2:13:18 | 21 | plasma at the very front of it to get people's attention, and we |
| 2:13:27 | 22 | had the Nextel brand logo in a PowerPoint presentation. |
| 2:13:32 | 23 | MS. DeFORD:  I'd like to go ahead and show Mr. Wiley |
| 2:13:36 | 24 | Exhibit 30, Your Honor.  There's no objection to this exhibit. |
| 2:13:37 | 25 | THE COURT:  Exhibit 30. |

| | | |
|---|---|---|
| 2:13:38 | 1 | MS. DeFORD:  Exhibit 30. |
| 2:13:39 | 2 | THE COURT:  All right. |
| 2:13:45 | 3 | THE WITNESS:  Was I also supposed to have a binder up |
| 2:13:45 | 4 | here? |
| 2:13:48 | 5 | MS. DeFORD:  Would you like a binder up here?  You'll |
| 2:13:53 | 6 | be able to see them on a screen. |
| 2:13:53 | 7 | THE COURT:  There's a screen right in front of you. |
| 2:13:56 | 8 | MS. DeFORD:  And just to be clear, Your Honor, is that |
| 2:13:56 | 9 | admitted into evidence? |
| 2:13:56 | 10 | THE COURT:  It's into evidence.  Without objection, |
| 2:13:58 | 11 | it's admitted. |
| 2:13:59 | 12 | MS. DeFORD:  Thank you, Your Honor. |
| 2:13:59 | 13 | (Plaintiff's Exhibit 30 in evidence) |
| 2:13:59 | 14 | BY MS. DeFORD: |
| 2:14:01 | 15 | Q.  Mr. Wiley, do you recognize this exhibit? |
| 2:14:02 | 16 | A.  Yes, I do. |
| 2:14:02 | 17 | Q.  What is it? |
| 2:14:08 | 18 | A.  So this is the PowerPoint presentation that we had cycling |
| 2:14:10 | 19 | through on the plasma screen. |
| 2:14:15 | 20 | Q.  Okay.  I'm going to have Carl scroll slowly for you through |
| 2:14:20 | 21 | the first seven pages.  Once he's done, can you tell the jury |
| 2:14:24 | 22 | generally what the purpose of these seven slides are? |
| 2:14:30 | 23 | A.  This is high-level review of what our product does, |
| 2:14:35 | 24 | features, you know, stuff to get people's attention to walk in |
| 2:14:38 | 25 | and talk to us in the booth. |

| | | |
|---|---|---|
| 2:14:42 | 1 | Q.  If we can go to the 8th page?  Says why Sprint at the top. |
| 2:14:43 | 2 | Do you see that, Mr. Wiley? |
| 2:14:45 | 3 | A.  Yes, it does. |
| 2:14:47 | 4 | Q.  What's the purpose of this slide? |
| 2:14:54 | 5 | A.  So we want to frame with the customers who we are, who's at |
| 2:14:59 | 6 | the booth, the experience that we have.  We always want to |
| 2:15:02 | 7 | reiterate the value of our network and the support that we |
| 2:15:03 | 8 | bring. |
| 2:15:08 | 9 | Q.  Does Sprint have competitors at trade shows that it's trying |
| 2:15:13 | 10 | to keep customers from going to so that they buy from Sprint |
| 2:15:13 | 11 | instead? |
| 2:15:21 | 12 | A.  Yes, a lot of that show is around push-to-talk, so there are |
| 2:15:24 | 13 | a lot of competitive push-to-talk providers there. |
| 2:15:28 | 14 | Q.  How does this slide fit into that conversation to help |
| 2:15:33 | 15 | customers know why to choose Sprint instead of Sprint's |
| 2:15:34 | 16 | competitors? |
| 2:15:39 | 17 | A.  Well, when we use the Nextel brand which is in here, it |
| 2:15:44 | 18 | really frames with the customer who we are, our experience, the |
| 2:15:50 | 19 | reliability of our products and really identifies us to our |
| 2:15:53 | 20 | potential -- to our current and potential customers. |
| 2:15:56 | 21 | Q.  So you said that the Nextel brand is on the slide.  Would |
| 2:15:59 | 22 | you point out specifically for the jury where they can see it? |
| 2:16:01 | 23 | A.  Yes, it's on the far left. |
| 2:16:03 | 24 | THE COURT:  You can circle it.  You should be able to |
| 2:16:05 | 25 | write on the screen. |

| | | |
|---|---|---|
| 2:16:06 | 1 | MS. DeFORD:  Thank you, Your Honor. |
| 2:16:11 | 2 | THE COURT:  With your finger.  Mr. Witness. |
| 2:16:12 | 3 | THE WITNESS:  Do you want me to? |
| 2:16:14 | 4 | THE COURT:  I don't care if you do or not.  I'm telling |
| 2:16:15 | 5 | you you can. |
| 2:16:17 | 6 | MS. DeFORD:  It makes it a little more fun.  You can |
| 2:16:23 | 7 | play a little.  The perks of modern technology for you. |
| 2:16:23 | 8 | BY MS. DeFORD: |
| 2:16:26 | 9 | Q.  So I'm sorry, Scott.  Could you just repeat where its for |
| 2:16:28 | 10 | the jury?  I know you've circled it. |
| 2:16:31 | 11 | A.  Yes.  It's on the left in the center, and I circled it with |
| 2:16:32 | 12 | green. |
| 2:16:35 | 13 | Q.  Thank you.  All right.  We can go ahead and put that one |
| 2:16:36 | 14 | aside. |
| 2:16:38 | 15 | MS. DeFORD:  I'm going to go ahead and hand you what's |
| 2:16:42 | 16 | been marked as Exhibit 41 A.  There is no objection to this one |
| 2:16:45 | 17 | either, Your Honor.  May I approach the witness? |
| 2:16:48 | 18 | THE COURT:  41 A is admitted in evidence without |
| 2:16:50 | 19 | objection.  Yes, you may approach. |
| 2:16:50 | 20 | (Plaintiff's Exhibit 41 A in evidence) |
| 2:16:50 | 21 | BY MS. DeFORD: |
| 2:17:18 | 22 | Q.  Do you recognize that Exhibit, Mr. Wiley? |
| 2:17:26 | 23 | A.  Yes, I do.  This is a tablecloth that we had at our booth at |
| 2:17:29 | 24 | IWCE 2018. |
| 2:17:31 | 25 | MS. DeFORD:  Go ahead and keep that banner with you and |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2:17:35  1   so the jury can see it, but Carl could you please pull up joint

2:17:40  2   Exhibit 32, this one is also no objections Your Honor.

2:17:42  3           THE COURT:  Without objection, 32 is admitted in

2:17:43  4   evidence.

2:17:43  5           (Plaintiff's Exhibit 32 in evidence)

2:17:45  6           THE COURT:  Photograph.

2:17:45  7       BY MS. DeFORD:

2:17:48  8   Q.  What is the jury seeing in this Exhibit, Mr. Wiley?

2:17:58  9   A.  So this is the -- our booth at IWCE 2018, and if you look,

2:18:04  10  this tablecloth is in the back and I can circle it here, on the

2:18:05  11  table.

2:18:08  12  Q.  So when you say "this tablecloth is in the back", are you

2:18:11  13  referring to the one you just held up for the jury?

2:18:13  14  A.  Yes, I'm referring to this one that I held up here.

2:18:20  15  Q.  Is that the only use of Nextel that Sprint had at its both?

2:18:23  16  A.  No, we also had another banner at this white flag down here

2:18:29  17  at the lower left.  It's cut off, but it's the same Sprint

2:18:35  18  Together with Nextel logo, just cut off in the camera.

2:18:41  19  Q.  And Mr. Wiley, why use tablecloths and banners at IWCE in

2:18:46  20  2018 that say Sprint Together with Nextel?

2:18:54  21  A.  I mean, it's our brand.  Same trade show, same types of

2:18:59  22  customers.  We want them to know when they walk up you can find

2:19:03  23  out about Nextel here, you can find out about Sprint products,

2:19:05  24  that's --

2:19:12  25  Q.  When you get banners like this for trade shows, is there an

2:19:15  1  approval process that you have to go through, do you have to get
2:19:16  2  branding approval?
2:19:21  3  A.  Yeah, there's an internal website where you can order like
2:19:25  4  shirts that have our brands on them, tablecloths, you know,
2:19:29  5  stuff that might be given out at a trade show that would have
2:19:32  6  brand approved logos on them.
2:19:36  7  Q.  Is it the type of situation where Sprint could just go to a
2:19:40  8  broom closet and pull an old banner out, or do you have to have
2:19:43  9  prior approval to use it?
2:19:49  10  A.  Well, I think as an employee you're allowed to order.  So
2:19:55  11  you know, if you're going the pay for it, I mean, that has to be
2:19:59  12  approved, so that would be your approval.
2:20:02  13  Q.  We can go ahead and set those aside.
2:20:04  14        How did you use Nextel at IWCE in 2019?
2:20:16  15  A.  2019, we had some poster boards that had the Sprint Together
2:20:21  16  with Nextel logo, I believe each poster board had it appear on
2:20:22  17  there twice.
2:20:24  18        MS. DeFORD:  Your Honor, I'm going to offer Joint
2:20:26  19  Exhibit 33 to which there is no objection.
2:20:29  20        THE COURT:  33 is admitted in evidence with no
2:20:30  21  objection.
2:20:30  22        (Joint Exhibit 33 in evidence)
2:20:30  23  BY MS. DeFORD:
2:20:34  24  Q.  Scott, this is a three-page document, so I'm going to go
2:20:37  25  ahead and let Carl scroll down quickly for you so you can see

| | | |
|---|---|---|
| 2:20:37 | 1 | all three pages. |
| 2:20:41 | 2 | Okay.  Now we can go back to the first one.  What do we |
| 2:20:43 | 3 | see in this first picture here? |
| 2:20:47 | 4 | A.  So this is a picture of some other Sprint employees and |
| 2:20:54 | 5 | partners that were manning our booth for IWCE 2019. |
| 2:20:56 | 6 | Q.  Okay.  Where are you in this photo? |
| 2:21:02 | 7 | A.  I am right there on the -- to the left center, but without a |
| 2:21:04 | 8 | beard. |
| 2:21:07 | 9 | Q.  I was going to say you're looking a little younger, but |
| 2:21:11 | 10 | don't we all four years ago.  Or three years ago. |
| 2:21:15 | 11 | Go ahead and go to the second page for me, Carl. |
| 2:21:17 | 12 | What do we see in this picture? |
| 2:21:22 | 13 | A.  So we're seeing a poster board for a free tablet drawing but |
| 2:21:29 | 14 | we have our Sprint Together with Nextel logo on there. |
| 2:21:33 | 15 | Q.  If we go back to the first photo, could you show the jury |
| 2:21:37 | 16 | where in Sprint's booth that Sprint Together with Nextel placard |
| 2:21:38 | 17 | was? |
| 2:21:42 | 18 | A.  Yeah, so that's sort of front, back center there and I'll |
| 2:21:45 | 19 | circle around that. |
| 2:21:50 | 20 | Q.  If we go to the third photo, what do we see in this picture? |
| 2:21:55 | 21 | A.  This was the other poster board that was in the booth and |
| 2:21:59 | 22 | I'll go ahead and circle around that. |
| 2:22:04 | 23 | Q.  And what -- Carl, could you actually blow that up for the |
| 2:22:04 | 24 | jury? |
| 2:22:07 | 25 | What does that say in yellow on that placard? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2:22:13  1   A.  So that, again, is our brand, Sprint Together with Nextel.

2:22:17  2   Q.  If we go back to the first photo, where in the booth was

2:22:18  3   that placard we just saw Mr. Wiley?

2:22:23  4   A.  Yeah, so it's a little cut off but you can see half of it,

2:22:26  5   it's in the bottom right corner.

2:22:28  6        MS. DeFORD:  Thank you.  We can put that one aside,

2:22:29  7   Carl.

2:22:29  8     BY MS. DeFORD:

2:22:31  9   Q.  So you mentioned before that you were also involved in

2:22:34  10  business to business sales meetings.  Could you give the jury an

2:22:39  11  overview of exactly what those meetings entail?

2:22:45  12  A.  Yeah, I can.  You know, when I get pulled into a business

2:22:48  13  sales meeting, it's because our sales team wants to talk to the

2:22:54  14  customer about our push-to-talk services.  And I typically have

2:23:00  15  a PowerPoint presentation that I will present to the customer

2:23:06  16  that really frames, you know, our history of Nextel and our

2:23:12  17  present and our future and the legacy and experience to really

2:23:15  18  -- you know, you want to frame that conversation like this is

2:23:17  19  who we are, this is what we're bringing to the table.  And then

2:23:22  20  it really kind of spells out what push-to-talk is, you know, the

2:23:28  21  features, functionality and -- yeah, so I will typically be the

2:23:30  22  one presenting my product.

2:23:32  23  Q.  So you anticipated my question a little bit there,

2:23:35  24  Mr. Wiley, but do you use Nextel in those meetings?

2:23:36  25  A.  Yes, we do.

```
2:23:40   1            MS. DeFORD:  Can we pull up Exhibit 27 which there is
2:23:41   2    no objection to?
2:23:42   3            THE COURT:  Without objection, 27 is admitted in
2:23:43   4    evidence.
2:23:43   5            (Plaintiff's Exhibit 27 in evidence)
2:23:43   6        BY MS. DeFORD:
2:23:46   7    Q.  And thank you, Carl.
2:23:48   8            Do you recognize this document, Mr. Wiley?
2:23:49   9    A.  Yes, I do.
2:23:50  10    Q.  What is it?
2:23:55  11    A.  So it's titled here A Battle Card for Sprint Direct Connect
2:24:00  12    Plus, and so our business salespeople, you know, they typically
2:24:03  13    know what they're going to be presenting to customers on.  So
2:24:08  14    these battle cards are created to call out, you know, these are
2:24:11  15    the items, these are the high-level points you need to make sure
2:24:15  16    that you discuss with the customer.
2:24:18  17    Q.  And so if you look for me where it says "customer benefits"
2:24:23  18    at that last bullet at the bottom, would you blow that up, Carl
2:24:28  19    where it says "why Sprint", what is the purpose of this, what is
2:24:31  20    this telling Sprint salespeople to do when they're going into
2:24:32  21    meetings?
2:24:38  22    A.  This is really to remind the salesperson, you know, who we
2:24:45  23    are, to remind the customer of why they're dealing with us.  The
2:24:49  24    next thing we see is "we own the chirp", and that we were the
2:24:52  25    first to offer nationwide push-to-talk with Nextel Direct
```

| | | |
|---|---|---|
| 2:24:58 | 1 | Connect.  So really framing and closing out that discussion with |
| 2:25:00 | 2 | the customer. |
| 2:25:04 | 3 | Q.  So taking those one and a time, what does "we own the chirp" |
| 2:25:05 | 4 | mean? |
| 2:25:11 | 5 | A.  So we call it the Nextel chirp, and it is the sound that is |
| 2:25:16 | 6 | made when you make a push-to-talk call.  And this sound tells |
| 2:25:21 | 7 | you that the call has been connected and that the person on the |
| 2:25:26 | 8 | receiving end is going to hear what you say.  So it's a -- it's |
| 2:25:30 | 9 | something that always plays out when you use it and it's |
| 2:25:32 | 10 | something that people around you will hear. |
| 2:25:37 | 11 | Q.  You mention that it's known as the Nextel chirp.  Is that a |
| 2:25:40 | 12 | recent thing or has it always been known as the Nextel chirp? |
| 2:25:44 | 13 | A.  It's always been known as the Nextel chirp, before I started |
| 2:25:47 | 14 | there, but when I was using the products before. |
| 2:25:50 | 15 | MS. DeFORD:  Your Honor, I'm going to offer Joint |
| 2:25:54 | 16 | Exhibit 8.  There's no objection.  It's audio.  Just 8. |
| 2:25:56 | 17 | THE COURT:  I know, but I'm talking about that 8, not |
| 2:25:58 | 18 | A.  Eight. |
| 2:25:59 | 19 | MS. DeFORD:  Eight. |
| 2:26:02 | 20 | THE COURT:  Without objection, admitted in evidence. |
| 2:26:04 | 21 | Joint 8 is in evidence. |
| 2:26:04 | 22 | (Joint Exhibit 8 in evidence) |
| 2:26:08 | 23 | MS. DeFORD:  Can you go ahead and play Exhibit 8 for |
| 2:26:11 | 24 | Mr. Wiley? |
| 2:26:15 | 25 | (Joint Exhibit 8 played in open court) |

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 2:26:15 | 1  | BY MS. DeFORD:                                                |
| 2:26:19 | 2  | Q.  What was that sound that we just heard, Mr. Wiley?        |
| 2:26:21 | 3  | A.  That would be the Nextel chirp.                           |
| 2:26:25 | 4  | Q.  So going back to Exhibit 27 which is the battle card, why is |
| 2:26:29 | 5  | the chirp a selling point for Sprint?                         |
| 2:26:36 | 6  | A.  The brand Nextel and that chirp are intertwined together. |
| 2:26:42 | 7  | Why is it a selling point?  I mean, it's that recognizable    |
| 2:26:49 | 8  | sound, it shows reliability, your call's connected, you can   |
| 2:26:55 | 9  | talk, you should feel comfortable knowing that if you're a first |
| 2:26:57 | 10 | responder using this product, that your message is going to get |
| 2:26:58 | 11 | out.                                                          |
| 2:27:02 | 12 | Q.  In looking at the battle card, you mentioned the second line |
| 2:27:06 | 13 | too which is that "Sprint was the first to over nationwide    |
| 2:27:10 | 14 | push-to-talk with Nextel Direct Connect".  And it goes on to say |
| 2:27:13 | 15 | "we have a proven commit to PTT legacy and future".          |
| 2:27:16 | 16 | When you talk about Nextel in business meetings,             |
| 2:27:20 | 17 | Mr. Wiley, is the conversation limited to the history of Nextel |
| 2:27:21 | 18 | or is it broader than that?                                   |
| 2:27:27 | 19 | A.  No, the conversation is this is our past, our present and |
| 2:27:28 | 20 | our future.                                                   |
| 2:27:32 | 21 | MS. DeFORD:  We can go ahead and put that one aside.          |
| 2:27:36 | 22 | Could you pull up for me Joint Exhibit 52?  This one          |
| 2:27:43 | 23 | has no objection, Your Honor.                                 |
| 2:27:44 | 24 | THE COURT:  Is it Number 22?                                  |
| 2:27:44 | 25 | MS. DeFORD:  52.                                              |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2:27:54  1          THE COURT:  52.  Excuse me.  I dozed off for a moment.

2:27:56  2          MS. DeFORD:  It's all right.  You and me both.  It's

2:27:56  3   okay.

2:27:58  4          THE COURT:  52 is admitted in evidence without

2:27:59  5   objection.

2:27:59  6          (Joint Exhibit 52 in evidence)

2:28:01  7          MS. DeFORD:  Thank you, Your Honor.  Can we go ahead

2:28:06  8   and put this one in presentation mode, Carl?

