1
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
2
**MIAMI DIVISION**
**CASE NO. 18-cv-60788-JEM**
3

4   **SPRINT COMMUNICATIONS, INC.,**

5        Plaintiff/Counterclaim Defendant,

6        vs.

7                                                          Miami, Florida
                                                           April 13, 2022
8   **STEPHEN CALABRESE,** as an individual,              Pages 1-78
    **NEXTEL, INC.,** d/b/a **NEXTEL WORLDWIDE,**          9:30 p.m. - 11:30 a.m.
9   **RETROBRANDS USA LLC,**
    **JEFFREY KAPLAN,** as an individual, and
10  **NEXTEL WORLDWIDE MOBILE, INC.,**

11       Defendants/Counterclaimants.
    _____

12
                    **TRANSCRIPT OF JURY TRIAL**
13                          **VOLUME 3**
                **BEFORE THE HONORABLE JOSE E. MARTINEZ**
14                 **UNITED STATES DISTRICT JUDGE**

15  **APPEARANCES:**

16  **FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:**
                        *McGuireWoods, LLP*
17                      BY:  **BRIAN C. RIOPELLE, ESQ.**
                        BY:  **LUCY J. WHEATLEY, ESQ.**
18                      BY:  **AMANDA L. DeFORD, ESQ.**
                        800 East Canal Street
19                      Richmond, Virginia 23219

20  **FOR THE DEFENDANTS/COUNTERCLAIMANTS:**
                        *Erickson Kernell IP*
21                      BY:  **JAMES J. KERNELL, ESQ.**
                        8900 State Line Road
22                      Suite 500
                        Leawood, Kansas 66206
23
                        *Lee & Amtzis, PL*
24                      BY:  **WAYNE SCHWARTZ, ESQ.**
                        5550 Glades Road
25                      Boca Raton, Florida 33431

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

REPORTED BY:          DAWN M. SAVINO, R.P.R., C.R.R.
                     Official Federal Court Stenographer
                     400 N. Miami Avenue, 10S03
                     Miami, Florida  33128
                     Telephone:  305-523-5598

                          * * * * *

09:45:57  5           (Court called to order)

09:46:01  6           THE COURT:  Be seated, please.

09:46:04  7           One preliminary matter before we bring the jury in,

09:46:07  8    yesterday there was some discussion about a witness, I don't

09:46:12  9    even remember his name, that Plaintiff said had not been

09:46:15  10   disclosed.  It appears that Plaintiff had that witness listed

09:46:23  11   and the defense said me too.  I think that's disclosure.  If

09:46:26  12   somebody could tell me otherwise and give me some case law, I'd

09:46:29  13   be happy to hear it, but I don't know of any case law that says

09:46:32  14   that that's not disclosure.

09:46:38  15           MR. RIOPELLE:  So Your Honor, this Court required that

09:46:44  16   the parties file preliminary witness lists.  So Mr. Rivera was

09:46:49  17   not on their initial disclosures, and then when we filed

09:46:57  18   preliminary witness lists I believe in September of --

09:46:58  19           THE COURT:  Whenever it was.

09:47:01  20           MR. RIOPELLE:  November of 2018, we, out of an

09:47:02  21   abundance of caution because we knew Mr. Rivera was a part

09:47:10  22   owner, we put him on there, they did not put him on there that

09:47:16  23   yes, they did have the catchall.  We then, in December of 2018,

09:47:19  24   took Mr. Calabrese's deposition.  Based on that deposition, it

09:47:24  25   did not appear that Mr. Rivera was a person of importance in

3

09:47:31  1    this case.  And so when it came time to get ready for the trial,

09:47:33  2    the first scheduled trial in this case in September of 2019, we

09:47:37  3    did not put him on our witness list.  They did not put him on

09:47:41  4    their witness list and then when we came to get ready for this

09:47:44  5    trial on the witness list they filed, I believe on March 14,

09:47:49  6    2022, they did not put him on the witness list, we did not put

09:47:54  7    him on the witness list.  And I would refer, Your Honor -- and I

09:47:55  8    think I have the case --

09:47:59  9          THE COURT:  Give me the case.  That's what I asked for.

09:48:05  10         MR. SCHWARTZ:  Do you have a copy, Brian?

09:48:09  11         MR. RIOPELLE:  I do not.  This is highlighted, it's the

09:48:15  12   National Union Fire case versus Tyco decided by Judge Bloom in

09:48:23  13   this courthouse, it had a cite of 2015 Westlaw 11251736 in which

09:48:23  14   --

09:48:26  15         THE COURT:  We could probably find it.  She's right

09:48:27  16   across the hall.

09:48:30  17         MR. RIOPELLE:  Right.  What she decided, or she made --

09:48:33  18   because it was not disclosed and because the depositions did not

09:48:41  19   indicate that the witness was going to be a prominent witness,

09:48:48  20   she disallowed the late designation of the witness.  And I will

09:48:52  21   note that in her case, the disclosure of the witness was much

09:48:57  22   before this one.  They did not tell us that Mr. Rivera was going

09:49:01  23   to be a witness in this case until the meet and confer we had

09:49:09  24   with them on Friday after the Court's calendar call.  And what I

09:49:12  25   would have expected them to do is when this Court found out

09:49:15  1    Mr. Calabrese was not going to be here and ruled that he was not

09:49:18  2    going to be able to testify remotely, they could have stood up

09:49:21  3    in front of this Court and said well then, Your Honor we would

09:49:25  4    like to bring Mr. Rivera.  They did not do that.  They just

09:49:27  5    disclosed it there, we told them that we would object and

09:49:31  6    they've not -- we're the ones who are having to raise it with

09:49:32  7    the Court.

09:49:34  8            THE COURT:  All right.  Let me look at Judge Bloom's

09:49:37  9    opinion and I'll discuss it with you further.  But I just wanted

09:49:40 10    to tell you what I was thinking at this point.  Okay.  Can we

09:49:44 11    bring the jury in?  Please bring in the jury.

09:49:45 12            COURT SECURITY OFFICER:  All rise for the jury.

09:49:51 13            MR. RIOPELLE:  Your Honor, we do have some exhibit

09:49:51 14    issues.

09:49:56 15            THE COURT:  Wait.  Don't bring in the jury yet.  If he

09:50:00 16    brings in the jury, we'll take those up later but if you can,

09:50:04 17    put them back in.  Put the cork back in the bottle.

09:50:14 18            Be seated, please.

09:50:24 19            Let's see what we're talking about.  I may or may not

09:50:25 20    need it.

09:50:26 21            MR. SCHWARTZ:  Excuse me, Your Honor.  I thought the

09:50:29 22    protocol typically is whoever starts the witness finishes the

09:50:36 23    witness, not switching batters in the middle of the game.

09:50:39 24            MR. RIOPELLE:  She's going to take the witness.

09:50:39 25            MR. SCHWARTZ:  All right.

09:50:42  1          THE COURT:  Sorry.  What is it?  What's the reason?

09:50:44  2          MR. RIOPELLE:  He's objecting to me arguing these

09:50:47  3    exhibits.  I was saying I'm arguing the witness, I'm not taking

09:50:48  4    the witness.

09:50:54  5          THE COURT:  Okay.  Let's hear about the exhibits.

09:50:55  6    What's the problem.

09:50:57  7          MR. RIOPELLE:  We intend, with Mr. Shaughnessy, to

09:51:02  8    offer Plaintiff's Exhibit 13.  This is sales data showing sales

09:51:04  9    of --

09:51:06  10         THE COURT:  Put it on my screen so I know what you're

09:51:08  11   talking about?

09:51:10  12         MR. RIOPELLE:  Can you put up 13?

09:51:12  13         THE COURT:  Okay.  What's the objection?

09:51:15  14         MR. KERNELL:  Your Honor, there's no -- the underlying

09:51:19  15   data, there's no underlying data to authenticate or to figure

09:51:23  16   out what this -- these sales data is.  There's no -- absolutely

09:51:31  17   no tie to this with this exhibit.  It's undated, the source.  It

09:51:36  18   doesn't have any tie to Nextel or, in fact, it doesn't even tie

09:51:41  19   to Sprint in any way whatsoever.  These are just numbers that

09:51:44  20   someone put in a spreadsheet.  We don't know where they came

09:51:46  21   from, we don't have --

09:51:48  22         THE COURT:  Well, I assume somebody is going to tell us

09:51:50  23   where they came from.  I would assume they're not just going to

09:51:53  24   offer it without some substantiation.

09:51:57  25         MR. KERNELL:  We have to be under -- I think it's Rule

6

| | | |
|---|---|---|
| 09:52:00 | 1 | 602, we have to be provided with the data, all the underlying |
| 09:52:04 | 2 | data that -- where these numbers come from.  We don't have that |
| 09:52:06 | 3 | data. |
| 09:52:10 | 4 | MR. RIOPELLE:  And Your Honor, we produced the Excel |
| 09:52:13 | 5 | data in the discovery that had the underlying data. |
| 09:52:15 | 6 | MR. SCHWARTZ:  An Excel spreadsheet is not the |
| 09:52:20 | 7 | underlying data.  We need to see all the invoices for all these |
| 09:52:22 | 8 | numbers.  That should have been produced, it has not been |
| 09:52:26 | 9 | produced.  And that's what the rule requires, that all the |
| 09:52:33 | 10 | underlying data has to be provided before you use a summary. |
| 09:52:37 | 11 | Actually the next exhibit is even worse. |
| 09:52:39 | 12 | THE COURT:  Rule on summaries. |
| 09:52:46 | 13 | MR. RIOPELLE:  1006, I believe. |
| 09:52:50 | 14 | THE COURT:  Yeah, I know.  It's not 602.06. |
| 09:52:52 | 15 | MR. RIOPELLE:  And I would say one thing, Your Honor. |
| 09:52:54 | 16 | MR. KERNELL:  It's 1006. |
| 09:52:56 | 17 | THE COURT:  Okay. |
| 09:52:58 | 18 | MR. RIOPELLE:  As you're looking at 1006, I would say |
| 09:53:02 | 19 | this is not a summary.  This actually comes directly from |
| 09:53:07 | 20 | Sprint's sales records out of their operating system. |
| 09:53:10 | 21 | THE COURT:  Okay.  So this is not a summary, this is a |
| 09:53:19 | 22 | -- well, set up the foundation out of the presence of the jury |
| 09:53:22 | 23 | right now and let's see what -- where it goes. |
| 09:53:24 | 24 | MR. RIOPELLE:  All right.  Do you want to do those now |
| 09:53:26 | 25 | or do you want me to go to the other exhibits? |

09:53:29   1         THE COURT:  No, let's do this one right now so we can

09:53:31   2  deal with it.

09:53:36   3            EXAMINATION OUTSIDE PRESENCE OF JURY

09:53:36   4  BY MS. WHEATLEY:

09:53:42   5  Q. So Mr. Shaughnessy, are you familiar with this document on

09:53:43   6  the screen?

09:53:44   7  A. I'm familiar with it.

09:53:49   8  Q. And where does the data shown in here come from?

09:53:54   9  A. Comes from our billing system, our RISE billing system.  I

09:53:57  10  don't know what RISE stands for, but it's the system that keeps

09:54:00  11  all of our data.

09:54:03  12  Q. And were you able to confirm if these numbers are accurate?

09:54:06  13  A. Yes.

09:54:09  14         THE COURT:  The question is did they have access to the

09:54:15  15  same records, did you provide them with this information before

09:54:16  16  today.

09:54:18  17         MS. WHEATLEY:  Yes, Your Honor.  This information was

09:54:19  18  provided in discovery.

09:54:20  19         THE COURT:  In what manner?

09:54:23  20         MR. RIOPELLE:  We provided this underlying data, the

09:54:27  21  spreadsheet, and they did not ask for all of our invoices for

09:54:31  22  each individual sale.

09:54:34  23         THE COURT:  When is the first time they saw this

09:54:35  24  particular document?

09:54:38  25         MS. WHEATLEY:  No, it's not the first time, this was

09:54:39    1    produced in discovery.

09:54:41    2            THE COURT:  The question is when?  When is the first

09:54:44    3    time they saw this particular document?

09:54:46    4            MS. WHEATLEY:  Gosh, I think it was created in 2018 so

09:54:51    5    I would assume it was produced in 2018 or early 2019.  It was

09:54:55    6    also in the summary judgment motion.

09:54:58    7            THE COURT:  All right.  Tell me, you have any questions

09:55:02    8    on the foundation?

09:55:04    9            MR. KERNELL:  Yes, Your Honor.

09:55:05   10            THE COURT:  Okay.  Go.

09:55:08   11            MR. KERNELL:  So this is not -- they didn't make the

09:55:11   12    originals, they didn't make duplicates, they didn't make

09:55:15   13    anything available, this is under Rule 1006, they didn't provide

09:55:19   14    anything for us to go and verify the documents.  This was first

09:55:22   15    used in their motion for summary judgment.  There was no

09:55:27   16    underlying data, they didn't give us any invoices, they didn't

09:55:29   17    show us anything from their billing system whatsoever.  This was

09:55:33   18    after all the depositions were taken.  So we don't have any idea

09:55:38   19    what these numbers are, where they came from.  And as part of --

09:55:43   20    if you are going to use this as a summary, you have to provide

09:55:48   21    those documents, the underlying documents, the invoices, the

09:55:52   22    bills, all those things, you have to provide that to opposing

09:55:54   23    counsel before it's used.

09:55:57   24            MS. WHEATLEY:  Your Honor, if I may address that

09:55:57   25    quickly?

9

09:55:59   1              THE COURT:  Go ahead.

09:56:00   2              MS. WHEATLEY:  It is not correct that this was first

09:56:03   3      provided at summary judgment.  This was provided in discovery

09:56:06   4      and was available for the depositions.

09:56:11   5              MR. KERNELL:  What's the Bates stamp?

09:56:13   6              MR. RIOPELLE:  We can find it if you want the Bates

09:56:14   7      stamp.

09:56:16   8              MS. WHEATLEY:  Because we provided it in its original

09:56:19   9      native form, the PDF is not stamped.  But the original native

09:56:22  10      that we provided which that is this document is stamped.

09:56:24  11              MR. KERNELL:  Where is the underlying data that

09:56:27  12      supports this?  That's what the rule requires.  The underlying

09:56:31  13      data that supports it, not just a summary.  Anybody can put

09:56:36  14      together a spreadsheet and say oh yeah, this is what we have.

09:56:41  15      We have no way to authenticate or verify any of these.

09:56:43  16              MS. WHEATLEY:  Your Honor, Defendants had a full

09:56:47  17      opportunity to authenticate and verify this.  This is the

09:56:50  18      underlying data.  This is pulled directly, as Mr. Shaughnessy

09:56:54  19      testified, from Sprint's sales records.

09:56:56  20              MR. KERNELL:  Your Honor, we've never been given access

09:57:00  21      to Sprint's sales records in any way, shape, or form.

09:57:05  22              MS. WHEATLEY:  Defendants never requested access to

09:57:07  23      Sprint's sales database.

09:57:08  24              THE COURT:  Don't you have to ask for them?  I mean,

09:57:10  25      you got the summary at some point; is that correct?  When did

09:57:13  1    you get this summary?

09:57:15  2            MR. KERNELL:  I don't recall this before the motion for

09:57:19  3    summary judgment.  Which is after the close of discovery.

09:57:21  4            MS. WHEATLEY:  Your Honor, this was produced in

09:57:22  5    discovery.

09:57:23  6            MR. KERNELL:  What date please?

09:57:25  7            MS. WHEATLEY:  They do not have an objection to this

09:57:28  8    based on the fact this was produced after the close of

09:57:28  9    discovery.

09:57:30  10           MR. SCHWARTZ:  What date, Ms. Wheatley?

09:57:32  11           MR. KERNELL:  There's not a Bates number on here so --

09:57:34  12           MR. RIOPELLE:  There is a Bates number right here.

09:57:39  13           MS. WHEATLEY:  It's 2866.  SPR 2866.

09:57:41  14           MR. RIOPELLE:  Our exhibit list lists the Bates number

09:57:43  15   on it, Your Honor.

09:57:44  16           MS. WHEATLEY:  But I note that they did not object that

09:57:51  17   this was not produced during discovery because it was.

09:57:56  18           MR. KERNELL:  We're objecting under Rule 1006 as not

09:57:57  19   supported by any underlying originals --

09:58:08  20           THE COURT:  I suppose we could extend this dog and pony

09:58:11  21   show by requiring them to show all of the original documents in

09:58:19  22   court which 1006 contemplates.  Seems like a lot of trouble.  I

09:58:23  23   think it's admissible.  I think the question is whether you have

09:58:34  24   access, whether they made the originals available for

09:58:38  25   examination by the other parties.  I don't think that

09:58:40   1   contemplates them having to ask for it, I think that

09:58:44   2   contemplates you telling them we're going to use this as a

09:58:48   3   summary and here the originals are, you can come look at them

09:58:49   4   next week in our offices or something.

