**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO.  18-cv-60788-JEM**

**SPRINT COMMUNICATIONS, INC.,**

    Plaintiff/Counterclaim Defendant,

    vs.

                                  Miami, Florida
                                  April 13, 2022
**STEPHEN CALABRESE,** as an individual,   Pages 1-121
**NEXTEL, INC.,** d/b/a **NEXTEL WORLDWIDE,**  1:35 p.m. - 4:55 p.m.
**RETROBRANDS USA LLC,**
**JEFFREY KAPLAN,** as an individual, and
**NEXTEL WORLDWIDE MOBILE, INC.,**

    Defendants/Counterclaimants.

---

**TRANSCRIPT OF JURY TRIAL**
**VOLUME 4**
**BEFORE THE HONORABLE JOSE E. MARTINEZ**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:**
                *McGuireWoods, LLP*
                BY:  **BRIAN C. RIOPELLE, ESQ.**
                BY:  **LUCY J. WHEATLEY, ESQ.**
                BY:  **AMANDA L. DeFORD, ESQ.**
                800 East Canal Street
                Richmond, Virginia 23219

**FOR THE DEFENDANTS/COUNTERCLAIMANTS:**
                *Erickson Kernell IP*
                BY:  **JAMES J. KERNELL, ESQ.**
                8900 State Line Road
                Suite 500
                Leawood, Kansas 66206

                *Lee & Amtzis, PL*
                BY:  **WAYNE SCHWARTZ, ESQ.**
                5550 Glades Road
                Boca Raton, Florida 33431

```
          1    REPORTED BY:        DAWN M. SAVINO, R.P.R., C.R.R.
                                   Official Federal Court Stenographer
          2                        400 N. Miami Avenue, 10S03
                                   Miami, Florida  33128
          3                        Telephone:  305-523-5598
```

| | | |
|---|---|---|
| 1:35:24 | 4 | (Jury in at 1:35 p.m.) |
| 1:36:57 | 5 | (Court called to order) |
| 1:37:04 | 6 | THE COURT:  All right.  Please call your first witness. |
| 1:37:06 | 7 | MR. KERNELL:  Mr. Shaughnessy. |
| 1:37:31 | 8 | THE COURT:  All right, sir.  Please remain standing and |
| 1:37:33 | 9 | raise your right hand. |
| 1:37:33 | 10 | THOMAS SHAUGHNESSY, DEFENSE WITNESS, SWORN. |
| 1:37:36 | 11 | THE COURT:  All right.  Please be seated.  Tell us your |
| 1:37:38 | 12 | name again and spell it. |
| 1:37:40 | 13 | THE WITNESS:  Hi.  Tom Shaughnessy, |
| 1:37:45 | 14 | S-H-A-U-G-H-N-E-S-S-Y. |
| 1:37:50 | 15 | THE COURT:  All right.  You may proceed, sir. |
| 1:37:50 | 16 | DIRECT EXAMINATION |
| 1:38:03 | 17 | BY MR. KERNELL: |
| 1:38:11 | 18 | Q.  Good afternoon, Mr. Shaughnessy. |
| 1:38:13 | 19 | A.  Good afternoon. |
| 1:38:44 | 20 | (Counsel conferring) |
| 1:38:48 | 21 | THE COURT:  We've had two hours.  Can you please get |
| 1:38:49 | 22 | moving? |
| 1:38:50 | 23 | MR. KERNELL:  I'm sorry? |
| 1:38:52 | 24 | THE COURT:  We've had two hours.  Can you please get |
| 1:38:54 | 25 | moving? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1:38:57   1         MR. KERNELL:  Yes, Your Honor.

1:39:04   2         5016 is a Defense Exhibit that is not objected, so we

1:39:06   3   ask that it --

1:39:11   4         THE COURT:  5016?  Is that correct?  5016?

1:39:13   5         MR. KERNELL:  5016.

1:39:14   6         THE COURT:  All right.  Is there any objection?

1:39:21   7   Hearing no objection, 5016 is admitted in evidence.

1:39:21   8         (Defense Exhibit 5016 in evidence)

1:39:25   9         MR. KERNELL:  If I may approach the witness?

1:39:27  10         THE COURT:  You may.  Give it to the court security

1:39:33  11   officer, he'll hand it over.

1:39:33  12      BY MR. KERNELL:

1:39:52  13   Q.  Mr. Shaughnessy, I've just handed you what's marked as

1:39:56  14   Exhibit 5016.  Do you see that?

1:39:57  15   A.  Yes.

1:40:00  16   Q.  Do you recognize that document?

1:40:02  17   A.  I don't believe I've read this document, no.

1:40:08  18   Q.  It's an SEC filing that Sprint is required to file with the

1:40:12  19   Securities and Exchange Commission.  Do you understand that?

1:40:13  20   A.  I understand it, yeah.

1:40:19  21   Q.  And you're here on behalf of Sprint to testify on Sprint's

1:40:21  22   behalf; is that correct?

1:40:21  23         MS. WHEATLEY:  Objection, Your Honor.

1:40:24  24         THE COURT:  I'll sustain the objection.  He is the

1:40:30  25   Sprint representative, but you called him as a witness, they

```
1:40:32   1    didn't put him forward at this time.
1:40:32   2        BY MR. KERNELL:
1:40:37   3    Q.  This SEC filing was filed on December 31, 2005.  Do you see
1:40:39   4    that?
1:40:41   5            MS. WHEATLEY:  Your Honor, can we have what is
1:40:44   6    published to the jury just include the exhibit?
1:40:47   7            THE COURT:  I don't know what all that other stuff is.
1:40:49   8    What is that?
1:40:51   9            MR. KERNELL:  This is exhibit --
1:40:53  10            THE COURT:  On the left, what is all that stuff on the
1:40:54  11    left?
1:40:57  12            MR. KERNELL:  Oh, I'm sorry.
1:40:59  13            THE COURT:  Just the exhibit.
1:41:01  14            MR. KERNELL:  That's what I'm trying to do, Your Honor.
1:41:03  15    There.  Sorry.
1:41:03  16        BY MR. KERNELL:
1:41:12  17    Q.  So this was the form 10-K that was filed on December 10th or
1:41:16  18    December 31, 2005.  Do you see that?
1:41:18  19    A.  I see it.
1:41:26  20    Q.  Okay.  Now, if I can direct your to Page 19 which is on the
1:41:29  21    monitor.
1:41:32  22    A.  I just want to make sure I'm following along here.
1:41:35  23            THE COURT:  Page 2 of 2 it says at the bottom.
1:41:39  24            THE WITNESS:  Okay.  I've got Page 19 up.
1:41:39  25        BY MR. KERNELL:
```

1:41:43  1   Q.  And if I could have you, do you see the heading patents,

1:41:45  2   trademarks and licenses?

1:41:45  3   A.  Yes.

1:41:51  4   Q.  And if I could ask you to read the highlighted portion

1:41:52  5   there.

1:41:56  6   A.  Trademarks.  We have a program to file applications for

1:41:59  7   trademarks, service marks and patents where we believe this

1:42:05  8   protection is appropriate.  Sprint Power Vision and Sprint PCS,

1:42:09  9   Nextel and Boost Mobile are our registered trademarks.

1:42:13  10  Q.  And could I have you read the next line?  Or the next

1:42:14  11  highlighted line?

1:42:17  12  A.  We occasionally license our intellectual property to others,

1:42:22  13  including licenses to others to use as trademarks Sprint and

1:42:22  14  Nextel.

1:42:29  15  Q.  So at this time in 2005, Sprint identified the trademarks,

1:42:33  16  Sprint and Nextel, as intellectual property that they may

1:42:36  17  license.  Correct?

1:42:38  18  A.  According to the 10-K document here.

1:42:41  19  Q.  Yes.  And this is a publicly filed document, correct?

1:42:43  20  A.  I believe it is.  I'm not --

1:42:44  21          MS. WHEATLEY:  Objection, Your Honor.

1:42:46  22          THE WITNESS:  I don't know anything about the 10-K.

1:42:48  23          THE COURT:  Hold on a second.  What is the objection?

1:42:49  24          MS. WHEATLEY:  The objection is the witness has

1:42:51  25  testified that he's not familiar with this document.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 1:42:54 | 1 | THE COURT:  Yeah, I don't think he ever read it before, |
| 1:42:56 | 2 | so I don't know if this is the right witness to talk to you |
| 1:42:58 | 3 | about it.  But, I mean, I thought you were going to ask him a |
| 1:43:03 | 4 | question after he read it.  I don't believe this is -- if it's a |
| 1:43:07 | 5 | reading test, he's passed it, he can read.  I don't know what |
| 1:43:10 | 6 | you're doing. |
| 1:43:10 | 7 | BY MR. KERNELL: |
| 1:43:17 | 8 | Q.  This document identifies trademarks of Sprint; is that |
| 1:43:17 | 9 | correct? |
| 1:43:19 | 10 | A.  Some of them are listed here, yes. |
| 1:43:24 | 11 | Q.  And it identifies in particular Sprint Power Vision, Sprint |
| 1:43:27 | 12 | PCS, Nextel and Boost Mobile, correct? |
| 1:43:29 | 13 | A.  Correct. |
| 1:43:44 | 14 | Q.  Now if I can have -- so that was in 2005, those trademarks |
| 1:43:51 | 15 | were identified.  Do you have Exhibit 57 (inaudible). |
| 1:44:28 | 16 | So Mr. Shaughnessy, I've just handed you what's marked |
| 1:44:31 | 17 | as Defense Exhibit 5017. |
| 1:44:32 | 18 | MR. KERNELL:  Your Honor, which is not objected to Your |
| 1:44:34 | 19 | Honor, and I ask that this be entered. |
| 1:44:36 | 20 | THE COURT:  Okay.  Is there any objection to this |
| 1:44:37 | 21 | document? |
| 1:44:37 | 22 | MS. WHEATLEY:  No, Your Honor. |
| 1:44:44 | 23 | THE COURT:  All right.  5017 is admitted in evidence. |
| 1:44:44 | 24 | (Defense Exhibit 5017 in evidence) |
| 1:44:44 | 25 | BY MR. KERNELL: |

1:44:48   1    Q.   Do you see at the top of the page, this is the form 10-K

1:44:53   2    filing with the SEC on December 31, 2007?

1:44:54   3    A.   Correct.

1:45:08   4    Q.   And if I can have you scroll down to the first page, and

1:45:16   5    then would you read the highlighted portion for the jury please?

1:45:21   6    A.   We, together with three third-party affiliates or PCS

1:45:27   7    affiliates, offer digital wireless service in all 50 states,

1:45:32   8    Puerto Rico and the US Virgin Islands under the Sprint brand

1:45:37   9    name utilizing wireless code division multiple access or CDMA.

1:45:44   10   We offer digital wireless services under our Nextel brand using

1:45:49   11   integrated digital enhanced network or iDEN technology.

1:45:53   12   Q.   So on this page, again it identifies two of Sprint's brands

1:45:56   13   or Sprint Nextel brands.

1:45:59   14          MS. WHEATLEY:  Your Honor, objection.  Are we just

1:46:02   15   going to read from the 10-Ks?  The witness has not established

1:46:03   16   any knowledge and this is a direct examination.

1:46:05   17          THE COURT:  I don't understand what we're doing here.

1:46:08   18   As I said, if it is for the purpose of proving that he can read

1:46:11   19   it, he has read it.  But unless you're going to ask him

1:46:14   20   questions about the contents of this, which apparently you have

1:46:19   21   not, I'm going to -- you can read it to them in closing, it's in

1:46:22   22   evidence.  You can read it to them whenever you want.  He

1:46:28   23   doesn't have to read it.  I mean, it just doesn't seem --

1:46:32   24   doesn't make sense for him to be reading it.  Ask him questions

1:46:36   25   about it, about his involvement, what his knowledge is this of

1:46:42  1   document, if any, that's fine.  But you can't just put one of

1:46:44  2   their witnesses on the stand and ask them to read from your

1:46:51  3   exhibit.  I'm not familiar with any procedure like that.  So

1:46:52  4   move on.

1:46:52  5       BY MR. KERNELL:

1:46:57  6   Q.  In 2007, did Sprint offer digital wireless services under

1:47:00  7   the Nextel brand?

1:47:01  8   A.  We did.

1:47:06  9   Q.  And in 2007, did Sprint offer digital wireless services

1:47:08  10  under the Sprint brand?

1:47:09  11  A.  We did.

1:47:13  12  Q.  And in this document it publicly identified those two

1:47:16  13  brands, correct?

1:47:19  14  A.  In this document.

1:47:29  15  Q.  On Page 4 if you could look at the highlighted portions

1:47:39  16  here, says we market our post-paid services under the Sprint and

1:47:41  17  Nextel brands.  Do you see that?

1:47:42  18  A.  I see that.

1:47:46  19  Q.  And in 2007 Sprint marketed their services under the Sprint

1:47:47  20  and Nextel brands, correct?

1:47:49  21  A.  Correct.

1:47:56  22  Q.  And in fact, there was a NASCAR Cup Series that Sprint

1:47:58  23  sponsored at that time.

1:48:00  24  A.  Correct.  I mentioned that yesterday.

1:48:00  25  Q.  I'm sorry?

1:48:04  1    A.   I mentioned that earlier this morning or yesterday.

1:48:15  2    Q.   Now before this, before it was the Sprint Cup Series, it was

1:48:18  3    the NASCAR Nextel Cup Series, correct?

1:48:19  4    A.   Correct.

1:48:25  5    Q.   So why did Sprint drop Nextel from the NASCAR series?

1:48:27  6    A.   That's a good question, and I think it kind of goes back to

1:48:31  7    what I talked about the evolution of the brand.  So what you're

1:48:33  8    seeing from a time-line perspective is as we integrated the

1:48:37  9    companies, we're moving from a top line -- two top line brands,

1:48:40  10   Sprint and Nextel, like I said, very confusing in market if

1:48:44  11   you're trying to compete in market with two major brands.  The

1:48:48  12   Sprint brand had a broader appeal from a consumer-market

1:48:52  13   perspective, which is where a lot of our subscriber growth was,

1:48:55  14   and we're started to integrate the Nextel brand into our

1:48:55  15   business-focus category.  So it's going to take a sub-brand,

1:48:58  16   like we looked at in the packaging, and it ultimately it will

1:49:02  17   become part of our business product portfolio.  So this is

1:49:05  18   exactly what's happening right here.

1:49:15  19   Q.   Now on Page 5 of this exhibit it states that we have

1:49:20  20   experienced declines in the number of new iDEN post-paid

1:49:24  21   subscribers in recent quarters, and we lost about 2.8 million

1:49:30  22   net post-paid subscribers of the iDEN based services during

1:49:31  23   2007.

1:49:34  24        Do you recall that event or those events at Sprint when

1:49:36  25   you were working there?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1:49:39  1    A.  I don't recall the exact numbers, I'll trust that the 10-K

1:49:43  2    that we provided has those numbers as accurate.

1:49:55  3    Q.  So the next sentence states that consumer sentiment

1:49:56  4    regarding the iDEN network, reduced marketing programs and

1:50:01  5    limited new handset offerings at the higher-than-market prices,

1:50:07  6    have all contributed to the decline in new iDEN consumers.

1:50:07  7          Do you see that?

1:50:08  8    A.  I do.

1:50:14  9    Q.  Is that -- the iDEN consumer market, is that an area that

1:50:17  10    you were working in at the time at Sprint?

1:50:21  11    A.  I was working in the iDEN business markets.  Again, I think

1:50:25  12    we've kind of covered that the iDEN brand, from a consumer

1:50:30  13    perspective, was transitioning over to the CDMA network, high

1:50:30  14    broadband data applications like Facebook and things like that.

1:50:35  15    So, yeah, absolutely makes complete, 100% that we have that in

1:50:36  16    here.

1:50:38  17    Q.  Then the next sentence states that capacity constraints in

1:50:44  18    certain markets on the iDEN network have improved in recent

1:50:47  19    quarters due to fewer subscribers.  Do you see that?

1:50:47  20    A.  Correct.

1:50:52  21    Q.  So because customers are moving off the iDEN network for

1:50:58  22    either to the CDMA or to other carriers, then the bandwidth on

1:51:01  23    the iDEN network has improved?

1:51:03  24    A.  It has.  That's what that states.

1:51:22  25    Q.  Okay.  So if I can direct you to Page 19 under the heading

1:51:25  1    of patents, trademarks and licenses.  Again it identifies

1:51:32  2    Sprint, Nextel and Boost Mobile as the trademarks.

1:51:37  3    A.  It says among our trademarks.  Yes.  We have quite a few.

1:51:40  4    Q.  And then one of the sentences in here, it says generally our

1:51:46  5    trademarks and service marks endure and are enforceable so long

1:51:48  6    as they continued to be used.  Do you see that?

1:51:50  7    A.  I see that.

1:51:51  8    Q.  Do you know what that means?

1:51:55  9    A.  I think it means generally the trademarks and service marks

1:51:59  10    endure and are enforceable as long as they continue to be used.

1:52:00  11    I think that's what that means.

1:52:04  12    Q.  So if you stop using a trademark or service mark --

1:52:07  13          MS. WHEATLEY:  Objection, foundation.

1:52:08  14          MR. KERNELL:  -- then those trademarks are not

1:52:09  15    enforceable.

1:52:13  16          THE COURT:  All right.  You're asking him --

1:52:14  17          THE WITNESS:  I'm sorry.  Could you repeat the

1:52:16  18    question?  You broke it up.

1:52:16  19     BY MR. KERNELL:

1:52:25  20    Q.  So if Sprint stops using a trademark, then it's no longer

1:52:27  21    enforceable?

1:52:29  22          MS. WHEATLEY:  Objection, Your Honor.  Foundation.

1:52:29  23          THE COURT:  Sustained.

1:52:29  24     BY MR. KERNELL:

1:52:38  25    Q.  What do you understand that sentence to mean.

| | |
|---|---|
| 1:52:39 | 1 |
| 1:52:41 | 2 |
| 1:52:46 | 3 |
| 1:53:32 | 4 |
| 1:53:37 | 5 |
| 1:53:45 | 6 |
| 1:53:46 | 7 |
| 1:53:48 | 8 |
| 1:53:48 | 9 |
| 1:53:48 | 10 |
| 1:53:55 | 11 |
| 1:54:00 | 12 |
| 1:54:06 | 13 |
| 1:54:08 | 14 |
| 1:54:11 | 15 |
| 1:54:16 | 16 |
| 1:54:17 | 17 |
| 1:54:17 | 18 |
| 1:54:30 | 19 |
| 1:54:33 | 20 |
| 1:54:37 | 21 |
| 1:54:37 | 22 |
| 1:54:40 | 23 |
| 1:54:44 | 24 |
| 1:54:46 | 25 |

1    MS. WHEATLEY:  Same objection, Your Honor.

2    THE COURT:  I'll sustain the objection.  He's not here

3 to interpret legal filings by the company.

4    MR. KERNELL:  I'm going to call or offer 5018.

5    THE COURT:  5018?  Any objection 2008 Sprint 10-K?

6    MS. WHEATLEY:  No, Your Honor.

7    THE COURT:  Without objection, it's admitted in

8 evidence.

9    (Defense Exhibit 5018 in evidence)

10   BY MR. KERNELL:

11 Q.  Mr. Shaughnessy, you've just been handed what's marked as

12 Defense Exhibit 5018 which is the 10-K SEC filing of December

13 31, 2018 for Sprint Nextel.  Do you see that?

14 A.  I see that.

15   MS. WHEATLEY:  Can we clarify it's 2008?

16   MR. KERNELL:  I'm sorry, 2008.  December 31, 2008.

17   THE WITNESS:  Yep.

18   BY MR. KERNELL:

19 Q.  Now in the trademark section, and in the -- you were in the

20 marketing group or department at Sprint at this time?

21 A.  In 2013 I was in the sales department.

22 Q.  In 2008 --

23 A.  Oh, in 2008, I was in the marketing department.

24 Q.  And are you -- you're aware of all the Sprint brands and

25 trademarks and such?

1:54:50  1   A.   Well, I was aware of the brands that were in the area that I

1:54:53  2   kind of focused on, the business brands.  Not all the brands

1:54:57  3   that are Sprint brands I was involved in or have knowledge of.

1:54:59  4   Q.   You were aware of the Sprint brand?

1:55:02  5   A.   Certainly aware of the Sprint brand.

1:55:03  6   Q.   And the Nextel brand?

1:55:04  7   A.   Yes.

1:55:06  8   Q.   And the Direct Connect brand?

1:55:07  9   A.   Direct Connect brand.

1:55:10  10  Q.   And the Boost Mobile brand?

1:55:13  11  A.   Yes.

1:55:21  12  Q.   And then if I could have you look at the paragraph that's

1:55:29  13  highlighted on this, it's on page F-22.

1:55:34  14  A.   I don't know if I'll be able to flip to page F-22 on this

1:55:37  15  big document you got.  I got it.  Okay.  I don't want to slow

1:55:40  16  things down, I just want to make sure I got the right page in

1:55:41  17  front of me.

1:55:43  18  Q.   I think it's Page 99 of 131.

1:55:45  19  A.   Yep.  Got it right here.  Thank you.

1:55:50  20  Q.   Now, it states that in the fourth quarter 2007, we conducted

1:55:56  21  our annual impairment assessment of our then $30. billion of

1:56:01  22  goodwill.  Approximately 26.3 billion of our goodwill was

1:56:05  23  recorded in connection with the recent business combinations of

1:56:11  24  Nextel Communications, Inc., Nextel Partners, Inc., and other

1:56:15  25  acquisitions such as certain PCS affiliates.

```
1:56:16   1              Do you see that?
1:56:17   2    A.  I see that.
1:56:22   3    Q.  Do you know what goodwill is?
1:56:24   4    A.  From a finance --
1:56:25   5              MS. WHEATLEY:  Objection, foundation.
1:56:26   6              THE COURT:  Sustained.
1:56:26   7         BY MR. KERNELL:
1:56:37   8    Q.  When you were at, well, at Sprint, do you recall an event
1:56:42   9    where Sprint wrote-down the goodwill of Nextel?
1:56:47  10    A.  I do remember a goodwill write-down.
1:56:49  11    Q.  And what is your understanding of what a goodwill write-down
1:56:51  12    is?
1:56:55  13    A.  I'm going to be honest, I don't know what a goodwill
1:56:59  14    write-down is.  I know what it says here in the document, but I
1:57:02  15    do not know what a goodwill write-down is.
1:57:09  16    Q.  So if a company writes off $30 billion of goodwill, is that
1:57:11  17    a tax advantage for the company?
1:57:14  18              MS. WHEATLEY:  Objection, Your Honor.  The witness says
1:57:15  19    he does not know.
1:57:17  20              THE COURT:  I'll sustain the objection.  He's not here
1:57:19  21    as an expert to testify to that.
1:57:21  22              MR. KERNELL:  I'm asking for his understanding of --
1:57:23  23              THE COURT:  What's the relevance of his understanding?
1:57:24  24              MR. KERNELL:  He's here --
1:57:27  25              THE COURT:  Or mine for that matter.  I mean, what does
```

1:57:31   1   it matter what he understands that to be?

1:57:42   2       BY MR. KERNELL:

1:58:06   3   Q.  All right.  So on page F-23, the next page, it states that

1:58:10   4   based on the results of our 2008 assessment, the net book value

1:58:15   5   of the wireless reporting unit exceeded its fair value.  We

1:58:19   6   performed the hypothetical purchase price, allocation and fair

1:58:24   7   value of our goodwill was zero.  The decrease in the fair value

1:58:30   8   of the goodwill was due to lower forecasted cash flows for our

1:58:35   9   wireless reporting, as well as a substantial excess in the over

1:58:39   10  book value of FCC licenses and trade names.  We consequently

1:58:44   11  reduced goodwill to zero as of December 31, 2008.

1:58:52   12          At this time in 2008, was Sprint experiencing a decline

1:58:56   13  in subscribers and customers?

1:58:58   14  A.  I believe we were.

1:59:03   15  Q.  And it was a substantial decline, the churn at Sprint was

1:59:06   16  very high at that time, wasn't it?

1:59:08   17  A.  It was higher than other carriers, yes.

1:59:12   18  Q.  And can you explain to the jury what churn is in the --

1:59:16   19  A.  Churn is when a customer leaves, stops billing and goes to

1:59:20   20  either potentially another carrier.  So switching from carrier A

1:59:26   21  to carrier B or doesn't switch at all and just turns off the

1:59:27   22  device.

1:59:34   23  Q.  And in fact, the churn rate for Nextel, the Nextel platform,

1:59:37   24  was substantially higher than the Sprint platform; isn't that

1:59:38   25  correct?

1:59:43   1   A.   It does, it makes complete sense, because they're moving

1:59:47   2   customers off the iDEN platform over to the Sprint platform, so

1:59:50   3   mathematically it's going to be higher because we're reducing

1:59:54   4   the number of subscribers on the iDEN network, as we migrate

1:59:57   5   them to the CDMA network.  So every month that number is going

2:00:00   6   to go up because your base on that network is shrinking.  So

2:00:02   7   absolutely going to be higher.

2:00:06   8   Q.   So this is in 2008, this is before Sprint announced the

2:00:09   9   shutdown of the iDEN network; isn't that correct?

2:00:12   10   A.   This would be when we were migrating customers over.

2:00:16   11   Leading up to the shutdown of the network, which is always the

2:00:17   12   intention, when you're bringing two companies together and

2:00:18   13   you're managing two separate networks, which are really

2:00:21   14   expensive, so in 2005 when the merger closed, the intent was to

2:00:26   15   take those subscribers from the iDEN network to the Sprint

2:00:30   16   network so it could reduce and eliminate one network, providing

2:00:34   17   a better network for all those Nextel subscribers that we

2:00:37   18   acquired.  So yeah, absolutely makes sense.