2:28:06  9       BY MS. DeFORD:

2:28:08  10  Q.  Mr. Wiley, do you recognize this PowerPoint?

2:28:13  11  A.  Yes, this is -- this would be a presentation that we would

2:28:17  12  give to a customer for our push-to-talk services.

2:28:22  13  Q.  And if we go from the first slide to the next slide please?

2:28:29  14  Can you go back for me?  And go again?

2:28:33  15                  (Chirp)

2:28:33  16      BY MS. DeFORD:

2:28:35  17  Q.  What was that sound we just heard, Mr. Wiley?

2:28:37  18  A.  That was the familiar Nextel chirp.

2:28:42  19  Q.  Why use the Nextel chirp as part of this slide deck when

2:28:45  20  you're switching from the title page to the first slide?

2:28:51  21  A.  You know, you're presenting to the customers, it kind of

2:28:55  22  lightens the conversation, they recognize that Nextel chirp.

2:29:01  23  You know, most business customers know Nextel, know that chirp

2:29:07  24  and just kind of makes the presentation fun.

2:29:12  25  Q.  Looking at this slide here, how does this slide relate to

2:29:16  1    those "why Sprint" talking points that we just looked at on the

2:29:18  2    battle card?

2:29:24  3    A.   Well, like I said, you know, our in-person meetings and we

2:29:30  4    always want to frame our experience in the space, we want to

2:29:34  5    show our brand, you know, that recognition that the customer has

2:29:38  6    and reiterate to the customers that we're here and we're going

2:29:40  7    to take care of their PTT needs.

2:29:44  8    Q.   And looking at the middle there, why is Nextel shown in

2:29:46  9    those colors?

2:29:54 10    A.   So black and yellow was the coloring that Nextel used.  That

2:30:01 11    was iconic, their logo.  Even in the application it's our --

2:30:05 12    it's the colors we're known as, just kind of like T-Mobile has

2:30:13 13    magenta and Verizon's red and black, we are black and yellow.

2:30:16 14    Q.   Is this the only slide deck you have, Mr. Wiley, that uses

2:30:20 15    the Nextel trademark?

2:30:24 16    A.   No, we have it in the presentation that we just looked at

2:30:28 17    earlier.  This one, there's other sales presentations.  I try to

2:30:33 18    make sure that in any kind of customer-facing presentation that

2:30:36 19    we talk about our brand.

2:30:38 20    Q.   Do you continue to use slide presentations with customers

2:30:42 21    that have Nextel in them now that you're a T-Mobile employee?

2:30:47 22    A.   Yeah, we have these existing ones and we'll be working on

2:30:52 23    making new ones as we sell the service in T-Mobile.

2:30:58 24    Q.   Switching gears a little bit, I want to talk more about the

2:31:01 25    Nextel chirp that the jury heard.  Other than the presentation

2:31:05  1    we just saw, can you give the jury an example of a way that

2:31:09  2    Sprint uses this the chirp sound?

2:31:14  3    A.   Yeah.  So the chirp sound, like I said, it occurs when

2:31:19  4    you're making a push-to-talk call.  So when you have the phone

2:31:23  5    or the application and you want to make a push-to-talk call to

2:31:26  6    someone, you press the button, you're going to hear that Nextel

2:31:30  7    chirp and that tells you that the call is connected.

2:31:32  8         MS. DeFORD:  Your Honor, I would move in at this time

2:31:38  9    Exhibits 125 and 126 to which there are no objection.

2:31:44  10        THE COURT:  125 and 126 are admitted in evidence

2:31:45  11   without objection.

2:31:47  12        MS. DeFORD:  And may I approach the witness to hand him

2:31:47  13   the device?

2:31:49  14        THE COURT:  You may.  Once you got permission to

2:31:52  15   approach him, you can keep approaching.

2:31:52  16        (Plaintiff's Exhibit 125 & 126 in evidence)

2:32:03  17        MS. DeFORD:  Carl, can you please pull up 125 for me?

2:32:03  18   BY MS. DeFORD:

2:32:11  19   Q.   Starting with Exhibit 125, Mr. Wiley, can you tell the jury

2:32:15  20   what this box is, device is?

2:32:19  21   A.   Yeah.  So this is a box that has one of our latest

2:32:25  22   push-to-talk products that we just launched this last year in

2:32:31  23   2021, made by -- you see the name CAT, that's for Caterpillar.

2:32:33  24   Q.   Is this a rugged device?

2:32:36  25   A.   This is a rugged push-to-talk device.

2:32:39  1    Q.  Does Nextel appear anywhere on the packaging of this device?

2:32:43  2    A.  Yes, it does, it appears on the label on the side.

2:32:45  3         MS. DeFORD:  Carl, can you go to the image that shows

2:32:49  4    that for the jury please?

2:32:49  5       BY MS. DeFORD:

2:32:56  6    Q.  And looking at Exhibit 126, could you pull that one up,

2:32:58  7    Carl?  What is this device, Mr. Wiley?

2:33:04  8    A.  This is another CAT device, it's a rugged PTT device, this

2:33:07  9    one is actually a full smartphone.

2:33:10  10   Q.  And does that one have Nextel anywhere on the packaging?

2:33:16  11   A.  Yeah, it has it on the label in the same location.

2:33:18  12   Q.  Mr. Wiley, are these phones activated?

2:33:21  13   A.  Yes, these are activated.

2:33:23  14        MS. DeFORD:  Your Honor, may Mr. Wiley briefly

2:33:27  15   demonstrate a push-to-talk call?  Actually, let me ask you this

2:33:31  16   first Mr. Wiley, if you were to demonstrate a push-to-talk call,

2:33:34  17   could you show the jury how the chirp is used on Sprint's

2:33:35  18   devices.

2:33:37  19        THE WITNESS:  Yes, I can demonstrate that.

2:33:39  20        MS. DeFORD:  May he have permission to do that, Your

2:33:40  21   Honor?

2:33:43  22        THE COURT:  He may.

2:33:43  23       BY MS. DeFORD:

2:33:45  24   Q.  Could you tell the jury what you're doing when you're

2:33:46  25   walking through it, Scott?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2:33:50  1   A.  Yeah.  Well, right now I'm just pulling them out of the box

2:33:57  2   and so I'm going to take our -- this is what, like, a rugged

2:34:03  3   flip phone push-to-talk device is.  And on the side I have a

2:34:09  4   large PTT key it stands out.  And I'm going to go into the

2:34:13  5   application, and then I will go ahead and select who I want to

2:34:17  6   push-to-talk and I will press the key.

2:34:18  7           (Chirp)

2:34:22  8           THE WITNESS:  And I know the call is connected.

2:34:22  9       BY MS. DeFORD:

2:34:26  10  Q.  Thank you, Mr. Wiley.  Are these the only two devices that

2:34:32  11  Sprint sells on which the chirp is used when you initiate a

2:34:33  12  push-to-talk call?

2:34:39  13  A.  No.  We have other rugged push-to-talk devices, older ones

2:34:44  14  as well, and we also have the application available as a

2:34:48  15  downloadable app so you can put it on like a Samsung Android

2:34:52  16  device or an Apple iPhone or an iPad.

2:34:56  17  Q.  Since you started with the original Nextel in 2004 all the

2:35:01  18  way up through present, has there ever been a time at which

2:35:06  19  Sprint did not offer for sale a device that used the chirp?

2:35:11  20  A.  No, all of our push-to-talk devices have always had the

2:35:12  21  chirp.

2:35:17  22  Q.  Switching gears a little bit now Scott, how did you first

2:35:20  23  learn about the Defendants in this case?

2:35:26  24  A.  So, I learned when I was at IWCE 2017, I was just standing

2:35:32  25  in our -- in the Sprint Nextel booth and had a couple people

2:35:39  1    come up, approach me.  Some were ex-Nextel, meaning they worked

2:35:45  2    at Nextel in the past and, you know, I got comments like hey,

2:35:50  3    you guys have two booths or I also got one that said hey,

2:35:55  4    someone just has a poster on their booth, is that with you guys?

2:36:01  5    And so they were kind of confused, but more confused was I that

2:36:03  6    people were coming up and asking that.

2:36:06  7    Q.  You mentioned you were confused.  Why were you confused when

2:36:09  8    you heard there was another Nextel booth at IWCE?

2:36:17  9    A.  Well, as someone that's been working here or at Sprint since

2:36:23  10   2004, and even before Sprint merged with Nextel, I was very

2:36:27  11   frustrated because that is someone at a trade show trying to

2:36:33  12   talk to my customers, our potential future customers and telling

2:36:39  13   them that they are us.  You just you don't do that.

2:36:42  14   Q.  Did you go by the Defendants' booth?

2:36:45  15   A.  I did walk by the Defendants' booth.

2:36:47  16   Q.  And what did you see?

2:36:53  17   A.  I saw a Nextel banner that would have been ordered, and that

2:37:00  18   was hanging at the top of their booth behind another big banner

2:37:05  19   that said "critical RF" and there were walkie-talkie devices

2:37:10  20   that said -- that had Nextel stickers affixed to them.

2:37:14  21   Q.  Was 2017 -- was IWCE in 2017 the only time you saw the

2:37:17  22   Defendants at that trade show?

2:37:23  23   A.  No, they made an appearance at IWCE 2018 and also again at

2:37:27  24   2019.

2:37:28  25            MS. DeFORD:  Your Honor, I'd offer Joint Exhibit 97,

| | | |
|---|---|---|
| 2:37:31 | 1 | there's no objection to this one. |
| 2:37:33 | 2 | THE COURT:  Without objection, 97 is admitted in |
| 2:37:34 | 3 | evidence. |
| 2:37:34 | 4 | (Joint Exhibit 97 in evidence) |
| 2:37:34 | 5 | BY MS. DeFORD: |
| 2:37:38 | 6 | Q.  Mr. Wiley, do you recognize this photograph? |
| 2:37:39 | 7 | A.  Yes, I do. |
| 2:37:39 | 8 | Q.  What is it? |
| 2:37:44 | 9 | A.  I believe this is from IWCE 2019. |
| 2:37:55 | 10 | Q.  How did you feel when you saw this Nextel booth in 2019? |
| 2:38:06 | 11 | A.  I'm thinking this might be IWCE 2018, but this was the |
| 2:38:12 | 12 | follow-on year, this wasn't the first year.  And so what |
| 2:38:15 | 13 | differed from their first year was before it was just a little |
| 2:38:21 | 14 | poster.  Now someone has gone and printed custom full-booth |
| 2:38:27 | 15 | pictures that are of our brand and really are kind of |
| 2:38:33 | 16 | double-downing (sic) on this impersonation, to the point that, |
| 2:38:37 | 17 | you know, you might really be confused on who you're talking to |
| 2:38:40 | 18 | and who they are representing. |
| 2:38:43 | 19 | Q.  Does the Defendants' use of the Nextel brand make your job |
| 2:38:44 | 20 | harder? |
| 2:38:52 | 21 | A.  Absolutely.  I mean, the professional nature of the back |
| 2:38:57 | 22 | board would confuse anyone.  When someone takes and prints your |
| 2:39:05 | 23 | brand and goes to this level of -- I don't know, I would call it |
| 2:39:12 | 24 | orchestration that definitely makes it hard to sell.  It |
| 2:39:14 | 25 | confuses the customers that are there.  You see lots of people |

| | | |
|---|---|---|
| 2:39:17 | 1 | looking at their booth and they're probably like oh, Nextel's |
| 2:39:23 | 2 | right here.  That makes my job hard. |
| 2:39:26 | 3 | MS. DeFORD:  I'm going to go ahead and show you what's |
| 2:39:29 | 4 | been marked as Exhibit 157. |
| 2:39:33 | 5 | There's no objection to this one, Your Honor. |
| 2:39:34 | 6 | THE COURT:  What number please? |
| 2:39:36 | 7 | MS. DeFORD:  157. |
| 2:39:52 | 8 | THE COURT:  157?  Without objection, 157 is admitted in |
| 2:39:53 | 9 | evidence. |
| 2:39:53 | 10 | (Plaintiff's Exhibit 157 in evidence) |
| 2:39:53 | 11 | BY MS. DeFORD: |
| 2:40:01 | 12 | Q.  Mr. Wiley, do you recognize the device that I just handed |
| 2:40:02 | 13 | you? |
| 2:40:03 | 14 | A.  Yes, I do. |
| 2:40:03 | 15 | Q.  What is it? |
| 2:40:09 | 16 | A.  So this is a device that was shipped to me, I believe the |
| 2:40:15 | 17 | Defendant had shipped it to our counsel, to you guys, and I was |
| 2:40:19 | 18 | shipped this to kind of check it out and see what I thought of |
| 2:40:20 | 19 | the service. |
| 2:40:23 | 20 | Q.  Were you actually able to do any testing or comparison of |
| 2:40:27 | 21 | the quality and durability of Defendants' device as compared to |
| 2:40:29 | 22 | Sprint's? |
| 2:40:35 | 23 | A.  No, I couldn't.  So I received a device that, you know, it |
| 2:40:39 | 24 | looks like it would work.  The battery was dead, I attempted to |
| 2:40:43 | 25 | charge it, it would not charge.  I could not power it up.  It |

2:40:49  1   had no kind of SIM card or service in it and really, to me, I

2:40:52  2   received a paperweight.

2:40:54  3   Q.  And were you able, looking at the device, to tell who makes

2:40:55  4   it?

2:41:02  5   A.  No.  That was one item that I was inspecting and, you know,

2:41:10  6   reputable brands put their name on there.  When you buy an

2:41:13  7   iPhone, you've got that Apple logo, you've got the wording.

2:41:19  8   When you buy our devices, you know, there's brands on them.

2:41:24  9   This device, on the back there's a sticker and it's another

2:41:30  10  printed sticker that says Nextel and a model number.  I don't

2:41:35  11  know the origin, I don't know the source of this device.  To me,

2:41:39  12  that's concerning because I don't know who would support it, and

2:41:42  13  also I don't know why a company wouldn't want their name on

2:41:48  14  their for brand recognition and trust.

2:41:50  15          MS. DeFORD:  Thank you, Mr. Wiley.  That's all I have.

2:41:53  16          THE COURT:  Cross-examination?

2:41:57  17          MR. KERNELL:  Your Honor, would this be a good time to

2:41:58  18  take a --

2:42:00  19          THE COURT:  No.  No.  A little later please.  Let's go

2:42:03  20  with this one.

2:42:20  21                       CROSS-EXAMINATION

2:42:20  22     BY MR. KERNELL:

2:42:28  23  Q.  Good afternoon, Mr. Wiley.  How are you today?

2:42:30  24  A.  I'm doing well.

2:42:37  25  Q.  So in this case, you recall when I took your deposition?

2:42:38  1   A.  Yes.

2:42:41  2   Q.  And at that time when I took your deposition you were a

2:42:42  3   Sprint employee, correct?

2:42:43  4   A.  That's correct.

2:42:46  5   Q.  And now you're a T-Mobile employee, correct?

2:42:48  6   A.  Yes, I'm a T-Mobile employee.

2:42:57  7   Q.  Now, in your testimony just now, you had referred to that

2:43:03  8   the black and yellow -- and we had a board with the black and

2:43:06  9   yellow on it, and I believe you showed some pictures of the

2:43:16  10  black and yellow Nextel banners that are known, you said are

2:43:20  11  known for with Sprint.  Is that correct?

2:43:21  12  A.  Yes.

2:43:26  13  Q.  T-Mobile is not moving that forward are they?  The black and

2:43:30  14  yellow, they've abandoned that.

2:43:35  15  A.  T-Mobile has the color magenta and they are using T-Mobile,

2:43:44  16  the color magenta, for their overarching brand.

2:43:57  17  Q.  Okay.  You referred to the two CAT boxes or the CAT devices,

2:44:02  18  and I believe you turned one of them on; is that correct?

2:44:04  19  A.  I have both of them on.

2:44:07  20  Q.  Did you play the sound for both of them?

2:44:11  21  A.  I just played it on one.

2:44:18  22  Q.  And these are devices from 2021 or 2022; is that correct?

2:44:24  23  A.  Yeah, launched in 2021, they're actively sold.

2:44:30  24  Q.  Do you have any of the devices that Sprint used with the

2:44:35  25  Nextel -- what you've referred to as the Nextel chirp sound,

2:44:41   1   that sound, do you have any devices here today from 2015 to

2:44:44   2   2022?

2:44:52   3   A.   Do -- there may be some additional devices.  These are the

2:44:53   4   ones that I have here right now.

2:44:57   5        THE COURT:  The question is do you have any?

2:45:01   6        THE WITNESS:  I submitted as evidence or, like, on me?

2:45:03   7        THE COURT:  I don't know.  He asked you do you have

2:45:05   8   any.

2:45:05   9        BY MR. KERNELL:

2:45:08  10   Q.   Did you bring any with you?

2:45:13  11   A.   I just have my iPhone which --

2:45:19  12   Q.   Okay.  Do you know if counsel for T-Mobile Sprint brought

2:45:29  13   any of those devices from 2015 to now that will play the sound

2:45:32  14   on them?

2:45:39  15   A.   I believe so.  There were several boxes that we had of

2:45:40  16   phones.

2:45:44  17   Q.   Do you have them at your disposal?

2:45:49  18   A.   No, I just have these two phones right here.

2:45:52  19   Q.   And both of those two phones that you have, those CAT boxes,

2:46:03  20   or the CAT phones, they just have Nextel printed on the label

2:46:06  21   next to a recycling bin, don't they?

2:46:08  22   A.   Yes, they do.

2:46:12  23   Q.   They don't have it on the box itself anywhere, it's just on

2:46:14  24   this printed label.

2:46:26  25   A.   These boxes are branded by the device manufacturer, so you

2:46:30   1    really don't have the carrier branded on the box.  You brand it

2:46:35   2    on the label.  That's so that if you -- if we end up with an

2:46:40   3    extra inventory, you can move that stuff around.  I would kind

2:46:47   4    of say even though look at an iPhone, no one really brands it

2:46:51   5    for the carrier, it's just the white box with the phone in it

2:46:54   6    and that's how packaging has evolved.

2:47:03   7            MR. KERNELL:  I'm looking for those --

2:47:09   8            (Counsel conferring)

2:47:21   9            MS. DeFORD:  Carl, could you pull up Exhibit 125

2:47:22  10    please?

2:47:25  11            THE COURT:  This is Exhibit 125?

2:47:26  12            MS. DeFORD:  Yes, Your Honor.  This was previously

2:47:28  13    admitted.

2:47:32  14            MR. KERNELL:  So can I go to the next?  Is this

2:47:39  15    something I can flip through?  Okay.  If we can go to the next

2:47:42  16    slide.  And then the next one.

2:47:42  17            BY MR. KERNELL:

2:47:51  18    Q.  So Mr. Wiley, you said that the manufacturers or the

2:47:54  19    companies don't put their names on the boxes anymore.  I believe

2:47:58  20    that was your testimony, they put them on the label?

2:48:05  21    A.  I mean, it has evolved.  Some devices have it, some don't.