09:58:51   5        MS. WHEATLEY:  Your Honor, I just want to be clear,

09:58:55   6   this is not a summary.  This is pulled directly from the

09:58:55   7   records.

09:58:57   8        THE COURT:  Okay.  So this is an Excel spreadsheet that

09:59:02   9   is in the records of the Plaintiff?

09:59:03   10        MS. WHEATLEY:  Yes.

09:59:05   11        MR. KERNELL:  So Your Honor, if I could, the very first

09:59:11   12   -- let's look at access revenue -- ARPU revenue.  It has a

09:59:16   13   number of $4,330,464.

09:59:19   14        THE COURT:  You're not really anywhere near a

09:59:22   15   microphone.  I don't know where you put them.

09:59:25   16        MR. KERNELL:  The top line under 2013 has a $4.3

09:59:30   17   million number.  That is a summary.  That is a number that is

09:59:34   18   calculated from somewhere or just entered.  To say this is not a

09:59:37   19   summary, I mean, this is absolutely and that's what they

09:59:41   20   originally came in and said no, this is a summary of our

09:59:43   21   business records.  But the underlying business records as

09:59:46   22   required by the rule have not been produced.  They have not been

09:59:50   23   shown to us that we can verify these numbers.

09:59:51   24        MS. WHEATLEY:  And actually Your Honor, there is

09:59:55   25   another document on our exhibit list that does go through the

| | | |
|---|---|---|
| 10:00:00 | 1 | sales in a more granular fashion.  I mean, we could use that one |
| 10:00:01 | 2 | instead. |
| 10:00:03 | 3 | THE COURT:  I don't know that you have to if it's been |
| 10:00:05 | 4 | produced to them already. |
| 10:00:06 | 5 | MS. WHEATLEY:  Yes, it has. |
| 10:00:08 | 6 | THE COURT:  What is it? |
| 10:00:12 | 7 | MS. WHEATLEY:  We can pull it up.  It goes through the |
| 10:00:16 | 8 | source of the particular sales. |
| 10:00:18 | 9 | THE COURT:  Tell me where it is so that -- if you don't |
| 10:00:23 | 10 | know where it is, how are they supposed to know where it is? |
| 10:00:25 | 11 | MR. RIOPELLE:  We're calling it up.  We're firing up |
| 10:00:35 | 12 | the computer here to look for it. |
| 10:01:04 | 13 | (Counsel conferring) |
| 10:01:07 | 14 | THE COURT:  All right.  Who is going to testify -- if |
| 10:01:12 | 15 | this is coming in, it would be under 803.6, correct?  Records of |
| 10:01:15 | 16 | regularly conducted activity? |
| 10:01:16 | 17 | MR. RIOPELLE:  Yes, Your Honor. |
| 10:01:19 | 18 | THE COURT:  Who is going to testify as to whether this |
| 10:01:21 | 19 | is -- then ask the questions, because I haven't heard those |
| 10:01:24 | 20 | questions asked.  Is this something that is, well, whatever |
| 10:01:28 | 21 | 803.6 A, B and C say? |
| 10:01:30 | 22 | MS. WHEATLEY:  Of course, Your Honor. |
| 10:01:30 | 23 | BY MS. WHEATLEY: |
| 10:01:34 | 24 | Q.  Mr. Shaughnessy, does Sprint regularly maintain records of |
| 10:01:37 | 25 | its sales activity for the devices it sells? |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

10:01:37  1    A.  Yes.

10:01:40  2    Q.  And where does it maintain those records?

10:01:42  3    A.  In our RISE billing system.

10:01:48  4    Q.  Okay.  And how was this report generated that's on your

10:01:48  5    screen?

10:01:52  6    A.  I believe the finance team generates it using their software

10:01:56  7    package and pulls the data right out of our RISE billing system.

10:02:01  8    The software package is called MAP, if I'm not mistaken.

10:02:04  9             MS. WHEATLEY:  Thank you, sir.

10:02:15 10             THE COURT:  Why is it not 8,036?

10:02:18 11             MR. KERNELL:  Your Honor, because this is not a record

10:02:23 12    that's regularly kept.  This is a summary of records that.

10:02:25 13             THE COURT:  I don't think it is.  If it's a spreadsheet

10:02:30 14    that's in their records, they say that it is regularly kept.

10:02:32 15             MR. KERNELL:  Your Honor, this was created specifically

10:02:35 16    for this case.

10:02:37 17             THE COURT:  That's not what they said.  That's not what

10:02:40 18    this gentleman said.  I mean, that's what you said.  That's not

10:02:43 19    what they said.

10:02:46 20             MR. KERNELL:  Well Your Honor, if I could cross-examine

10:02:46 21    this gentleman?

10:02:48 22             THE COURT:  I gave you the opportunity, I said what --

10:02:54 23    they took their turn at authenticating it and I said your turn

10:02:59 24    and now ask the questions.  Let him have the lectern.

10:03:01 25                        CROSS-EXAMINATION

```
10:03:01   1        BY MR. KERNELL:
10:03:07   2    Q.  Mr. Shaughnessy, was this particular exhibit created for
10:03:08   3    this case?
10:03:11   4    A.  I believe it was created for this case.
10:03:15   5    Q.  Okay.  And so -- and the underlying data, there are invoices
10:03:19   6    that come in that are entered into the system?
10:03:24   7    A.  You're getting a little technical on me there, but there's
10:03:27   8    certainly generated reports out of RISE, which is our billing
10:03:29   9    system, that would pull the information in.  That would include
10:03:33  10    the revenue billed, it would include the minutes of use, it
10:03:38  11    would include model of the phone, it would include customer
10:03:40  12    information such as name, billing address, telephone number, how
10:03:42  13    the devices were used from a data-session perspective, and any
10:03:46  14    other billing accessory revenue, things like that that would go
10:03:48  15    through it.  And it would pull into our RISE billing system, and
10:03:50  16    that would generate a bill.  And those bills then would
10:03:53  17    aggregate from a finance perspective and we would manage the
10:03:57  18    business either through, you know, we can extract the data
10:04:00  19    however we want to extract the data as far as, you know, how we
10:04:03  20    want to look at the reports.  Is it geographical?  Is it by
10:04:08  21    device?  Is it by sales professional?  Is it by channel?  So we
10:04:13  22    have retail and business direct.  So yeah.
10:04:17  23    Q.  If I could, so this -- these types of charts are created
10:04:20  24    based on the questions, the queries that you make to a database
10:04:26  25    so that you manipulated or you generate the type of report that
```

| | |
|---|---|
| 10:04:28 | 1 |
| 10:04:32 | 2 |
| 10:04:36 | 3 |
| 10:04:40 | 4 |
| 10:04:43 | 5 |
| 10:04:49 | 6 |
| 10:04:50 | 7 |
| 10:04:53 | 8 |
| 10:05:00 | 9 |
| 10:05:03 | 10 |
| 10:05:08 | 11 |
| 10:05:11 | 12 |
| 10:05:16 | 13 |
| 10:05:18 | 14 |
| 10:05:22 | 15 |
| 10:05:28 | 16 |
| 10:05:31 | 17 |
| 10:05:34 | 18 |
| 10:05:35 | 19 |
| 10:05:38 | 20 |
| 10:05:42 | 21 |
| 10:05:44 | 22 |
| 10:05:50 | 23 |
| 10:05:59 | 24 |
| 10:06:02 | 25 |

you would like to use?

A.  Yes, we do query the RISE database to pull reports.

Q.  And so all these bills that go out, the bills that come in or the invoices coming in, bills that go out, there's all -- there's a lot of underlying data that goes into this report which is a summary of all that activity somewhere in Sprint.

A.  Yeah, that's a fair assessment.

        THE COURT:  All right.  I do not believe that it meets the criteria for 803, or -- excuse me 603 -- I'm sorry 803.6, A B or C, it's not admissible under that.  I don't think it's admissible as a summary either because it's -- I do not think that anybody has made any effort to offer the underlying exhibits to the Defendant.  Therefore, I will not permit this to come in at this time.  I suspect that there are ways that it could come in, but I haven't heard it articulated yet so move to the next document please.  I'll sustain the objection.

        MR. RIOPELLE:  Next document would be Exhibit 14, Your Honor, but I assume that based on your ruling on 13 it's going to be the same.

        THE COURT:  I don't know what 14 is.  Okay then, you're conceding that it's the same.  Let's move on then.  So same ruling then.

        MR. RIOPELLE:  The next exhibit is Exhibit 38.  They're objecting to us using the box which we -- one of the boxes, one of the devices that has Nextel on it.

```
10:06:04   1              THE COURT:  All right.  Tell us what the objection is.
10:06:15   2    Now please.  Any time.  Object.
10:06:17   3              MR. KERNELL:  We're trying to figure -- this figure
10:06:18   4    out.
10:06:21   5              THE COURT:  They showed it to you yesterday, didn't
10:06:22   6    they?
10:06:24   7              MR. KERNELL:  I don't know we didn't see this
10:06:24   8    yesterday.
10:06:26   9              MR. RIOPELLE:  Pictures of the box have been produced,
10:06:27  10    they've been used.
10:06:31  11              THE COURT:  I saw it.  I don't know why you didn't --
10:06:33  12              MR. KERNELL:  No, it's a different box.  That was our
10:06:36  13    box not their box.
10:06:38  14              THE COURT:  I kind of remember seeing this, but go
10:06:43  15    ahead.  Look at it and tell us what the objection is.
10:06:49  16              MR. KERNELL:  So because this is the first time we've
10:06:51  17    actually seen this physical --
10:06:52  18              THE COURT:  I don't need to hear a speech.  Just tell
10:06:53  19    me.
10:06:55  20              MR. KERNELL:  We don't object to it, Your Honor.
10:06:57  21              THE COURT:  Okay.  That's what I want.  Move on.  No
10:07:01  22    objection to 38.
10:07:03  23              MR. KERNELL:  Your Honor, I'm sorry to interrupt.  Just
10:07:04  24    one more final housekeeping.
10:07:07  25              THE COURT:  Wait.  Is there more exhibits?
```

| | | |
|---|---|---|
| 10:07:11 | 1 | MR. RIOPELLE:  Yes, Your Honor.  They've indicated this |
| 10:07:15 | 2 | will be on their exhibit list, they've indicated they're going |
| 10:07:20 | 3 | to use Exhibit 5206. |
| 10:07:23 | 4 | THE COURT:  Okay. |
| 10:07:27 | 5 | MR. RIOPELLE:  We object on relevance. |
| 10:07:30 | 6 | THE COURT:  I don't know what 5006 is. |
| 10:07:33 | 7 | MR. RIOPELLE:  5206. |
| 10:07:34 | 8 | THE COURT:  5206? |
| 10:07:35 | 9 | MR. RIOPELLE:  Yes, Your Honor. |
| 10:07:37 | 10 | THE COURT:  Is that it on the screen? |
| 10:07:37 | 11 | MR. RIOPELLE:  Yes, Your Honor. |
| 10:07:40 | 12 | THE COURT:  Okay.  Why is this admissible? |
| 10:07:42 | 13 | MR. KERNELL:  Your Honor, that's an SEC filing that |
| 10:07:50 | 14 | Sprint made that removed them from the reporting requirements |
| 10:07:55 | 15 | for the SEC because they're no longer a publicly traded company. |
| 10:07:58 | 16 | That's with the merger with T-Mobile, this is what was filed so |
| 10:08:01 | 17 | that Sprint no longer exists except under T-Mobile. |
| 10:08:04 | 18 | THE COURT:  And why is this not admissible? |
| 10:08:06 | 19 | MR. RIOPELLE:  First it's irrelevant.  This is talking |
| 10:08:13 | 20 | about SEC filings and taking specific types of bonds, and taking |
| 10:08:18 | 21 | them off the registration of filing with the SEC that does not |
| 10:08:22 | 22 | mean that Sprint corporation doesn't exist, it means that Sprint |
| 10:08:27 | 23 | no longer has SEC filing requirements under the securities laws |
| 10:08:28 | 24 | because it's part of T-Mobile. |
| 10:08:31 | 25 | THE COURT:  What is the jury supposed to gather from |

```
10:08:33   1    this?
10:08:37   2            MR. KERNELL:  Your Honor, this is when T-Mobile took
10:08:45   3    over and bought Sprint.  Sprint is gone and this is in the whole
10:08:52   4    the process of Sprint -- Nextel went away, Sprint's gone away
10:08:56   5    and it's just the continuous process to show the abandonment of
10:08:56   6    these --
10:09:01   7            THE COURT:  This doesn't abandon anything.
10:09:04   8            MR. KERNELL:  Not by itself.  This shows the
10:09:07   9    termination of Sprint Corporation.  They don't even file with
10:09:10   10   the SEC anymore.
10:09:10   11           MR. RIOPELLE:  That doesn't mean --
10:09:13   12           THE COURT:  So what does that matter?
10:09:15   13           MR. KERNELL:  This is just the evidence of it.
10:09:17   14   Otherwise, I'm just telling them.
10:09:18   15           THE COURT:  Do you have to be filing with the SEC to
10:09:20   16   own a trademark?
10:09:22   17           MR. KERNELL:  No, you don't have to file with the SEC.
10:09:24   18           THE COURT:  Then what's the difference?
10:09:26   19           MR. KERNELL:  But this is evidence to show that even --
10:09:28   20           THE COURT:  I think it's misleading and I don't think
10:09:31   21   it's admissible.  I'll sustain the objection to this.
10:09:33   22           What else you got?
10:09:39   23           MR. RIOPELLE:  Next one, Your Honor, is Exhibit 5226.
10:09:41   24           THE COURT:  What is it?
10:09:45   25           MR. RIOPELLE:  It is a petition to renew Nextel
```

10:09:51  1    trademark that is not at issue in this case.  It is irrelevant

10:09:56  2    to the two trademarks that we are asserting in this case.

10:10:00  3              THE COURT:  What is the purpose of this?

10:10:08  4              MR. KERNELL:  Your Honor, if I may, this trademark was

10:10:13  5    asserted in this case.  This is one of the trademarks.  There

10:10:17  6    were two Nextel trademarks that were originally filed against

10:10:22  7    our client.  Both of them are Nextel.  One was for

10:10:28  8    telecommunications services, one is for the actual devices.

10:10:34  9    Then they amended the complaint and they add in the sound mark.

10:10:39  10   This was absolutely in the case.  Then while the case -- and we

10:10:42  11   filed this with the Court in a status conference saying these

10:10:48  12   marks are gone abandoned.  They let this mark go abandoned and

10:10:52  13   then they tried to revive it.  They made representations to the

10:10:57  14   trademark office.  This is absolutely relevant to the dealings

10:11:01  15   with the Patent and Trademark Office, all the other filings that

10:11:04  16   they've done for these marks have all been entered.  There's

10:11:08  17   been no objection to them whatsoever.  But they made

10:11:12  18   representations in the middle of our case to the Patent and

10:11:15  19   Trademark Office through these filings.

10:11:20  20             THE COURT:  What is -- you say it's a different

10:11:21  21   trademark?

10:11:23  22             MR. KERNELL:  No, it's the Nextel Trademark 139.

10:11:25  23             THE COURT:  I'm asking him.  You say it's a different

10:11:26  24   trademark, what is it?

10:11:28  25             MR. RIOPELLE:  Yes, Your Honor.  This is registration

10:11:33   1    Number 163139.  It is not one of the ones we are asserting here
10:11:37   2    at trial, we're asserting, I believe it's Number 244 then, the
10:11:42   3    chirp mark.  This is not being asserted here now.  They're doing
10:11:46   4    it purely to mislead the jury.  It's irrelevant.
10:11:49   5               THE COURT:  Why is this relevant at all?
10:11:51   6               MR. KERNELL:  This goes to our defense of abandonment.
10:11:56   7    They continued to abandon Nextel trademarks.  This is --
10:11:59   8               THE COURT:  They may, but they're not after every
10:12:02   9    Nextel trademark, they're after a particular one with whatever
10:12:03   10   the heck that number was.
10:12:09   11              MR. KERNELL:  Your Honor, in this case, the trademark
10:12:12   12   -- and if I could put on the ELMO?
10:12:20   13              THE COURT:  Sure.
10:12:29   14              MR. KERNELL:  This is from Paragraph 26 of the
10:12:38   15   complaint, actually the first amended complaint, Nextel, the
10:12:44   16   139.  That's exactly what they then filed with the trademark
10:12:50   17   office to try and revive or reinstate.  They had every intention
10:12:54   18   of enforcing or asserting this mark.  They tried to reinstate
10:12:56   19   it.  And they --
10:12:58   20              THE COURT:  But I thought he said they're not doing
10:12:59   21   this in this case.
10:13:03   22              MR. KERNELL:  This is going to our abandonment defense.
10:13:06   23              THE COURT:  How can they abandon something -- they're
10:13:09   24   not trying to get this one, they're saying that they're not
10:13:10   25   seeking this one.