2:00:40   19   Q.   And at that time though, Sprint had a much higher churn rate

2:00:42   20   than the rest of the industry.

2:00:45   21   A.   Well, you'll have to define much higher.  I don't know.

2:00:47   22   Q.   It was higher than the rest of the industry.

2:00:50   23   A.   It was higher, yeah, I said that.  But I was trying -- you

2:00:53   24   said much higher.  That's relevant.

2:01:01   25   Q.   So if -- so Sprint was not capturing 100% or even close to

| | | |
|---|---|---|
| 2:01:06 | 1 | 100% of the iDEN or the Nextel customers coming off of the iDEN |
| 2:01:13 | 2 | network onto the CDMA network, they were losing customers. |
| 2:01:16 | 3 | A.  I don't know which network they're coming from, but I'm |
| 2:01:19 | 4 | going to go with you there, and I'll assume that some of course |
| 2:01:23 | 5 | didn't make that journey from iDEN to CDMA.  They could have |
| 2:01:25 | 6 | gone to another carrier, absolutely.  And there's probably some |
| 2:01:28 | 7 | Sprint customers that moved over in that time frame as well.  So |
| 2:01:31 | 8 | I'm not sure that mix or balance that you're asking about from |
| 2:01:37 | 9 | an iDEN perspective, but I know that common sense would say both |
| 2:01:42 | 10 | networks probably had some churn going on. |
| 2:02:07 | 11 | THE COURT:  May I remind the parties that if something |
| 2:02:10 | 12 | is not in evidence yet, you need to tell me so that I shut the |
| 2:02:13 | 13 | monitors for the jury off.  It can't be shown to them until it's |
| 2:02:16 | 14 | in evidence.  If you want to offer it in evidence, then once |
| 2:02:19 | 15 | it's in evidence, you can show it to anybody in the world.  And |
| 2:02:22 | 16 | then also when you're finished with it, take it off the screen, |
| 2:02:25 | 17 | don't leave it staying on the screen when you sit down after |
| 2:02:28 | 18 | you're finished with your questioning. |
| 2:03:05 | 19 | MR. KERNELL:  Your Honor, I have Exhibit 5021 which has |
| 2:03:08 | 20 | not been objected to.  I ask to move it into evidence. |
| 2:03:09 | 21 | MS. WHEATLEY:  No objection. |
| 2:03:10 | 22 | THE COURT:  Any objection? |
| 2:03:10 | 23 | MS. WHEATLEY:  No, Your Honor. |
| 2:03:13 | 24 | THE COURT:  Without objection, 5021 is admitted in |
| 2:03:14 | 25 | evidence. |

```
2:03:16   1              (Defense Exhibit 5021 in evidence)
2:03:16   2         BY MR. KERNELL:
2:03:43   3    Q.  Mr. Shaughnessy, I handed you Defendants' Exhibit 5021 which
2:03:48   4    is the December 31, 2012 form 10 SEC filing.  Do you see that?
2:03:53   5    A.  I see that for Sprint Nextel Corporation, yes.
2:04:09   6    Q.  Was there anything significant in Sprint, at Sprint in 2012?
2:04:11   7              MS. WHEATLEY:  Objection to form.
2:04:14   8              THE COURT:  Sustained.  I don't understand it.  At all.
2:04:14   9         BY MR. KERNELL:
2:04:22  10    Q.  You recall any significant events in 2012 with Sprint?
2:04:24  11              MS. WHEATLEY:  Same objection.
2:04:27  12              THE COURT:  If he can answer it, he should answer.  But
2:04:30  13    I don't know what he's talking about.
2:04:33  14              THE WITNESS:  There's lots of events every day.
2:04:33  15         BY MR. KERNELL:
2:04:38  16    Q.  Okay.  Well, on Page 1 it says recent developments.  Do you
2:04:39  17    see that?
2:04:43  18    A.  Is it highlighted?
2:04:47  19    Q.  Midway down through the page it's highlighted.  On October
2:04:52  20    15, 2012 we entered into an agreement and plan of merger, merger
2:04:54  21    agreement with Soft Bank Corp?
2:04:56  22    A.  Yeah, I'm aware of that.
2:04:59  23    Q.  Was that a major event in Sprint history?
2:05:03  24    A.  That was a big event, yeah.
2:05:12  25    Q.  And before that on the same Page 1 of this exhibit, it
```

2:05:22  1   identifies trademarks are retail brands of Sprint, Boost Mobile,

2:05:30  2   Virgin Mobile, Assurance Wireless on the 3G network.  Do you see

2:05:30  3   that?

2:05:32  4   A.  I see that.

2:05:45  5   Q.  Then it also talks about in the next I believe -- now the

2:05:50  6   Virgin Mobile and Assurance Wireless, were those new

2:05:52  7   acquisitions for Sprint?

2:05:54  8   A.  I don't know if they're acquisitions or developments.  So I

2:06:00  9   believe Virgin was an acquisition as an MVNO, I think we

2:06:03  10  acquired them.  I don't know the exact time that took place, but

2:06:08  11  I know that we eventually owned that MVNO.  Assurance, I believe

2:06:12  12  that's an MVNO, but I don't know.  I guess we acquired them if

2:06:17  13  it's in our 10-K.

2:06:26  14  Q.  So if I can direct you to Page 4, I have it highlighted that

2:06:31  15  it states our Nextel platform, which is expected to be shutdown

2:06:39  16  by June 30, 2013, is an all digital pact data network based on

2:06:46  17  iDEN wireless technology provided by Motorola Solutions.  So do

2:06:52  18  you know if this was the first time within Sprint that they

2:06:57  19  announced that there would be the shutdown of the Nextel

2:06:59  20  platform on June 30, 2013?

2:07:03  21  A.  I don't know that.

2:07:07  22  Q.  I'm sorry?

2:07:10  23  A.  I don't know if that's the first time or not.  Your question

2:07:12  24  is do I know that.  I don't know that it was.  I do not know

2:07:14  25  that it was the first time.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2:07:14   1    Q.  Okay.

2:07:17   2    A.  It may be the first time in a document like this, but it may

2:07:19   3    not be the first time we announced it.

2:07:26   4    Q.  Do you know when the discussions within Sprint Nextel began?

2:07:28   5    A.  I would imagine --

2:07:31   6    Q.  About shutting down the iDEN network?

2:07:32   7    A.  I would imagine they began --

2:07:35   8         THE COURT:  Don't imagine, tell us what you know.

2:07:37   9         THE WITNESS:  I don't know.

2:07:37  10    BY MR. KERNELL:

2:07:39  11    Q.  Were you involved in any of those discussions?

2:07:42  12    A.  No.

2:07:51  13    Q.  And then below this it says we market our post-paid services

2:07:53  14    under the Sprint brand.  Do you see that?

2:07:54  15    A.  I see that.

2:08:02  16    Q.  And post-paid services, those were Nextel services also at

2:08:02  17    that time, correct?

2:08:03  18    A.  Correct.

2:08:09  19    Q.  But this document doesn't mention Nextel as being marketed

2:08:11  20    for post-paid services, does it?

2:08:16  21    A.  I don't know that this document would include that.  I don't

2:08:18  22    think this document has anything to do with how we market -- our

2:08:21  23    marketing of services.  This is a financial statement.

2:08:24  24    Q.  Right.  But it does have statements as to what you're

2:08:25  25    marketing, certainly.

2:08:26  1            MS. WHEATLEY:  Objection.

2:08:29  2            THE COURT:  I'll sustain the objection.

2:08:29  3       BY MR. KERNELL:

2:08:40  4   Q.  In about the middle of that paragraph it states as we shut

2:08:43  5   down the Nextel platform, our efforts will continue to pursue

2:08:48  6   the recapture of Nextel platform subscribers.  However,

2:08:54  7   particularly, we will continue our efforts to focus on

2:08:58  8   profitable growth through service provided on an enhanced

2:09:03  9   wireless network on the Sprint platform.  Do you see that?

2:09:04  10  A.  I see that.

2:09:09  11  Q.  And so that is just a statement or -- your experience that

2:09:14  12  you were trying to, or Sprint was trying to retain as many of

2:09:17  13  the Nextel customers as possible.  Is that fair?

2:09:19  14           MS. WHEATLEY:  Objection, foundation.

2:09:20  15           THE COURT:  Ladies and gentlemen, let's talk about

2:09:23  16  this.  Why don't you go into the jury room so we can talk about

2:09:25  17  this.

2:09:26  18           COURT SECURITY OFFICER:  All rise for the jury.

2:09:33  19           (Jury out at 2:09 p.m.)

2:09:51  20           THE COURT:  Please be seated.

2:10:04  21           Okay.  I've presided over a lot of trials and I

2:10:07  22  participated in a lot of trials.  I don't have any -- I usually

2:10:11  23  know what's going on.  I don't have any idea what you're up to.

2:10:15  24  What is it you're trying to do with this?  It is very unusual to

2:10:20  25  introduce a document and then read it and then expect the

| | | |
|---|---|---|
| 2:10:24 | 1 | witness to comment on it when he didn't have anything to do with |
| 2:10:28 | 2 | writing the document, he said that he had never seen it before. |
| 2:10:32 | 3 | What is it you're doing?  I mean, if you're trying to publish |
| 2:10:35 | 4 | the document, you don't need this witness to do it.  Just |
| 2:10:38 | 5 | publish it whenever you get around to it.  You can hand it to |
| 2:10:42 | 6 | them, you can make nine copies of it and give it to them, I |
| 2:10:46 | 7 | don't care.  But the bottom line is normally, if you're trying |
| 2:10:51 | 8 | to impeach this witness, you would ask him a question first and |
| 2:10:56 | 9 | then say but doesn't your 10-K of 2008 say differently, in which |
| 2:10:59 | 10 | case he would say I don't have any idea what that says, I didn't |
| 2:11:01 | 11 | have anything to do with it.  But I don't know what you're |
| 2:11:06 | 12 | doing, and it's taking me a long time to -- you know, I think |
| 2:11:10 | 13 | I've been reasonably patient waiting for something to happen, |
| 2:11:14 | 14 | nothing has happened except that you ask him does it say that. |
| 2:11:20 | 15 | And then he says usually yeah, it says that, and then you move |
| 2:11:22 | 16 | on to something else. |
| 2:11:26 | 17 |          What is it that you're trying to do and under what |
| 2:11:29 | 18 | theory are you doing it?  What is it you're up to?  I mean, I'm |
| 2:11:33 | 19 | not saying you're up to anything wrong, don't misunderstand me. |
| 2:11:37 | 20 | I just don't understand, and I just am afraid that we're killing |
| 2:11:40 | 21 | a lot of time for no reason whatsoever.  Tell me what you're |
| 2:11:41 | 22 | doing. |
| 2:11:45 | 23 |          MR. KERNELL:  Yes, Your Honor.  This shows Sprint -- |
| 2:11:46 | 24 |          THE COURT:  What shows? |
| 2:11:48 | 25 |          MR. KERNELL:  These documents. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2:11:48  1          THE COURT:  Uh-huh.

2:11:51  2          MR. KERNELL:  Year after year, they show the

2:11:58  3    progression of Sprint and the promotion of the Nextel trademark.

2:12:00  4          THE COURT:  What does it have to do with this

2:12:00  5    gentleman?

2:12:04  6          MR. KERNELL:  He is the Sprint employee, he knows --

2:12:07  7          THE COURT:  There were probably thousands of Sprint

2:12:08  8    employees, but he says --

2:12:10  9          MR. KERNELL:  He's the only one we have here.

2:12:12  10         THE COURT:  Yeah, I know.  But you have subpoena power

2:12:16  11   but he says that he never saw this document before.

2:12:18  12         MR. KERNELL:  Your Honor, we don't have subpoena power

2:12:22  13   over folks in Kansas City.  We tried to get Melissa Jobe here.

2:12:24  14         THE COURT:  Well, that may be, but I suspect that they

2:12:27  15   got people around here or you could have gone up and deposed

2:12:31  16   them sometime ago at some point in time to develop your case.

2:12:35  17   But this guy is not the guy, and you keep asking him questions

2:12:40  18   and he keeps, you know, doing the four-corner press or

2:12:43  19   something.  I don't know what he's -- he's dancing around trying

2:12:45  20   to answer your questions, and he can't because he doesn't know

2:12:49  21   anything about this document.  And so you're publishing this

2:12:52  22   document through somebody that knows nothing about it.  That's

2:12:54  23   wrong.  If you want to publish the document, publish the

2:13:01  24   document.  If you want to, after you've published the document,

2:13:04  25   you know, during your final argument say this document proves

24

```
2:13:08   1   this, this, this, this and this, that's fine.  That's your
2:13:10   2   prerogative.  You can do that.  But I don't know what you're
2:13:13   3   trying to do with this gentleman.  And if you're trying to do
2:13:17   4   something that's certainly far beyond my ability to understand
2:13:22   5   it, and I suspect that I probably have a better handle on this
2:13:24   6   than the jurors do.  So I don't know what you're doing, but it
2:13:25   7   ain't working.
2:13:30   8         So I'd ask you to move on to something else because I
2:13:32   9   don't think this is the right person to be asking questions
2:13:36  10   about a document that he has never seen before.
2:13:38  11         MR. KERNELL:  Your Honor, I'm asking him about the
2:13:44  12   circumstances that are documented here.  In his experience in
2:13:47  13   working with the Nextel trademark that he has testified now for
2:13:53  14   a day that Sprint has continued to use the Nextel network, that
2:13:58  15   they're continuing to promote it and that this document says
2:14:01  16   different than what he has testified earlier.
2:14:06  17         THE COURT:  Okay.  And he told you on several occasions
2:14:08  18   yeah, but this is a financial document, I was in marketing.
2:14:12  19   He's not a financial guy apparently.  I don't know.  I don't
2:14:15  20   know the gentleman.  I've never seen him before.  The bottom
2:14:21  21   line is I don't know what you're trying to accomplish with this,
2:14:24  22   but I'm suggesting to you that you're not accomplishing it.  So
2:14:28  23   I'll let you go a little bit longer, but then I'm going to shut
2:14:32  24   you down because you can't keep asking him about stuff he knows
2:14:34  25   nothing about.
```

| | | |
|---|---|---|
| 2:14:36 | 1 | As I said, you can publish the document and you can |
| 2:14:39 | 2 | make argument, whatever argument you want to make and say here, |
| 2:14:44 | 3 | look at this, I'll blow it up for you, read what it says and |
| 2:14:47 | 4 | they sent this to the whatever it was, Securities and Exchange |
| 2:14:53 | 5 | Commission on such and such a date and they were saying this. |
| 2:14:55 | 6 | But you're asking him -- this guy is doing a lot of supposition, |
| 2:15:03 | 7 | and I think I've heard him say on many occasions "I suppose so" |
| 2:15:13 | 8 | or "I don't know" or "I guess so".  But the bottom line is maybe |
| 2:15:17 | 9 | I'm overreacting because I try to be as protective as I can of |
| 2:15:22 | 10 | my jurors, but if one of them falls out of his chair and hurts |
| 2:15:25 | 11 | himself, I'm going to hold you personally responsible. |
| 2:15:26 | 12 | Yes, ma'am.  You have a comment. |
| 2:15:28 | 13 | MS. WHEATLEY:  Yes, Your Honor.  I don't think Mr. |
| 2:15:33 | 14 | Kernell has laid any foundation for connecting these documents |
| 2:15:38 | 15 | to any knowledge of Mr. Shaughnessy or any issue in this case. |
| 2:15:41 | 16 | That these documents are relevant to how Sprint uses the Nextel |
| 2:15:49 | 17 | brand at all.  Or relevant to Sprint's trademark registrations. |
| 2:15:52 | 18 | THE COURT:  I don't think he has either, but it's not |
| 2:15:56 | 19 | for me to decide, it's for them to decide.  But I don't see it |
| 2:16:00 | 20 | at all, and at some point I guess as a gatekeeper I'm supposed |
| 2:16:03 | 21 | to stop irrelevant material from coming in and confusing the |
| 2:16:05 | 22 | jury. |
| 2:16:09 | 23 | MS. WHEATLEY:  Your Honor we have -- we are willing to |
| 2:16:11 | 24 | let -- we've not objected to these documents, and if they want |
| 2:16:14 | 25 | to submit them as evidence, we don't have an objection to that. |

2:16:17  1   But we do have an objection to Mr. Shaughnessy being made to

2:16:21  2   testify about them when he's not responsible for them.

2:16:23  3        THE COURT:  Well, I'll agree with you and if you

2:16:25  4   object, unless it's something different I'll sustain the

2:16:26  5   objections.

2:16:31  6        Bring the jury back in please.

2:16:32  7        COURT SECURITY OFFICER:  All rise for the jury.

2:16:36  8        (Jury in at 2:16 p.m.)

2:17:15  9        THE COURT:  Please be seated.

2:17:20  10        All right, sir.  You may proceed.

2:17:42  11        MR. KERNELL:  May I proceed?

2:17:46  12        THE COURT:  I told you you may proceed, yes.

2:17:50  13        MR. KERNELL:  I'm going to introduce Exhibits Number

2:18:07  14   5020, 5022, 5024, and 5231, none of which are objected to.

2:18:14  15        THE COURT:  All right.  5020, 5022, what were the

2:18:18  16   others, 5024?

2:18:20  17        MR. KERNELL:  And 5231.

2:18:24  18        THE COURT:  Okay.  5231.  I have to get to that one.

2:18:33  19   5231?

2:18:34  20        MR. KERNELL:  Yes.

2:18:36  21        THE COURT:  Without objection, all of those are

2:18:37  22   admitted in evidence.

2:18:37  23        (Defense Exhibits 5020, 5022, 5024 & 5231 in evidence)

2:18:37  24      BY MR. KERNELL:

2:19:20  25   Q.  Mr. Shaughnessy, if I could, Defendants' Exhibit 5,020 is

27

| | | |
|---|---|---|
| 2:19:29 | 1 | the December 31, 2013 10-K that was filed by Sprint.  Did |
| 2:19:58 | 2 | Sprint, this was in -- did Sprint shut down the iDEN network on |
| 2:19:59 | 3 | June 30, 2013? |
| 2:20:02 | 4 | A.  Yes, I believe we did. |
| 2:20:09 | 5 | MS. WHEATLEY:  Mr. Shaughnessy, could you take off your |
| 2:20:09 | 6 | mask? |
| 2:20:11 | 7 | THE WITNESS:  Oh, I'm sorry.  Forgot it was on. |
| 2:20:15 | 8 | Yes, I believe we did.  Excuse me. |
| 2:20:15 | 9 | BY MR. KERNELL: |
| 2:20:23 | 10 | Q.  Now, did Sprint continue to offer services, |
| 2:20:31 | 11 | telecommunication services under the Nextel trademark in 2013? |
| 2:20:33 | 12 | A.  Yes, I believe we did. |
| 2:20:34 | 13 | Q.  On what platform? |
| 2:20:36 | 14 | A.  On CDMA platform. |
| 2:20:42 | 15 | Q.  And that's also the Sprint platform, correct? |
| 2:20:46 | 16 | A.  It can be referred to as Sprint platform, sure. |
| 2:20:50 | 17 | Q.  Was it referred to publicly as the Sprint platform? |
| 2:20:53 | 18 | A.  Probably. |
| 2:21:07 | 19 | Q.  Now, do you recall a lawsuit that was filed against Sprint |
| 2:21:12 | 20 | regarding the write-down of the -- |
| 2:21:15 | 21 | MS. WHEATLEY:  Objection, relevance. |
| 2:21:19 | 22 | MR. KERNELL:  Write-down of the goodwill? |
| 2:21:23 | 23 | THE COURT:  I don't know what the relevance of that is. |
| 2:21:26 | 24 | MS. WHEATLEY:  Objection, Your Honor. |
| 2:21:29 | 25 | THE COURT:  I don't know what the relevance of that is. |

2:21:32   1    You're going to have to explain it to me.  Let's do a sidebar,

2:21:36   2    please.

2:21:39   3           (SIDEBAR CONFERENCE:

2:21:52   4           MR. KERNELL:  Your Honor, it just goes to -- these are

2:21:55   5    events that were happening regarding the write-down of the

2:21:56   6    goodwill.

2:21:58   7           THE COURT:  You have to speak up a little bit so she

2:21:59   8    can hear you.

2:22:01   9           MR. KERNELL:  The write-down of the goodwill which is

2:22:04   10   what we're saying that when they wrote-down the goodwill, they

2:22:11   11   gave up all value to that mark.  I mean, that's what a trademark

2:22:14   12   is known for is, its goodwill.

2:22:15   13          THE COURT:  Let me hear your position.

2:22:17   14          MS. WHEATLEY:  They have not established any connection

2:22:20   15   between any lawsuit and the trademark.

2:22:22   16          THE COURT:  Speak up a little bit they.  Can't hear you

2:22:22   17   over the noise.

2:22:23   18          MS. WHEATLEY:  Sorry.  They haven't established any

2:22:27   19   connection between any lawsuit they're referencing and the

2:22:32   20   trademark.  It's also improper character evidence about Sprint

2:22:35   21   that has nothing to do with the rights and the trademark.

2:22:38   22          THE COURT:  I didn't know a corporation could have

2:22:42   23   character, but it doesn't seem particularly relevant to me.  But

2:22:47   24   I also don't see it particularly prejudicial in any way.

2:22:49   25          MS. WHEATLEY:  Well Your Honor, we would -- I mean,

| | | |
|---|---|---|
| 2:22:53 | 1 | suggesting that Sprint did something wrong by referencing a |
| 2:22:54 | 2 | lawsuit. |
| 2:22:58 | 3 | THE COURT:  I don't believe he's done that yet. |
| 2:23:01 | 4 | MS. WHEATLEY:  This, I mean, it's a shareholder |
| 2:23:04 | 5 | lawsuit.  It has nothing to do with the brand whatsoever. |
| 2:23:07 | 6 | THE COURT:  Yeah, I don't think lawsuits should be |
| 2:23:12 | 7 | involved in this at all.  What is the lawsuit about? |
| 2:23:13 | 8 | MR. KERNELL:  It had to do with the write-down of the |
| 2:23:16 | 9 | goodwill for Nextel. |
| 2:23:19 | 10 | THE COURT:  And it is by shareholders suing Sprint |
| 2:23:22 | 11 | saying you shouldn't have written it down? |
| 2:23:25 | 12 | MR. KERNELL:  No, that they misled that there was -- |
| 2:23:28 | 13 | they misled and filed false documents with the SEC. |
| 2:23:31 | 14 | THE COURT:  No, I'll sustain the objection. |
| 2:23:31 | 15 | (END OF SIDEBAR) |
| 2:23:31 | 16 | BY MR. KERNELL: |
| 2:24:09 | 17 | Q.  So Mr. Shaughnessy, in 2013, there were no customers on the |
| 2:24:13 | 18 | Nextel platform, correct? |
| 2:24:16 | 19 | MS. WHEATLEY:  Objection, foundation. |
| 2:24:21 | 20 | THE COURT:  If he knows.  If you know. |
| 2:24:25 | 21 | THE WITNESS:  I believe after June 30, 2013?  When we |
| 2:24:28 | 22 | turned the network down?  That's probably an accurate statement. |
| 2:24:28 | 23 | BY MR. KERNELL: |
| 2:24:34 | 24 | Q.  And it was actually on that date at midnight on June 30, |
| 2:24:40 | 25 | 2013 all the towers were turned off, correct? |

| | | |
|---|---|---|
| 2:24:43 | 1 | A.  I'm not a technical expert on how they actually shut a |
| 2:24:46 | 2 | network down, but I believe that was probably in the marketed |
| 2:24:50 | 3 | date like hey, we need to make sure our customers are taken care |
| 2:24:53 | 4 | of, upgraded and moved off so there's no service disruption.  I |
| 2:24:56 | 5 | don't know if it was a turn off all the towers overnight or if |
| 2:25:00 | 6 | it was a couple of weeks, but that's the published date it looks |
| 2:25:04 | 7 | like that we want to make sure everybody's taken care of and off |
| 2:25:06 | 8 | the network. |
| 2:25:11 | 9 | Q.  In your position at Sprint from 2009 through 2013, did you |
| 2:25:17 | 10 | have occasions to keep track of the number of customers that |
| 2:25:20 | 11 | were on the Nextel network? |
| 2:25:22 | 12 | A.  I did not. |
| 2:25:25 | 13 | Q.  Did you keep track of any of those numbers? |
| 2:25:30 | 14 | A.  That wasn't my job.  I was in sales from 2009 to 2013. |
| 2:25:35 | 15 | Q.  In sales, did you have any reports that would tell you |
| 2:25:38 | 16 | whether we have an up month or a down month? |
| 2:25:40 | 17 | A.  For my sales areas, yes. |
| 2:25:42 | 18 | Q.  And what sales were those? |
| 2:25:46 | 19 | A.  Well, I had quite a few different areas over time.  So from |
| 2:25:51 | 20 | 2009 to 2013, I was building our business and consumer channels |
| 2:25:54 | 21 | so I worked with our retail stores, I worked with our |
| 2:25:58 | 22 | third-party locations across the country to establish a |
| 2:26:00 | 23 | distribution, if you will, for small businesses. |
| 2:26:04 | 24 |         And then in 2013 I went to become the area sales |
| 2:26:10 | 25 | director for Kansas City and for St. Louis, Birmingham, New |

| | | |
|---|---|---|
| 2:26:15 | 1 | Orleans, Little Rock, Wichita, Oklahoma city and Tulsa. |
| 2:26:19 | 2 | Q.  And did that include Nextel subscribers? |
| 2:26:21 | 3 | A.  It did. |
| 2:26:26 | 4 | Q.  And so would you know how many Nextel subscribers you gained |
| 2:26:28 | 5 | or lost during those time periods? |
| 2:26:33 | 6 | A.  In those windows I probably would have. |
| 2:26:38 | 7 | Q.  And so this document shows in 2009 there were, I think these |
| 2:26:44 | 8 | are in millions, 7.255 million subscribers on the Nextel |
| 2:26:45 | 9 | platform; is that correct? |
| 2:26:47 | 10 | MS. WHEATLEY:  Objection, relevance and foundation. |
| 2:26:52 | 11 | THE COURT:  Yeah.  You're asking him if he knew and |
| 2:26:56 | 12 | then you're telling him what some paper says, whether he knew |
| 2:27:00 | 13 | that or not.  If you know it, you can answer it.  If you are |
| 2:27:04 | 14 | asking if he can read it, I'll bet you probably can. |
| 2:27:07 | 15 | THE WITNESS:  The only way I would know these numbers, |
| 2:27:09 | 16 | Your Honor, would be reading them off this page right now. |
| 2:27:12 | 17 | THE COURT:  Okay.  He doesn't have personal knowledge. |
| 2:27:12 | 18 | BY MR. KERNELL: |
| 2:27:17 | 19 | Q.  Were you aware that there was a trend, a declining trend of |
| 2:27:22 | 20 | subscribers on the Nextel network from 2009 through 2012? |
| 2:27:26 | 21 | A.  Yes.  Yes.  I believe I answered that we were in the process |
| 2:27:29 | 22 | of transitioning those subscribers from the iDEN base all the |
| 2:27:33 | 23 | way over to the new CDMA base, right, providing that better |
| 2:27:36 | 24 | network experience.  So that was the plan all along, and that |
| 2:27:43 | 25 | was a way to logically do it in a management way of moving those |

2:27:44   1   subscribers over.