2:48:12  22    Q.  Okay.  So this device has T-Mobile.com, Metro by

2:48:16  23    T-Mobile.com or Sprint.com, do you see that?

2:48:23  24    A.  Yes, those are our main brands as we operate as overarching

2:48:27  25    brand where you can go to Sprint.com to buy devices.

| | | |
|---|---|---|
| 2:48:35 | 1 | Q.  T-Mobile is not an overarching brand, correct? |
| 2:48:38 | 2 | A.  I would say that's the name of the company.  That would be |
| 2:48:40 | 3 | an overarching brand. |
| 2:48:44 | 4 | Q.  I'm sorry, I misspoke.  Nextel is not an overarching brand |
| 2:48:47 | 5 | of T-Mobile? |
| 2:48:51 | 6 | A.  I would call it a sub-brand that we use to market our |
| 2:48:53 | 7 | push-to-talk services. |
| 2:49:01 | 8 | Q.  So it's a niche brand on push-to-talk devices. |
| 2:49:06 | 9 | A.  A niche, but very important market of business customers and |
| 2:49:12 | 10 | government, education, first responders. |
| 2:49:15 | 11 | Q.  Okay.  But that's a very small segment of the population. |
| 2:49:19 | 12 | Correct? |
| 2:49:25 | 13 | A.  I mean, it's smaller than the consumer side but -- |
| 2:49:30 | 14 | Q.  Vastly smaller than the consumer side, wouldn't you agree? |
| 2:49:33 | 15 | A.  I don't know exact break-down. |
| 2:49:36 | 16 | Q.  You don't have in your possession at T-Mobile, you don't |
| 2:49:43 | 17 | know a break-down as to what part of the market or of the sales |
| 2:49:47 | 18 | that are through the push-to-talk devices that T-Mobile offers |
| 2:49:53 | 19 | as opposed to their total offering? |
| 2:49:54 | 20 | MS. DeFORD:  Objection, Your Honor.  There's no |
| 2:49:56 | 21 | foundation and I'm not sure the relevance of this. |
| 2:49:58 | 22 | THE COURT:  I'm not either, but I'll permit him to |
| 2:50:02 | 23 | answer the question if he knows. |
| 2:50:05 | 24 | THE WITNESS:  I don't know our current consumer |
| 2:50:10 | 25 | numbers.  They may be in public records, but those aren't things |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2:50:13  1    that I track.

2:50:13  2        BY MR. KERNELL:

2:50:25  3    Q.  Now, at the trade show, you saw some Defendants' Nextel

2:50:28  4    devices, correct?

2:50:30  5    A.  From a distance.

2:50:34  6    Q.  Did you ask to operate any of those devices?

2:50:40  7    A.  No, I said I saw them from a distance.  I didn't talk to

2:50:40  8    anyone.

2:50:45  9    Q.  In the device I believe that you looked at that you said was

2:50:49 10    produced in this case, do you know the history of that device at

2:50:51 11    all?

2:50:53 12    A.  No.

2:50:56 13    Q.  Do you know if Sprint had asked for an operating device?

2:51:05 14    A.  Well, this is a trademark lawsuit.  I would -- can't imagine

2:51:09 15    someone would say send me a nonoperating device.  And I would

2:51:13 16    think you would want to lead with your best foot forward and

2:51:16 17    send an operating device so that people can check it out.

2:51:20 18    Q.  Do you know if Sprint asked for an operating device from

2:51:22 19    Defendants?

2:51:27 20    A.  I think that would be implied.  I don't know what was asked,

2:51:30 21    but the thought that you would have to say "send me a working

2:51:36 22    device" doesn't really make sense.

2:51:39 23    Q.  So this could have been a used device that was in someone's

2:51:43 24    drawer that says hey, I want to see a device that has Nextel on

2:51:46 25    it as an example, or it could have been a spare device for

2:51:49  1    Defendants, correct?

2:51:57  2    A.  Yeah, that makes sense.  But I would still think I would --

2:51:59  3    I would send a working device if it was me.

2:52:01  4    Q.  But you're not Defendants.

2:52:03  5    A.  I am not the Defendants.

2:52:08  6    Q.  And you don't know exactly what Sprint asked for, do you?

2:52:09  7             MS. DeFORD:  Your Honor, he's answered this question.

2:52:12  8             THE COURT:  Yes, he has.  Don't badger.  Move on.

2:52:12  9             BY MR. KERNELL:

2:52:21  10   Q.  So after you viewed this device, when you first saw it, do

2:52:25  11   you know when that was in 2018 time frame?

2:52:34  12   A.  I believe this was 2018, 2019 before my deposition.

2:52:40  13   Q.  Did you then ask Defendants for a working device?

2:52:43  14   A.  No, I didn't.

2:52:53  15   Q.  So at the time, the complete time that you've been at

2:52:59  16   Sprint, going back to when you were hired at Nextel and if I

2:53:04  17   recall correctly, you were first working for Nextel and then for

2:53:05  18   Sprint is that correct?

2:53:07  19   A.  That is correct.

2:53:12  20   Q.  And in that time period, had Sprint ever sold a device that

2:53:14  21   was strictly a walkie-talkie?

2:53:24  22   A.  Sprint hadn't sold a device that was just a walkie-talkie.

2:53:26  23   Q.  Okay.

2:53:31  24   A.  Our services typically have phone calls, phone calling,

2:53:39  25   data, text messaging, they are really kind of all-in-one.

2:53:53  1    Q.  Now, you also looked at some of the devices, like the i400

2:53:59  2    or the i450.  Do you recall that device?

2:54:04  3    A.  From the Defendants Nextel Worldwide?  I get confused

2:54:12  4    because that i400, i450 sounds like a Motorola brand.

2:54:17  5    Q.  Does Motorola have a trademark on the i450?

2:54:23  6    A.  I don't know anything about Motorola's trademarks.

2:54:33  7    Q.  Does Motorola -- and if Mr. Kohman's testimony we heard

2:54:33  8    earlier --

2:54:35  9         MS. DeFORD:  Your Honor, he wasn't in the courtroom for

2:54:37  10   Mr. Kohman's testimony.

2:54:39  11        THE COURT:  I don't really know where you're going with

2:54:43  12   this, but ask him questions about what he knows.

2:54:43  13        BY MR. KERNELL:

2:54:51  14   Q.  Do you know how the "I" nomenclature on the Motorola phones

2:54:54  15   came about?

2:55:04  16   A.  I don't know how it came about.  I can say what I believe it

2:55:05  17   represents.

2:55:10  18   Q.  Doesn't it represent the iDEN network?

2:55:14  19   A.  That would be my answer for the iDEN network that Motorola

2:55:15  20   manufactured.

2:55:20  21   Q.  And then in 2013 when the iDEN network was shut down,

2:55:28  22   Motorola dropped the "I" nomenclature for phones, isn't that

2:55:31  23   correct?

2:55:36  24   A.  No, I believe Motorola -- I mean, I know this just because

2:55:40  25   I'm in the space, but I know Motorola to still sell iDEN phones.

2:55:43  1    I don't know if they're still selling them today, it's been a

2:55:52  2    long time.  But I've seen the "I" with like a "swoosh" on it for

2:56:01  3    their devices in other countries, and I believe even at the

2:56:04  4    Newark airport I've seen some of those devices around.  So I

2:56:06  5    would say they still use it.

2:56:10  6    Q.  But those are for specialized -- for specialized Motorola

2:56:13  7    networks, correct?

2:56:18  8    A.  Well, they're more iDEN networks so that when the "I" is

2:56:20  9    used, it's for an iDEN network.

2:56:22  10   Q.  Correct.  And those are not Sprint networks?

2:56:25  11   A.  They have been Sprint networks.

2:56:30  12   Q.  Today they're not a Sprint network, correct?

2:56:36  13   A.  Yeah, that is correct.  We shut down the iDEN network and

2:56:39  14   evolved to faster technologies with high-speed data.

2:56:44  15   Q.  So other manufacturers use an "I" nomenclature with their

2:56:47  16   phones too, the iPhone.

2:56:54  17   A.  They do.  They don't do a "swoosh" underneath them on a

2:57:03  18   line.  And they say "phone".

2:57:44  19        MR. KERNELL:  Let me hand you -- what I'm going to show

2:57:49  20   you is Plaintiff's Exhibit 161 and it's offered into evidence

2:57:52  21   without objection.

2:57:54  22        THE COURT:  161 will be marked in evidence.

2:57:54  23        (Plaintiff's Exhibit 161 in evidence)

2:57:54  24   BY MR. KERNELL:

2:57:59  25   Q.  Do you recognize this catalogue, this Nextel catalogue?

2:58:10   1   A.  I don't know if I have seen this catalogue.  Is this a PDF?

2:58:16   2   Is this something that you may have shown at a deposition?  I

2:58:18   3   don't recognize it.

2:58:24   4   Q.  Let me look, point you to, this is Page 3 of the catalogue,

2:58:33   5   I think -- well it's two -- keep going down, Wayne.  This one.

2:58:36   6   The i450.  Do you see that one?

2:58:38   7   A.  I do.

2:58:46   8   Q.  Is that similar to the device that you have, the Nextel

2:58:48   9   device there?

2:58:54   10  A.  Yes, from my view here, it looks like it is.

2:59:00   11  Q.  And does Sprint sell a device that looks like the i450?

2:59:03   12  A.  No, we do not.

2:59:11   13  Q.  And if we go up to the previous, the i315, does Sprint sell

2:59:13   14  a device --

2:59:15   15          MS. DeFORD:  Your Honor, I'm not sure the relevance of

2:59:18   16  this.  The witness has not even identified what this document

2:59:21   17  is, nor can he.

2:59:23   18          THE COURT:  The witness has indicated he knows nothing

2:59:27   19  about this.  Can you move on please?

2:59:28   20          MR. KERNELL:  Your Honor, the witness identified the

2:59:32   21  i450 as the device that he has in front of him.

2:59:35   22          THE COURT:  No, he didn't.  He said it's similar.  He

2:59:41   23  did not say it was the device that was in front, did you?

2:59:44   24          THE WITNESS:  I said it looked like the similar device.

2:59:47   25          THE COURT:  He said he was similar, he did not say it

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 2:59:48 | 1 | was the device. |
| 2:59:48 | 2 | BY MR. KERNELL: |
| 2:59:51 | 3 | Q.  Mr. Wiley, did you investigate any of the other devices that |
| 2:59:55 | 4 | Defendants were selling under the Nextel trademark? |
| 3:00:04 | 5 | A.  No.  I'm a very busy person and I don't have time to chase |
| 3:00:05 | 6 | down other -- |
| 3:00:10 | 7 | Q.  Now, so there was one device that you have, the device that |
| 3:00:15 | 8 | looks similar to the i450, and you don't know if that device |
| 3:00:22 | 9 | actually uses the Sprint sound mark, do you? |
| 3:00:27 | 10 | A.  As I stated before, I couldn't even power it on.  I would |
| 3:00:30 | 11 | have no idea if it uses the sound. |
| 3:00:38 | 12 | Q.  Do you know if Defendants sell any device that uses the |
| 3:00:42 | 13 | Sprint sound mark? |
| 3:00:51 | 14 | A.  This is the only one I've had in my hand.  I don't know. |
| 3:01:30 | 15 | Q.  Let me -- |
| 3:01:33 | 16 | THE COURT:  Question please. |
| 3:01:35 | 17 | MR. KERNELL:  No further questions, Your Honor. |
| 3:01:39 | 18 | THE COURT:  Thank you.  Redirect? |
| 3:01:44 | 19 | MS. DeFORD:  I'm sorry.  Thank you, Your Honor. |
| 3:01:44 | 20 | REDIRECT EXAMINATION |
| 3:01:44 | 21 | BY MS. DeFORD: |
| 3:01:48 | 22 | Q.  Very, very brief, Mr. Wiley.  Counsel asked you about, and I |
| 3:01:50 | 23 | believe this was his words, whether or not T-Mobile has |
| 3:01:57 | 24 | abandoned the black and yellow mark.  To your knowledge, does |
| 3:02:00 | 25 | T-Mobile still use Nextel in black and yellow? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 3:02:03 | 1 | A.  Nextel is still used in black and yellow.  I could imagine |
| 3:02:06 | 2 | no reason anyone would want to change that coloring. |
| 3:02:08 | 3 | Q.  He also asked you whether or not you had other devices today |
| 3:02:14 | 4 | that use the Nextel chirp.  Specifically I think he mentioned |
| 3:02:20 | 5 | 2015 devices.  Do 2015 devices necessarily still work?  What |
| 3:02:23 | 6 | would you have to do to get those activated to demonstrate for |
| 3:02:25 | 7 | the jury that the chirp is on there? |
| 3:02:27 | 8 | A.  I have to think back through the years.  Give me a second. |
| 3:02:39 | 9 | So 2015 would have been -- so a 2015 push-to-talk device would |
| 3:02:46 | 10 | have been using a different technology platform.  I upgraded |
| 3:02:54 | 11 | that to a new push-to-talk platform.  So if we powered up a 2015 |
| 3:03:02 | 12 | rugged PTT device, it would not get logged into our current |
| 3:03:06 | 13 | push-to-talk service.  Those devices that go in there that were |
| 3:03:10 | 14 | rugged that could be used today really launched around 2018.  So |
| 3:03:13 | 15 | that was a previous generation of push-to-talk services. |
| 3:03:16 | 16 | Q.  So is the reason today that you only have those two boxes to |
| 3:03:20 | 17 | show the Sprint, the Sprint chirp on the phone, because you |
| 3:03:24 | 18 | don't have other devices that use it, or is it because you would |
| 3:03:27 | 19 | have to go through the process of activating them, giving them |
| 3:03:30 | 20 | SIM cards, connecting them to the network, et cetera? |
| 3:03:36 | 21 | A.  Correct.  Yeah.  I mean, I brought two devices to show a |
| 3:03:40 | 22 | push-to-talk call here, and these are the latest and greatest. |
| 3:03:43 | 23 | Q.  And you understand you're under oath today right, Mr. Wiley? |
| 3:03:44 | 24 | A.  Yes. |
| 3:03:48 | 25 | Q.  How many devices does Sprint sell that use the Sprint chirp |

3:03:49  1   mark?

3:03:54  2   A.  Well, of our current there are -- well, use the chirp mark

3:03:58  3   in general or just can I speak to the most current devices?

3:04:01  4   Q.  I'm asking generally.  Let's just take the whole time

3:04:04  5   period.  So counsel has said you don't have a device that has

3:04:09  6   used the Sprint chirp mark in 2015.  You're under oath.  Can you

3:04:13  7   tell this jury, has Sprint used the Sprint sound mark on its

3:04:17  8   devices from 2013 all the way to the present?

3:04:22  9   A.  Yes.  Any rugged PTT device or smartphone that could

3:04:26  10  download the app when a push-to-talk call started, that Nextel

3:04:30  11  chirp is in all of those.

3:04:34  12  Q.  Carl, could you pull up Exhibit 125 for me and go to the

3:04:35  13  third page?

3:04:44  14       Mr. Wiley, do you remember when counsel was asking you

3:04:50  15  about T-Mobile.com, Metro by T-Mobile.com or Sprint.com on this

3:04:50  16  box?

3:04:51  17  A.  Yes, I do.

3:04:57  18  Q.  Do you see that the lead-in to those websites is see terms

3:05:00  19  and conditions, including the arbitration provision?

3:05:01  20  A.  I do see that.

3:05:04  21  Q.  Is that a brand use on this box, or is that just directing

3:05:07  22  customers where to go if they have questions about the terms and

3:05:08  23  conditions of their device?

3:05:16  24  A.  As I read this, it says see terms and conditions at those

3:05:20  25  locations for additional information, restrictions and details.

| | | |
|---|---|---|
| 3:05:23 | 1 | Q.  Okay.  And last question, Mr. Wiley.  Counsel was asking you |
| 3:05:27 | 2 | questions about other companies that have branded their devices |
| 3:05:30 | 3 | with an "I" nomenclature.  Do you recall that? |
| 3:05:31 | 4 | A.  Yes. |
| 3:05:33 | 5 | Q.  I think you specifically mentioned the iPhone? |
| 3:05:34 | 6 | A.  Yes, he did. |
| 3:05:39 | 7 | Q.  Does Apple use the Nextel mark in connection with the |
| 3:05:39 | 8 | iPhone? |
| 3:05:47 | 9 | A.  Apple does not use the Nextel mark in connection with the |
| 3:05:47 | 10 | iPhone. |
| 3:05:50 | 11 | Q.  Do the Defendants' use the Nextel mark in connection with |
| 3:05:51 | 12 | their "I" branded phones? |
| 3:05:53 | 13 | A.  Say it again? |
| 3:05:57 | 14 | Q.  Do the Defendants use the Nextel mark in connection with |
| 3:06:00 | 15 | their phones that are branded using that "I" and three numbers |
| 3:06:03 | 16 | that's known for Motorola's Nextel phones? |
| 3:06:08 | 17 | A.  Yes, that's what these stickers are on the phones.  They're |
| 3:06:11 | 18 | putting the Nextel sticker on there. |
| 3:06:13 | 19 | MS. DeFORD:  Thank you, Mr. Wiley.  I have no further |
| 3:06:13 | 20 | questions. |
| 3:06:16 | 21 | THE COURT:  Thank you, sir.  You are excused. |
| 3:06:21 | 22 | MR. RIOPELLE:  Your Honor may he be released? |
| 3:06:35 | 23 | THE COURT:  Beg your pardon?  You're excused, sir. |
| 3:06:37 | 24 | Thank you. |
| 3:06:40 | 25 | THE WITNESS:  Thank you. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

3:06:41  1          THE COURT:  We're going to take a short break unless

3:06:48  2    you all are real busy and I hate to interrupt you.

3:06:53  3          MR. KERNELL:  If I may, the agreement between counsel

3:06:53  4    --

3:06:55  5          MR. RIOPELLE:  We can do this outside the jury.

3:06:56  6          THE COURT:  I don't know what's going on.  I'm just

3:06:59  7    about to take a break.  Okay?

3:07:02  8          Yes, sir.  What is your agreement between counsel?

3:07:05  9          MR. KERNELL:  That I was going to exhaust Mr. Wiley.

3:07:08  10   We were going to call him as a witness in our case.

3:07:11  11         THE COURT:  He looks exhausted already.  What are you

3:07:13  12   trying to do?  What do you want to do?

3:07:17  13         MR. KERNELL:  I just have two of the exhibits that he

3:07:20  14   testified to that go -- through those two exhibits with him to

3:07:23  15   show that they are not trademark use.

3:07:24  16         THE COURT:  All right.  Then she's going to have a

3:07:27  17   cross-examination and then you can have a redirect.  Is that

3:07:28  18   what it is?

3:07:31  19         MR. KERNELL:  No.  I was going to do it just these her

3:07:33  20   two, my two.