10:13:16   1          MR. KERNELL:  They have abandoned, over time, 55 Nextel
10:13:17   2     trademarks.
10:13:20   3          THE COURT:  Okay.  And they're not suing for those.
10:13:23   4          MR. KERNELL:  No.  It goes to abandonment.  It shows
10:13:28   5     that they don't have any intent to use these.  It's one of the
10:13:32   6     elements in our abandonment defense.  If we cannot bring in --
10:13:35   7          THE COURT:  What does this make more or less true with
10:13:37   8     relation to this case?
10:13:39   9          MR. KERNELL:  Abandonment, and it goes to fraud on the
10:13:44  10     trademark office.  The statements that they made in this
10:13:48  11     petition to the Patent and Trademark Office, along with what
10:13:59  12     they did before, it shows a continuing effort by Sprint to
10:14:03  13     defraud the Patent and Trademark Office.
10:14:06  14          THE COURT:  I know that's the why you characterize it,
10:14:09  15     but I'm not sure that's a fair characterization.  The bottom
10:14:10  16     line is they are not.
10:14:11  17          MR. KERNELL:  The evidence will show that.
10:14:13  18          THE COURT:  Okay.  Can I talk now?
10:14:13  19          MR. KERNELL:  I'm sorry.
10:14:17  20          THE COURT:  Okay.  They are saying that they are not
10:14:24  21     pursuing 1,637,139 in this case.  How does the fact that at one
10:14:28  22     point they asked for it to be extended move the ball in this
10:14:31  23     case?
10:14:34  24          MR. KERNELL:  The way it moves the ball in this case is
10:14:39  25     it establishes that fraud on the trademark office.

| | | |
|---|---|---|
| 10:14:40 | 1 | THE COURT:  Okay. |
| 10:14:43 | 2 | MR. KERNELL:  Stop using pejorative terms.  Tell me |
| 10:14:45 | 3 | what the jury is supposed to draw from the fact that at some |
| 10:14:49 | 4 | point they asked the Securities and Exchange Commission or |
| 10:14:54 | 5 | Patent and Trademark Office, excuse me, that they wanted to |
| 10:14:56 | 6 | extend 139. |
| 10:14:58 | 7 | MR. KERNELL:  Yes, and then along with that they filed |
| 10:15:01 | 8 | documents with that application.  They filed documents and they |
| 10:15:05 | 9 | made representations that those were current documents.  They |
| 10:15:08 | 10 | were not current documents.  And what happened before, and they |
| 10:15:14 | 11 | asked Mr. Kaplan about this, saying so what your representation |
| 10:15:21 | 12 | to the Patent and Trademark Office, you have a duty to -- under |
| 10:15:28 | 13 | perjury, to the truth of what you're submitting to the Patent |
| 10:15:31 | 14 | and Trademark Office.  They rely on it because you have a |
| 10:15:33 | 15 | declaration.  You have sworn -- |
| 10:15:35 | 16 | THE COURT:  That had to do with the statements that he |
| 10:15:35 | 17 | made. |
| 10:15:37 | 18 | MR. KERNELL:  Right.  And so they asked him that, we |
| 10:15:41 | 19 | are asking Sprint the same thing because they file a trademark |
| 10:15:42 | 20 | office -- |
| 10:15:44 | 21 | THE COURT:  The statements that he made were in |
| 10:15:47 | 22 | relation to the trademarks involved in this case.  This does not |
| 10:15:49 | 23 | appear to be. |
| 10:15:51 | 24 | MR. KERNELL:  Yes, this is one of the Nextel trademarks |
| 10:15:52 | 25 | that is involved in this case. |

| | | |
|---|---|---|
| 10:15:54 | 1 | THE COURT:  139 is? |
| 10:15:55 | 2 | MR. KERNELL:  Yes, it was. |
| 10:15:57 | 3 | THE COURT:  It was, but it isn't. |
| 10:15:59 | 4 | MR. KERNELL:  But it is still part of their -- |
| 10:16:00 | 5 | THE COURT:  No. |
| 10:16:02 | 6 | MR. KERNELL:  Of their fraud on the trademark office. |
| 10:16:06 | 7 | THE COURT:  No, it is not.  That's not admissible. |
| 10:16:11 | 8 | Poisoning the well.  It has nothing to do with what is going on |
| 10:16:15 | 9 | in this case right now.  I'll sustain the objection to 5226. |
| 10:16:18 | 10 | Next? |
| 10:16:20 | 11 | MR. RIOPELLE:  I believe that your ruling now would |
| 10:16:25 | 12 | take care of the next one, Your Honor, but 5227 was our response |
| 10:16:31 | 13 | on that one to the USPTO.  But it goes to the same matter and is |
| 10:16:32 | 14 | irrelevant for the same reasons. |
| 10:16:35 | 15 | THE COURT:  Same ruling.  Next? |
| 10:16:36 | 16 | MR. RIOPELLE:  That's all we have, Your Honor. |
| 10:16:37 | 17 | THE COURT:  All right.  Is there anything else before |
| 10:16:39 | 18 | we bring the jury in? |
| 10:16:45 | 19 | Wait.  The brains of the outfit is telling you what to |
| 10:16:46 | 20 | do.  Tell me. |
| 10:16:53 | 21 | MR. RIOPELLE:  No kidding.  Can we call up Exhibit 131 |
| 10:16:54 | 22 | please? |
| 10:17:10 | 23 | THE COURT:  131.  Are we on the ELMO?  Is that what the |
| 10:17:12 | 24 | problem is?  Oh. |
| 10:17:13 | 25 | MR. RIOPELLE:  This, Your Honor, is the underlying data |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | |
|---|---|
| 10:17:20 | 1 |
| 10:17:23 | 2 |
| 10:17:25 | 3 |
| 10:17:27 | 4 |
| 10:17:32 | 5 |
| 10:17:36 | 6 |
| 10:17:37 | 7 |
| 10:17:50 | 8 |
| 10:17:53 | 9 |
| 10:17:58 | 10 |
| 10:18:04 | 11 |
| 10:18:07 | 12 |
| 10:18:12 | 13 |
| 10:18:16 | 14 |
| 10:18:19 | 15 |
| 10:18:28 | 16 |
| 10:18:33 | 17 |
| 10:18:41 | 18 |
| 10:18:45 | 19 |
| 10:18:50 | 20 |
| 10:18:53 | 21 |
| 10:18:57 | 22 |
| 10:18:59 | 23 |
| 10:19:01 | 24 |
| 10:19:02 | 25 |

on the sales of the -- for the Exhibits 13 and 14 that we were talking about earlier.

THE COURT:  Why are you showing me this?

MR. RIOPELLE:  To show that we have, in fact, produced to them and have on our exhibit list the underlying data.

THE COURT:  Is this the underlying data to the other exhibits?

MR. RIOPELLE:  Yes.

MR. KERNELL:  Your Honor, there's no sales numbers on this page.  There's no -- they don't tie to any invoices, they don't tie it to any bills.  Mr. Shaughnessy just testified that there are bills that come in, there's invoices that come in, there's bills that go out, there's customer data, there's all the information that goes into these -- you know, again, this is a summary of something.  We don't know what it is or what it points to and how it relates to the exhibit that they purport it to be summarized from.  There's no numbers on here in order to -- you know, I don't see any $4.3 million worth of sales, there's not even a dollar amount on this.  This can't be the complete summary of that or the complete basis of that summary.

MR. RIOPELLE:  I would just say the underlying data they're not claiming that they wanted, that they never asked for, would have literally been --

THE COURT:  They don't have to ask for it.  You have to give it to them.

10:19:04  1          MR. RIOPELLE:  Would have literally been hundreds of

10:19:06  2     thousands of pages of documents.

10:19:08  3          THE COURT:  Should have been given to them.  The rule

10:19:12  4     says that for there to be a summary, the other material must be

10:19:16  5     available to them.  That doesn't mean that they have to ask you

10:19:16  6     for it.

10:19:18  7          MR. RIOPELLE:  Well, it would have been available.

10:19:22  8     They would have had to come to our offices at Sprint and

10:19:26  9     T-Mobile.  It was available to them, they just never asked for

10:19:30 10     it.  But it was certainly available to them.  Under the 1006 of

10:19:35 11     the rule, it was available to them.  They just never asked for

10:19:37 12     it because they never wanted it because they don't want the

10:19:44 13     sales data in because they don't want to show that we've been

10:19:47 14     selling this, so that we've been using the trademark.

10:19:54 15          THE COURT:  You'll have to show it some other way next.

10:19:55 16          MR. SCHWARTZ:  Your Honor, based on representations in

10:19:59 17     open court by the Plaintiffs, the Defendants move under Rule

10:20:01 18     50(a)(2) for judgment as a matter of law, that there's no in

10:20:03 19     infringement as to the Defendants as to any issues related to

10:20:07 20     the 1,637,139 trademark in this case.

10:20:10 21          THE COURT:  You want to do this now before they rest?

10:20:11 22          MR. SCHWARTZ:  That's what the rule --

10:20:13 23          THE COURT:  How many times do you think you can do it?

10:20:15 24          MR. SCHWARTZ:  The rule says that on this issue --

10:20:19 25     they've just stated as to that issue, so we're clear that,

| | | |
|---|---|---|
| 10:20:24 | 1 | they're not seeking anything concerning that particular |
| 10:20:24 | 2 | trademark. |
| 10:20:27 | 3 | THE COURT:  As to 136. |
| 10:20:29 | 4 | MR. SCHWARTZ:  It's the 1,637,139 trademark. |
| 10:20:34 | 5 | THE COURT:  139, excuse me.  All right.  Is that |
| 10:20:35 | 6 | abandoned? |
| 10:20:39 | 7 | MR. RIOPELLE:  Is it abandoned?  No.  First of all, |
| 10:20:43 | 8 | they're misrepresenting trademark law to you, Your Honor. |
| 10:20:47 | 9 | Trademark rights come from use of the trademark.  If you have a |
| 10:20:52 | 10 | registration, it gives you additional rights.  We are still |
| 10:20:59 | 11 | using the trademark, we still have trademark rights under -- |
| 10:21:00 | 12 | that we're using it. |
| 10:21:02 | 13 | THE COURT:  You're not pursuing damages. |
| 10:21:05 | 14 | MR. RIOPELLE:  We're not pursuing it in this case |
| 10:21:10 | 15 | because we don't have the registration.  But we still have |
| 10:21:15 | 16 | rights under that trademark under the law in the United States. |
| 10:21:17 | 17 | MR. SCHWARTZ:  Your Honor? |
| 10:21:17 | 18 | THE COURT:  I'm listening. |
| 10:21:20 | 19 | MR. SCHWARTZ:  Can't have it both ways.  You can't -- |
| 10:21:22 | 20 | MR. RIOPELLE:  Actually you can have it both ways |
| 10:21:25 | 21 | because what they've been doing, one of the things -- and this |
| 10:21:29 | 22 | is an issue that may come up on the jury instructions, they're |
| 10:21:31 | 23 | misrepresenting to this jury. |
| 10:21:35 | 24 | MR. SCHWARTZ:  We're not even there yet, Mr. Riopelle. |
| 10:21:37 | 25 | MR. RIOPELLE:  Will you be quiet?  I'm talking.  Thank |

10:21:37  1   you.
10:21:40  2          That you have trademark rights come from use.  You get
10:21:44  3   extra rights with the registration, but you can sue in a federal
10:21:47  4   court in the United States under the Lanham Act if you have an
10:21:51  5   unregistered mark.
10:21:52  6          MR. SCHWARTZ:  Your Honor.
10:21:53  7          THE COURT:  What rule with you traveling under?
10:21:58  8          MR. SCHWARTZ:  Rule 50(a)(2).
10:22:17  9          THE COURT:  Read to me what 50(a)(2) says because my 50
10:22:18 10   doesn't have subheadings.
10:22:21 11          MR. SCHWARTZ:  Motion for judgment as a matter of law
10:22:24 12   may be made at any time before the case is submitted to the
10:22:25 13   jury.  The motion must specify the judgment sought, and the law
10:22:28 14   and the facts that entitle the movant to the judgment.
10:22:32 15          When I said they can't have it both ways, it's because
10:22:36 16   Your Honor just made a specific ruling excluding the use of
10:22:40 17   certain evidence related to the 139 because they said it's not
10:22:46 18   an issue in this case.  So that's the issue.  If they're not
10:22:50 19   seeking any damages, if they're not seeking any claims, and
10:22:54 20   that's what they're stating, then the Defendants are entitled to
10:22:58 21   a judgment as a matter of law.  This is a claim that they
10:23:01 22   brought in the amended complaint.
10:23:02 23          THE COURT:  I'll deny your motion at this point.
10:23:05 24          Next.
10:23:07 25          MR. RIOPELLE:  I believe we're done, right?

10:23:11   1          THE COURT:  Okay.  Can we bring the jury in please?

10:23:13   2          COURT SECURITY OFFICER:  All rise for the jury.

10:23:18   3          (Jury in at 10:23 a.m.)

10:24:34   4          THE COURT:  Please be seated.  Sorry to make you wait

10:24:36   5  in the jury room, but I thought it was better than having you

10:24:39   6  sit over there while we huddle in the corner.

10:24:43   7          Please continue your questioning, ma'am.  You're

10:24:50   8  reminded, sir, that you're still under oath.

10:24:50   9                   CONTINUED DIRECT EXAMINATION

10:24:50  10    BY MS. WHEATLEY:

10:24:54  11  Q.  Mr. Shaughnessy, yesterday you discussed how business

10:24:59  12  marketing was done via meetings and customized solutions.  Do

10:25:04  13  you personally discuss Nextel with customers to market Sprint's

10:25:04  14  businesses services?

10:25:09  15  A.  I do.  When given the chance.  I'm sorry if I yelled that

10:25:11  16  really loud.

10:25:14  17          THE COURT:  Better loud than not loud.

10:25:14  18    BY MS. WHEATLEY:

10:25:20  19  Q.  I believe through the course of this trial you've also heard

10:25:25  20  Mr. Kohman testify about prioritization.  For the push-to-talk

10:25:29  21  marketed with the Nextel brand, is Sprint able to prioritize the

10:25:30  22  calls of first responders?

10:25:32  23  A.  We are, yes.

10:25:38  24  Q.  And do all companies that offer PTT, push-to-talk, offer

10:25:42  25  that same prioritization service?

10:25:46  1    A.  No, they can't unless they're integrated into the carrier's

10:25:51  2    network.  As Mr. Kohman testified around the software that's

10:25:54  3    integrated into our network, it's software that's also --

10:25:57  4    collaborates and works with the phones that are engineered for

10:25:59  5    our network.

10:26:03  6    Q.  Now, are you aware of whether the Nextel brand appears on

10:26:05  7    the packaging for rugged devices?

10:26:07  8    A.  I am aware, yes, it does.

10:26:12  9         MS. WHEATLEY:  Okay.  I'd like to introduce Exhibit 38

10:26:15  10   which had no objections.  Your Honor, may I approach the

10:26:16  11   witness?

10:26:21  12        THE COURT:  You may.  38 is admitted in evidence.

10:26:21  13        (Plaintiff's Exhibit 38 in evidence)

10:26:21  14   BY MS. WHEATLEY:

10:26:36  15   Q.  Now, Mr. Shaughnessy, do you recognize what I've just handed

10:26:36  16   you?

10:26:37  17   A.  I do.

10:26:38  18   Q.  What is this?

10:26:49  19   A.  This is a Sonim XP Strike intrinsically safe device.

10:26:52  20   Q.  Can you tell the jury what intrinsically safe means?