2:27:54   2   Q.  Okay.  And then -- so also in 2013, did Sprint change its

2:27:56   3   name?

2:28:00   4   A.  2013, I believe Sprint changed its name back to Sprint

2:28:06   5   Corporation with the closing of the Soft Bank deal.

2:28:09   6   Acquisition.  The big event from 2012.

2:28:14   7   Q.  It went from Sprint Nextel to Sprint back to Sprint.

2:28:16   8   A.  I believe the legal entity did, yes.

2:28:20   9   Q.  And that's the way it was then marketed -- and sales and

2:28:24   10  marketing was Sprint Corporation, correct?

2:28:27   11  A.  Yeah, correct.

2:28:32   12        THE COURT:  It's hard to put nodding head and uh-huh

2:28:38   13  and huh-uh are remarkably similarly spelled, so you have to say

2:28:39   14  yes or no.

2:28:40   15        THE WITNESS:  Yes, sir.  Yes, Your Honor.

2:28:40   16      BY MR. KERNELL:

2:28:46   17  Q.  Were you aware of any -- in the -- in your capacity in

2:28:50   18  sales, was it sales and marketing or just sales?

2:28:53   19  A.  I was in sales at that time.

2:28:58   20  Q.  Were you involved at all or know about any decommissioning

2:29:05   21  of infrastructure or anything on the technical side of the

2:29:07   22  network?

2:29:10   23  A.  I would have no firsthand knowledge of that.

2:29:43   24  Q.  A little bit earlier we talked about the churn rate.  Do you

2:29:43   25  recall that?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 2:29:45 | 1 | A.  I do. |
| 2:29:48 | 2 | Q.  And I believe you testified that you're familiar with the |
| 2:29:53 | 3 | churn and what was going on at Sprint at this time. |
| 2:29:54 | 4 | A.  What time? |
| 2:29:58 | 5 | Q.  In this 2013 time frame. |
| 2:30:01 | 6 | A.  2013.  Okay.  Yes. |
| 2:30:08 | 7 | Q.  On this document, it talks about the churn rate from 2011 |
| 2:30:10 | 8 | through 2013.  Do you see that? |
| 2:30:12 | 9 | A.  I see that. |
| 2:30:15 | 10 | MS. WHEATLEY:  Objection, relevance. |
| 2:30:21 | 11 | THE COURT:  Well, the question so far is just did he |
| 2:30:25 | 12 | see it.  He saw it.  What's the next question? |
| 2:30:25 | 13 | BY MR. KERNELL: |
| 2:30:34 | 14 | Q.  You had stated that Sprint had a higher churn rate than |
| 2:30:36 | 15 | average in the industry.  Is that correct? |
| 2:30:40 | 16 | A.  I stated that, yes. |
| 2:30:44 | 17 | Q.  If you look at the churn rate for the Sprint platform at the |
| 2:30:47 | 18 | end of June 30, 2013 -- |
| 2:30:49 | 19 | MS. WHEATLEY:  Objection, foundation. |
| 2:30:51 | 20 | THE COURT:  Sustain the objection.  He can read as well |
| 2:30:56 | 21 | as anyone else.  This is in evidence, the jury can read it. |
| 2:30:59 | 22 | Unless you got a question that relates to the document, not just |
| 2:31:01 | 23 | reading it. |
| 2:31:04 | 24 | MR. KERNELL:  I was going to ask him a question about |
| 2:31:04 | 25 | -- |

```
2:31:07   1          THE COURT:  Well, go ahead and ask the question then.

2:31:07   2       BY MR. KERNELL:

2:31:13   3    Q.  Is a 5.22% churn rate a high churn rate?

2:31:17   4          THE COURT:  You may answer that question if you know.

2:31:18   5          THE WITNESS:  It's high.

2:31:18   6       BY MR. KERNELL:

2:31:22   7    Q.  Do you know what the average churn rate in the industry was

2:31:24   8    at that time?

2:31:29   9    A.  I don't know.  Let me just be clear, no I don't know what

2:31:32  10    the average churn rate was in the industry at that time.

2:31:41  11    Q.  And then a churn rate of 33.9%.  Is that high?

2:31:45  12    A.  That is high.  And that particular one was when we actually

2:31:48  13    turned off the iDEN network and the remaining subscribers were

2:31:53  14    turned off.  Now, that 33.9% is relevant to how many subscribers

2:31:57  15    are left and as I talked about before, the shrinking number of

2:32:01  16    iDEN subscribers makes that number go up every month, and you

2:32:04  17    can actually look at it on the page here and you'll see that it

2:32:08  18    does go up every month because the base is migrating off of that

2:32:12  19    network over to the CDMA network.  So absolutely, makes complete

2:32:16  20    sense.

2:32:21  21    Q.  Then the next section where it says Nextel platform

2:32:28  22    subscribers recaptures, it shows in June 30, 2013 that on the

2:32:34  23    post-paid for Nextel platform recaptures is only 34%.  Do you

2:32:34  24    see that?

2:32:36  25    A.  I see that.
```

```
2:32:40   1    Q.  That's only a third of those leaving the iDEN network,
2:32:41   2    correct?
2:32:42   3             MS. WHEATLEY:  Objection, foundation and relevance.
2:32:44   4             THE COURT:  I'll permit him to answer it if he can.
2:32:47   5             THE WITNESS:  It's a reflection of the 34% of those
2:32:51   6    subscribers that were left on that month on June 30, 2013, which
2:32:54   7    I've explained is the last month which will be our smallest
2:32:59   8    amount of relevant subscribers on the base.  So there's probably
2:33:03   9    -- I wouldn't say there's probably, there was subscribers that
2:33:07  10    were not in use anymore, so those customers would just roll off
2:33:12  11    naturally.  So your recapture rate of 34% is what, of that
2:33:18  12    month, that last month we had the subscribers how many of them
2:33:22  13    we recaptured and put them on the CDMA network.  The other 60 --
2:33:23  14    I'm going to do the math real quick here, 66%, would have been
2:33:25  15    turned off.
2:33:25  16             BY MR. KERNELL:
2:33:30  17    Q.  You don't know where those subscribers went off after that?
2:33:33  18    A.  Well, if they were turned off by us after that, I know they
2:33:36  19    were nonuse subscribers.  If they were left, they would have
2:33:41  20    already been moved to a different carrier.  So those went away.
2:33:49  21    Q.  Can you explain why in March 31, 2011, two years before the
2:33:54  22    network was shutdown, the retention or the recaptures were only
2:33:57  23    27%?
2:34:02  24    A.  I don't know that I can -- of post-paid?
2:34:06  25    Q.  Of post-paid and of prepaid.  Only 27%.
```

2:34:12  1    A.  No, I can't explain that particular month, no.

2:35:11  2    Q.  What I've displayed here is Defendants' Exhibit 5022 which

2:35:19  3    is the 2014 -- from January 1, 2014 to March 31, 2014 SEC

2:35:41  4    filing.  Now, in 2014 Sprint continued to identify Nextel as a

2:35:43  5    trademark, correct?

2:35:48  6    A.  Yes, we have and continued to.

2:36:03  7    Q.  And in looking at Page 29, this exhibit, it shows that --

2:36:10  8    were you aware that in 2014 that Sprint's continued to lose

2:36:11  9    customers?

2:36:15  10   A.  Every carrier loses customers.  It's called churn, and it's

2:36:21  11   measured on a monthly basis.  And as subscribers move from one

2:36:24  12   carrier to another carrier, that's churn.  So every customer,

2:36:29  13   every carrier loses churn.  So yes, I'm aware that Sprint lost

2:36:29  14   customers.

2:36:32  15   Q.  But they had a net loss of customers, correct?

2:36:36  16   A.  Well, would you show that to me here so I can affirm that?

2:36:39  17   Because I don't recall this net subscriber number from every

2:36:44  18   quarter and every year.

2:36:58  19   Q.  So does this help refresh your memory on the losses?

2:37:02  20   A.  Does it refresh my memory?  It's -- actually I'm looking at

2:37:05  21   this the first time, so I'm going to have to read it.

2:37:06  22   Q.  That's fair.

2:37:08  23        MS. WHEATLEY:  Objection, Your Honor.  He's asking him

2:37:09  24   to read the document.