3:07:35  21         MS. DeFORD:  Your Honor, my understanding was that when

3:07:38  22   you exhaust a witness, you do both your cross and direct.  I

3:07:42  23   didn't object to anything that was outside the scope of my

3:07:45  24   direct examination because that was my understanding about what

3:07:50  25   we were doing.  I didn't expect counsel to get back up and have

```
3:07:50   1    --
3:07:52   2              THE COURT:  No.  There's direct, there's cross, and
3:07:59   3    there's redirect.  There is no fourth questioning.  You're
3:08:01   4    excused, sir.  Thank you.
3:08:05   5              We're going to take about a ten minute break.  We'll
3:08:08   6    call you back in in about ten minutes.  We're going to break for
3:08:14   7    the day today at about quarter of 4 if we can.  Quarter of 5.
3:08:18   8    Excuse me.  Tomorrow I'm teaching a class, a Zoom class at 5, so
3:08:22   9    we'll definitely break before 5, but I think I'll do it from
3:08:25  10    here instead of driving home because it could be I'll never get
3:08:28  11    home.  Anyway, ten minutes, see you back in here.
3:08:31  12              COURT SECURITY OFFICER:  All rise for the jury.
3:08:36  13              (Jury out at 3:08 p.m.)
3:17:55  14              (Brief recess)
3:20:03  15              COURT SECURITY OFFICER:  All rise for the jury.
3:20:06  16              (Jury in at 3:20 p.m.)
3:21:50  17              THE COURT:  Be seated please.
3:21:52  18              Please call your next witness.
3:21:54  19              MR. RIOPELLE:  Your Honor, Plaintiffs call Brian
3:22:01  20    Mancuso, it will be read in by deposition, not to be too long.
3:22:02  21              THE COURT:  It's not a video, it's a reading
3:22:04  22    deposition?
3:22:07  23              MR. RIOPELLE:  This is a reading.  There was no video
3:22:12  24    taken, and my colleague Mr. Dan Rogers will play the role of
3:22:13  25    Brian Mancuso.
```

| | | |
|---|---|---|
| 3:22:15 | 1 | THE COURT:  Welcome, Mr. Rogers. |
| 3:22:20 | 2 | MR. ROGERS:  Thank you, Judge. |
| 3:22:23 | 3 | THE COURT:  Then I guess this one we need to write down |
| 3:22:25 | 4 | with a court reporter, correct? |
| 3:22:29 | 5 | MR. RIOPELLE:  No, we can also prepare -- because I'm |
| 3:22:33 | 6 | reading from the transcript, it's highlighted here. |
| 3:22:36 | 7 | THE COURT:  Prepare an excerpted transcript.  Is there |
| 3:22:39 | 8 | an agreement that the court reporter does not have to transcribe |
| 3:22:46 | 9 | this?  It will go from the transcript?  Okay.  Thank you. |
| 3:23:27 | 10 | Can we start?  Ladies and gentlemen, as I told you |
| 3:23:31 | 11 | yesterday, this is a deposition that was taken and -- where is |
| 3:23:38 | 12 | it?  I got it here somewhere.  A deposition is sworn testimony |
| 3:23:43 | 13 | that was given at the time.  He's under oath, swears to tell the |
| 3:23:46 | 14 | truth, the lawyers may ask questions, the court reporter is |
| 3:23:49 | 15 | present and that's what we have now is the transcript that's |
| 3:23:53 | 16 | being read.  When a deposition is read, do not place any |
| 3:23:56 | 17 | significance on the behavior or tone of voice of the person |
| 3:24:02 | 18 | reading the questions or answers.  They're just dummies.  But |
| 3:24:07 | 19 | not in that sense of the word. |
| 3:24:09 | 20 | MR. RIOPELLE:  I thought only my wife could call me |
| 3:24:11 | 21 | that. |
| 3:24:16 | 22 | (Deposition of Brian Mancuso read to the jury by Mr. |
| 3:24:16 | 23 | Brian Riopelle and Mr. Daniel Rogers) |
| 3:28:06 | 24 | MR. RIOPELLE:  For the record, Your Honor, this is |
| 3:28:10 | 25 | trial Exhibit 84 to which there's no objection. |

| | | |
|---|---|---|
| 3:28:13 | 1 | THE COURT:  84? |
| 3:28:15 | 2 | MR. RIOPELLE:  Yes, and it's now on the screen. |
| 3:28:17 | 3 | (Plaintiff's Exhibit 84 admitted in evidence) |
| 3:28:25 | 4 | (Continued reading of deposition). |
| 3:29:50 | 5 | MR. RIOPELLE:  For the record, Your Honor, this is |
| 3:29:56 | 6 | trial Exhibit 95 which is there's no current objection, it is |
| 3:29:58 | 7 | can be admitted. |
| 3:29:59 | 8 | THE COURT:  95. |
| 3:29:59 | 9 | (Plaintiff's Exhibit 95 admitted in evidence) |
| 3:30:00 | 10 | MR. SCHWARTZ:  Your Honor? |
| 3:30:01 | 11 | THE COURT:  Yes. |
| 3:30:03 | 12 | MR. SCHWARTZ:  I don't mean to interrupt, but counsel |
| 3:30:08 | 13 | is reading, and then they're skipping stuff that was submitted |
| 3:30:12 | 14 | as designations and skipping our designations.  Now they may |
| 3:30:16 | 15 | have mentioned something about paring down, but I don't know |
| 3:30:20 | 16 | that they have the right to just automatically pare down our |
| 3:30:27 | 17 | designations without asking about that issue.  So I'm seeing |
| 3:30:32 | 18 | here and they just didn't say our designation.  I'm not sure |
| 3:30:33 | 19 | what's going on here. |
| 3:30:36 | 20 | THE COURT:  Well, I don't know.  Maybe he'll tell us. |
| 3:30:37 | 21 | I don't know. |
| 3:30:39 | 22 | MR. RIOPELLE:  They did not provide their designations |
| 3:30:43 | 23 | to us as counters, it's the same thing we talked about the issue |
| 3:30:45 | 24 | this morning.  If they would like to read them in their case, |
| 3:30:48 | 25 | they are entitled to do so.  But they did not give them to us as |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 3:30:51 | 1 | counters, they gave them to us as designations. |
| 3:30:52 | 2 | THE COURT:  All right.  Designations you can bring them |
| 3:30:56 | 3 | in yourself.  If it's not a counter-designation, they don't have |
| 3:30:59 | 4 | to read it at the same time as theirs.  All right? |
| 3:31:01 | 5 | MR. SCHWARTZ:  Okay.  That's fine, Your Honor. |
| 3:31:08 | 6 | THE COURT:  Mr. Rogers isn't coming back, I'm sure. |
| 3:31:09 | 7 | MR. SCHWARTZ:  We're going to get someone prettier, |
| 3:31:10 | 8 | Your Honor. |
| 3:31:15 | 9 | THE COURT:  That's not going to be hard. |
| 3:31:21 | 10 | (Continued reading of deposition) |
| 3:33:39 | 11 | MR. RIOPELLE:  And that concludes the testimony Your |
| 3:33:39 | 12 | Honor. |
| 3:33:41 | 13 | THE COURT:  All right. |
| 3:33:54 | 14 | MS. WHEATLEY:  Plaintiff will call Ryan Rabenold. |
| 3:34:19 | 15 | THE COURT:  There's a little ramp there.  Be careful. |
| 3:34:23 | 16 | When you reach the seat here, please remain standing and raise |
| 3:34:29 | 17 | your right hand. |
| 3:34:29 | 18 | RYAN RABENOLD, PLAINTIFF WITNESS, SWORN. |
| 3:34:35 | 19 | THE COURT:  Please be seated.  You may remove your mask |
| 3:34:37 | 20 | when you're behind the plastic.  Tell us your name and spell it, |
| 3:34:39 | 21 | please. |
| 3:34:43 | 22 | THE WITNESS:  Ryan Rabenold.  R-Y-A-N. |
| 3:34:45 | 23 | THE COURT:  That part I can spell. |
| 3:34:46 | 24 | THE WITNESS:  R-A-B-E-N-O-L-D. |
| 3:34:50 | 25 | THE COURT:  Okay.  You may proceed. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

150

```
3:34:50   1                      DIRECT EXAMINATION
3:34:50   2       BY MS. WHEATLEY:
3:34:57   3   Q.  Good afternoon, Mr. Rabenold.  Can you tell -- can you tell
3:35:00   4   the jury where you work?
3:35:04   5   A.  Vaudra International.
3:35:06   6   Q.  What is Vaudra International?
3:35:09   7   A.  We are a private investigations company that specializes in
3:35:10   8   intellectual property investigations.
3:35:16   9   Q.  Okay.  And what is your job title at Vaudra International?
3:35:17  10   A.  Private investigator.
3:35:20  11   Q.  And do you have a private investigator's license?
3:35:20  12   A.  I do.
3:35:24  13   Q.  And what is required to secure a private investigator's
3:35:24  14   license?
3:35:28  15   A.  You need 3,000 hours of investigative experience under
3:35:33  16   direct supervision of a senior investigator, and then you need
3:35:36  17   approval by the Private Protective Services Board of North
3:35:37  18   Carolina.
3:35:40  19   Q.  Okay.  And can you describe your job responsibilities at
3:35:42  20   Vaudra?
3:35:46  21   A.  Yes.  They include anything from counterfeit goods
3:35:52  22   investigations, trademark investigations, diverted goods, stolen
3:35:57  23   goods, background investigations, all types of investigations
3:35:59  24   related to intellectual property.
3:36:04  25   Q.  Okay.  And do you have a standard procedure to determine if
```

3:36:06  1   a counterfeit trademark is being used?

3:36:11  2   A.  Yes.  The first step is to complete an evidentiary purchase,

3:36:15  3   so that way you can get your hands on the product and determine

3:36:16  4   authenticity.

3:36:20  5   Q.  Okay.  And were you retained to perform a counterfeiting

3:36:23  6   investigation related to the Nextel mark in this case?

3:36:23  7   A.  Yes.

3:36:26  8   Q.  And who retained you to perform that investigation?

3:36:30  9   A.  McGuireWoods, the counsel for Sprint.

3:36:34  10  Q.  Okay.  And when did you perform that investigation?

3:36:36  11  A.  November of 2018.

3:36:38  12  Q.  Okay.  And to your knowledge, had this lawsuit been filed as

3:36:40  13  of November 2018?

3:36:41  14  A.  Yes, it was already filed.

3:36:46  15  Q.  Okay.  And were you asked to investigate a particular

3:36:49  16  website regarding counterfeiting of Nextel?

3:36:50  17  A.  Yes.

3:36:52  18  Q.  Which website was that?

3:36:54  19  A.  Nextelworldwide.com.

3:37:00  20  Q.  Okay.  And what was the first step of your investigation?

3:37:06  21  A.  I accessed nextelworldwide.com and reviewed it for any

3:37:08  22  information on how to purchase their products.

3:37:11  23  Q.  Okay.

3:37:15  24        MS. WHEATLEY:  Carl, can we put up Exhibit 69 on the

3:37:18  25  screen?  And this one has no objection, so we'd ask that it be

3:37:22   1    admitted into evidence.

3:37:23   2         THE COURT:   69 with no objection is admitted in

3:37:24   3    evidence.

3:37:24   4         (Plaintiff's Exhibit 69 in evidence)

3:37:27   5    BY MS. WHEATLEY:

3:37:32   6    Q.   So is what is shown here the nextelworldwide.com website

3:37:34   7    that you visited?

3:37:35   8    A.   Yes.

3:37:37   9    Q.   And are you able to tell whose website this is?

3:37:40   10   A.   Yes.   If you look at the bottom it says Nextel,

3:37:41   11   Incorporated.

3:37:44   12   Q.   Okay.   And were you able to link this website to any

3:37:47   13   individuals?

3:37:52   14   A.   Yes.   Nextel, Incorporated is a registered Florida

3:37:58   15   corporation, and I accessed publicly available corporate records

3:38:01   16   with the Secretary of State and determined that Stephen

3:38:04   17   Calabrese is the president of Nextel, Incorporated.

3:38:09   18   Q.   Okay.   Now, were you able to locate any information about

3:38:12   19   how to purchase Nextel devices on this website?

3:38:17   20   A.   Yes.   You would access the contact a dealer on the

3:38:19   21   right-hand side of the page.

3:38:23   22   Q.   Okay.   Carl, do you mind going to Page 8, the contact a

3:38:24   23   dealer sub-page?

3:38:32   24        Is this the contacted contact a dealer page you looked

3:38:32   25   at?

153

3:38:33   1    A.   Yes.

3:38:36   2    Q.   And did you contact any of the dealers listed here?

3:38:39   3    A.   I contacted the two that you're looking at now.

3:38:43   4    Q.   Is that Northeast Two Way Radio Corp and Seacoast

3:38:44   5    Communications?

3:38:45   6    A.   Correct.

3:38:47   7    Q.   And how did you contact them?

3:38:50   8    A.   I called them via the telephone numbers that are listed on

3:38:53   9    the screen.

3:38:56   10   Q.   Okay.  And what did you say when you first contacted these

3:38:57   11   dealers?

3:39:01   12   A.   My first question was are you distributors for

3:39:03   13   nextelworldwide.com.

3:39:05   14   Q.   And how did they respond?

3:39:09   15   A.   They both confirmed that they are distributors.

3:39:13   16   Q.   Did you ask about purchasing Nextel products?

3:39:14   17   A.   Yes.

3:39:17   18   Q.   Okay.  And how did they respond to that?

3:39:21   19   A.   They told me that Nextel products are available for purchase

3:39:22   20   or rent.

3:39:27   21   Q.   Okay.  And were you able to get any pricing for the Nextel

3:39:29   22   products the dealers were selling?

3:39:35   23   A.   Yes.  There were approximately $250 to $400 a unit.

3:39:41   24   Q.   Okay.  And did that -- were there any other costs involved

3:39:44   25   in purchasing a unit potentially?

```
3:39:46   1    A.  Yes, activation fees and monthly fees.

3:39:50   2    Q.  Okay.  Did you talk with either dealer about the Nextel

3:39:51   3    chirp?

3:39:54   4    A.  Yes.  I specifically remember talking to Northeast Two Way

3:39:59   5    Radio Corp about the Nextel chirp.

3:40:00   6    Q.  Do you remember the name of the gentleman you talked to at

3:40:01   7    northeast?

3:40:05   8    A.  Yes.  Jason Martocchio.

3:40:09   9    Q.  And what did he say?

3:40:13  10    A.  He said the radios do not have the chirp at the moment, but

3:40:17  11    they are working on integrating them.  And, you know, I asked

3:40:24  12    you know could I, you know, have the Nextel chirp -- if I

3:40:26  13    purchased these radios now, could I have the Nextel chirp later

3:40:30  14    and he said I assume so, through a firmware upgrade.

3:40:35  15    Q.  Okay.  And when you were talking to Jason, how did you refer

3:40:36  16    to the Nextel chirp?

3:40:38  17    A.  I called it the Nextel chirp.

3:40:42  18    Q.  Okay.  Did Jason ask you any questions about what the Nextel

3:40:43  19    chirp was?

3:40:46  20    A.  No, he seemed to know exactly what I was talking about.

3:40:51  21    Q.  Okay.  Did you end up purchasing anything from either

3:40:51  22    dealer?

3:40:54  23    A.  Yes.  I purchased two radios from Northeast Two Way Radio

3:40:57  24    Corp.

3:41:01  25    Q.  Okay.  And what was the purchase process to get the radios
```

3:41:02  1    from Northeast?

3:41:07  2    A.  So on their website you fill out the new customer set-up

3:41:10  3    form, then you send them an e-mail telling them what you would

3:41:11  4    like to purchase.

3:41:15  5    Q.  Okay.  And did you receive -- so you did finalize the

3:41:16  6    purchase?

3:41:16  7    A.  Yes.

3:41:19  8    Q.  Okay.  Did you receive what you purchased from Northeast?

3:41:20  9    A.  Yes.  They were shipped to me.

3:41:24  10   Q.  Okay.  And after you received the radios, what did you do

3:41:26  11   with them?

3:41:30  12   A.  I photographed them, I processed them as evidence, assigned

3:41:33  13   evidence numbers to them and we kept them secured in our

3:41:35  14   evidence locker.

3:41:38  15   Q.  Okay.

3:41:42  16        MS. WHEATLEY:  Your Honor, I'd like to introduce

3:41:46  17   Exhibit 135 which has no objections and move to admit this in

3:41:47  18   evidence.

3:41:49  19        THE COURT:  135 is admitted in evidence without

3:41:50  20   objection.

3:41:50  21        (Plaintiff's Exhibit 135 in evidence)

3:41:53  22        MS. WHEATLEY:  May I approach to give this to the

3:41:54  23   witness?

3:41:56  24        THE COURT:  You may.  Actually give it to the court

3:42:00  25   security officer, he'll give it to the witness.  It's easier.

```
3:42:09   1        BY MS. WHEATLEY:

3:42:14   2    Q.  Mr. Rabenold, do you recognize what I've just handed you?

3:42:15   3    A.  Yes.

3:42:16   4    Q.  What is that?

3:42:20   5    A.  This is one of the radios that I purchased from Northeast

3:42:22   6    Two Way Radio Corp.

3:42:26   7    Q.  Okay.  Did you mark the outside of the box in any way?

3:42:28   8    A.  Yes, they have evidence tags.

3:42:39   9    Q.  Okay.  And do you mind unpacking the device?  Carl, can we

3:42:42   10   pull up -- we've got a picture of the device here so people can

3:42:49   11   see it on the screen.  So do you mind showing the jury where on

3:42:51   12   this device it says Nextel?

3:42:57   13   A.  Yes.  So on the front face, on this crooked yellow and black

3:42:59   14   sticker it says Nextel.

3:43:03   15        MR. SCHWARTZ:  Objection, Your Honor.  Describing it as

3:43:03   16   crooked.

3:43:06   17        THE COURT:  I don't think he meant like it's crook, I

3:43:09   18   think he meant that it's not straight.

3:43:11   19        MR. SCHWARTZ:  I looked at the picture.

3:43:13   20        THE COURT:  The picture looks straight.  Is it?

3:43:16   21        MR. SCHWARTZ:  If the witness could just stick to the

3:43:16   22   --

3:43:18   23        THE WITNESS:  Looks crooked to me.

3:43:21   24        THE COURT:  He's describing it.  You can cross-examine

3:43:25   25   him on whether it really is crooked.  You can impeach him.  He
```

3:43:29  1    thinks it's crooked.  I didn't think he meant anything

3:43:31  2    pejorative.

3:43:34  3         THE WITNESS:  And then when you remove the battery

3:43:39  4    pack, there's this rectangular white and black sticker that says

3:43:41  5    Nextel.

3:43:41  6         BY MS. WHEATLEY:

3:43:48  7    Q.  Okay.  And you can set that one aside.  Give me a second.

3:43:51  8         You mentioned earlier that Jason said that Northeast

3:43:57  9    was working on adding the chirp.  Have you located any other

3:43:58  10   information on that?

3:44:02  11   A.  Yes.  There's a recent video, I believe it's from February

3:44:07  12   2022, that's been uploaded to You Tube by Northeast Two Way

3:44:16  13   Radio Corp, and it's a demonstrative video.