10:26:56  21   A.  Intrinsically safe is specifically designed to provide

10:26:59  22   another level of security.  When you're talking about rugged

10:27:03  23   devices, intrinsically safe are very specific devices that when

10:27:06  24   dropped or come apart, like I mentioned yesterday, the rugged

10:27:10  25   devices can come apart to absorb the shock, it doesn't emit a

| | | |
|---|---|---|
| 10:27:12 | 1 | spark.  And so that's really important in industries like oil |
| 10:27:15 | 2 | refinement, chemical development, manufacturing where you may |
| 10:27:20 | 3 | have a vapor of some sort, that could create an explosion if you |
| 10:27:22 | 4 | drop your equipment. |
| 10:27:27 | 5 | Q.  And do you know what years that Sprint sold the Sonim XP |
| 10:27:29 | 6 | Strike IS? |
| 10:27:33 | 7 | A.  We introduced this in 2013, and we sold it at least through |
| 10:27:38 | 8 | 2018, maybe through 2019 as inventory levels remained. |
| 10:27:44 | 9 | Q.  Okay.  And where does Nextel appear on this box? |
| 10:27:51 | 10 | A.  It appears on the back of the box. |
| 10:27:57 | 11 | Q.  Are you able to circle the spots on your screen? |
| 10:28:05 | 12 | A.  There and there. |
| 10:28:09 | 13 | Q.  Now, does Nextel appear anywhere else along with the |
| 10:28:11 | 14 | packaging for this product? |
| 10:28:15 | 15 | A.  It does.  It appears in the start-up guides, I think maybe |
| 10:28:18 | 16 | they call them the easy use start-up guides. |
| 10:28:22 | 17 | Q.  Would you mind unpacking and showing the jury, and we can |
| 10:28:26 | 18 | also flip to an image? |
| 10:28:31 | 19 | A.  I won't be able to put this box back together.  I apologize |
| 10:28:35 | 20 | on behalf of the industry for making these very hard to put back |
| 10:28:42 | 21 | together.  They appear on the back of these user guides. |
| 10:28:45 | 22 | There's one in English and one in Spanish.  Says Nextel Inspired |
| 10:28:49 | 23 | here -- |
| 10:28:55 | 24 | THE COURT:  Is there any reason why the -- I went to |
| 10:29:02 | 25 | touch it to delete that mark and it did this, I love IT people. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:29:11  1          MS. WHEATLEY:  Your Honor, may we put the images up on
10:29:12  2  the screen?
10:29:16  3          THE COURT:  We can try.  I don't have it, but that
10:29:21  4  doesn't matter.  Do you all have it on your screen?
10:29:25  5          MS. WHEATLEY:  Can we also show the image of the second
10:29:31  6  catalogue?  That he pointed out?
10:29:35  7          THE WITNESS:  There you go.  Thank you.
10:29:35  8      BY MS. WHEATLEY:
10:29:42  9  Q.  Now, why include Nextel with this particular device?
10:29:46  10  A.  Well, again as I mentioned yesterday, from a marketing
10:29:52  11  perspective, the ability to connect and keep current the Nextel
10:29:55  12  mark with these particular products and services is a
10:30:01  13  differentiator for us, and it provides that end user and the
10:30:05  14  customer with the knowledge that this is built on that platform,
10:30:09  15  that gold standard that we talked about it, the value that comes
10:30:11  16  with it, the reliability, the instant communications, what
10:30:13  17  they've purchased from us is exactly what they're going to get.
10:30:17  18  So Nextel, obviously very quality mark, very well-regarded in
10:30:20  19  the rugged and PTT space.
10:30:23  20  Q.  And Mr. Shaughnessy, does Sprint do any vetting of the
10:30:30  21  quality of the Sonim XP Strike IS with Nextel on it?
10:30:32  22  A.  We do.  We vet all of the phones that we bring in as what we
10:30:34  23  call tier one inventory, inventory that we stock and sell in our
10:30:38  24  stores, and our through our business-to-business channels.
10:30:43  25  Q.  Okay.  And can you give me generally or give the jury a

| | | |
|---|---|---|
| 10:30:47 | 1 | general idea of what that vetting process evolves? |
| 10:30:48 | 2 | MR. KERNELL:  Your Honor, I'm going to object to this |
| 10:30:51 | 3 | as relevance.  What does that have to do with the trademark in |
| 10:30:53 | 4 | this case? |
| 10:30:54 | 5 | MS. WHEATLEY:  Your Honor, may I respond? |
| 10:30:55 | 6 | THE COURT:  Yes. |
| 10:30:56 | 7 | MS. WHEATLEY:  The quality of the goods and services |
| 10:30:59 | 8 | and the difference between the quality has to do with the |
| 10:31:04 | 9 | reputational harm to Sprint and also the damage to the public. |
| 10:31:06 | 10 | THE COURT:  I'll overrule the objection.  I'll permit |
| 10:31:34 | 11 | it.  I can't make it do anything.  How long does it take reboot? |
| 10:31:37 | 12 | Let's wait until a break then. |
| 10:31:37 | 13 | BY MS. WHEATLEY: |
| 10:31:39 | 14 | Q.  Mr. Shaughnessy, could you give the jury a general idea of |
| 10:31:40 | 15 | what the vetting process is? |
| 10:31:45 | 16 | A.  Sure.  So when we're looking at developing phones, whether |
| 10:31:47 | 17 | they're the rugged phones or any of our phones, there's several |
| 10:31:51 | 18 | things that go into it.  One is manufacture, who we're going to |
| 10:31:56 | 19 | do business with.  Second is specifications, what those need to |
| 10:31:59 | 20 | meet and how they integrate with the network.  So there's |
| 10:32:03 | 21 | software that's in every phone, and every network is different. |
| 10:32:06 | 22 | So you have to be able to ensure that the device works on the |
| 10:32:09 | 23 | network as it's designed, works on other networks as we hand |
| 10:32:12 | 24 | off.  We heard a little bit about roaming over the last couple |
| 10:32:15 | 25 | of days.  Other networks, using your service on other networks. |

10:32:19  1    Then it's got to deliver out of the package the quality that you

10:32:22  2    expect from the actual physical device.

10:32:26  3    Q.   And are there any costs involved in this vetting process?

10:32:30  4    A.   There are costs.  Time and money.  It takes upwards of a

10:32:35  5    year to bring a device on to our network, and then the cost, of

10:32:39  6    course, we have teams so there's the actual labor costs from our

10:32:42  7    company.  But then also the cost of the manufacturing as well

10:32:45  8    that have to build to our specifications.

10:32:49  9    Q.   And do any devices not pass this vetting process?

10:32:53  10   A.   They do.  Not pass.  Yes.  There are devices that do not

10:32:56  11   make the cut.

10:33:01  12   Q.   And do Sprint's business customers generally independently

10:33:04  13   check the quality of the devices they buy?

10:33:07  14   A.   They don't typically independently check the quality of the

10:33:08  15   device.  What we'll do is work with them to make sure the

10:33:12  16   devices work to meet the needs within the environment that

10:33:14  17   they're operating.  We'll certainly give units to test so they

10:33:15  18   can try the services, as well as obviously the fit and feel of

10:33:18  19   the devices for the end users to see if it's, again, delivering

10:33:22  20   the application that they want.  But typically, it's not a

10:33:28  21   device, it's more of a complete solution test.  You know, can

10:33:30  22   assume that the devices that they're buying from us have already

10:33:33  23   gone through that particular process.

10:33:39  24   Q.   And have there been any other versions of this packaging for

10:33:46  25   the Sonim XP Strike IS that you are aware of?

```
10:33:48   1    A.  I believe there was an early version that was produced for
10:33:50   2    this particular device.
10:33:54   3          MS. WHEATLEY:  Okay.  Going to introduce what's been
10:33:55   4    marked exhibit ten with no objections.
10:34:00   5          THE COURT:  Exhibit 10 admitted in evidence without
10:34:01   6    objection.
10:34:07   7          It's already in.  Been in since the 12th.
10:34:07   8        BY MS. WHEATLEY:
10:34:19   9    Q.  Mr. Shaughnessy, can you identify this box and can we put an
10:34:21  10    image up on the screen?
10:34:25  11    A.  This box matches the image on the screen.  This is, again,
10:34:32  12    intrinsic safe Sonim XP Strike IS box.  It's the same device
10:34:32  13    model.
10:34:35  14    Q.  And does Nextel appear on this box?
10:34:36  15    A.  It does.
10:34:37  16    Q.  Can you tell the jury where?
10:34:40  17    A.  On the back of the box.
10:34:44  18          MS. WHEATLEY:  Can we put that image up?
10:34:44  19        BY MS. WHEATLEY:
10:34:48  20    Q.  Can you point out where it is on the back of the box?
10:34:55  21          Does Nextel appear on any of the other packaging in
10:34:57  22    this box or other material?
10:35:01  23    A.  It does.  I believe it's on the user manuals that I showed
10:35:03  24    before, the start-up manuals.
10:35:08  25    Q.  Do you mind pulling those out and just showing the jury?
```

10:35:11  1    Sorry to make you work.

10:35:16  2    A.   Same thing.  Spanish version and the English version on the

10:35:21  3    back, I'll circle it on the thing.  It's got Nextel mobile

10:35:23  4    phone.

10:35:29  5    Q.   And is there -- between these two versions, is there one

10:35:33  6    that you've seen more often?

10:35:39  7    A.   I see more often I think it's the newer one as we've evolved

10:35:42  8    the product line, the first one.  One box.

10:35:49  9    Q.   And are you generally aware or -- scratch that.  Has Sprint

10:35:55  10   continuously sold the Sonim XP Strike IS from 2013 to 2019?

10:35:56  11   A.   Yes.

10:35:59  12   Q.   And are you aware generally of Sprint's revenues from that

10:36:02  13   sales of that device?

10:36:05  14   A.   I'm aware of them.  Yeah.

10:36:09  15   Q.   Could you give an approximation on what those revenues are?

10:36:14  16   A.   It really depends based on the year.  And so when I said

10:36:18  17   that we introduced it in 2013, we upgraded a lot of devices in

10:36:24  18   2013.  And the way the phones work, I'm sure you're familiar in

10:36:27  19   the industry, especially in the business space, we typically

10:36:31  20   discount or give the phones at no cost when you sign a contract.

10:36:35  21   And so the revenues from the actual phones will vary.  In that

10:36:40  22   first year, our revenues were actually negative because we gave

10:36:44  23   away a lot of phones.  Then as we generate more sales from those

10:36:48  24   phones in the subsequent years, it becomes more positive or

10:36:50  25   above the line.  So anywhere from you know, a million to

10:36:54   1    probably 2 million a year in annual revenue associated with
10:36:59   2    these particular boxes.  That first year, like I said, we took a
10:37:02   3    hefty loss as we normally do when we upgrade a device like this.
10:37:08   4    Q.  Okay.  And to your knowledge, from 2019 to the present, has
10:37:11   5    Sprint sold any phones with Nextel on the packaging?
10:37:13   6    A.  Yes.
10:37:18   7    Q.  And what kind of devices has it sold from 2019 to the
10:37:20   8    present with Nextel on the packaging?
10:37:23   9    A.  Typically the same devices that we've seen, the rugged
10:37:27  10    devices that we have.  The two I think we saw yesterday, the
10:37:32  11    Sonim devices, were introduced last year.  Prior to that we had
10:37:37  12    a Kyocera devices, a whole line of Kyocera.  We had Sonim again
10:37:43  13    before that as well.  So we've had, I'd say a portfolio of at
10:37:47  14    least three to five devices every year.
10:37:57  15    Q.  Okay.  And now does Sprint currently still use the Nextel
10:37:57  16    chirp?
10:37:58  17    A.  We do.
10:38:01  18    Q.  And how does Sprint currently use the Nextel chirp?
10:38:05  19    A.  We use it in our Sonim devices.  We use it in the devices
10:38:08  20    that are currently still active on our network that we sold and
10:38:18  21    have sold since 2013 on the CDMA network, and now the LTE
10:38:18  22    network.
10:38:22  23            So every time we introduce a new device it is a
10:38:26  24    PTT-enabled device, and I think Scott might have mentioned it
10:38:28  25    yesterday, Mr. Wiley, that these devices are engineered with

10:38:31  1    buttons on the side.  So anytime we have a button device, we

10:38:33  2    certainly ensure that that chirp works, and we do that with the

10:38:39  3    Kodiak that and the integrator.  And then on our over-the-top

10:38:42  4    application, downloadable application, we use it there as well.

10:38:46  5    Q.  And does T-Mobile plan to use the Nextel chirp going

10:38:47  6    forward?

10:38:52  7    A.  We do.  Yeah.  We definitely brought it forward in 2021 with

10:38:57  8    the Sonim S22 and S62.

10:39:03  9    Q.  And do other PTT or push-to-talk companies use the Nextel

10:39:03  10   chirp?

10:39:07  11   A.  No.

10:39:15  12   Q.  Now, Mr. Shaughnessy, I want to go back to the Nextel brand.

10:39:18  13   Does Sprint license the Nextel mark at all to your knowledge?

10:39:23  14   A.  I believe there is an open license with the carrier in South

10:39:28  15   America.  I only know it as NII.  I don't know the actual

10:39:32  16   company name, but they're an operator that I think still uses

10:39:36  17   the iDEN network and so is a Nextel partner.  I believe that

10:39:39  18   Sprint licenses the name so they can continue to operate in

10:39:40  19   South America.

10:39:47  20   Q.  And does Sprint have any plans for using the Nextel -- well,

10:39:51  21   Sprint and T-Mobile have any plans for using the Nextel brand

10:39:51  22   going forward?

10:39:54  23   A.  Well, we certainly use it today in our sales environment

10:39:57  24   just like we've talked about, our business-to-business and the

10:40:00  25   meetings, some of the packaging you see here.  Certainly the

10:40:05  1    chirp is iconic and it does bring a smile to our faces when we

10:40:06  2    get a chance to talk about that in front of our customers.

10:40:09  3         And then long-term, as we've integrated into T-Mobile,

10:40:13  4    T-Mobile didn't really have a push-to-talk platform and so

10:40:18  5    obviously very interested, and that's why Kodiak is working with

10:40:19  6    T-Mobile to integrate the software into the T-Mobile network, so

10:40:23  7    we can continue to market our Direct Connect product line.

10:40:27  8         Now, what we do with Nextel and how we use that, lots

10:40:33  9    of possibilities.  From anywhere from third-party distribution,

10:40:37  10   MVNO, you've heard about MVNOs and certainly those are

10:40:40  11   opportunities for us to look at as well.  The opportunities are

10:40:43  12   endless, we just have to kind of sit down and have those

10:40:46  13   planning sessions once I think all the integration work is

10:40:46  14   complete.

10:40:50  15   Q.  And has Sprint's ability to make plans for Nextel been

10:40:53  16   impacted by the Defendants' use of Nextel?

10:40:58  17   A.  It certainly has thrown a wrench in our ability to really

10:41:02  18   get things moving because there is open litigation.  So, you

10:41:05  19   know, we need to close this out, we need to move forward so that

10:41:09  20   we can take the marks that we own and put them into, you know,

10:41:13  21   business streams, revenue streams that we want to produce.

10:41:17  22   Q.  And to be absolutely clear, does Sprint intend to stop using

10:41:19  23   Nextel?

10:41:21  24   A.  No.

10:41:25  25   Q.  In your time with the company, has Sprint ever stopped using

10:41:26  1    the Nextel brand?

10:41:28  2    A.  No.

10:41:31  3    Q.  In your time with the company has Sprint ever stopped using

10:41:32  4    the Nextel chirp?

10:41:34  5    A.  No.

10:41:37  6    Q.  And Mr. Shaughnessy, can you remind the jury how long you've

10:41:39  7    been with Sprint?

10:41:44  8    A.  I started in 1997 with Sprint.  This week in fact will be,

10:41:48  9    what is that, 25 years, 30?  25 years.

10:41:52  10   Q.  Now I'm going to briefly -- we've heard about IWCE before,

10:41:55  11   but I'm going to talk about that a little bit with you.

10:41:59  12        Did you attend IWCE ever on behalf of Sprint?

10:42:04  13   A.  I did.  I've attended it once.

10:42:05  14   Q.  When was that?

10:42:05  15   A.  2017.

10:42:12  16   Q.  Can you remind the jury what is the IWCE focus on?

10:42:16  17   A.  It focuses on the mobile radio, the two-way radio industry,

10:42:20  18   the segment if you will.  So lots of manufacturing, lots of

10:42:25  19   public safety, first responders, those type of users.

10:42:30  20   Q.  Okay.  And did Sprint have a booth at IWCE 2017?

10:42:32  21   A.  We did.  We had a real nice booth.

10:42:36  22   Q.  And did Sprint use the Nextel brand at IWCE in 2017?

10:42:38  23   A.  We did.

10:42:40  24   Q.  Okay.  Do you recall how Sprint used it?

10:42:43  25   A.  It was on a video loop.  We were introducing our

10:42:49   1   relationship with Kodiak.  We had just upgraded or platform, I

10:42:52   2   think Scott mentioned QChat was the platform between iDEN and

10:42:56   3   Kodiak.  And we were just introducing our Kodiak platform.  And

10:43:02   4   so stringing together the Nextel brand, the Sprint brand,

10:43:04   5   Kodiak, all of that was an exciting time for us.