2:37:11  25        MR. KERNELL:  No, I said that's

```
2:37:12   1          (Cross-talk)
2:37:13   2          MS. WHEATLEY: ...since this is not a document he
2:37:14   3   authored or had anything to do with.
2:37:14   4          MR. KERNELL:  That's why I've moved on.
2:37:17   5       THE COURT:  I'll sustain the objection.  Move on.
2:37:37   6          MS. WHEATLEY:  Your Honor, can we not publish
2:37:39   7   Defendants' screen to the jury?
2:37:42   8          THE COURT:  Defendants' what?
2:37:43   9          MS. WHEATLEY:  Defendants' screen shows up for the jury
2:37:47  10   when they change exhibits.
2:37:49  11          MR. KERNELL:  Tried not to do it, but I clicked on the
2:37:52  12   wrong button.
2:37:56  13          THE COURT:  I'll click on the other button that shuts
2:37:57  14   it off.
2:37:57  15       BY MR. KERNELL:
2:38:05  16   Q.  What's shown in Exhibit 5024 is the form 10-K SEC filing of
2:38:16  17   March 31, 2015 for Sprint Corporation.  Again, in this document
2:38:21  18   it identifies Nextel as one of the trademarks of Sprint along
2:38:27  19   with Sprint Direct Connect, Boost Mobile and Assurance Wireless.
2:38:30  20   Were there any other -- do you know of any other trademarks that
2:38:36  21   Sprint was using at this time that is not -- that are not
2:38:37  22   identified here?
2:38:43  23   A.  I think Virgin.  You know, I don't know them all, but I know
2:38:47  24   we just talked about Virgin as an acquisition, so I know we used
2:38:51  25   Virgin.  But again, I don't really keep track of all of the
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 2:38:57 | 1 | trademarks at Sprint Corporation, just the ones I deal with. |
| 2:39:01 | 2 | Q.  And I believe on the previous page it identifies Sprint, |
| 2:39:05 | 3 | Boost Mobile, Virgin Mobile and Assurance Wireless there. |
| 2:39:06 | 4 | A.  Okay. |
| 2:39:07 | 5 | Q.  So -- |
| 2:39:08 | 6 | THE COURT:  Is that a question? |
| 2:39:11 | 7 | MR. KERNELL:  Just in response to his saying he didn't |
| 2:39:13 | 8 | see Virgin, and I said I believe it is there. |
| 2:39:15 | 9 | Do you see that, Mr. Shaughnessy? |
| 2:39:17 | 10 | THE WITNESS:  I saw that. |
| 2:39:17 | 11 | MR. KERNELL:  Okay. |
| 2:39:17 | 12 | BY MR. KERNELL: |
| 2:39:36 | 13 | Q.  Now, this is the fiscal year ended March 31, 2006, it's |
| 2:39:42 | 14 | Exhibit Number 5231, Form 10-K for Sprint. |
| 2:39:52 | 15 | Now, in the trademarks section here on this page, nine, |
| 2:39:57 | 16 | it identifies Sprint, Boost Mobile and Assurance Wireless.  Do |
| 2:39:59 | 17 | you see that? |
| 2:40:02 | 18 | MS. WHEATLEY:  Renew the objection. |
| 2:40:04 | 19 | MR. KERNELL:  It's a question, do you see that. |
| 2:40:07 | 20 | THE COURT:  I know it's a question, but okay.  Do you |
| 2:40:09 | 21 | see that? |
| 2:40:11 | 22 | THE WITNESS:  Can you restate the question?  I'm sorry. |
| 2:40:11 | 23 | BY MR. KERNELL: |
| 2:40:15 | 24 | Q.  Yes.  I said under the trademarks it identifies Sprint, |
| 2:40:19 | 25 | Boost Mobile and Assurance Wireless.  Do you see that? |

| | | |
|---|---|---|
| 2:40:19 | 1 | A.  I see that. |
| 2:40:29 | 2 | Q.  Now, all previous years leading up to this date, March 31, |
| 2:40:42 | 3 | 2016, from 2005 to 2015, Nextel was identified as a trademark. |
| 2:40:46 | 4 | Why isn't it in the 2016, do you know? |
| 2:40:53 | 5 | A.  I don't know.  I know that we don't use this as a marketing |
| 2:40:58 | 6 | document, this is a financial statement.  I was in the marketing |
| 2:41:02 | 7 | side, 2016 I rejoined the marketing side in fact.  I was in |
| 2:41:07 | 8 | sales up until 2016.  So I don't know and I know this is not a |
| 2:41:11 | 9 | marketing guide. |
| 2:41:32 | 10 | MR. KERNELL:  I'm going to offer into evidence |
| 2:41:40 | 11 | Defendants' Exhibit 5019 which is not objected to. |
| 2:41:49 | 12 | THE COURT:  Is 5019 not objected to, the press release? |
| 2:41:50 | 13 | MR. KERNELL:  Yes. |
| 2:41:53 | 14 | THE COURT:  I'm looking at them.  No offense but -- |
| 2:41:55 | 15 | MS. WHEATLEY:  Sorry.  No objection, Your Honor. |
| 2:41:58 | 16 | THE COURT:  Without objection, 5019 is admitted in |
| 2:42:02 | 17 | evidence. |
| 2:42:06 | 18 | (Defense Exhibit 5019 in evidence) |
| 2:42:06 | 19 | BY MR. KERNELL: |
| 2:42:24 | 20 | Q.  In your, I guess, work as sales and marketing, have you ever |
| 2:42:30 | 21 | been in charge of producing press releases for Sprint? |
| 2:42:34 | 22 | A.  No, I've never been in charge of producing them.  I have |
| 2:42:36 | 23 | reviewed them, but I've not produced them. |
| 2:42:37 | 24 | Q.  You've used them? |
| 2:42:40 | 25 | A.  I've reviewed them, but I've not produced them. |

2:42:42  1   Q.  Do you recall reviewing this press release?

2:42:44  2   A.  I don't recall reviewing this press release.  I may have

2:42:49  3   read it, but I don't recall reviewing it from a -- like a

2:42:50  4   publication perspective.

2:42:54  5   Q.  Before today, have you seen this press release?

2:43:00  6   A.  I've seen a lot of press releases from Sprint so I'm going

2:43:03  7   to -- I'll answer that I could have.  I don't know definitively

2:43:08  8   if I've read this press release.

2:43:31  9   Q.  In this press release, let me look, it refers to the iDEN

2:43:33  10  Nextel National Network.  Do you see that?

2:43:34  11  A.  I see that.

2:43:38  12  Q.  Now, is that terminology that you used in sales and

2:43:39  13  marketing?

2:43:43  14  A.  No, it usually just use the Nextel Network.  The iDEN piece

2:43:47  15  was not something that we necessarily had in our sales and

2:43:48  16  marketing collateral.

2:43:51  17  Q.  You just referred to the Nextel Network?

2:43:53  18  A.  We just referred to Nextel.

2:43:54  19  Q.  On the Sprint Network?

2:43:55  20  A.  Direct Connect, push-to-talk, yeah.

2:43:58  21  Q.  Okay.

2:44:26  22           MR. KERNELL:  If I may take a moment, Your Honor?

2:44:29  23           THE COURT:  You have.

2:45:20  24           MR. KERNELL:  I'd like to offer into evidence

2:45:25  25  Defendants Exhibit 5036.

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 2:45:28 | 1  | THE COURT:  5036.  Being offered into evidence.  Is          |
| 2:45:30 | 2  | there any objection?                                         |
| 2:45:32 | 3  | MS. WHEATLEY:  Your Honor, that wasn't disclosed so we       |
| 2:45:36 | 4  | need just a moment to see it on our list.                    |
| 2:45:39 | 5  | THE COURT:  I'm sorry, I could not hear what you said.       |
| 2:45:43 | 6  | Wasn't disclosed to us, so need a moment to see it.  Take your |
| 2:45:45 | 7  | moment.                                                      |
| 2:45:47 | 8  | MS. WHEATLEY:  Your Honor, we do object to the              |
| 2:45:50 | 9  | foundation of using this document with this witness.         |
| 2:45:52 | 10 | THE COURT:  All right.  Then let's -- jurors, if you         |
| 2:45:55 | 11 | can please excuse us, go into the jury room, we'll call you back |
| 2:46:00 | 12 | in a couple minutes.  Sorry, but I figured you would be more |
| 2:46:03 | 13 | comfortable.                                                 |
| 2:46:11 | 14 | (Jury out at 2:46 p.m.)                                      |
| 2:46:34 | 15 | THE COURT:  Okay.  What's the objection?                     |
| 2:46:37 | 16 | MS. WHEATLEY:  Your Honor, this is a compilation of          |
| 2:46:45 | 17 | cease and desist letters.  We object to these coming in through |
| 2:46:48 | 18 | Mr. Shaughnessy because he is not the author, he's not CCed, he |
| 2:46:50 | 19 | has, to my knowledge, no knowledge of these letters.         |
| 2:46:57 | 20 | THE COURT:  Okay. What is the purpose of introducing         |
| 2:46:59 | 21 | them now?                                                    |
| 2:47:00 | 22 | MR. KERNELL:  Well Your Honor, Mr. Shaughnessy               |
| 2:47:11 | 23 | testified earlier that he was at the IWCE trade show and in 2017 |
| 2:47:19 | 24 | that he sent his pictures to Melissa Jobe, and then -- and   |
| 2:47:26 | 25 | identified the individuals here in this courtroom.  So the   |

2:47:27  1   question is did he --

2:47:30  2        THE COURT:  I don't know how that makes him the guy to

2:47:34  3   introduce them through.  I mean, this is just very strange.  I

2:47:37  4   don't understand the juxtaposition of exhibits with this

2:47:43  5   gentleman that's on the stand.  It doesn't make any sense to me.

2:47:47  6        MR. KERNELL:  Well Your Honor, that's why quite frankly

2:47:52  7   why we asked that Ms. Jobe be present.  She was identified on

2:47:57  8   all the exhibits -- on all the witness lists up until just

2:48:01  9   recently.  She's the author of these, she's the trademark

2:48:05 10   attorney that was involved in all these matters.  So we're

2:48:11 11   asking a Sprint representative to bring these documents in.

2:48:13 12        MS. WHEATLEY:  Your Honor, they were able to question

2:48:16 13   Ms. Jobe on these letters in her deposition, and they have her

2:48:21 14   transcript and they plan to read it to the jury.

2:48:24 15        THE COURT:  I'll be honest with you, I'm seriously

2:48:28 16   considering putting a time limit on you for the witness because

2:48:31 17   this is an awful waste of time what you're doing right now.

2:48:39 18   Offering these through Mr. Shaughnessy makes no sense to me at

2:48:44 19   all.  I've just looked through it very briefly, they don't seem

2:48:49 20   to have anything to do with him.  You have taken the deposition

2:48:55 21   of whatever the lady's name was, and I'll sustain the objection

2:49:00 22   at this point.  Doesn't mean they're not admissible, and you can

2:49:03 23   introduce them right now, but don't ask this witness any

2:49:08 24   questions about them other than have you ever seen them before,

2:49:13 25   something like that.  So bring the jury back in please.

| | | |
|---|---|---|
| 2:49:18 | 1 | (Jury in at 2:49 p.m.) |
| 2:49:21 | 2 | MR. KERNELL:  Do I publish this to the jury? |
| 2:49:25 | 3 | THE COURT:  You can, by handing it to them or |
| 2:49:28 | 4 | something.  But move on.  You've got a witness on the stand. |
| 2:49:35 | 5 | Ask the witness a question.  When you're done with him, you're |
| 2:49:37 | 6 | done with him. |
| 2:50:07 | 7 | Take my advice, never pass up a chance to go to the |
| 2:50:09 | 8 | bathroom. |
| 2:50:10 | 9 | COURT SECURITY OFFICER:  Three in the bathroom, Your |
| 2:50:11 | 10 | Honor. |
| 2:50:13 | 11 | THE COURT:  That's good.  There's only two bathrooms. |
| 2:50:19 | 12 | What are you doing?  Jurors can be seated.  We're standing for |
| 2:50:20 | 13 | you. |
| 2:50:22 | 14 | MR. KERNELL:  No further questions, Your Honor. |
| 2:50:24 | 15 | THE COURT:  All right.  Hold on.  Wait until all the |
| 2:50:29 | 16 | jurors are here, then you can have no further questions. |
| 2:50:43 | 17 | There's two missing and two bathrooms.  That's makes sense.  I |
| 2:51:23 | 18 | can count, and I do.  You all can be seated.  We'll just wait |
| 2:51:55 | 19 | for them sitting down.  Orlando, you didn't scare them out the |
| 2:51:56 | 20 | other door, did you? |
| 2:51:59 | 21 | COURT SECURITY OFFICER:  I didn't Your Honor.  Promise. |
| 2:52:26 | 22 | THE COURT:  Go make sure they're not sitting in the |
| 2:52:29 | 23 | jury room waiting for us.  I don't think they would be but just |
| 2:52:31 | 24 | in case. |
| 2:52:35 | 25 | COURT SECURITY OFFICER:  They're not. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 2:52:38 | 1 | THE COURT:  Okay.  We can wait.  They've had to wait on |
| 2:52:42 | 2 | us many times so we'll wait for them.  Not a problem. |
| 2:53:34 | 3 | You may proceed, sir. |
| 2:53:37 | 4 | MR. KERNELL:  No further questions. |
| 2:53:37 | 5 | THE COURT:  Thank you, sir. |
| 2:53:47 | 6 | Yes, ma'am.  You may proceed. |
| 2:53:47 | 7 | CROSS-EXAMINATION |
| 2:53:47 | 8 | BY MS. WHEATLEY: |
| 2:53:52 | 9 | Q.  Mr. Shaughnessy, Mr. Kernell took you through what's called |
| 2:53:53 | 10 | 10-K documents, correct? |
| 2:53:54 | 11 | A.  Correct. |
| 2:53:58 | 12 | Q.  And these are financial reports submitted to the Securities |
| 2:54:00 | 13 | and Exchange Commission, correct? |
| 2:54:01 | 14 | A.  Correct. |
| 2:54:07 | 15 | Q.  When you decide to use the Nextel brand in marketing, do you |
| 2:54:09 | 16 | consult the 10-Ks? |
| 2:54:10 | 17 | A.  No. |
| 2:54:12 | 18 | Q.  Do you rely on the 10-Ks at all? |
| 2:54:13 | 19 | A.  No. |
| 2:54:25 | 20 | Q.  Okay.  Now, I'd like to pull up exhibit 5231 that Defendants |
| 2:54:34 | 21 | showed to you.  5231. |
| 2:54:38 | 22 | THE COURT:  Which is in evidence, correct? |
| 2:54:38 | 23 | MS. WHEATLEY:  Yes, Your Honor. |
| 2:54:39 | 24 | THE COURT:  Okay. |
| 2:54:39 | 25 | BY MS. WHEATLEY: |

2:54:47  1   Q.   If we could turn to Page 9, I just want to look at the

2:54:50  2   patents, trademarks and licenses section that Mr. Kernell talked

2:54:57  3   to you about.   And do you see where it says we own numerous

2:55:02  4   patents, patent applications, service marks, trademarks, and

2:55:05  5   other intellectual property in the US and other countries

2:55:12  6   including Sprint, Boost Mobile and Assurance Wireless.

2:55:16  7           Now, are Sprint, Boost Mobile and Assurance Wireless

2:55:19  8   the only trademarks Sprint owns?

2:55:19  9   A.   No.

2:55:22  10  Q.   And in this sentence are there any patents listed?

2:55:26  11  A.   Not that I can see, no.

2:55:28  12  Q.   Are there any patent applications listed?

2:55:30  13  A.   No.

2:55:32  14  Q.   Any other intellectual property listed?

2:55:37  15  A.   Not in the highlighted sentence, no.

2:55:40  16           MS. WHEATLEY:   Thank you Mr. Shaughnessy.

2:55:41  17           No further questions.

2:55:44  18           THE COURT:   Redirect?

2:55:48  19           MR. KERNELL:   No redirect.

2:55:51  20           THE COURT:   Thank you, sir.   You are excused.

2:55:58  21           THE WITNESS:   Thank you.   Do I take this evidence back

2:56:00  22  with me or leave it here.

2:56:01  23           THE COURT:   Leave it there.   Leave it on the desk.

2:56:04  24  Somebody will come get it.

2:56:06  25           Call your next witness please.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 2:56:07 | 1 | MR. SCHWARTZ:  Your Honor, could we have a quick |
| 2:56:11 | 2 | sidebar on the witness we discussed earlier this morning, and |
| 2:56:14 | 3 | then we have one other issue.  We've been trying to work out |
| 2:56:15 | 4 | some issues on the transcript. |
| 2:56:17 | 5 | THE COURT:  No, but I'll tell you what, I'm going to |
| 2:56:21 | 6 | send you back so the rest of you can use the bathroom, after |
| 2:56:22 | 7 | these two did. |
| 2:56:26 | 8 | COURT SECURITY OFFICER:  All rise for the jury. |
| 2:56:30 | 9 | (Jury out at 2:56 p.m.) |
| 2:56:36 | 10 | THE COURT:  I don't like sidebars. |
| 2:57:00 | 11 | You may be seated.  Door closed?  All right.  You may |
| 2:57:01 | 12 | proceed. |
| 2:57:04 | 13 | MR. SCHWARTZ:  Yes, Your Honor.  Earlier this morning, |
| 2:57:08 | 14 | just to deal with some housekeeping, you reserved ruling on the |
| 2:57:12 | 15 | issue of Mr. Jose Rivera.  So we just -- in order to manage our |
| 2:57:15 | 16 | schedule, we just wanted to know what the Court'S position was |
| 2:57:16 | 17 | on that. |
| 2:57:17 | 18 | THE COURT:  Remind me again what the issue was. |
| 2:57:20 | 19 | MR. SCHWARTZ:  The issue was, Your Honor, that we |
| 2:57:26 | 20 | intend to call Jose Rivera, corporate rep for Nextel and, |
| 2:57:30 | 21 | Plaintiffs claim that he's a surprise witness, we both submitted |
| 2:57:36 | 22 | trial memos.  I advised the Court that there was at least six, |
| 2:57:41 | 23 | seven, eight instances of disclosures going back as far as 2017 |
| 2:57:46 | 24 | pre-suit.  And then in the year of 2018, Mr. Rivera was listed |
| 2:57:52 | 25 | actually on the Plaintiff's preliminary witness list.  He was on |

| | | |
|---|---|---|
| 2:57:55 | 1 | our -- identified as an employee of one of the Defendants. |
| 2:58:00 | 2 | There was letters, the investigation that the gentleman |
| 2:58:04 | 3 | testified to, he was told specifically by Ms. Wheatley about Mr. |
| 2:58:09 | 4 | Kaplan, Mr. Rivera and Mr. Calabrese.  There was a few other |
| 2:58:13 | 5 | instances, and so there's no prejudice with regard to that |
| 2:58:16 | 6 | particular witness. |
| 2:58:19 | 7 |         THE COURT:  All right.  I remember now.  I'll permit |
| 2:58:21 | 8 | it. |
| 2:58:23 | 9 |         MR. RIOPELLE:  May I address the point? |
| 2:58:26 | 10 |         THE COURT:  Sure.  Of course you may.  For a reasonable |
| 2:58:27 | 11 | amount of time. |
| 2:58:29 | 12 |         MR. RIOPELLE:  Of course.  The issue here, Your Honor, |
| 2:58:35 | 13 | is not whether we knew the identity of Mr. Rivera; the issue is |
| 2:58:40 | 14 | whether Defendants identified Mr. Rivera as someone who would |
| 2:58:46 | 15 | support its claims.  That's exactly what Judge Bloom in the |
| 2:58:52 | 16 | National Union case pointed out and made her decision on.  The |
| 2:59:00 | 17 | reason that he was on our list in November of 2018, the Court |
| 2:59:04 | 18 | had ordered preliminary witness lists.  It was before any |
| 2:59:08 | 19 | depositions had been taken.  So out of an abundance of caution, |
| 2:59:13 | 20 | of course we knew from corporate records that he was an owner. |
| 2:59:17 | 21 | When we sought the deposition of 30(b)(6) deposition of Nextel, |
| 2:59:25 | 22 | Inc.  Mr. Calabrese was identified on all topics and based on |
| 2:59:29 | 23 | his deposition testimony, it appeared that Mr. Rivera had no |
| 2:59:33 | 24 | major role and was not going to be used, was not being |
| 2:59:35 | 25 | identified as someone on who they were going to rely on their |

| | | |
|---|---|---|
| 2:59:40 | 1 | claims.  So the next time we filed our witness list, which was |
| 2:59:43 | 2 | getting ready for the first time this trial was scheduled, we |
| 2:59:48 | 3 | removed him.  Defendants did not put him on their witness list. |
| 2:59:51 | 4 | Fast-forward now to when we the trial gets rescheduled |
| 2:59:57 | 5 | until now, in March we do not put him on our witness list, they |
| 3:00:01 | 6 | do not put him on their witness list.  The first time they -- so |
| 3:00:03 | 7 | he's not been deposed, we have no idea what he's going to |
| 3:00:08 | 8 | testify about, he did not testify, was not designated by them as |
| 3:00:13 | 9 | a 30(b)(6), and they have never -- what they're doing is they're |
| 3:00:19 | 10 | trying to put the burden on us, but the burden under the rules, |
| 3:00:22 | 11 | under Rule 37, it's on them.  They have to have identified him |
| 3:00:25 | 12 | as someone who would support their claims.  They did not do |
| 3:00:30 | 13 | that.  So under Rule 37, as Judge Bloom held in the National |
| 3:00:35 | 14 | Union case, they do not get to call him as a witness. |
| 3:00:40 | 15 | And the one thing I'd also add to this, they were doing |
| 3:00:50 | 16 | this because Mr. Calabrese was now unavailable.  We have waived |
| 3:00:55 | 17 | our right to object to them reading Mr. Calabrese's deposition |
| 3:01:00 | 18 | in their case.  So they can remedy it through the deposition |
| 3:01:04 | 19 | that has been read.  They don't get to remedy it. |
| 3:01:07 | 20 | MR. SCHWARTZ:  I didn't need his permission, Your |
| 3:01:08 | 21 | Honor. |
| 3:01:09 | 22 | MR. RIOPELLE:  Stop.  Stop this. |
| 3:01:11 | 23 | THE COURT:  Why do you keep interrupting? |
| 3:01:12 | 24 | MR. SCHWARTZ:  I'm sorry, Your Honor. |
| 3:01:13 | 25 | THE COURT:  Don't. |

| | | |
|---|---|---|
| 3:01:14 | 1 | MR. SCHWARTZ:  I apologize. |
| 3:01:14 | 2 | THE COURT:  Go. |
| 3:01:16 | 3 | MR. RIOPELLE:  They don't get to remedy it by calling a |
| 3:01:19 | 4 | witness who has never been identified by them as a witness and |
| 3:01:23 | 5 | was never identified as someone who was going to support their |
| 3:01:27 | 6 | claims.  And I would say that we did have a right to not have |
| 3:01:33 | 7 | them read Mr. Calabrese's deposition, but we're waiving that |
| 3:01:35 | 8 | right because we, of course, know that we have no idea what |
| 3:01:40 | 9 | Mr. Rivera is going to say.  And again, I do have a copy of the |
| 3:01:43 | 10 | National Union case Your Honor, but I will say that it is |
| 3:01:44 | 11 | highlighted. |
| 3:01:45 | 12 | THE COURT:  I don't care about the highlighting.  I |
| 3:02:02 | 13 | read the case.  I'm not real sure that her case is really |
| 3:02:09 | 14 | exactly on point, but that's not the issue.  I don't know why |
| 3:02:14 | 15 | you didn't take his deposition anyway as an owner. |
| 3:02:20 | 16 | MR. RIOPELLE:  I can address that. |
| 3:02:21 | 17 | THE COURT:  Go ahead. |
| 3:02:23 | 18 | MR. RIOPELLE:  We took it because -- we took the |
| 3:02:25 | 19 | deposition of the company as a 30(b)(6), and the personal |
| 3:02:28 | 20 | deposition of Mr. Calabrese.  And the way Mr. Calabrese -- and I |
| 3:02:32 | 21 | can find it here, I have it.  When he testified about what |
| 3:02:43 | 22 | Mr. Rivera was doing, he testified -- for example, we asked him |
| 3:02:46 | 23 | the question can you give me some examples of some assistance |
| 3:02:51 | 24 | Mr. Rivera has provided at NW?  Answer, today he's answering my |
| 3:02:55 | 25 | phone.  Maybe shipping something.  Helping me go to the Post |

| | | |
|---|---|---|
| 3:03:00 | 1 | Office and ship something.  Question, has he done any more |
| 3:03:04 | 2 | substantive work for NW or was it mostly tasks like that? |
| 3:03:07 | 3 | Answering of phones, shipping something.  Stuff like that, |
| 3:03:08 | 4 | that's it. |
| 3:03:12 | 5 | Based on that, we had no reason to waste our client's |
| 3:03:13 | 6 | money or our time. |
| 3:03:16 | 7 | THE COURT:  Yeah, that doesn't really give them much |
| 3:03:19 | 8 | reason to talk to him at all. |
| 3:03:21 | 9 | All right.  Now it's your turn. |
| 3:03:24 | 10 | MR. SCHWARTZ:  Your Honor, the test is not whether or |
| 3:03:29 | 11 | not they decided in their own case to depose other witnesses. |
| 3:03:35 | 12 | They listed 50 or so witnesses.  The principle of Rule 26 is to |
| 3:03:39 | 13 | exchange basic information.  And they actually knew about |
| 3:03:43 | 14 | Mr. Rivera before the lawsuit was even filed. |
| 3:03:45 | 15 | THE COURT:  Yeah, but when they took the deposition of |
| 3:03:49 | 16 | the guy that is acknowledged to have been the main guy, he said |
| 3:03:53 | 17 | he was a gopher.  He was the office boy. |
| 3:03:55 | 18 | MR. SCHWARTZ:  Your Honor, with all due respect to |
| 3:03:59 | 19 | Mr. Rivera sitting here, he's a 50/50 owner.  He's the vice |
| 3:04:02 | 20 | president.  He's listed on SunBiz.  He has been since |
| 3:04:06 | 21 | incorporation.  He's a director, he's an officer, he was more |
| 3:04:08 | 22 | than that.  We would have to go through the whole deposition to |
| 3:04:11 | 23 | see and parse out -- and by the way, I wasn't the one taking the |
| 3:04:14 | 24 | deposition, Ms. Wheatley took it.  I don't know what she was |
| 3:04:17 | 25 | going to ask.  Maybe she looked at Mr. Calabrese and thought -- |

3:04:21  1    you saw him on the video, maybe she asked him a few questions,

3:04:25  2    didn't ask the right questions.  That's not my job.  That's

3:04:25  3    their job.

3:04:27  4            THE COURT:  One of the questions that was asked was

3:04:32  5    what was his role and the answer was that he picked up coffee

3:04:38  6    and ran errands.  Read that part back to me again, Counsel.

3:04:41  7    Read the question and the answer.

3:04:42  8            MR. RIOPELLE:  Yes, Your Honor.

3:04:45  9            Question:  Can you give me some examples of some

3:04:51  10   assistance Mr. Rivera has provided to NW?  Answer:  Today he's

3:04:55  11   answering my phone.  Maybe shipping something, helping me go to

3:04:59  12   the Post Office and ship something.  Question:  Has he done any

3:05:03  13   more substantive work for NW or is it mostly tasks like that

3:05:06  14   answering of phone, shipping something?  Answer:  Stuff like

3:05:09  15   that, that's it.

3:05:11  16           MR. SCHWARTZ:  Your Honor, I can show you other areas

3:05:15  17   of the deposition where he asks him no, I consider him a 50/50

3:05:19  18   owner with me.  Does he do any work for NW?  Yeah, he helps me.

3:05:23  19   It's maybe work if you define it like that.  I mean, it's just,

3:05:29  20   he does what needs to be done.  So it could be work, you know.

3:05:36  21   That's very subjective for a small business where it's just at

3:05:40  22   that moment in time.  Mr. Rivera and Mr. Calabrese.  And it

3:05:43  23   would be highly prejudicial under the rules, under the case law

3:05:48  24   cited in the memo for you to foreclose us from calling

3:05:52  25   Mr. Rivera as a witness in this particular case.

3:05:55  1        THE COURT:  You have a duty to disclose, which is wiped

3:05:59  2   out by their having noticed him.  But then they removed him and

3:06:02  3   it appears that at least one of the reasons for them removing

3:06:05  4   was that they were told he had nothing to do with anything, and

3:06:08  5   that would have been a waste of time and money to take his

3:06:15  6   deposition.  Your president told them he was the office boy.

3:06:17  7        MR. SCHWARTZ:  I don't think he said office boy, Your

3:06:17  8   Honor.

3:06:20  9        THE COURT:  Of course not.  But he said he ran

3:06:25  10  errands, he made shipments, he answered the phone.  That doesn't

3:06:30  11  sound like a person that's worth taking a deposition of.

3:06:32  12       MR. SCHWARTZ:  I can't control what they've decided to

3:06:33  13  do on their case.

3:06:35  14       THE COURT:  No, and that's not what they're asking you

3:06:40  15  to, but you can control what your president says is this guy's

3:06:45  16  function to prevent them being misled.  And I think they were

3:06:48  17  misled in this one.

3:06:50  18       MR. SCHWARTZ:  Your Honor, if I could point out --

3:06:52  19       THE COURT:  In determining whether to exclude the

3:06:55  20  testimony of a nondisclosed witness, the Court must consider

3:06:59  21  three factors:  one, the importance of the testimony; two, the

3:07:02  22  reason for the failure to disclose the witness earlier; three,

3:07:06  23  the prejudice to opposing party if the witness is allowed to

3:07:11  24  testify.  I would say that at least two of those three are very

3:07:14  25  strongly in favor of not allowing him to testify.

3:07:18  1          MR. SCHWARTZ:  Your Honor, Mr. Rivera handles all

3:07:22  2      aspects of that business.  The tech side, the sales side, the

3:07:25  3      financial side.  He's important to the case in terms of just

3:07:29  4      discussing the damages that have incurred to Nextel and --

3:07:31  5          THE COURT:  But that's not what the president of the

3:07:36  6      company said.  And that was a deposition, a sworn testimony.

3:07:39  7      Wasn't it?

3:07:42  8          MR. SCHWARTZ:  It's very subjective as to what they

3:07:45  9      considered his answers to be.  He was identified --

3:07:48  10          THE COURT:  He read the answer to me.

3:07:50  11          MR. SCHWARTZ:  He wasn't just identified on one

3:07:52  12      particular page.  I mean, there was other issues.

3:07:54  13          THE COURT:  Well, give me something else that shows

3:07:58  14      that he did, because what you just read to me before was

3:08:02  15      basically very general and yeah, he does a lot whatever is

3:08:07  16      needed.  Whatever is needed includes picking up the mail,

3:08:10  17      whatever it was that he said before.

3:08:16  18          MR. SCHWARTZ:  If you give me one minute, Your Honor.

3:09:01  19      On Page 268 of the deposition, Mr. Calabrese was asked well,

3:09:04  20      since -- if you want to send -- you know, as your attorneys, I'm

3:09:07  21      sure, have told you, you're required to disclose your

3:09:09  22      calculations of damages.  Uh-huh, yes.  So you know, and, you

3:09:13  23      know, you're required to work -- disclose any documents you rely

3:09:17  24      on to calculate those you damages.  Are you able to do that by

3:09:20  25      the end of this week.  Is that feasible.  Well, it's a team

3:09:24   1   effort.  So I would say yes on my own personal part, but these

3:09:25   2   gentlemen would be involved.

3:09:27   3          So Mr. Calabrese relied upon Mr. Rivera.

3:09:32   4          THE COURT:  Where does he even mention his name?

3:09:34   5          MR. SCHWARTZ:  Well, it's just Mr. Calabrese and

3:09:38   6   Mr. Rivera.  So when he says it's a team effort, he's referring

3:09:42   7   to his partner, his 50/50 partner, Your Honor.

3:09:45   8          THE COURT:  Does his 50/50 partner have a frog in his

3:09:47   9   pocket when he said these gentlemen?  That's more than one so

3:09:50   10  there's three?  There's seven?

3:09:52   11         MR. SCHWARTZ:  Well, there was lawyers also that were

3:09:54   12  going to be involved per the --

3:09:57   13         THE COURT:  I don't know.  I don't buy that.  I'm

3:10:01   14  sorry.  He said -- he doesn't mention his name, he says these

3:10:04   15  gentlemen are going to be involved, and now you're telling me

3:10:08   16  there was only one involved, and that was this gentleman that

3:10:10   17  you want him to testify.

3:10:15   18         MR. SCHWARTZ:  Your Honor, the private investigator's

3:10:22   19  report identified, per McGuireWoods, that Jose Rivera was one of

3:10:25   20  the owners of the company that they --

3:10:27   21         THE COURT:  That has not been an issue.  Nobody has

3:10:29   22  said that he isn't one of the owners.

3:10:31   23         MR. SCHWARTZ:  So for them to suggest that oh, well

3:10:35   24  because of the way Mr. Calabrese answered a particular question

3:10:38   25  which is very subjective, they decided oh, we're not going to

| | | |
|---|---|---|
| 3:10:39 | 1 | take a deposition. |
| 3:10:42 | 2 | THE COURT:  It's a very direct question.  It was a very |
| 3:10:45 | 3 | direct question and it was asked very direct way, was not |
| 3:10:51 | 4 | confusing.  It was not obtuse, it was not -- you know, it was a |
| 3:10:58 | 5 | very simple question.  What's his job?  He helps with the mail. |
| 3:11:01 | 6 | Does this, he does that.  Why in the world would anybody take |
| 3:11:06 | 7 | his deposition?  The fact that he's an owner?  Yeah, there's -- |
| 3:11:09 | 8 | I suspect that public companies have thousands of owners and you |
| 3:11:14 | 9 | can't go take a deposition of everybody that's an owner.  In |
| 3:11:17 | 10 | this case, there just happens to be two of them but one of them, |
| 3:11:21 | 11 | you know, I don't know the percentage of ownership, 50/50, okay, |
| 3:11:25 | 12 | then what is it?  You know, I don't know the splitting of |
| 3:11:28 | 13 | profits, I don't know the responsibilities, but Calabrese should |
| 3:11:32 | 14 | know the responsibilities and what he said made his |
| 3:11:34 | 15 | responsibilities sound like nothing. |
| 3:11:36 | 16 | MR. SCHWARTZ:  May I? |
| 3:11:38 | 17 | THE COURT:  Go ahead.  I gave you the opportunity and I |
| 3:11:41 | 18 | thought you were starting, but what you said to me before |
| 3:11:44 | 19 | doesn't move the ball at all.  Tell me what you got. |
| 3:11:49 | 20 | MR. SCHWARTZ:  On Page 32 when he's first asked about |
| 3:11:55 | 21 | -- that he's the co-owner of NW which is Nextel Worldwide. |
| 3:11:57 | 22 | THE COURT:  I know what it is.  Go ahead. |
| 3:12:00 | 23 | MR. SCHWARTZ:  He says Mr. Rivera.  He asked how he met |
| 3:12:02 | 24 | him.  He said I met him through the telecommunications business |
| 3:12:08 | 25 | and then on Page 33, the questions continue.  We don't really |

3:12:11  1    have roles.  I mean, he just helps me with taking care of

3:12:15  2    business.  Are you -- do you have equal say in all business

3:12:19  3    decisions as far as yes, we both have an equal amount of the

3:12:23  4    company, equal voting.  I believe yes.  And you are the

3:12:27  5    president.  Or is Mr. Rivera the president.  They already knew

3:12:30  6    that Calabrese was the president and they knew Mr. Rivera was

3:12:33  7    the vice president.

3:12:35  8            THE COURT:  But here's the problem.  If you knew that

3:12:38  9    he was so important, then you should have identified him

3:12:42  10   yourself, not just tagged along with whatever they say.  You

3:12:46  11   should have said, you know, that he was going to be one of your

3:12:52  12   witnesses, not just tagged along.  That's for inferential

3:12:56  13   people.  Failure to disclose, I don't think, is justified.  If

3:13:02  14   you knew that he was a very important figure in this case, you

3:13:05  15   can't hide him in the weeds.

3:13:07  16           MR. SCHWARTZ:  We certainly weren't hiding him.  He was

3:13:10  17   identified by name on the preliminary witness list and then in

3:13:15  18   our response we indicated that we agreed with the Plaintiff.

3:13:17  19           THE COURT:  Oh, come on.  I see that language in all of

3:13:22  20   them and that's great, but that doesn't mean, you know, that of

3:13:26  21   itself -- if were talking about somebody that nobody knew was

3:13:29  22   important, then that's fine.  But if you knew that he was

3:13:31  23   important, I think you should have identified him.  And then

3:13:36  24   when they dropped him, you certainly should have identified him.

3:13:40  25   When they dropped him from their witness list, you certainly

3:13:47  1    should have identified him.  I don't think it's harmless.

3:13:52  2           MR. SCHWARTZ:  I think one other point, Your Honor, is

3:13:56  3    that he was identified not three days before trial, but on March

3:14:01  4    13th as being the corporate representative to attend.

3:14:03  5           THE COURT:  Well of course, because the other guy was

3:14:06  6    in the mental health place.  I mean that's --

3:14:07  7           MR. SCHWARTZ:  I mean that's --

3:14:09  8           THE COURT:  And according to you, there's only two of

3:14:14  9    them.  So the other guy has locked himself up or been sent to

3:14:19  10   somewhere and then who else is there going to be?  There isn't

3:14:19  11   anybody else.

3:14:22  12          MR. SCHWARTZ:  I'm not -- I can't deny that.  That's

3:14:25  13   how fate has it.  I lost one and I --

3:14:27  14          THE COURT:  I think you had a duty to identify him and

3:14:29  15   you didn't, and I will not permit him to testify.

3:14:32  16          Let's move on.  What else you got?

3:14:35  17          MR. SCHWARTZ:  I just want to know one thing, that he

3:14:39  18   can be called as a rebuttal or impeachment witness if necessary.

3:14:43  19          THE COURT:  Well, if there's something that's -- yes,

3:14:45  20   the rebuttal witness does not need to be identified, and if

3:14:49  21   there is an occasion why he should be a rebuttal witness, we can

3:14:52  22   -- you know, he can testify in his capacity as a rebuttal

3:14:54  23   witness.

3:14:56  24          MR. SCHWARTZ:  Just wanted to be clear on that, Your

3:14:56  25   Honor.

3:14:56  1          THE COURT:  Yeah.

3:14:58  2          MR. SCHWARTZ:  On the issue of a transcript with

3:15:07  3   Mr. Calabrese, our portion that we plan to read, in the break, I

3:15:11  4   was trying -- they've asked me to look at certain issues that

3:15:15  5   they felt needed to be removed from the transcript.  I've been

3:15:19  6   able to deal with three of the four of their items without an

3:15:25  7   issue.  They want to -- but there's, let's call it, ten pages of

3:15:30  8   transcripts concerning what they call damages which they want

3:15:34  9   stricken, but that's not what was discussed among counsel.  What

3:15:37  10  was discussed was that we had designated -- they had designated,

3:15:41  11  they were going to read or show the video in theirs and we were

3:15:43  12  going to do the same.  Not that we were going to come here today

3:15:46  13  and have further dialogue about it.

3:15:52  14          Now on the issue of what's in the order of the motion

3:15:57  15  in limine, on the abandonment issue, no problem, I agreed and I

3:16:01  16  struck out certain issues on the issue of advice of counsel.

3:16:04  17  Again per the order, I took care of that striking out, you know,

3:16:09  18  what they pointed out to me not an issue.  But we shouldn't have

3:16:13  19  further dialogue and argument about what they now maybe don't

3:16:14  20  want to see read.

3:16:16  21          THE COURT:  Well, they removed some of theirs and your

3:16:21  22  testimony would have been in response to that wasn't it?  I

3:16:24  23  don't know.  Let me hear from their side.

3:16:27  24          MR. RIOPELLE:  They had provided to us what were

3:16:31  25  designations.  They were not identified as counters.  Your Honor

3:16:42  1   has never seen any of theirs.  So when they weren't read or
3:16:46  2   played in our case, I told them yesterday what are you going to
3:16:52  3   play or read from Mr. Calabrese, and they said what we sent you
3:16:56  4   on Sunday.  We said okay fine, we haven't given you any
3:17:00  5   objections yet, let us look at it tonight and we'll give you the
3:17:02  6   objections tomorrow.  And so that's what we've done.  There is
3:17:08  7   parts in there that we're going to object to or we think is
3:17:08  8   objectionable.
3:17:12  9                On the damages Your Honor, Your Honor ruled on a
3:17:16  10  motion in limine that they have to be very careful about what
3:17:22  11  they put in on the damage.  They can't be putting in speculative
3:17:25  12  stuff, it has to be supported and that's why we're objecting.
3:17:28  13  The testimony they want to put in from Mr. Calabrese is
3:17:29  14  extremely --
3:17:33  15               THE COURT:  Let me hear it so I can rule.
3:17:36  16               MR. SCHWARTZ:  Well, it's about ten pages, Your Honor.
3:17:39  17  Should I just give you the transcript and you take a quick look
3:17:40  18  at it?
3:17:42  19               THE COURT:  All right.  Do you have a witness to put on
3:17:43  20  while I'm doing that?
3:17:47  21               MR. RIOPELLE:  I do have -- I have a marked one that's
3:17:52  22  been marked.  Just highlighted.
3:17:58  23               THE COURT:  You guys haven't agreed on whether the sky
3:18:01  24  is blue, so I don't know how you're going to agree to this.
3:18:02  25               MR. RIOPELLE:  The markings are blue.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

3:18:07  1          THE COURT:  I saw them.  I saw them.

3:18:30  2          (Counsel conferring)

3:18:38  3          MR. RIOPELLE:  While he's looking for this, Your Honor,

3:18:42  4   so we can take stuff and not waste more of the jurors' time, my

3:18:44  5   understanding is they also plan to read from the Jobe

3:18:47  6   deposition, they also plan to read from the Mancuso deposition.

3:18:51  7   We have just some minor things that need to be addressed in

3:18:53  8   those before they're read so we don't interrupt it in the middle

3:18:54  9   of the reading.

3:18:58  10         THE COURT:  Well, why don't we -- you have anything

3:19:05  11  that can be done for the next, roughly, hour or so so that we

3:19:08  12  can let the jury go home early and we'll deal with it after

3:19:11  13  they're gone?

3:19:12  14         MR. RIOPELLE:  Maybe we can work out this Calabrese.  I

3:19:17  15  really would not want the jury to go home early.  I would really

3:19:20  16  like to shoot to getting these closings done and the case go to

3:19:22  17  the jury tomorrow afternoon if we could do that.

3:19:24  18         THE COURT:  That would be very nice.  I would love to

3:19:27  19  do it.

3:19:30  20         MR. RIOPELLE:  You and my wife.

3:19:34  21         THE COURT:  I'm sure.  We're very close, me and your

3:19:35  22  wife.

3:19:38  23         MR. RIOPELLE:  I wondered why she kept saying she

3:19:40  24  wanted to come down here, now I know why.

3:19:42  25         THE COURT:  This case is driving me to take senior

3:19:47   1    status and become a male model.  That's probably what attracted

3:20:00   2    her to me.  I already got Judge Bloom to take May.

3:20:33   3           MR. RIOPELLE:  The issues on the Mancuso one, Your

3:20:36   4    Honor, are very small if you want to address that.

3:20:37   5           THE COURT:  I don't care, but they're working on

3:20:41   6    something so how are they going to deal with it while --

3:20:46   7           MS. DeFORD:  Your Honor, I can briefly address the two

3:20:50   8    issues that we have with Mr. Mancuso's transcript.

3:20:53   9           THE COURT:  Somebody give me a copy of his transcript

3:20:56  10   and the issues involved, let me read it.

3:20:58  11          MS. DeFORD:  Yes, Your Honor.

3:21:28  12          The two issues we have, Your Honor, are related.  They

3:21:32  13   start on Page 83 at Line 20.  The issue we have with this line

3:21:37  14   of testimony is it's testimony from Mr. Mancuso about the letter

3:21:41  15   that Mr. Rubin had given to Mr. Calabrese that he was showing at

3:21:47  16   IWCE.  Prior to yesterday when Mr. Kaplan told the jury that

3:21:52  17   Mr. Rubin had given advice of counsel to Mr. Calabrese, this

3:21:55  18   testimony probably wouldn't have had any context.  But since

3:22:00  19   that disclosure, we're concerned that it will.

3:22:03  20          THE COURT:  Okay.  Tell me that again please.  Page 83,

3:22:05  21   Line 20?

3:22:08  22          MS. DeFORD:  Line 20.  So where we're saying what was

3:22:10  23   that paper he showed you, it was just something that he bought,

3:22:13  24   that they bought or owned the name.  If you go down, you can see

3:22:13  25   the questions --