3:44:19  14   Q.  How do you know the video is from Northeast?

3:44:24  15   A.  So I notice the company name and logo in the video which are

3:44:28  16   on the invoice from this purchase.  The telephone number that's

3:44:31  17   on the screen during the video is the same telephone number on

3:44:36  18   my invoice from this purchase.  The caption of the video says

3:44:42  19   "Nextel Boston" which is their website, and then in the

3:44:45  20   beginning of the video, the male who is narrating the video,

3:44:50  21   says "I'm Jason from Northeast Two Way Radio Corp in Woburn,

3:44:56  22   Massachusetts".  And I recognize that voice and accent, that

3:45:03  23   name and, you know, Northeast Two Way Radio Corp is in Woburn,

3:45:04  24   Massachusetts.

3:45:08  25        MS. WHEATLEY:  Before we put on the video, I'd like to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 3:45:15 | 1 | play for you Exhibit 8 which is the Nextel chirp. |
| 3:45:21 | 2 | (Chirp) |
| 3:45:25 | 3 | MS. WHEATLEY:  Now, I'd like to introduce Exhibit 158 |
| 3:45:28 | 4 | and there were no objections on this one. |
| 3:45:31 | 5 | THE COURT:  158 admitted in evidence. |
| 3:45:32 | 6 | (Plaintiff's Exhibit 158 in evidence) |
| 3:45:36 | 7 | MS. WHEATLEY:  So Carl, if you can go ahead and play |
| 3:45:38 | 8 | it. |
| 3:45:55 | 9 | (Plaintiff's Exhibit 158 video Exhibit playing) |
| 3:48:25 | 10 | BY MS. WHEATLEY: |
| 3:48:29 | 11 | Q.  Now Mr. Rabenold, before that video I played for you the |
| 3:48:32 | 12 | Nextel chirp.  Did you hear the Nextel chirp in the video that |
| 3:48:33 | 13 | was just played? |
| 3:48:34 | 14 | A.  Yes. |
| 3:48:36 | 15 | Q.  Where did you hear it? |
| 3:48:42 | 16 | A.  The very first device that Jason picks up to demonstrate, I |
| 3:48:47 | 17 | believe it's the one minute eight second mark, I heard the |
| 3:48:48 | 18 | Nextel chirp. |
| 3:48:53 | 19 | Q.  All right.  And Mr. Rabenold, did you do any other |
| 3:48:56 | 20 | investigation related to Nextel website? |
| 3:48:57 | 21 | A.  Yes. |
| 3:49:01 | 22 | Q.  Which other Nextel website did you visit? |
| 3:49:04 | 23 | A.  Well, there were a few, but I guess we could start with |
| 3:49:08 | 24 | nextelmobileworldwide.com. |
| 3:49:13 | 25 | Q.  Okay.  Exhibit 67 was previously admitted, so if we could |

| | | |
|---|---|---|
| 3:49:18 | 1 | put that on the screen?  Is this the nextelmobileworldwide.com |
| 3:49:21 | 2 | website you visited? |
| 3:49:21 | 3 | A.  Yes. |
| 3:49:26 | 4 | Q.  Okay.  Now, were you able to determine if there is any link |
| 3:49:32 | 5 | between this website and the Calabrese Nextel, Inc. |
| 3:49:35 | 6 | nextelworldwide.com website? |
| 3:49:36 | 7 | A.  Yes, there is. |
| 3:49:41 | 8 | Q.  Okay.  Where did you see that link? |
| 3:49:43 | 9 | A.  If you -- |
| 3:49:49 | 10 | Q.  I realize this can't scroll.  Carl, can you go to Page 6? |
| 3:49:54 | 11 | A.  Right here.  So you'll see under this little animated guy |
| 3:49:58 | 12 | here, "visit our new Nextel devices and telecommunications |
| 3:50:02 | 13 | services, please visit nextelworldwide.com". |
| 3:50:08 | 14 | Q.  All right.  And now did you visit any other Nextel websites? |
| 3:50:14 | 15 | A.  Nextelisback.com and getnextel.com. |
| 3:50:17 | 16 | Q.  And what did you learn about those websites? |
| 3:50:23 | 17 | A.  Both redirect to the current website on the screen here, |
| 3:50:29 | 18 | Nextelmobileworldwide.com, which is Kaplan's website. |
| 3:50:31 | 19 | MS. WHEATLEY:  Thank you.  No further questions. |
| 3:50:41 | 20 | CROSS-EXAMINATION |
| 3:50:41 | 21 | BY MR. SCHWARTZ: |
| 3:50:45 | 22 | Q.  Good afternoon, Mr. Rabenold, my name is Wayne Schwartz, I |
| 3:50:48 | 23 | represent the Defendants. |
| 3:51:10 | 24 | Can we switch over to my side? |
| 3:51:18 | 25 | You indicated you were hired by McGuireWoods in |

| | | |
|---|---|---|
| 3:51:20 | 1 | connection with this lawsuit? |
| 3:51:20 | 2 | A.  Yes, sir. |
| 3:51:24 | 3 | Q.  And McGuireWoods is the Plaintiff's counsel, correct? |
| 3:51:25 | 4 | A.  Yes, sir. |
| 3:51:28 | 5 | Q.  Did you deal with an attorney at McGuireWoods specifically? |
| 3:51:28 | 6 | A.  Yes, sir. |
| 3:51:30 | 7 | Q.  Was it Lucy Wheatley? |
| 3:51:31 | 8 | A.  Yes, sir. |
| 3:51:33 | 9 | Q.  Was it the attorney that just asked you the questions? |
| 3:51:34 | 10 | A.  Yes, sir. |
| 3:51:37 | 11 | Q.  Did Ms. Wheatley provide you specific information about the |
| 3:51:40 | 12 | Defendants in connection with your investigation? |
| 3:51:45 | 13 | A.  No, sir.  She provided me with a website and asked me if I |
| 3:51:49 | 14 | could see if I could purchase Nextel products from the website. |
| 3:51:53 | 15 | Q.  Isn't that Ms. Wheatley providing you information, how else |
| 3:51:56 | 16 | would you start your investigation, isn't that correct? |
| 3:51:58 | 17 | A.  Well yeah, how else would I start the investigation, yeah, |
| 3:51:59 | 18 | correct. |
| 3:52:02 | 19 | Q.  Ms. Wheatley provided you the information, right? |
| 3:52:03 | 20 | A.  Yes. |
| 3:52:10 | 21 | Q.  And on the screen is marked as 93.  This is your particular |
| 3:52:12 | 22 | report after you did your investigation, correct? |
| 3:52:14 | 23 | A.  Correct. |
| 3:52:19 | 24 | Q.  And that's your company that you work for, Vaudra |
| 3:52:19 | 25 | International? |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

3:52:21   1    A.   Correct.

3:52:22   2         THE COURT:  It's not in evidence, is it?

3:52:24   3         MR. SCHWARTZ:  This is in evidence, Your Honor.

3:52:27   4         THE COURT:  How come I don't know that it's in

3:52:30   5    evidence?

3:52:32   6         MS. WHEATLEY:  It has not been admitted, but we have no

3:52:33   7    objection.

3:52:35   8         THE COURT:  The problem is if you show it to the jury,

3:52:36   9    it's got to be in evidence.

3:52:38   10        MR. SCHWARTZ:  I apologize, Your Honor.  I thought this

3:52:39   11   was in.

3:52:41   12        THE COURT:  93 is admitted in evidence without

3:52:45   13   objection, offered by the Defendant.  Go ahead.

3:52:45   14        (Plaintiff's Exhibit 93 in evidence)

3:52:45   15   BY MR. SCHWARTZ:

3:52:52   16   Q.   Do you see there on the very first paragraph on November 19,

3:52:57   17   2018, Lucy Wheatley requested a trademark counterfeiting

3:52:59   18   investigation.  Do you see that?

3:52:59   19   A.   Yes, sir.

3:53:03   20   Q.   And then in the second paragraph it identifies you, this is

3:53:05   21   you -- prepared this report, correct?

3:53:06   22   A.   Yes, sir.

3:53:10   23   Q.   And in the second paragraph it says "Lucy Wheatley provided

3:53:14   24   the following information".  Would you read those two sentences?

3:53:19   25   A.   "Lucy Wheatley provided the following information,

3:53:24  1   RetroBrands, Inc. who calls itself Nextel, appears to be selling

3:53:24  2   counterfeiting Nextel-branded phones, radios or walkie-talkies,

3:53:27  3   to distributors that are listed on their website

3:53:30  4   nextelworldwide.com".

3:53:32  5   Q.   Please, the second sentence.

3:53:36  6   A.   "The company is run by Stephen Calabrese, Jeffrey Kaplan and

3:53:37  7   Jose Rivera".

3:53:40  8   Q.   You said that you looked up the Florida Secretary of State,

3:53:41  9   correct?

3:53:42  10  A.   Correct.

3:53:45  11  Q.   Did you determine that Jose Rivera was the vice president of

3:53:49  12  Nextel, Inc.?

3:53:55  13  A.   I don't recall 100%, but I do remember seeing his name tied

3:53:59  14  to some sort of Nextel entity.

3:54:02  15  Q.   And Ms. Wheatley was the one who provided you that

3:54:05  16  information concerning Mr. Rivera, correct?

3:54:12  17  A.   She just provided his name.  She did not provide a company

3:54:13  18  name.

3:54:16  19  Q.   Did you look up or do any investigation concerning

3:54:19  20  RetroBrands on the Secretary of State website?

3:54:21  21  A.   No, sir.

3:54:25  22  Q.   But you're tasked with investigating that particular company

3:54:28  23  it says it right there, RetroBrands, Inc., right?

3:54:32  24  A.   Our focus was on nextelworldwide.com and completing a

3:54:33  25  purchase.

3:54:36   1   Q.  So was it an incomplete investigation, you only decided to

3:54:38   2   do part of the investigation?

3:54:41   3        MS. WHEATLEY:  Objection, foundation.

3:54:42   4        THE COURT:  Sustained.

3:54:42   5   BY MR. SCHWARTZ:

3:54:44   6   Q.  You didn't do any investigation concerning RetroBrands,

3:54:45   7   Incorporated?

3:54:53   8   A.  No, that wasn't my task.  It's not what I was asked to do.

3:54:59   9   Q.  Were you told that RetroBrands USA, Incorporated doesn't

3:55:02  10   have anything to do with selling radios?

3:55:08  11   A.  Again, I never got into any investigation into RetroBrands,

3:55:12  12   Incorporated.  If you look at the first paragraph you'll see

3:55:15  13   what I was instructed to do.

3:55:19  14   Q.  So you were simply tasked with acquiring -- let me finish,

3:55:21  15   please.  You were just simply asked to acquire phones from

3:55:25  16   distributors and then test them, right?

3:55:30  17   A.  Not test them, no.  I was instructed to complete a purchase

3:55:33  18   to see if they are selling counterfeit Nextel phones, radios or

3:55:38  19   walkie-talkies, and if they use the Nextel chirp sound.

3:55:41  20   Q.  So was it just determining if they made the sound?

3:55:42  21   A.  No.

3:55:44  22   Q.  What was the second part?

3:55:48  23   A.  Determining if they're counterfeit Nextel devices and then

3:55:51  24   seeing if they play the Nextel chirp sound.

3:55:55  25   Q.  What did you use to determine if they were going to be a

| | | |
|---|---|---|
| 3:55:58 | 1 | counterfeit device, and what do you mean by counterfeit device? |
| 3:56:02 | 2 | A.  I was not asked to authenticate the product.  I was asked to |
| 3:56:09 | 3 | get the product in, make the purchase.  Counsel, and -- I assume |
| 3:56:12 | 4 | Sprint and counsel together, made the determination that these |
| 3:56:15 | 5 | are counterfeit.  I don't make those determinations. |
| 3:56:20 | 6 | Q.  Why did you just call it a counterfeit product when that's |
| 3:56:25 | 7 | not what you were tasked to do, correct? |
| 3:56:26 | 8 | MS. WHEATLEY:  Objection, foundation. |
| 3:56:28 | 9 | MR. SCHWARTZ:  The witness testified that he was asked |
| 3:56:32 | 10 | to find out if these were counterfeit, then he just testified |
| 3:56:35 | 11 | that that's not what he was tasked to do. |
| 3:56:35 | 12 | THE WITNESS:  What I meant was -- |
| 3:56:38 | 13 | THE COURT:  Wait a second.  What's your point?  Do you |
| 3:56:39 | 14 | want to -- |
| 3:56:41 | 15 | MR. SCHWARTZ:  I was just responding to the particular |
| 3:56:43 | 16 | objection, Your Honor.  This is what he testified. |
| 3:56:46 | 17 | THE COURT:  The objection was the foundation.  I don't |
| 3:56:48 | 18 | know -- you know, I know that you want to say it and you're |
| 3:56:51 | 19 | allowed to say it, and there's plenty of times that you'll be |
| 3:56:53 | 20 | able to argue to the jury that he lied to you because he said |
| 3:56:57 | 21 | this and that.  But asking the question isn't the way of doing |
| 3:57:03 | 22 | it, so I'll sustain the objection.  Ask another question. |
| 3:57:06 | 23 | MR. SCHWARTZ:  I will, Your Honor.  Thank you. |
| 3:57:06 | 24 | BY MR. SCHWARTZ: |
| 3:57:15 | 25 | Q.  After you bought the two radios from Northeast Two Way Radio |

3:57:23  1   Corp, they arrived at the location where you had them sent,

3:57:24  2   right?

3:57:24  3   A.   Correct.

3:57:28  4   Q.   And then you powered them up?

3:57:33  5   A.   I believe so, if I remember correctly.  That was in 2018.

3:57:43  6   Q.   And if you could just scroll up just a little bit, stop.

3:57:58  7        Do you see at the bottom of your report, the third

3:58:00  8   sentence from the bottom, would you read that to the jury

3:58:01  9   please?

3:58:03  10  A.   Where it says "the radios had"?

3:58:04  11  Q.   Yes.

3:58:04  12  A.   Right there?

3:58:05  13  Q.   Yes, please.

3:58:08  14  A.   "The radios have a push-to-talk sound but do not have the

3:58:10  15  Nextel chirp sound".

3:58:14  16  Q.   So you determine after powering up the phones that they

3:58:15  17  actually didn't have the chirp sound, right?

3:58:20  18  A.   No, that paragraph is what Jason at Northeast Two Way Radio

3:58:23  19  Corp told me.

3:58:26  20  Q.   Did you power up the phones?

3:58:30  21  A.   I don't recall.  I'd have to look through this report

3:58:34  22  further.  This is in 2018.  If you go -- if you scroll through

3:58:39  23  the report, I'm sure you'll find something where I process them

3:58:43  24  as evidence and all that.

3:58:47  25  Q.   Why would you tell Ms. Wheatley that they don't have the

3:58:52  1   chirp sound if you didn't even listen to the radio?

3:58:54  2           MS. WHEATLEY:  Objection.

3:58:55  3           THE WITNESS:  When did I say that?

3:58:59  4           MR. SCHWARTZ:  Right here in your investigative report.

3:59:00  5           THE COURT:  If you read it, what it says that "Jason

3:59:04  6   told him that it had no chirp sound."  That's what it says in

3:59:09  7   that paragraph.  Are you talking about somewhere else?

3:59:12  8           THE WITNESS:  It says "Jason informed me of the

3:59:16  9   following", and then you continue reading and that's where that

3:59:19 10   part comes in to play.

3:59:34 11           (Counsel conferring)

3:59:34 12   BY MR. SCHWARTZ:

3:59:39 13   Q.  You bought phones also from Seacoast Communications,

3:59:39 14   correct?

3:59:42 15   A.  No.

3:59:59 16   Q.  So you spoke to someone at Seacoast, they told you they sold

4:00:01 17   the particular phone but then you didn't purchase the phones

4:00:02 18   from them?

4:00:02 19   A.  Correct.

4:00:06 20   Q.  What was the reason for not purchasing the phone from them?

4:00:10 21   A.  I just chose to go with Northeast Two Way Radio.

4:00:16 22   Q.  If you scroll down please,

4:00:23 23   A.  So I did turn the radios on.

4:00:30 24   Q.  So Mr. Rabenold, you're tasked with doing this

4:00:32 25   investigation, you buy just the one phone, I guess, from

| | | |
|---|---|---|
| 4:00:37 | 1 | Northeast Two Way, and then now you did power up the radio |
| 4:00:39 | 2 | radios, right? |
| 4:00:42 | 3 | A.  I bought two radios and according to my report, it's coming |
| 4:00:46 | 4 | back to me, yes, I turned the radios on. |
| 4:00:50 | 5 | Q.  When you say it's coming back to you, is that because your |
| 4:00:55 | 6 | memory from 2018 is not as good today? |
| 4:01:00 | 7 | A.  It was quite a while ago. |
| 4:01:08 | 8 | Q.  On Page 4 you see what you wrote in the summary to Ms. |
| 4:01:14 | 9 | Wheatley, the first bullet point?  Would you read that to the |
| 4:01:14 | 10 | jury? |
| 4:01:19 | 11 | A.  "When you turn the radios on, a noise is emitted but it does |
| 4:01:22 | 12 | not appear to be the Nextel chirp". |
| 4:01:37 | 13 | Q.  When you spoke to this gentleman at Seacoast Communications |
| 4:01:43 | 14 | as indicated in your report, he told you the devices do not have |
| 4:01:45 | 15 | the Nextel chirp sound, correct? |
| 4:01:49 | 16 | A.  If that's what my report says then correct, but I do not |
| 4:01:52 | 17 | recall. |
| 4:02:10 | 18 | Q.  See the first paragraph on Page 2, last sentence? |
| 4:02:12 | 19 | A.  Yep.  I do see that. |
| 4:02:15 | 20 | Q.  Does that refresh your recollection as to what he told you |
| 4:02:17 | 21 | about the phones being offered for sale? |
| 4:02:18 | 22 | A.  Yes, sir. |
| 4:02:21 | 23 | Q.  And he told you that the devices do not have the Nextel |
| 4:02:23 | 24 | chirp sound, right? |
| 4:02:24 | 25 | A.  Yes, sir. |

168

| | | |
|---|---|---|
| 4:02:27 | 1 | Q.  They have some sort of sound is what you wrote. |
| 4:02:29 | 2 | A.  Yes, sir. |
| 4:02:45 | 3 | Q.  Do you have any background, sir, in audio engineering? |
| 4:02:46 | 4 | A.  No, sir. |
| 4:02:51 | 5 | Q.  Do you know what a radio frequency megahertz is? |
| 4:02:52 | 6 | A.  I don't have a background in that, no. |
| 4:02:56 | 7 | Q.  Do you even know what the actual Nextel as you describe it, |
| 4:03:00 | 8 | chirp, the specific sound specifications are? |
| 4:03:02 | 9 | A.  I know what it sounds like. |
| 4:03:05 | 10 | Q.  No, I didn't ask you that.  I asked you do you know what the |
| 4:03:10 | 11 | specific radio frequency specs are for that sound? |
| 4:03:11 | 12 | A.  No. |
| 4:03:14 | 13 | Q.  You're just going by what you're hearing when you -- |
| 4:03:16 | 14 | A.  It's a pretty distinct sound. |
| 4:03:19 | 15 | Q.  I'm asking you, you're just going by your hearing, correct? |
| 4:03:21 | 16 | A.  Correct. |
| 4:03:28 | 17 | Q.  And when you testified earlier about watching some You Tube |
| 4:03:31 | 18 | video and then you were listening to the gentleman talk about |
| 4:03:38 | 19 | the radios, you're going again by hearing over a You Tube video? |
| 4:03:39 | 20 | A.  Yes. |
| 4:03:43 | 21 | Q.  That's what you're basing your opinion that it sounds like |
| 4:03:45 | 22 | the Nextel chirp, correct? |
| 4:03:47 | 23 | A.  I mean, it's a very distinct sound. |
| 4:03:50 | 24 | Q.  Is there a reason, sir, why you didn't actually purchase a |
| 4:03:56 | 25 | phone, this new i615 that they were describing in the You Tube |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

4:03:57   1    video?