10:43:08   6   Q.  Now, did you see the Nextel brand anywhere other than

10:43:10   7   Sprint's booth at IWCE in 2017?

10:43:12   8   A.  I did.

10:43:13   9   Q.  Where did you see it?

10:43:18   10   A.  I saw it at a booth, it was about three rows from our, it

10:43:20   11   was the Defendants' booth.

10:43:24   12   Q.  And how did you discover Defendants' Nextel booth?

10:43:29   13   A.  Very similar story to, I think, we've heard which is

10:43:35   14   customers and employees and members of the Kodiak team coming up

10:43:40   15   and wanting to know why we had two booths at the show, what we

10:43:41   16   were doing at the other booth, since the primary booth was

10:43:43   17   really kind of to introduce the Kodiak platform.  So there was

10:43:46   18   general confusion as to what was happening.

10:43:49   19        MS. WHEATLEY:  Okay.  I'd like to introduce what's been

10:43:54   20   marked Exhibit 96 B without objection.

10:43:56   21        THE COURT:  Without objection, 96 B is admitted in

10:43:57   22   evidence.

10:43:58   23        (Plaintiff's Exhibit 96 B in evidence)

10:43:58   24   BY MS. WHEATLEY:

10:44:04   25   Q.  And Carl, if you could briefly flip through this for him so

| | | |
|---|---|---|
| 10:44:06 | 1 | he can see all the pages. |
| 10:44:20 | 2 | Now, do you recognize these photographs? |
| 10:44:23 | 3 | A.  I do recognize them.  I believe they're photographs that I |
| 10:44:25 | 4 | actually took at that show. |
| 10:44:34 | 5 | Q.  Okay.  And if we could go back to Page 1.  What is depicted |
| 10:44:36 | 6 | here in the photograph? |
| 10:44:42 | 7 | A.  Well, you see some products laid out on a table, different |
| 10:44:45 | 8 | types of configurations, looks like phone and some radios there. |
| 10:44:49 | 9 | You've got sales sheets kind of outlining what those particular |
| 10:44:53 | 10 | products are, they've got the Nextel brand on them.  You see two |
| 10:44:57 | 11 | individuals behind the table with Nextel apparel.  Someone is |
| 10:45:01 | 12 | holding, looks like a sales sheet and having a discussion on |
| 10:45:03 | 13 | what they're looking at.  I assume they're having a discussion, |
| 10:45:05 | 14 | but someone is holding the sales sheet. |
| 10:45:11 | 15 | Q.  Okay.  And what kind of products or services were Defendants |
| 10:45:12 | 16 | offering here? |
| 10:45:17 | 17 | A.  We've got a smartphone right there to the bottom, I'll kind |
| 10:45:20 | 18 | of check that one off.  Then you've got, looks like some -- a |
| 10:45:26 | 19 | two-way dispatch type radio here, a radio here and a radio here. |
| 10:45:38 | 20 | Q.  And if we could flip to Page 4, can you describe for the |
| 10:45:39 | 21 | jury what's shown here? |
| 10:45:44 | 22 | A.  This is the booth from a different angle.  It has the Nextel |
| 10:45:47 | 23 | banner.  Can I go ahead and circle that right here? |
| 10:45:48 | 24 | Q.  You can circle it. |
| 10:45:51 | 25 | THE COURT:  I think we might be able to see it. |

10:45:51  1        BY MS. WHEATLEY:

10:45:56  2    Q.  And do you see the name that's underneath the Nextel banner?

10:46:01  3    A.  Yeah, I kind of crossed through it with my green mark there.

10:46:04  4    It says Critical RF.

10:46:06  5    Q.  Had you ever heard of Critical RF prior to this lawsuit?

10:46:07  6    A.  No.

10:46:09  7    Q.  What was your reaction when you saw this booth?

10:46:12  8    A.  Well, my reaction was to find out exactly kind of what was

10:46:16  9    going on if I could.  We're a big company.  We've got

10:46:20  10   distributors, we've got third-party folks that work with us, so

10:46:23  11   I wanted to find out if there was something that I was missing.

10:46:26  12   Sometimes the left hand doesn't talk to the right hand in a big

10:46:30  13   company like ours.  We had a fairly decent presence and spent a

10:46:33  14   lot of money at this particular show, so I wanted to find out if

10:46:36  15   there was another one of our partners, third-party distributors,

10:46:40  16   someone that we had a relationship with that we said go ahead

10:46:43  17   and use this particular product.  So I was confused, you know,

10:46:45  18   just trying to figure out what was going on.

10:46:52  19   Q.  Okay.  And let's pull up what's been marked 96A without

10:46:54  20   objection.

10:47:02  21            And do you recognize this document here on the screen?

10:47:05  22   A.  I believe it's one of the sales sheets that was attached to

10:47:09  23   one of the devices or in front of the devices.

10:47:14  24   Q.  And do you see on there there's a diagram and then the

10:47:17  25   diagram something is labeled Nextel?

| | | |
|---|---|---|
| 10:47:17 | 1 | A.  Yes. |
| 10:47:23 | 2 | Q.  Okay.  Now, before Nextel merged with Sprint, did it have |
| 10:47:26 | 3 | its own network of cellular towers? |
| 10:47:27 | 4 | A.  Yes, it did. |
| 10:47:31 | 5 | Q.  And does Sprint have its own network of cellular towers? |
| 10:47:32 | 6 | A.  We do. |
| 10:47:35 | 7 | Q.  To your knowledge, did Defendants own a network of cellular |
| 10:47:35 | 8 | towers? |
| 10:47:37 | 9 | A.  No. |
| 10:47:39 | 10 | Q.  Okay. |
| 10:47:43 | 11 | A.  Let me answer the question.  I said no.  No, they do not. |
| 10:47:46 | 12 | So yes, I do know that they do not. |
| 10:47:51 | 13 | Q.  Thank you.  And is there any advantage from purchasing PTT, |
| 10:47:55 | 14 | push-to-talk, services directly from a carrier that has its own |
| 10:47:56 | 15 | network? |
| 10:48:00 | 16 | A.  Absolutely.  Couple things.  One is obviously we talked |
| 10:48:03 | 17 | about the quality of the device and the connection and the |
| 10:48:06 | 18 | service that you're getting from the carrier.  We certainly |
| 10:48:11 | 19 | talked about the priority service and making sure the packets |
| 10:48:16 | 20 | and data and sessions go through in times of trouble, but also |
| 10:48:19 | 21 | just configuring the solution.  Not everybody is a first |
| 10:48:23 | 22 | responder, but there are other ways to configuration the devices |
| 10:48:27 | 23 | to work as either stand-alone PTT devices, integrated dispatch |
| 10:48:31 | 24 | services.  You know, working within an environment that you |
| 10:48:34 | 25 | have, a manufacturing environment, sometimes you have to add |

10:48:35  1    extra antennas inside those environments called in-building

10:48:39  2    solutions.  So working with a carrier is going to ensure that

10:48:41  3    in-building solution works with the macro network, which is the

10:48:46  4    national network, and assures, you know, quality of service that

10:48:49  5    you are purchasing.  So absolutely.

10:48:55  6    Q.   Okay.  Now, throughout the course of this show, did any

10:48:58  7    customers approach you to talk about Defendants' Nextel booth?

10:49:03  8    A.   Yes.  Very similar to the other folks that have talked about

10:49:07  9    the confusion within not only our internal employees and

10:49:11  10   partners, but also customers just coming up wanting to know what

10:49:15  11   the difference is, why two booths, what's going on in the other

10:49:19  12   booth that's not going on in this booth, just general confusion.

10:49:25  13   Q.   Now, Mr. Shaughnessy, after seeing Defendants at IWCE, did

10:49:28  14   you take any action or do anything further?

10:49:31  15   A.   Well, I called back to the corporate office, I sent the

10:49:37  16   pictures in to our legal team and that was generally about it.

10:49:43  17   I didn't want to create an issue or a scene inside a convention

10:49:46  18   center.  Again, didn't exactly know what was happening, so I

10:49:49  19   just wanted to make sure that I didn't miss anything, I wasn't

10:49:52  20   confused about anything on my end.  So just generally reporting

10:49:56  21   back to the company some of the higher level officers within the

10:49:57  22   company.

10:50:02  23   Q.   And why take the time to report that there was another

10:50:03  24   Nextel?

10:50:07  25   A.   Well, because we are Nextel, and so understanding the

| | | |
|---|---|---|
| 10:50:12 | 1 | confusion that it caused with just the people that came up to us |
| 10:50:16 | 2 | on a broad scale -- I wasn't at the trade show the whole time, I |
| 10:50:19 | 3 | was there for a couple hours.  We have a call center in Las |
| 10:50:23 | 4 | Vegas, I was there for other business as well.  But just the |
| 10:50:27 | 5 | confusion and that general state is concerning.  And then seeing |
| 10:50:31 | 6 | products and services that aren't ours being represented as ours |
| 10:50:36 | 7 | to the individuals that need these devices the most and rely on |
| 10:50:39 | 8 | these devices the most, it was concerning.  So it's concerning |
| 10:50:43 | 9 | enough that I needed to get others involved from a corporate |
| 10:50:44 | 10 | perspective. |
| 10:50:50 | 11 | Q.  Okay.  And has Defendants' use of Nextel harmed Sprint? |
| 10:50:55 | 12 | A.  It has.  And continues to harm Sprint. |
| 10:50:57 | 13 | MS. WHEATLEY:  Thank you.  No further questions. |
| 10:50:58 | 14 | THE COURT:  Cross-examination. |
| 10:51:02 | 15 | MR. KERNELL:  Your Honor, is it possible to take a |
| 10:51:04 | 16 | short break, bathroom break? |
| 10:51:20 | 17 | THE COURT:  No.  Unless the jury needs a break.  Does |
| 10:51:26 | 18 | the jury need a break?  Anybody.  Go forward. |
| 10:51:26 | 19 | CROSS-EXAMINATION |
| 10:51:30 | 20 | BY MR. KERNELL: |
| 10:51:37 | 21 | Q.  Good morning, Mr. Shaughnessy. |
| 10:51:39 | 22 | A.  Good morning. |
| 10:51:49 | 23 | Q.  You started talking yesterday or testifying yesterday and |
| 10:51:58 | 24 | then into today, and one of the -- during your testimony |
| 10:52:05 | 25 | yesterday there was a video, it was marked as Exhibit 64 B and |

| | |
|---|---|
| 10:52:15 | 1 |
| 10:52:22 | 2 |
| 10:52:27 | 3 |
| 10:52:28 | 4 |
| 10:52:28 | 5 |
| 10:52:31 | 6 |
| 10:52:39 | 7 |
| 10:52:40 | 8 |
| 10:52:41 | 9 |
| 10:52:43 | 10 |
| 10:52:47 | 11 |
| 10:52:48 | 12 |
| 10:52:52 | 13 |
| 10:52:53 | 14 |
| 10:52:57 | 15 |
| 10:53:05 | 16 |
| 10:53:09 | 17 |
| 10:53:13 | 18 |
| 10:53:16 | 19 |
| 10:53:21 | 20 |
| 10:53:24 | 21 |
| 10:53:29 | 22 |
| 10:53:34 | 23 |
| 10:53:39 | 24 |
| 10:53:46 | 25 |

1  it was a Sprint or it was a Nextel video.  I believe this was
2  the Super Bowl video; is that right?  No, this was the -- oh,
3  when they're in the power plant?  Oh, the power plant video.  Do
4  you recall that video?
5  A.  I do.
6  Q.  When did that air?
7  A.  You know, it's probably going to air between 2006 and 2009.
8  I don't know the exact dates.
9  Q.  Okay.
10  A.  I'm going to say in that general time frame.
11  Q.  And then the Super Bowl video was a Nextel video?
12  A.  It was.
13  Q.  And that aired in, what, 2004 before Sprint and Nextel
14  merged?
15  A.  Yeah, during the merger, right before the close.
16  Q.  When was the last time either Exhibit 64B or 64C were
17  actually broadcast on network TV?
18  A.  That's a good question.  I don't have the media schedules
19  from those commercials.
20  Q.  So they haven't aired any time recently, have they?  Has
21  Sprint paid to air either of these videos in the last 15 years?
22  A.  I'd have to do the math but I don't know.  It could have
23  gone from -- so from 2009, let's just say we'll agree, I'm
24  ranging this from 2005 to 2009.  So then that would be 13 years.
25  Q.  Okay.  And I believe you said that Sprint paid $10 million

10:53:49  1    for those ads?

10:53:53  2    A.  I don't believe I said how much they paid.  I mentioned how

10:53:57  3    much ads can cost from an development perspective and how ads

10:54:04  4    like a Super Bowl ad, certainly the most expensive ads in all of

10:54:08  5    broadcasting probably cost that much.  And then to run a

10:54:10  6    sustained campaign could be easily $10, could be $20 or $30

10:54:15  7    million.  But again, I didn't mention anything about those

10:54:15  8    particular campaigns because again, I don't know how much those

10:54:16  9    were.

10:54:19  10   Q.  So you were just talking in general that those types of

10:54:20  11   campaigns could --

10:54:23  12   A.  Yeah, that was the question that was asked.

10:54:30  13   Q.  So has Sprint done an ad campaign or a commercial campaign

10:54:35  14   like that for Nextel since 2009?

10:54:40  15   A.  I believe there's some ads after 2009, but again, it's not

10:54:45  16   my area in that time.  I was in sales at that time, so I don't

10:54:51  17   know the media schedule for the Nextel brand.

10:55:09  18   Q.  Now, we talked about -- I wanted to just clarify one thing.

10:55:14  19   You're here as the corporate representative for Sprint

10:55:17  20   Communications LLC; is that correct?

10:55:23  21   A.  That's what I've been told, yeah.

10:55:28  22   Q.  And that's your understanding, that you are the Sprint

10:55:31  23   representative for all questions related to Sprint.

10:55:35  24            MS. WHEATLEY:  Objection, relevance and it's not --

10:55:36  25            THE COURT:  I'll permit him to answer the question if

10:55:38  1    he knows.

10:55:41  2              THE WITNESS:  I don't know the scope of the corporate

10:55:44  3    representative.  I do not know that.

10:55:44  4        BY MR. KERNELL:

10:55:47  5    Q.  So you're not -- you may not be able to answer questions on

10:55:51  6    behalf of Sprint in this trial today?

10:55:53  7              MS. WHEATLEY:  Objection.  The witness was not

10:55:56  8    designated as any sort of corporate representative beyond being

10:56:00  9    the corporate representative at the table.

10:56:02  10             THE COURT:  Yeah, I don't know -- well, let's see where

10:56:08  11   this goes.  You can ask the question, he can answer it if he

10:56:09  12   can.

10:56:09  13       BY MR. KERNELL:

10:56:16  14   Q.  You talked about -- and there's the exhibit I believe it's

10:56:21  15   been marked as Exhibit 10, do you have that in front of you?

10:56:23  16   A.  I do not.

10:56:24  17   Q.  The box?

10:56:30  18   A.  Oh, I've got Exhibit 38 and I've got Exhibit 40.

10:56:35  19   Q.  I think on the side it has another sticker on one of those.

10:56:37  20             THE COURT:  38 is not really 38, I think it's 18 but

10:56:40  21   I'm not sure what it is.

10:56:43  22             THE WITNESS:  Ten.  I'm sorry.  I've seen it right

10:56:44  23   here.