```
3:22:15   1              THE COURT:  I remember reading this before when I was
3:22:16   2      looking at the deposition.
3:22:18   3              MS. DeFORD:  Sure.  And so my concern, Your Honor, is
3:22:21   4      now the jury has context around this issue because Mr. Kaplan
3:22:25   5      testified yesterday, without prompting, that Mr. Rubin had given
3:22:29   6      advice of counsel.  And I'm just concerned that that will
3:22:34   7      reinforce something that Your Honor has already excluded by
3:22:36   8      talking about this letter that the Court has excluded and the
3:22:43   9      context of Mr. Mancuso's deposition.
3:22:57  10              THE COURT:  You want that in?
3:22:59  11              MS. DeFORD:  We want that be excluded, Your Honor.
3:23:01  12              THE COURT:  I know.  I'm asking them.  They want it in.
3:23:04  13      Why do you want it in?  What does it prove other than the fact
3:23:06  14      that you might have gotten advice of counsel because when you
3:23:11  15      see that piece of paper, it shows his -- the guy's name and it
3:23:18  16      shows that he's a lawyer and it shows what the advice was that
3:23:26  17      he was giving.  Why is that relevant at all?  What's the
3:23:34  18      relevance of 20 through the next Page, Line 7 on 84?  I think
3:23:38  19      that what you want is in the answer that's immediately before
3:23:46  20      that.  That one I don't see as being particularly relevant.
3:23:58  21              MR. SCHWARTZ:  Well, I would say, Your Honor --
3:24:01  22              THE COURT:  Use the microphone.  Okay?
3:24:08  23              MR. SCHWARTZ:  I'm sorry.  I would say lines 20 through
3:24:13  24      23 should be acceptable.  I understand, you know, 24 and 25
3:24:17  25      which refers to the exhibit.  I'm going to say it continues
```

| | | |
|---|---|---|
| 3:24:19 | 1 | where he mentions Mr. Rubin. |
| 3:24:21 | 2 | THE COURT:  All right.  20 through 23, what's the |
| 3:24:23 | 3 | objection to that? |
| 3:24:25 | 4 | MS. DeFORD:  I think the objection there is it's highly |
| 3:24:29 | 5 | misleading.  Mr. Mancuso is testifying from memory on this. |
| 3:24:32 | 6 | He's testifying about what Mr. Rubin had told Mr. Calabrese. |
| 3:24:35 | 7 | Mr. Rubin certainly didn't, in that letter, tell him that they |
| 3:24:38 | 8 | had bought the name or that they owned the name, he was just |
| 3:24:40 | 9 | giving his legal opinion.  It's a back-door way, Your Honor, to |
| 3:24:45 | 10 | get in the legal opinion that this Court has already excluded. |
| 3:24:51 | 11 | THE COURT:  Yeah, I'm going to exclude 20 through the |
| 3:24:52 | 12 | next Page 7. |
| 3:24:54 | 13 | MS. DeFORD:  The only other small issue we have related |
| 3:24:56 | 14 | to that is on Page 85. |
| 3:24:57 | 15 | THE COURT:  What do you got? |
| 3:25:00 | 16 | MS. DeFORD:  This testimony from 15 to -- I'm sorry |
| 3:25:06 | 17 | 85/15 all the way down to 86/18 I believe already came in in |
| 3:25:09 | 18 | Plaintiff's case.  I would just like to be clear that the |
| 3:25:13 | 19 | exhibit there, per the Court's ruling yesterday, has been |
| 3:25:16 | 20 | truncated just to the cover e-mail to remove Mr. Rubin's letter. |
| 3:25:20 | 21 | So we would ask that they don't try to introduce a version of |
| 3:25:24 | 22 | that exhibit that would include his letter. |
| 3:25:26 | 23 | THE COURT:  Okay.  So as long as they don't include |
| 3:25:30 | 24 | Mr. Rubin's letter then there's no objection.  You don't plan on |
| 3:25:36 | 25 | trying to sneak Mr. Rubin's letter in through that, are you? |

3:25:38   1          MR. SCHWARTZ:  We've tried, Your Honor, and you shut us

3:25:38   2     down.

3:25:41   3          THE COURT:  So you're not going to try again.  All

3:25:42   4     right.  It's understood.  Is that it?

3:25:43   5          MS. DeFORD:  Thank you, Your Honor.  That's it.

3:25:45   6          THE COURT:  That was easy.  Got to be some

3:25:49   7     complication.  Give it back.  You can have this back.

3:26:07   8          What else do we have that we can discuss right now?

3:26:15   9          MR. RIOPELLE:  We can address some issues in Jobe and,

3:26:19  10     we can go back and address Calabrese.

3:26:21  11          THE COURT:  Somebody is going have to give me Jobe, or

3:26:34  12     the wisdom of, or something.  Patience of Jobe, not the depo of

3:26:35  13     Jobe.

3:26:44  14          All right.  We're talking about Jobe and what else?

3:26:47  15          MR. RIOPELLE:  Judge, did you finish up?  I know that

3:26:50  16     he's looking at the ones he's looking at, but also the damages

3:26:50  17     part.

3:26:52  18          THE COURT:  Okay.  Let's see.  I'll get my copy so I

3:26:55  19     can follow.

3:27:01  20          MR. RIOPELLE:  If you'd like, Your Honor --

3:27:01  21          (Cross-talk)

3:27:06  22          THE COURT:  Very complicated.

3:27:17  23          MS. DeFORD:  I apologize, Your Honor.  On Ms. Jobe, do

3:27:18  24     we have a copy for him?

3:27:21  25          THE COURT:  I have a copy.  It's coming, but it's not

| | | |
|---|---|---|
| 3:27:23 | 1 | here yet. |
| 3:27:24 | 2 | MS. DeFORD:  Sure.  Would you like me to wait, Your |
| 3:27:25 | 3 | Honor? |
| 3:27:27 | 4 | THE COURT:  Tell me in general terms so I can hear it |
| 3:27:30 | 5 | and I'll read it when it gets here. |
| 3:27:32 | 6 | MS. DeFORD:  Sure.  In our objections to Ms. Jobe's |
| 3:27:35 | 7 | testimony from pages 104 all the way through 107, the Court |
| 3:27:39 | 8 | sustained our objections to testimony from Ms. Jobe based off of |
| 3:27:43 | 9 | a letter that has not been authenticated that she was not on, |
| 3:27:48 | 10 | and that constitutes an inadmissible hearsay between what we |
| 3:27:52 | 11 | think is Mr. Calabrese and some individual who is not going to |
| 3:27:54 | 12 | testify in this case. |
| 3:28:04 | 13 | Later on at 107/13 all the way down to 108/7, there is |
| 3:28:09 | 14 | continued discussion about what Ms. Jobe did in response or what |
| 3:28:13 | 15 | nobody did in response, because no one at Sprint actually knew |
| 3:28:17 | 16 | that this e-mail exchange had occurred between Mr. Calabrese and |
| 3:28:21 | 17 | this supposed individual.  And out of context, well to start, |
| 3:28:25 | 18 | the entire point of that testimony is to discuss hearsay |
| 3:28:34 | 19 | testimony the Court has already excluded it's 107/13 through |
| 3:28:38 | 20 | 108/7. |
| 3:28:42 | 21 | MR. KERNELL:  108/7 we're not reading that.  You said |
| 3:28:43 | 22 | an earlier one though -- |
| 3:28:44 | 23 | THE COURT:  104. |
| 3:28:46 | 24 | MR. KERNELL:  104 what? |
| 3:28:48 | 25 | MS. DeFORD:  Those were already sustained so those |

| | | |
|---|---|---|
| 3:28:52 | 1 | should not be in.  I wanted to make sure.  So if you're saying |
| 3:28:55 | 2 | you're not reading 107, that addresses that. |
| 3:28:57 | 3 | Then the other issue, Your Honor, is very -- |
| 3:29:01 | 4 | THE COURT:  Let's make sure we're on the right page. |
| 3:29:03 | 5 | MR. KERNELL:  We're not reading anything off 104. |
| 3:29:07 | 6 | MS. DeFORD:  So it would be 104/13 -- well, you've got |
| 3:29:11 | 7 | to read our counters on 104. |
| 3:29:16 | 8 | (Cross-talk) |
| 3:29:19 | 9 | MS. DeFORD:  Jim, you can't strike our counters without |
| 3:29:23 | 10 | telling us, without giving me -- because we actually counter |
| 3:29:28 | 11 | your designations and we counter them in line.  So if you cut |
| 3:29:31 | 12 | affirmative designations, we need to know what those are. |
| 3:29:32 | 13 | MR. KERNELL:  We were not given -- |
| 3:29:36 | 14 | THE COURT:  Okay.  Stop.  Both of you.  Stop, both of |
| 3:29:41 | 15 | you.  The one that's on 104, the yellow, is that the one we're |
| 3:29:41 | 16 | talking about? |
| 3:29:43 | 17 | MS. DeFORD:  Yes, Your Honor.  The yellow on 104. |
| 3:29:45 | 18 | THE COURT:  You're saying that's a counter of 103? |
| 3:29:48 | 19 | MS. DeFORD:  That is a counter to, and I can pull out |
| 3:29:52 | 20 | the chart that we filed with the Court that has the in-line |
| 3:29:54 | 21 | designations.  If you give me one moment, I can tell you what |
| 3:30:10 | 22 | it's a counter to.  It's a counter to several lines of |
| 3:30:11 | 23 | testimony, Your Honor, that start on Page 95. |
| 3:30:20 | 24 | MR. KERNELL:  We're not reading anything before Page |
| 3:30:21 | 25 | 108. |

| | | |
|---|---|---|
| 3:30:23 | 1 | MS. DeFORD:  So Your Honor, we haven't been given |
| 3:30:26 | 2 | updated designations from them.  We did provide in-line |
| 3:30:29 | 3 | counters, so at this point there's no way for us to follow along |
| 3:30:33 | 4 | in the transcript to make sure that our portions with being read |
| 3:30:37 | 5 | as well.  We did provide actual counters to their affirmative |
| 3:30:39 | 6 | designations within this Court's procedures and within the |
| 3:30:41 | 7 | deadline filed by the Court. |
| 3:30:44 | 8 | THE COURT:  It was not easy to do the deposition |
| 3:30:47 | 9 | designations, because apparently they do it differently where |
| 3:30:55 | 10 | you all come from.  It was very hard to follow.  But what she |
| 3:31:00 | 11 | has indicated is that this is -- well, it seems like you really |
| 3:31:04 | 12 | got to get together and you got to figure out what it is that's |
| 3:31:09 | 13 | a designation and opposition to something or supplementation to |
| 3:31:15 | 14 | something, and if they're not reading it, then explain what it |
| 3:31:18 | 15 | is.  Try to figure it out and let me know.  But I can't really |
| 3:31:22 | 16 | rule on it if you guys haven't decided what the issues are. |
| 3:31:25 | 17 | MS. DeFORD:  I understand, Your Honor.  We can work |
| 3:31:28 | 18 | with opposing counsel after today.  If all they do is provide us |
| 3:31:31 | 19 | the lines of their affirmative testimony they've struck, we can |
| 3:31:36 | 20 | take our own chart that we provided to this Court and figure out |
| 3:31:38 | 21 | what counters go with it. |
| 3:31:41 | 22 | THE COURT:  Okay.  Would it serve you any purpose to do |
| 3:31:45 | 23 | a little bit of it now so we can try to get more in before the |
| 3:31:48 | 24 | end of the day?  I doubt that you'll be able to get through |
| 3:31:49 | 25 | Jobe, but is there -- |

| | | |
|---|---|---|
| 3:31:51 | 1 | MS. DeFORD:  With the Court's permission, I'm happy, if |
| 3:31:54 | 2 | counsel is okay, to go in the back while the jury is listening |
| 3:31:57 | 3 | to Mr. Mancuso and work with them on what they've cut to check |
| 3:31:58 | 4 | at this -- |
| 3:32:01 | 5 | THE COURT:  That would be wonderful if you can do that. |
| 3:32:03 | 6 | MS. DeFORD:  Sure.  I'm happy to do that, Your Honor. |
| 3:32:05 | 7 | THE COURT:  Is everybody happy?  I want to make |
| 3:32:06 | 8 | everybody happy. |
| 3:32:08 | 9 | MS. DeFORD:  There is one other issue that I did want |
| 3:32:10 | 10 | to raise with the Court.  I think this is a pretty |
| 3:32:15 | 11 | noncontroversial one with her testimony which is on Page 148. |
| 3:32:18 | 12 | Line 10 of that is just a question by counsel to which there's |
| 3:32:22 | 13 | no answer, and we would just ask that the Court strike that. |
| 3:32:24 | 14 | THE COURT:  Page 148, Line 10? |
| 3:32:27 | 15 | MS. DeFORD:  Line 10. |
| 3:32:31 | 16 | THE COURT:  I'm sorry.  I'm on 149.  My vision is |
| 3:32:41 | 17 | failing me.  It is a question.  There's no answer to it.  Let's |
| 3:32:44 | 18 | see.  Let me see. |
| 3:32:53 | 19 | MR. KERNELL:  We're not going to read that.  There's no |
| 3:32:53 | 20 | answer. |
| 3:32:55 | 21 | THE COURT:  Yeah, there is no answer to Line 10. |
| 3:32:56 | 22 | MS. DeFORD:  Thank you, Judge. |
| 3:32:57 | 23 | THE COURT:  So it's excluded. |
| 3:32:59 | 24 | MS. DeFORD:  So Your Honor, with the Court's |
| 3:33:01 | 25 | permission, may one of my colleagues, in the event that anything |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 3:33:05 | 1 | occurs during Mr. Mancuso's reading of his deposition, I assume |
| 3:33:09 | 2 | nothing will, but may one of them take over my role in terms of |
| 3:33:12 | 3 | objecting since I'll be in the back working with counsel on Ms. |
| 3:33:12 | 4 | Jobe? |
| 3:33:15 | 5 | THE COURT:  Yep.  I don't care who objects, and you can |
| 3:33:18 | 6 | even swap back. |
| 3:33:18 | 7 | MS. DeFORD:  Thank you, Your Honor. |
| 3:33:21 | 8 | THE COURT:  And the same with them.  Okay.  So we can |
| 3:33:24 | 9 | get forward on some of them? |
| 3:33:28 | 10 | MR. RIOPELLE:  We can move forward on Mancuso.  The |
| 3:33:30 | 11 | only one we're waiting for is Calabrese. |
| 3:33:32 | 12 | THE COURT:  All right.  What's the plan on Calabrese? |
| 3:33:34 | 13 | Do I have Calabrese. |
| 3:33:35 | 14 | MR. RIOPELLE:  I have a copy if you would like, Your |
| 3:33:35 | 15 | Honor. |
| 3:33:42 | 16 | THE COURT:  I got copies.  I don't need anymore paper. |
| 3:33:44 | 17 | MR. SCHWARTZ:  Your Honor, on Calabrese we should just |
| 3:33:46 | 18 | give you the page and section because it's just the last of the |
| 3:33:48 | 19 | four items that we could not. |
| 3:33:50 | 20 | THE COURT:  Okay.  Yeah.  Let me get my copy. |
| 3:33:51 | 21 | MR. SCHWARTZ:  So let's -- |
| 3:33:53 | 22 | THE COURT:  Let me get my copy here first. |
| 3:33:53 | 23 | MR. SCHWARTZ:  Okay. |
| 3:33:56 | 24 | THE COURT:  He's bringing it in from my office. |
| 3:34:07 | 25 | I can't run late today because I told you, I'm doing a |

3:34:09  1    pretrial conference Zoom at 5:00.

3:34:12  2            MR. RIOPELLE:  We could have your law clerk serve as

3:34:12  3    the judge.

3:34:14  4            THE COURT:  I'd rather have the court reporter do it.

3:34:16  5            MR. RIOPELLE:  No, no, no.  I've seen some of her

3:35:01  6    decisions.  I can't do that.

3:35:04  7            THE COURT:  All right.  I have Mr. Calabrese's.

3:35:10  8    Mancuso and Calabrese.  Talk about Calabrese.

3:35:16  9            MR. RIOPELLE:  I'm ready to go.  Are you --

3:35:21  10   Mr. Schwartz, you would like to talk about Calabrese?

3:35:22  11           THE COURT:  Ready.

3:35:25  12           MR. RIOPELLE:  If you want to go ahead, if you reached

3:35:27  13   any agreement on what we sent you.

3:35:28  14           MR. SCHWARTZ:  Well, it was just that the sections, the

3:35:36  15   one final section that they're concerned about that starts at

3:35:40  16   Page 260 Line 17.

3:35:43  17           THE COURT:  Hold on.  260, Line 17.

3:35:47  18           MR. SCHWARTZ:  Then it runs to 270, Line 6.  On pages

3:35:48  19   268.

3:35:59  20           THE COURT:  All right.  260, Line 17.  Okay.  And it

3:36:08  21   runs through 270 Line 6.  This is his calculation of damages.

3:36:10  22           MR. SCHWARTZ:  Right.  I don't see any issue with the

3:36:16  23   language on Page 260, then it rolls over to Page 261.  He's

3:36:20  24   asking about the calculation of damages.  He mentions how it's

3:36:25  25   going to be calculated, residual revenue, equipment sales.

3:36:27  1          THE COURT:  Tell me, what is the objection to that?

3:36:29  2          MR. RIOPELLE:  It is speculative, it is inadmissible

3:36:35  3   under the Florida State Supreme Court's ruling in the W.W. Gay

3:36:39  4   Mechanical case.  That case requires it has to be a reasonable

3:36:44  5   yardstick and there's nothing concrete in here.  These are just

3:36:49  6   speculative numbers, damages.  And as the Court ruled in the

3:36:53  7   motion in limine, they can't be submitting anything damages

3:36:57  8   without proper support.

3:36:58  9          MR. SCHWARTZ:  The support was all provided in

3:37:02 10   discovery, Your Honor.

3:37:55 11          THE COURT:  Is this going to be videotaped or read?

3:38:46 12          MR. RIOPELLE:  Read.  266 certainly looks entirely like

3:38:53 13   speculation.  Based on the Chicago equipment stuff, does not

3:38:56 14   seem to be based on anything.

3:38:57 15          MR. SCHWARTZ:  The support was all provided in

3:39:02 16   underlying disclosures, Your Honor, with the detail.  It was in

3:39:05 17   our supplemental Rule 26 disclosures, and that was delivered to

3:39:10 18   the Plaintiff on January 31st.

3:39:13 19          THE COURT:  That may be the basis for damages, but this

3:39:19 20   isn't.  This is him saying what he thinks Chicago would have

3:39:22 21   done or could have done.  I can't tell you what they would have

3:39:25 22   done, but what I can tell you is they're skilled in the business

3:39:28 23   and they would never have agreed to this if they couldn't do it.

3:39:31 24   Well, that's total speculation, isn't it?

3:39:33 25          MR. SCHWARTZ:  266, Your Honor.  Which line, Your

```
3:39:34   1    Honor?

3:39:39   2            THE COURT:  Right at the top.  Actually it's 265, last

3:39:47   3    line through 266, line -- well, that's the whole thing.  Line

3:39:54   4    12.  Line 13.  I mean, it's talking about what he's talking

3:39:56   5    about on 265.

3:39:58   6            MR. SCHWARTZ:  But he says right there that on Line 12

3:40:04   7    that they signed for it, meaning they signed an agreement to pay

3:40:10   8    for equipment and services.  And then he identified the

3:40:13   9    distributors and all that information was provided to the

3:40:22  10    Plaintiffs in the disclosures and all the details.  I'm happy

3:40:26  11    to, you know, show the Court a copy.

3:41:21  12            THE COURT:  I'm sorry, but it sure looks speculative to

3:41:27  13    me.  Keeps referring that the lawyers can give the information,

3:41:33  14    I've had -- felt the effect of it, but he doesn't really have

3:41:40  15    any solid reason, any solid basis for his -- if there is any

3:41:42  16    calculation I haven't seen it yet.  Where is it?

3:41:48  17            MR. SCHWARTZ:  It's Defendants' Exhibit 5074.  So if

3:41:50  18    you would like to see it on the screen, you can see it.

3:41:53  19            THE COURT:  Yeah, put it up.  Let me see.

3:41:55  20            MR. SCHWARTZ:  If you go to Page 7.

3:41:58  21            THE COURT:  Where is that mentioned in this?

3:42:02  22            MR. SCHWARTZ:  I'm sorry, Your Honor.  The question?

3:42:03  23            THE COURT:  Where is that mentioned in these pages that

3:42:05  24    we're talking about right now?