4:04:00   2    A.   I just became aware of that video.

4:04:03   3    Q.   That was almost two months ago.  Is there a reason why you

4:04:07   4    couldn't have just called up and expedited the purchase of that

4:04:08   5    particular phone?

4:04:10   6    A.   Like I said, I just learned of the video recently.

4:04:12   7    Q.   How did you learn of the video?

4:04:14   8    A.   I was told about it by counsel.

4:04:18   9    Q.   So three years later, they were the ones who told you about

4:04:22   10   the, this Boston --

4:04:23   11           MS. WHEATLEY:  Objection, foundation and outside the

4:04:25   12   scope.

4:04:27   13           THE COURT:  I'll permit him to ask it.  I'm not sure

4:04:33   14   about the relevance of it, but I'll permit him to ask that

4:04:35   15   question.  You may answer that question.

4:04:37   16           THE WITNESS:  Can you repeat the question please?

4:04:39   17           THE COURT:  Three years later they were the ones that

4:04:40   18   told you about it?

4:04:43   19           THE WITNESS:  The video was posted in February 2022.

4:04:43   20       BY MR. SCHWARTZ:

4:04:45   21   Q.   Right.  They were the ones that told you about the video?

4:04:46   22   A.   Yes.

4:04:49   23   Q.   Why did they need to tell you about the video?

4:04:50   24           MS. WHEATLEY:  Objection, foundation.

4:04:52   25           THE COURT:  No, I'll permit him to answer the question.

4:04:56   1   Were you still doing an investigation in February of 2022?

4:05:00   2          THE WITNESS:  I was asked to see if this is the same

4:05:05   3   Northeast Two Way Radio Corp that I purchased from, because back

4:05:11   4   in 2018, Northeast Two Way Radio Corp told me there's no Nextel

4:05:14   5   chirp.  But according to this video it sure sounds like they're

4:05:16   6   using the Nextel chirp now.

4:05:16   7          BY MR. SCHWARTZ:

4:05:21   8   Q.  So you want this jury to make decisions based upon just your

4:05:25   9   audio sound of a You Tube video for maybe three or four seconds.

4:05:28  10   Is that what you're saying?

4:05:31  11   A.  It appears it's the Nextel chirp.

4:05:33  12   Q.  Based upon you, right?

4:05:36  13   A.  I mean, they can make their own judgment.

4:05:41  14   Q.  But you didn't -- were you told not to purchase the i615 as

4:05:43  15   part of your investigation?

4:05:47  16   A.  Honestly, I didn't even know that product was available.

4:05:53  17   Q.  My question was were you asked to purchase the i615 as part

4:05:54  18   of your investigation?

4:05:56  19          THE COURT:  That wasn't your question.  Your question

4:06:02  20   was were you told not to purchase the i615 as part of your

4:06:02  21   investigation.

4:06:05  22          THE WITNESS:  After I purchased these two radios, I was

4:06:08  23   never asked to make another purchase.

4:06:08  24          BY MR. SCHWARTZ:

4:06:12  25   Q.  And that includes being told about this particular video in

```
4:06:14   1    February of 2022.

4:06:18   2    A.  I was not told about the video in February of 2022.

4:06:19   3    Q.  When were you told about it?

4:06:20   4    A.  This month.

4:06:23   5    Q.  When this month?

4:06:25   6    A.  A couple days ago.

4:06:26   7    Q.  A couple of days ago?

4:06:27   8    A.  Yes.

4:06:29   9    Q.  Can you be more specific?

4:06:32  10    A.  I honestly do not recall what day.

4:06:35  11    Q.  And who spoke to you about it a couple of days ago?

4:06:40  12    A.  Ms. Wheatley.  We had just learned about it.

4:06:43  13    Q.  But she obviously didn't just learn about it, correct?

4:06:47  14    A.  I don't know.  I'm not her.

4:07:00  15    Q.  Between the purchase of the two radios in or around

4:07:05  16    November, December of 2018 and you sitting here today, did you

4:07:06  17    purchase any other radios?

4:07:07  18    A.  No, sir.

4:07:10  19    Q.  Did you listen to any other of the Defendants' radios that

4:07:13  20    they may have in their possession?

4:07:15  21    A.  No, sir.

4:08:01  22    Q.  Were you told by Ms. Wheatley that the Nextel network was

4:08:01  23    shut down?

4:08:03  24    A.  No, sir.

4:08:09  25    Q.  Were you told by Ms. Wheatley that the iconic yellow and
```

| | | |
|---|---|---|
| 4:08:15 | 1 | black Nextel logo was abandoned by Sprint at the time of your |
| 4:08:16 | 2 | investigation? |
| 4:08:19 | 3 | MS. WHEATLEY:  Objection, outside the scope and |
| 4:08:21 | 4 | misleads the jury. |
| 4:08:22 | 5 | MR. SCHWARTZ:  This is cross, Your Honor. |
| 4:08:24 | 6 | THE COURT:  Yes, it is, but you can't go outside the |
| 4:08:29 | 7 | scope of direct.  I don't think he's testified anything about -- |
| 4:08:36 | 8 | well, I don't know.  I'll permit it.  Very limited though.  Did |
| 4:08:46 | 9 | she tell you that the yellow and black Nextel logo was abandoned |
| 4:08:48 | 10 | by Sprint? |
| 4:08:50 | 11 | THE WITNESS:  There was no talk about that, but I know |
| 4:08:52 | 12 | Nextel is still used on packaging. |
| 4:08:52 | 13 | BY MR. SCHWARTZ: |
| 4:08:54 | 14 | Q.  Excuse me? |
| 4:08:57 | 15 | A.  I said I know Nextel is still used on packaging for phones. |
| 4:09:01 | 16 | Q.  What are you talking about? |
| 4:09:03 | 17 | A.  Exactly what I said.  Nextel is still used on packaging. |
| 4:09:06 | 18 | Q.  Please elaborate.  Tell me what you're talking about. |
| 4:09:08 | 19 | A.  That's all I know. |
| 4:09:12 | 20 | Q.  Well, what's the foundation for that statement? |
| 4:09:15 | 21 | A.  Well, you asked me about Nextel being abandoned. |
| 4:09:18 | 22 | Q.  I'm specifically asking you what specific products are you |
| 4:09:23 | 23 | seeing that are still bearing the besides the Defendants' |
| 4:09:27 | 24 | phones, the yellow and black banded Nextel? |
| 4:09:30 | 25 | A.  I don't recall the exact product line names. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

173

| | | |
|---|---|---|
| 4:09:33 | 1 | Q.  And where did you see these product lines? |
| 4:09:35 | 2 | A.  During the course of this investigation. |
| 4:09:39 | 3 | Q.  Well, your investigation ended three years ago, correct? |
| 4:09:41 | 4 | A.  No, we did a little bit more. |
| 4:09:42 | 5 | Q.  What more did you do? |
| 4:09:46 | 6 | A.  We looked into some more websites that kept popping up. |
| 4:09:49 | 7 | Q.  Did you provide any reports? |
| 4:09:50 | 8 | A.  Yes. |
| 4:09:52 | 9 | Q.  Do you know why they haven't been produced to us? |
| 4:09:54 | 10 | A.  Couldn't tell you. |
| 4:09:57 | 11 | Q.  So besides this particular report, there's been more |
| 4:09:57 | 12 | reports? |
| 4:09:58 | 13 | A.  Yes. |
| 4:09:59 | 14 | Q.  Did you do them? |
| 4:10:02 | 15 | A.  Yes. |
| 4:10:11 | 16 | Q.  Were those also done at the direction of Ms. Wheatley? |
| 4:10:13 | 17 | A.  Yes. |
| 4:10:43 | 18 | Q.  Are you just generally aware that the Nextel network is shut |
| 4:10:43 | 19 | down? |
| 4:10:48 | 20 | A.  I don't know that information. |
| 4:10:50 | 21 | Q.  Do you think it would have been wise to determine whether or |
| 4:10:53 | 22 | not you could have powered those phones up on to the -- if there |
| 4:10:54 | 23 | was a network? |
| 4:10:58 | 24 | A.  Well, when I bought them I never activated them so there's |
| 4:11:00 | 25 | no possible way. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

4:11:01  1    Q.  No possible way?

4:11:05  2    A.  They're not activated.  They don't have active SIM cards.

4:11:08  3    Q.  You couldn't have bought a SIM card at a Radio Shack.

4:11:09  4         MS. WHEATLEY:  Objection, relevance.

4:11:12  5         THE COURT:  I'll sustain the objection.

4:11:12  6    BY MR. SCHWARTZ:

4:11:37  7    Q.  With regard to the radio that you received, did you have

4:11:42  8    anyone besides yourself analyze the sound that it emits?

4:11:46  9    A.  No.

4:12:07  10   Q.  With regard to this You Tube video you talked about that you

4:12:12  11   believe you heard, did you have anyone analyze the sound like an

4:12:15  12   audio engineer to determine whether or not it was the chirp

4:12:16  13   sound?

4:12:18  14   A.  No.

4:12:19  15        MR. SCHWARTZ:  No further questions.

4:12:23  16        THE COURT:  Redirect?

4:12:23  17                         REDIRECT EXAMINATION

4:12:30  18   BY MS. WHEATLEY:

4:12:36  19   Q.  Mr. Rabenold, earlier I believe Mr. Schwartz asked you how

4:12:43  20   you knew the Nextel phone was counterfeit.  As a general matter,

4:12:45  21   do you understand what a counterfeit product is from a trademark

4:12:45  22   perspective?

4:12:50  23   A.  Yes.  It's the unauthorized use of a registered trademark on

4:12:59  24   a product and only that, you know, trademark owner, brand owner

4:13:00  25   can use that trademark on a product.

4:13:02   1          MR. SCHWARTZ:  I'm going to object, Your Honor, to this

4:13:09   2    witness testifying about trademark law and legal issues.

4:13:12   3          THE COURT:  What's your legal objection?  I know that

4:13:14   4    you don't want him saying that, but what's your legal objection.

4:13:16   5          MR. SCHWARTZ:  It's unduly prejudicial, misleads the

4:13:19   6    jury and foundation, Your Honor.

4:13:20   7          THE COURT:  Overruled.

4:13:20   8       BY MS. DeFORD:

4:13:26   9    Q.  And Mr. Rabenold, Mr. Schwartz brought up that you had not

4:13:31   10   recently purchased a new Nextel phone from Defendants'

4:13:36   11   distributors.  As a general matter in your job, do you ever

4:13:41   12   purchase counterfeit products without being instructed to by a

4:13:41   13   client?

4:13:42   14   A.  No.

4:13:49   15   Q.  Okay.  And he mentioned you discussed other investigation

4:13:53   16   you performed in this case.  Did that involve the websites we

4:13:55   17   spoke about in your direct?

4:13:57   18   A.  Correct.

4:13:58   19          MS. WHEATLEY:  Thank you.  No further questions.

4:14:00   20          THE COURT:  Thank you, sir.  You are excused.

4:14:04   21          Please call another witness.

4:14:08   22          MS. WHEATLEY:  We will call Tom Shaughnessy.

4:14:36   23          THE COURT:  Very well.  Watch your step on the ramp.

4:14:46   24          Please remain standing raise your right hand.

4:14:46   25          THOMAS SHAUGHNESSY, PLAINTIFF WITNESS, SWORN.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

176

| | | |
|---|---|---|
| 4:14:48 | 1 | THE COURT:  Please be seated.  Get as close to the |
| 4:14:51 | 2 | microphone as you can, you may remove your mask while you're |
| 4:14:55 | 3 | behind the plastic, tell us your name and spell it please. |
| 4:14:57 | 4 | THE WITNESS:  Hi.  My name is Thomas Shaughnessy. |
| 4:15:00 | 5 | T-H-O-M-A-S. |
| 4:15:04 | 6 | THE COURT:  I'm a good speller.  I won 50 pieces of |
| 4:15:08 | 7 | bubble gum in third grade in the spelling bee contest.  I know |
| 4:15:11 | 8 | how to spell Thomas.  It's the other one. |
| 4:15:15 | 9 | THE WITNESS:  Yes, sir.  S-H-A-U-G-H-N-E-S-S-Y. |
| 4:15:18 | 10 | THE COURT:  You may proceed. |
| 4:15:18 | 11 | DIRECT EXAMINATION |
| 4:15:18 | 12 | BY MS. WHEATLEY: |
| 4:15:21 | 13 | Q.  Mr. Shaughnessy, where are you employed? |
| 4:15:23 | 14 | A.  I'm employed by T-Mobile USA. |
| 4:15:26 | 15 | Q.  Okay.  And what is your job title at T-Mobile? |
| 4:15:28 | 16 | A.  Director of marketing. |
| 4:15:30 | 17 | Q.  And how long have you worked for T-Mobile? |
| 4:15:34 | 18 | A.  I've been a T-Mobile employee since the merger closed April |
| 4:15:36 | 19 | 1, 2020. |
| 4:15:38 | 20 | Q.  Okay.  Before that, where did you work? |
| 4:15:42 | 21 | A.  I worked for 23 years for Sprint Corporation. |
| 4:15:45 | 22 | Q.  And at the time of the merger with T-Mobile, what was your |
| 4:15:46 | 23 | title at Sprint? |
| 4:15:48 | 24 | A.  Director of marketing. |
| 4:15:53 | 25 | Q.  Okay.  And prior to working for Sprint, did you have any |

177

| | | |
|---|---|---|
| 4:15:57 | 1 | experience in the telecommunications industry? |
| 4:16:04 | 2 | A.  Yes.  I worked in wireless communications since 1990.  So I |
| 4:16:08 | 3 | worked for a local cellular carrier called Cybertel Cellular, |
| 4:16:13 | 4 | and they were acquired by Ameritech.  So I worked at Ameritech |
| 4:16:15 | 5 | Cellular and Paging as well. |
| 4:16:18 | 6 | Q.  Have you held any positions at Sprint other than director of |
| 4:16:19 | 7 | marketing? |
| 4:16:22 | 8 | A.  Yes.  Quite a few. |
| 4:16:24 | 9 | Q.  Can you generally describe what other positions you've held? |
| 4:16:28 | 10 | A.  Sure.  Director of regional sales for business, director of |
| 4:16:32 | 11 | area sales for business, director of sales operations, market |
| 4:16:38 | 12 | manager for national accounts.  Those are primarily the main |
| 4:16:40 | 13 | areas that I focused on. |
| 4:16:48 | 14 | Q.  Okay.  And currently what your are your responsibilities as |
| 4:16:50 | 15 | the director of marketing? |
| 4:16:54 | 16 | A.  Currently I'm in the business markets group.  Most of my |
| 4:16:54 | 17 | career has been in the business markets group. |
| 4:16:57 | 18 | My current area of responsibility is customer life |
| 4:17:01 | 19 | cycle management, which includes post-sales life cycle |
| 4:17:04 | 20 | management of our customers; cross-sell, upsell, communications, |
| 4:17:10 | 21 | retention, retention strategy, offers, upgrades, technology |
| 4:17:17 | 22 | changes.  What I'm mostly focused on right now is in the |
| 4:17:19 | 23 | integration of the Sprint base into the T-Mobile base. |
| 4:17:22 | 24 | Q.  Do your responsibilities include any push-to-talk services? |
| 4:17:23 | 25 | A.  They do. |

```
4:17:27   1    Q.   Okay.  Now, are you familiar with the Nextel brand?
4:17:29   2    A.   Very familiar with the Nextel brand.
4:17:33   3    Q.   In your own words, what is the Nextel brand?
4:17:37   4    A.   In my own words, the Nextel brand is the premiere
4:17:42   5    push-to-talk product.  We do refer to it as the gold standard of
4:17:48   6    push-to-talk services.  It's the original, it's the company that
4:17:53   7    brought the product forward and -- invented is kind of a harsh
4:17:56   8    word, but invented that nationwide push-to-talk product and
4:17:57   9    service.
4:18:00  10    Q.   Okay.  And today do you work with the Nextel brand as part
4:18:01  11    of your job?
4:18:02  12    A.   I do.
4:18:05  13    Q.   Okay.  And are you familiar with what we've been referring
4:18:06  14    to as the Nextel chirp?
4:18:10  15    A.   Very familiar with the chirp.
4:18:11  16    Q.   Can you describe what is the chirp?
4:18:15  17    A.   Well, the Nextel chirp is the sound, you've heard it a
4:18:19  18    couple times today, it's the distinct high-pitched chirp that
4:18:23  19    means a call has been initiated and someone on the other end is
4:18:28  20    ready to receive the communication.
4:18:31  21    Q.   And do you work with the chirp as part of your job?
4:18:32  22    A.   I do.
4:18:37  23    Q.   And when did the Nextel brand and chirp first become part of
4:18:38  24    your job responsibilities?
4:18:43  25    A.   I was part of the integration team when the Sprint Nextel
```

4:18:48   1    merger took place from 2003 to about 2005 when it closed.  So I

4:18:52   2    work very closely in the planning of bringing the two companies

4:18:57   3    together on the business side.  And then after that, integrating

4:19:02   4    the Nextel subscriber base into the Sprint base.

4:19:06   5    Q.   And from your perspective as a marketing professional, do

4:19:10   6    you consider the Nextel brand and chirp to be valuable brands?

4:19:11   7    A.   Extremely valuable.

4:19:15   8    Q.   And why is that from your perspective, as a marketing

4:19:16   9    director?

4:19:19   10   A.   Well, from a marketing perspective, as we've heard and

4:19:23   11   certainly my experience with the brand is the value that it

4:19:29   12   brings, the resonation, the recall, the familiarization, the

4:19:33   13   reliability that it brings to market.  Provides, you know, our

4:19:37   14   customers with a certain level of comfort in that reliability,

4:19:42   15   certain level of -- what's the word I'm looking for, reliability

4:19:45   16   in that brand.

4:19:51   17   Q.   And after the merger, what was Sprint called?