10:56:45  24       BY MR. KERNELL:

10:56:48  25   Q.  Okay.  Thank you.  So there's an Exhibit 10, that's the

| | | |
|---|---|---|
| 10:56:50 | 1 | intrinsically safe -- |
| 10:56:51 | 2 | A.   Correct. |
| 10:56:55 | 3 | Q.   -- Sonim.  Is the other one also an intrinsically safe? |
| 10:56:56 | 4 | A.   They are. |
| 10:57:00 | 5 | Q.   And intrinsically safe is not exclusive to Sprint, is it? |
| 10:57:02 | 6 | A.   No.  No.  It's a standard. |
| 10:57:07 | 7 | Q.   Okay.  And when you say "a standard" so if other |
| 10:57:14 | 8 | manufacturing make an intrinsically safe device, then it falls |
| 10:57:19 | 9 | under certain specs for as defined by that terminology; is that |
| 10:57:19 | 10 | correct? |
| 10:57:21 | 11 | A.   Correct. |
| 10:57:24 | 12 | Q.   Do you know if Defendants sell any intrinsically safe |
| 10:57:25 | 13 | devices? |
| 10:57:28 | 14 | A.   I don't. |
| 10:57:35 | 15 | Q.   So if they sold that a device that's intrinsically safe, |
| 10:57:41 | 16 | it's the manufacturer who is certifying that as intrinsically |
| 10:57:43 | 17 | safe, correct? |
| 10:57:47 | 18 | MS. WHEATLEY:  Objection, foundation. |
| 10:57:49 | 19 | THE COURT:  Well, if he knows.  If he knows he can |
| 10:57:51 | 20 | answer. |
| 10:57:53 | 21 | THE WITNESS:  Can you repeat the question? |
| 10:57:53 | 22 | BY MR. KERNELL: |
| 10:57:57 | 23 | Q.   Well, let me withdraw that question.  The Sonim device in |
| 10:58:01 | 24 | front of you, intrinsically safe, they can sell those to other |
| 10:58:02 | 25 | carriers, correct? |

| | | |
|---|---|---|
| 10:58:03 | 1 | A.  They could. |
| 10:58:05 | 2 | Q.  And it's Sonim that is representing that those are |
| 10:58:08 | 3 | intrinsically safe, correct? |
| 10:58:10 | 4 | A.  They're representing it to Sprint, and we're representing it |
| 10:58:14 | 5 | to our customers.  And so it's kind of a jointly-represented |
| 10:58:16 | 6 | when you go in and sell a solution and you represent it as |
| 10:58:21 | 7 | intrinsically safe, we have to assume that as well from a |
| 10:58:26 | 8 | standards perspective.  So our brand and our reputation is on |
| 10:58:28 | 9 | the line just as the manufacturer's is. |
| 10:58:30 | 10 | Q.  Right.  Because they're going to come back to you if that |
| 10:58:34 | 11 | phone doesn't work right, they're going to come back to Sprint? |
| 10:58:34 | 12 | A.  That's correct. |
| 10:58:37 | 13 | Q.  And they would come back to AT&T if Sonim sold them an |
| 10:58:40 | 14 | intrinsically safe device and it didn't operate that way. |
| 10:58:45 | 15 | A.  If they bought an AT&T push-to-talk intrinsically safe |
| 10:58:48 | 16 | device from AT&T, they would come back to AT&T. |
| 10:58:58 | 17 | Q.  So did Sprint sell other devices that were -- are |
| 10:59:00 | 18 | non-intrinsically safe devices? |
| 10:59:01 | 19 | A.  Yes. |
| 10:59:08 | 20 | Q.  And they sold a Sonim device that's -- or it's not marked as |
| 10:59:09 | 21 | intrinsically safe, correct? |
| 10:59:11 | 22 | A.  Correct. |
| 10:59:27 | 23 | MR. KERNELL:  Your Honor, may I approach the witness. |
| 10:59:28 | 24 | THE COURT:  Yes, you may.  Give it to the court |
| 10:59:32 | 25 | security officer who will hand it to him. |

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 10:59:32 | 1  | BY MR. KERNELL:                                          |
| 10:59:43 | 2  | Q.  Mr. Shaughnessy, do you recognize this device?       |
| 10:59:49 | 3  | A.  This is a Sonim Ultra Rugged design, Strike.         |
| 10:59:51 | 4  | Q.  And it's not a Strike IS, correct?                   |
| 10:59:52 | 5  | A.  No, it's not.                                        |
| 10:59:55 | 6  | Q.  Now, is that a device that Sprint sold?              |
| 10:59:55 | 7  | A.  Yes.                                                 |
| 11:00:00 | 8  | Q.  And is that a device that was used on the Nextel network? |
| 11:00:03 | 9  | A.  Yes.                                                 |

11:00:08  10        MR. KERNELL:  Your Honor, I ask to admit this device
11:00:09  11   into evidence.
11:00:13  12        THE COURT:  Does it have a number?
11:00:18  13        MR. KERNELL:  5029.  No.  The 5029 was the photographs
11:00:22  14   of that box.  I don't know if we need to put another Defendant
11:00:23  15   sticker on it.
11:00:26  16        THE COURT:  Yeah, I can't let it in if it doesn't have
11:00:28  17   a number.
11:00:53  18        MR. KERNELL:  Is 5232 the last --
11:00:56  19        THE COURT:  5199 is the last number that I have.  I'm
11:01:03  20   looking at my trial exhibit list, ten pages long, the end of the
11:01:10  21   10th page, Page 10 is 5199.  Defendants' trial exhibit list.  If
11:01:13  22   there's another list, I'm not aware of it.
11:01:15  23        MR. KERNELL:  We need to get you the updated list.
11:01:20  24        THE COURT:  That would be good if I had it.  Just give
11:01:23  25   me a number.  Pick a number.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
11:01:24  1            MR. SCHWARTZ:  5232.
11:01:29  2            THE COURT:  5232 is a wonderful number.
11:01:33  3            MR. KERNELL:  So if we can talk about this Exhibit 5232
11:01:33  4       --
11:01:35  5            THE COURT:  Is it offered in evidence?  Is there any
11:01:35  6       objection?
11:01:36  7            MS. WHEATLEY:  No objection, Your Honor.
11:01:37  8            THE COURT:  Without objection, then admitted in
11:01:38  9       evidence.
11:01:38  10            (Defense Exhibit 5232 in evidence)
11:01:42  11            MR. KERNELL:  May I take those to the ELMO so we can
11:01:44  12       show those to the jury?
11:01:57  13            THE COURT:  Yes.  What other one?  You got to tell us
11:01:59  14       what number so that the record is clear as to what we're talking
11:02:01  15       about.
11:02:04  16            MR. KERNELL:  Yes, Your Honor.
11:02:04  17        BY MR. KERNELL:
11:02:27  18       Q.  So Mr. Shaughnessy, this is the device that you were just
11:02:31  19       looking at, it's been marked as 5210.  I just want to make sure
11:02:34  20       that this is the device that you were.
11:02:36  21            THE COURT:  I thought it was 5232.
11:02:40  22            MR. KERNELL:  I'm sorry.  5232.  Misspoke.
11:02:41  23            THE COURT:  Okay.
11:02:41  24        BY MR. KERNELL:
11:02:43  25       Q.  Is that --
```

| | | |
|---|---|---|
| 11:02:44 | 1 | A.  Is there a question? |
| 11:02:49 | 2 | Q.  Yes.  I just want to verify that this is the device that we |
| 11:02:51 | 3 | had identified as 5232. |
| 11:02:56 | 4 | THE COURT:  I thought that was 108.  Is that -- |
| 11:02:58 | 5 | MR. SCHWARTZ:  That was from a prior deposition, Your |
| 11:02:58 | 6 | Honor. |
| 11:03:01 | 7 | THE COURT:  Okay.  All right. |
| 11:03:01 | 8 | BY MR. KERNELL: |
| 11:03:11 | 9 | Q.  Now, as we are talking about this, this is a Sonim XP |
| 11:03:12 | 10 | Strike, correct? |
| 11:03:13 | 11 | A.  Correct. |
| 11:03:17 | 12 | Q.  And it's not marked as intrinsically safe.  What is the |
| 11:03:20 | 13 | difference between these two devices that are intrinsically and |
| 11:03:22 | 14 | not intrinsically safe? |
| 11:03:27 | 15 | A.  Well, where it says right there submersible up to 6.5 feet |
| 11:03:31 | 16 | of water for 30 minutes, that kind of gives you the general idea |
| 11:03:34 | 17 | that this is a -- I won't call this a mill spec or rugged device |
| 11:03:37 | 18 | that you can drop.  You can work in a rugged environment.  But |
| 11:03:40 | 19 | the difference is if this drops and comes apart, it's not going |
| 11:03:45 | 20 | to emit a spark.  And so again, intrinsically safe is there to |
| 11:03:50 | 21 | provide that lawyer of security within highly, you know, |
| 11:03:55 | 22 | dangerous-type environments; oil refineries, chemical plants, |
| 11:03:59 | 23 | things where you'd have an explosion if you dropped and had a |
| 11:04:00 | 24 | spark. |
| 11:04:03 | 25 | Q.  Okay.  This is a device that you may not need it to be |

11:04:09  1    intrinsically safe for use in whatever your job is or whatever

11:04:11  2    you're using it for.

11:04:16  3    A.  Well, I mean, yes.  I mean, is there a question?

11:04:19  4         THE COURT:  I don't even understand the question.  You

11:04:23  5    may not need it to be intrinsically safe for use in whatever

11:04:28  6    your job is or whatever you're using it for?  I don't even know

11:04:32  7    that there's a question there.  Ask a different question.

11:04:32  8         BY MR. KERNELL:

11:04:37  9    Q.  This is a device that's not meant to be used in environments

11:04:41  10   that require intrinsically safe devices, correct?

11:04:42  11   A.  Correct.

11:04:44  12   Q.  And if you look on here, there's a number of different

11:04:45  13   trademarks.  You recognize the trademarks?

11:04:45  14   A.  I do.

11:04:49  15   Q.  There's a Sonim and it's marked with a circle R.  Do you see

11:04:49  16   that?

11:04:50  17   A.  I do.

11:04:55  18   Q.  And you see the Sprint and that's the pin drop?

11:04:58  19   A.  Well, that's called the fan.

11:05:00  20   Q.  The fan trademark?

11:05:03  21   A.  It's built on the pin drop, but thank you for remembering

11:05:07  22   that.  It's built on the pin drop, but it's called a fan.

11:05:12  23   Q.  This device is actually marked with Sprint on the device?

11:05:12  24   A.  Correct.

11:05:15  25   Q.  And it's also marked with the Sonim on the device itself.

```
11:05:16   1    A.  Correct.
11:05:24   2    Q.  And if we look at the back there's a number of places where
11:05:32   3    trademarks are used; Sonim XP, Sprint, the Sprint Network.  Now
11:05:36   4    will this device work on an iDEN network?
11:05:38   5    A.  You know, I don't believe it will.  I believe this was built
11:05:45   6    from a CDMA perspective.  Maybe even LTE.  But I don't believe
11:05:46   7    it works on an iDEN.
11:05:49   8    Q.  The copyright on this one is a 2012, do you see that?
11:05:52   9    A.  I see that, yep.
11:05:59   10   Q.  And so would this have been offered for sale in the 2012
11:06:01   11   time frame?
11:06:03   12        MS. WHEATLEY:  Objection.  This was the subject of a
11:06:05   13   motion in limine, Your Honor.
11:06:08   14        MR. KERNELL:  It's just a date, Your Honor.
11:06:08   15        MS. WHEATLEY:  Counsel was cautioned about
11:06:13   16   misrepresenting the meaning of a copyright date.
11:06:15   17        THE COURT:  I don't know what that means, but I do
11:06:18   18   remember that there was a motion in limine and that I granted
11:06:23   19   the motion in limine.  So if you are violating that, I'll figure
11:06:26   20   it out, but I'm not prepared to say.  You decide.  If you think
11:06:31   21   you're not, go forward and we'll deal with it later.
11:06:31   22        BY MR. KERNELL:
11:06:38   23   Q.  So there is a date on this box of 2012.  Did Sprint --
11:06:39   24   A.  There is.
11:06:45   25   Q.  -- offer this device in the 2012 time frame?
```

11:06:48   1    A.   I can't be 100% sure, but I would imagine that if we had a

11:06:51   2    box that we produced in 2012, we probably sold the device in

11:06:53   3    2012.

11:07:00   4    Q.   Okay.  Now, if we can look at what's been marked as

11:07:08   5    Plaintiff's Exhibit 10 which also has a 40 on the front, and

11:07:12   6    this is the Sonim XP Strike IS, correct?

11:07:12   7    A.   Correct.

11:07:18   8    Q.   And I guess a difference between these two is it says IS and

11:07:22   9    it says intrinsically safe, correct?

11:07:24   10   A.   Yeah, we've covered that, but yeah.

11:07:27   11   Q.   Well, I didn't have this device up here.

11:07:33   12        And so this meets additional specifications, this

11:07:39   13   device Exhibit 10 meets additional specifications that the --

11:07:54   14   I'm sorry.  That the device marked as 5232 at least is not

11:07:57   15   marketed as meeting, correct?

11:08:00   16   A.   So can you just state the question again?  I was zooming in

11:08:01   17   and out.

11:08:06   18   Q.   Yes.  I'm sorry.  So the device with the Exhibit 40 on the

11:08:12   19   front which is Plaintiff's Exhibit 10 which is an intrinsically

11:08:12   20   safe device?

11:08:12   21   A.   Uh-huh.

11:08:19   22   Q.   Meets additional more stringent specifications?

11:08:20   23   A.   Correct.

11:08:24   24   Q.   Than the device, the Sonim device marked as Exhibit 108

11:08:27   25   which is Defendants' Exhibit 5232; is that correct?

```
11:08:30   1    A.  As I understand it yes, that would be the case.

11:08:30   2    Q.  I'm sorry?

11:08:34   3    A.  I said as I understand it, yes, that would be the case.

11:08:42   4    Q.  Now, do you know if Defendants could buy a Sonim XP Strike

11:08:45   5    and resell it as their device?

11:08:47   6    A.  I don't know.

11:08:51   7    Q.  Is it -- are there any restrictions on Sonim selling their

11:08:53   8    devices to other third parties?

11:08:59   9    A.  I don't know.  I'm not in the supply chain.

11:09:04  10    Q.  So if we could look at the back of Plaintiff's Exhibit 10,

11:09:16  11    we see that it has the same -- focus there --

11:09:18  12         THE COURT:  It's auto focus but if you want to zoom,

11:09:20  13    that's a different matter.

11:09:22  14         MR. KERNELL:  Is that focused on your screen?

11:09:25  15         THE COURT:  Well, more or less.  My eyes can focus but

11:09:27  16    that's a different problem.

11:09:28  17         MR. KERNELL:  Maybe it's my eyes.

11:09:30  18         THE COURT:  I think it is focused.  I think it's just

11:09:33  19    you need to zoom if you want to get somebody to read that little

11:09:37  20    bitty print.  That's all.

11:09:50  21         MR. KERNELL:  Now that looks like my vision.

11:09:52  22         THE COURT:  It's a lot worse.  It's going in the right

11:09:59  23    direction.  Why is it not auto focusing, Dawn, do you know?