3:42:08  25            MR. SCHWARTZ:  Well, he's identifying the different
```

3:42:11   1    distributors Nextel had, had signed agreements, then they asked

3:42:15   2    will you provide the back-up, he said yes and then it was

3:42:20   3    provided.  And all the details are on the disclosures.

3:42:29   4              THE COURT:  Where is this document, what does it say?

3:42:31   5              MR. RIOPELLE:  It's their supplemental initial

3:42:35   6    disclosures.  I'm not sure they can submit their supplemental

3:42:36   7    initial disclosures.

3:42:38   8              THE COURT:  How is that admissible?

3:42:40   9              MR. SCHWARTZ:  I'm not saying this particular document

3:42:43   10   is, Your Honor.  You asked where the underlying data was, it was

3:42:44   11   provided to the Plaintiffs.

3:42:46   12             THE COURT:  All right.  Where is it that he says I'm

3:42:51   13   owed X dollars?  Because of the damage?  He talks about hundreds

3:42:56   14   of thousands of dollars, but that's looking at our balance

3:43:00   15   sheet, you know, it's in the hundreds of thousands, that's the

3:43:05   16   business we were able to do.  And I don't see anywhere in here

3:43:37   17   that he talks about any particular damage, does he?  The only

3:43:40   18   place I see is where he says:  So you believe you would have

3:43:45   19   made millions of dollars if Sprint had not sent its cease and

3:43:48   20   desist letter.  Oh, absolutely.  We had a lot of momentum and

3:43:51   21   this caused a huge, huge -- you know, I would just say

3:43:55   22   confidence crisis and other, however you want to, whatever your

3:43:58   23   intentions were, you definitely achieved them.

3:44:01   24             That is absolutely clearly speculation.  That's not

3:44:07   25   based on anything that I can see.  It's just his gut feeling.  I

| | | |
|---|---|---|
| 3:44:23 | 1 | don't think that's admissible.  Do you?  He's talking about |
| 3:44:27 | 2 | escalating just off the cuff.  That doesn't work.  You can't do |
| 3:44:30 | 3 | that.  If he were here, I wouldn't let him do it so how can I |
| 3:44:34 | 4 | let him do it on deposition? |
| 3:44:36 | 5 | MR. SCHWARTZ:  That goes to the heart of issue earlier |
| 3:44:42 | 6 | about the striking of our ability to call Mr. Rivera, who knows |
| 3:44:46 | 7 | the financial information and was prepared to discuss that |
| 3:44:49 | 8 | aspect of the case. |
| 3:44:53 | 9 | THE COURT:  You should have identified him so they |
| 3:44:55 | 10 | could take his deposition a couple weeks ago.  I don't know. |
| 3:45:01 | 11 | You didn't and I won't.  So you have a hole in your case at this |
| 3:45:06 | 12 | point.  I believe that the testimony that has been -- that I |
| 3:45:14 | 13 | have read so far is pure speculation and is not admissible.  So |
| 3:45:20 | 14 | leave out 265 to 270, is that what we're talking about? 260, |
| 3:45:26 | 15 | Line 17 through 270, Line 6 is not to be read. |
| 3:45:35 | 16 | What else we got? |
| 3:45:37 | 17 | MR. RIOPELLE:  Mr. Schwartz, have you reached a |
| 3:45:39 | 18 | conclusion on the other three categories? |
| 3:45:41 | 19 | MR. SCHWARTZ:  Well, I haven't had a chance because we |
| 3:45:43 | 20 | were in the middle of the trial.  But the other issues that |
| 3:45:47 | 21 | they've raised, I have no issue with so we just -- we had to |
| 3:45:48 | 22 | just do the logistics. |
| 3:45:51 | 23 | THE COURT:  You have to just cut it out.  Okay.  Then |
| 3:45:54 | 24 | do we have any disputed issues that we need to deal with before |
| 3:45:58 | 25 | I call the jury back? |

| | | |
|---|---|---|
| 3:45:59 | 1 | MR. RIOPELLE:  I just want to make sure. |
| 3:46:01 | 2 | THE COURT:  You guys figure it out. |
| 3:46:02 | 3 | MR. SCHWARTZ:  I mean I'm going -- |
| 3:46:27 | 4 | (Counsel conferring) |
| 3:46:29 | 5 | MR. RIOPELLE:  I don't know what order they plan to |
| 3:46:32 | 6 | call.  I've asked them last night for their order of witness and |
| 3:46:36 | 7 | readings, and I have not received so I don't know.  I'm not the |
| 3:46:39 | 8 | right guy to ask. |
| 3:47:05 | 9 | THE COURT:  We're going to take a short break so our |
| 3:47:07 | 10 | court reporter go to the bathroom. |
| 3:47:08 | 11 | MR. RIOPELLE:  It's so she can shoot herself. |
| 3:47:14 | 12 | THE COURT:  Five minutes of we'll start again.  Tell me |
| 3:47:16 | 13 | what we've done by then. |
| 3:49:14 | 14 | MR. RIOPELLE:  Thank you, Your Honor. |
| 3:49:16 | 15 | (Brief recess). |
| 3:54:33 | 16 | THE COURT:  Are we ready to proceed? |
| 3:54:35 | 17 | MR. SCHWARTZ:  Two minutes, Your Honor.  We don't want |
| 3:54:39 | 18 | there to be any issues once you pull the jury back in. |
| 3:54:40 | 19 | THE COURT:  All right. |
| 3:54:59 | 20 | (In-place recess) |
| 3:56:33 | 21 | THE COURT:  Now are we ready? |
| 3:56:35 | 22 | MR. SCHWARTZ:  30 seconds, Your Honor. |
| 3:58:56 | 23 | THE COURT:  Okay.  Can we please start? |
| 3:58:57 | 24 | MR. SCHWARTZ:  Yes, Your Honor. |
| 3:58:59 | 25 | THE COURT:  Bring the jury in please. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
3:59:00   1              COURT SECURITY OFFICER:  All rise for the jury.
3:59:05   2              (Jury in at 3:59 p.m.)
4:00:04   3              THE COURT:  Be seated please.  Now we've reached the
4:00:06   4       stage where they're going to read some depositions.
4:00:10   5              You may proceed, sir.
4:00:21   6              MR. KERNELL:  Yes, Your Honor.  We're going to read the
4:00:33   7       deposition of Brian Mancuso.
4:00:37   8              THE COURT:  All right.  And again as I told you,
4:00:42   9       deposition testimony, deposition is a witness's sworn testimony
4:00:46   10      that is taken before the trial.  During a deposition the witness
4:00:49   11      is under oath, swears to tell the truth.  Lawyers for each party
4:00:53   12      may ask questions.  The deposition of this person was taken on
4:00:58   13      -- I don't even know whose it is, he'll tell you a date, has
4:01:03   14      been presented to you.  By reading.  When the deposition is
4:01:06   15      read, you must not place any significance of on the behavior or
4:01:10   16      tone of voice of any person reading the question or the answers.
4:01:13   17              You may proceed.  Do you have a date for when this was
4:01:14   18      taken?
4:01:15   19              MR. KERNELL:  Yes, Your Honor.  This was the deposition
4:01:21   20      of Brian Mancuso, on Wednesday, March 30, 2022.
4:01:24   21              THE COURT:  Okay.  You may proceed.
4:01:24   22              MR. RIOPELLE:  Your Honor?
4:01:29   23              THE COURT:  It's January 29, 2019?
4:01:31   24              MR. KERNELL:  Oh, I'm sorry.  What was this?
4:01:33   25              MR. RIOPELLE:  That's when you printed it.
```

4:01:36  1                MR. KERNELL:  I'm sorry.  January 29, 2019.

4:01:36  2                THE COURT:  Okay.

4:01:36  3                (Deposition of Brian Mancuso read into the record by

4:01:36  4     Mr. Kernell (Q) and Ms. Solomon (A))

4:01:47  5     Q.  Good afternoon, Mr. Mancuso.  Would you please state your

4:01:49  6     full name for the record?

4:01:51  7     A.  Brian Anthony Mancuso.

4:01:53  8                THE COURT:  You got to get closer to the microphone and

4:01:55  9     speak louder.

4:02:00  10               MS. SOLOMON:  Brian Anthony Mancuso.

4:02:03  11    Q.  What did you do after Baker University?

4:02:05  12    A.  As far as work?

4:02:05  13    Q.  Yes?

4:02:08  14    A.  I worked for MCI Communications.

4:02:10  15    Q.  Do you recall when?

4:02:12  16    A.  In the 90s, early 90s.

4:02:14  17    Q.  What did you do for MCI?

4:02:15  18    A.  Sales rep.

4:02:18  19    Q.  And what were the products that you were selling?

4:02:24  20    A.  Wireline products, so like long distance, data, internet.

4:02:26  21    Q.  Were you at a store MCI store?

4:02:29  22    A.  No, it was in the business office.

4:02:31  23    Q.  How long did you work for MCI?

4:02:33  24    A.  Couple years.

4:02:37  25    Q.  And after MCI, who did you work for.

| | | |
|---|---|---|
| 4:02:39 | 1 | A.  Let's see, Icon Business Solutions. |
| 4:02:40 | 2 | Q.  Icon? |
| 4:02:41 | 3 | A.  Uh-huh. |
| 4:02:44 | 4 | Q.  What did you do for Icon? |
| 4:02:44 | 5 | A.  Sales. |
| 4:02:47 | 6 | Q.  Was that in a store or in -- |
| 4:02:49 | 7 | A.  It was in a business office here in Kansas City. |
| 4:02:51 | 8 | Q.  And what sales did you do? |
| 4:02:55 | 9 | A.  Printer sales, selling big printers. |
| 4:02:58 | 10 | Q.  That was printers to businesses or -- |
| 4:03:00 | 11 | A.  Yes. |
| 4:03:02 | 12 | Q.  After Icon, who did you work for? |
| 4:03:05 | 13 | A.  That would push me.  That would push me right up to whenever |
| 4:03:09 | 14 | I started for AT&T in 2003, I think. |
| 4:03:11 | 15 | Q.  What did you do for AT&T? |
| 4:03:12 | 16 | A.  I was a sales engineer. |
| 4:03:14 | 17 | Q.  And what does a sales engineer do? |
| 4:03:18 | 18 | A.  I went out on calls with the reps for technical solutions. |
| 4:03:20 | 19 | Q.  What type of technical solutions? |
| 4:03:24 | 20 | A.  Talking about our products for AT&T wireless so it would |
| 4:03:27 | 21 | have been Blackberry, e-mail at that time. |
| 4:03:31 | 22 | Q.  Were there certain products that you were part of the sales |
| 4:03:31 | 23 | for? |
| 4:03:35 | 24 | A.  It would be like Blackberries, phones or e-mail. |
| 4:03:38 | 25 | Q.  And after how long did you work for AT&T? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
4:03:42   1    A.  2003 to 2007.

4:03:45   2    Q.  What did you do, where did you work after AT&T?

4:03:48   3    A.  I went to HP.

4:03:49   4    Q.  What did you do for HP?

4:03:52   5    A.  I was in charge of technical solutions for the United

4:03:56   6    States.  So I was the technical overlaid position, so when

4:03:59   7    people needed questions, because we were putting solutions on

4:04:04   8    the iPAQs.

4:04:06   9    Q.  What type of business or product?

4:04:10   10   A.  They would usually be medical, government.

4:04:11   11   Q.  So you were in sales?

4:04:16   12   A.  No, it was more -- I was more of an overlay.  I was more of

4:04:19   13   a technical.  Like kind of a sales engineer overlay.

4:04:23   14   Q.  After HP, where did you go to work?

4:04:26   15   A.  I went back to HP and they decided they were getting out of

4:04:33   16   the handheld business and I left and went back to AT&T in 2008.

4:04:34   17   Q.  Into the same position?

4:04:36   18   A.  No.  It was government sales.

4:04:39   19   Q.  What did you do in government sales?

4:04:43   20   A.  Sold phones and air cards and hotspots to customers.

4:04:45   21   Q.  After AT&T where did you work?

4:04:48   22   A.  It was a cable company here, which is Spectrum now I think

4:04:53   23   it's called.  At the time it was Time Warner before, but at that

4:04:55   24   time it was Spectrum.

4:04:59   25   Q.  What was the time frame you worked at Spectrum?
```

| | | |
|---|---|---|
| 4:05:00 | 1 | A.  Like 2009. |
| 4:05:06 | 2 | Q.  2009? You only worked one year there? |
| 4:05:06 | 3 | A.  Yes. |
| 4:05:08 | 4 | Q.  What did you do for Spectrum? |
| 4:05:09 | 5 | A.  Sales manager. |
| 4:05:11 | 6 | Q.  Did you have any employees working for you? |
| 4:05:12 | 7 | A.  Yes, I had eight. |
| 4:05:13 | 8 | Q.  You had eight? |
| 4:05:13 | 9 | A.  Uh-huh. |
| 4:05:15 | 10 | Q.  What were your duties as a sales manager? |
| 4:05:19 | 11 | A.  I helped them with -- we were selling internet and wireline |
| 4:05:22 | 12 | products like phone lines and stuff.  Go out and do calls, make |
| 4:05:23 | 13 | sure they made their quotas. |
| 4:05:27 | 14 | Q.  And after Spectrum Cable, where do you work? |
| 4:05:29 | 15 | A.  Then I started my own business. |
| 4:05:31 | 16 | Q.  What was that business that you started? |
| 4:05:35 | 17 | A.  It was called 4G Mobility. |
| 4:05:36 | 18 | Q.  4G Mobility? |
| 4:05:37 | 19 | A.  Uh-huh. |
| 4:05:39 | 20 | Q.  What was the purpose of this business? |
| 4:05:42 | 21 | A.  It was to sell wireless solutions. |
| 4:05:43 | 22 | Q.  To whom? |
| 4:05:44 | 23 | A.  Companies. |
| 4:05:46 | 24 | Q.  What type of wireless solutions? |
| 4:05:49 | 25 | A.  It was more about selling the phones and the product, you |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

4:05:52  1   know, and the solutions that go with them, like because I knew a

4:05:56  2   lot of how to do solutions.  So if somebody had a problem, I

4:05:59  3   know how to kind of fix it wirelessly.

4:06:01  4   Q.  Was this more of a consulting business?

4:06:02  5   A.  Yes.

4:06:04  6   Q.  So you go into a business and you'd listen to their

4:06:08  7   problems, and then you suggest a solution to their problem and

4:06:10  8   help implement it?

4:06:12  9   A.  And/or carrier, yes.

4:06:15  10  Q.  Do you still have this business 4G Mobility?

4:06:16  11  A.  No.

4:06:19  12  Q.  How long was 4G Mobility in business?

4:06:22  13  A.  Until about 2011, I think, maybe.

4:06:23  14  Q.  Did you sell the company?

4:06:24  15  A.  No.

4:06:26  16  Q.  You just shut it down?

4:06:28  17  A.  I was working with the carriers and one of the carriers

4:06:34  18  wanted me to become -- to go to work for them.  So I had

4:06:36  19  children and needed insurance, so I went to work there.

4:06:38  20  Q.  And what carrier did you go work for?

4:06:41  21  A.  In 2009 I went to work for T-Mobile.

4:06:43  22  Q.  How long did you work for T-Mobile?

4:06:45  23  A.  Almost five years.

4:06:47  24  Q.  What was your position at T-Mobile?

4:06:49  25  A.  Government sales rep.

```
4:06:52   1    Q.  Was it similar to what you did at AT&T?

4:06:52   2    A.  Yes.

4:06:56   3    Q.  And you've been working for Sprint since August of 2016; is

4:06:56   4    that correct?

4:06:59   5    A.  Yes, sir.

4:07:04   6    Q.  Now you also are a part-time LEO certified deputy sheriff;

4:07:06   7    is that correct?

4:07:07   8    A.  Correct.

4:07:10   9    Q.  And what does LEO stand for?

4:07:10   10   A.  Law enforcement officer.

4:07:13   11   Q.  Isn't that what deputy sheriffs mean?

4:07:16   12   A.  Well, no.  The typical deputies, majority of them are

4:07:20   13   jailers and do jail only.  So they don't have the same powers.

4:07:25   14   An LEO has been through the certification to go like on patrol,

4:07:27   15   make arrests and so on.

4:07:29   16   Q.  And you're currently a deputy sheriff?

4:07:30   17   A.  Yes.

4:07:32   18   Q.  Have you had any specialized training?

4:07:36   19   A.  I've had technology training in the companies I've worked

4:07:36   20   for.

4:07:38   21   Q.  Do you have any training in quality assurance?

4:07:39   22   A.  No.

4:07:41   23   Q.  Do you have any training in quality control?

4:07:42   24   A.  No.

4:07:45   25   Q.  Do you have any certification training?
```

```
4:07:47   1    A.  Again in what?
4:07:50   2    Q.  For instance a UL mark, it's a certification for UL, do you
4:07:53   3    have any training in any certifications?
4:07:55   4    A.  No.
4:07:56   5    Q.  Do you have any training in standards?
4:07:58   6    A.  No.
4:08:03   7    Q.  Criminal, do you have any legal training in civil matters?
4:08:04   8    A.  No.
4:08:08   9    Q.  Have you had any formal transaction, education in trademark
4:08:08  10    law?
4:08:09  11    A.  No, sir.
4:08:12  12    Q.  Have you taken any training classes or education in
4:08:13  13    trademark law?
4:08:15  14    A.  No, sir.
4:08:18  15    Q.  Do you have any technical experience?
4:08:21  16    A.  Besides like working with partners and learning technology,
4:08:26  17    just 20 years of working with technology on-the-job training.
4:08:27  18    Q.  So it's on-the-job training?
4:08:28  19    A.  Yes, sir.
4:08:32  20    Q.  You haven't had any formal technical training?
4:08:32  21    A.  No, sir.
4:08:36  22    Q.  Let me hand you what's been marked as Exhibit 131.  Do you
4:08:38  23    recognize this exhibit?
4:08:38  24    A.  Yes, sir.
4:08:38  25    Q.  What is it?
```

| | | |
|---|---|---|
| 4:08:40 | 1 | A.  It's the declaration. |
| 4:08:41 | 2 | Q.  This is your declaration? |
| 4:08:43 | 3 | A.  Yes, sir. |
| 4:08:44 | 4 | Q.  Did you prepare your declaration? |
| 4:08:48 | 5 | A.  You mean did I type all that up or -- |
| 4:08:49 | 6 | Q.  Yes. |
| 4:08:51 | 7 | A.  I worked with our Sprint legal team. |
| 4:08:55 | 8 | Q.  Who in the legal team did you work with to prepare your |
| 4:08:55 | 9 | declaration? |
| 4:08:59 | 10 | A.  I don't remember the exact person.  It might have been Jobe. |
| 4:09:00 | 11 | I'm not sure. |
| 4:09:01 | 12 | Q.  Melissa Jobe? |
| 4:09:02 | 13 | A.  Yes. |
| 4:09:04 | 14 | Q.  Did you make any changes to the draft that you were |
| 4:09:05 | 15 | presented with? |
| 4:09:06 | 16 | A.  No. |
| 4:09:09 | 17 | Q.  Are all the statements made in your declaration your own |
| 4:09:10 | 18 | statements? |
| 4:09:13 | 19 | A.  You mean did I write all this? |
| 4:09:15 | 20 | Q.  Are these based on your own knowledge? |
| 4:09:18 | 21 | A.  I mean, I did not write all this material.  I worked with |
| 4:09:22 | 22 | legal and we added.  I mean, I gave them my statement and |
| 4:09:23 | 23 | information. |
| 4:09:27 | 24 | Q.  Were all statements that are included in your declaration |
| 4:09:27 | 25 | true? |

| | | |
|---|---|---|
| 4:09:32 | 1 | A.  I gave them -- yes, I gave them my details of what I saw. |
| 4:09:35 | 2 | Q.  Did you express any legal opinions in your declaration? |
| 4:09:36 | 3 | A.  Did I? |
| 4:09:38 | 4 | Q.  Yes. |
| 4:09:43 | 5 | A.  I don't think so. |
| 4:09:49 | 6 | Q.  Were all the statements in your declaration accurate and |
| 4:09:54 | 7 | absolutely true when you signed the declaration on April 12, |
| 4:09:55 | 8 | 2018? |
| 4:09:57 | 9 | A.  Yes. |
| 4:09:59 | 10 | Q.  Are all the statements in your declaration accurate and |
| 4:10:00 | 11 | absolutely true today? |
| 4:10:02 | 12 | A.  Yes. |
| 4:10:08 | 13 | Q.  So how familiar are you with the Nextel brand? |
| 4:10:09 | 14 | A.  I know the name. |
| 4:10:10 | 15 | Q.  Anything else? |
| 4:10:14 | 16 | A.  I was familiar with them as a wireless provider, and we also |
| 4:10:17 | 17 | use it today in our history when speaking with customers in our |
| 4:10:21 | 18 | history and how we use it. |
| 4:10:22 | 19 | Q.  Have you ever used a Nextel product? |
| 4:10:23 | 20 | A.  Yes. |
| 4:10:25 | 21 | Q.  When was that? |
| 4:10:27 | 22 | A.  From late 2000. |
| 4:10:30 | 23 | Q.  From late -- from around 2000? |
| 4:10:31 | 24 | A.  Yes, correct. |
| 4:10:36 | 25 | Q.  And do you recall what was -- was it a phone? |