4:19:51   18   A.   Sprint Nextel.

4:19:55   19   Q.   Okay.  And how long was Sprint Nextel used as the name of

4:19:56   20   the entire company?

4:20:01   21   A.   I believe it was until 2013, right around that time we were

4:20:06   22   being purchased by a company called SoftBank out of Japan, and I

4:20:09   23   believe during that transaction the name of the company was

4:20:13   24   moved back to Sprint.

4:20:16   25   Q.   In your experience, do your customers associate Sprint and

4:20:18   1    Nextel together?

4:20:21   2          MR. KERNELL:  Your Honor, objection leading.

4:20:29   3          THE COURT:  Please repeat your question so I can get

4:20:30   4    it.

4:20:30   5      BY MS. WHEATLEY:

4:20:34   6    Q.  In your experience, do your customers associate Sprint and

4:20:36   7    Nextel together.

4:20:38   8          THE COURT:  I'll permit it.  Doesn't suggest the

4:20:40   9    answer.  I'll permit it.

4:20:45  10          THE WITNESS:  Yes.  In my experience, in my almost 30

4:20:49  11    years now, 25 years with Sprint and T-Mobile, yeah, customers

4:20:52  12    associate Sprint and Nextel together.

4:20:52  13      BY MS. WHEATLEY:

4:20:57  14    Q.  Okay.  Now, so you've been in the industry a long time.  Had

4:21:01  15    you heard of the Nextel brand and the Nextel chirp before the

4:21:02  16    merger with Sprint?

4:21:06  17    A.  Yes, they're a competitor of ours.

4:21:09  18    Q.  And what type of services was Nextel known for prior to the

4:21:09  19    merger?

4:21:14  20    A.  Primarily in the space that I mentioned earlier, I've been

4:21:16  21    in business for most of the time.  So primarily where I was

4:21:19  22    focused was in the business markets.  So the two-way direct

4:21:22  23    connect was a product that we were competing against, so that's

4:21:27  24    my main area of work with Nextel as a competitor was in the

4:21:28  25    business space.

4:21:34  1  Q.  And has Nextel's reputation changed or is it still that
4:21:35  2  space?
4:21:38  3  A.  Well, it's still the gold standard.  It is still recognized,
4:21:43  4  it's still a warm, you know, smile on many people's face when
4:21:47  5  they hear the chirp and, you know, certainly a comfort level
4:21:50  6  knowing that the engineering, the design work, the reliability
4:21:55  7  is carried through through the different technology evolutions
4:21:59  8  which is why we continue to do, I call it a single thread use of
4:22:04  9  the chirp, is to connect all of that together to deliver that
4:22:09  10  value, deliver that emotion that goes along with, you know,
4:22:12  11  knowing they've purchased a quality product.
4:22:15  12  Q.  So are you familiar with any of the television advertising
4:22:17  13  that Nextel did prior to the merger?
4:22:18  14  A.  I am.
4:22:22  15  Q.  How would you characterize that advertising generally?
4:22:25  16  A.  It was really good advertising from a marketing perspective.
4:22:29  17  It was -- it was somewhat frustrating because they really broke
4:22:32  18  through and could cut through, and memorable commercials.
4:22:35  19         So when you're in marketing, you have a 30-second spot,
4:22:38  20  you really want to hit your message home, and also remember and
4:22:41  21  recall.  And they did a really good job of breaking through some
4:22:45  22  pretty boring or harsh environments.  Those are two different
4:22:49  23  things, boring and harsh.  But things that were out of the
4:22:54  24  ordinary, contrasting them with some humor.
4:22:55  25         MS. WHEATLEY:  So I would like to introduce what has

4:22:59    1    been marked Exhibit 64.  This is a Joint Exhibit with no

4:23:02    2    objection.  So I'd ask that it be moved into evidence.  And if

4:23:07    3    you could just show him the still first so he can identify it.

4:23:07    4        BY MS. WHEATLEY:

4:23:13    5    Q.  Do you recognize the image that I've put on your screen,

4:23:14    6    Tom?

4:23:15    7    A.  I recognize it.  Thank you.

4:23:18    8    Q.  And is what is that?

4:23:22    9    A.  This is the intro to the commercial we saw it yesterday,

4:23:25   10    it's a Super Bowl ad that ran prior to the merger.

4:23:27   11            MS. WHEATLEY:  Okay.  So I'd like to play Exhibit 64

4:23:30   12    now.

4:23:32   13            MR. KERNELL:  Your Honor, objection.  Relevance on

4:23:33   14    this?

4:23:34   15            THE COURT:  What is the relevance?

4:23:36   16            MR. KERNELL:  What is the relevance of a --

4:23:38   17            THE COURT:  I'm asking her to tell us what the

4:23:38   18    relevance.

4:23:41   19            MS. WHEATLEY:  It goes to the strength of the mark

4:23:46   20    which is one of the factors for likelihood of confusion.  Goes

4:23:46   21    to --

4:23:49   22            THE COURT:  How does playing it again do that?  We've

4:23:52   23    heard it.  We've seen it.  You can play it again to the jury

4:23:55   24    during your final argument if you want to give up 90 seconds of

4:23:58   25    your final argument.

4:24:00   1          MS. WHEATLEY:  Understood, Your Honor.  I like the

4:24:03   2  commercial, but I don't want to waste everyone's time.

4:24:06   3          So if it's moved into evidence, then we don't have to

4:24:07   4  play it again.

4:24:11   5          THE COURT:  It's in evidence as Number 64, correct?

4:24:13   6          MS. WHEATLEY:  Yeah, we should call this one 64A

4:24:18   7  because there are several commercials that were in that one.

4:24:18   8          (Plaintiff's Exhibit 64A in evidence)

4:24:18   9      BY MS. WHEATLEY:

4:24:26  10  Q.  Mr. Shaughnessy, from memory, do you know if that commercial

4:24:27  11  plays the Nextel chirp?

4:24:29  12  A.  It does.

4:24:32  13  Q.  And is it the same chirp that Sprint uses today?

4:24:33  14  A.  It is.

4:24:40  15  Q.  And you mentioned that it's a Super Bowl commercial.  What

4:24:43  16  would creating a commercial like this cost?

4:24:47  17  A.  Super Bowl specifically?  Is that your question?

4:24:48  18  Q.  Just a commercial --

4:24:50  19          MR. KERNELL:  I'm going to object again to this line of

4:24:53  20  questioning.  This is with Nextel, this wasn't Sprint, and this

4:25:00  21  is from 2004.  what does that have to do with any issues in this

4:25:01  22  today?

4:25:02  23          THE COURT:  Same mark, isn't it?

4:25:05  24          MR. KERNELL:  But how much they spent on a commercial

4:25:10  25  15 years ago is irrelevant to any issue in this case today.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 4:25:12 | 1 | THE COURT:  I don't think so.  Overruled. |
| 4:25:12 | 2 | BY MS. WHEATLEY: |
| 4:25:16 | 3 | Q.  A commercial, a full-scale television commercial like the |
| 4:25:21 | 4 | one we saw in opening, can you give us an idea of what that |
| 4:25:21 | 5 | would cost? |
| 4:25:26 | 6 | A.  I can.  I'll break it down into two areas.  One is the |
| 4:25:29 | 7 | actual production cost and then we've got the air time cost. |
| 4:25:35 | 8 | So the production cost builds into that, and it can be |
| 4:25:38 | 9 | upwards of a million dollars to create and build an actual |
| 4:25:41 | 10 | commercial.  Even though it's 30 seconds, you have to hire a |
| 4:25:45 | 11 | producer, director, script writers, actors, locations, permits, |
| 4:25:49 | 12 | lots of work that goes into creating what is a mini movie, if |
| 4:25:53 | 13 | you will, down to a 30-second spot, all the editing that goes |
| 4:25:55 | 14 | into that.  So that's on the production side. |
| 4:25:58 | 15 | Then you would schedule with a media purchasing agency |
| 4:26:02 | 16 | how you want that media to run.  And if you want it broken-down |
| 4:26:09 | 17 | into TV or radio or both, or cable network.  So those are run |
| 4:26:12 | 18 | millions and millions and millions of dollars depending on how |
| 4:26:16 | 19 | many frequencies you want it to go every week and what programs |
| 4:26:19 | 20 | you're aligning to based on their popularity as well.  So tens |
| 4:26:23 | 21 | of millions of dollars from a campaign perspective. |
| 4:26:27 | 22 | Q.  Does Sprint currently known the pre-merger Nextel |
| 4:26:28 | 23 | commercials? |
| 4:26:29 | 24 | A.  We do. |
| 4:26:33 | 25 | Q.  And have you seen that dance party commercial we just |

4:26:37   1   watched used by anyone other than Sprint?

4:26:40   2   A.  Yes, I've seen it used on the Defendants' website.

4:26:49   3   Q.  Okay.  Now, the Defendants, the Nextel, Inc. and Nextel

4:26:53   4   Mobile Worldwide, are they competitors to Sprint?

4:26:55   5   A.  They are competitors to Sprint.

4:26:57   6   Q.  In what ways are they competitors?

4:27:03   7   A.  They're selling products and services that are labeled in

4:27:08   8   the same kind of capacity that I'm selling or we're selling

4:27:12   9   products and services.  Same market, same opportunity from a

4:27:14   10   wireless perspective.

4:27:16   11        THE COURT:  I've changed my mind.  I'll let you play

4:27:20   12   the commercials.  30 seconds?

4:27:21   13        MS. WHEATLEY:  Yes, it's only 30 seconds.

4:27:24   14        THE COURT:  I'll let you play it because I've forgotten

4:27:28   15   the chirp was in it, and I think that the jury is the one that's

4:27:32   16   got to decide whether that chirp is the chirp or a chirp.

4:27:35   17        MS. WHEATLEY:  Okay.  Carl, would you mind playing the

4:27:37   18   commercial?

4:27:39   19        THE COURT:  Of course not.  He's getting paid.

4:27:45   20        (Plaintiff's Exhibit 64A playing)

4:27:45   21   BY MS. WHEATLEY:

4:28:15   22   Q.  Now, I'll ask again Mr. Shaughnessy, was that the Nextel

4:28:16   23   chirp?

4:28:17   24   A.  Yes.

4:28:23   25   Q.  Okay.  Now, to your knowledge, has Sprint ever given

4:28:26 1    Defendants permission to put any Nextel commercials on their

4:28:26 2    website?

4:28:28 3    A.  No.

4:28:31 4    Q.  Has Sprint ever given any of the Defendants in this case any

4:28:33 5    permission to use Nextel at all?

4:28:34 6    A.  No.

4:28:39 7    Q.  Okay.  Did Sprint give Defendants permission to use the

4:28:40 8    chirp?

4:28:41 9    A.  No.

4:28:46 10   Q.  Okay.  Is there any harm to Sprint from Defendants using the

4:28:50 11   Sprint's Nextel commercial?

4:28:52 12   A.  There is harm, yes.

4:28:55 13   Q.  Can you describe it?

4:29:00 14   A.  I think it's -- well, it's obvious, but again I'll answer

4:29:04 15   it.  The harm is really in confusion that it creates.  It's

4:29:08 16   creating linkage to a brand that is our brand that has a very

4:29:12 17   specific reputation in market, specific value and a specific

4:29:15 18   outcome you expect when you purchase our products.  And by

4:29:19 19   creating that linkage, and that video on a site that's not ours

4:29:23 20   and a product that's not ours, it's creating confusion within

4:29:27 21   the market, specifically the markets that we are -- you know, we

4:29:31 22   want to promote that product and service within.

4:29:35 23   Q.  Now, moving ahead, we've talked about before the merger.

4:29:39 24   After the merger, did Sprint get rid of the Nextel brand?

4:29:39 25   A.  No.

| | | |
|---|---|---|
| 4:29:43 | 1 | Q.  Okay.  Did Sprint get rid of the Nextel chirp? |
| 4:29:43 | 2 | A.  No. |
| 4:29:47 | 3 | Q.  Did Sprint stop advertising the Nextel brand and chirp after |
| 4:29:47 | 4 | the merger? |
| 4:29:52 | 5 | A.  Immediately after the merger, no. |
| 4:30:00 | 6 | Q.  And what sort of consumer advertising did Sprint do for the |
| 4:30:01 | 7 | Nextel brand after the merger? |
| 4:30:09 | 8 | A.  Well, the consumer media for Nextel post-merger was |
| 4:30:14 | 9 | primarily driven by the business team.  There was some things |
| 4:30:19 | 10 | that were visible.  We continued to do the NASCAR series, the |
| 4:30:22 | 11 | Nextel Cup, certainly that's a very big and expensive |
| 4:30:26 | 12 | sponsorship, so we continued on with that, a really good |
| 4:30:28 | 13 | sponsorship to be part of. |
| 4:30:30 | 14 | Then there was, you know, I guess a general |
| 4:30:33 | 15 | communications that you'd see like in retail, posters and things |
| 4:30:36 | 16 | like that.  But for the most part from a media perspective, we |
| 4:30:40 | 17 | tied a lot of business advertising, although it wasn't as much |
| 4:30:44 | 18 | advertising, right, from that perspective. |
| 4:30:46 | 19 | Q.  Did Sprint continue to do any television advertising after |
| 4:30:47 | 20 | the merger? |
| 4:30:49 | 21 | A.  Oh, yes. |
| 4:31:00 | 22 | Q.  Okay.  And did Sprint continue to use any Nextel slogans |
| 4:31:01 | 23 | after the merger? |
| 4:31:05 | 24 | A.  We did.  Sprint Together with Nextel was probably the most |
| 4:31:08 | 25 | visible one, and then Sprint Nextel, which was our company name, |

4:31:13  1    I believe was in some of our tag lines and things like that.  So

4:31:16  2    yeah, we continued to integrate the brands together.

4:31:23  3    Q.  Okay.  And so the Sprint part of T-Mobile's business now,

4:31:26  4    what colors does it use for its branding?

4:31:27  5    A.  Yellow and black.

4:31:32  6    Q.  Okay.  And when did Sprint start using yellow and black?

4:31:36  7    A.  Right after the Nextel Sprint merger.  Prior to the merger,

4:31:40  8    Sprint was -- you would see it in either red and white or red

4:31:46  9    and black and Nextel was in yellow and black, and so we adopted

4:31:49  10   the Nextel color.

4:31:52  11   Q.  So the yellow and black is Sprint's color scheme?

4:31:56  12   A.  It is now, yeah, post the Nextel merger, yes.

4:32:04  13   Q.  Okay.  And how is color used in branding by the major

4:32:05  14   telecommunications companies?

4:32:09  15   A.  It's definitely evolved over time.  For a while Sprint and

4:32:14  16   Verizon both had red, AT&T had blue and T-Mobile, which was kind

4:32:16  17   of a start-up at that point, wasn't even magenta at that point.

4:32:21  18   But now it's evolved to, you know, very distinct colors within

4:32:25  19   the telecommunications industry.  Verizon is red, T-Mobile is

4:32:30  20   magenta, AT&T is blue, Sprint is yellow.

4:32:32  21   Q.  So I'd like to look -- you mentioned that there was

4:32:37  22   post-merger television advertising.  I'd like to look at an

4:32:40  23   example of one of those.  So I'll introduce what we can mark

4:32:45  24   Exhibit 64B, and there are no objections to 64, so I would ask

4:32:46  25   that it be admitted.

4:32:50  1          Mr. Shaughnessy, do you recognize the still that you

4:32:51  2    see on your screen?

4:32:53  3    A.  I do.

4:32:56  4    Q.  Is that a Sprint Nextel commercial?

4:32:56  5    A.  It is.

4:32:58  6    Q.  Okay.

4:33:00  7          MS. WHEATLEY:  Can we go ahead and play that for the

4:33:01  8    jury?

4:33:02  9          THE COURT:  You may.

4:33:08  10          (Plaintiff's Exhibit 64B playing in open court)

4:33:08  11    BY MS. WHEATLEY:

4:33:38  12    Q.  Now, Mr. Shaughnessy, did you see the logo at the end of

4:33:41  13    that commercial, and it's up on your screen now, Sprint Together

4:33:43  14    with Nextel?

4:33:45  15    A.  Yes.

4:33:49  16    Q.  Why is Nextel presented that way in this logo?

4:33:55  17    A.  Well after the merger, you know, we have two major carrier

4:34:01  18    brands we have to work with and integrate into one company.  And

4:34:06  19    Sprint acquired Nextel, we called it a merger of equals, but it

4:34:11  20    was an acquisition of Sprint acquiring Nextel and Sprint had a

4:34:14  21    better overall consumer brand in market at that point.  And so

4:34:19  22    again, we've heard, and I confirmed Nextel had a very strong

4:34:23  23    business following, so as we started to integrate Nextel into

4:34:26  24    the Sprint family, as we started to move the Nextel subscribers

4:34:31  25    from one network to another, you know, the Nextel brand became a

| | | |
|---|---|---|
| 4:34:35 | 1 | little bit smaller part of our story as we started to focus it |
| 4:34:36 | 2 | in on the business markets. |
| 4:34:49 | 3 | Q.  And the commercial we just saw, did that include the Nextel |
| 4:34:49 | 4 | chirp? |
| 4:34:51 | 5 | A.  It did. |
| 4:34:58 | 6 | Q.  Okay.  And I'd like to play we'll call this 64C.  I'd like |
| 4:35:03 | 7 | to do one more example of Sprint's advertising, television |
| 4:35:07 | 8 | advertising that incorporated Nextel. |
| 4:35:09 | 9 | MS. WHEATLEY:  So Your Honor, may I play that one for |
| 4:35:09 | 10 | the jury? |
| 4:35:12 | 11 | THE COURT:  What is the number on it? |
| 4:35:13 | 12 | MS. WHEATLEY:  64C. |
| 4:35:15 | 13 | THE COURT:  64C is admitted in evidence. |
| 4:35:16 | 14 | (Plaintiff's Exhibit 64C in evidence) |
| 4:35:16 | 15 | BY MS. WHEATLEY: |
| 4:35:20 | 16 | Q.  And I'll ask on the still, Mr. Shaughnessy, do you recognize |
| 4:35:22 | 17 | this image from a commercial? |
| 4:35:30 | 18 | A.  I do.  It's one of our spots.  We ran a campaign series |
| 4:35:35 | 19 | called What if Firefighters and What if First Responders Ran |
| 4:35:36 | 20 | Things. |
| 4:35:39 | 21 | MS. WHEATLEY:  Can we play that for the jury? |
| 4:35:47 | 22 | (Plaintiff's Exhibit 64C playing in open court) |
| 4:35:47 | 23 | BY MS. WHEATLEY: |
| 4:36:18 | 24 | Q.  And now, Mr. Shaughnessy, you spoke about the transition to |
| 4:36:22 | 25 | a business brand.  Is this commercial part of that? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

4:36:23   1   A.   It is.

4:36:28   2   Q.   And why choose to have firefighters in the commercial?

4:36:34   3   A.   Again, the Direct Connect product, the rugged device

4:36:37   4   portfolio was really well-received and well-known in the public

4:36:41   5   safety environment.  So this particular campaign we chose

4:36:45   6   firefighters, they use our products, they rely on our products.