11:10:05  24    There you go.  Don't touch it.  Leave it alone.  It gets annoyed

11:10:09  25    when it try to countermand it's commands.
```

| | | |
|---|---|---|
| 11:10:09 | 1 | BY MR. KERNELL: |
| 11:10:19 | 2 | Q. So this is the Sonim XP Strike IS and again, this is for the |
| 11:10:20 | 3 | Sprint network only? |
| 11:10:21 | 4 | A. This device is. |
| 11:10:27 | 5 | Q. And so this one is not marked with the any Nextel name on |
| 11:10:27 | 6 | it, correct? |
| 11:10:29 | 7 | A. No.  Incorrect. |
| 11:10:30 | 8 | Q. I'm sorry? |
| 11:10:31 | 9 | A. Incorrect. |
| 11:10:32 | 10 | Q. I'm sorry? |
| 11:10:32 | 11 | A. It's right here. |
| 11:10:35 | 12 | Q. That does have -- did you do that? |
| 11:10:38 | 13 | A. I did.  Just helping you out. |
| 11:10:46 | 14 | Q. Very nice.  So it talks about -- now it says 2013, copyright |
| 11:10:51 | 15 | 2013 Sprint, Sprint and the Sprint logo are trademarks are |
| 11:10:52 | 16 | Sprint.  Do you see that? |
| 11:10:56 | 17 | A. I do.  I apologize for striking through that.  If you need |
| 11:10:59 | 18 | to take that off? |
| 11:11:02 | 19 | THE COURT:  You can, you have to see clear annotation |
| 11:11:04 | 20 | on the bottom of the screen. |
| 11:11:04 | 21 | BY MR. KERNELL: |
| 11:11:09 | 22 | Q. Next to it it says Sonim, the Sonim logo and XP Strike IS |
| 11:11:12 | 23 | are trademarks of Sonim Technologies.  Do you see that? |
| 11:11:13 | 24 | A. I see that. |
| 11:11:18 | 25 | Q. And other marks are the property of their respective owners. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 11:11:18 | 1 | A.  Correct. |
| 11:11:23 | 2 | Q.  Correct?  Then it just says Nextel mobile phone. |
| 11:11:23 | 3 | A.  Correct. |
| 11:11:29 | 4 | Q.  So there's no link between Sprint and Nextel on this box, is |
| 11:11:30 | 5 | there? |
| 11:11:31 | 6 | A.  Oh, sure there is. |
| 11:11:32 | 7 | Q.  How? |
| 11:11:35 | 8 | A.  Well, Sprint owns the Nextel brand, so there's inherent |
| 11:11:40 | 9 | ownership linkage, the trademark. |
| 11:11:46 | 10 | Q.  So is there a linkage between Sonim and Sprint?  They're on |
| 11:11:47 | 11 | the same line? |
| 11:11:51 | 12 | A.  Well, other than linking them as partners in this particular |
| 11:11:53 | 13 | device, yeah, sure. |
| 11:11:59 | 14 | Q.  And the Nextel with the circle R after it, it's buried in |
| 11:12:03 | 15 | the text in small, very small print on this box, correct? |
| 11:12:08 | 16 | A.  It's the same print as the rest of the box, for the most |
| 11:12:08 | 17 | part. |
| 11:12:13 | 18 | Q.  If we look at the front, this is a much bigger logo, |
| 11:12:14 | 19 | correct? |
| 11:12:14 | 20 | A.  That's right. |
| 11:12:16 | 21 | Q.  And these are bigger logos? |
| 11:12:16 | 22 | A.  Uh-huh. |
| 11:12:20 | 23 | Q.  And it's actually -- the Sprint logo is actually printed |
| 11:12:28 | 24 | right on the device itself.  On the back of this box in the |
| 11:12:31 | 25 | middle of very small text. |

| | | |
|---|---|---|
| 11:12:32 | 1 | THE COURT:  The jury will decide whether it's very |
| 11:12:35 | 2 | small or not, you don't need to characterize it.  Ask a question |
| 11:12:37 | 3 | please. |
| 11:12:37 | 4 | BY MR. KERNELL: |
| 11:12:40 | 5 | Q.  That is the only place that the Nextel is on this box, |
| 11:12:41 | 6 | correct? |
| 11:12:44 | 7 | A.  I believe it's on the manuals as well. |
| 11:12:46 | 8 | Q.  And the question was on the box. |
| 11:12:47 | 9 | A.  On the box, correct. |
| 11:12:50 | 10 | Q.  And so on the manuals, and I believe we looked  at those |
| 11:13:09 | 11 | earlier, if we could.  That's an exhibit. |
| 11:13:16 | 12 | So let me ask you, that said Nextel Inspired.  And I |
| 11:13:23 | 13 | believe this box has the logo or a the Nextel on it as Nextel |
| 11:13:25 | 14 | Inspired.  Do you see that? |
| 11:13:26 | 15 | A.  When you say this box? |
| 11:13:28 | 16 | Q.  The box in front of you. |
| 11:13:29 | 17 | A.  Okay. |
| 11:13:31 | 18 | THE COURT:  What exhibit?  Can you refer to a number, |
| 11:13:34 | 19 | because that way we don't get all these boxes mixed up. |
| 11:13:37 | 20 | MR. KERNELL:  If I could look at this exhibit -- |
| 11:13:39 | 21 | THE COURT:  What number is the exhibit that you have in |
| 11:13:41 | 22 | front of you? |
| 11:13:42 | 23 | THE WITNESS:  38 on the front of the box. |
| 11:13:45 | 24 | THE COURT:  No, that's not the right number. |
| 11:13:46 | 25 | THE WITNESS:  I don't see any other number on the box, |

11:13:48   1   Your Honor.

11:13:50   2          THE COURT:  What is the exhibit number of the box that

11:13:57   3   has 38 on it, which I thought we concluded was not actually 38?

11:14:01   4   I guess it is a box.  Okay.  So it is 38.

11:14:03   5          MS. WHEATLEY:  Yes, I believe it is 38.

11:14:05   6          THE COURT:  It's Plaintiff's Exhibit 38.

11:14:05   7      BY MR. KERNELL:

11:14:27   8   Q.  So this is Plaintiff's Exhibit 38.  And on the back, again

11:14:35   9   it says -- this one, instead of saying Nextel Mobile Phone, it

11:14:38  10   says Nextel Inspired, correct?

11:14:39  11   A.  Correct.

11:14:42  12   Q.  And it also says Nextel Inspired over here.

11:14:43  13   A.  Correct.

11:14:49  14   Q.  Now, both of these have a date of 2013 on them.  Do you see

11:14:49  15   that?

11:14:50  16   A.  I do.

11:14:57  17   Q.  I'm talking about Plaintiff's Exhibit 10 and  Plaintiff's

11:15:10  18   Exhibit 38 have the same 2010 or 2013 date on them.  But they

11:15:21  19   have a different -- this exhibit uses Nextel Inspired on it.

11:15:21  20   Correct?

11:15:22  21   A.  It does.

11:15:23  22   Q.  Do you know when that changed?

11:15:25  23   A.  I don't.

11:15:27  24   Q.  Do you know why it changed?

11:15:31  25   A.  Well, I would imagine, and again this is from my experience

11:15:34  1   in working, that it's part of the evolution of how we're using

11:15:40  2   Nextel within the brand.  You mentioned change, and change over

11:15:44  3   time how we use it, where it's used, how it's positioned, how we

11:15:49  4   leverage it, is probably why that changed.

11:15:58  5   Q.  This was after -- 2013 is the year that the Nextel platform,

11:16:02  6   Nextel network was shutdown, correct?

11:16:05  7   A.  That's the year that the iDEN network was shutdown.

11:16:09  8   Q.  And it's also referred to as the Nextel network?

11:16:11  9   A.  Some people call it the Nextel network.

11:16:14  10  Q.  Internally Sprint has called it the Nextel platform and the

11:16:16  11  Nextel network?

11:16:19  12  A.  We called it Nextel platform, Nextel network.  We called it

11:16:21  13  iDEN network, we called it direct connect network, the

11:16:24  14  push-to-talk network.  We called it a lot of things.

11:16:28  15  Q.  If it's push-to-talk, that's a generic term, correct?

11:16:31  16  A.  Well, as it relates to our products it's not a generic term.

11:16:35  17  As it relates to our product and how we market it, it relates to

11:16:36  18  our direct connect.

11:16:40  19  Q.  But Sprint doesn't have a trademark on push-to-talk.

11:16:44  20  A.  No.

11:16:49  21  Q.  I think -- I believe earlier you testified that Sprint

11:16:55  22  currently sells three to five devices that are intrinsically

11:16:55  23  safe; is that correct?

11:16:59  24  A.  No, I did not say that.

11:17:03  25  Q.  Does Sprint sell or T-Mobile sell any intrinsically safe

| | | |
|---|---|---|
| 11:17:04 | 1 | devices today? |
| 11:17:08 | 2 | A.  In our current portfolio we do not have intrinsically safe |
| 11:17:08 | 3 | devices. |
| 11:17:16 | 4 | Q.  What is the typical shelf life of a cellphone? |
| 11:17:22 | 5 | A.  Well, that's subjective.  You know, there's some that are |
| 11:17:25 | 6 | artificial, like we would -- we stimulate the market for shelf |
| 11:17:30 | 7 | life.  As new models come out every year, a lot of demand.  For |
| 11:17:34 | 8 | example, the iPhone, it's an annual event.  Some people line up |
| 11:17:38 | 9 | for it, so that shelf life might be a little bit shorter.  Other |
| 11:17:42 | 10 | organizations purchase devices and they're on our network for |
| 11:17:44 | 11 | years and years and years. |
| 11:17:46 | 12 | Q.  And what organizations are those? |
| 11:17:50 | 13 | A.  Lot of government agencies, first responders, lot of |
| 11:17:54 | 14 | manufacturing, folks that either have purchased a specialized |
| 11:17:58 | 15 | device from us, a specific device from us and aren't necessarily |
| 11:18:03 | 16 | worried about the latest and greatest data devices and color |
| 11:18:08 | 17 | screens and pixels and cameras and things like that. |
| 11:18:12 | 18 | Q.  Now, I believe you testified that you saw some of |
| 11:18:16 | 19 | Defendants' devices at the IWCE? |
| 11:18:19 | 20 | A.  Yeah, close enough to take those pictures. |
| 11:18:24 | 21 | Q.  And those photographs were -- and this is in Exhibit 96, I |
| 11:18:27 | 22 | believe, those were photographs that you personally took? |
| 11:18:29 | 23 | A.  I believe they were. |
| 11:18:32 | 24 | Q.  And did you test any of their devices? |
| 11:18:33 | 25 | A.  No. |

| | | |
|---|---|---|
| 11:18:35 | 1 | Q.  Did you operate any of their devices? |
| 11:18:36 | 2 | A.  No. |
| 11:18:39 | 3 | Q.  Did you pick up and inspect any of their devices? |
| 11:18:40 | 4 | A.  No. |
| 11:18:44 | 5 | Q.  Do you know if any of those devices that you were looking at |
| 11:18:44 | 6 | were intrinsically safe? |
| 11:18:49 | 7 | A.  No.  I wasn't really interested in the devices.  I was |
| 11:18:52 | 8 | interested in the Nextel brand that was being shown. |
| 11:18:55 | 9 | Q.  So they could be selling intrinsically safe devices. |
| 11:18:58 | 10 | A.  They could be selling intrinsically safe devices, but |
| 11:19:02 | 11 | they're not Nextel devices.  That's what the concern was and why |
| 11:19:06 | 12 | I took the pictures is because they're labeled Nextel which is |
| 11:19:08 | 13 | our trademark. |
| 11:19:16 | 14 | Q.  I believe you testified earlier that there was a general |
| 11:19:19 | 15 | confusion, some of the people that talked to you.  Is that |
| 11:19:19 | 16 | correct? |
| 11:19:20 | 17 | A.  Correct. |
| 11:19:22 | 18 | Q.  How many individuals came up and talked to you about |
| 11:19:26 | 19 | Defendants booth at the IWCE? |
| 11:19:32 | 20 | A.  You know, half a dozen customers, probably the same number |
| 11:19:36 | 21 | of employees from Kodiak and Sprint.  Pretty early on in the |
| 11:19:37 | 22 | show. |
| 11:19:37 | 23 | Q.  I'm sorry? |
| 11:19:42 | 24 | A.  I said it was pretty early on in the show.  And those are |
| 11:19:49 | 25 | the ones that prompted me to go see the booth, you know. |

```
11:19:52    1    Q.   And which show was this, the 2017?

11:19:53    2    A.   2017 IWCE.

11:20:02    3    Q.   Have you been to -- did you go to the IWCE 2018 show?

11:20:03    4    A.   I did not.

11:20:06    5         THE COURT:  He said he only went once, I thought.

11:20:11    6         THE WITNESS:  I did say that.

11:20:11    7         BY MR. KERNELL:

11:20:17    8    Q.   Earlier you were talking about, you know, these

11:20:21    9    intrinsically safe devices, and I think you used the term that

11:20:27   10    it was built on that platform, the push-to-talk was built on

11:20:32   11    that platform.  You used that terminology.  You're referring to

11:20:33   12    the iDEN platform?

11:20:37   13    A.   Yeah, the Nextel platform.

11:20:42   14    Q.   And that was the gold standard was the iDEN platform.

11:20:45   15    A.   Well, the Nextel Direct Connect is the gold standard for

11:20:48   16    direct connect.  IDEN was the technology that delivered it

11:20:53   17    originally.  Then we evolved it to QChat, using the same

11:20:56   18    specifications, the iDEN from a call delivery perspective and

11:20:58   19    prioritization and feature set.  And then we evolved that to

11:21:01   20    Kodiak which continued to expand the feature set and allow us to

11:21:07   21    use broadband networks.  It's all tied to the gold standard,

11:21:08   22    which is Nextel.

11:21:11   23    Q.   But Sprint doesn't own Kodiak.  That's a third-party.

11:21:11   24    A.   Correct.