```
4:10:36    1    A.  Yes.
4:10:39    2    Q.  What phone was it do you recall?
4:10:44    3    A.  i580 or 60 I think the number was.  I don't remember it.
4:10:47    4    Q.  It was a Motorola i580?
4:10:50    5    A.  I think so.  I've seen a million phones in this business.
4:10:51    6    I'm sorry.
4:10:54    7    Q.  Are there any phones that you currently have that are
4:10:55    8    branded Nextel?
4:10:58    9    A.  The XP Strike I think it is.
4:11:00   10    Q.  It was -- it has Nextel on the phone itself?
4:11:03   11    A.  Not on the phone, but it's on the box.
4:11:05   12    Q.  And where is it on the box?
4:11:08   13    A.  I don't know exactly.  A lot of the phones, because people
4:11:11   14    started losing track of names, I think moved away from putting
4:11:16   15    names on phones or whatever and to work because you could move
4:11:17   16    them to different carriers.
4:11:22   17    Q.  When is the last time Sprint sold an XP Strike phone, and
4:11:25   18    that's a Sonim?
4:11:25   19    A.  I believe so.
4:11:29   20    Q.  Do you know when the last time Sprint sold an XP Strike?
4:11:32   21    A.  I don't have any -- I don't have any access to that.  I
4:11:36   22    wouldn't know.
4:11:38   23    Q.  What do you mean by famous mark?
4:11:45   24    A.  I'm not asking you for any legal conclusion because I
4:11:48   25    believe you earlier --
```

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 4:11:49  | 1  |          MS. SOLOMON:  Oh, I'm sorry. |
| 4:11:52  | 2  | Q.  I'm not asking you for any legal conclusion because I |
| 4:11:55  | 3  | believe you earlier testified that you have no legal opinions in |
| 4:11:57  | 4  | this document; is that accurate? |
| 4:11:59  | 5  | A.  Do I have any legal as a lawyer? |
| 4:12:02  | 6  | Q.  Yes, a legal opinion in this document. |
| 4:12:04  | 7  | A.  I have no legal opinion. |
| 4:12:08  | 8  | Q.  So what did you mean by famous Nextel mark? |
| 4:12:12  | 9  | A.  Well, the Nextel mark is very well known out in the world. |
| 4:12:17  | 10 | It's been like the Sprint Nextel racetrack, NASCAR and it was |
| 4:12:20  | 11 | well known.  And the chirp. |
| 4:12:22  | 12 | Q.  And the second sentence you state in particular, the famous |
| 4:12:26  | 13 | Nextel mark and Nextel brand became known for its innovative |
| 4:12:31  | 14 | two-way radio or push-to-talk wireless service in capable |
| 4:12:36  | 15 | devices often marketed as direct connect which permitted users |
| 4:12:40  | 16 | not just to use their devices as cellular phones, but also to |
| 4:12:44  | 17 | use them as walkie-talkies and connect to other Nextel users, |
| 4:12:50  | 18 | groups of users and even from coast to coast with just the push |
| 4:12:51  | 19 | of a button.  Do you see that? |
| 4:12:52  | 20 | A.  Yes. |
| 4:12:53  | 21 | Q.  Did I read that correctly? |
| 4:12:54  | 22 | A.  Uh-huh. |
| 4:12:58  | 23 | Q.  What's the difference between the mark and a brand?  Again, |
| 4:13:02  | 24 | I'm not asking you for a legal opinion, I believe you testified |
| 4:13:05  | 25 | that you gave no legal opinions in this document, correct? |

| | | |
|---|---|---|
| 4:13:08 | 1 | A.  Correct. |
| 4:13:13 | 2 | Q.  This history was provided to you by someone else? |
| 4:13:14 | 3 | A.  Yes. |
| 4:13:18 | 4 | Q.  You say in the last sentence of Paragraph 4, it says as a |
| 4:13:23 | 5 | result the Nextel brand was popular amongst businesses, field |
| 4:13:26 | 6 | workers, first responders for its fast responding push-to-talk |
| 4:13:28 | 7 | capability.  Do you see that? |
| 4:13:29 | 8 | A.  Yes. |
| 4:13:33 | 9 | Q.  How popular was the Nextel brand in 1993? |
| 4:13:36 | 10 | A.  I don't know.  I know they had a million of customers at one |
| 4:13:37 | 11 | point. |
| 4:13:42 | 12 | Q.  You don't know if it was the 1993 time frame? |
| 4:13:43 | 13 | A.  No, I don't, sir. |
| 4:13:47 | 14 | Q.  If we look at Paragraph 5, it starts in fact, the Nextel |
| 4:13:50 | 15 | brand push-to-talk direct connect products and services quickly |
| 4:13:55 | 16 | became the go-to, best-in-class method for communication in |
| 4:13:59 | 17 | first responder industry because of the innovative Nextel |
| 4:14:06 | 18 | push-to-talk features, and their reputation of reliability of |
| 4:14:10 | 19 | their products and services sold under or in connection with the |
| 4:14:16 | 20 | famous Nextel mark, satisfied that businesses peculiar need for |
| 4:14:20 | 21 | dependable instantaneous communication.  Do you see that? |
| 4:14:21 | 22 | A.  Yes, sir. |
| 4:14:25 | 23 | Q.  What's the basis for your statement that the Nextel brand |
| 4:14:28 | 24 | push-to-talk direct connect products and services quickly became |
| 4:14:36 | 25 | the go-to, best-in-class method for communication in the first |

4:14:37  1    responder industry?

4:14:40  2    A.  At the time Nextel was the only one that had the best, the

4:14:44  3    biggest network base direct connect out there.

4:14:45  4    Q.  What was the time frame?

4:14:49  5    A.  That would have been in the '90s.

4:14:54  6    Q.  Saying this, it's a fact you're stating that Nextel brand

4:14:57  7    push-to-talk and direct connect product and services quickly

4:15:01  8    became the go-to, best-in-class method for communications of

4:15:06  9    first responder industry.  Were you in the first responder

4:15:07  10   industry in the early; 90s?

4:15:12  11   A.  No, sir.  It was typical material that is in our PowerPoints

4:15:17  12   when we're talking about our Direct Connect product.

4:15:20  13   Q.  In Paragraph 6 you state it is my understanding from the

4:15:26  14   mid-1990s to 2013 Sprint, again, through or with its

4:15:31  15   predecessors in interest, built and operated a wireless network

4:15:35  16   in the United States offering wireless services and products to

4:15:42  17   customers in via a network Integrated Digital Enhanced Network,

4:15:48  18   it's iDEN, I-D-E-N protocol which allows the use of 800

4:15:53  19   megahertz specialized mobile radio SMR frequencies for customer

4:15:56  20   and business wireless services.  Do you see that?

4:15:57  21   A.  Yes.

4:16:02  22   Q.  What's the basis of our understanding of that statement?

4:16:06  23   A.  That is how the iDEN network operated on what Sprint Nextel

4:16:07  24   sold.

4:16:10  25   Q.  I'm sorry.  You said that that's the way that the product

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 4:16:12 | 1 | operated on the iDEN network? |
| 4:16:15 | 2 | A.  The Sprint iDEN network. |
| 4:16:19 | 3 | Q.  The first part you say Sprint built this network; is that |
| 4:16:19 | 4 | correct? |
| 4:16:21 | 5 | A.  Originally you mean? |
| 4:16:22 | 6 | Q.  Yes. |
| 4:16:24 | 7 | A.  No. |
| 4:16:29 | 8 | Q.  So are you saying originally Nextel built the network? |
| 4:16:30 | 9 | A.  The original network. |
| 4:16:32 | 10 | Q.  The iDEN network. |
| 4:16:33 | 11 | A.  Originally, I believe so. |
| 4:16:35 | 12 | Q.  Based on what?  What's your understanding? |
| 4:16:39 | 13 | A.  History.  Just seeing it on TV, knowing that they got bought |
| 4:16:41 | 14 | by Sprint Nextel. |
| 4:16:43 | 15 | Q.  Did you review any documents prior to making this statement? |
| 4:16:44 | 16 | A.  No. |
| 4:16:49 | 17 | Q.  I'm going to hand you what was previously marked as Exhibit |
| 4:16:56 | 18 | 122.  Have you ever reviewed a form ten -- 5 10-K, I'm sorry. |
| 4:16:59 | 19 | Form 10-K SEC document filed by Sprint? |
| 4:17:00 | 20 | A.  No, sir. |
| 4:17:04 | 21 | Q.  Let me refer you to Page 6.  There's a small Page 6 at the |
| 4:17:06 | 22 | bottom. |
| 4:17:07 | 23 | A.  Right here? |
| 4:17:10 | 24 | Q.  Yes.  And this is under -- there's a heading iDEN network. |
| 4:17:14 | 25 | It's not Page 6 of 8, there's a small six at the bottom.  This |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

4:17:16  1    is Page 8 of --

4:17:17  2    A.   Sorry.

4:17:20  3    Q.   Do you see where there's a heading iDEN network?

4:17:21  4    A.   Yes.

4:17:25  5    Q.   In the first sentence says we provide our Nextel branded

4:17:30  6    post-paid and Boost Mobile branded prepaid wireless services

4:17:35  7    over our iDEN network.  Our iDEN network is an all-digital

4:17:40  8    packet data network based on iDEN wireless technologies provided

4:17:43  9    by Motorola, Inc.  Do you see that?

4:17:43  10   A.   Yes.

4:17:47  11   Q.   So is your statement accurate that Sprint or its predecessor

4:17:51  12   in interest built this wireless network in the United States or

4:17:53  13   does it actually come from Motorola?

4:17:57  14   A.   I don't know.  I can't -- I have no knowledge.  I know

4:17:59  15   Sprint owned it.

4:18:05  16   Q.   If I can refer you to Page 26 of Exhibit 122?

4:18:06  17   A.   26?

4:18:14  18   Q.   Yes.  It's the first full paragraph.  The caption is if

4:18:16  19   Sprint is or Motorola is unable or unwilling to provide us with

4:18:21  20   equipment and handsets in support of our iDEN-based services as

4:18:25  21   well as handsets and infrastructure improvements to those

4:18:28  22   services, our operations will be adversely affected.  Do you see

4:18:28  23   that?

4:18:29  24   A.   Yes.

4:18:33  25   Q.   So if Sprint owned the network, why would they be absolutely

92

| | | |
|---|---|---|
| 4:18:34 | 1 | dependent on Motorola? |
| 4:18:36 | 2 | A.  I don't know. |
| 4:18:39 | 3 | Q.  Now, the second sentence in Paragraph 6 of your declaration |
| 4:18:44 | 4 | states after the shutdown of Sprint's iDEN network in 2013, |
| 4:18:50 | 5 | Sprint migrated iDEN customers to its code division multiplex |
| 4:18:54 | 6 | access, CDMA, platform in 2014.  Do you see that? |
| 4:18:54 | 7 | A.  Yes, sir. |
| 4:19:02 | 8 | Q.  Did all the Nextel customers migrate to the Sprint CDMA |
| 4:19:03 | 9 | network? |
| 4:19:04 | 10 | A.  I don't know. |
| 4:19:08 | 11 | Q.  My question was did all the customers go from Nextel to |
| 4:19:12 | 12 | Sprint in 2013 when the iDEN network was shutdown? |
| 4:19:13 | 13 | A.  I don't know. |
| 4:19:17 | 14 | Q.  The last sentence in Paragraph 6 says building on the |
| 4:19:21 | 15 | goodwill embodied in the Nextel brand, Sprint continues to offer |
| 4:19:27 | 16 | direct connect push-to-talk services which remain popular with |
| 4:19:28 | 17 | first responders.  Do you see that? |
| 4:19:29 | 18 | A.  Yes. |
| 4:19:30 | 19 | Q.  What do you mean by goodwill? |
| 4:19:33 | 20 | A.  I don't know what that means. |
| 4:19:36 | 21 | Q.  And why did you put goodwill in your declaration? |
| 4:19:41 | 22 | A.  Being I think it's just reference to how our brand is. |
| 4:19:45 | 23 | Q.  Did you know that Sprint wrote-off the goodwill of Nextel in |
| 4:19:47 | 24 | February of 2008? |
| 4:19:49 | 25 | A.  I have no knowledge of that. |

| | | |
|---|---|---|
| 4:19:52 | 1 | Q.  Did you know that Sprint wrote-off approximately 30 billion |
| 4:20:00 | 2 | in goodwill associated with the Nextel mark in 2007 -- I'm |
| 4:20:01 | 3 | sorry, 2008? |
| 4:20:02 | 4 | A.  I don't know. |
| 4:20:07 | 5 | Q.  So when Sprint shut down the Nextel network on June 3, 2013, |
| 4:20:12 | 6 | what goodwill did it have remaining in the Nextel brand? |
| 4:20:15 | 7 | A.  Although we stopped using the technology, we didn't stop |
| 4:20:17 | 8 | using the brand. |
| 4:20:21 | 9 | Q.  But after it already written off all of the goodwill |
| 4:20:24 | 10 | associated with that brand, Sprint had in 2008, February of |
| 4:20:30 | 11 | 2008, it shut down the Nextel network, what additional goodwill |
| 4:20:30 | 12 | is left? |
| 4:20:35 | 13 | A.  We have other Nextel equipment like the SP Strike, as well |
| 4:20:38 | 14 | as talking about what Nextel meant to our first responders and |
| 4:20:43 | 15 | stuff in our push-to-talk platform that we were working with. |
| 4:20:45 | 16 | Q.  Today can you buy a Nextel plan? |
| 4:20:50 | 17 | A.  I believe we have plans that could be built on our -- or are |
| 4:20:54 | 18 | being built by still on old plans. |
| 4:20:59 | 19 | Q.  If I'm a brand new customer today, can I walk into a Sprint |
| 4:21:00 | 20 | store and buy a Nextel plan? |
| 4:21:01 | 21 | A.  I don't think so. |
| 4:21:04 | 22 | Q.  Why did you attend the IWCE conference in 2017? |
| 4:21:08 | 23 | A.  I go to the law enforcement shows particularly. |
| 4:21:11 | 24 | Q.  Are the IWCE conferences law enforcement shows? |
| 4:21:14 | 25 | A.  They are usually emergency communications. |

| | | |
|---|---|---|
| 4:21:18 | 1 | Q.  Now, the IWCE, is it always in March? |
| 4:21:20 | 2 | A.  Typically, yes. |
| 4:21:21 | 3 | Q.  What time of year? |
| 4:21:22 | 4 | A.  Yes. |
| 4:21:24 | 5 | Q.  Oh, that time of year.  I'm sorry. |
| 4:21:25 | 6 | A.  Yes. |
| 4:21:29 | 7 | Q.  Are you planning to attend the IWCE conference in 2019? |
| 4:21:33 | 8 | A.  I'm working on it.  I placed a funding request but nothing |
| 4:21:37 | 9 | has been approved yet. |
| 4:21:43 | 10 | Q.  At the IACP conference in Orlando in 2018, did you have a |
| 4:21:46 | 11 | Nextel banner at the Sprint both? |
| 4:21:46 | 12 | A.  No. |
| 4:21:51 | 13 | Q.  At the IACP conference in 2017 in Philadelphia, did you have |
| 4:21:53 | 14 | a Nextel banner at the Sprint booth? |
| 4:21:53 | 15 | A.  No. |
| 4:21:57 | 16 | Q.  Now, the 2017 IWCE conference, who else attended from |
| 4:21:58 | 17 | Sprint? |
| 4:21:59 | 18 | A.  In 2017? |
| 4:22:00 | 19 | Q.  Yes. |
| 4:22:02 | 20 | A.  Which one, which conference? |
| 4:22:05 | 21 | Q.  The 2017 IWCE. |
| 4:22:08 | 22 | A.  I believe Scott Wiley was there, maybe.  He's either at the |
| 4:22:13 | 23 | IACP or the IWCE. |
| 4:22:17 | 24 | Q.  Did Sprint have a booth at the 2017 IWCE conference? |
| 4:22:17 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 4:22:22 | 1 | Q.  Did Sprint have a Nextel booth at the 2017 IWCE conference? |
| 4:22:22 | 2 | A.  No. |
| 4:22:23 | 3 | Q.  Your answer was no. |
| 4:22:25 | 4 | A.  No. |
| 4:22:30 | 5 | Q.  Did the Sprint booth at the 2017 IWCE conference have a |
| 4:22:31 | 6 | Nextel banner? |
| 4:22:32 | 7 | A.  No. |
| 4:22:37 | 8 | Q.  Did the Sprint booth at the 2017 IWCE conference have any |
| 4:22:38 | 9 | Nextel signs? |
| 4:22:40 | 10 | A.  No. |
| 4:22:48 | 11 | Q.  What is your role when you attend the IWCE conference in |
| 4:22:49 | 12 | 2017. |
| 4:22:53 | 13 | A.  Answer customers' questions about our products, and if we |
| 4:22:56 | 14 | had things demonstrated like our push-to-talk solution for LMR, |
| 4:23:01 | 15 | that's for Land Mobile Radio, and talk to them about the Sprint |
| 4:23:02 | 16 | network. |
| 4:23:02 | 17 | Q.  Anything else? |
| 4:23:04 | 18 | A.  No. |
| 4:23:07 | 19 | Q.  Did Sprint have a booth at the 2018 IWCE conference? |
| 4:23:08 | 20 | A.  Yes. |
| 4:23:13 | 21 | Q.  Did Sprint have a Nextel booth at the 2018 IWCE conference? |
| 4:23:14 | 22 | A.  No. |
| 4:23:19 | 23 | Q.  Did the Sprint booth have -- at the 2018 IWCE conference, |
| 4:23:21 | 24 | have a Nextel banner? |
| 4:23:21 | 25 | A.  No. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
4:23:25   1    Q.  Did the Sprint booth at the 2018 IWCE conference have any
4:23:26   2    Nextel signs?
4:23:31   3    A.  Not that I was aware of.
4:23:41   4    Q.  At the 2017 IWCE conference, at some point you were browsing
4:23:45   5    through vendors' tables and came across a Nextel booth.  Is that
4:23:45   6    correct?
4:23:47   7    A.  Correct.
4:23:51   8    Q.  And if I can have you take a look at Exhibit 126, do you
4:23:56   9    recognize the document or that picture of the first page?
4:23:57  10    A.  Yes.
4:24:00  11    Q.  And did you take that picture, is that one of the pictures
4:24:00  12    you took?
4:24:01  13    A.  Yes.
4:24:03  14    Q.  Can you tell me what that picture is of?
4:24:08  15    A.  It's a booth displaying phones or radios.
4:24:10  16    Q.  Is it displaying anything else?
4:24:12  17    A.  There's a Nextel banner and there's another banner behind
4:24:14  18    it.
4:24:17  19    Q.  You said that you noticed an individual with a name tag,
4:24:19  20    Stephen Calabrese.  Do you recall that?
4:24:20  21    A.  Yes.
4:24:22  22    Q.  Did you talk to Mr. Calabrese?
4:24:26  23    A.  I believe that's who -- I'm not sure.  I think that's who it
4:24:27  24    was.
4:24:33  25    Q.  Is that the name you recall or you're not sure if it's that
```

```
4:24:33   1    --

4:24:36   2    A.  They either told me that's who owned it or that's the name

4:24:38   3    that was on there.

4:24:40   4    Q.  On there?  What do you mean by on there?

4:24:43   5    A.  On the name tag.

4:24:50   6    Q.  I hand you Exhibit 134.  Do you recognize these handsets

4:24:53   7    shown in Exhibit 134.

4:24:55   8    A.  Any of them or all of them or what do you mean?

4:24:58   9    Q.  Some.  In general, do you recognize any of them?

4:25:02   10   A.  They look like they were the ones that were being splayed.

4:25:11   11   Q.  Mr. Mancuso, before we took a break, we were talking about

4:25:15   12   Paragraph 9 of your declaration.  And we just talked about

4:25:19   13   nongenuine products, and next you referred to them as

4:25:23   14   counterfeit products using the Nextel mark.  What do you mean by

4:25:23   15   counterfeit?

4:25:27   16   A.  They aren't the devices that we are selling today.

4:25:30   17   Q.  Is Sprint selling an i300?

4:25:31   18   A.  No.

4:25:36   19   Q.  If you look at the Exhibit 134, is Sprint selling an i300?

4:25:36   20   A.  No, sir.

4:25:40   21   Q.  Is Sprint selling an i300 handset radio that looks anything

4:25:44   22   like the i300 shown in Exhibit 134?

4:25:44   23   A.  No, sir.

4:25:48   24   Q.  Is Sprint selling and i400 handheld radio?

4:25:49   25   A.  No, sir.
```

| | | |
|---|---|---|
| 4:25:52 | 1 | Q.  Is Sprint selling a handset radio that looks like the i400 |
| 4:25:53 | 2 | radio? |
| 4:25:55 | 3 | A.  No, sir. |
| 4:25:59 | 4 | Q.  I'm not asking you a legal opinion, I'm asking you to look |
| 4:26:03 | 5 | at the i400.  Does Sprint sell a device that looks like the i400 |
| 4:26:05 | 6 | handheld radio? |
| 4:26:06 | 7 | A.  No, sir. |
| 4:26:09 | 8 | Q.  Does Sprint sell an i500 handset radio? |
| 4:26:10 | 9 | A.  No, sir. |
| 4:26:15 | 10 | Q.  Does Sprint sell an i500 or a radio that looks like the i500 |
| 4:26:16 | 11 | handheld radio? |
| 4:26:18 | 12 | A.  That looks like how? |
| 4:26:22 | 13 | Q.  Is it the same setup as the i500 handheld radio? |
| 4:26:23 | 14 | A.  Probably no. |
| 4:26:26 | 15 | Q.  Does Sprint sell a rugged smartphone? |
| 4:26:32 | 16 | A.  Yes.  Sonim XP 8. |
| 4:26:34 | 17 | Q.  Does that use the Direct Connect app? |
| 4:26:37 | 18 | A.  It utilizes the Sprint Kodiak push-to-talk platform which |
| 4:26:39 | 19 | allows it to do push-to-talk. |
| 4:26:44 | 20 | Q.  Is the Sonim XP 8 branded as a Sprint device? |
| 4:26:45 | 21 | A.  Branded how? |
| 4:26:49 | 22 | Q.  Does it have a Sprint -- does it have Sprint on the device |
| 4:26:49 | 23 | itself? |
| 4:26:50 | 24 | A.  No. |
| 4:26:53 | 25 | Q.  It only has Sonim on the device, doesn't it? |

```
4:26:55   1    A.  Yes.

4:27:05   2    Q.  Do you know, does Sprint sell a mobile radio like the M300

4:27:07   3    mobile radio from Nextel?

4:27:08   4    A.  No.

4:27:11   5    Q.  So what is your definition of counterfeit?

4:27:14   6    A.  It would be things that are not ours, not Sprint.  Again, I

4:27:18   7    saw the yellow Nextel which I knew was Sprint's, my company and

4:27:22   8    in our booth we had Sprint push-to-talk people there, you know.

4:27:26   9    And we even had a PowerPoint going and it had Nextel going in

4:27:29  10    the background.  None of that looks like stuff that we had.

4:27:33  11    Q.  When you say it was the Nextel mark that was Sprint's, were

4:27:39  12    you referring to the sign at the Nextel booth at the IWCE at the

4:27:39  13    2017 conference?

4:27:41  14    A.  Say that again.

4:27:45  15    Q.  When you said that the Nextel booth -- said at the Nextel

4:27:49  16    booth they had the Nextel mark that was Sprint's, are you

4:27:53  17    referring to the banner that was in the Nextel booth at the IWCE

4:27:54  18    2017 conference?

4:27:57  19    A.  Yes.  I didn't sit there and go through all their equipment

4:27:58  20    with them.

4:28:02  21    Q.  Did you see -- you saw some equipment that also had the

4:28:08  22    Nextel mark on it at the Nextel booth at the IWCE 2017.

4:28:09  23    Correct?

4:28:11  24    A.  At the '17?

4:28:12  25    Q.  Yes.
```

```
4:28:14   1    A.  I saw devices on their table.

4:28:17   2    Q.  Did they have the yellow and black Nextel mark on their

4:28:17   3    devices?

4:28:20   4    A.  I didn't look that closely to be honest.

4:28:24   5    Q.  Did you see any devices at the 2018 IWCE reference that had

4:28:28   6    the Nextel black and yellow and black logo on it?

4:28:32   7    A.  The boxes, from what I say, were marked -- looked like our

4:28:36   8    boxes by the color, the yellow and black color and said Nextel.

4:28:39   9    Q.  When you say they looked like our color, the boxes that you

4:28:44  10    had, did you have any particular -- any yellow and black boxes

4:28:49  11    at the Sprint booth at the IWCE 2018 conference?

4:28:52  12    A.  I've seen those yellow and black before at Sprint's, and

4:28:56  13    it's the same as our banner colors and that's how I knew that.

4:28:59  14    Q.  Did you have any yellow and black boxes at the Sprint booth

4:29:01  15    at the IWCE 2018 conference?

4:29:03  16    A.  No.

4:29:09  17    Q.  Are you aware that that trademark was cancelled in 2014 by

4:29:10  18    Sprint?

4:29:11  19    A.  No.

4:29:15  20    Q.  So was Sprint using the mark, the Nextel mark shown in

4:29:19  21    Exhibit 130 at the 2017 IWCE conference?

4:29:23  22    A.  It was being displayed on the PowerPoint that was going on

4:29:28  23    one of our screens we had in our booth next to -- we had an ERT

4:29:30  24    truck there.

4:29:31  25    Q.  That's IWCE, right?
```

| | | |
|---|---|---|
| 4:29:33 | 1 | A.  Yes.  It's the IWCE. |
| 4:29:37 | 2 | Q.  So it was only on the PowerPoint, it was not on a banner? |
| 4:29:40 | 3 | A.  Just on the PowerPoint that I remember.  But we also |
| 4:29:42 | 4 | verbally told people about it when they would come up and talk |
| 4:29:44 | 5 | to us. |
| 4:29:46 | 6 | Q.  And what do you mean by Nextel branding? |
| 4:29:50 | 7 | A.  So the yellow and black with the banner is the Nextel, is |
| 4:29:54 | 8 | the known brand in the industry and by the people.  That's the |
| 4:29:56 | 9 | first responder showed it was there, so it was a known thing. |
| 4:30:00 | 10 | We -- typically when we go out and talk to government accounts, |
| 4:30:04 | 11 | most accounts used to be with Sprint Nextel at some point, and |
| 4:30:07 | 12 | so we would bring that up in reference to our history that we've |
| 4:30:09 | 13 | done business with them before. |
| 4:30:15 | 14 | Q.  Did you talk to anybody at the Nextel booth in the 2017 IWCE |
| 4:30:16 | 15 | conference? |
| 4:30:17 | 16 | A.  Yes. |
| 4:30:18 | 17 | Q.  Who did you talk to? |
| 4:30:21 | 18 | A.  I think I put down what Stephen's name was, but I wasn't |
| 4:30:25 | 19 | quite sure.  I didn't think that's what it was. |
| 4:30:26 | 20 | Q.  What did you guys talk about? |
| 4:30:30 | 21 | A.  First I asked him if they were a Sprint agent because we |
| 4:30:33 | 22 | have agents all over, and maybe they grabbed an old banner.  And |
| 4:30:36 | 23 | then they told me no, that they were Nextel, that Sprint had |
| 4:30:39 | 24 | dropped -- because he saw my name tag and that we had abandoned |
| 4:30:43 | 25 | the mark, name and all that.  And I was like I don't think so |

| | | |
|---|---|---|
| 4:30:46 | 1 | because we're still using -- we actually have it over in our |
| 4:30:50 | 2 | booth.  And then he had like a piece of paper that he pulled out |
| 4:30:53 | 3 | and showed, and I was like that's above my pay grade, and I |
| 4:30:56 | 4 | basically walked away and reported it. |
| 4:30:59 | 5 | Q.  After the 2017 IWCE conference, what did you do? |
| 4:31:04 | 6 | A.  I forwarded an e-mail to my bosses stating what I had saw, |
| 4:31:07 | 7 | somebody was using the Nextel name and what they were doing, |
| 4:31:09 | 8 | sent them pictures. |
| 4:31:16 | 9 | Q.  I've handed you what is marked as Exhibit 135.  Is this the |
| 4:31:19 | 10 | e-mail that you were just referring to? |
| 4:31:20 | 11 | A.  Yes. |
| 4:31:25 | 12 | Q.  And in this e-mail it states at IWCE, I observed a booth |
| 4:31:30 | 13 | using and flying the Nextel name and banner, and it appears to |
| 4:31:33 | 14 | be in direct competition as a PTT company.  People were confused |
| 4:31:38 | 15 | about it, asking us what did you mean by that. |
| 4:31:43 | 16 | A.  People came to our booth asking about what was the deal. |
| 4:31:45 | 17 | Q.  About how many people came to your booth? |
| 4:31:47 | 18 | A.  At '17? |
| 4:31:48 | 19 | Q.  Yes. |
| 4:31:48 | 20 | A.  A few. |
| 4:31:50 | 21 | Q.  How many is a few, five? |
| 4:31:52 | 22 | A.  Less than ten. |
| 4:31:53 | 23 | Q.  And what did they say? |
| 4:31:55 | 24 | A.  They were just asking -- they were confused and saying do |
| 4:32:00 | 25 | you guys have two booths here?  Some people were saying like are |