4:36:50   7   They are kind of the original Nextel users and, you know, really

4:36:54   8   provide that testimony that the product is of really good

4:37:00   9   quality and delivers that instant communication, and no better

4:37:03   10   than a first responder to know about instant communication

4:37:06   11   needs.  So it tied really well into the target market.

4:37:11   12   Q.   You mentioned earlier that at some point after the merger,

4:37:15   13   Sprint started, you know, using it more exclusively as a

4:37:22   14   business brand.  What is the marketing you do for a business

4:37:23   15   brand like Nextel?

4:37:26   16   A.   So we heard a little bit -- we heard a lot about that.

4:37:32   17   Trade shows is a good place to market B-to-B type groups,

4:37:35   18   especially if you pick trade shows where other businesses are

4:37:37   19   the businesses that you want to do business with attend.  But

4:37:41   20   beyond that, we do one-to-one marketing, right, so that would be

4:37:45   21   on-site business presentations.  So we come to your business

4:37:49   22   location or your manufacturing plant or wherever we want to

4:37:53   23   meet.  We have -- and host business clients, we have several

4:37:57   24   what we call executive briefing centers throughout the country,

4:38:00   25   we bring folks in and again, do product demonstrations and

4:38:04   1   really show those products and solutions basically tailored to

4:38:10   2   the customer need in those meetings.  So you know, from a

4:38:15   3   business-to-business perspective, we do a little solutions, you

4:38:17   4   know, investigation if you will with our clients beforehand.  We

4:38:20   5   kind of know what we're going to show them based on what they've

4:38:23   6   told us they're looking for or what the needs of their

4:38:26   7   businesses are.  Makes a lot of sense, very effective way to use

4:38:31   8   time and then when you have a portfolio as broad as the Sprint

4:38:36   9   portfolio, you want those meetings to be tailored.

4:38:45  10   Q.  And so Nextel is used with businesses.  So is it really a

4:38:47  11   consumer-facing brand today?

4:38:48  12   A.  No, it's not.

4:38:53  13   Q.  Now, to your knowledge, has Sprint done anything to protect

4:38:55  14   the Nextel brand legally?

4:39:01  15   A.  We've renewed the trademarks on the Nextel brand, and the

4:39:02  16   chirp.

4:39:06  17          MS. WHEATLEY:  Okay.  I'd like to introduce Exhibit 165

4:39:10  18   which I believe was previously admitted into evidence.

4:39:18  19          THE COURT:  I think so.  165 sounds like it's in.  165

4:39:23  20   is in evidence.

4:39:25  21          MS. WHEATLEY:  Just briefly talk about it with

4:39:35  22   Mr. Shaughnessy.  Do we have the physical copies?

4:39:52  23          Your Honor, may I hand -- it's actually 165 and 166.

4:39:55  24   May I hand those to the witness?

4:39:56  25          THE COURT:  Both are in evidence.

4:39:59  1          MS. WHEATLEY:  May I hand them to the witness?

4:40:01  2          THE COURT:  Yes, you may.  Give them to the court

4:40:05  3   security officer, he'll give it over.

4:40:05  4          BY MS. WHEATLEY:

4:40:17  5   Q.  So Mr. Shaughnessy, if you could look at Exhibit 165 and the

4:40:23  6   first page of it is up on your screen.  And actually, I would

4:40:27  7   like it if you could read for the jury from where it says "the

4:40:31  8   attached" and down through "a corporation of Kansas".  Do you

4:40:33  9   see that section for me?

4:40:35  10  A.  The first two paragraphs basically?

4:40:36  11  Q.  Yes, please.

4:40:40  12  A.  Sure.  It's probably easier for me to read it to on this big

4:40:44  13  screen here.  "The attached US trademark registration 1,884,244

4:40:53  14  is certified to be a true copy which is in full force and effect

4:40:59  15  with notations of all statutory actions taken thereon as

4:41:01  16  disclosed by the records of the United States Patent and

4:41:06  17  Trademark Office.  Registered for a term of ten years from March

4:41:11  18  14, 1995, second renewal for a term of ten years from March 14,

4:41:17  19  2015.  Section 8 and 15.  Said records show title to be in

4:41:22  20  Sprint Communications Inc., a corporation of Kansas".

4:41:28  21  Q.  Thank you, Mr. Shaughnessy.  So this document with the gold

4:41:32  22  seal I've just handed you, what do you understand this to be?

4:41:39  23  A.  I understand it to be a certified copy of the registration.

4:41:46  24  Q.  And can you turn to the second page?  And do you know what

4:41:47  25  this part is called?

| | | |
|---|---|---|
| 4:41:51 | 1 | A.  I believe this is the trademark itself. |
| 4:41:58 | 2 | Q.  And do you see where it lists "for" and it lists items? |
| 4:42:00 | 3 | A.  Yes. |
| 4:42:02 | 4 | Q.  Could you read that list of goods? |
| 4:42:06 | 5 | A.  "For equipment used in providing telecommunications |
| 4:42:11 | 6 | services, namely mobile radios, namely two-way radios, mobile |
| 4:42:18 | 7 | telephones, dispatch radios, pagers and mobile data transceivers |
| 4:42:19 | 8 | in class nine". |
| 4:42:24 | 9 | Q.  Now, does Sprint currently use the Nextel brand with these |
| 4:42:25 | 10 | types of telecommunication equipment? |
| 4:42:26 | 11 | A.  We do. |
| 4:42:31 | 12 | Q.  Can you tell me what type of devices meet this definition? |
| 4:42:36 | 13 | A.  Well, our phones that we have labeled the Nextel brand on |
| 4:42:40 | 14 | the packaging provide these services.  Our phones and our |
| 4:42:47 | 15 | services can be configured to provide a full suite of mobile |
| 4:42:50 | 16 | communications or tailored to deliver specific functions that a |
| 4:42:55 | 17 | customer may want their users to have.  So they don't always |
| 4:42:58 | 18 | have to be cellular phones.  Even though they're packaged as |
| 4:43:02 | 19 | cellular phones, we can turn of those features either through |
| 4:43:06 | 20 | SoT codes, or feature codes that we put when you sign up for |
| 4:43:10 | 21 | service.  So we can limit to make them direct connect only. |
| 4:43:17 | 22 | Q.  Why does Sprint maintain its registration for the Nextel |
| 4:43:17 | 23 | trademark? |
| 4:43:20 | 24 | A.  Because we continued to use and develop and look for ways to |
| 4:43:25 | 25 | market or push-to-talk services and our Nextel services. |

| 4:43:28 | 1 | Q.  And to your knowledge, has Sprint let any trademark |

Q.  And to your knowledge, has Sprint let any trademark
registrations for Nextel lapse?

A.  Yes.

Q.  And why would any trademark registrations for Nextel lapse?

A.  Well again, going back to having two separate carriers as we
integrate and brought the carriers together, there's lots of
products and services and rate plans and just different product
names that weren't going to be used.  So there's no real reason
to carry them forward.  It's not uncommon for any carrier to do
that.  Sprint's let trademarks lapse, Verizon probably has as
well.  I think if you go out and searched it, you'd see that
most companies do have trademarks that have lapsed because
they're not using them anymore.  Campaigns run their course,
natural course.

Q.  Has this registration for Nextel ever lapsed?

A.  No, it's not.

Q.  I'd like to turn to the second document I gave you that's
Exhibit 166.  And do you recognize this document?

A.  This is the chirp registration.

Q.  Okay.  And is this a certified copy?

A.  It is.

Q.  And if we could play Exhibit 8 which is the chirp?

        (Plaintiff's Exhibit 8 played in open court)

        BY MS. WHEATLEY:

Q.  And if we could go back to the registration, if we could go

```
4:45:06   1    to the second page.  To your knowledge, Mr. Shaughnessy, is this
4:45:09   2    registration for the sound we just heard?
4:45:10   3    A.  Yes, that's what this is.
4:45:14   4    Q.  Okay.  And is this registration current?
4:45:15   5    A.  It is.
4:45:21   6    Q.  Okay.  And can you explain to the jury how Sprint uses the
4:45:23   7    Nextel chirp as a brand?
4:45:26   8    A.  Well, we use it in conjunction with our direct connect
4:45:30   9    service.  It really ties, like I said before, kind of the single
4:45:35   10   thread of evolution of technology over time to, again, deliver
4:45:38   11   that comfort that when you hear that chirp, you know it's a
4:45:41   12   two-way, direct connect product that you've kind of come to rely
4:45:47   13   on from an instant communication and delivery perspective.
4:45:52   14   Q.  Does Sprint use the chirp with telecommunication services
4:45:52   15   today?
4:45:53   16   A.  We do.
4:45:59   17   Q.  And I believe you heard earlier Mr. Wiley testify that to
4:46:04   18   his knowledge you know the PTT and rugged devices had used the
4:46:07   19   chirp continuously for many years.  Do you agree with that?
4:46:09   20   A.  100%.
4:46:15   21   Q.  And do you have any idea of what the revenue or sales volume
4:46:21   22   would be for devices and services selling the chirp or if it's
4:46:22   23   in the millions or tens of millions?
4:46:27   24   A.  I do know.  It is in the millions, and it's more in the
4:46:32   25   hundreds of millions when you factor in business customers not
```

4:46:34   1   only buy the Nextel products from a direct connect perspective,

4:46:36   2   but many of our customers also buy other products and services

4:46:40   3   from Sprint.  So if you look at the collective revenue streams,

4:46:43   4   you're really, over that time period I think you just mentioned,

4:46:47   5   it's hundreds of millions of dollars in revenue associated with

4:46:50   6   these customers.

4:46:58   7   Q.  Okay.  Now, turning back to the Nextel brand, you've already

4:47:03   8   stated that Sprint currently uses the Nextel brand.  Does the

4:47:08   9   Nextel brand appear on any -- with any particular devices today?

4:47:15  10   A.  It does.  I think we just reviewed the two that are the most

4:47:20  11   recent devices.  I don't know that the inventory is completely

4:47:25  12   out of some of those Kyoceras and the other devices out there as

4:47:29  13   well, but on the CAT, is it the S22 and the S62?  Yes.  We've

4:47:32  14   got the Nextel mark on those.

4:47:40  15   Q.  And can you describe for the jury what a rugged device is?

4:47:45  16   A.  Yes.  You heard a little bit about that from Mr. Kohman.  A

4:47:47  17   rugged device is kind of what it says it is.  It's a device

4:47:51  18   that's engineered and designed so that it will work in a very

4:47:55  19   tough environment.  You can drop it, kick it, bump it up against

4:47:58  20   the wall if it's on your belt, the screen will not crack, it

4:48:03  21   won't break.  It may come apart, but it's not going to not work

4:48:08  22   anymore.  You may have to put it back together, the battery may

4:48:11  23   separate from it.  In fact, many times they're designed to break

4:48:15  24   apart and take those shocks so that they don't stop working.  So

4:48:18  25   they're designed specifically for very tough environments or

| | | |
|---|---|---|
| 4:48:19 | 1 | tough users. |
| 4:48:25 | 2 | Q.  Okay.  And do ordinary consumers like someone who is looking |
| 4:48:29 | 3 | for a cellphone, are they typically in the market for rugged |
| 4:48:29 | 4 | devices? |
| 4:48:34 | 5 | A.  Typically not.  We do sell the rugged devices themselves in |
| 4:48:38 | 6 | a few of our stores.  In fact, quite a few of our stores have |
| 4:48:41 | 7 | them on display.  But for the most part, they're not a flagship |
| 4:48:44 | 8 | product that you would have in a retail environment. |
| 4:48:48 | 9 | MS. WHEATLEY:  Okay.  Your Honor, I've just been |
| 4:48:50 | 10 | notified that it's 4:45. |
| 4:48:51 | 11 | THE COURT:  It is. |
| 4:48:54 | 12 | MS. WHEATLEY:  Would you like me to stop for the day? |
| 4:48:58 | 13 | THE COURT:  I'd like to stop for good, but I don't know |
| 4:49:02 | 14 | that I can get you to do that.  How much longer do you have? |
| 4:49:03 | 15 | MS. WHEATLEY:  Quite a bit, Your Honor. |
| 4:49:05 | 16 | THE COURT:  All right.  We'll recess for the day.  Come |
| 4:49:08 | 17 | back tomorrow morning, 9:30. |
| 4:49:11 | 18 | You're reminded you're not to discuss the case with |
| 4:49:14 | 19 | anyone.  Also remember you're not to read or listen to anything |
| 4:49:17 | 20 | touching on the case.  Don't do any research or make any |
| 4:49:20 | 21 | investigation on your own.  Don't have any contact with the |
| 4:49:24 | 22 | attorneys, parties or witnesses.  Don't form any opinion. |
| 4:49:27 | 23 | Remember, I told you at the beginning, and I've been |
| 4:49:31 | 24 | neglectful because I had -- I've never done it before in a case, |
| 4:49:34 | 25 | if you have questions for a witness, when the witness is |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
4:49:37   1    finished, raise your hand and we'll let you ask -- write it down
4:49:41   2    and ask a question.  I don't know how that's going to work and
4:49:46   3    I'll try it until I see that it's driving me crazy, but we'll
4:49:50   4    try it and see.  As I told you at the beginning that we'll have
4:49:53   5    -- you'll have an opportunity to do so.  I apologize for not
4:49:56   6    having done it earlier.  But honestly, as I said, I've never
4:49:59   7    done it before.  The Eleventh Circuit just passed the rules on
4:50:03   8    how to do it, so that's why it hasn't been done.  All right?
4:50:06   9         We'll see you tomorrow morning at 9:30.  I hope you
4:50:09  10    drive carefully and we'll see you then.  Tomorrow we're going to
4:50:12  11    break a little -- no, we'll probably break at the same time
4:50:16  12    because I'm going to do it from here.  It will only take me a
4:50:20  13    few minutes to set up, so we'll go until about quarter to 5
4:50:22  14    again.  Thank you very much.
4:50:26  15         (Jury out at 4:50 p.m.)
4:50:47  16         THE COURT:  We'll be in recess until 9:30.
4:50:48  17         (See Volume 3 for continuation)
4:50:48  18                    C E R T I F I C A T E
4:50:48  19    I certify that the foregoing is a correct transcript from the
              record of proceedings in the above-entitled matter.
4:50:48  20    4/12/2022                  /s/ Dawn M. Savino, R.P.R., C.R.R.
              Date                           DAWN M. SAVINO, R.P.R., C.R.R.
4:50:48  21
         22
         23
         24
         25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
4:50:48   1                    I N D E X

4:50:48   2                    WITNESSES

4:50:48   3    ALL WITNESSES:                                   PAGE:

4:50:48   4    For Plaintiff:

4:50:48   5      Jeffrey Kaplan:
                   Direct Examination by Mr. Riopelle          13:13
4:50:48   6        Cross-Examination by Mr. Schwartz           45:8
                   Redirect Examination by Mr. Riopelle        58:15
4:50:48   7
                 Stephen Calabrese:
4:50:48   8        Videotaped Deposition by Played for the Jury  64:13

4:50:48   9      Brent Kohman:
                   Direct Examination by Ms. DeFord            66:17
4:50:48  10        Cross-Examination by Mr. Kernell            81:5
                   Redirect Examination by Ms. DeFord          104:5
4:50:48  11
                 Scott Wiley:
4:50:48  12        Direct Examination by Ms. DeFord            107:23
                   Cross-Examination by Mr. Kernell            131:21
4:50:48  13        Redirect Examination by Ms. DeFord          141:20

4:50:48  14      Brian Mancuso:
                   Deposition Read into the Record by          147:22
4:50:48  15
                 Ryan Rabenold:
4:50:48  16        Direct Examination by Ms. Wheatley          150:1
                   Cross-Examination by Mr. Schwartz           159:20
4:50:48  17        Redirect Examination by Ms. Wheatley        174:17

4:50:48  18      Thomas Shaughnessy:
                   Direct Examination by Ms. Wheatley          176:11
4:50:48  19
                               EXHIBITS
4:50:48  20
               NO.:     DESCRIPTION:                           PAGE:
4:50:48  21
               For Plaintiff's:
4:50:48  22
               34       :
4:50:48  23               In Evidence                          4:12

4:50:48  24    95       :
                         In Evidence                           8:14
4:50:48  25
               34, 47 & :
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
4:50:48  1      97
                        In Evidence                         15:15
4:50:48  2
                77      :
4:50:48  3              In Evidence                         21:7
4:50:48  4      86      :
                        In Evidence                         26:5
4:50:48  5
                117     :
4:50:48  6              In Evidence                         28:4
4:50:48  7      78      :
                        In Evidence                         29:10
4:50:48  8
                79      :
4:50:48  9              In Evidence                         30:10
4:50:48 10      67      :
                        In Evidence                         32:10
4:50:48 11
                136     :
4:50:48 12              In Evidence                         34:8
4:50:48 13      107     :
                        In Evidence                         34:24
4:50:48 14
                160     :
4:50:48 15              In Evidence                         36:5
4:50:48 16      108     :
                        In Evidence                         37:7
4:50:48 17
                80      :
4:50:48 18              In Evidence                         39:15
4:50:48 19      167     :
                        In Evidence                         45:7
4:50:48 20
                165     :
4:50:48 21              In Evidence                         46:21
4:50:48 22      166     :
                        In Evidence                         47:17
4:50:48 23
                59      :
4:50:48 24              In Evidence                         60:23
4:50:48 25              110, 111, 48, 62, 87 & 99:
                        In Evidence                         65:22
```

```
4:50:48   1
4:50:48   2    10          :
                           In Evidence                    104:1
4:50:48   3    30          :
4:50:48   4                In Evidence                    113:13
4:50:48   5    41 A        :
                           In Evidence                    115:20
4:50:48   6    32          :
4:50:48   7                In Evidence                    116:5
4:50:48   8    27          :
                           In Evidence                    120:5
4:50:48   9    125 & 126 :
4:50:48  10                In Evidence                    125:16
4:50:48  11    157         :
                           In Evidence                    130:10
4:50:48  12    161         :
4:50:48  13                In Evidence                    139:23
4:50:48  14    84          :
                           In Evidence                    148:3
4:50:48  15    95          :
4:50:48  16                In Evidence                    148:9
4:50:48  17    69          :
                           In Evidence                    152:4
4:50:48  18    135         :
4:50:48  19                In Evidence                    155:21
4:50:48  20    158         :
                           In Evidence                    158:6
4:50:48  21    93          :
4:50:48  22                In Evidence                    161:14
4:50:48  23    64A         :
                           In Evidence                    183:8
4:50:48  24    64C         :
                           In Evidence                    190:14
         25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
4:50:48    1      For Joint:

4:50:48    2
                          :
4:50:48    3              In Evidence                    117:22

4:50:48    4      8       :
                          In Evidence                    121:22
4:50:48    5
                  52      :
4:50:48    6              In Evidence                    123:6

4:50:48    7      97      :
                          In Evidence                    129:4
4:50:48    8
4:50:48    9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**