11:21:16   25    Q.   And Kodiak provides their services to other carriers also,
```

11:21:16  1    correct?

11:21:20  2    A.  Correct.  They integrate into their network.

11:21:23  3    Q.  So if you're using Kodiak as your gold standard, then any of

11:21:27  4    these other carriers that use Kodiak would have the same gold

11:21:28  5    standard?

11:21:31  6    A.  Except they don't have the legacy of Nextel.  They don't

11:21:35  7    have the inherent knowledge of the industry like we do.

11:21:42  8    Q.  Right.  And so this legacy of Nextel, go back to the Nextel

11:21:44  9    Inspired, do you paint?

11:21:45  10   A.  Do I paint?

11:21:48  11   Q.  You ever paint?  You like to --

11:21:50  12        MS. WHEATLEY:  Objection, relevance.

11:21:52  13        THE COURT:  A wall or a portrait?  What are you asking

11:21:54  14   about?  I'll sustain the objection.

11:21:55  15        BY MR. KERNELL:

11:22:05  16   Q.  If you saw a painting and it said Monet at the bottom, would

11:22:08  17   you expect that to be a Monet?

11:22:12  18   A.  I would expect to be -- well, it really depends on where I'm

11:22:16  19   at.  If I'm in a museum?  Yes.  If I'm in an art print shop in

11:22:17  20   the mall?  No.

11:22:22  21   Q.  If you are in a museum and you see Monet inspired, would you

11:22:26  22   expect that to be an original Monet?

11:22:29  23   A.  Would I expect it to be an original?  No, I would have to

11:22:31  24   ask a few more questions.

11:22:38  25        MR. KERNELL:  No further questions, Your Honor.

| | | |
|---|---|---|
| 11:22:40 | 1 | THE COURT:  Redirect. |
| 11:22:40 | 2 | REDIRECT EXAMINATION |
| 11:22:40 | 3 | BY MS. WHEATLEY: |
| 11:22:55 | 4 | Q.  Can we call up exhibit 38?  And can we go to the back of the |
| 11:22:56 | 5 | box? |
| 11:23:07 | 6 | Now, Mr. Shaughnessy, do you see the word Nextel on |
| 11:23:08 | 7 | here in two spots? |
| 11:23:10 | 8 | A.  I do. |
| 11:23:15 | 9 | Q.  And do you see the symbol that appears after Nextel? |
| 11:23:15 | 10 | A.  Circle R. |
| 11:23:19 | 11 | Q.  Do you know what a circle R means? |
| 11:23:22 | 12 | A.  Registered trademark. |
| 11:23:25 | 13 | Q.  And the circle R does not appear after inspired, correct? |
| 11:23:26 | 14 | A.  Correct. |
| 11:23:35 | 15 | Q.  And counsel asked you about the 2013 copyright date on the |
| 11:23:40 | 16 | box.  Does that copyright date represent when Sprint sells this |
| 11:23:40 | 17 | device? |
| 11:23:45 | 18 | A.  Not necessarily.  I think it means when the actual box was |
| 11:23:46 | 19 | printed. |
| 11:23:52 | 20 | Q.  Okay.  And to your knowledge, has Sprint sold this device |
| 11:23:53 | 21 | after 2013? |
| 11:23:58 | 22 | A.  Yes, I believe I mentioned that we sold the device from 2013 |
| 11:24:02 | 23 | all the way through at least 2018, and maybe even into 2019 as |
| 11:24:04 | 24 | inventories remain. |
| 11:24:10 | 25 | Q.  Okay.  And is that typical for a device like this that you |

11:24:13  1   would sell it for that period of time?

11:24:18  2   A.  It's a little longer than we typically would do.  It's a

11:24:23  3   specialty device, so those specialty devices take a little bit

11:24:26  4   longer to go through the inventory.  Many times people use them

11:24:29  5   specifically for industries and/or commerce.

11:24:33  6   Q.  And I think earlier when you were talking about how Sprint

11:24:37  7   sells these devices, you indicated at the beginning you would

11:24:41  8   have -- you would give, in conjunction with the wireless

11:24:45  9   services, you would sell a large number of these devices in the

11:24:45  10  early years?

11:24:46  11  A.  Correct.

11:24:49  12  Q.  And so you would place a large order of these devices from

11:24:51  13  Sonim?

11:24:55  14  A.  Right.  Typically a manufacturer like Sonim or Apple or

11:24:58  15  Samsung, they have minimum requirements to get their goods

11:25:02  16  purchased, their plant run, the lines run, because they may be

11:25:05  17  building other things on those lines as well.  So they need to

11:25:07  18  have a minimum order.

11:25:10  19  Q.  And so you would get your full inventory and continue to

11:25:13  20  sell those devices over the years; is that accurate?

11:25:14  21  A.  Correct.

11:25:25  22  Q.  Okay.  And in your experience, is there anything unusual

11:25:26  23  about having multiple versions of packaging?

11:25:32  24  A.  Unusual?  No.

11:25:35  25        MS. WHEATLEY:  Thank you, Mr. Shaughnessy.  No further

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 11:25:35 | 1 | questions. |
| 11:25:37 | 2 | THE COURT:  Thank you, sir.  You are excused. |
| 11:25:42 | 3 | Please call another witness. |
| 11:25:57 | 4 | MR. RIOPELLE:  Your Honor, Mr. Shaughnessy was Sprint's |
| 11:26:04 | 5 | last witness.  We have some stipulated facts and a couple of |
| 11:26:07 | 6 | responses to requests for admissions that we would like read |
| 11:26:09 | 7 | into the record before resting. |
| 11:26:12 | 8 | THE COURT:  Go. |
| 11:26:16 | 9 | MR. RIOPELLE:  The first ones I'm going to read, Your |
| 11:26:18 | 10 | Honor, are stipulated facts.  I don't know if the Court wants to |
| 11:26:21 | 11 | instruct the jury about what a stipulated fact is. |
| 11:26:23 | 12 | THE COURT:  Well, I will instruct you at the end of the |
| 11:26:29 | 13 | trial that the only things that you may consider are evidence, |
| 11:26:34 | 14 | which comes from the stand or from exhibits.  Another form of |
| 11:26:37 | 15 | evidence is facts that are stipulated to by the parties.  And |
| 11:26:40 | 16 | he's going to read you now some facts that have apparently been |
| 11:26:42 | 17 | stipulated.  I don't know what they are, so I don't have any |
| 11:26:46 | 18 | idea, but I assume that they are facts that have been agreed to |
| 11:26:49 | 19 | by both sides and you're to talk them as proven. |
| 11:26:52 | 20 | You may proceed. |
| 11:26:54 | 21 | MR. RIOPELLE:  I'm going to read four stipulated facts. |
| 11:26:58 | 22 | First one.  Mr. Calabrese informed Mr. Kaplan about |
| 11:27:05 | 23 | Sprint's objections to NW's use of the Nextel mark. |
| 11:27:09 | 24 | The second one is Defendant RetroBrands registered the |
| 11:27:15 | 25 | domains nextelisback.com, getnextel.com, and |

| | | |
|---|---|---|
| 11:27:18 | 1 | nextelmobileworldwide.com in 2018. |
| 11:27:25 | 2 | Third one is nextelisback.com and getnextel.com |
| 11:27:29 | 3 | redirect to nextelmobileworldwide.com. |
| 11:27:33 | 4 | And the last one is the website at |
| 11:27:38 | 5 | nextelmobileworldwide.com advertises the Nextel brand, includes |
| 11:27:43 | 6 | a link to nextelworldwide.com and includes contact information |
| 11:27:47 | 7 | for Defendant Nextel Mobile Worldwide, Inc. listing Mr. Jeffrey |
| 11:27:50 | 8 | Kaplan as the president. |
| 11:27:51 | 9 | THE COURT:  Those are facts that you -- that have been |
| 11:27:56 | 10 | agreed to and you must find them as having been proven. |
| 11:27:57 | 11 | Next? |
| 11:28:00 | 12 | MR. RIOPELLE:  The next ones, Your Honor, are responses |
| 11:28:04 | 13 | to requests for admissions. |
| 11:28:06 | 14 | THE COURT:  Requests for admissions are one side can |
| 11:28:10 | 15 | ask the other side to admit to something and if they do, then it |
| 11:28:15 | 16 | is admissible as having proven that fact, or being admitted to. |
| 11:28:17 | 17 | Go ahead. |
| 11:28:20 | 18 | MR. RIOPELLE:  So, the request is Stephen Calabrese |
| 11:28:26 | 19 | decided Nextel, Inc. would use Defendants' Nextel mark.  The |
| 11:28:28 | 20 | response is admitted. |
| 11:28:33 | 21 | Next request is Nextel, Inc. does not include a |
| 11:28:38 | 22 | disclaimer regarding Sprint or the historic Nextel brand on |
| 11:28:42 | 23 | packaging for goods it sells under or in connection with the |
| 11:28:45 | 24 | Defendants' Nextel mark.  Response, admitted. |
| 11:28:50 | 25 | The next one.  Nextel, Inc. does not include a |

11:28:54   1   disclaimer regarding Sprint or the historic Nextel brand on

11:28:59   2   telecommunication devices it sells under or in connection with

11:29:01   3   the Defendants Nextel mark.  Admitted.

11:29:05   4        Nextel, Inc. does not include a disclaimer regarding

11:29:08   5   Sprint or the historic Nextel brand on boxes containing

11:29:13   6   telecommunication devices it sells under or in connection with

11:29:16   7   the Defendants' Nextel mark.  Admitted.

11:29:21   8        The goods Nextel, Inc. and/or its dealers or

11:29:26   9   distributors on behalf of Nextel, Inc. advertise, promote, sell,

11:29:31  10   or offer for sale under, or in connection with Defendants'

11:29:34  11   Nextel mark are telecommunications devices that are capable of

11:29:39  12   making two-way radio calls.  The response.  Defendants object to

11:29:43  13   this request on the grounds that goods and two-way radio calls

11:29:47  14   are vague and unclear.  Subject to and without waiving this

11:29:50  15   objection, the request is admitted.

11:29:55  16        Only three more.

11:29:57  17        THE COURT:  Go.

11:30:01  18        MR. RIOPELLE:  Request.  At some point between August

11:30:07  19   2018 and November 2018, Defendants' chirp was used on the web

11:30:14  20   pages hosted at the domain nextelmobileworldwide.com.  Response.

11:30:18  21   Defendants Stephen Calabrese and Nextel, Inc. object to this

11:30:22  22   request on the grounds that Defendant RetroBrands USA, LLC's

11:30:27  23   pending trademark with the United States Patent Office is Nextel

11:30:32  24   chirp and not chirp.  Defendants Stephen Calabrese and Nextel,

11:30:36  25   Inc. are not parties to the Nextel chirp trademark application.

11:30:39  1   Subject to and without waiving this objection, the request is

11:30:40  2   admitted.

11:30:45  3          The request, next request.  The intended customers for

11:30:50  4   goods and services offered in connection with were under

11:30:53  5   Defendants' Nextel mark by Nextel, Inc. And/or its dealers and

11:30:56  6   distributors include first responders and other government

11:30:59  7   entities.  Response, admitted.

11:31:08  8          And the last one.  Request.  Nextel, Inc. told

11:31:12  9   RetroBrands about Sprint's objections to Nextel, Inc.'s use of

11:31:17  10  Defendant's Nextel mark prior to Nextel, Inc. and RetroBrands

11:31:21  11  entering into a license agreement related to Defendants' Nextel

11:31:24  12  mark.  Response, admitted.

11:31:27  13         With those Your Honor, Sprint rests its case.

11:31:31  14         THE COURT:  All right.  Now ladies and gentlemen, we're

11:31:34  15  going to need to have some legal arguments and discussions at

11:31:38  16  this point, which are going to take a while and all of us got to

11:31:42  17  eat.  As you can tell, anorexia has been ruled out in my case

11:31:49  18  and so we're going to break until 1:30.  I also have two

11:31:52  19  sentencings in criminal cases that are pending that are going to

11:31:58  20  start at 12:15.  So I may have to suck it up.

11:32:00  21         Anyway, the bottom line is you don't have to come back

11:32:05  22  until 1:30.  You're free to go to lunch.  Remember you're not to

11:32:09  23  discuss the case with anyone or permit anyone to discuss it with

11:32:13  24  you, even among yourselves.  Secondly, don't -- if you see the

11:32:16  25  lawyers and they run away and hide, they're not being rude,

11:32:20  1   they're following instructions.  Third, remember you must not

11:32:23  2   form any opinion about this case until all the evidence is in.

11:32:27  3   You are required to keep an open mind until you start your

11:32:29  4   deliberations at the end of the case.

11:32:33  5          We are making progress, so let's see if we can get this

11:32:37  6   done.  All right?  We'll be in recess until 1:30 for the jury.

11:32:38  7          COURT SECURITY OFFICER:  All rise.

11:32:44  8          (Jury out at 11:32 a.m.)

11:33:15  9          THE COURT:  You may be seated.

11:33:17  10         Okay.  What's next?

11:33:19  11         MR. SCHWARTZ:  Your Honor, the Defendants at this time,

11:33:23  12   after the Plaintiff has rested their case under Rule 50(a)(1) as

11:33:28  13   to the claims for all Defendants related to the 139 mark that

11:33:33  14   the Plaintiff, earlier in these proceedings in open court,

11:33:36  15   stipulated that they were not proceeding against and that they

11:33:41  16   have not put forth any sufficient evidentiary basis, we move for

11:33:44  17   a judgment as a matter of law that there is no infringement as

11:33:48  18   to the 139 mark for all Defendants.  I don't know if the Court

11:33:50  19   wants to take each of my --

11:33:52  20         THE COURT:  Yeah, let's deal with that.  Is that agreed

11:33:53  21   upon?

11:33:55  22         MS. WHEATLEY:  Your Honor, we did not include that

11:33:59  23   registration in the joint pretrial order so we can do -- we are

11:34:03  24   not asserting counterfeiting with respect to that registration.

11:34:07  25   However, we maintain our claims for infringement with respect to

74

| | | |
|---|---|---|
| 11:34:11 | 1 | Nextel with telecommunications services which is based on |
| 11:34:13 | 2 | Sprint's use that was presented today. |
| 11:34:19 | 3 | THE COURT:  So what is your argument as to his motion? |
| 11:34:24 | 4 | MS. WHEATLEY:  Our argument is that we -- that is not |
| 11:34:28 | 5 | as currently asserted in the case any counterfeiting claim with |
| 11:34:28 | 6 | respect to that registration. |
| 11:34:32 | 7 | THE COURT:  Okay.  So he's moved to strike any mention |
| 11:34:35 | 8 | of 139.  Any problem with that? |
| 11:34:36 | 9 | MS. WHEATLEY:  That's acceptable. |
| 11:34:39 | 10 | THE COURT:  Okay.  Then you've won to the extent that |
| 11:34:42 | 11 | 139 will not be argued to the jury, will not be presented to the |
| 11:34:43 | 12 | jury. |
| 11:34:46 | 13 | Next. |
| 11:34:54 | 14 | MR. SCHWARTZ:  Your Honor, it has to include both their |
| 11:34:58 | 15 | claims and defenses of abandonment.  It's all. |
| 11:35:00 | 16 | THE COURT:  Say again? |
| 11:35:01 | 17 | MR. SCHWARTZ:  We have our counterclaims for |
| 11:35:03 | 18 | abandonment, it has to -- |
| 11:35:06 | 19 | THE COURT:  You can argue your case for abandonment all |
| 11:35:10 | 20 | you want, but not at this point.  At this point all I'm saying |
| 11:35:14 | 21 | is dropping their claim. |
| 11:35:17 | 22 | MR. SCHWARTZ:  Second, Your Honor, as to each of the |
| 11:35:21 | 23 | Defendants separately, in their individual basis and then their |
| 11:35:26 | 24 | corporate basis, they move for a judgment as a matter of law on |
| 11:35:30 | 25 | the Plaintiff's affirmative claims of infringement as to the |

| | | |
|---|---|---|
| 11:35:38 | 1 | sound mark that's Registered Number 5047282, based upon the |
| 11:35:42 | 2 | Plaintiff's failure to provide sufficient evidence to support |
| 11:35:48 | 3 | the claim as to Mr. Kaplan, as to Mr. Calabrese separately, |
| 11:35:53 | 4 | individually, as to Nextel, Inc., as to RetroBrands USA, LLC and |
| 11:35:58 | 5 | as to Nextel Mobile Worldwide, Inc. |
| 11:36:02 | 6 | THE COURT:  Okay.  Let me hear your response please. |
| 11:36:05 | 7 | MS. WHEATLEY:  Your Honor, we introduced Exhibit 113 |
| 11:36:10 | 8 | which was a video that included the Nextel chirp, it was |
| 11:36:13 | 9 | acknowledged to have been created by Mr. Kaplan and RetroBrands, |
| 11:36:17 | 10 | Mr. Kaplan is the only employee in RetroBrands.  And we also |
| 11:36:22 | 11 | introduced a video showing a Nextel device that had the Nextel |
| 11:36:26 | 12 | chirp from one of Defendants acknowledged distributors |
| 11:36:27 | 13 | Northeast. |
| 11:36:30 | 14 | THE COURT:  Defendant being whom? |
| 11:36:32 | 15 | MS. WHEATLEY:  Nextel, Inc. though Nextel, Inc. is |
| 11:36:35 | 16 | acting as a licensee for Defendant Jeffrey Kaplan and |
| 11:36:38 | 17 | RetroBrands and Nextel Mobile Worldwide. |
| 11:36:40 | 18 | THE COURT:  Okay.  What about Mr. Calabrese? |
| 11:36:44 | 19 | MS. WHEATLEY:  Mr. Calabrese is also liable in his |
| 11:36:47 | 20 | personal capacity for infringement of the chirp because he is |
| 11:36:51 | 21 | the president of Nextel, Inc.  He has testified that he made the |
| 11:36:57 | 22 | decision to use the Nextel branding and Northeast is his |
| 11:37:00 | 23 | distributor on his website which he testified he created. |
| 11:37:03 | 24 | THE COURT:  I'll deny your motion on that issue. |
| 11:37:05 | 25 | Next? |

| | | |
|---|---|---|
| 11:37:12 | 1 | MR. SCHWARTZ:  Finally Your Honor, the Defendants, all |
| 11:37:17 | 2 | Defendants in their individual capacity, and the corporate |
| 11:37:22 | 3 | Defendants, with the exception of Nextel, Inc. move for a |
| 11:37:24 | 4 | judgment as a matter of law as to the claims of infringement for |
| 11:37:33 | 5 | equipment which is the 1,884,244 trademark, based upon the fact |
| 11:37:36 | 6 | that Plaintiffs have failed to put forth a sufficient |
| 11:37:38 | 7 | evidentiary basis as to claims of infringement to the |
| 11:37:43 | 8 | individuals and the corporations I just identified. |
| 11:37:44 | 9 | THE COURT:  I'll deny that motion. |
| 11:37:47 | 10 | Next? |
| 11:37:50 | 11 | MR. SCHWARTZ:  No further. |
| 11:37:53 | 12 | THE COURT:  All right.  Then we'll be in recess.  Be |
| 11:38:01 | 13 | ready to proceed starting at whatever I said, 1:30?  Okay? |
| 11:38:06 | 14 | How long do you think your case will take? |
| 11:38:16 | 15 | MR. SCHWARTZ:  We likely will go past today, Your |
| 11:38:20 | 16 | Honor, and maybe part of the morning tomorrow morning. |
| 11:38:22 | 17 | THE COURT:  Okay.  I'll try to get the proposed |
| 11:38:25 | 18 | instructions with the understanding that clearly they're not |
| 11:38:28 | 19 | going to be finalized until we finished all of the evidence, but |
| 11:38:32 | 20 | it will give you some idea of which way we're going, which way |
| 11:38:37 | 21 | my thinking is on the instructions, and we'll try to get them to |
| 11:38:39 | 22 | you this afternoon before we break so that you can look at them |
| 11:38:43 | 23 | tonight and we can take -- have a charge conference tomorrow, |
| 11:38:46 | 24 | maybe we can give this case to the jury tomorrow afternoon. |
| 11:38:48 | 25 | We'll see what we can do. |

```
11:38:51   1              All right?  We'll be in recess until 1:30.  I have two
11:38:55   2   sentencings, so unless you don't value your pens or anything
11:38:58   3   else, I would definitely remove them from this table.  This
11:39:02   4   table I think you're reasonably safe, just move them to the end
11:39:08   5   if you need to.  The prosecutors don't usually cop small items,
11:39:11   6   but I can't speak for the people that are coming over from the
11:39:16   7   jail.  They're in there for a reason.
11:39:16   8              (See Volume 4 for continuation)
11:39:16   9                    C E R T I F I C A T E
               I certify that the foregoing is a correct transcript from the
11:39:16  10   record of proceedings in the above-entitled matter.
11:39:16  11   4/13/2022            /s/ Dawn M. Savino, R.P.R., C.R.R.
               Date                 DAWN M. SAVINO, R.P.R., C.R.R.
11:39:16  12
11:39:16  13                        I N D E X
11:39:16  14                        WITNESSES
11:39:16  15   ALL WITNESSES:                                    PAGE:
11:39:16  16   For Plaintiff:
11:39:16  17     Thomas Shaughnessy:
                   Examination outside presence of jury by Ms.    7:3
               Wheatley
11:39:16  18       Cross-Examination by Mr. Kernell              13:25
                   Continued Direct Examination by Ms. Wheatley  28:9
11:39:16  19       Cross-Examination by Mr. Kernell             45:19
                   Redirect Examination by Ms. Wheatley          67:2
11:39:16  20
11:39:16  21                        EXHIBITS
11:39:16  22   NO.:     DESCRIPTION:                             PAGE:
11:39:16  23   For Plaintiff:
11:39:16  24   38       :
                        In Evidence                              29:13
11:39:16  25   96B      :
                        In Evidence                              40:23
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

|  |  |
|---|---|
| 11:39:16 | 1 |
| 11:39:16 | 2 |
| 11:39:16 | 3 |

For Defense:

5232        :
            In Evidence                                    52:10

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**