| | | |
|---|---|---|
| 4:32:03 | 1 | you guys starting -- are you doing something different with |
| 4:32:06 | 2 | Nextel?  They were just asking what's the deal.  They were just |
| 4:32:10 | 3 | confused because they saw --they knew it was Sprint Nextel, they |
| 4:32:12 | 4 | didn't understand why we were separated. |
| 4:32:15 | 5 | Q.  Did you get anybody's name? |
| 4:32:16 | 6 | A.  No. |
| 4:32:19 | 7 | Q.  Did anybody mention to you that they thought the brand was |
| 4:32:19 | 8 | dead? |
| 4:32:20 | 9 | A.  No. |
| 4:32:23 | 10 | Q.  Did you tell anyone anybody that you were not affiliated |
| 4:32:25 | 11 | with the other Nextel booth? |
| 4:32:28 | 12 | A.  I said that we're not sure what those guys are doing and we |
| 4:32:30 | 13 | reported it. |
| 4:32:36 | 14 | Q.  After the 2018 IWCE conference, did you make any reports to |
| 4:32:36 | 15 | your boss? |
| 4:32:38 | 16 | A.  In what year? |
| 4:32:39 | 17 | Q.  2018. |
| 4:32:40 | 18 | A.  Yes, I did. |
| 4:32:42 | 19 | Q.  What was your report in 2018? |
| 4:32:45 | 20 | A.  That they were there again. |
| 4:32:49 | 21 | Q.  In 2018 did you visit the Nextel booth at the IWCE |
| 4:32:49 | 22 | conference? |
| 4:32:51 | 23 | A.  When? |
| 4:32:54 | 24 | Q.  In the 2018 IWCE conference. |
| 4:32:58 | 25 | A.  Yes.  I walked up there with an individual before. |

```
4:33:00   1    Q.  Who did you go over there with?
4:33:04   2    A.  One of our partners was there, Colombia Tech, Tobias
4:33:05   3    England.
4:33:11   4    Q.  Did you talk to anybody at that time Nextel booth at the
4:33:12   5    2018 IWCE conference?
4:33:15   6    A.  Tobias walked up first and started inquiring.
4:33:17   7    Q.  And then did you talk to anyone?
4:33:21   8    A.  I walked up to get Tobias as to leave, and then they were
4:33:24   9    talking about that and they were referencing that they had, they
4:33:28   10   were telling Tobias about they had a letter that was on an iPad
4:33:34   11   or a tablet, I believe.  No, it was displayed, the article from
4:33:37   12   the journal I think it was, and they were saying that they had
4:33:39   13   this letter, and I asked them a question about what networks it
4:33:43   14   worked on, and they told me.
4:33:48   15   Q.  Did you independently verify whether or not the NW devices
4:33:51   16   could work on any of the named networks?
4:33:53   17   A.  I did not verify any of them.
4:34:00   18   Q.  Now on Paragraph 10 you said -- you state that at the IWCE
4:34:06   19   2018, I observed that the NW entity was also informing customers
4:34:10   20   or consumers, that the counterfeit Nextel products could be
4:34:15   21   acquired and used in connection with T-Mobile wireless network,
4:34:21   22   or if they preferred otherwise, it could be used with Verizon or
4:34:22   23   T-Mobile's network.  Do you see that?
4:34:23   24   A.  Yes.
4:34:24   25   Q.  How did you observe that?
```

```
4:34:25   1    A.   I asked the person.

4:34:27   2    Q.   The person at the NW booth?

4:34:28   3    A.   Yes.

4:34:36   4    Q.   And the person at that time NW booth told you that they were

4:34:37   5    selling counterfeit Nextel products?

4:34:40   6    A.   That was not said.

4:34:45   7    Q.   So I believe earlier you said that you didn't use any of the

4:34:47   8    Nextel devices, correct?

4:34:52   9    A.   That I didn't use them?  I had looked at them in 2018.

4:34:55   10   Q.   But you didn't operate any of the Nextel devices.

4:34:57   11   A.   That's correct.

4:34:59   12   Q.   In the next sentence you state it is my understanding,

4:35:05   13   however, that although marked and made to appear as devices with

4:35:12   14   genuine instantaneous two-way radio communication technology,

4:35:13   15   the counterfeit Nextel products being offered are simply

4:35:16   16   smartphones hidden inside cases made to look like genuine

4:35:20   17   instantaneous two-way radio devices.  Do you see that?

4:35:20   18   A.   Yes.

4:35:22   19   Q.   What's the basis for that sentence?

4:35:25   20   A.   When the person told me that they operated on all three

4:35:28   21   carriers' networks, it was my assumption, because of the

4:35:32   22   different technologies, that they were doing it based on -- and

4:35:34   23   I believe the person there was talking about it had Android or

4:35:38   24   whatever on it they were displaying.  Again, I didn't get into a

4:35:42   25   big technical discussion with them about it, but that that was
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

4:35:46  1    my -- is my understanding of how communications work when you

4:35:50  2    have different carriers because we got -- we don't all share the

4:35:50  3    same platforms.

4:35:54  4    Q.  All right.  But they're not using the Sprint platform

4:35:58  5    whatsoever in their devices, NW isn't, is it?

4:35:59  6    A.  Correct.

4:36:03  7    Q.  So what made you state that these are simply smartphones

4:36:08  8    hidden inside cases to look like genuine instantaneous two-way

4:36:08  9    radios?

4:36:12  10   A.  Again, from what I saw and the person had an Android, one

4:36:15  11   that they were showing, that is what my assumption was.

4:36:16  12   Q.  So you just assumed this.

4:36:17  13   A.  Yes.

4:36:22  14   Q.  So if I look at the i300 handheld radio in Exhibit 134, are

4:36:27  15   you saying the i300 there is a smartphone hidden in that case?

4:36:29  16   A.  Well, because they told me that it operated for all three

4:36:34  17   carriers told me, there's a smartphone or basically what I call

4:36:37  18   a smartphone, there's something smart in it that operates it

4:36:39  19   across those carriers.

4:36:43  20   Q.  So if I opened up the I300 case, I would it's your

4:36:47  21   assumption that I would find a smartphone inside there?

4:36:50  22   A.  Well, a smartphone is nothing more than a board with a modem

4:36:54  23   on it that communicates to the network.

4:36:57  24   Q.  Did you do anything to verify this statement?

4:36:58  25   A.  No.

4:37:03  1   Q.  Did you ask anybody at the Nextel or NW booth whether their

4:37:06  2   devices were simply smartphones hidden inside these cases?

4:37:08  3   A.  I did not ask that.

4:37:12  4   Q.  Did you ask anyone at the NW booth who manufactures their

4:37:13  5   devices?

4:37:14  6   A.  I did not.

4:37:19  7   Q.  Did you ask anyone at the NW booth if their devices use an

4:37:21  8   application that enables the user to communicate using a

4:37:23  9   walkie-talkie feature?

4:37:25  10  A.  I did not.

4:37:28  11  Q.  Have you tested any NW device?

4:37:30  12  A.  No.

4:37:35  13  Q.  Have you evaluated the reliability of any NW device?

4:37:36  14  A.  No.

4:37:39  15  Q.  Have you evaluated the range of an NW device?

4:37:41  16  A.  No.

4:37:45  17  Q.  In Paragraph 13 of your declaration, this is about halfway

4:37:51  18  down and this is at the IWCE 2017 conference where you asked

4:37:56  19  Tobias England, a com tech?

4:37:57  20  A.  Columbia.

4:38:01  21  Q.  Columbia Tech to approach NW entities' booth and ask about

4:38:03  22  its use of the Nextel brand, do you see that?

4:38:04  23  A.  Yes.

4:38:07  24  Q.  And then you state the NW entity falsely informed England

4:38:12  25  that Sprint no longer owned the Nextel brand.  What do you mean

```
4:38:13   1    by that?
4:38:16   2    A.  That they were telling us that we walked away from the name,
4:38:17   3    that we abandoned it.
4:38:20   4    Q.  And in fact, that's what the lawsuit is about, isn't it?
4:38:22   5    The abandonment of the Nextel mark?
4:38:24   6    A.  It's about what again?
4:38:28   7    Q.  The claim that Nextel was abandoned, that Nextel has
4:38:33   8    abandoned the mark.  That Sprint has abandoned the Nextel mark.
4:38:36   9    A.  The company hadn't abandoned it, we use it.
4:38:39  10    Q.  That is your opinion though, isn't it?  There hasn't been a
4:38:41  11    legal determination as to whether Sprint has or has not
4:38:44  12    abandoned the Nextel mark, has it?
4:38:47  13    A.  We use it day-to-day in the field and to customers talking
4:38:50  14    about what we're doing, and not to say that we can't use it
4:38:54  15    again, but there's nothing been -- we've never been told by the
4:38:56  16    company that we're not to use it anymore.
4:39:02  17    Q.  So this saying NW falsely informed England that Sprint no
4:39:05  18    longer owns the Nextel mark, that's your opinion, correct?
4:39:08  19    A.  That's my basis of knowledge, yes.
4:39:13  20    Q.  So when you approached the NW booth at IWCE 2017, were you
4:39:16  21    told exactly the same thing by the individual at the NW booth
4:39:17  22    correct?
4:39:18  23    A.  Yes.
4:39:22  24    Q.  So they were consistent in their story that they believed
4:39:25  25    that Sprint had abandoned the Nextel mark, correct?
```

```
4:39:27   1    A.  Yes, they were saying the same story, yes.

4:39:32   2    Q.  And they weren't hiding it from you wearing a Sprint shirt.

4:39:32   3    A.  Correct.

4:39:37   4    Q.  That's the exact same thing in 2018 at the IWCE in Paragraph

4:39:45   5    14 at the IWCE 2018.  You again observed the NW entity informing

4:39:48   6    customers that NW entity owns the Nextel brand and that Sprint

4:39:50   7    had abandoned it, correct?

4:39:51   8    A.  I'm sorry.  Say it again?

4:39:59   9    Q.  You again observed at the IWCE 2018 that the NW entity was

4:40:03  10    informing customers that it believed that Sprint had abandoned

4:40:06  11    the Nextel mark and that it had a legal right to use the mark,

4:40:07  12    correct?

4:40:07  13    A.  Correct.

4:40:09  14    Q.  And it didn't try to hide that from you?

4:40:13  15    A.  Correct.  It was displaying with their news stories and

4:40:13  16    stuff.

4:40:16  17    Q.  It was open and obvious, and they were claiming ownership of

4:40:18  18    the Nextel mark, correct?

4:40:20  19    A.  Yes.

4:40:28  20    Q.  In Paragraph 16 you state that during the IWCE 2017 show,

4:40:34  21    approximately six to ten attendees came to me to discuss the NW

4:40:39  22    entities' booth and the counterfeit and Nextel products,

4:40:43  23    material and services being offered by the NW entity.  Do you

4:40:44  24    see that?

4:40:45  25    A.  Yes.
```

110

4:40:51  1   Q.   You then go on to say they stated or suggested that their

4:40:54  2   belief that Sprint was providing authorized or affiliated with

4:41:01  3   the NW entities' offering of Sprint of Nextel branded products,

4:41:03  4   materials or services.   Do you see that?

4:41:04  5   A.   Yes.

4:41:11  6   Q.   How are these six to ten entities -- now, are these six to

4:41:14  7   ten entities, are they the same distributors, were these

4:41:18  8   different individuals than the distributors?   I think you said

4:41:23  9   six to eight distributors or dealers that you talked to about

4:41:24  10  previously?

4:41:27  11  A.   It would probably have been made up of both people

4:41:31  12  mentioning it and/or people like law enforcement or some or

4:41:34  13  distributors.   So it would not -- it wasn't like six in one

4:41:37  14  group and another six in another group.   That was my total.

4:41:43  15  Q.   How do these six to ten attendees suggest that they believe

4:41:47  16  the NW entity-branded products or services were affiliated with

4:41:50  17  Sprint at the 2017 IWCE conference?

4:41:53  18  A.   They were confused by the name, the banner and the name and

4:41:54  19  knew that was us.

4:42:02  20  Q.   And you look -- you took a picture of the very -- of the

4:42:16  21  very letter -- and you took a picture of the very letter they

4:42:17  22  were showing, correct?

4:42:19  23  A.   Yes.

4:42:20  24  Q.   And did you read that letter?

4:42:22  25  A.   Yeah.

4:42:24  1   Q.  Did you get the names of these individuals that approached

4:42:27  2   you at the 2017 IWCE conference?

4:42:30  3   A.  At what year?

4:42:31  4   Q.  2017.

4:42:32  5   A.  No.

4:42:37  6   Q.  Did you tell me these six to ten attendees that came to the

4:42:43  7   Sprint booth at the 2017 IWCE conference, that NW was not

4:42:44  8   affiliated with Sprint?

4:42:46  9   A.  Which year?

4:42:46  10  Q.  2017?

4:42:50  11  A.  They were not affiliated with Sprint.

4:42:50  12  Q.  Yes.

4:42:51  13  A.  Correct.

4:42:54  14  Q.  And that Sprint was not affiliated with the NW entity.

4:42:56  15  A.  Correct.  First of all, I thought it was just a big

4:43:00  16  confusion.  They just assumed, and it was just a big mistake.

4:43:06  17  Q.  Now, in Paragraph 17 you state that similarly during the

4:43:10  18  IWCE 2018 show, at least two attendees approached me expressing

4:43:14  19  confusion regarding the relationship between Sprint on the one

4:43:19  20  hand, and the NW entities' booth in the counterfeit and Nextel

4:43:22  21  products, materials and services offered by Defendants on the

4:43:23  22  other hand.  Do you see that?

4:43:25  23  A.  Yes.

4:43:31  24  Q.  So there were only two attendees that approached you at the

4:43:31  25  2018 Sprint booth?

4:43:34   1    A.   I just remember the person said well, do I deal with you

4:43:39   2    guys or do I deal with those guys.  That's what I kind of meant

4:43:42   3    by on one hand or the other, that's what they were doing.  Do I

4:43:44   4    deal with you guys or those guys.

4:43:48   5    Q.   Did you get the names of these two confused attendees at

4:43:50   6    that time 2018 IWCE conference?

4:43:54   7    A.   Again, I think only one of them had cards, and I thought I

4:43:57   8    then transmitted that I thought to somebody in legal, and said

4:43:59   9    hey, these people are confused.

4:44:03   10   Q.   Now, in Paragraph 18 you state that Defendants' counterfeit

4:44:08   11   Nextel products and services appear to be of inferior quality to

4:44:12   12   the genuine Nextel products and services offered by Sprint based

4:44:16   13   upon my observations of the counterfeit Nextel products, my

4:44:19   14   experience working at Sprint and my experience using two-way

4:44:23   15   radios for communications as a first responder.  Do you see

4:44:23   16   that?

4:44:24   17   A.   Yes.

4:44:28   18   Q.   How did their products appear to be of inferior quality?

4:44:31   19   A.   They didn't -- they didn't look and feel like some of the

4:44:33   20   devices that we have.

4:44:36   21   Q.   So just the look and feel test?

4:44:37   22   A.   Yes.

4:44:42   23   Q.   That's the basis of -- how many of these products did you --

4:44:45   24   that's the basis of -- how many of these products did you

4:44:47   25   actually handle?

4:44:47   1   A.  What year?

4:44:49   2   Q.  This is in 2017?

4:44:53   3   A.  '17, maybe one and then '18, maybe one or two.  I think I

4:44:58   4   just picked them up and looked at it and put it back down.

4:44:59   5   Q.  Did you operate any of the devices?

4:45:00   6   A.  No.

4:45:04   7   Q.  Then how can you state that the Nextel services appear to be

4:45:06   8   of inferior quality?

4:45:09   9   A.  Again, it was just from my observation.  My own personal

4:45:12   10  response of what I saw and used.  They weren't our equipment,

4:45:13   11  that's what I meant by that.

4:45:17   12  Q.  But that's not what you said.  You just didn't say hey,

4:45:22   13  these are different equipment.  You said absolutely, no idea

4:45:28   14  sitting here today how the Nextel, how those Nextel products

4:45:34   15  that you saw in 2018 or 2019 IWCE conference operate, do you?

4:45:37   16  A.  I don't know who manufactured them; no, I don't.  So I don't

4:45:39   17  know anything about it.

4:45:40   18  Q.  You don't know anything about the operations of these

4:45:42   19  devices, do you?

4:45:44   20  A.  No.

4:45:48   21  Q.  Exactly.  You don't know because you didn't turn on one of

4:45:52   22  these devices, did you, to check out the services that's offered

4:45:54   23  by Nextel, did you?

4:45:57   24  A.  No, because it wasn't on Sprint service so there's no need

4:45:58   25  for me to use it.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

|  |  |  |
|---|---|---|
| 4:46:00 | 1 | Q.  Did you purchase any of the Nextel products? |
| 4:46:03 | 2 | A.  You talking about the -- |
| 4:46:05 | 3 | Q.  NW products. |
| 4:46:05 | 4 | A.  No. |
| 4:46:11 | 5 | Q.  Did you do any testing to assess the durability of any NW |
| 4:46:11 | 6 | device? |
| 4:46:12 | 7 | A.  No. |
| 4:46:15 | 8 | Q.  Did you do any testing or certifications on the NW devices? |
| 4:46:16 | 9 | A.  No. |
| 4:46:20 | 10 | Q.  Do you know what testing or certifications NW devices go |
| 4:46:21 | 11 | through? |
| 4:46:21 | 12 | A.  No. |
| 4:46:25 | 13 | Q.  Did you ask anybody at the NW booth what testing or |
| 4:46:28 | 14 | certifications the NW devices go through? |
| 4:46:29 | 15 | A.  I did not. |
| 4:46:33 | 16 | Q.  Are you certified to evaluate the durability of a product? |
| 4:46:35 | 17 | A.  No. |
| 4:46:37 | 18 | Q.  Do you have any training to determine whether a product is |
| 4:46:42 | 19 | certified to meet military specifications or form factors? |
| 4:46:42 | 20 | A.  No. |
| 4:46:47 | 21 | Q.  What did you do to determine if any NW product did or did |
| 4:46:50 | 22 | not meet military specification form factors? |
| 4:46:52 | 23 | A.  What did I do?  Say that again?  I'm sorry. |
| 4:46:57 | 24 | Q.  What did you do to determine if any NW product did or did |
| 4:47:00 | 25 | not meet military specification form factors? |

```
4:47:02   1    A.  I didn't do anything.
4:47:05   2    Q.  Do you have any training to determine whether a product is
4:47:10   3    certified to meet military standard 810G for dust, shock,
4:47:12   4    vibration or blowing rain?
4:47:12   5    A.  No.
4:47:16   6    Q.  What did you do to determine if any NW product did or did
4:47:19   7    not meet military standard 810G for dust, shock, vibration and
4:47:19   8    blowing rain?
4:47:21   9    A.  Nothing.
4:47:23   10   Q.  Do you have any training to determine whether a product is
4:47:27   11   certified to meet IP68 standard as dustproof?
4:47:29   12   A.  No.
4:47:33   13   Q.  What did you do to determine if any NW product did or did
4:47:41   14   not meet IP68 standard as dustproof?  What did you do to
4:47:47   15   determine if any NW product did or did not meet IP68 standard as
4:47:48   16   dustproof?
4:47:49   17   A.  I didn't.
4:47:52   18   Q.  Do you have any training to determine whether a product is
4:47:58   19   certified to withstand immersion up to two meters for 30
4:47:58   20   minutes?
4:47:59   21   A.  No.
4:48:04   22   Q.  What did you do to determine if any NW product did or did
4:48:04   23   not withstand immersion up to two meters for 30 minutes?
4:48:04   24   A.  Nothing
4:48:08   25   Q.  Did you immerse any NW product in water?
```

```
4:48:08    1    A.   No.

4:48:12    2    Q.   Did you do any durability testing on any NW product?

4:48:13    3    A.   No.

4:48:16    4    Q.   What's the basis in Paragraph 20 that you state that there

4:48:23    5    are quality concerns with products at NW?   What was your basis

4:48:27    6    in Paragraph 20 for saying that there were quality concerns with

4:48:29    7    the products NW was offering?

4:48:33    8    A.   Because my belief or knowledge that we're still having or

4:48:36    9    using the Nextel name, we have Nextel devices like Strike, and I

4:48:39   10    believe that it is causing confusion from the black and yellow

4:48:42   11    colors, that all those things were causing confusion and that

4:48:47   12    not knowing the information about all the devices.   That, to me,

4:48:50   13    until somebody proved otherwise, they were counterfeit.

4:48:57   14    Q.   In fact Mr. Mancuso, you've stated affirmatively that the NW

4:49:01   15    devices did not meet any of these standards that we just talked

4:49:06   16    about, and in your declaration stated affirmatively that it did

4:49:12   17    not and that caused you that there were quality concerns with

4:49:18   18    the NW devices.   Yet you didn't do a single standards test,

4:49:22   19    quality indication test, certification test to any NW device,

4:49:23   20    correct?

4:49:26   21    A.   What was the question again?

4:49:27   22    Q.   I'm asking you what did you do.

4:49:32   23    A.   It wasn't really my job.   I was just -- I just was reporting

4:49:35   24    up to my supervisors about my concerns.   What I saw and what was

4:49:39   25    being told by customers coming up, based on what we are
```

4:49:41  1    communicating day in and day out.

4:49:48  2    Q.   Okay.   In Paragraph 19 you state -- you say -- state that I

4:49:51  3    believe consumers, including first responder organizations are

4:49:56  4    likely to believe falsely that NW entities' counterfeit products

4:50:00  5    are genuine Nextel products, and purchase them believing that

4:50:05  6    they are of the same quality and dependability as genuine Nextel

4:50:07  7    products when they are not.   Do you see that?

4:50:08  8    A.   Yes.

4:50:11  9    Q.   You didn't test a single Nextel product for quality, did

4:50:11  10   you?

4:50:12  11   A.   No.

4:50:16  12   Q.   You didn't test a single Nextel product for dependability,

4:50:17  13   did you?

4:50:17  14   A.   No.

4:50:22  15   Q.   You didn't do anything to determine whether NW entity

4:50:25  16   products are of the same or lesser quality, or the same or

4:50:29  17   lesser dependability as a genuine Nextel product, did you?

4:50:32  18   A.   Again, my statement from that is because we are using the

4:50:36  19   Nextel name from our products' standpoint, and our customers

4:50:41  20   know what is tested on our network and that was from -- that was

4:50:45  21   what my observations were and that is what I reported to my

4:50:45  22   supervisors.

4:50:49  23   Q.   The Nextel name, putting the Nextel on a device does that

4:50:53  24   have -- what does that have to do with the quality or

4:50:55  25   dependability of that device?

4:51:00   1   A.   If it's coming from a Sprint sticker or -- I mean, who.   I

4:51:04   2   guess I need to know who is doing the stickering.

4:51:08   3   Q.   Are you using Sprint services?

4:51:09   4        MR. KERNELL:   Oh, that's you.

4:51:10   5   A.   Are you using Sprint services.

4:51:15   6   Q.   It doesn't matter.   Does it change the quality or durability

4:51:16   7   of this iPhone?

4:51:19   8   A.   If it's being sold by Sprint, I know it's been certified by

4:51:23   9   Sprint.   Those are Sprint solutions and products that we've been

4:51:27  10   selling.   That sticker, that's what I referenced it to.

4:51:31  11   Q.   It could be that the quality standards that NW holds its

4:51:35  12   manufacturer to could be higher than that what Sprint does,

4:51:35  13   couldn't it?

4:51:37  14   A.   It's possible.   I wouldn't know, but --

4:51:40  15   Q.   No, you wouldn't know because you didn't test.   You didn't

4:51:45  16   check a single quality standard of any Nextel device, did you?

4:51:48  17   A.   I have not.

4:51:51  18        MR. KERNELL:   That's the end of Mr. Mancuso's

4:51:53  19   testimony.

4:51:54  20        THE COURT:   Okay.   Ladies and gentlemen, we're going to

4:51:59  21   break for the day now.   I'm going to ask you to come back at 10

4:52:03  22   a.m. tomorrow morning.   As I told you, I have therapy tomorrow

4:52:09  23   at 9:00, at 8:00, and I don't get finished until just a little

4:52:12  24   bit after 9.   So I'm going to ask you to come back at -- let's

4:52:15  25   say quarter of 10.   I should be done by then.   I should be

4:52:16  1    ready.

4:52:22  2             I want you to tell me tomorrow what your position is on

4:52:25  3    Good Friday.  Do any of you have any strongly-held beliefs that

4:52:29  4    we should not hold court on Good Friday?  If so, raise your

4:52:35  5    hand.  Anybody?  If not, we'll motor through, but we won't go

4:52:37  6    late in the day no matter what.  All right?

4:52:39  7             Remember not to talk to anybody about the case,

4:52:43  8    remember not to look up anything, remember not to do anything.

4:52:49  9    Go home, eat, sleep, come back.  Good night.

4:52:53  10            (Jury out at 4:52 p.m.)

4:53:21  11            THE COURT:  Please be seated for a moment.  I've got

4:53:27  12   eight minutes before I start my Zoom conference call.

4:53:36  13            Okay.  First of all, I know there's no universal rule,

4:53:41  14   but my understanding or my custom is when you are reading from a

4:53:44  15   deposition, when you skip lines you say going to Page 80, Line

4:53:51  16   4.  That way it makes it much easier to follow.  If there's a

4:53:53  17   mistake, then the court reporter can figure out where it is that

4:53:55  18   they are and look at the transcript.

4:53:58  19            The second thing is, I feel like a potted plant.  Over

4:54:01  20   the weekend I spent a lot of time going through these

4:54:06  21   depositions, ruling on objections.  You just read at least 15

4:54:12  22   different things that I had ruled was were inadmissible.  Why

4:54:16  23   did I bother?  What was the point?  I'm not a happy camper.

4:54:19  24   You've ruined my weekend already and then you ignore it.  What's

4:54:23  25   the point of doing that?  There were several things that I -- as

4:54:27  1    I was looking when I could see where you were, that I had

4:54:32  2    written Xed out and had lined out saying sustained. Or not

4:54:42  3    admissible.  What the hell?  I'm done.  I'm gone.  You ask me to

4:54:45  4    redo any more things, we'll go through them line by line and I

4:54:50  5    will listen to objections that you have here in court and I will

4:54:54  6    rule on them in court, because obviously you guys are trying

4:54:58  7    whatever case it is you want to try rather than the case that I

4:54:58  8    want to try.

4:55:01  9         So good-bye.  See you tomorrow morning.

4:55:08  10         COURTROOM DEPUTY:  All rise.

4:55:08  11         (See Volume 5 for continuation)

4:55:08  12                    C E R T I F I C A T E

4:55:08  13    I certify that the foregoing is a correct transcript from the
              record of proceedings in the above-entitled matter.

4:55:08  14    4/13/2022_____          /s/ Dawn M. Savino, R.P.R., C.R.R.
              Date                       DAWN M. SAVINO, R.P.R., C.R.R.

4:55:08  15

4:55:08  16                    I N D E X

4:55:08  17                    WITNESSES

4:55:08  18    ALL WITNESSES:                            PAGE:

4:55:08  19    For Defense:

4:55:08  20      Thomas Shaughnessy:
                  Direct Examination by Mr. Kernell        2:16
4:55:08  21        Cross-Examination by Ms. Wheatley       44:7

4:55:08  22      Brian Mancuso:
                  Deposition read into the record by       77:3
4:55:08  23                    EXHIBITS

4:55:08  24    NO.:    DESCRIPTION:                        PAGE:

        25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
4:55:08   1      For Defense:

4:55:08   2
                 5016        :
4:55:08   3                  In Evidence                        3:8

4:55:08   4      5017        :
                             In Evidence                        6:24
4:55:08   5
                 5018        :
4:55:08   6                  In Evidence                        12:9

4:55:08   7      5021        :
                             In Evidence                        18:1
4:55:08   8
                             5020, 5022, 5024, 5231:
4:55:08   9                  In Evidence                        26:23

4:55:08  10      5019        :
                             In Evidence                        39:18
4:55:08  11

4:55:08  12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**