**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO.  18-cv-60788-JEM**

**SPRINT COMMUNICATIONS, INC.,**

    Plaintiff/Counterclaim Defendant,

    vs.

                                Miami, Florida
                                April 14, 2022
**STEPHEN CALABRESE,** as an individual,   Pages 1-127
**NEXTEL, INC.,** d/b/a **NEXTEL WORLDWIDE,**   9:53 a.m. - 1:05 p.m.
**RETROBRANDS USA LLC,**
**JEFFREY KAPLAN,** as an individual, and
**NEXTEL WORLDWIDE MOBILE, INC.,**

    Defendants/Counterclaimants.

_____

**TRANSCRIPT OF JURY TRIAL**
**VOLUME 5**
**BEFORE THE HONORABLE JOSE E. MARTINEZ**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:**
                *McGuireWoods, LLP*
                BY:  **BRIAN C. RIOPELLE, ESQ.**
                BY:  **LUCY J. WHEATLEY, ESQ.**
                BY:  **AMANDA L. DeFORD, ESQ.**
                800 East Canal Street
                Richmond, Virginia 23219

**FOR THE DEFENDANTS/COUNTERCLAIMANTS:**
                *Erickson Kernell IP*
                BY:  **JAMES J. KERNELL, ESQ.**
                8900 State Line Road
                Suite 500
                Leawood, Kansas 66206

                *Lee & Amtzis, PL*
                BY:  **WAYNE SCHWARTZ, ESQ.**
                5550 Glades Road
                Boca Raton, Florida 33431

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2

1   **REPORTED BY:      DAWN M. SAVINO, R.P.R., C.R.R.**
            **Official Federal Court Stenographer**
2            **400 N. Miami Avenue, 10S03**
            **Miami, Florida  33128**
3            **Telephone:  305-523-5598**

4

9:53:29   5                    (Court called to order)

9:53:31   6            THE COURT:  Good morning.  Somebody needed to talk to

9:53:32   7   me?

9:53:34   8            MR. RIOPELLE:  Yes, Your Honor.  We need to go over

9:53:37   9   some exhibits before the testimony today.

9:53:39  10            THE COURT:  All right.

9:53:42  11            MR. RIOPELLE:  These are all exhibits that Defendants

9:53:44  12   disclosed last night to which we have objections.

9:53:47  13            THE COURT:  All right.  Talk to me about them.

9:53:49  14            MR. RIOPELLE:  First one if we could call up is Exhibit

9:53:53  15   5002.

9:54:01  16            THE COURT:  5002, a *New York Times* article.

9:54:02  17            MR. RIOPELLE:  It's a series of actually *New York Times*

9:54:09  18   articles and it is hearsay, nor do I understand the relevance.

9:54:12  19            THE COURT:  How are newspaper articles admissible?

9:54:14  20            MR. SCHWARTZ:  Self-authenticating, Your Honor.  It's a

9:54:18  21   website article, 901, digital.  The federal rules now have

9:54:21  22   advanced themselves to discuss how those are self-authenticating

9:54:27  23   by the person who types in the website, looks at it, goes

9:54:30  24   through a foundation, if necessary, that the document on the

9:54:33  25   screen reflects what you've seen and the printout matches and

| | | |
|---|---|---|
| 9:54:36 | 1 | the relevance.  That this is part of Mr. Kaplan's investigation, |
| 9:54:41 | 2 | which is at the heart of this case. |
| 9:55:09 | 3 | THE COURT:  901?  What part of 901? |
| 9:55:27 | 4 | MR. SCHWARTZ:  901.1A digital and electronic evidence. |
| 9:55:31 | 5 | THE COURT:  901.1 A.  I don't have a 901.  I have a 901 |
| 9:55:42 | 6 | A and a 901 B.  2022 rules, I don't see it.  What are you |
| 9:55:45 | 7 | talking about? |
| 9:55:56 | 8 | MR. RIOPELLE:  I'm also not sure it addresses the |
| 9:56:02 | 9 | issue.  Authentication is not hearsay, there's still hearsay. |
| 9:56:06 | 10 | MR. KERNELL:  It's not being presented for -- you know, |
| 9:56:11 | 11 | to go to the truth asserted. |
| 9:56:24 | 12 | THE COURT:  I think you might be talking about 902, Not |
| 9:56:45 | 13 | 901.  And you're talking about 902.6? |
| 9:56:54 | 14 | MR. SCHWARTZ:  Yes, Your Honor. 902, R 6, extension to |
| 9:56:57 | 15 | digital and electronic evidence. |
| 9:56:59 | 16 | THE COURT:  It doesn't really say anything about |
| 9:57:02 | 17 | digital and electronic.  It says printed material purporting to |
| 9:57:07 | 18 | be a newspaper or periodic.  I mean, I think you may be right |
| 9:57:09 | 19 | that it does include that, but it doesn't say that.  You're |
| 9:57:16 | 20 | telling me stuff that -- never mind. |
| 9:57:19 | 21 | Okay.  Now the question is what's the relevance of |
| 9:57:22 | 22 | this? |
| 9:57:25 | 23 | MR. SCHWARTZ:  The relevance, Your Honor, is it |
| 9:57:29 | 24 | supports Mr. Kaplan's investigation and the -- all of the issues |
| 9:57:32 | 25 | that the witnesses have talked about during this trial |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

4

9:57:37   1       concerning the reasons why Sprint abandoned Nextel.

9:57:39   2               THE COURT:  You mean because they were losing money?

9:57:41   3               MR. SCHWARTZ:  Well, there was a variety of reasons,

9:57:44   4       losing money was one of them.

9:57:46   5               THE COURT:  So you are introducing it for its truth.

9:57:49   6               MR. SCHWARTZ:  Well, Your Honor, every article is going

9:57:55   7       to be talking about the issues and why things happened, but

9:57:59   8       we're not putting it in for the truth, we're just putting it in

9:57:59   9       --

9:58:01   10              THE COURT:  You just said it's to show that they lost

9:58:05   11      money.  It's one of the things that -- all of this stuff is bad

9:58:08   12      for them that they lost money.  You're going to have to prove

9:58:11   13      that some other way.  Not this way.  I'll sustain the objection

9:58:15   14      as to newspaper articles, at least this one.  I don't know what

9:58:19   15      the other ones are, but it is coming in for its truth.  You are

9:58:22   16      trying to prove that they were losing money.  You're going to

9:58:26   17      have to prove that some other way with a real witness.

9:58:27   18              MR. RIOPELLE:  A whole series of these are articles,

9:58:36   19      but you can see them if they want to try to -- 5003.

9:58:38   20              MR. SCHWARTZ:  Before we switch to an exhibit, inside

9:58:41   21      this exhibit --

9:58:48   22              MR. RIOPELLE:  Do you want us to page to the exhibit?

9:58:52   23      He can take off the blow-up if you want.

9:58:58   24              MR. SCHWARTZ:  Go to Page 4.  This is from the *Los

9:59:03   25      Angeles Times*, Your Honor.  Again, this is --

9:59:05   1          THE COURT:  The west coast?  That's going to make it
9:59:09   2   more credible?  What's the point?
9:59:12   3          MR. SCHWARTZ:  Well, I didn't want to be accused that
9:59:14   4   behind that exhibit is others because the Court just mentioned
9:59:18   5   about other articles.  Mr. Kaplan did a host of searching to
9:59:22   6   find out what the status of this --
9:59:23   7          THE COURT:  He's testified about that.  I don't have a
9:59:27   8   problem with him testifying that he's read articles and that as
9:59:32   9   a result of his investigation whatever he determined.  I don't
9:59:35  10   know that he can quote a newspaper article because I think it is
9:59:37  11   hearsay.
9:59:42  12          MR. SCHWARTZ:  Again, we're not offering it for the
9:59:43  13   truth of the matter.
9:59:44  14          THE COURT:  But you are offering it for the truth of
9:59:47  15   the matter.  You're offering it for the fact that they lost
9:59:51  16   money.  You're offering it for the fact that this showed that
9:59:57  17   they lost money.  I don't think -- I think that that's the
10:00:00  18   definition of offering it for the truth.
10:00:02  19          MR. SCHWARTZ:  I think there's always the exception, no
10:00:06  20   matter what the document looks like, so that's the exception.
10:00:07  21          THE COURT:  Exception of what?
10:00:08  22          MR. SCHWARTZ:  The hearsay rule.
10:00:10  23          THE COURT:  The exceptions to the hearsay rule:
10:00:14  24   Testimony at a former trial.  Admission of a party opponent.
10:00:17  25   Dying declaration.  Declaration against interest.  Spontaneous

6

```
10:00:21  1    statement.  Excited utterance.  Record of past recollection.
10:00:24  2    Business record.  Which one of those is it?
10:00:31  3             MR. RIOPELLE:  That was impressive
10:00:35  4             THE COURT:  Naval Justice School drummed hearsay
10:00:38  5    exceptions into my brain.
10:00:40  6             MR. SCHWARTZ:  It's the exception for periodicals,
10:00:41  7    newspapers.
10:00:43  8             THE COURT:  No, that makes it authenticating.  It does
10:00:49  9    not make it nonhearsay.  I believe it's hearsay.  I will sustain
10:00:57 10    it as to the newspaper articles.  I mean, there are, I think, 14
10:01:04 11    exceptions in the rules of evidence and if you can show me one
10:01:11 12    that it fits, I don't believe 80 something --
10:01:13 13             MR. SCHWARTZ:  I'll take a look at that, Your Honor,
10:01:16 14    when I have -- you know, this morning we're going to be reading
10:01:21 15    a couple of transcripts, so I'll revisit that if necessary.  Mr.
10:01:24 16    Kaplan is not going until late morning.
10:01:28 17             THE COURT:  803.  Tell me which one of 803 it fits and
10:01:31 18    I'll look at it and I'll consider it, but so far you have not
10:01:33 19    given me any reason.
10:01:34 20             MR. SCHWARTZ:  Understood, Your Honor.
10:01:35 21             THE COURT:  All right?
10:01:37 22             MR. RIOPELLE:  Exhibit 5003.
10:01:38 23             THE COURT:  What is that?
10:01:48 24             MR. RIOPELLE:  It's another article.
10:01:49 25             THE COURT:  All right.  What's the objection?
```

```
10:01:51   1              MR. RIOPELLE:  So sorry.  The objection is hearsay as
10:01:57   2     well as relevance.  And in addition, I mean, the fact that the
10:02:04   3     iDEN network was shut down on June 30th is already in evidence.
10:02:19   4              THE COURT:  What is the relevance of this?
10:02:22   5              MR. SCHWARTZ:  Again, it's the same argument as
10:02:25   6     earlier, Your Honor.  We don't need to belabor the issue.
10:02:27   7              THE COURT:  Same ruling.  Next?
10:02:31   8              MR. RIOPELLE:  Exhibit 5006.
10:02:33   9              THE COURT:  Show me.
10:02:36  10              MR. RIOPELLE:  More articles.  Objections, hearsay and
10:02:40  11     relevance.
10:02:47  12              THE COURT:  What paper is this?
10:02:56  13              MR. SCHWARTZ:  It's an online financial called
10:03:00  14     InvestorPlace Market Insight.  We can skip this, Your Honor.
10:03:00  15              THE COURT:  Yeah, please.
10:03:03  16              MR. SCHWARTZ:  We can get to the one that came from
10:03:07  17     Sprint's own press release on their website, their press one.
10:03:08  18              THE COURT:  All right.  Is that one you're objecting
10:03:10  19     to, the press release?
10:03:12  20              MR. RIOPELLE:  I don't know which one.  I got these at
10:03:18  21     1:15 in the morning, so I can -- 5008.
10:03:21  22              THE COURT:  That's when I do some of my best thinking.
10:03:23  23              MR. SCHWARTZ:  I don't have a team of ten, Your Honor.
10:03:25  24              MR. RIOPELLE:  Neither do we, Your Honor.
10:03:27  25              MR. SCHWARTZ:  I meant 11.
```

10:03:29  1          MR. RIOPELLE:  This is another article.  This is from
10:03:35  2    some publication or online publication called *Fierce Wireless*.
10:03:36  3          THE COURT:  Sustained.
10:03:42  4          MR. RIOPELLE:  5011 is a little different.  This is
10:03:47  5    excerpts from 10-Ks.  I have no issue with this being a
10:03:51  6    demonstrative, Your Honor, but the 10-Ks are in and if they're
10:03:54  7    going to submit this as to be a summary, it's not a summary
10:03:57  8    because it's not a complete summary of the 10-Ks.
10:04:00  9          THE COURT:  I'll sustain the objection, you may use it
10:04:01 10    as a demonstrative.
10:04:11 11          MR. SCHWARTZ:  The Sprint website is exhibit 5019.
10:04:12 12          THE COURT:  The whole website?
10:04:13 13          MR. SCHWARTZ:  The Sprint's website.
10:04:16 14          THE COURT:  I'm sorry.  You said the Sprint website.  I
10:04:19 15    wanted to know if you were introducing the entire website.
10:04:21 16          MR. SCHWARTZ:  No, Your Honor.
10:04:24 17          MR. RIOPELLE:  5019 was not disclosed to us last night
10:04:28 18    Your Honor.  I'll have to look real quick.  We do have an
10:04:33 19    objection to it, I'll have to look at it.  Oh, it's in evidence?
10:04:37 20    My understanding is it's in evidence so I withdraw my objection.
10:04:40 21          THE COURT:  Yeah, I think you offered it.
10:04:44 22          MR. RIOPELLE:  The next one, Your Honor --
10:04:47 23          THE COURT:  Hold on.  I got to make sure that 5019 is
10:04:49 24    in evidence.
10:04:51 25          MR. RIOPELLE:  Okay.

10:04:53  1        THE COURT:  Yep, it's in evidence, it came in

10:04:54  2  yesterday.

10:04:56  3        Next?

10:05:08  4        MR. RIOPELLE:  5012.  This is a search done on the

10:05:14  5  *Trademark Electronic Search System*.  It is -- the objection is

10:05:18  6  it's irrelevant and it's misleading.  I don't know what the

10:05:22  7  authentication is going to be, but it is irrelevant because it's

10:05:25  8  talking -- they're going to put it in for the purpose of talking

10:05:32  9  about the cancellation and abandonment of marks that are not at

10:05:34 10  issue in this case.

10:05:39 11        THE COURT:  What is the purpose of this and where is it

10:05:40 12  coming from?

10:05:44 13        MR. SCHWARTZ:  This is a search done by Mr. Kaplan.

10:05:48 14  He's familiar with the trademark office, and went to that

10:05:55 15  particular site to search Nextel, and this is a list of all of

10:05:59 16  the trademarks, live or dead.  Supports his investigation.  And

10:06:07 17  the three trademarks at issue are listed, of course, on this

10:06:08 18  exhibit.

10:06:10 19        THE COURT:  You can talk about those three trademarks

10:06:13 20  but you can't put all of this in.  I'll sustain the objection as

10:06:17 21  to the rest of them.

10:06:22 22        MR. RIOPELLE:  5014 Your Honor, is another article.  I

10:06:25 23  believe it's a *Bloomberg* article.

10:06:26 24        MR. SCHWARTZ:  We can skip.

10:06:28 25        THE COURT:  Skipping that one?

| | | |
|---|---|---|
| 10:06:30 | 1 | MR. SCHWARTZ:  Yeah.  It's the same arguments from |
| 10:06:31 | 2 | before. |
| 10:06:33 | 3 | THE COURT:  Okay, same argument, same ruling. |
| 10:06:38 | 4 | MR. RIOPELLE:  5037. |
| 10:06:40 | 5 | THE COURT:  5037. |
| 10:06:44 | 6 | MR. RIOPELLE:  Another article, hearsay, relevance. |
| 10:06:47 | 7 | THE COURT:  Sustained.  Unless you come up with a |
| 10:06:48 | 8 | different argument. |
| 10:06:57 | 9 | MR. RIOPELLE:  5047.  Another article, another hearsay, |
| 10:06:58 | 10 | relevance. |
| 10:06:59 | 11 | THE COURT:  Sustained. |
| 10:07:10 | 12 | MR. RIOPELLE:  5053.  This is a search on the database, |
| 10:07:17 | 13 | the trademark database.  It's not for any of the marks that are |
| 10:07:18 | 14 | at issue in this case. |
| 10:07:19 | 15 | THE COURT:  If it's not the marks that we're talking |
| 10:07:21 | 16 | about, I'll sustain the objection. |
| 10:07:22 | 17 | MR. SCHWARTZ:  Can I just be heard on this one |
| 10:07:24 | 18 | particular one? |
| 10:07:24 | 19 | THE COURT:  Sure. |
| 10:07:26 | 20 | MR. SCHWARTZ:  It's simply the issue of the iconic |
| 10:07:29 | 21 | yellow and black that people have talked about throughout this |
| 10:07:36 | 22 | trial, and it's part of Mr. Kaplan's investigation. |
| 10:07:41 | 23 | THE COURT:  I don't understand.  Explain to me how does |
| 10:07:44 | 24 | this move the ball in our case? |
| 10:07:46 | 25 | MR. SCHWARTZ:  Well, it's simple, Your Honor.  This is |

|          |    |                                                                     |
|----------|----|---------------------------------------------------------------------|
| 10:07:51 | 1  | the one that stands for Nextel, the most iconic of their design     |
| 10:07:56 | 2  | logos.  The black and yellow rectangle, people have talked about    |
| 10:08:01 | 3  | it.  The gold standard.  And it turns out that this one went        |
| 10:08:05 | 4  | dead October 3, 2014.                                               |
| 10:08:07 | 5  |       THE COURT:  Is this one of the ones that's being sued |
| 10:08:08 | 6  | on?                                                                 |
| 10:08:08 | 7  |       MR. SCHWARTZ:  No, it's not.     |
| 10:08:12 | 8  |       THE COURT:  Then it's out.       |
| 10:08:21 | 9  |       MR. SCHWARTZ:  Well, let me step back.  The name Nextel |
| 10:08:27 | 10 | is the trademark at issue here for equipment.  The word Nextel      |
| 10:08:32 | 11 | all caps in black.  So I guess one could argue --                   |
| 10:08:34 | 12 |       THE COURT:  Do you think that because they gave up this |
| 10:08:38 | 13 | one, somebody could make it a little bit different, make it --      |
| 10:08:40 | 14 |       MR. SCHWARTZ:  No, that's not what I'm saying, Your |
| 10:08:42 | 15 | Honor.  Just people, like their witnesses, have testified that      |
| 10:08:48 | 16 | -- and by the way, they're still using this, even after the mark    |
| 10:08:53 | 17 | went dead on their brochures, on their presentations, it shows      |
| 10:08:58 | 18 | up everywhere.  No one has told Sprint that this one went dead      |
| 10:09:01 | 19 | and they're just still using it.                                    |
| 10:09:03 | 20 |       THE COURT:  I don't understand that comment.  What does |
| 10:09:04 | 21 | that mean?                                                          |
| 10:09:07 | 22 |       MR. SCHWARTZ:  What I'm saying to you is even their own |
| 10:09:14 | 23 | employees think that this particular iconic Nextel design logo      |
| 10:09:19 | 24 | still belongs to Sprint and is alive and well and it's not.  I'm    |
| 10:09:23 | 25 | just pointing that out.  And it was part of Mr. Kaplan's            |

```
10:09:23   1    investigation.
10:09:27   2           THE COURT:  I'll sustain the objection.
10:09:29   3           MR. RIOPELLE:  I'm going to skip one, Your Honor,
10:09:30   4    because I have two left.
10:09:43   5           Let me go to 5170.  Another article, hearsay.
10:09:46   6           MR. SCHWARTZ:  No issue here on this one, we'll address
10:09:48   7    it later if necessary.
10:09:49   8           THE COURT:  All right.
10:09:53   9           MR. RIOPELLE:  Then the last one is 5063.
10:10:02  10           THE COURT:  Calendar.
10:10:04  11           MR. RIOPELLE:  I'm not sure what the relevance is, but
10:10:05  12    it's also not authenticated.
10:10:08  13           MR. SCHWARTZ:  This is a Wayback Machine printout, Your
10:10:12  14    Honor.  Same Wayback, if you've heard that term, the Wayback
10:10:12  15    Machine.
10:10:15  16           THE COURT:  What is the content?
10:10:19  17           MR. SCHWARTZ:  This is the search is nextel.com, their
10:10:22  18    website, the one that they had prior to, I guess, shutting down
10:10:28  19    the network, and this indicates that in the first quarter of
10:10:33  20    2014, the website went dark.
10:10:37  21           THE COURT:  What's the relevance of that?
10:10:39  22           MR. SCHWARTZ:  It's nonuse, Your Honor.
10:10:41  23           THE COURT:  Well, are you being sued for using the
10:10:43  24    website?
10:10:44  25           MR. SCHWARTZ:  Cybersquatting.
```

| | |
|---|---|
| 10:10:48 | 1 |
| 10:10:52 | 2 |
| 10:10:53 | 3 |
| 10:10:56 | 4 |
| 10:11:00 | 5 |
| 10:11:04 | 6 |
| 10:11:09 | 7 |
| 10:11:13 | 8 |
| 10:11:15 | 9 |
| 10:11:20 | 10 |
| 10:11:23 | 11 |
| 10:11:31 | 12 |
| 10:11:34 | 13 |
| 10:11:35 | 14 |
| 10:11:35 | 15 |
| 10:11:40 | 16 |
| 10:11:43 | 17 |
| 10:11:44 | 18 |
| 10:11:49 | 19 |
| 10:11:51 | 20 |
| 10:11:54 | 21 |
| 10:11:55 | 22 |
| 10:12:00 | 23 |
| 10:12:06 | 24 |
| 10:12:08 | 25 |

MR. RIOPELLE:  They are being sued, Your Honor, for using Nextel in the domain names of their websites, that is cybersquatting.

THE COURT:  Yeah, I don't think the fact that they let this website go dead lets you make another one up with it. Although I think it's probably fairly common in the cyberworld, does not seem to me to be -- okay.  So this is to show -- what difference does it make if they let it go dead?  Tell me?

MR. SCHWARTZ:  Again, it goes to their state of mind, their intent that they were basically letting go of everything Nextel.  That's the heart of this whole case.  The abandonment of Nextel, the shuttering, closing it down, finito.

THE COURT:  I'll sustain the objection.

MR. RIOPELLE:  Thank you, Your Honor.  That's all we have.

THE COURT:  Okay.  Can we bring the jury in?  Do we have a witness ready to go on?  Are we going to do a deposition?

MR. SCHWARTZ:  One more, Brian.

Your Honor, I'm sorry Your Honor.  There was one more.

MR. SCHWARTZ:  It's 5046.

MR. RIOPELLE:  5046.

MR. SCHWARTZ:  May not have been on the original list but just address it now.  This is from Sprint's website, Your Honor.  Indicates their brands.

THE COURT:  And the relevance is?

```
10:12:10   1            MR. SCHWARTZ:  That they don't consider Nextel one of
10:12:16   2    their brands based upon what they're expressing to the public,
10:12:20   3    and the same public that had to search to see, like Mr. Kaplan,
10:12:25   4    what's going on with the brand Nextel.  It's all part of his
10:12:31   5    investigation, support, what he's being accused of.
10:12:33   6            MR. RIOPELLE:  It's fine.
10:12:35   7            THE COURT:  I don't see any problem.
10:12:37   8            Okay.  What else?
10:12:40   9            MR. SCHWARTZ:  I believe that's it, Your Honor.
10:12:43  10            THE COURT:  Okay.  When you read a deposition, please
10:12:47  11    make sure that tell us where you start, and then when you skip,
10:12:50  12    tell us where you go to because it just makes it a lot easier to
10:12:52  13    follow.
10:12:55  14            MR. KERNELL:  Yes, I apologize for that yesterday, Your
10:12:55  15    Honor.
10:12:59  16            And if I could address the comments of the Court at the
10:13:03  17    end of the session yesterday when we read in Brian Mancuso.
10:13:09  18    Plaintiff and Defendants both worked together to create or to
10:13:14  19    designate that transcript, and I apologize if I missed some of
10:13:19  20    the Court's rulings on that transcript.  We didn't intend to.
10:13:21  21            THE COURT:  There was a lot of stuff that I ruled was
10:13:25  22    inadmissible that got read into the record.  Now, it's very
10:13:28  23    possible that they withdrew their objection, but I'd kind of
10:13:31  24    like to know about that so that I could have a clue.
10:13:34  25            MR. KERNELL:  We worked jointly together.
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
10:13:36   1          MS. DeFORD:  Your Honor, if I may address that.  I do
10:13:41   2     not work best at 1 a.m., but I think I follow the Court's chart
10:13:44   3     very clearly when I was going through it.  I'm a little
10:13:46   4     concerned that perhaps some of the Court's objections that might
10:13:50   5     have been handwritten on the transcripts may have not made it on
10:13:52   6     the chart that was filed.
10:13:54   7          THE COURT:  It's very possible.  All I know is what I
10:13:59   8     wrote on my note, then somebody else sent it to you.  I presume
10:14:04   9     that it got through.  If it didn't get through, I'll see to it
10:14:06  10     that that employee is beaten.
10:14:09  11          MS. DeFORD:  We don't ask that, but I would raise, Your
10:14:12  12     Honor, because there is one other transcript that they plan to
10:14:15  13     read today which is Ms. Jobe, and if there are additional
10:14:18  14     sustained objections that the Court has made, the parties didn't
10:14:20  15     receive, I'm a little bit concerned about that evidence coming
10:14:24  16     in.  There's nothing we can do about Mr. Mancuso.
10:14:26  17          THE COURT:  No, what's done is done.  If I thought it
10:14:29  18     was real harmful, I would have stopped it.  But, you know, when
10:14:32  19     I saw it -- but I didn't see all of it because I didn't know
10:14:36  20     where we were, and I would have to keep looking.  And when I'd
10:14:41  21     see something that looked familiar, I'd know where that was and
10:14:44  22     I would look for that, and I would follow it for a little while.
10:14:47  23     But it looked like we were going back and forth in some
10:14:51  24     instances, back and forth as far as going back in the testimony,
10:14:54  25     but it doesn't matter.  What's done is done.  Let's deal with it
```

10:14:56   1    from this point forward.  And I would presume that you're going

10:14:59   2    to do it right and if you tell me that, I'll stop you if

10:15:04   3    something is -- now, if I know where you are in the depo, I'll

10:15:05   4    do it.

10:15:07   5            MR. KERNELL:  Yes, Your Honor.  I'll point out the

10:15:08   6    pages that we're going to.

10:15:11   7            THE COURT:  And that's fine.  Can we bring the jury in?

10:15:12   8            MS. DeFORD:  I appreciate it.  Thank you.

10:15:15   9            THE COURT:  Okay.  Bring the jury in please.

10:15:18   10           COURT SECURITY OFFICER:  All rise for the jury.

10:15:26   11           (Jury in at 10:15 a.m.)

10:16:18   12           THE COURT:  Please be seated.  I trust all of you had a

10:16:20   13   nice, restful evening.

10:16:25   14           Ready to go.  We're getting close.  You may proceed.

10:16:31   15           MR. KERNELL:  Your Honor, we call Stephen Calabrese by

10:16:32   16   deposition.

10:16:34   17           THE COURT:  Okay.  As I told you before, deposition is

10:16:40   18   proceeding that's held outside of court.  The witness is sworn

10:16:43   19   and the attorneys have opportunities to ask questions.  And it's

10:16:53   20   being reenacted, so don't worry about -- place any significance

10:16:56   21   on the behavior or tone of voice of any person reading the

10:16:58   22   questions or answers.

10:17:00   23           You may proceed, sir.

10:17:06   24           MR. KERNELL:  This is the videotape deposition of

10:17:16   25   Stephen Calabrese taken on December 5, 2018.  We're starting on

| | | |
|---|---|---|
| 10:17:18 | 1 | Page 9. |
| 10:17:18 | 2 | (Deposition of Stephen Calabrese read into the record by Mr. |
| 10:17:18 | 3 | Kernell (Q) and Ms. Solomon (A)) |
| 10:17:25 | 4 | Q.  Good morning, Mr. Calabrese.  First question, how should I |
| 10:17:27 | 5 | pronounce your last name? |
| 10:17:29 | 6 | A.  Calabrese is fine. |
| 10:17:33 | 7 | Q.  Okay.  Do you understand that we've been here -- you're here |
| 10:17:36 | 8 | today to first answer some background questions about you |
| 10:17:40 | 9 | personally, and then to appear as the corporate representative |
| 10:17:41 | 10 | of Nextel, Inc. |
| 10:17:43 | 11 | A.  Yes. |
| 10:17:48 | 12 | Q.  To make things less confusing today, when I am talking about |
| 10:17:51 | 13 | Nextel, Inc., I'm going to refer to it as NW.  Does that make |
| 10:17:51 | 14 | sense? |
| 10:17:52 | 15 | A.  Yes. |
| 10:17:56 | 16 | Q.  And then when I'm talking about Sprint, I'll say Sprint, and |
| 10:18:00 | 17 | Sprint should also encompass Nextel, the company that merged |
| 10:18:02 | 18 | into Sprint.  Does that make sense? |
| 10:18:03 | 19 | A.  Yes. |
| 10:18:07 | 20 | Q.  And then, when I'm talking about RetroBrands, I'll |
| 10:18:13 | 21 | RetroBrands I'll say RetroBrands.  When I'm talking about Nextel |
| 10:18:17 | 22 | Mobile Worldwide, I will say Nextel mobile or Nextel Mobile |
| 10:18:19 | 23 | Worldwide. |
| 10:18:22 | 24 | A.  Yes. |
| 10:18:28 | 25 | MR. KERNELL:  If we go onto the next Page 10, Line 20. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
10:18:31   1    Q.  Are you a resident of Florida, Mr. Calabrese?
10:18:33   2    A.  Yes.
10:18:34   3    Q.  Where specifically?
10:18:37   4    A.  604 Boca Marina Court.
10:18:39   5    Q.  Is that your primary residence?
10:18:40   6    A.  No.
10:18:44   7    Q.  What is the address you just gave me?
10:18:46   8    A.  It's where I keep some things and I stay closer to the
10:18:50   9    office within Fort Lauderdale during the week.
10:18:52  10    Q.  What is your other address?
10:18:57  11    A.  600 South Dixie Highway, Apartment 836, West Palm Beach,
10:18:59  12    Florida, 33401.
10:19:03  13    Q.  Okay.  And is the South Dixie Highway address your primary
10:19:04  14    residence?
10:19:07  15    A.  You could say that, you know, it's where I keep most of my
10:19:08  16    stuff.
10:19:12  17    Q.  Which of those two addresses is your primary residence?
10:19:15  18    A.  Neither.  I don't really have a primary residence.  I work
10:19:18  19    on the road and pretty much, I mean, my family owns a lot of
10:19:21  20    different places, so I'll stay wherever I'm closer to with
10:19:24  21    driving and traffic.  That kind of stuff.
10:19:29  22            MR. KERNELL:  If we could continue to Page 13, Line 4.
10:19:33  23    Q.  Prior to 2016, were you in the telecommunications business?
10:19:34  24    A.  Yes.
10:19:34  25    Q.  What did you do?
```

| | | |
|---|---|---|
| 10:19:41 | 1 | A.  Well, I mean, as simple as I can make it I -- I conceived, |
| 10:19:46 | 2 | built, designed wireless switching company for what they call |
| 10:19:50 | 3 | mobile backhaul and interoperability. |
| 10:19:52 | 4 | Q.  Can you explain to me what -- in layman's terms, what mobile |
| 10:19:53 | 5 | backhaul is? |
| 10:19:58 | 6 | A.  Yeah, it's pretty simple.  Towers are circles, and backhaul |
| 10:20:01 | 7 | is the sticks in between the circles.  So if you were Sprint, |
| 10:20:05 | 8 | you would understand that, you know, you have your towers |
| 10:20:07 | 9 | connected to the switching center and in between each other so |
| 10:20:11 | 10 | that the phones can -- what radios, phones are just radios and |
| 10:20:13 | 11 | can hand off between each other. |
| 10:20:17 | 12 | Q.  Okay.  And did you work for a company when you did this? |
| 10:20:20 | 13 | A.  Well, I founded the company and I worked for it as an |
| 10:20:21 | 14 | employee. |
| 10:20:24 | 15 | Q.  Okay.  What company was that? |
| 10:20:29 | 16 | A.  It's called Critical RF, Incorporated and Critical RF |
| 10:20:35 | 17 | Direct.  One, one is engineering one is the sales and service. |
| 10:20:48 | 18 | MR. KERNELL:  Then we're going to forward onto Page 32, |
| 10:20:51 | 19 | Line 10. |
| 10:20:51 | 20 | BY DEFENSE 2: |
| 10:20:56 | 21 | Q.  Who owns NW, Mr. Calabrese? |
| 10:21:02 | 22 | A.  It's me, myself, a 50/50 partnership.  Myself and another |
| 10:21:07 | 23 | gentleman.  So myself and another gentleman 50/50, it's pretty |
| 10:21:11 | 24 | much a public record, you know, the corporate secretary, you can |
| 10:21:12 | 25 | look it up. |

10:21:15  1    Q.  Who is your co-owner of NW?

10:21:16  2    A.  Mr. Rivera.

10:21:18  3    Q.  And how did you meet Mr. Rivera?

10:21:21  4    A.  I don't really recall.  I met him.  I mean, I just know him

10:21:23  5    through the telecommunications business.

10:21:28  6    Q.  And I should back up.  Is his name Jose Rivera?

10:21:28  7    A.  Yes.

10:21:31  8    Q.  And can you explain to me how did you become co-owners of NW

10:21:33  9    with Mr. Rivera?

10:21:38  10   A.  I just asked him if he wanted -- if he liked Nextel and

10:21:41  11   wanted to work with me on bringing the brand back that was

10:21:41  12   abandoned.

10:21:44  13   Q.  And when did you ask him that?

10:21:48  14   A.  I don't, like, I don't recall the exact date, but it was

10:21:50  15   probably like November of 2016.

10:21:53  16   Q.  And what is Mr. Rivera's role at NW?

10:21:57  17   A.  We don't really have roles.  I mean, he just -- he helps me

10:22:00  18   with, you know, taking care of business.

10:22:02  19   Q.  Are you -- do you have equal say in all business decisions?

10:22:06  20   A.  As far as yes, we do it, have an equal amount of the

10:22:09  21   company, equal voting I believe, yes.

10:22:12  22   Q.  Well, are you the president or is Mr. Rivera the president?

10:22:15  23   A.  I think I'm the president.  Yeah, I haven't reviewed, I

10:22:19  24   don't know.  I'm not really a businessman.  I know that most --

10:22:22  25   you know, I just know that we are partners and we're 50/50.

10:22:26    1    Q.   But it was your idea to use Nextel, correct?

10:22:30    2    A.   Yes.  I mean, I -- I -- yes.

10:22:33    3    Q.   And you said you knew Mr. Rivera from the telecommunications

10:22:35    4    industry; is that correct?

10:22:37    5    A.   Yes.

10:22:46    6    Q.   How did you meet Mr. Rivera through the telecommunications

10:22:48    7    industry?

10:22:52    8    A.   I don't really recall exactly how I met him, you know.  He

10:22:56    9    bought, he had bought products from my Critical RF company

10:22:56   10    before.

10:23:01   11    Q.   And had he bought, bought products from Critical RF as a

10:23:05   12    consumer, or did he have his own company or how did that --

10:23:07   13    A.   He had his own company.

10:23:09   14    Q.   Is -- what was his company?

10:23:13   15    A.   I think it's Reliable something.  Reliable Communications.

10:23:14   16    Q.   And does he still have that company?

10:23:15   17    A.   Yes.

10:23:18   18    Q.   And did you ask Mr. Rivera to invest in NW?

10:23:20   19    A.   No.

10:23:22   20    Q.   Has he invested any money in NW?

10:23:23   21    A.   No.

10:23:30   22    Q.   And does Mr. Rivera work for NW?  Well first, is Mr. Rivera

10:23:31   23    an employee of NW?

10:23:34   24    A.   I'm not sure what you mean by employee.

10:23:37   25    Q.   Does he receive a salary from NW?

| | | |
|---|---|---|
| 10:23:38 | 1 | A.  No. |
| 10:23:41 | 2 | Q.  So you did not consider him an employee of NW? |
| 10:23:45 | 3 | A.  No, I consider him a 50/50 owner with me. |
| 10:23:47 | 4 | Q.  Does he do any work for NW? |
| 10:23:51 | 5 | A.  Yeah, I mean he -- he helps me.  So, I mean, it's maybe |
| 10:23:55 | 6 | work, if you define it like that.  I mean, he just does what |
| 10:23:58 | 7 | needs to be done so it could be work, you know. |
| 10:24:02 | 8 | Q.  I'm trying to understand.  Is Mr. Rivera compensated for any |
| 10:24:04 | 9 | work he does for NW? |
| 10:24:07 | 10 | A.  No.  No.  Neither of us are.  No. |
| 10:24:12 | 11 | Q.  So neither you nor Mr. Rivera receive any sort of salary? |
| 10:24:13 | 12 | A.  No. |
| 10:24:18 | 13 | Q.  But you split profits from NW 50/50? |
| 10:24:22 | 14 | A.  When we have a profit, we will.  Not at this time. |
| 10:24:29 | 15 |         MR. KERNELL:  If we can skip to Page 38, Line 19. |
| 10:24:34 | 16 | Q.  Well, I'm trying to understand, do you have your own |
| 10:24:37 | 17 | wireless network, Mr. Calabrese? |
| 10:24:38 | 18 | A.  No. |
| 10:24:41 | 19 | Q.  Does NW have its own wireless network? |
| 10:24:41 | 20 | A.  No. |
| 10:24:44 | 21 | Q.  So where do you get the service for the devices on the |
| 10:24:44 | 22 | table? |
| 10:24:46 | 23 | A.  I buy the SIM cards at Walmart. |
| 10:24:49 | 24 | Q.  So the services you sell in connection with these devices, |
| 10:24:51 | 25 | those devices are SIM cards from Walmart? |

| | | |
|---|---|---|
| 10:24:55 | 1 | A.  Not necessarily, but that's, you know, that's an example of |
| 10:24:58 | 2 | where you can get service for these. |
| 10:24:59 | 3 | Q.  Well, where do you get service for those? |
| 10:25:03 | 4 | A.  It just depends on where the customer is.  I mean, different |
| 10:25:06 | 5 | geographical areas.  There's different service providers. |
| 10:25:14 | 6 | Q.  Do you -- does NW procure it for a consumer or does the |
| 10:25:15 | 7 | consumer procure it themselves? |
| 10:25:19 | 8 | A.  Both.  Some customers prefer to procure it themselves and |
| 10:25:22 | 9 | sometimes they ask us to procure it. |
| 10:25:26 | 10 | Q.  Okay.  So can you list for me the services NW has procured |
| 10:25:27 | 11 | for customers? |
| 10:25:28 | 12 | A.  Data plan. |
| 10:25:31 | 13 | Q.  Where do they get those data plans? |
| 10:25:34 | 14 | A.  Sometimes we get them at off the shelf.  Sometimes we order |
| 10:25:40 | 15 | them from what they call an IOT provider which is they sell SIM |
| 10:25:44 | 16 | cards for like, you know, for devices.  You can buy SIM cards on |
| 10:25:47 | 17 | line for two or three dollars, and they'll go up and you can put |
| 10:25:48 | 18 | them in devices. |
| 10:25:52 | 19 | Q.  Okay.  Do you know what network these devices use? |
| 10:25:56 | 20 | A.  They can use any GSM network. |
| 10:26:00 | 21 | Q.  So for instance they might use AT&T's network? |
| 10:26:03 | 22 | A.  If the customer wants that, we'll give them that network, |
| 10:26:04 | 23 | yes. |
| 10:26:06 | 24 | Q.  So you can purchase the service from AT&T and resell it to a |
| 10:26:07 | 25 | consumer; is that accurate? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 10:26:11 | 1 | A.  No.  We don't purchase it from AT&T.  We have no |
| 10:26:15 | 2 | relationship with AT&T.  We buy it from an IOT provider who has |
| 10:26:20 | 3 | a relationship with AT&T.  Like everybody else does that.  Does |
| 10:26:25 | 4 | like ATM machines, vending machines, traffic lights, Onstar, |
| 10:26:27 | 5 | that kind of stuff. |
| 10:26:31 | 6 | Q.  So NW does not, in fact, have its own wireless network or -- |
| 10:26:32 | 7 | A.  No. |
| 10:26:34 | 8 | Q.  Create any sort of wireless services? |
| 10:26:35 | 9 | A.  No. |
| 10:26:39 | 10 | Q.  It resells wireless services is that accurate? |
| 10:26:47 | 11 | A.  Yes.  It's more, more or less.  Again, only when the |
| 10:26:51 | 12 | customer asks us to provide that, but not in an absolute |
| 10:26:53 | 13 | statement that we do, you know, always.  You know, when you work |
| 10:26:59 | 14 | with us, you have the option to do that.  The device is an |
| 10:27:02 | 15 | off-the-shelf device, takes a SIM card.  You can procure the |
| 10:27:05 | 16 | service from anywhere.  We just bundle it if you ask us to. |
| 10:27:09 | 17 | Q.  And how would you go about -- can you give me an example of |
| 10:27:13 | 18 | the time you have bundled the service and the device for a |
| 10:27:13 | 19 | customer? |
| 10:27:16 | 20 | A.  I mean, I can give you an example of a customer that |
| 10:27:19 | 21 | provides their own cards, yes.  In fact, they're in your |
| 10:27:21 | 22 | documents that you talk about. |
| 10:27:24 | 23 | Q.  Well, I think I'm asking a different question than you're |
| 10:27:30 | 24 | answering.  I'm asking for an example of when you have sold the |
| 10:27:31 | 25 | service to the customer? |

10:27:35   1   A.   I mean, I'm just thinking of a -- we don't have that many

10:27:38   2   customers.  We're pretty small, but like a security company that

10:27:42   3   down here local.

10:27:50   4           MR. KERNELL:  I'm skipping to Line 7 of Page 42.

10:27:52   5   Q.   But where did you get the service bundled with the device?

10:27:55   6   A.   Oh, at a store called Mobile Source.

10:27:57   7   Q.   And what did you purchase there?

10:27:58   8   A.   SIM cards.

10:28:04   9   Q.   You just bought SIM cards, you just bought SIM cards to the

10:28:04   10  customer?

10:28:08   11  A.   Well, we put it into the device and we give it to them and

10:28:10   12  that, and they use it.

10:28:15   13          MR. KERNELL:  Now if we could skip to Page 45, Line 5.

10:28:17   14  Q.   Those devices say Nextel on them, correct?

10:28:19   15  A.   They say it, yes.

10:28:22   16  Q.   How did Nextel get on those devices?

10:28:25   17  A.   Well we -- they put -- the people who make the devices put a

10:28:27   18  sticker on it that says Nextel.

10:28:29   19  Q.   And who made these devices?

10:28:33   20  A.   I mean, I'm not -- they have really long Chinese names but

10:28:37   21  we submitted a list of our -- of our vendors.  I don't know

10:28:41   22  their exact names.  They, you know, so everybody buys these from

10:28:45   23  different places just like anybody could buy an iPhone from

10:28:49   24  different places, you know.  It just -- one says a different

10:28:51   25  carrier name on the back than the other.

| | | |
|---|---|---|
| 10:28:55 | 1 | Q.  So do you order these devices from a specific manufacturer? |
| 10:28:58 | 2 | A.  No.  There's lots of manufacturers. |
| 10:29:02 | 3 | Q.  How do you get these devices, Mr. Calabrese?  How does NW |
| 10:29:04 | 4 | get these devices that are branded Nextel? |
| 10:29:08 | 5 | A.  We order them from the different vendors that we submitted. |
| 10:29:10 | 6 | Q.  And how did you find those vendors? |
| 10:29:14 | 7 | A.  Well, at the trade show. |
| 10:29:15 | 8 | Q.  What trade show? |
| 10:29:18 | 9 | A.  The one you reference in your documents. |
| 10:29:20 | 10 | Q.  Are you referring to IWCE? |
| 10:29:21 | 11 | A.  Correct. |
| 10:29:22 | 12 | Q.  Didn't you -- |
| 10:29:25 | 13 | A.  The manufacturers have booths there so that people can do |
| 10:29:27 | 14 | business with them. |
| 10:29:30 | 15 | Q.  So tell me how you got in touch with the manufacturers at |
| 10:29:35 | 16 | the trade show and what year trade show you're referring to. |
| 10:29:40 | 17 | A.  Well in 2015, 2016, I saw the booth for different vendors |
| 10:29:44 | 18 | with this technology, and I said that that's a real cool |
| 10:29:48 | 19 | technology.  So I, I just, you know, I met them.  That's how I |
| 10:29:52 | 20 | got in touch with them.  I visited their booth at the trade |
| 10:29:52 | 21 | show. |
| 10:29:56 | 22 | Q.  What vendor's booth did you visit at the trade show? |
| 10:29:58 | 23 | A.  Maybe there's eight or nine of them.  I mean, they have -- |
| 10:30:01 | 24 | like I said they have strange names that aren't, you know, |
| 10:30:06 | 25 | remembered, they're just, you know, Quan Doan Technology Go. |

| | | |
|---|---|---|
| 10:30:11 | 1 | You know, it's nothing that us Westerners would ever remember. |
| 10:30:14 | 2 | MR. KERNELL:  If I could skip to Page 48, Line 4. |
| 10:30:17 | 3 | Q.  Is it correct that you get Nextel-branded devices from |
| 10:30:17 | 4 | vendors? |
| 10:30:18 | 5 | A.  Yes. |
| 10:30:21 | 6 | Q.  Do those vendors manufacture those devices specifically for |
| 10:30:22 | 7 | your company? |
| 10:30:23 | 8 | A.  No. |
| 10:30:27 | 9 | Q.  How did the vendors get the Nextel-branded devices? |
| 10:30:30 | 10 | A.  The vendors make them.  They don't get them. |
| 10:30:34 | 11 | Q.  So did the vendors manufacture Nextel-branded devices and |
| 10:30:37 | 12 | sell them to companies other than NW? |
| 10:30:40 | 13 | A.  No, they would sell them to other companies with their brand |
| 10:30:41 | 14 | on them. |
| 10:30:45 | 15 | Q.  Okay.  So you instruct -- is this accurate as to how NW gets |
| 10:30:49 | 16 | the Nextel-branded devices?  You instruct the vendors what |
| 10:30:54 | 17 | devices you want manufactured and ask them to brand the devices |
| 10:30:56 | 18 | Nextel; is that correct? |
| 10:30:59 | 19 | A.  No, we don't instruct them on which ones to manufacture. |
| 10:31:02 | 20 | They already manufacture them.  We just instruct them on which |
| 10:31:07 | 21 | ones we like to put the Nextel brand on that was abandoned. |
| 10:31:12 | 22 | MR. KERNELL:  If we could skip to Page 49, Line 6. |
| 10:31:15 | 23 | Q.  All right.  So NW instructs the vendor to affix the Nextel |
| 10:31:19 | 24 | brand to certain devices, and they send you the devices with the |
| 10:31:20 | 25 | brand affixed; is that correct? |

```
10:31:22   1    A.  Yes.
10:31:28   2            MR. KERNELL:  Skip to Page 50, Line 15.
10:31:33   3    Q.  I'll rephrase.  Is Quanzhou Sam (ph) Radios Limited a vendor
10:31:38   4    that manufactures Nextel devices for NW?
10:31:42   5    A.  No.  They affix the Nextel brand on the devices they already
10:31:44   6    manufacture, but yes, they're a vendor.
10:31:48   7    Q.  Can you explain to me the distinction you're making?  Is it
10:31:52   8    that they or you -- what is the distinction between they affix
10:31:55   9    the brand on devices they already manufacture and they
10:31:58  10    manufacture devices for NW?
10:32:01  11    A.  Well, let me put it into your own terms since you're with
10:32:05  12    Sprint or you represent Sprint.  Sprint buys iPhones from Apple.
10:32:08  13    When they buy them from Apple for their own inventory, they have
10:32:12  14    the Sprint logo on the back.  But Apple manufactures the iPhone
10:32:16  15    for sale at their store without any carrier logos, and when we
10:32:20  16    order our inventory, these are items that are in the public
10:32:23  17    domain, anybody can buy them.
10:32:27  18            MR. KERNELL:  If we can skip to Page 52, Line 9.
10:32:31  19    Q.  Getting back to the Quanzhou Sam Radios Limited, is that one
10:32:32  20    of your vendors?
10:32:34  21    A.  Sounds like it, yeah.
10:32:40  22    Q.  And how about Quanzhou Sin Hazan Electronic Technology Co,
10:32:41  23    Limited?
10:32:43  24    A.  Yes, I believe so.
10:32:48  25    Q.  Okay.  And what about Quanzhou Tiso (ph) Electronics Co,
```

10:32:49  1   Limited?

10:32:52  2   A.  Yes.  Those sound like the folks that I met at the trade

10:32:56  3   show, the IWCE trade show that I recall.

10:33:03  4        MR. KERNELL:  We can skip to Page 54, Line 17.

10:33:06  5   Q.  Can you give me -- about how many Nextel branded devices in

10:33:11  6   terms of numbers, number of units has NW purchased from vendors?

10:33:14  7   A.  I can't recall an exact number.  It would be in the

10:33:15  8   hundreds.

10:33:16  9   Q.  In the hundreds of devices?

10:33:18  10  A.  Right.

10:33:18  11  Q.  Total?

10:33:22  12  A.  Total, yeah.  We sold probably a few hundred.

10:33:28  13        MR. KERNELL:  Skip to Page 56, Line 7.

10:33:30  14  Q.  Who is in charge of working on the taxes?

10:33:34  15  A.  I don't know the name of his company.  His name is Noel.

10:33:37  16  Q.  But who at NW gets him the information he needs?

10:33:42  17  A.  Well we, like he has, he has a things where we through, like

10:33:47  18  he goes on our PayPal account or whatever and he looks at it so

10:33:48  19  he, he has access to it.

10:33:52  20  Q.  Mr. Calabrese, do you keep any sales or other financial

10:33:53  21  records at NW?

10:33:58  22  A.  I, I don't.  I mean, I write my to-do list on a piece of

10:34:01  23  paper and that's pretty much, we have a PayPal which helps us do

10:34:04  24  that invoicing kind of thing.

10:34:05  25  Q.  Do you create balance sheets for NW?

10:34:09   1   A.   I don't.  No.  I mean, that's part of what we -- we asked
10:34:13   2   the guy Noel to do as a service, just tell us how we're doing as
10:34:18   3   a couple guys.  You know, how we're doing with our sales, how
10:34:21   4   we're doing with our expenses and so that's -- we hired, you
10:34:26   5   know, this company to do us a service for us.    I'm sorry.  I
10:34:29   6   don't know his last name.  I had lunch with him once.
10:34:32   7   Q.   Mr. Calabrese, are you the person who communicates with your
10:34:37   8   vendors regarding affixing the Nextel brand to the devices?
10:34:38   9   A.   No.
10:34:40   10   Q.   Who communicates with the vendors on that point?
10:34:42   11   A.   Mostly Mr. Rivera.
10:34:46   12   Q.   And does Mr. Rivera act independently or is he acting on
10:34:48   13   your instructions?
10:34:51   14   A.   He's pretty independent.  I mean, he -- I don't really know
10:34:55   15   all the communication because again, I mostly work with the
10:34:59   16   sales to the dealers.  So that's mostly my role, answer
10:35:02   17   technical questions, that kind of thing.  What I call the front
10:35:05   18   of house.
10:35:13   19        I don't recall if you made a decision.  I mean, it's
10:35:17   20   pretty much implied like with our order and that's our company
10:35:23   21   name.  So they put it on there.  That's what the offer is OEM.
10:35:27   22   It's called OEM.  You know, like when Sprint orders 100,000 car
10:35:32   23   chargers, maybe the car charger may put a little Sprint logo on
10:35:35   24   it, so I don't think he really made a decision.  It's just that
10:35:38   25   that's kind of what he's there to talk to them about, you know

10:35:41  1    what I mean?  They understand that, they do it for other people

10:35:42  2    too.

10:35:47  3    Q.  But can you choose to use Nextel; correct, Mr. Calabrese?

10:35:49  4    A.  What do you mean by use Nextel?

10:35:52  5    Q.  You made the decision to apply the Nextel brand to the

10:35:54  6    devices that NW sells, correct?

10:35:56  7    A.  Yes.

10:36:03  8         MR. KERNELL:  Skip to Page 62, Line 3.

10:36:07  9    Q.  Who created the website nextelworldwide.com?

10:36:08  10   A.  I did.

10:36:10  11   Q.  Okay.  Did anyone else assist with the creation of the

10:36:13  12   website nextelworldwide.com?

10:36:17  13   A.  No.

10:36:26  14        MR. KERNELL:  Skip to Page 66 Line 24.  Then on to 67.

10:36:31  15   Q.  Mr. Calabrese, is this the corporate -- Florida corporate

10:36:32  16   record for NW?

10:36:35  17   A.  Yes, it looks that way.

10:36:37  18   Q.  And the principle address listed here, it's on the page

10:36:40  19   number SPR 34?

10:36:42  20   A.  Uh-huh.

10:36:46  21   Q.  6191 Orange Drive, Suite 4466; is that correct?

10:36:52  22   A.  That's in Davie, Florida, which is right near the airport.

10:36:56  23   Q.  But is that an office space NW rents?

10:36:57  24   A.  No.

10:36:58  25   Q.  What is that?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 10:37:01 | 1 | A.  That belongs to Mr. Rivera's company, Reliable Two-way and |
| 10:37:06 | 2 | he lets us, you know, basically use it as an address, a business |
| 10:37:09 | 3 | so that, you know, is a place where we can you know, have a |
| 10:37:13 | 4 | business that is not in a home. |
| 10:37:16 | 5 | MR. KERNELL:  You can move on to Page 68, Line 6. |
| 10:37:19 | 6 | Q.  Do you know who drafted these electronic articles of |
| 10:37:20 | 7 | incorporation? |
| 10:37:23 | 8 | A.  I don't.  I don't know who drafted them. |
| 10:37:25 | 9 | Q.  Did you provide this information? |
| 10:37:30 | 10 | A.  I, I provided like my name when we started the company for |
| 10:37:33 | 11 | like the place you start your company with.  And then |
| 10:37:36 | 12 | Mr. Rivera, I guess, worked on all that.  You know, like I said, |
| 10:37:41 | 13 | he does different things when the time is right to do them.  So |
| 10:37:41 | 14 | -- |
| 10:37:46 | 15 | Q.  So do you recall, did you or did Mr. Rivera take care of |
| 10:37:47 | 16 | getting NW incorporated? |
| 10:37:51 | 17 | A.  Mostly Mr. Rivera.  I mean, I was there and I signed the |
| 10:37:55 | 18 | documents.  And I gave you know my information. |
| 10:38:03 | 19 | MR. KERNELL:  We can move to Page 70, Line 25. |
| 10:38:08 | 20 | Q.  What is Mr. Kaplan's current relationship to NW? |
| 10:38:13 | 21 | A.  He's a licensor, I'm a licensee of the Nextel trade brand. |
| 10:38:14 | 22 | Nextel, Inc. is a licensee. |
| 10:38:17 | 23 | Q.  When did RetroBrands gain ownership of the brand Nextel? |
| 10:38:21 | 24 | A.  I'm not certain when.  That's Mr. Kaplan.  I don't really do |
| 10:38:22 | 25 | anything with the brand. |

| | | |
|---|---|---|
| 10:38:26 | 1 | Q.  How did you -- how did NW decide to become RetroBrands |
| 10:38:27 | 2 | licensee? |
| 10:38:31 | 3 | A.  Well Mr. Kaplan, I, I guess researched the abandoned, being |
| 10:38:36 | 4 | Nextel and he, he asked us if we would be interested in |
| 10:38:39 | 5 | licensing it from him. |
| 10:38:50 | 6 | MR. KERNELL:  Skip to Page 79, Line 3. |
| 10:38:53 | 7 | Q.  But Mr. Calabrese, you went from using the Nextel brand and |
| 10:38:57 | 8 | paying no royalties to anyone for that use to paying Mr. Kaplan |
| 10:39:02 | 9 | a royalty to use the Nextel brand, and I'm trying to understand |
| 10:39:04 | 10 | why you made that decision. |
| 10:39:10 | 11 | A.  Because again, to maintain and acquire abandoned marks is a |
| 10:39:12 | 12 | -- is a specialty that I didn't possess and, you know, the |
| 10:39:17 | 13 | expertise and as far as you know, I, I'm more of a |
| 10:39:20 | 14 | telecommunications expert.  Mr. Kaplan is -- |
| 10:39:24 | 15 | MR. RIOPELLE:  Objection, Your Honor, that is. |
| 10:39:25 | 16 | THE COURT:  Come to the side. |
| 10:39:25 | 17 | (SIDEBAR CONFERENCE: |
| 10:39:43 | 18 | THE COURT:  Sidebar. |
| 10:39:53 | 19 | What's the problem? |
| 10:39:57 | 20 | MR. SCHWARTZ:  Mr. Riopelle wasn't aware of the |
| 10:40:00 | 21 | stipulation I reached with his other colleague, and it was going |
| 10:40:02 | 22 | to be crossing out the two words that were skipped. |
| 10:40:07 | 23 | THE COURT:  What are we doing?  Did you get it out now? |
| 10:40:10 | 24 | MR. RIOPELLE:  I'll withdraw the objection.  It was |
| 10:40:17 | 25 | red'd out on mine, and there was an agreement I wasn't aware of |

| | | |
|---|---|---|
| 10:40:19 | 1 | and I'm willing to live by my side's agreement. |
| 10:40:32 | 2 | THE COURT:  Okay.  Read what you agreed upon.  If you |
| 10:40:52 | 3 | can remember it.  You may proceed. |
| 10:40:52 | 4 | (END OF SIDEBAR) |
| 10:40:56 | 5 | MR. KERNELL:  Do you want to withdraw the objection? |
| 10:40:57 | 6 | THE COURT:  He did. |
| 10:41:00 | 7 | MR. KERNELL:  I'm sorry.  Do you want to proceed with |
| 10:41:01 | 8 | the question again? |
| 10:41:02 | 9 | THE COURT:  Yes. |
| 10:41:03 | 10 | MR. KERNELL:  Okay. |
| 10:41:06 | 11 | Q.  But Mr. Calabrese, you went from using the Nextel brand and |
| 10:41:12 | 12 | paying no royalty to someone for that use to paying Mr. Kaplan a |
| 10:41:16 | 13 | royalty to use the Nextel brand, and I'm trying to understand |
| 10:41:19 | 14 | why you made that decision? |
| 10:41:24 | 15 | A.  Because again, to maintain and acquire abandoned marks is a |
| 10:41:27 | 16 | -- is a specialty that I didn't possess and, you know, the |
| 10:41:30 | 17 | expertise and as far as, you know, I'm more of a |
| 10:41:35 | 18 | telecommunications expert and Mr. Kaplan is, is more of a brands |
| 10:41:38 | 19 | expert like this brand.  And essentially I felt it was in my |
| 10:41:42 | 20 | interest of time and expense, beneficial to let him do, you |
| 10:41:46 | 21 | know, play to that strength and I can continue my role with the |
| 10:41:49 | 22 | telecommunications side. |
| 10:41:52 | 23 | MR. KERNELL:  If we move on to Page 80, Line 2. |
| 10:41:56 | 24 | Q.  Is RetroBrands paying NW's legal fees in this action? |
| 10:41:56 | 25 | A.  Yes. |

| | |
|---|---|
| 10:42:00 | 1 |
| 10:42:04 | 2 |
| 10:42:05 | 3 |
| 10:42:06 | 4 |
| 10:42:21 | 5 |
| 10:42:23 | 6 |
| 10:42:25 | 7 |
| 10:42:26 | 8 |
| 10:42:27 | 9 |
| 10:42:32 | 10 |
| 10:42:37 | 11 |
| 10:42:40 | 12 |
| 10:42:45 | 13 |
| 10:42:50 | 14 |
| 10:42:54 | 15 |
| 10:42:58 | 16 |
| 10:43:01 | 17 |
| 10:43:04 | 18 |
| 10:43:09 | 19 |
| 10:43:12 | 20 |
| 10:43:17 | 21 |
| 10:43:22 | 22 |
| 10:43:27 | 23 |
| 10:43:29 | 24 |
| 10:43:32 | 25 |

Q.   Is RetroBrands paying, to the extent they are separate, is
RetroBrands paying you Stephen Calabrese's legal fees in this
action?

A.   Yes.

     MR. KERNELL:   If we could move on to Page 94, Line 22.

Q.   Would you consider Nextel a famous brand?

A.   What do you mean by famous?

Q.   Well-known?

A.   Yes.

Q.   What was your impression of the Nextel brand prior to 2016?

A.   It differs.  I mean, in the early days, you know, when the
network, you know, before it had been abandoned, the network was
up to the times as far as its ability to handle data and
multiple functions, calling and low rate data.  But as you know,
as smartphones became in around 2007 with the, I guess you call
it the crystallization of smartphones be an every day thing.  My
impression wasn't so favorable because the network that they
abandoned and took down was not able to handle the functions of
a modern wireless customer.  So in the beginning it was very
favorable and, and before, right before, the brand was
abandoned.  Starting around 2008, so it was abandoned in 2013.
It was not so favorable because it couldn't keep up with the
demands of subscribers that, you know, as a person gets in the
wireless business, you know, looking at it from a capability
standpoint, it wasn't that -- seemed that capable anymore.  Just

10:43:37  1   like if I was in the aircraft business, you know, a propeller

10:43:41  2   aircraft wouldn't have seemed as great in 1956 as it would in

10:43:44  3   1906.

10:43:48  4          MR. KERNELL:  If we could move on to Page 98, Line 3.

10:43:51  5   Q.  When do you believe the iDEN network shut down?

10:43:54  6   A.  On June, June 30, 2013.

10:43:57  7   Q.  And after that, did Sprint sell any devices that were

10:43:59  8   branded Nextel?

10:44:02  9   A.  I mean, you'd have to ask Sprint that.  I don't know if -- I

10:44:05  10  mean, they could have sold something.  I don't know.  I mean,

10:44:08  11  they could have sold some leftovers.  I mean, it's not my

10:44:11  12  business, you know.  I know that they publicly took down the

10:44:15  13  network and stopped providing services on that date.  The

10:44:18  14  network was shut off.  I mean, did they --

10:44:23  15  Q.  Okay.  But you do not know whether Sprint continued to sell

10:44:27  16  devices that were branded Nextel that were not connected to the

10:44:28  17  iDEN network?

10:44:33  18  A.  I, I, I do not know.  It's possible.  It's probable really,

10:44:36  19  because you couldn't have a Nextel device with iDEN operating if

10:44:39  20  it didn't have a network to go on.

10:44:43  21         MR. KERNELL:  You can move to Page 100, Line 15.

10:44:45  22  Q.  Were you aware that Sprint purchased Nextel?

10:44:46  23  A.  Yes.

10:44:50  24  Q.  And were you aware that Sprint was called Sprint Nextel?

10:44:56  25  A.  Up until 2013, yes.  When they abandoned it.  Yeah.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
10:44:59    1            MR. KERNELL:  We could move to Page 104.  I'm sorry.
10:45:02    2   103, Line 25.
10:45:06    3   Q.  But so you have no personal knowledge of whether or not
10:45:09    4   Sprint has used the Nextel mark in the last three years.
10:45:11    5   A.  No.
10:45:13    6   Q.  Have you ever talked to anyone at Sprint about their use of
10:45:15    7   the Nextel mark?
10:45:16    8   A.  Yes.
10:45:19    9   Q.  I don't know their names -- oh, who?
10:45:21   10   A.  I don't know their names.  I just go to different stores and
10:45:26   11   ask them if I can buy a Nextel and --
10:45:28   12   Q.  Which stores have you gone to?
10:45:31   13   A.  Sprint stores.  I mean, there's one in -- we went to one in
10:45:36   14   Orlando during the trade show.  The one, the one near our, our
10:45:39   15   -- Jose's office in Davie, on University Drive.  And they just
10:45:42   16   tell us they make an app called Direct Connect, but there's no
10:45:44   17   Nextel anymore.
10:45:46   18   Q.  And when did you visit the store precisely?
10:45:49   19   A.  I don't know the exact dates, but it would have been one
10:45:55   20   time during the trade show and then probably in 2017 sometime.
10:45:58   21            MR. KERNELL:  We can move to Page 105, Line 18.
10:46:03   22   Q.  Did anyone visit the Sprint store in Las Vegas with you in
10:46:03   23   2017?
10:46:04   24   A.  Yes.
10:46:05   25   Q.  Who?
```

| | | |
|---|---|---|
| 10:46:06 | 1 | A.  Mr. Rivera. |
| 10:46:08 | 2 | Q.  And who did you talk to at the Sprint store? |
| 10:46:10 | 3 | A.  Some faceless employee that essentially answered -- you |
| 10:46:14 | 4 | know, asked me if I wanted to buy anything and I said I want to |
| 10:46:16 | 5 | buy a Nextel. |
| 10:46:18 | 6 | Q.  So a retail store employee? |
| 10:46:21 | 7 | A.  I think I spoke to the manager because I kept asking for to |
| 10:46:24 | 8 | buy 20 Nextels. |
| 10:46:28 | 9 | Q.  So the employee referred you to Nextel app? |
| 10:46:33 | 10 | A.  No, it's it was an app called Direct Connect.  Not a Nextel |
| 10:46:34 | 11 | app. |
| 10:46:35 | 12 | Q.  And so this visit -- |
| 10:46:38 | 13 | A.  Which is not the same thing as the device that I was looking |
| 10:46:42 | 14 | for.  And he said you couldn't by the Nextel device anymore. |
| 10:46:46 | 15 | You could just get an app called Direct Connect.  I said I don't |
| 10:46:47 | 16 | want an app. |
| 10:46:50 | 17 | Q.  And you're certain you spoke to a manager during this visit? |
| 10:46:52 | 18 | A.  Yes. |
| 10:46:59 | 19 |      MR. KERNELL:  Continue onto Page 110.  Line 10. |
| 10:47:03 | 20 | Q.  Did you search Google for Nextel? |
| 10:47:07 | 21 | A.  As far as what do you mean search for, to buy Nextel? |
| 10:47:11 | 22 | Q.  No, did you -- yeah, well sure.  Did you search, did you |
| 10:47:14 | 23 | attempt to buy Nextel-branded products to determine if Sprint |
| 10:47:16 | 24 | was still using it? |
| 10:47:19 | 25 | A.  Like I said, I did try the stores because that's where you |

10:47:23  1    buy them normally since Sprint bought Nextel, but they just

10:47:28  2    basically looked at me like I was crazy.

10:47:32  3         MR. KERNELL:  Continue on at Page 111, Line 20.

10:47:36  4    Q.  Can you mark this as Exhibit 6.

10:47:38  5    A.  Thank you.

10:47:43  6    Q.  So Mr. Calabrese, did you perform a Google search for Nextel

10:47:45  7    when you were trying to determine if Sprint was still using the

10:47:46  8    Nextel mark?

10:47:48  9    A.  Yes.

10:47:51  10   Q.  And did you get the results that looked like this?

10:47:52  11   A.  Yes.

10:47:53  12   Q.  Picture on Exhibit 8?

10:47:55  13   A.  Uh-huh.

10:47:56  14   Q.  8?

10:48:00  15   A.  Uh-huh.  In fact, I do.  I remember this exact result.

10:48:03  16   Q.  Okay.  And if you could turn to the next page, it shows a

10:48:04  17   second result.

10:48:05  18   A.  Yes.

10:48:07  19   Q.  Do you see the word Nextel on the page?

10:48:09  20   A.  The third page or the second page?

10:48:11  21   Q.  Oh, I'm sorry, the third page.

10:48:15  22   A.  Right.  Yes.  And I, I did.  And I -- and this is the exact

10:48:19  23   thing I arrived at.  And when I clicked on it, it took me to a

10:48:24  24   thing which didn't have Nextel product anymore.  It was like an

10:48:27  25   old page.  You know, like for instance, the phone I see at the

| | |
|---|---|
| 10:48:31 | 1 |
| 10:48:34 | 2 |
| 10:48:39 | 3 |
| 10:48:40 | 4 |
| 10:48:43 | 5 |
| 10:48:47 | 6 |
| 10:48:52 | 7 |
| 10:48:54 | 8 |
| 10:48:58 | 9 |
| 10:49:02 | 10 |
| 10:49:06 | 11 |
| 10:49:08 | 12 |
| 10:49:11 | 13 |
| 10:49:12 | 14 |
| 10:49:15 | 15 |
| 10:49:19 | 16 |
| 10:49:22 | 17 |
| 10:49:26 | 18 |
| 10:49:34 | 19 |
| 10:49:37 | 20 |
| 10:49:41 | 21 |
| 10:49:44 | 22 |
| 10:49:45 | 23 |
| 10:49:48 | 24 |
| 10:49:53 | 25 |

top right there, it wasn't available for purchase.  That model.
And like it showed the old iDEN phone statute of limitation.  So
when I clicked on it, it took me to a new page with all the
smartphones on the app.

Q.  And this phone you see at the top, what phone is that?

A.  I'm not sure what the model is, but it's -- it's like, it's
not the iDEN phone.  It's the one that's on the Sprint PCS.  You
know, CDMA network.

Q.  But so you agree that when you searched, you saw that Nextel
was used in the Sprint website, correct?

A.  Yeah, I didn't see that it was used, I saw that it was old
information.

Q.  Okay.  But you saw the word Nextel on the website; is that
correct?

A.  No.  I didn't see.  I don't remember what I saw when I did
the search.  I just remember trying to find the product that
was, that was -- you know, looking for, and then I drilled down
to it and it -- and then it would go to an app.

Q.  When you say drilled down, what are you clicking on?

A.  I don't, I mean, links that said, you know, push-to-talk and
stuff like that.  But I pushed, you know.

Q.  But so you don't recall whether Nextel was on the page or
not?

A.  See, see, I, I don't recall whether Nextel was on the page
or not.  I, I, I do remember it said Direct Connect and I said

| | | |
|---|---|---|
| 10:49:59 | 1 | this, this.  And then it said Sprint Direct Connect.  Sprint |
| 10:50:02 | 2 | Direct Connect Plus.  And then it showed a bunch of smartphones, |
| 10:50:06 | 3 | but it didn't say, you know, well, the first page that came up |
| 10:50:09 | 4 | showed like old stuff that was over ten years old.  And then I'd |
| 10:50:13 | 5 | click on it and it would like be like redirecting.  And it would |
| 10:50:17 | 6 | show like smartphones and apps. |
| 10:50:20 | 7 | Q.  Well, I'm not asking you what products were for sale.  I'm |
| 10:50:26 | 8 | simply asking are you telling me that you Google searched |
| 10:50:26 | 9 | Nextel? |
| 10:50:26 | 10 | A.  Uh-huh. |
| 10:50:30 | 11 | Q.  And you just testified that you remembered this list of |
| 10:50:32 | 12 | results, correct? |
| 10:50:35 | 13 | A.  I remember a, a Google search result and it said like |
| 10:50:38 | 14 | Wikipedia, this, that and the other thing. |
| 10:50:42 | 15 | Q.  And did it say Nextel Direct Connect push-to-talk mobile |
| 10:50:44 | 16 | phones from Sprint? |
| 10:50:47 | 17 | A.  I don't recall it said exactly that, but it said shop at |
| 10:50:50 | 18 | Sprint and I was trying to shop. |
| 10:50:52 | 19 | Q.  But you don't remember if it said Nextel. |
| 10:50:56 | 20 | A.  No.  I remembered it said that you could shop for the one -- |
| 10:51:01 | 21 | Q.  Why did you click on the link if it didn't say Nextel? |
| 10:51:05 | 22 | A.  Why didn't I click on it if it said Nextel?  Because I was |
| 10:51:08 | 23 | trying to research everything.  I mean, I didn't know if it |
| 10:51:12 | 24 | didn't say -- it did say it or it didn't if I got there, you |
| 10:51:15 | 25 | know.  But all I can tell you is that, you know, essentially |

10:51:18   1    when I arrived on it and I did click on it -

10:51:19   2    Q.  Click on what?

10:51:19   3    A.  The link.

10:51:20   4    Q.  I'm sorry, what link?

10:51:24   5    A.  The link that came out that I got as a result.

10:51:37   6        MR. KERNELL:  If we could move on to Page 130 Line 6.

10:51:40   7    Q.  Mr. Calabrese, are you familiar with the Nextel chirp?

10:51:41   8    A.  No.

10:51:45   9        MR. KERNELL:  Moving on to Line 23.

10:51:47   10   Q.  Okay.  So NW does not use a Nextel chirp?

10:51:49   11   A.  No.

10:51:59   12       MR. KERNELL:  Move to Page 139 Line 12.

10:52:04   13   Q.  Have you or NW ever used what we're referring to as the

10:52:07   14   Motorola tone in any manner whatsoever?

10:52:11   15   A.  No.

10:52:21   16       MR. KERNELL:  If we move to Page 148, Line 10.

10:52:25   17   Q.  Do you require that your customers inform the public that

10:52:27   18   Sprint has abandoned the Nextel brand?

10:52:27   19   A.  No.

10:52:31   20   Q.  Do you require that your customers place any disclaimer of

10:52:35   21   association with Sprint on their Nextel materials?

10:52:38   22   A.  Let me back up a little bit.  When you say customers, you're

10:52:43   23   referring to end users or are you referring to our dealers?

10:52:46   24   Q.  I'm referring to companies or individuals who purchase

10:52:48   25   Nextel products directly from NW.

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 10:52:52 | 1  | A.  Okay.  Yeah.  Those are our dealers and yes, we ask our         |
| 10:52:55 | 2  | dealers to put on their website or their informational the same    |
| 10:52:59 | 3  | disclaimer that we have on our website.                            |
| 10:53:12 | 4  |           MR. KERNELL:  We can move on to Page 161, Line 24.        |
| 10:53:16 | 5  | Q.  Do you use Kodiak technology to provide push-to-talk?          |
| 10:53:18 | 6  | A.  No.                                                             |
| 10:53:22 | 7  | Q.  What technology do you use?                                    |
| 10:53:27 | 8  | A.  I'm sorry.  Go back one.  We use the technology in my          |
| 10:53:28 | 9  | patents.                                                           |
| 10:53:30 | 10 | Q.  What technology is that?                                       |
| 10:53:35 | 11 | A.  It's basically ROIP that we purchased a source code for my    |
| 10:53:41 | 12 | other company in 2004 or '05.  We license it.                     |
| 10:54:06 | 13 |     MR. KERNELL:  If we can move to Page 169.  Line 3.  Sorry.     |
| 10:54:24 | 14 | If we could move to Page 196, Line 17.                            |
| 10:54:27 | 15 |           THE COURT:  Not 169, Line 3.                             |
| 10:54:31 | 16 |           MR. KERNELL:  196 Line 17.                               |
| 10:54:40 | 17 | Q.  At the IWCE 2017, did anyone ask you or other NW employee      |
| 10:54:44 | 18 | how NW was related to the original Nextel?                        |
| 10:54:47 | 19 | A.  People definitely did, but I don't recall who it was because  |
| 10:54:50 | 20 | there was a lot, many thousands of people there.                  |
| 10:54:54 | 21 | Q.  Okay.  About how many people would you say asked?             |
| 10:54:58 | 22 | A.  Not many.  I mean very, very few.  I don't know.  I couldn't  |
| 10:55:01 | 23 | give you, you know, an exact number.                              |
| 10:55:06 | 24 | Q.  Okay.  More than five?  Less than five?                        |
| 10:55:08 | 25 | A.  Less than five.                                                |

44

| | | |
|---|---|---|
| 10:55:21 | 1 | MR. KERNELL:  We could move on to Page 204, Line 10. |
| 10:55:24 | 2 | Q.  And when does -- the nextelworldwide.com website right now |
| 10:55:29 | 3 | includes the disclaimer relating to Sprint, correct? |
| 10:55:32 | 4 | A.  Has a disclaimer at the bottom, yeah, basically saying that |
| 10:55:36 | 5 | we're not affiliated with Sprint in any way and we, you know, |
| 10:55:40 | 6 | because of the bad reputation that we known to have and that can |
| 10:55:46 | 7 | affect our people's perception on the Nextel brand. |
| 10:55:53 | 8 | MR. KERNELL:  Continue to Page 213, Line 17. |
| 10:55:56 | 9 | Q.  Mr. Calabrese, this is Exhibit 21.  Do you recognize this |
| 10:55:57 | 10 | document? |
| 10:56:03 | 11 | A.  I, I, I, I do recognize this document.  Not as a current |
| 10:56:06 | 12 | document, but I do recognize this.  I do recollect the document. |
| 10:56:12 | 13 | Q.  Okay.  So this document marked Nextel 1055.  Is this a |
| 10:56:12 | 14 | letter that you drafted? |
| 10:56:14 | 15 | A.  Yes. |
| 10:56:16 | 16 | Q.  Was this letter ever sent? |
| 10:56:21 | 17 | A.  It was sent and when, when I, we signed up our manufacture |
| 10:56:25 | 18 | reps being, this one being Power Sales, it was sent with their |
| 10:56:29 | 19 | demo equipment like a welcome letter.  So it was sent, it wasn't |
| 10:56:32 | 20 | sent, you know, it was sent in conjunction with one of these, |
| 10:56:34 | 21 | I'm not sure. |
| 10:56:37 | 22 | Q.  So the purpose of this letter was to welcome a |
| 10:56:40 | 23 | manufacturer's rep essentially? |
| 10:56:40 | 24 | A.  Yes. |
| 10:56:45 | 25 | Q.  And is Power Sales no longer a manufacturer's representative |

10:56:46  1   for NW?

10:56:50  2   A.  No, they're -- they're, I mean, yes, they are no longer a

10:56:55  3   manufacturer's rep.  They are highly influenced negatively by

10:56:57  4   what they were sent by your client.

10:57:00  5   Q.  And in the first paragraph of this letter it states you may

10:57:04  6   be familiar with our brand name and we believe it is key in

10:57:09  7   customer residual goodwill, as well as telegraphing to dealer

10:57:17  8   and end users our business in one single word.  What do you mean

10:57:23  9   by customer residual goodwill?

10:57:25  10  A.  Meaning the good experience, you know, the goodwill that

10:57:27  11  basically was written off when the brand was abandoned that we

10:57:31  12  can bring back and you know to its former glory by being good

10:57:35  13  steward of the brands with RetroBrands.  So that's pretty much

10:57:37  14  the one, you know.  That's one thing that we feel that the

10:57:40  15  brand, before it was affiliated with Sprint, had a lot of --

10:57:43  16  people had a favorable experience.

10:57:45  17  Q.  And is it your position that there's no remaining goodwill

10:57:47  18  in the Nextel brand?

10:57:50  19  A.  No.  I thought it was your position because you guys wrote

10:57:53  20  the goodwill off.  You said, and you dropped the name.

10:57:56  21  Q.  Well Mr. Calabrese, I'm asking.  Do you believe that there's

10:57:59  22  any remaining goodwill in the Nextel brand?

10:58:02  23  A.  Now that we're, you know, have the Nextel brand yes, I

10:58:06  24  believe that now, that now, that there's -- goodwill has been

10:58:07  25  returned.

```
10:58:11   1    Q.  Before NW started selling Nextel products, was there any

10:58:13   2    remaining goodwill in the Nextel brand?

10:58:17   3    A.  No.  It had been written off and it was abandoned.

10:58:31   4          MR. KERNELL:  Continuing on at Page 234, Line 5.

10:58:35   5    Q.  Mr. Calabrese, can I -- can you tell me generally who are

10:58:38   6    the end users for NW Nextel product?

10:58:41   7    A.  To be brief, I mean mostly transportation, security,

10:58:45   8    hospitality.  Transportation is a big one because these people

10:58:47   9    don't -- they don't want them to use their cellphones and

10:58:50   10   driving, so mostly those three industries.  But it could be

10:58:53   11   anybody that wants a walkie-talkie.

10:58:57   12         MR. KERNELL:  Continue onto Page 237, Line 6.

10:59:01   13   Q.  Mr. Calabrese, do you recognize the document marked as

10:59:05   14   Exhibit 26 and stamped on the bottom with Nextel 1022?

10:59:08   15   A.  I've never seen it but I recognize it, yes.

10:59:09   16   Q.  And what is this document?

10:59:11   17   A.  It's a balance sheet.

10:59:13   18   Q.  Is this NW's balance sheet?

10:59:14   19   A.  Yes.

10:59:16   20   Q.  Does this look accurate to you?

10:59:20   21   A.  Yes, it looks accurate.  I mean, we rely on, on the --

10:59:22   22   somebody to help us keep it accurate.  So I would think it's

10:59:24   23   accurate.

10:59:37   24         MR. KERNELL:  Continuing on to Page 252, Line 20.

10:59:41   25   Q.  Have you written down anything anywhere that details of what
```

| | | |
|---|---|---|
| 10:59:44 | 1 | you view as your losses from Sprints cease and desist letters |
| 10:59:46 | 2 | Mr. Calabrese? |
| 10:59:46 | 3 | A.  Yes. |
| 10:59:47 | 4 | Q.  Where? |
| 10:59:49 | 5 | A.  In my notebook. |
| 10:59:53 | 6 | Q.  Have you produced your notebook to your attorneys? |
| 10:59:56 | 7 | A.  I don't know if I produced it.  I mean, I have -- I have a |
| 11:00:00 | 8 | notebook and they're more than welcome to look at it.  You know, |
| 11:00:03 | 9 | I don't know if I produced it or they sat with me and, you know, |
| 11:00:08 | 10 | yesterday and we reviewed all the, the -- what do you call it, |
| 11:00:11 | 11 | topics for examination. |
| 11:00:17 | 12 |         MR. KERNELL:  If we can continue on to Page 260, Line |
| 11:00:19 | 13 | 17. |
| 11:00:22 | 14 | Q.  All right.  So Mr. Calabrese, a few times today you've |
| 11:00:28 | 15 | alluded to damages that you believe -- monetary damages. |
| 11:00:32 | 16 |         MR. RIOPELLE:  Excuse me. |
| 11:00:34 | 17 |         MS. SOLOMON:  Jim, no. |
| 11:00:35 | 18 |         MR. RIOPELLE:  This was ruled out yesterday by the |
| 11:00:37 | 19 | Court. |
| 11:00:49 | 20 |         (Counsel conferring) |
| 11:01:18 | 21 |         MR. KERNELL:  If we can continue to Page 278.  Line 15. |
| 11:01:21 | 22 | Q.  All right.  Mr. Calabrese, do you recall receiving this |
| 11:01:27 | 23 | letter that I've handed you marked as Exhibit 27, the SPR 114 on |
| 11:01:28 | 24 | it, on the bottom? |
| 11:01:30 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:01:34 | 1 | Q.  Okay.  When you received this letter, did you investigate |
| 11:01:37 | 2 | whether or not Sprint was still using Nextel? |
| 11:01:40 | 3 | A.  I did not.  I believe Mr. Rubin was involved at that point |
| 11:01:43 | 4 | so we relied on his information that you see. |
| 11:01:49 | 5 | MR. RIOPELLE:  Objection, Your Honor.  That answer was |
| 11:01:52 | 6 | ruled out yesterday too. |
| 11:02:05 | 7 | THE COURT:  You guys get together away from the |
| 11:02:08 | 8 | microphone and deal with this. |
| 11:02:23 | 9 | MR. KERNELL:  Your Honor, may I approach the witness |
| 11:02:27 | 10 | make sure our copies are in sync? |
| 11:02:31 | 11 | THE COURT:  Certainly. |
| 11:02:45 | 12 | (In-place recess) |
| 11:03:19 | 13 | THE COURT:  Where are we now? |
| 11:03:39 | 14 | MR. KERNELL:  I apologize, Your Honor. |
| 11:03:40 | 15 | THE COURT:  Not a problem. |
| 11:03:46 | 16 | MR. KERNELL:  We're starting at Page 278, Line 15. |
| 11:03:49 | 17 | Q.  All right.  Mr. Calabrese, do you recall receiving this |
| 11:03:54 | 18 | letter that I've handed to you marked as Exhibit 27 with SPR 114 |
| 11:03:55 | 19 | on the bottom? |
| 11:03:56 | 20 | A.  Yes. |
| 11:03:59 | 21 | Q.  Okay.  When you received this letter, did you investigate |
| 11:04:02 | 22 | whether or not Sprint was still using Nextel? |
| 11:04:03 | 23 | A.  I did not. |
| 11:04:08 | 24 | Q.  And you did -- and did you -- what did you do in response to |
| 11:04:08 | 25 | the letter? |

| | | |
|---|---|---|
| 11:04:12 | 1 | A. I pretty much just, like, shook my head at it. |
| 11:04:15 | 2 | Q. So did you do anything in response to this letter? |
| 11:04:18 | 3 | A. Not that I can recall. |
| 11:04:22 | 4 | Q. Did you -- did NW stop selling Nextel-branded goods in |
| 11:04:23 | 5 | response to this letter? |
| 11:04:27 | 6 | A. Not that I can recall.  No. |
| 11:04:31 | 7 | Q. So you kept selling Nextel-branded goods after receiving |
| 11:04:32 | 8 | this letter. |
| 11:04:35 | 9 | A. Yes. |
| 11:04:43 | 10 | MR. KERNELL:  Continuing on to Page 286, Line 16. |
| 11:04:53 | 11 | Q. Okay.  Mark this as 30. |
| 11:04:54 | 12 | A. Thank you. |
| 11:04:57 | 13 | THE COURT:  What line on 286? |
| 11:05:00 | 14 | MR. KERNELL:  Really starting at Line 22. |
| 11:05:02 | 15 | THE COURT:  Okay. |
| 11:05:07 | 16 | Q. Okay.  Mr. Calabrese, the exhibit marked as Exhibit 30, it's |
| 11:05:13 | 17 | marked SPR 257 at the bottom, do you see the CC line where it |
| 11:05:14 | 18 | says Stephen Calabrese? |
| 11:05:15 | 19 | A. Yes. |
| 11:05:17 | 20 | Q. Did you receive this e-mail? |
| 11:05:19 | 21 | A. Most likely, yes. |
| 11:05:32 | 22 | MR. KERNELL:  Continuing on to Page 292.  Line 7. |
| 11:05:37 | 23 | Q. Mr. Calabrese, the e-mail marked as Exhibit 31, it's SPR |
| 11:05:37 | 24 | 186. |
| 11:05:38 | 25 | A. Uh-huh. |

```
11:05:40   1    Q.  Did you receive this e-mail?

11:05:41   2    A.  It looks like I did, yes.

11:05:46   3    Q.  And this e-mail was sent on February 18, 2018; is that

11:05:46   4    correct?

11:05:48   5    A.  Yes.

11:05:51   6    Q.  Was Mr. Rubin representing you at the time this e-mail was

11:05:51   7    sent?

11:05:53   8    A.  Yes.

11:05:57   9    Q.  Do you disagree with anything that Mr. Rubin said in this

11:05:59  10    e-mail?

11:06:02  11    A.  At the time period of February 8th, yeah, I do not disagree

11:06:05  12    with any of it.

11:06:21  13         MR. KERNELL:  That is all for Mr. Calabrese's

11:06:22  14    deposition.

11:06:25  15         THE COURT:  Any counter-designations?  Or cross?

11:06:26  16         MR. RIOPELLE:  No, Your Honor.

11:06:30  17         THE COURT:  All right.  Next?  Thank you, ma'am.

11:06:33  18    Unless you're reading the next one too.

11:06:34  19         MS. SOLOMON:  I am.

11:06:38  20         THE COURT:  There is a next one.  Go.

11:06:44  21         MR. RIOPELLE:  We do have one issue in relation to

11:06:48  22    bring up with the Court, but we can do it during a break.

11:06:50  23         THE COURT:  Well, we can take a break right now.  It's

11:06:53  24    been a little over an hour so let's take a break right now and

11:06:55  25    then we'll come back, take ten minutes.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
11:06:58   1              COURT SECURITY OFFICER:  All rise for the jury.
11:06:59   2              THE COURT:  Might be a little more because we're going
11:07:04   3    to have to talk and I need to go too.
11:07:19   4              (Jury out at 11:07 a.m.)
11:07:32   5              THE COURT:  Be seated.  Yes?
11:07:37   6              MR. RIOPELLE:  I just want to -- how should I deal --
11:07:39   7    now that his testimony has gone in, we believe some of the
11:07:43   8    testimony is untrue, how would you like me to deal with
11:07:49   9    informing the jury that Mr. Calabrese is a convicted felon?
11:07:51  10              THE COURT:  What's your position?
11:07:53  11              MR. SCHWARTZ:  That it's totally impermissible.
11:07:57  12              THE COURT:  Why?  If a witness takes the stand.
11:08:00  13              MR. SCHWARTZ:  There's nothing impeach.  He hasn't
11:08:00  14    impeached anything.
11:08:03  15              THE COURT:  He doesn't have to impeach.  He just has to
11:08:07  16    argue to them you have to consider his testimony carefully
11:08:10  17    because he's a convicted felon.  Isn't that what the rule says?
11:08:11  18              MR. SCHWARTZ:  That was not my understanding of the
11:08:12  19    rule, Your Honor.
11:08:16  20              THE COURT:  Well, what does it say?  Impeachment of a
11:08:31  21    witness by felony conviction?  If they put him on the stand,
11:08:35  22    they couldn't impeach him but I don't see any reason why they
11:08:44  23    can't impeach him if you put the -- what's the rule?
11:08:46  24              MR. KERNELL:  Your Honor, this deposition was taken by
11:08:48  25    Plaintiff.
```

```
11:08:51   1            THE COURT:  I know, but they didn't introduce it.  They
11:08:55   2   didn't believe him for a minute so they didn't introduce him.
11:08:57   3            MR. KERNELL:  They put him on their witness list.
11:08:59   4            THE COURT:  Sure, but they didn't call him.
11:09:02   5            MR. KERNELL:  They have not pointed out anything in his
11:09:05   6   testimony where he contradicted himself, that he --
11:09:07   7            THE COURT:  He doesn't have to contradict himself.
11:09:16   8   What is the rule on impeachment by felony conviction?
11:09:18   9            MR. RIOPELLE:  I believe it's Rule 609, Your Honor.
11:09:19  10            THE COURT:  That's what I thought it was, but I'm
11:09:22  11   getting there.
11:09:26  12            MR. RIOPELLE:  And I know you have obviously the motion
11:09:34  13   in limine ruling on it, may be easier to look at that.
11:09:56  14            THE COURT:  The question is when you offer his
11:09:59  15   testimony by deposition, what is the manner of introducing the
11:10:03  16   criminal conviction.  Is there any dispute as to the fact that
11:10:07  17   there was, in fact, a criminal conviction?  Did you ever -- did
11:10:11  18   he ever admit it during his deposition?  Was he asked it?
11:10:13  19            MR. RIOPELLE:  As a matter of fact, during his
11:10:16  20   deposition the reason we didn't play it is because he lied about
11:10:19  21   it.  He did not say it was a felony conviction.  He said he had
11:10:22  22   an argument with his girlfriend and he got three years'
11:10:25  23   probation which is not true.
11:10:28  24            THE COURT:  Do you have a certified record of his
11:10:35  25   conviction?  It's got to be admissible.  Can't just say he was
```

| | | |
|---|---|---|
| 11:10:36 | 1 | convicted. |
| 11:10:40 | 2 | MR. RIOPELLE:  I do not have a certified copy because I |
| 11:10:42 | 3 | believe some of it is under seal. |
| 11:10:44 | 4 | THE COURT:  I don't understand.  How does it get to be |
| 11:10:46 | 5 | under seal? |
| 11:10:47 | 6 | MR. RIOPELLE:  I don't understand either. |
| 11:10:48 | 7 | THE COURT:  Where is the conviction? |
| 11:10:50 | 8 | MR. RIOPELLE:  I believe it's in the Northern District |
| 11:10:52 | 9 | of Illinois. |
| 11:10:58 | 10 | THE COURT:  That's the problem with having -- well, but |
| 11:11:01 | 11 | if he lied about it, I don't know what you could do about it. |
| 11:11:05 | 12 | Seems to me that when he lied about it, you should have come up |
| 11:11:10 | 13 | with some way of proving it.  How do you -- you know, I don't |
| 11:11:13 | 14 | think you can say that he has a felony conviction even if |
| 11:11:19 | 15 | everybody knows it.  You have to prove it.  How do you propose |
| 11:11:23 | 16 | to prove it? |
| 11:11:26 | 17 | MR. RIOPELLE:  I was going -- based on the Court's |
| 11:11:33 | 18 | motion in limine ruling, all I was planning on doing was either |
| 11:11:36 | 19 | me informing the jury that he's a convicted felon or having the |
| 11:11:37 | 20 | Court inform the jury. |
| 11:11:40 | 21 | THE COURT:  I don't know that he's a convicted felon. |
| 11:11:43 | 22 | MR. RIOPELLE:  I believe they did not -- they moved -- |
| 11:11:49 | 23 | actually it was their motion to exclude the evidence that he's a |
| 11:11:51 | 24 | convicted felon, so they agree he's a convicted felon. |
| 11:11:53 | 25 | MR. SCHWARTZ:  That's not what we -- Your Honor, that's |

11:11:58  1    not what we moved for.  We moved to allow him to appear by video

11:12:01  2    after

11:12:05  3            (Counsel conferring)

11:12:06  4            MR. SCHWARTZ:  I apologize.

11:12:08  5            THE COURT:  Good Lord there's a lot of apologizing

11:12:13  6    going on.  How about thinking before we talk, then we don't have

11:12:22  7    to apologize.  I think you have to prove it and I don't know how

11:12:25  8    you're going to do that.  You better figure out a way to do it

11:12:28  9    because I don't think you saying so makes it so.  I don't think

11:12:33  10   that them -- what does their motion say?  I don't have it in

11:12:40  11   front of me at the moment.  I don't feel like looking it up.

11:13:02  12           MR. RIOPELLE:  The Court's ruling was they tried to

11:13:06  13   exclude evidence of his.

11:13:09  14           THE COURT:  Read to me what they said.

11:13:12  15           MR. RIOPELLE:  I don't have the motion, I just have

11:13:13  16   your ruling.

11:13:15  17           THE COURT:  I will have it.  Go ahead.  Read my ruling.

11:13:19  18           MR. RIOPELLE:  Your ruling is several pages, Your

11:13:20  19   Honor.

11:13:22  20           THE COURT:  Read the pertinent part.  There must be

11:13:23  21   something.

11:13:24  22           MR. RIOPELLE:  Therefore, this Court finds that on

11:13:28  23   balance, any prejudice suffered by Defendants is outweighed by

11:13:32  24   the assumed probative value in the civil matter of a criminal

11:13:35  25   conviction admissible under Rule 609 A.  Therefore, Defendants'

```
11:13:39   1    motion, ECF Number 239, is denied as to this issue.
11:13:40   2              THE COURT:  Okay.
11:13:42   3              MR. RIOPELLE:  While this Court finds that Plaintiff
11:13:44   4    may attack Mr. Calabrese's character for truthfulness --
11:13:50   5    truthfulness with his criminal conviction, this Court advises
11:13:53   6    Plaintiff to exercise caution regarding this issue at trial.
11:13:57   7              THE COURT:  Okay.  You still got to prove it.  Saying
11:13:59   8    so doesn't make it so.
11:14:03   9              MR. RIOPELLE:  Well, I mean, I do now have a copy of it
11:14:08  10    electronically which we could print out.  But --
11:14:08  11              THE COURT:  Is it.
11:14:12  12              MR. RIOPELLE:  I mean they -- well, I understand.
11:14:14  13              THE COURT:  You tell me what rule of evidence it comes
11:14:19  14    in under and I'll consider it.  See what loophole you can find
11:14:24  15    and if you find it, if it's admissible, I'll permit it.  If it's
11:14:29  16    not, I can't.  All right?  What else we got?
11:14:32  17              MR. RIOPELLE:  That was it.  I just wanted to get the
11:14:34  18    Court's guidance on that.  I thought the Court already ruled
11:14:35  19    that it's admissible.
11:14:36  20              THE COURT:  I don't know that it's admissible.  I'm
11:14:39  21    just saying I denied their motion.  If you can admit it, if you
11:14:50  22    can get it into evidence, it's admissible.  All right.  Going to
11:14:54  23    take five minutes then.  Be back in five
11:14:54  24              COURT SECURITY OFFICER:  All rise.
11:14:55  25              (Brief recess)
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 11:20:11 | 1 | THE COURT:  Be seated.  We'll wait until everybody's |
| 11:20:11 | 2 | here. |
| 11:21:17 | 3 | Do you know where counsel is, counsel? |
| 11:21:54 | 4 | Before we call the jury back in, I just reviewed the |
| 11:21:58 | 5 | documents on the evidence of Defendant Calabrese's criminal |
| 11:22:15 | 6 | history.  Defendants admit that he was a Defendant in a matter |
| 11:22:18 | 7 | in the US District Court in the Northern District of Illinois, |
| 11:22:23 | 8 | give the case number, he was sentenced to three years of |
| 11:22:33 | 9 | supervised release.  You indicate that it was not punishable by |
| 11:22:40 | 10 | imprisonment for more than one year.  Cyberstalking is an |
| 11:22:44 | 11 | offense that is clearly a felony, it is definitely by |
| 11:22:46 | 12 | imprisonment for more than one year.  The statement that it was |
| 11:22:52 | 13 | not a felony appears to be false.  I don't know if it's a |
| 11:22:55 | 14 | mistake, but it's not right.  Where did you get that? |
| 11:22:56 | 15 | MR. SCHWARTZ:  I'm sorry, Your Honor.  Where was the |
| 11:22:59 | 16 | statement made? |
| 11:23:02 | 17 | THE COURT:  Defendants; motion in limine to preclude |
| 11:23:06 | 18 | the Plaintiff from using this.  Introduction of the criminal |
| 11:23:09 | 19 | matter should be excluded because it is not -- it was not |
| 11:23:14 | 20 | punishable by imprisonment for more than one year.  Did not |
| 11:23:18 | 21 | involve a dishonest act or false statement. |
| 11:23:21 | 22 | MR. SCHWARTZ:  That must be a mistake, Your Honor. |
| 11:23:21 | 23 | Apologize. |
| 11:23:24 | 24 | THE COURT:  It is definitely a felony, wasn't it? |
| 11:23:24 | 25 | MR. SCHWARTZ:  Yes, Your Honor. |

```
11:23:26   1            THE COURT:  But the representation is that it was not a
11:23:29   2       felony and now -
11:23:37   3            MR. SCHWARTZ:  I think the simple confusion was that it
11:23:38   4       was a supervised release.
11:23:40   5            THE COURT:  Yeah.  He was not punished by more than one
11:23:44   6       year, but you don't have to get any jail time for it to be a
11:23:50   7       felony and it clearly is a felony.  Now I'm troubled by the fact
11:23:58   8       that although you admit that it was a felony and he's not here
11:24:02   9       because they asked for him to be here, and you say that he's not
11:24:08  10       here because he's in a mental health ward or something, or a
11:24:11  11       mental health facility?  Is that what it is?
11:24:12  12            MR. SCHWARTZ:  That's where he is.  They didn't
11:24:15  13       subpoena him.  They had to subpoena him.
11:24:17  14            THE COURT:  Well, I don't know that -- you know, I
11:24:21  15       don't know that they need to subpoena him, he's a party.  But --
11:24:24  16       well, let me hear from their side as to --
11:24:26  17            MR. RIOPELLE:  We certainly tried to subpoena him.  We
11:24:30  18       asked them if they would accept service of the subpoena because
11:24:32  19       on the witness list it was listed that we should serve through
11:24:36  20       them.  They did not agree.  We asked for address where we could
11:24:41  21       serve him, they did not give us one.  We tried various
11:24:48  22       locations, we could not find him.  We tried.  The Court recalls
11:24:53  23       last Friday at the calendar call I asked if we could serve him
11:24:56  24       through e-mail because we were unable to find him.  So we tried
11:24:57  25       to subpoena him.
```

```
11:24:58    1              THE COURT:  Yeah, and I'm not really requiring you to

11:25:03    2     bring a guy from a mental health facility to come to court.  I

11:25:05    3     don't want to be responsible for -- I don't think the Marshals

11:25:10    4     want me to bring people from mental health facilities, they want

11:25:13    5     me to send them to mental health facilities.

11:25:16    6              The point is this looks like you're using this as a

11:25:23    7     sword rather than a shield.  It's very troublesome to me that if

11:25:28    8     he were here, and further, it would appear that he lied on his

11:25:32    9     deposition when he said that it was -- you know, tell me what it

11:25:37   10     is that he said?  I don't want to read through that thing again.

11:25:41   11              MR. RIOPELLE:  Give me a second, Your Honor.  I'll find

11:25:44   12     it so I don't misrepresent or mischaracterize.

11:25:46   13              THE COURT:  I'd rather we didn't.  All things being

11:26:00   14     equal, I'd just as soon -- I'm not sure how much weight a jury

11:26:04   15     puts on a felony conviction, but it just seems wrong that this

11:26:08   16     -- here is a man who is convicted under a felony and who

11:26:14   17     apparently lied about it on his deposition, and has now,

11:26:20   18     according to you, checked himself into a mental health facility,

11:26:40   19     has not become amenable to the service, I might let them put the

11:26:43   20     electronic record in.

11:26:45   21              MR. RIOPELLE:  Your Honor, would you like me to read it

11:26:48   22     or would you like me to hand it up to you.

11:26:50   23              THE COURT:  Read it.  Don't put the emphasis on

11:26:54   24     whatever syllables you want.

11:26:55   25              MR. KERNELL:  Could we have the reference please?
```

| | |
|---|---|
| 11:26:59 | 1 |
| 11:27:04 | 2 |
| 11:27:12 | 3 |
| 11:27:24 | 4 |
| 11:27:25 | 5 |
| 11:27:30 | 6 |
| 11:27:31 | 7 |
| 11:27:34 | 8 |
| 11:27:37 | 9 |
| 11:27:41 | 10 |
| 11:27:43 | 11 |
| 11:27:46 | 12 |
| 11:27:47 | 13 |
| 11:27:50 | 14 |
| 11:27:52 | 15 |
| 11:27:55 | 16 |
| 11:27:58 | 17 |
| 11:28:02 | 18 |
| 11:28:06 | 19 |
| 11:28:10 | 20 |
| 11:28:14 | 21 |
| 11:28:16 | 22 |
| 11:28:17 | 23 |
| 11:28:20 | 24 |
| 11:28:21 | 25 |

         MR. RIOPELLE:  Yeah, I'm starting at -- I'm just going
to start at Page 23, Line 4 because that's where the colloquy
starts.  I don't know specifically how far it goes because I
haven't marked it.  All right.  I'm just going to start reading,
Your Honor.
         So starting at Mr. Calabrese's deposition Page 23, I'm
starting at Line 4.
         Mr. Calabrese, excluding traffic offences have you ever
been arrested?  Answer, yes.
         What for?  I think it was like driving, driving under
the influence and, like, I got in a fight with my girlfriend or
something like that and I said something to her that was
supposed to --
         Question, were you charged in connection with those
arrests?  To be clear, were you charged with a crime in
connection with those arrests?  Answer, yes, yes.
         Question, what were you charged with?  Answer, I'm not
sure of the actual crime.  I know -- I know, you know, I got
charged, like, because I wouldn't take a sobriety test, and then
one time -- and then basically that's pretty much all I remember
as far as a charge.  I just know I was definitely arrested.
         Question, were you -- have you been convicted of
driving under the influence.
         This isn't the one we're doing, but I'm just going
through.  If you want me to pause?

| | | |
|---|---|---|
| 11:28:24 | 1 | THE COURT:  No, I read it all.  I read fast.  I read it |
| 11:28:28 | 2 | all.  But you never asked him were you ever convicted of a |
| 11:28:35 | 3 | felony, did you?  I'm not finished reading, so let's see. |
| 11:28:45 | 4 | MR. RIOPELLE:  I think the question we asked is on Page |
| 11:28:48 | 5 | 24 at Line 20.  We asked him if he was convicted of a crime. |
| 11:28:49 | 6 | THE COURT:  Yeah. |
| 11:28:50 | 7 | MR. SCHWARTZ:  And he said yes, Your Honor. |
| 11:28:53 | 8 | THE COURT:  He said yes, so he hadn't lied yet. |
| 11:28:56 | 9 | Then were you convicted of a crime and his answer was |
| 11:29:00 | 10 | somewhat misleading, but not lie.  I got probation.  So I think |
| 11:29:01 | 11 | so, yeah. |
| 11:29:04 | 12 | You ever plead guilty or were you found guilty.  I |
| 11:29:06 | 13 | think so, I think I pleaded guilty. |
| 11:29:11 | 14 | That doesn't tee it up very well.  If you can prove it |
| 11:29:15 | 15 | before the trial is over, you can prove it.  How you're going to |
| 11:29:18 | 16 | prove it, you're going to have to tell me that it's admissible |
| 11:29:25 | 17 | some way, and frankly, that it's this Stephen Calabrese. |
| 11:29:31 | 18 | MR. RIOPELLE:  Well, they admit that it's this Stephen |
| 11:29:33 | 19 | Calabrese.  I understand to prove it I need to somehow get |
| 11:29:34 | 20 | something in. |
| 11:29:36 | 21 | THE COURT:  See what you can find and get -- |
| 11:29:38 | 22 | MR. RIOPELLE:  I have people smarter than me working on |
| 11:29:40 | 23 | it, Your Honor. |
| 11:29:45 | 24 | THE COURT:  I only hire people smarter than me.  Makes |
| 11:29:46 | 25 | it easier that way. |

| | | |
|---|---|---|
| 11:29:49 | 1 | Okay.  What are we waiting for?  What's next? |
| 11:29:53 | 2 | MR. KERNELL:  We'll be calling Melissa Jobe for |
| 11:29:54 | 3 | deposition. |
| 11:29:56 | 4 | MR. RIOPELLE:  You need the jury out. |
| 11:29:58 | 5 | THE COURT:  I just want to make sure we're ready to go |
| 11:30:00 | 6 | when the jury comes back in. |
| 11:30:04 | 7 | Please take the stand.  Bring the jury back in |
| 11:30:05 | 8 | COURT SECURITY OFFICER:  All rise for the jury. |
| 11:30:11 | 9 | (Jury in at 11:30 a.m.) |
| 11:31:27 | 10 | THE COURT:  Please be seated.  Please present your next |
| 11:31:28 | 11 | witness, please. |
| 11:31:30 | 12 | MR. KERNELL:  Yes, Your Honor.  We're calling Melissa |
| 11:31:32 | 13 | Jobe through her deposition. |
| 11:31:32 | 14 | THE COURT:  All right. |
| 11:31:38 | 15 | MR. KERNELL:  This was taken on January 30, 2019.  If |
| 11:31:52 | 16 | we could start on Page 7, Line 15. |
| 11:31:52 | 17 | (Deposition of Melissa Jobe read into the record by Mr. |
| 11:31:52 | 18 | Kernell (Q) and Ms. Solomon (A)) |
| 11:31:57 | 19 | Q.  Good morning, Ms. Jobe.  Could you please state your full |
| 11:31:58 | 20 | name for the record? |
| 11:32:01 | 21 | A.  My name is Melissa Jobe. |
| 11:32:02 | 22 | Q.  Do you have a middle name? |
| 11:32:04 | 23 | A.  Anne.  Sorry. |
| 11:32:14 | 24 | MR. KERNELL:  If we could go forward to Page 76, Line |
| 11:32:16 | 25 | 12. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
11:32:23   1    Q.  Let me hand you a box that was marked as Exhibit 108.  Can
11:32:26   2    you read the first sentence in the upper right-hand corner of
11:32:29   3    that on the back of the box?
11:32:33   4    A.  This is not the same box as in the picture.  This Sprint
11:32:36   5    device is designed to be activated on the Sprint network, and
11:32:40   6    has a software programming lock that, in part, protects many of
11:32:43   7    the device's features and functions against tampering and
11:32:46   8    unauthorized reprogramming.
11:32:49   9    Q.  Does that refresh your recollection as to what was on the
11:32:53   10   back of the box shown in Exhibit 137?
11:32:54   11   A.  Yes.
11:33:01   12   Q.  Do you believe that the sentence is accurate?
11:33:02   13   A.  Yes.
11:33:05   14   Q.  If you look about halfway down on that same paragraph, it
11:33:10   15   says this device will work with Sprint services.  Do you see
11:33:11   16   that?
11:33:11   17   A.  Yes.
11:33:14   18   Q.  And then the rest of the sentence is cut off.  Again, I'm
11:33:18   19   going back, I'm going to ask you to take a look at the box
11:33:22   20   that's marked as Exhibit 108, and if you could read the sentence
11:33:26   21   that same off the Exhibit 108.
11:33:29   22   A.  This device will work with Sprint services.  Service plans
11:33:34   23   and other services slash options must be purchased separately.
11:33:37   24   Q.  Does that appear to be the complete sentence that is on the
11:33:41   25   back on the box shown in Exhibit 137?
```

11:33:41  1    A.  Yes.

11:33:46  2    Q.  And then there's a copyright 2013 notice on this in the

11:33:50  3    right-hand box on the back of the box shown on Exhibit 137.  Do

11:33:50  4    you see that?

11:33:52  5    A.  Yes.

11:34:00  6    Q.  Do you know why a specimen from 2013 was being used for

11:34:04  7    Section 8 -- Section 8 and 9 in the declaration in 2015?

11:34:10  8    A.  It was not a 2013 box.  It was a current box in 2015 when I

11:34:14  9    filed it, and the copyright notice just hadn't been changed

11:34:18  10   since 2013 and I didn't catch it.  But these -- this box was

11:34:21  11   directly from our, you know, product team of what was currently

11:34:23  12   being offered into 2015.

11:34:30  13   Q.  Did you verify that this box or that this phone with 2013

11:34:33  14   box was actually being sold in a retail store?

11:34:36  15   A.  It was not in retail stores.

11:34:36  16   Q.  Where was it?

11:34:38  17   A.  It was available for purchase by businesses.

11:34:44  18   Q.  And could they purchase this phone that had a 2013 copyright

11:34:46  19   notice on it from the Sprint website?

11:34:50  20   A.  They could purchase it from a Sprint website.  It was

11:34:53  21   probably not a website that's available to the public.

11:34:56  22   Q.  And how?

11:34:59  23   A.  I mean, it's available to business customers that we have a

11:35:02  24   relationship with for them to place purchase orders, so we have

11:35:05  25   a prior -- I don't know how to explain it.

11:35:09  1   Q.  Well, let me see.  Are they business customers that have a
11:35:11  2   prior account with Sprint?
11:35:14  3   A.  They have an ongoing account and we sort of have, you know,
11:35:18  4   a website that they can go in and purchase for their business.
11:35:22  5   You know, it's like having a -- you know, a portal, you know,
11:35:24  6   that they can access and we know how the billing works and they
11:35:27  7   can purchase these devices.
11:35:29  8   Q.  Would this be like a login account for them and then --
11:35:31  9   A.  Yes.
11:35:35  10  Q.  Similar to what is available to a public customer, a home
11:35:39  11  user of Sprint products where you can login to my Sprint account
11:35:42  12  and see your devices, swap devices, buy different devices?
11:35:44  13  A.  Yes.
11:35:47  14  Q.  These are ones that set up for business accounts?
11:35:49  15  A.  Correct.
11:35:52  16        MR. KERNELL:  Then if we can continue to Page 80, Line
11:35:53  17  16.
11:35:59  18  Q.  The copyright notice on the Sonim devices, is that something
11:36:02  19  that Sprint directs Sonim to change or is that something that
11:36:04  20  Sonim changes on its own?
11:36:08  21  A.  Package is done collaboratively with the Sonim.  Both teams
11:36:09  22  would have reviewed it.
11:36:13  23  Q.  So this is a device that is now -- it's not a 2014 device,
11:36:20  24  it is not a 2015 device, or it doesn't have a 2014 copyright.
11:36:28  25  It doesn't have a 2015 copyright.  How often does Sprint and

11:36:30  1    Sonim team review these labels?

11:36:34  2    A.  Typically the life span of a device does not span multiple

11:36:37  3    years.  We typically review the packaging when a device first

11:36:41  4    comes out, and it pretty much stays that way until the end of

11:36:41  5    life.

11:36:45  6    Q.  So it will remain 2013 copyright notice on it to the end of

11:36:46  7    life?

11:36:49  8    A.  Typically, unless something comes up and we are aware it

11:36:52  9    needs to change and it's one that we didn't catch.  Devices

11:36:56  10   don't typically last multiple years, to be honest.  These are

11:37:00  11   rare devices.  Typical life span for a device is less than a

11:37:01  12   year.

11:37:07  13   Q.  Do you know if the Sonim XP IS currently is being sold by

11:37:07  14   Sprint?

11:37:08  15   A.  The Sonim XP?

11:37:09  16   Q.  Strike IS.

11:37:12  17   A.  We have Sonim devices that are currently for sale.  There

11:37:15  18   are multiple models, and it's very specific.  I'm not sure that

11:37:20  19   the Sonim strike XP IS is currently for sale.

11:37:25  20   Q.  Let me hand you a device that is the Sonim XP Strike that

11:37:32  21   was marked as Exhibit 108.  Do you see that -- do you see on

11:37:38  22   that box it has a copyright notice of 2012?  Is Nextel used on

11:37:39  23   the box anywhere?

11:37:40  24   A.  No.

11:37:41  25   Q.  Why is that?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

11:37:45  1    A.  This was prior.  This was a 2012 device, and we weren't

11:37:49  2    using the Nextel marks with Sonim devices at that time.

11:37:51  3    Q.  That's a push-to-talk device, correct?

11:37:52  4    A.  Yes.

11:37:57  5    Q.  And the iDEN, the Nextel network was actually active in

11:37:58  6    2012, correct?

11:38:02  7    A.  The iDEN network was being used in 2012.

11:38:05  8    Q.  The next plans were at the time currently being sold,

11:38:06  9    correct?

11:38:08  10   A.  I'm sorry, Nextel --

11:38:10  11   Q.  Nextel plans?

11:38:13  12   A.  In 2012, yes.

11:38:18  13   Q.  There were subscribers on the Nextel platform in 2012,

11:38:19  14   correct?

11:38:22  15   A.  What do you mean by platform?

11:38:24  16   Q.  That's a Sprint term, isn't it?

11:38:27  17   A.  I don't know what a Nextel platform is.  We have the iDEN

11:38:27  18   network.

11:38:32  19   Q.  Do you know if Sprint kept track of subscribers on the

11:38:36  20   Sprint network or the Sprint platform versus the Nextel network

11:38:37  21   or platform?

11:38:42  22   A.  We kept track of users on the CDMA network and users on the

11:38:42  23   iDEN network.

11:38:45  24   Q.  There was no designation as to whether it was a Sprint

11:38:47  25   platform or a Nextel platform?

| | | |
|---|---|---|
| 11:38:49 | 1 | A.   Designation by who? |
| 11:38:50 | 2 | Q.   By Sprint. |
| 11:38:52 | 3 | A.   I'm sorry.   Some people in the company called it Sprint |
| 11:38:55 | 4 | network and Nextel network.   But the distinguishing features are |
| 11:38:59 | 5 | the technology base.   CDMA or iDEN. |
| 11:39:03 | 6 | Q.   Do you know if Sprint would have made that designation |
| 11:39:07 | 7 | between, or as a Sprint platform in Nextel platform, in any |
| 11:39:08 | 8 | publicly available documents? |
| 11:39:10 | 9 | A.   I'm sure they did. |
| 11:39:14 | 10 | Q.   I'm going to hand you what I've marked as Exhibit 139.   This |
| 11:39:17 | 11 | is the form 10-K filed with the Securities and Exchange |
| 11:39:22 | 12 | Commission for the fiscal year ending December 31, 2012 for |
| 11:39:25 | 13 | Sprint Nextel corporation.   Do you see that? |
| 11:39:26 | 14 | A.   Yes. |
| 11:39:30 | 15 | Q.   If I could direct you to -- if I could direct you to the top |
| 11:39:36 | 16 | of the page, it's Page 35 of 213 which is actually Page 33 of |
| 11:39:44 | 17 | the report.   If I can direct your attention to it's right above |
| 11:39:50 | 18 | the table, it says the following table shows our trend of end of |
| 11:39:55 | 19 | period post-paid subscribers by platform for the past five |
| 11:39:56 | 20 | years.   Do you see that? |
| 11:39:56 | 21 | A.   Yes. |
| 11:39:58 | 22 | Q.   Did I read that correct? |
| 11:39:58 | 23 | A.   Uh-huh. |
| 11:40:03 | 24 | Q.   And then in the table, there's columns from 2012 to 2008 and |
| 11:40:08 | 25 | the rows are designated as the Sprint platform and the Nextel |

| | |
|---|---|
| 11:40:09 | 1 |
| 11:40:09 | 2 |
| 11:40:13 | 3 |
| 11:40:14 | 4 |
| 11:40:18 | 5 |
| 11:40:20 | 6 |
| 11:40:22 | 7 |
| 11:40:27 | 8 |
| 11:40:28 | 9 |
| 11:40:31 | 10 |
| 11:40:39 | 11 |
| 11:40:42 | 12 |
| 11:40:44 | 13 |
| 11:40:48 | 14 |
| 11:40:54 | 15 |
| 11:41:02 | 16 |
| 11:41:07 | 17 |
| 11:41:12 | 18 |
| 11:41:19 | 19 |
| 11:41:19 | 20 |
| 11:41:20 | 21 |
| 11:41:23 | 22 |
| 11:41:28 | 23 |
| 11:41:30 | 24 |
| 11:41:31 | 25 |

platform.  Do you see that?

A.  Yes.

Q.  So does that change your understanding of how Sprint
designates two platforms?

A.  I just merely asked what you meant by platform in your
question.  I understand what this means.

Q.  Okay.  What does this mean?

A.  This is revenue from -- Sprint is the CDMA network and
Nextel is the iDEN network.

Q.  And Sprint refers to them as the Sprint platform independent
of whether it's CDMA or iDEN, or whether our whatever Nextel
platform in these two labels, doesn't it?  Called them iDEN or
CDMA network, correct?

A.  No, it doesn't.  Those words are not used, but --

Q.  Look at it.  This is Page 44 of 213.  And it's the report
Page Number 42, it says the following table shows A, net
additions, losses of wireless subscribers; B, our total
subscribers as of the end of each quarter period for the past 12
months and C, end of period connected devices subscribers.  Do
you see that?

A.  Yes.

Q.  And if you look down the left-hand column, it breaks these
-- breaks up these, I guess, categories into Sprint platform and
Nextel platform.  Do you see that?

A.  Yes.

| | | |
|---|---|---|
| 11:41:34 | 1 | Q.  And it doesn't say anything about iDEN or CDMA networks, |
| 11:41:35 | 2 | correct? |
| 11:41:35 | 3 | A.  Correct. |
| 11:41:39 | 4 | Q.  So back to my question.  On the device, the Sonim device |
| 11:41:43 | 5 | that's marked as Exhibit 108, do you know if this Sonim device |
| 11:41:49 | 6 | is a Sonim XP Strike, it's a Sonim XP Strike could operate on |
| 11:41:50 | 7 | the Nextel platform? |
| 11:41:53 | 8 | A.  Can I look at the box? |
| 11:41:54 | 9 | Q.  Sure. |
| 11:41:59 | 10 | A.  They are not the same device.  This is a CDMA device. |
| 11:42:02 | 11 | Q.  Will it work on the iDEN network? |
| 11:42:05 | 12 | A.  No, it will not work on the iDEN network. |
| 11:42:07 | 13 | Q.  Why do you say it's a CDMA device? |
| 11:42:13 | 14 | A.  Because it says it's a CDMA device on the back of the box. |
| 11:42:26 | 15 | MR. KERNELL:  If we could move on to Page 108 starting |
| 11:42:30 | 16 | at Line 8. |
| 11:42:40 | 17 | Q.  This is for the Nextel registration 1,884,244 marked as |
| 11:42:46 | 18 | Exhibit 137.  When you filed the specimen statement of use in |
| 11:42:52 | 19 | 2015 showing the Nextel mark on the Sonim XP Strike IS, that |
| 11:42:54 | 20 | device is a mobile phone, correct? |
| 11:42:55 | 21 | A.  Yes. |
| 11:42:59 | 22 | Q.  And when you were provided with the box that you showed a |
| 11:43:03 | 23 | picture of -- or that was shown, submitted a picture of a box |
| 11:43:10 | 24 | for the specimen for Exhibit 137, did you have -- did that have |
| 11:43:12 | 25 | a device in the box also? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 11:43:14 | 1 | A.   No. |
| 11:43:17 | 2 | Q.   It was just -- it was an empty box? |
| 11:43:18 | 3 | A.   Uh-huh. |
| 11:43:22 | 4 | Q.   Before you filed the declaration on April 22, 2015, did you |
| 11:43:27 | 5 | verify that Sprint was offering equipment under the Nextel brand |
| 11:43:28 | 6 | for mobile radios? |
| 11:43:31 | 7 | A.   Yes. |
| 11:43:34 | 8 | Q.   What mobile radios were they selling at the time? |
| 11:43:37 | 9 | A.   Mobile radio functionality in this device. |
| 11:43:41 | 10 | Q.   So you're saying because this mobile telephone has a mobile |
| 11:43:44 | 11 | radio functionality, that that's -- |
| 11:43:47 | 12 | A.   I mean, a mobile phone is a mobile radio. |
| 11:43:52 | 13 | Q.   What about a two-way radio?  Did you verify that Sprint sold |
| 11:43:58 | 14 | a two-way radio in connection with the Nextel 224 registration? |
| 11:44:00 | 15 | A.   Yes. |
| 11:44:01 | 16 | Q.   What is that? |
| 11:44:03 | 17 | A.   It's a device I showed. |
| 11:44:07 | 18 | Q.   So it's only this device, the Sonim XP Strike IS. |
| 11:44:11 | 19 | A.   No.  It's not only that device, but we have -- I verified |
| 11:44:15 | 20 | that.  I review and verify the description that we offer all the |
| 11:44:18 | 21 | goods and services there in the description that we keep our |
| 11:44:22 | 22 | marks for or I change it, and I didn't need to change it because |
| 11:44:25 | 23 | we offer those services and we have that equipment. |
| 11:44:29 | 24 | Q.   Did you -- did you identify any other equipment other than |
| 11:44:32 | 25 | the Sonim XP Strike IS? |

```
11:44:36   1    A.  I don't recall.  I would have to go back and look at my
11:44:36   2    file.
11:44:39   3    Q.  Did you attend -- did you verify that Sprint was selling
11:44:42   4    dispatch radios under the Nextel mark in 2015?
11:44:44   5    A.  Yes.
11:44:49   6    Q.  What dispatch radios was Sprint offering in 2015 under the
11:44:49   7    Nextel mark?
11:44:53   8    A.  I would have to go back to my file and verify what we were
11:44:57   9    doing.  We're probably this particular phone, and then we have,
11:45:00  10    you know, services that we offer associated with that.  The
11:45:03  11    descriptions still fit with the goods and services we were
11:45:04  12    offering.
11:45:07  13    Q.  Prior to your testimony today, in preparing for your
11:45:11  14    deposition today, did you verify that Sprint in fact was selling
11:45:15  15    a two-way radio under the Nextel mark in 2015?
11:45:18  16    A.  A mobile phone is a two-way radio.
11:45:20  17    Q.  I'm sorry.  A dispatch radio?
11:45:24  18    A.  I consider a mobile phone a dispatch radio.
11:45:29  19        MR. KERNELL:  If we can continue on to Page 112, Line
11:45:31  20    16.
11:45:33  21    Q.  And what was the dispatch radio that you verified that
11:45:37  22    Nextel was being used on in 2015?
11:45:41  23    A.  I would have to go back and review my file.  I believe it's
11:45:44  24    the phone itself.  There may be other products offered.
11:45:48  25    Q.  So sitting here today, you don't know definitely what that
```

11:45:49   1   product is?

11:45:52   2   A.   I believe the phone itself provides dispatch functionality.

11:45:55   3   It works as a dispatch radio.

11:45:58   4   Q.   Again, that's your belief, that's not known?

11:46:00   5   A.   Correct.

11:46:04   6   Q.   And you understand that there is a claim of fraud on the

11:46:08   7   patent office regarding the Nextel mark in this case.

11:46:10   8         MR. RIOPELLE:   You misread that, Jim.

11:46:10   9         MR. KERNELL:   I'm sorry?

11:46:16   10         MR. RIOPELLE:   You said patent office.

11:46:26   11         MR. KERNELL:   I'm sorry.   Starting again at Line 10.

11:46:30   12   Q.   You understand there is a claim of fraud on the trademark

11:46:31   13   office regarding the Nextel mark in this case?

11:46:32   14   A.   Yes.

11:46:34   15   Q.   And that fraud on the trademark office would have been

11:46:38   16   committed by Melissa Jobe if that's true, correct?

11:46:41   17   A.   I did not commit fraud.

11:46:44   18   Q.   If the allegations prove to be true, then that would be

11:46:46   19   directed against you, correct?

11:46:49   20   A.   I'm not going to answer that question.

11:46:53   21   Q.   Who else handled -- who signed the declaration for the

11:46:57   22   Nextel mark, the 1, 884,244 mark?

11:47:00   23   A.   I signed it and I did not commit fraud.

11:47:04   24   Q.   Okay.   But sitting here today, you can't tell me whether or

11:47:08   25   not Sprint sold a dispatch radio under the Nextel mark on April

11:47:12   1   22, 2015 when you signed that declaration.

11:47:16   2   A.   Yes.  We sold a dispatch radio using the marks.

11:47:22   3   Q.   What's the model of that dispatch radio?  You never told me

11:47:28   4   what model of dispatch radios that Sprint sold in 2015, have

11:47:31   5   you?  Go ahead and answer.

11:47:33   6   A.   The phone.

11:47:35   7   Q.   Do you know what a dispatch radio is?

11:47:38   8   A.   I need to review my file.  I'm certain that I reviewed this.

11:47:42   9   I do it for every single application.  I need to review my

11:47:44   10  personal legal file to answer your question.

11:47:50   11  Q.   In 2015, what pagers were Sprint selling under the Nextel

11:47:51   12  mark?

11:47:55   13  A.   The phone provides pager technology.  Pager service.  It's a

11:47:59   14  device that provides paging services that works as a pager.

11:48:02   15  Q.   Was it selling any other devices that were strictly pagers?

11:48:06   16  A.   We didn't sell a single functioning pager.

11:48:10   17  Q.   What mobile data transceivers was Sprint selling in 2015

11:48:12   18  under the Nextel mark?

11:48:17   19  A.   This device that was included in the statement of use.

11:48:21   20  Q.   So your testimony, if I understand it correctly, is that is

11:48:25   21  Sonim XP Strike IS is a mobile radio, a two-way radio, it's a

11:48:29   22  mobile telephone, and it's a dispatch radio, it's a pager and

11:48:31   23  it's a mobile data transceiver; is that correct?

11:48:33   24  A.   Yes.

11:48:36   25  Q.   So it's a mobile phone that has all those functions in it?

```
11:48:38   1    A.  Yes.

11:48:40   2    Q.  Aren't all mobile phones two-way radios?

11:48:41   3    A.  Yes.

11:48:45   4    Q.  Then why did you list two-way radio separately?

11:48:48   5    A.  Yes, that would require me to give a legal opinion.  A legal

11:48:52   6    -- why I make that legal choice.

11:49:01   7    Q.  You're not going to answer the question as to why you listed

11:49:03   8    -- why all these devices are listed separately, listed namely

11:49:10   9    and that is a term of art in the trademark office, correct?

11:49:12   10   A.  What word?

11:49:18   11   Q.  When you say namely and then specific items or devices after

11:49:19   12   the word namely?

11:49:21   13   A.  Yes.

11:49:23   14   Q.  So those are different devices?

11:49:26   15   A.  No, they do not have to be different devices.

11:49:27   16   Q.  What do you mean by that?

11:49:30   17   A.  It needs to be a device that serves that purpose, and that's

11:49:34   18   what it helps identify what type of device.  Those are accurate

11:49:35   19   descriptions of the devices.

11:49:41   20   Q.  Do you know if Sprint has ever sold a device that is

11:49:44   21   strictly a mobile data transceiver?

11:49:45   22   A.  I don't know.

11:49:51   23   Q.  If I go to the Sprint website today and type in search for

11:49:54   24   pager, would I get any results on a pager?

11:49:56   25   A.  I have no idea.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
11:49:59   1    Q.  Before you filled your combination declaration for use for
11:50:06   2    the Nextel 224 trademarks, did you check and see if Sprint sold
11:50:07   3    pagers?
11:50:10   4    A.  Sprint has devices that have paging technology.
11:50:12   5    Q.  Did you search for pagers?
11:50:12   6    A.  No.
11:50:15   7    Q.  When was the last time you verified that Sprint uses the
11:50:19   8    Nextel trademark on each of the named devices in the trademark
11:50:21   9    on the trademark registration?
11:50:24   10   A.  Sitting here right now.
11:50:27   11   Q.  Do you have any of these other devices before you?
11:50:29   12   A.  I have knowledge of Sprint's -- the goods and services that
11:50:33   13   Sprint offers today, and I'm looking at the description and
11:50:36   14   asking myself if it's still valid, and it is.
11:50:44   15   Q.  Do you know if Sprint sells strictly two-way radios?  Not a
11:50:49   16   device with the function of a two-way radio, but strictly a
11:50:56   17   two-way radio?  I believe it's also referred to as a
11:50:58   18   walkie-talkie?
11:51:01   19   A.  We sell devices that can work as a two-way radio.
11:51:05   20   Q.  Do you sell any devices that can only work as a two-way
11:51:05   21   radio?
11:51:06   22   A.  No.
11:51:09   23   Q.  Do you sell any devices that can only work as a dispatch
11:51:10   24   radio?
11:51:13   25   A.  I don't know today.  I'd have to -- I would have to look.
```

```
11:51:18    1    Q.   Now, my understanding of a dispatch radio is a desktop or
11:51:22    2    mounted radio with a handset or microphone with -- there's a key
11:51:26    3    on the side or a button on the side which would I presume work
11:51:29    4    with a push-to-talk application.  Is that an accurate
11:51:32    5    understanding of what a dispatch radio is?
11:51:36    6    A.   That's one kind of dispatch radio.
11:51:43    7    Q.   Does Sprint sell any of that type of dispatch radios?
11:51:45    8    A.   It might.  I don't know.
11:51:50    9    Q.   Does Sprint sell any device that is strictly a pager?
11:51:51   10    A.   No.
11:51:56   11    Q.   Does Sprint sell any device that is strictly a mobile data
11:51:57   12    transceiver?
11:51:57   13    A.   Yes.
11:52:00   14    Q.   What device is that that is strictly a mobile data
11:52:01   15    transceiver?
11:52:04   16    A.   How are you defining a mobile data transceiver?
11:52:06   17    Q.   All it does is send and receive data.
11:52:10   18    A.   Yes, we sell devices that only send and receive data.
11:52:11   19    Q.   What device is that?
11:52:15   20    A.   Any of our My Wi-Fi devices or, you know.
11:52:15   21    Q.   I'm sorry?
11:52:19   22    A.   Any of the Wi-Fi devices are data transceivers.
11:52:22   23    Q.   Do you sell any of those under the Nextel trademark?
11:52:26   24    A.   I would have to look, but we have that functionality on the
11:52:26   25    phones.
```

11:52:29  1    Q.  On the phones or on a separate device?

11:52:35  2    A.  My phone works as a -- I mean, all of our phones work as

11:52:37  3    mobile data transceivers.

11:52:42  4    Q.  But the question was do they work as only a mobile data

11:52:43  5    transceiver and nothing else?

11:52:46  6    A.  No, the phones don't, but we do have other devices that are

11:52:49  7    strictly just mobile data transceiver that we offer for sale.

11:52:51  8    Q.  Under the Nextel mark?

11:52:56  9    A.  No.  Not under the Nextel mark.

11:53:08  10        MR. KERNELL:  If we could continue on Page 133, Line 2.

11:53:14  11   Q.  I'm sorry.  It was marked as Exhibit 134 yesterday.  You go

11:53:24  12   on to say that the use of the -- the use of the "I" followed by

11:53:29  13   a three -- the "I" followed by a three-digit number is the same

11:53:32  14   naming convention used by Sprint in connection with the genuine

11:53:34  15   Nextel products.  Do you see that?

11:53:35  16   A.  Yes.

11:53:39  17   Q.  As of 2018, did Sprint sell any products that used "I"

11:53:44  18   followed by a three-digit number in connection with genuine

11:53:45  19   Nextel products?

11:53:47  20   A.  In 2018, no.

11:53:54  21        MR. KERNELL:  Continue on to Page 134, Line 25.

11:53:57  22   Q.  So what was your point in stating that the use of "I"

11:54:02  23   followed by the three -- a three-digit number is the same naming

11:54:05  24   convention used by Sprint in connection with genuine Nextel

11:54:06  25   products?

11:54:09  1    A.   Trying to show that they're counterfeiting and trying to use

11:54:14  2    our goodwill and our history, trying to steal our complete

11:54:15  3    history to become their own.

11:54:19  4    Q.   At the time you signed your declaration on April 12, 2018,

11:54:25  5    was Nextel or Sprint selling a Nextel-branded i300 handheld

11:54:27  6    radio?

11:54:29  7    A.   In 2018, no.

11:54:33  8    Q.   In 2018?  That had an i300 on it?

11:54:34  9    A.   No.

11:54:38  10   Q.   There's no legal conclusion about that, that's a fact.

11:54:41  11   A.   I just answered your question.

11:54:47  12   Q.   Thank you.  Was Sprint selling a Nextel-branded i450 handset

11:54:48  13   radio in 2018?

11:54:50  14   A.   In 2018?  No.

11:54:55  15   Q.   Was Nextel selling an i650 handset radio Nextel-branded in

11:54:56  16   2018?

11:54:59  17   A.   No.

11:55:04  18   Q.   Was Sprint selling a Nextel-branded e300S rugged smartphone

11:55:05  19   in 2018?

11:55:07  20   A.   No.

11:55:15  21   Q.   Was Nextel selling an e300T rugged tablet branded as Nextel

11:55:16  22   in 2018?

11:55:17  23   A.   No.

11:55:23  24   Q.   Was Sprint selling a Nextel-branded m370 mobile radio in

11:55:24  25   2018?

11:55:25  1    A.  No.

11:55:29  2    Q.  Was Sprint selling a Nextel-branded PC-based dispatch

11:55:32  3    console software in 2018?

11:55:35  4    A.  Yes.

11:55:41  5    Q.  What was that product?

11:55:45  6    A.  Sprint had PC-based dispatch console software.

11:55:47  7    Q.  Was it Nextel-branded?

11:55:48  8    A.  Yes.

11:55:50  9    Q.  And what is that product's name?

11:55:53  10   A.  I know that we offer -- that we have dispatch software and

11:55:56  11   we use the Nextel marks to sell that as part of a business

11:55:59  12   product, you know, package.  So we use the Nextel marks in

11:56:03  13   conjunction with PC-based dispatch software.

11:56:04  14   Q.  Console software?

11:56:05  15   A.  I presume, yes.

11:56:08  16   Q.  You're presuming.  Do you know that for a fact?

11:56:12  17   A.  No, I don't.  I'll take that.  I don't know if it's the

11:56:12  18   console.

11:56:16  19   Q.  Does Nextel have or does Sprint have a Nextel trademark for

11:56:21  20   PC-based dispatch console software, a registration?

11:56:25  21   A.  Yes.  We consider that part of telecommunication services.

11:56:27  22   Q.  So telecommunication services is software?

11:56:30  23   A.  It can be separate classes, but they're telecommunications

11:56:35  24   services associated with dispatch console software, which

11:56:37  25   includes telecommunication services.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 11:56:41 | 1 | Q.  Is that named on the telecommunication services for the |
| 11:56:42 | 2 | registration for Nextel? |
| 11:56:45 | 3 | A.  It just says telecommunication services. |
| 11:56:47 | 4 | Q.  It doesn't say anything about software, does it? |
| 11:56:51 | 5 | A.  No.  Software is a separate class. |
| 11:56:53 | 6 | Q.  Right.  So it wouldn't fall under telecommunications? |
| 11:56:55 | 7 | A.  It might. |
| 11:57:05 | 8 | Q.  Since it's mainly software.  Well, you know the classes and |
| 11:57:09 | 9 | the classes that these products fall under, don't you? |
| 11:57:10 | 10 | A.  Yes. |
| 11:57:15 | 11 | Q.  As a normal duty at Sprint as a trademark attorney, you know |
| 11:57:17 | 12 | the classes of various devices? |
| 11:57:17 | 13 | A.  Yes. |
| 11:57:20 | 14 | Q.  And software and services fall under? |
| 11:57:21 | 15 | A.  Right. |
| 11:57:21 | 16 | Q.  Correct? |
| 11:57:23 | 17 | A.  Right. |
| 11:57:25 | 18 | Q.  And software falls under what class? |
| 11:57:26 | 19 | A.  Class 9 |
| 11:57:28 | 20 | Q.  And telecommunication services? |
| 11:57:30 | 21 | A.  Class 38. |
| 11:57:35 | 22 | Q.  If we look at Paragraph 28 of your declaration, you state on |
| 11:57:41 | 23 | or about April 26, 2017 on behalf of Sprint, I sent a cease and |
| 11:57:48 | 24 | desist letter to the NW entity and its distributors; the C and D |
| 11:57:50 | 25 | letters, true and accurate copies of which are attached hereto |

11:57:53   1    as Exhibit 17.  Do you see that?

11:57:55   2    A.  Yes.

11:57:58   3    Q.  Do you recall sending these cease and desist letters out to

11:58:00   4    the NW entity and its distributors?

11:58:01   5    A.  Yes.

11:58:05   6    Q.  Did you do this on your own or were you instructed to do so?

11:58:10   7    Did you make the decision to send these out, these cease and

11:58:14   8    desist letters, or were you instructed to send out the cease and

11:58:18   9    desist letters referenced in Paragraph 28 of your declaration,

11:58:19   10   Exhibit 136?

11:58:22   11   A.  I did the legal work associated with determining whether it

11:58:26   12   was -- whether a cease and desist fell within the bounds of the

11:58:29   13   law.  I made a recommendation to the marketing team and the

11:58:33   14   senior legal team.  Together we made the decision to move

11:58:37   15   forward with this and I sent the cease and desist letters.

11:58:42   16          MR. KERNELL:  If we could continue on to Page 142, Line

11:58:44   17   8.

11:58:48   18   Q.  And what I marked as Exhibit 144 are the cease and desist

11:58:52   19   letters, and I believe this is -- it was intended to be all of

11:58:56   20   the ones that were in Exhibit 17 attached to your declaration

11:58:59   21   which is marked as Exhibit 136.  Okay?

11:59:01   22   A.  Okay.

11:59:04   23   Q.  So if I can, do you recognize Exhibit 144?

11:59:05   24   A.  Yes.

11:59:07   25   Q.  And these are the cease and desist letters that you were

| | | |
|---|---|---|
| 11:59:10 | 1 | referring to earlier; is that correct? |
| 11:59:14 | 2 | A.  I don't think I referred to them, but these are the cease |
| 11:59:17 | 3 | and desist letters that I attached to my declaration. |
| 11:59:19 | 4 | Q.  If I can have you -- do you recognize the first one? |
| 11:59:21 | 5 | A.  Yes. |
| 11:59:23 | 6 | Q.  This is to Mr. Calabrese, correct? |
| 11:59:24 | 7 | A.  Yes. |
| 11:59:27 | 8 | Q.  And Mr. Calabrese is one of the Defendants in this case? |
| 11:59:28 | 9 | A.  Yes. |
| 11:59:33 | 10 | Q.  And DBA Nextel, Inc, Nextel, Inc. is another Defendant in |
| 11:59:34 | 11 | this case, correct? |
| 11:59:35 | 12 | A.  Yes. |
| 11:59:39 | 13 | Q.  So on -- do you know what triggered you to send the cease |
| 11:59:42 | 14 | and desist letter on April 26, 2017? |
| 11:59:43 | 15 | A.  Yes. |
| 11:59:46 | 16 | Q.  What was that? |
| 11:59:52 | 17 | A.  We discovered the website nextelworldwide.com and determined |
| 11:59:54 | 18 | that it was not authorized by us. |
| 11:59:58 | 19 | Q.  And how did you discover the website nextelworldwide.com? |
| 12:00:01 | 20 | A.  I believe after a trade show, some of our employees came |
| 12:00:05 | 21 | back and asked us about this, and that's when we discovered the |
| 12:00:08 | 22 | website doing the investigation into that matter. |
| 12:00:13 | 23 | Q.  Would that have been a report from Mr. Mancuso? |
| 12:00:15 | 24 | A.  I believe so, yes. |
| 12:00:16 | 25 | Q.  Or Mr. Shaughnessy? |

12:00:19  1    A.  Mr. Shaughnessy was the first one, yes.

12:00:26  2         MR. KERNELL:  If we could continue on to Page 147, Line

12:00:28  3    1.

12:00:34  4    Q.  If I could refer you to the letter to Mr. Calabrese on the

12:00:38  5    first page of Exhibit 144, this is in the second full paragraph.

12:00:43  6    About halfway down you state these words:  These marks present

12:00:49  7    all others -- prevent, present all others from using these names

12:00:54  8    in any design, including design marks we abandoned long ago in

12:00:57  9    the telecommunications equipment and services market without our

12:00:59  10   permission.  Do you see that?

12:01:00  11   A.  Yes.

12:01:04  12   Q.  So we talked about one of the marks, the design, it was a

12:01:09  13   design mark that Nextel in black bold letters, the X and T run

12:01:13  14   together with the yellow black, background, and a black line to

12:01:16  15   the right.  Is that one of the design marks that you had

12:01:17  16   previously abandoned?

12:01:19  17   A.  Yes.

12:01:24  18   Q.  So I believe earlier you testified that you'd never admit

12:01:27  19   that you abandoned the mark, yet in this letter you admitted

12:01:30  20   that Sprint does abandon marks.

12:01:33  21   A.  I didn't say Sprint doesn't abandon marks, we never

12:01:36  22   abandoned the Nextel mark.

12:01:40  23   Q.  But have you abandoned some of the Nextel design marks?

12:01:41  24   A.  Yes.

12:01:46  25   Q.  And in this sentence you state unequivocally these word

84

| | | |
|---|---|---|
| 12:01:50 | 1 | marks prevent all others from using those names in any design, |
| 12:01:54 | 2 | including design marks we abandoned long ago in the |
| 12:01:56 | 3 | telecommunications equipment and services market without our |
| 12:01:57 | 4 | permission.  Do you see that? |
| 12:01:59 | 5 | A.  Yes. |
| 12:02:04 | 6 | Q.  In the last sentence you state -- this is the last sentence |
| 12:02:10 | 7 | on the first page of Exhibit 144, you state accordingly, your |
| 12:02:14 | 8 | company's use of any of these marks without permission infringes |
| 12:02:20 | 9 | on our valuable trademark rights, dilutes the strength and value |
| 12:02:25 | 10 | of the marks, and unfairly trades on our valuable goodwill in |
| 12:02:28 | 11 | violation of federal state statutory and common laws.  Do you |
| 12:02:28 | 12 | see that? |
| 12:02:29 | 13 | A.  Yes. |
| 12:02:31 | 14 | Q.  What did you mean by valuable goodwill? |
| 12:02:35 | 15 | A.  Valuable goodwill is the value of the marks that accrues |
| 12:02:37 | 16 | over time from use in commerce. |
| 12:02:40 | 17 | Q.  And you're aware that Sprint wrote off all the goodwill of |
| 12:02:43 | 18 | Nextel in February of 2008, aren't you? |
| 12:02:47 | 19 | A.  They wrote off the goodwill of the merger with Nextel and |
| 12:02:50 | 20 | Sprint, but not the goodwill of the trademarks.  It doesn't say |
| 12:02:53 | 21 | we're writing off the goodwill of the Nextel trademarks that we |
| 12:02:55 | 22 | continue to use and maintain. |
| 12:02:57 | 23 | Q.  Apart from the trademarks of the brands, what other goodwill |
| 12:02:58 | 24 | is there? |
| 12:03:01 | 25 | A.  There's a long history of excellent service, and it's a |

12:03:05  1   famous mark.  It's a well-known mark that we own and continue to

12:03:06  2   use.

12:03:10  3            MR. KERNELL:  If I can continue on to Page 152, Line

12:03:11  4   17.

12:03:14  5   Q.  Did you value the Nextel mark?

12:03:16  6   A.  Yes.

12:03:18  7   Q.  Did you assign a value to the Nextel mark?

12:03:19  8   A.  No.

12:03:21  9   Q.  What was your valuation of the Nextel mark?

12:03:25  10  A.  That there was value in excess of $10 million.

12:03:41  11           MR. KERNELL:  If I could continue on to Page 160.  Line

12:03:43  12  23.

12:03:50  13  Q.  There's not a single device that Sprint sells that has the

12:03:53  14  Nextel -- that has Nextel on the device, correct?

12:03:55  15  A.  No, that's not correct.

12:03:59  16  Q.  What device does Sprint sell that has Nextel physically on

12:04:00  17  the device?

12:04:05  18  A.  There isn't a device that has it physically on the device.

12:04:07  19  Q.  Okay.  So that was my question.

12:04:10  20  A.  You didn't say physically.  You said on the device, and it's

12:04:14  21  possible that the Nextel mark will pop up on somebody's screen.

12:04:16  22  So that's technically on the device.

12:04:19  23  Q.  What do you mean possibly?  Are you aware of any devices

12:04:23  24  that Sprint sells where the Nextel logo pops up on the screen?

12:04:26  25  A.  No, but it's possible, you know.  I can't identify, but I

12:04:28  1    think it's possible.

12:04:31  2    Q.  Okay.  The push-to-talk services that you referred to

12:04:35  3    earlier, that is with respect to the direct connect service

12:04:37  4    offered by Sprint; isn't that true?

12:04:38  5    A.  That's correct.

12:04:44  6    Q.  That's not a Nextel direct connect service.  Is it a Sprint

12:04:48  7    Direct Connect service?  It is a Sprint Direct Connect service,

12:04:49  8    correct?

12:04:53  9    A.  We have customers that are built for direct connect even

12:04:55  10   though it runs on our Kodiak platform.

12:04:58  11   Q.  But those aren't new customers, are they?

12:05:00  12   A.  They have been long-standing customers, but they have moved

12:05:04  13   their device and the functionality to the Sprint platform, but

12:05:09  14   they're still being billed under Nextel Direct Connect plans.

12:05:12  15   Q.  But are they actually using the Sprint service?

12:05:14  16   A.  They're using the Kodiak technology.

12:05:18  17   Q.  Which is on the Sprint network under the Sprint service?

12:05:21  18   A.  It is.  I mean, we offer a lot of different brands under the

12:05:25  19   network.  We offer Sprint network, we offer Boost network, we

12:05:28  20   offer Assurance network, we have -- it's all the same network.

12:05:32  21   It can have whatever brand folks want to put on it, it just

12:05:35  22   depends on how it's offered for sale.  The network itself is not

12:05:38  23   a physical thing that we are selling that is branded as a

12:05:41  24   network.  It's the offering, the telecommunication offering, nd

12:05:46  25   those telecommunications are offered on a variety of brands but

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 12:05:48 | 1 | use the same physical network. |
| 12:05:50 | 2 | Q.  And it's the Sprint network? |
| 12:05:53 | 3 | A.  It is most commonly referred to as the Sprint network, ut it |
| 12:05:57 | 4 | is also the Boost network and the Assurance network and all of |
| 12:05:59 | 5 | our MVNO networks. |
| 12:06:03 | 6 | Q.  And for instance, Boost, that is a brand of Sprint? |
| 12:06:03 | 7 | A.  Yes. |
| 12:06:08 | 8 | Q.  That's a brand of Sprint that it advertises, correct? |
| 12:06:13 | 9 | There's Boost towers out there? |
| 12:06:14 | 10 | A.  Yes. |
| 12:06:20 | 11 | Q.  And Sprint's website, it identifies Boost as one of Sprint's |
| 12:06:20 | 12 | brands, correct? |
| 12:06:21 | 13 | A.  Yes. |
| 12:06:25 | 14 | Q.  As well as I think Virgin Mobile, Sprint identifies that as |
| 12:06:26 | 15 | a Sprint on its website? |
| 12:06:27 | 16 | A.  Yes. |
| 12:06:30 | 17 | Q.  But Sprint doesn't identify Nextel as a brand on its |
| 12:06:31 | 18 | website, does it? |
| 12:06:33 | 19 | A.  It advertises it as a former brand. |
| 12:06:38 | 20 | Q.  A former brand.  Okay.  Do you know when or -- |
| 12:06:40 | 21 | A.  A brand is not a trademark, by the way. |
| 12:06:45 | 22 | Q.  Over the years, Sprint has stopped identified Nextel as even |
| 12:06:48 | 23 | one of its trademarks, hasn't it? |
| 12:06:51 | 24 | A.  No, it has not.  We continue to identify it and use it as a |
| 12:06:52 | 25 | trademark. |

12:06:55  1    Q.  Is it identified in the SEC filings?

12:07:04  2    A.  There are --

12:07:08  3         MR. KERNELL:  And if I can continue on to page.

12:07:13  4         THE COURT:  Was that a question with no answer?  If it

12:07:17  5    was, then the jury will disregard it.  Questions are not

12:07:21  6    evidence.  Answers are.

12:07:28  7         MR. KERNELL:  If I can continue on to Page 190.  Line

12:07:30  8    7.

12:07:34  9    Q.  So when you were talking earlier today and you were -- I

12:07:36  10   believe you testified earlier today that you weren't sure

12:07:41  11   whether or not Sprint had current sales of the Sonim XP Strike

12:07:46  12   IS, what did you mean by current?  What time period were you

12:07:48  13   referring to?

12:07:49  14   A.  2019.

12:07:54  15   Q.  Are there sales numbers for Sprint's devices in 2019

12:07:55  16   available at this time?

12:07:56  17   A.  No.

12:08:00  18   Q.  Are you aware of whether Sprint had sales of the Sonim XP

12:08:05  19   Strike IS from 2013 every year from 2013 to 2018?

12:08:06  20   A.  Yes.

12:08:12  21   Q.  And have you had sales of Sonim Strike IS every year from

12:08:13  22   2013 to 2018?

12:08:15  23   A.  Yes.

12:08:19  24   Q.  Are you aware when Sprint placed its last order of Sonim

12:08:24  25   with Sonim, for a shipment of Sonim XP Strike IS devices?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
12:08:26   1    A.  Yes.

12:08:28   2    Q.  Approximately when was the last order made?

12:08:31   3    A.  In August of 2018.

12:08:36   4         MR. KERNELL:  And that concludes the deposition of or

12:08:39   5    transcript of Melissa Jobe.

12:08:42   6         THE COURT:  All right sir.  Next?

12:08:48   7         MR. SCHWARTZ:  It's 12:00, Your Honor.  Would you like

12:08:49   8    to pause here or proceed?

12:08:51   9         THE COURT:  I have a sentencing and I've set it for

12:08:57  10    1:15, so I thought we'd go a little late this morning.  I can do

12:08:59  11    my sentencing at 1:15.

12:09:00  12         MR. SCHWARTZ:  The Defendants call Jeffrey Kaplan.

12:09:07  13    Wait, wait.  There was a matter raised in the pretrial

12:09:07  14    proceedings.

12:09:10  15         THE COURT:  I have no idea what you're talking about.

12:09:11  16         MR. SCHWARTZ:  I don't know if you wanted to do a

12:09:11  17    sidebar.

12:09:15  18         THE COURT:  I don't know why you would want to, but --

12:09:16  19         MR. SCHWARTZ:  Well, you instructed the parties to

12:09:18  20    discuss the issue before the witness took the stand.

12:09:21  21         THE COURT:  All right.  How about you all go into the

12:09:24  22    jury room.  We may call you back out in a couple minutes, we may

12:09:28  23    call you back in three and a half days.  I have no idea.

12:09:29  24         COURT SECURITY OFFICER:  All rise for the jury.

12:09:33  25         (Jury out at 12:09 p.m.)
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | |
|---|---|
| 12:10:09 | 1 |
| 12:10:12 | 2 |
| 12:10:15 | 3 |
| 12:10:17 | 4 |
| 12:10:22 | 5 |
| 12:10:26 | 6 |
| 12:10:28 | 7 |
| 12:10:33 | 8 |
| 12:10:36 | 9 |
| 12:10:37 | 10 |
| 12:10:38 | 11 |
| 12:10:44 | 12 |
| 12:10:49 | 13 |
| 12:10:53 | 14 |
| 12:10:55 | 15 |
| 12:10:59 | 16 |
| 12:11:04 | 17 |
| 12:11:07 | 18 |
| 12:11:10 | 19 |
| 12:11:13 | 20 |
| 12:11:18 | 21 |
| 12:11:20 | 22 |
| 12:11:22 | 23 |
| 12:11:23 | 24 |
| 12:11:24 | 25 |

THE COURT:  All right.  What are we talking about?  We talked about so many things that it's hard for me to keep it straight.

MR. SCHWARTZ:  Simply put, Your Honor, in the motion in limine, it's in your order, subsection C, Page 11, the issue about conclusions of law on the issue of abandonment.

THE COURT:  Yeah.  I don't want this gentleman up there telling the jury that it's been abandoned, when in fact there's a definition of abandonment that we're going to give them in the instructions.

MR. SCHWARTZ:  Correct, Your Honor.  You just simply instructed us to address the issue.  I'm going to do my best to avoid -- and I've spoken to the witness, to avoid running afoul of this issue, and any issue will be simply as him as a layperson on that issue.

THE COURT:  Well, I don't think he's as a layperson.  Well, I don't know.  Let me hear the opposite -- the opposing side if they have a position that's different.  What is your position on it?

MR. RIOPELLE:  Our position is as the Court ruled.  He can't testify.  It says accordingly, Plaintiff's motion is granted in part as to lay witness's testimony regarding what legally constitutes abandonment.

MR. SCHWARTZ:  He's not going to address that, Your Honor.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 12:11:25 | 1  | THE COURT:  Okay.  But you just said as a layperson          |
| 12:11:28 | 2  | he's going to try to do it.  He can't do it as -- a layperson |
| 12:11:31 | 3  | cannot have -- well, he can have an opinion, but I'm not      |
| 12:11:34 | 4  | permitting him to tell it to the jury.                       |
| 12:11:36 | 5  | MR. SCHWARTZ:  Right.  He's not going to make any            |
| 12:11:38 | 6  | statements about legal conclusions on abandonment.           |
| 12:11:43 | 7  | THE COURT:  And if he tries to dance around it, I will       |
| 12:11:49 | 8  | probably step on his toes while he's dancing.  Understood?   |
| 12:11:50 | 9  | MR. SCHWARTZ:  Understood.                                   |
| 12:11:52 | 10 | THE COURT:  Okay.  In front of the jury if I have to.        |
| 12:11:57 | 11 | All right.  Bring the jury back in.  I hope they're all in the |
| 12:11:59 | 12 | bathroom.                                                    |
| 12:12:02 | 13 | COURT SECURITY OFFICER:  All rise for the jury.             |
| 12:12:07 | 14 | THE COURT:  I have a feeling it's going to be a while        |
| 12:12:10 | 15 | getting them back in.  How long do you think you're going to be? |
| 12:12:13 | 16 | MR. SCHWARTZ:  I'm going to try to breeze through this       |
| 12:12:14 | 17 | in --                                                        |
| 12:12:16 | 18 | THE COURT:  17 and half minutes.                            |
| 12:12:18 | 19 | MR. SCHWARTZ:  Maybe double that, but less.  Somewhere       |
| 12:12:20 | 20 | in there.  I'm trying to streamline.                         |
| 12:12:22 | 21 | THE COURT:  All right.                                      |
| 12:12:26 | 22 | MR. SCHWARTZ:  Just for the Court's -- after Mr.            |
| 12:12:28 | 23 | Kaplan, we just have one final witness.                      |
| 12:12:32 | 24 | THE COURT:  Okay.  We'll deal with it.                       |
| 12:12:39 | 25 | (Jury in at 12:12 p.m.)                                      |

| | | |
|---|---|---|
| 12:13:09 | 1 | COURT SECURITY OFFICER:  Two in the bathroom, Your |
| 12:13:10 | 2 | Honor. |
| 12:13:12 | 3 | THE COURT:  Good.  You all can be seated then.  We'll |
| 12:14:16 | 4 | Wait.  He didn't take the Sears Roebuck catalogue in there with |
| 12:14:18 | 5 | him, did he? |
| 12:14:20 | 6 | COURT SECURITY OFFICER:  Not that I know of, Your |
| 12:14:21 | 7 | Honor. |
| 12:14:23 | 8 | THE COURT:  I don't think they even make catalogues |
| 12:14:26 | 9 | anymore.  Everything is online. |
| 12:14:52 | 10 | All right sir.  Please call your next witness. |
| 12:14:54 | 11 | MR. SCHWARTZ:  Yes, Your Honor, the defense calls |
| 12:14:54 | 12 | Jeffrey Kaplan. |
| 12:14:58 | 13 | THE COURT:  Mr. Kaplan, please come forward.  Since |
| 12:15:03 | 14 | it's been a couple days, when you reach the chair, please remain |
| 12:15:05 | 15 | standing and raise your right hand. |
| 12:15:05 | 16 | JEFFREY KAPLAN, DEFENSE WITNESS, SWORN. |
| 12:15:14 | 17 | THE COURT:  Please be seated.  Although we know who you |
| 12:15:18 | 18 | are, tell us who you are and spell your last name please. |
| 12:15:21 | 19 | THE WITNESS:  Jeffrey Kaplan, K-A-P-L-A-N. |
| 12:15:22 | 20 | THE COURT:  You may proceed, sir. |
| 12:15:22 | 21 | DIRECT EXAMINATION |
| 12:15:22 | 22 | BY MR. SCHWARTZ: |
| 12:15:24 | 23 | Q.  Thank you.  Mr. Kaplan, where do you reside? |
| 12:15:26 | 24 | A.  I live in Pompano Beach. |
| 12:15:28 | 25 | Q.  How long have you lived there? |

```
12:15:29   1    A.   About 12 years.
12:15:32   2    Q.   And before that where?
12:15:37   3    A.   Before that, I lived in Plantation.
12:15:40   4    Q.   And how old are you?
12:15:42   5    A.   I'm 63.
12:15:43   6    Q.   And are you married?
12:15:45   7    A.   Single.
12:15:46   8    Q.   Do you have any children?
12:15:47   9    A.   No, sir.
12:15:50  10    Q.   And did you attend high school down here in Florida?
12:15:51  11    A.   Cooper City.
12:15:53  12    Q.   And then after high school did you?
12:15:56  13    A.   Couple of years of BCC.
12:15:58  14    Q.   Did you get your degree from BCC?
12:16:00  15    A.   No.
12:16:04  16    Q.   Would you describe to the jury just the jobs you've had
12:16:06  17    since leaving Broward community?
12:16:11  18    A.   Okay.  Around 1979, the video industry started with video
12:16:15  19    rental stores.  I opened one of the first video stores in
12:16:19  20    Broward County, and was in that business for about ten years.
12:16:22  21    And eventually had about five stores.
12:16:31  22              After 1979, again about ten years, 1989, another new
12:16:34  23    industry was starting which was one-hour photo labs where you
12:16:38  24    bring in your film, you get it developed.  So in Hollywood, I
12:16:42  25    opened the first store where you can bring in your film and get
```

12:16:46   1    it developed in one hour, and that also became a huge industry

12:16:48   2    where the machines were put into Walgreens and so forth.  And I

12:16:51   3    did that for about nine years.

12:16:57   4              In 1998, I changed course and got my license as a

12:17:01   5    public insurance adjuster whereby I would represent homeowners

12:17:06   6    in fire claims, hurricane claims, and I would battle against the

12:17:10   7    insurance companies to get funds for the people.  I did that

12:17:17   8    until about 2005 and at that time, I developed a beverage

12:17:22   9    company.  I made a drink called Mavi or Mavi in the Caribbean

12:17:27   10   which is a fermented type of beverage, and I bottled it and sold

12:17:32   11   it to Goya for distribution.  I also made a beverage called

12:17:37   12   Mr. Q. Cumber, which is a sparkling sort of a Perrier with

12:17:43   13   cucumber, rapino fresco, and to this day, well, I'm still

12:17:49   14   selling that product to Sedano's and Whole Foods, Fresh Market.

12:17:52   15   So that business is still running.

12:17:59   16             In 2012, is when I founded RetroBrands USA.

12:18:01   17   Q.  Have you invented in products?

12:18:05   18   A.  Yes, over the decades I invented about three different

12:18:10   19   products.  One product was when men shave, they tend to cut

12:18:15   20   themselves and it burns when you use a styptic pencil.  So I

12:18:19   21   said, I have to make something where it doesn't burn, so I

12:18:21   22   formulated a styptic pencil that doesn't burn.

12:18:24   23   And that's when I first started getting into trademarks.  I

12:18:28   24   registered, I think it was face protect or something, through

12:18:29   25   the USPTO.

12:18:35   1          I also invented an herbicide which killed an invasive
12:18:41   2   species that goes on the trees called ball moss or Spanish moss.
12:18:44   3   They would kill the trees, so I invented a herbicide and
12:18:46   4   trademark epizyme.
12:18:49   5          The third patent was I was discovering that a lot of
12:18:53   6   old paper had yellowing, or foxing it's called, for valuable
12:18:57   7   documents.  So I invented a formula where the foxing could be
12:19:01   8   removed without damaging the paper.
12:19:05   9   Q.   Thank you.  Are you the sole owner of RetroBrands USA?
12:19:06  10   A.   Yes, sir.
12:19:09  11   Q.   And why did you start RetroBrands?
12:19:14  12   A.   In 2012, I was reading in the Miami Herald and I saw an
12:19:18  13   article that got my attention.  The article was headed -- was
12:19:23  14   called White Cloud, which was a toilet paper brand, haunts
12:19:26  15   Proctor and Gamble.  So I remember, in the '80s there was
12:19:31  16   Charmin and White Cloud.  Then White Cloud kind of disappeared,
12:19:37  17   and this article stated that the White Cloud trademark was
12:19:41  18   re-launched by a company in Boca and it was licensed to Walmart.
12:19:47  19   And by 2012, it was doing about 600 million a year as a private
12:19:53  20   brand with Walmart.  So that's a great business model, find
12:19:57  21   brands that I grew up and maybe re-launch them.  So I started
12:20:01  22   doing research and started seeing a lot of brands in the '60s
12:20:06  23   and; 70s that were off the market.
12:20:09  24   Q.   Are trademarks important to businesses with regard to their
12:20:10  25   products or their brand?

```
12:20:13   1   A.   Yes.   You know, we all know the major, the major trademarks.
12:20:17   2   When someone says Mickey Mouse, you know who it belongs to and
12:20:21   3   so forth.   The industry has changed though over the years for
12:20:27   4   many decades.   When you set up a character, you knew who it
12:20:31   5   belonged to.   But nowadays with major mergers and so forth, if
12:20:35   6   you ask someone -- you tell someone the name of a brand,
12:20:38   7   sometimes they don't know who it belongs to because there's so
12:20:41   8   many different companies buying each other.   But they are
12:20:42   9   important to every company.
12:20:47  10   Q.   And what brands or products has RetroBrands sought to revive
12:20:47  11   over the years?
12:20:51  12   A.   Again, as I mentioned, I tried to find brands that were
12:20:56  13   called baby boomer brands for people my age.   Anyone under 50
12:21:01  14   won't remember these brands.   Brands like Di-Gel, which was an
12:21:06  15   antacid.   The commercial was, they had a sample stomach and they
12:21:10  16   would shake it up and then put the Di-Gel in there.   It was
12:21:13  17   number two after Tums, so these brands are tremendous revenue,
12:21:17  18   and they were very hot.
12:21:22  19        I re-launched a brand called Chipwich, which was a New
12:21:24  20   York ice cream, which was once owned by Nestle.   And it was
12:21:30  21   discontinued, taken off the market, and I re-launched that.
12:21:35  22   That brand is doing about 25 million a year in all -- it's in
12:21:36  23   all the Wawa's.   It's all over America.
12:21:40  24        I re-launched a brand called Saniflush which was
12:21:44  25   launched in 1922, a toilet bowel cleaner.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

12:21:49  1          I re-launched a brand called Modess which was a
12:21:54  2    feminine hygiene brand owned by Proctor and Gamble, and it was
12:22:00  3    number two after Kotex.  And many, many, many more brands.
12:22:06  4    Q.  Please explain to the jury what you do as part of your,
12:22:11  5    let's say, investigation of one of these nostalgic brands.
12:22:14  6    A.  Sure.  The first one is with today's technology, everything
12:22:18  7    is on the internet.  Thank goodness.  In the old days you had to
12:22:22  8    go through magazines and so forth, but the first thing is go to
12:22:25  9    Google and type in the name.  And as you know, everything comes
12:22:29  10   up, all the different links and so forth, which allows you to
12:22:34  11   click on the link, see articles, see blogs and everything about
12:22:39  12   that brand the everything is on the internet.  So I would read
12:22:43  13   all the history, all the press releases, everything is there.

12:22:47  14          Of course I would go to the US Patent and Trademark
12:22:51  15   Office and look at the history of the filing of the brand, who
12:22:55  16   owns it.  And every brand has maintenance requirements and so
12:23:00  17   forth.  So I would look at each brand and see the history.  Also
12:23:05  18   at the USPTO when a brand is -- a trademark is sold, there's an
12:23:10  19   assignment section where you can see who now has that, who now
12:23:12  20   owns the brand.  So everything is public records so it's really
12:23:18  21   easy to do, you know, do due diligence.  If it's in the market,
12:23:23  22   it's on the internet.  You can find it.  Anywhere in the world.
12:23:28  23   Q.  Prior to considering Nextel, has RetroBrands ever pursued a
12:23:32  24   brand with a trademark that was still registered to its owner?
12:23:36  25   A.  Oh, yes.  Many, many brands that I know are off the market.

| | |
|---|---|
| 12:23:39 | 1 |
| 12:23:43 | 2 |
| 12:23:47 | 3 |
| 12:23:53 | 4 |
| 12:23:56 | 5 |
| 12:24:01 | 6 |
| 12:24:04 | 7 |
| 12:24:08 | 8 |
| 12:24:13 | 9 |

Through all the research, once I get to the trademark office,
it's still listed as active.  And I'm thinking, why is it active
if I can't find it.  Through these ten years I've been doing
this, these big conglomerates sort of park the trademark there.
They don't pay attention to it, the government doesn't pay
attention, and it's sitting there parked.  The time that it gets
affected is when it has to be renewed.  Every ten years you have
to renew the brand and tell the government you're still selling
the product and show them a specimen of that product.

10   Q.  What do you mean by a specimen?

11   A.  A specimen would be the actual mark on the item or the
12   packaging in a prominent manner that you can see it.  And
13   there's a declaration which tells, you know, under oath you have
14   to state that this product is in the market.  And there's an
15   image.  The person who is filing this has to take a picture, and
16   nowadays it could be a website, you know with all the
17   e-commerce.  So the laws have changed over the years.

18   Q.  What types of proceedings has RetroBrands been involved in
19   with the trademark office?

20   A.  Well, there's two sections to the trademark office.  There's
21   the initial filing which is very simple.  I think on Monday I
22   explained you can file an application by yourself or your
23   company, and what's great about the USPTO is you don't need an
24   attorney.  You can do everything individually.  So that's the
25   filing part of the process.

| | | |
|---|---|---|
| 12:25:14 | 1 | There's another section called the Trademark Trial and |
| 12:25:18 | 2 | Appeal Board, the TTAB.  And that's where -- |
| 12:25:19 | 3 | MR. RIOPELLE:  Your Honor, I mean, I think we're |
| 12:25:25 | 4 | veering into administrative and procedural and legal things that |
| 12:25:29 | 5 | he's not supposed to be testifying about. |
| 12:25:30 | 6 | MR. SCHWARTZ:  The scope was very narrow, and I'm |
| 12:25:32 | 7 | trying to stay away from the issues that the Court mentioned |
| 12:25:38 | 8 | earlier.  He's just describing the two manners in which you can |
| 12:25:40 | 9 | proceed to get a trademark. |
| 12:25:45 | 10 | THE COURT:  And his basis for that is? |
| 12:25:49 | 11 | MR. SCHWARTZ:  His own personal knowledge and |
| 12:25:50 | 12 | expertise. |
| 12:25:52 | 13 | THE COURT:  I'll permit him to answer the question that |
| 12:25:54 | 14 | was asked, but please -- |
| 12:25:56 | 15 | THE WITNESS:  Yes, sir.  What was the question again |
| 12:25:57 | 16 | please? |
| 12:25:57 | 17 | BY MR. SCHWARTZ: |
| 12:25:59 | 18 | Q.  Well, I was asking you what types of applications has |
| 12:26:02 | 19 | RetroBrands used with regard to -- |
| 12:26:06 | 20 | A.  Well, just under applications, the brands, the name of the |
| 12:26:08 | 21 | trademarks applications that I've done? |
| 12:26:09 | 22 | Q.  Yes. |
| 12:26:13 | 23 | A.  Again, there's been at least 30, 40 over the years.  Every |
| 12:26:17 | 24 | time I file a trademark like Di-Gel, Modess, there's an |
| 12:26:18 | 25 | application that you have to file. |

| | | |
|---|---|---|
| 12:26:20 | 1 | Q.  Is there also an application called intent to use? |
| 12:26:23 | 2 | A.  Yes, there's two versions of your application.  The first |
| 12:26:28 | 3 | version is if you're actually making and selling the product or |
| 12:26:32 | 4 | licensing the product.  When you file the application, you check |
| 12:26:35 | 5 | off 1 A, which means you're telling the government you're |
| 12:26:40 | 6 | selling it and you put a specimen of the item.  The other one's |
| 12:26:47 | 7 | called intent to use where you would put 1 B, and you're telling |
| 12:26:52 | 8 | the government basically that you have a bonafide intent to use |
| 12:26:56 | 9 | the mark in the goods and services that you want to have it. |
| 12:27:02 | 10 | They give you approximately about 30 months to get the product |
| 12:27:05 | 11 | to the market.  There's extensions.  Every six months you have |
| 12:27:09 | 12 | to file an extension, and you're given 30 months to get the |
| 12:27:12 | 13 | product to the market. |
| 12:27:14 | 14 | Q.  Does RetroBrands, once it has acquired a trademark, always |
| 12:27:16 | 15 | manufacture a product? |
| 12:27:20 | 16 | A.  It all depends on how difficult it is.  If it's a |
| 12:27:25 | 17 | complicated product, then I might seek a licensee.  Also it |
| 12:27:28 | 18 | depends on the marketing.  You know, it's very difficult to get |
| 12:27:32 | 19 | a product on the shelf.  There's things called slotting fees. |
| 12:27:37 | 20 | You pay tens of thousands.  But if I assigned under -- license |
| 12:27:41 | 21 | the brand to a company that already had the infrastructure and |
| 12:27:45 | 22 | the connections in the industry, they can just add it to their |
| 12:27:48 | 23 | portfolio, and they know the buyers, they get it right on the |
| 12:27:50 | 24 | market.  It's a much easier way. |
| 12:27:54 | 25 | Q.  And what's the financial relationship between a licensee and |

12:27:55   1   a licensor?

12:27:58   2   A.  Well normally, you know, I'm eager to have a licensee

12:28:01   3   because I know it costs them a lot of money to get to this

12:28:05   4   market.  So when I make my license agreement, it depends on what

12:28:09   5   the retail price is.  For example, the product called Modess

12:28:14   6   that I mentioned, that sold in Dollar Tree, Dollar General, it's

12:28:18   7   a dollar.  Well a $1.25 now, it went up.  So something like

12:28:22   8   that.  I would do 2% because I know it costs him about $.60 to

12:28:26   9   make it, he's got to send it to Dollar Tree, they're making

12:28:31  10   money, so I get $.02 on every item for that price point.

12:28:37  11   Q.  And how did you first come to learn about the Nextel brand.

12:28:40  12   A.  In early January, beginning of January, I received a call

12:28:45  13   from a Mr. Stephen Calabrese who invited me to his store in

12:28:49  14   Davie.  He wanted to talk to me about something.  So I went down

12:28:53  15   there and met him and Mr. Rivera.  They showed me around the

12:28:58  16   office and the store.  And it was Reliable Two-Way.  And while

12:29:02  17   walking around, I saw, you know, Nextel boxed products, and they

12:29:07  18   basically explained their history in the industry, their

12:29:11  19   expertise in the industry, and they had said that do you

12:29:14  20   remember Nextel?  And I said I remember it, but I know it was

12:29:17  21   for businesses with a walkie-talkie.  So most of them --

12:29:21  22   basically they stated that the brand's been discontinued, they

12:29:26  23   can't find it anywhere and they launched it in 2017 at a trade

12:29:30  24   show.  And right after that, they started receiving cease and

12:29:34  25   desist letters and threatening letters, and their dealers were

12:29:39   1    receiving letters and they were losing a lot of clients.

12:29:45   2           So at that point, you know -- and again, Mr. Stephen

12:29:49   3    Calabrese knew that I brought back discontinued brands, so it

12:29:53   4    was kind of a perfect fit that he found me.  And he was so happy

12:29:56   5    that here's a person who knows about bringing back brands and

12:30:00   6    that's what he's trying to do.  But from my looking at the

12:30:02   7    business, I could see it was a start-up.  There were two

12:30:07   8    gentleman, sort of like Apple with the garage, it was the

12:30:10   9    beginning of something.  So I told them let me -- you know, I

12:30:13   10   said this is Sprint, this is not a little company that you might

12:30:17   11   be fighting against.  Let me investigate it and let me do due

12:30:21   12   diligence.  I want to make sure this brand is not on the market,

12:30:25   13   I'm not going to be fighting Sprint if I'm 120% sure it's not

12:30:29   14   available anywhere.  So then I left.

12:30:33   15   Q.  This meeting was the very beginning of 2018?  I wasn't sure

12:30:33   16   --

12:30:37   17   A.  Yeah, 2018.  I'm not sure what year I used.

12:30:39   18   Q.  And did you understand that Two-Way Radio was a business

12:30:40   19   owned by Mr. Rivera?

12:30:45   20   A.  I didn't really get into that, but I noticed the sign was

12:30:52   21   Two-Way -- Reliable Two-Way, but I wasn't sure of their exact

12:30:55   22   business relationship.  They didn't -- it was a 20-minute

12:30:57   23   meeting.  I didn't get into that at that point.

12:31:00   24   Q.  And what did you do with regard to investigating Nextel?

12:31:03   25   A.  Well, the first thing I did when I left there, I went to a

```
12:31:06   1    couple of Sprint stores.  You know, one was in Davie, I think
12:31:10   2    one was in Plantation.  And I walked in and I asked someone can
12:31:15   3    I get a Nextel?  You know, walkie-talkie?  And nobody knew what
12:31:19   4    it was.  They were young people.  I didn't expect them -- unless
12:31:23   5    it was there, they wouldn't really know about it.  So that was
12:31:26   6    my first, you know, inclination of my investigation.
12:31:28   7    Q.  And then what do you do next?
12:31:32   8    A.  The next few days I did what I did with all my other brands.
12:31:37   9    I went to Google, I typed in Nextel and as usual, all the
12:31:41  10    different links came up.  There were a few links that said
12:31:45  11    Nextel Direct Connect and shop.  Everything I clicked on either
12:31:51  12    were dead or went to a dead site or it went to an archival site
12:31:55  13    on the internet.  There's a lot of archival stuff that's stored
12:32:00  14    there.  I just couldn't find it.  There were also other links to
12:32:05  15    Wikipedia, there were tons of articles about the history of
12:32:10  16    Nextel, articles about the discontinued of the brand with no
12:32:13  17    intent to bringing it back.  There were so many articles, and I
12:32:18  18    was getting really like wow, this is everywhere.  And there were
12:32:21  19    articles from the *New York Times* --
12:32:23  20            MR. RIOPELLE:  Objection, Your Honor.
12:32:25  21            THE COURT:  Yeah, don't tell us what the articles said.
12:32:26  22    That's hearsay.
12:32:29  23            THE WITNESS:  So there were many, many articles.  And
12:32:34  24    again, articles from reputable places that all stated the same
12:32:36  25    thing over and over, that it's --
```

12:32:38   1          MR. RIOPELLE:  Objection, Your Honor.  He's going to

12:32:39   2   say what the articles state.

12:32:42   3          THE COURT:  Yeah, I think you are and you're not.

12:32:44   4          THE WITNESS:  I'm sorry.  So I basically looked at the

12:32:46   5   articles for the history of Nextel.

12:32:46   6      BY MR. SCHWARTZ:

12:32:50   7   Q.  Did you do anything else with regard to your investigation?

12:32:57   8   A.  Yes.  I went to You Tube and typed in Nextel, and saw about

12:33:02   9   six to seven videos, again made by people in the industry, again

12:33:05   10   talking about the history of Nextel and the discontinue of

12:33:12   11   Nextel.  I also went to nextel.com because I figured if I'm

12:33:17   12   going to get on Nextel, it would be nextel.com.  And that was a

12:33:23   13   dead website.  It did not work.  And I also went to the USPTO

12:33:33   14   and as before, I investigated -- I put in Nextel and about 50 to

12:33:36   15   70 Nextel trademarks came.

12:33:44   16          MR. RIOPELLE:  Objection, Your Honor.  Relevance.

12:33:48   17          THE COURT:  Yeah, I don't see the relevance but I don't

12:33:51   18   see the harm either.  Let him finish the answer.

12:33:53   19          THE WITNESS:  Thank you, Your Honor.  So I went there

12:33:58   20   and again, as part of my due diligence, I want to see what's

12:34:01   21   active and what's alive and what's dead, and I found only three

12:34:02   22   at that time.

12:34:04   23          THE COURT:  That's enough.  I really have ruled that

12:34:08   24   these were irrelevant before, so don't try to --

12:34:09   25          THE WITNESS:  Yes, sir.

12:34:10  1             MR. SCHWARTZ:  I thought Your Honor said don't bring in

12:34:13  2     all the different paperwork and stuff.

12:34:15  3             THE COURT:  Go ahead.  Ask a different question.

12:34:15  4         BY MR. SCHWARTZ:

12:34:20  5     Q.  Are there -- is Sprint a public company?

12:34:20  6     A.  Yes, it is.

12:34:24  7     Q.  Explain to the jury, what does that mean, a public company

12:34:26  8     versus a private company?

12:34:29  9     A.  A public company is they're behold to their shareholders.

12:34:33  10    You invest in it, you have the right to know what's going on in

12:34:34  11    that company.

12:34:37  12    Q.  And do public companies file reports online?

12:34:42  13    A.  Oh, yes.  One of the important things I forgot to mention

12:34:45  14    was as part of my due diligence I go to the Securities and

12:34:51  15    Exchange Commission, and I review the annual reports of these

12:34:54  16    companies that own these trademarks.

12:34:57  17    Q.  And did you do that for Sprint?

12:35:00  18    A.  Yes, I did it for Sprint.  And again, the important thing

12:35:04  19    about the annual report is that it tells the public how healthy

12:35:07  20    the company is.  It tells you the trademarks they own, the

12:35:11  21    companies they're buying, the companies they're selling, it has

12:35:16  22    everything about the company.  And I did Sprint.  I looked at

12:35:22  23    even Sprint Nextel before the merger.  I mean, after the merger.

12:35:28  24    Q.  And did you look at the filings that were prior to this time

12:35:29  25    period of January 2018?

```
12:35:35   1    A.  Yes.  I started around 2012 and went all the way to 2018.
12:35:39   2    Each year I looked at the annual report.
12:35:59   3    Q.  What was your perception after you had concluded this
12:36:03   4    particular investigation as to Nextel?
12:36:08   5    A.  My perception was of all the brands I've brought back and
12:36:13   6    applied for, about 30 of them, this trademark brand had the most
12:36:22   7    convincing evidence to me that Sprint publicly told the public
12:36:23   8    that Nextel was discontinued.
12:36:28   9         MR. RIOPELLE:  Objection, Your Honor.  Hearsay.  He's
12:36:32  10    going to say what Sprint was telling the public.
12:36:34  11         THE WITNESS:  I said what I believe, what I felt
12:36:39  12    through my years of experience that I felt that this brand was
12:36:41  13    discontinued.  With no intent to bring it back.
12:36:43  14         THE COURT:  That's not what you said, but --
12:36:44  15         THE WITNESS:  I apologize, Your Honor.
12:36:45  16         THE COURT:  Go ahead.
12:36:57  17         MR. SCHWARTZ:  Can I bring up Exhibit 5019, and it's in
12:37:00  18    evidence, Your Honor.  Can I publish this to the jury, Your
12:37:05  19    Honor?  Yes, I can't see the screens.  Thank you, Your Honor.
12:37:05  20         BY MR. SCHWARTZ:
12:37:07  21    Q.  Mr. Kaplan.
12:37:08  22    A.  Yes, sir.
12:37:13  23    Q.  Do you recognize this particular exhibit, 5019?
12:37:17  24    A.  Yes, this is one of the -- this is an article from the
12:37:19  25    Sprint newsroom.
```

12:37:22  1    Q.  And how did you come to see this particular article?

12:37:26  2    A.  This was from one of the links when I Google searched

12:37:27  3    Nextel.

12:37:29  4    Q.  And what was your understanding after reading this

12:37:32  5    particular article?

12:37:36  6    A.  May I refresh for a second?

12:37:37  7    Q.  Yes, of course.

12:37:40  8    A.  Thanks.

12:37:50  9        THE COURT:  Come on.  You have this document, you've

12:37:55 10    been sitting there and now you're going to read it to see what's

12:37:58 11    in it?  Ask a question.

12:37:58 12        BY MR. SCHWARTZ:

12:38:01 13    Q.  What was your perception after reading this particular

12:38:01 14    article?

12:38:04 15    A.  That this verified my conclusion that the Nextel was

12:38:08 16    discontinued, the brand.

12:38:13 17        MR. KERNELL:  I'm finished with the exhibit, Your

12:38:15 18    Honor.

12:38:23 19        THE COURT:  Take it off the screen please.  Thank you.

12:38:23 20        BY MR. SCHWARTZ:

12:38:28 21    Q.  Did you convey -- strike that.  Based upon your perception,

12:38:32 22    did you decide to go forward with the process of acquiring the

12:38:33 23    Nextel trademark?

12:38:35 24    A.  Yes.

12:38:53 25    Q.  Did Mr. Calabrese and Mr. Rivera have a company already

```
12:38:54   1    named?
12:38:57   2    A.  Yes, they had a company called Nextel, Inc.
12:39:00   3    Q.  And did you establish a business relationship between
12:39:02   4    RetroBrands and Nextel, Inc.
12:39:07   5    A.  Yes.  We formed a licensor/licensee agreement.
12:39:10   6    Q.  And is that similar to what you described earlier where you
12:39:12   7    would get a royalty?
12:39:15   8    A.  Yes, because I personally knew not much about the industry.
12:39:20   9    And meeting Mr. Calabrese and Mr. Rivera with their multiple
12:39:23   10   years in the industry, I figured they knew what they were
12:39:28   11   talking about, about all this new technology to bring back the
12:39:30   12   Nextel brand with the new technologies.
12:39:33   13   Q.  And how is that royalty fee calculated?
12:39:40   14   A.  It's based on a quarterly report.  Every quarter they'll
12:39:43   15   send me their profit and loss statement, and I would get 10% of
12:39:46   16   the net, the net revenue.
12:39:49   17   Q.  And net revenue for the jury's sake?
12:39:54   18   A.  Yes, the gross revenue is the money coming in from air time,
12:40:01   19   subscriptions, selling of devices, et cetera, minus the cost to
12:40:03   20   pay for the air time and the cost to pay for the devices, plus
12:40:09   21   the expenses of employees, rent and so forth.  Then your bottom
12:40:13   22   number is what you made that quarter for three months.
12:40:19   23   Q.  And since the beginning of 2018 to the present, how much has
12:40:23   24   RetroBrands been paid in a royalty fee from Nextel, Inc.?
12:40:28   25   A.  Approximately 40 to 50,000.
```

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 12:40:35 | 1  | Q.  If the revenue generated by Nextel was higher, RetroBrands'        |
| 12:40:37 | 2  | would get a higher royalty fee?                                        |
| 12:40:40 | 3  | A.  Oh yes.  Uh-huh.                                                   |
| 12:40:54 | 4  | Q.  At some point you were -- you being you personally -- were         |
| 12:40:56 | 5  | sued by the Plaintiff Sprint?                                          |
| 12:41:00 | 6  | A.  Yes.  I've received, I'm not sure if it was a subpoena or I        |
| 12:41:04 | 7  | just don't recall, but I did receive notice that I was you know        |
| 12:41:06 | 8  | being sued.                                                            |
| 12:41:09 | 9  | Q.  And that holds true for RetroBrands USA as well?                   |
| 12:41:10 | 10 | A.  Yes.                                                               |
| 12:41:13 | 11 | Q.  And you have another company Nextel Mobile Worldwide.              |
| 12:41:14 | 12 | Correct?                                                               |
| 12:41:14 | 13 | A.  Yes.                                                               |
| 12:41:17 | 14 | Q.  And that particular company does what?                            |
| 12:41:23 | 15 | A.  That's a holding company.  My plan was to take the                 |
| 12:41:27 | 16 | intellectual property of Nextel which was with RetroBrands, and        |
| 12:41:32 | 17 | to move it to this Nextel Mobile Worldwide as the holding              |
| 12:41:36 | 18 | company, and then raise funds through that company for                 |
| 12:41:37 | 19 | investors.                                                             |
| 12:41:41 | 20 | Q.  And was that company also named as a Defendant in the              |
| 12:41:41 | 21 | lawsuit?                                                               |
| 12:41:44 | 22 | A.  Yes.  That was also named as a Defendant.                          |
| 12:41:50 | 23 | Q.  And then was Mr. Calabrese and the company Nextel also named       |
| 12:41:51 | 24 | as Defendants?                                                         |
| 12:41:54 | 25 | A.  Yes, they were also named.                                         |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 12:41:55 | 1 | Q.  You reviewed the lawsuit? |
| 12:41:57 | 2 | A.  Yes, I went through the lawsuit. |
| 12:41:59 | 3 | Q.  And then did you decided to defend the lawsuit? |
| 12:42:05 | 4 | A.  Yes.  I felt everything in there was not true, and I knew I |
| 12:42:09 | 5 | was in for a big legal bill, but I guess I wanted to fight this |
| 12:42:13 | 6 | because I felt it's a great brand to bring back. |
| 12:42:17 | 7 | Q.  And did RetroBrands agree on behalf of everybody to pay the |
| 12:42:18 | 8 | legal fees? |
| 12:42:22 | 9 | A.  Yes, that's in the license agreement. |
| 12:42:25 | 10 | Q.  In the license agreement, if there's an issue between the |
| 12:42:29 | 11 | particular trademark or brand or product, then RetroBrands takes |
| 12:42:31 | 12 | care of -- |
| 12:42:36 | 13 | A.  Yeah, there's a section where if a trademark is brought on |
| 12:42:40 | 14 | to us, I will pay for all the parties to the license.  And |
| 12:42:44 | 15 | there's also a section where if my licensee starts a lawsuit, |
| 12:42:47 | 16 | then I'm not going to be involved in it. |
| 12:42:53 | 17 | Q.  Was it your perception that the lawsuit interfered with |
| 12:42:55 | 18 | Nextel's business? |
| 12:43:01 | 19 | A.  Yes.  Cease and desist letters were sent and as anybody who |
| 12:43:04 | 20 | gets a letter like that, they get scared. |
| 12:43:07 | 21 | Q.  Did the royalty fees diminish? |
| 12:43:11 | 22 | A.  Well, we were just starting, it was 2018, and I'm not sure |
| 12:43:15 | 23 | when the letters went out, I think it was '19.  So it was first |
| 12:43:19 | 24 | starting, and then it just collapsed basically. |
| 12:43:33 | 25 | Q.  And have you incurred legal fees in this particular |

```
12:43:33   1    proceedings?

12:43:35   2    A.  Tremendous legal fees.

12:43:39   3    Q.  How much have you spent on behalf of yourself?

12:43:40   4    A.  As of beginning of the trial --

12:43:42   5            MR. RIOPELLE:  Objection, relevance.

12:43:43   6            THE COURT:  Hold on.

12:43:45   7            MR. SCHWARTZ:  Goes to damages, Your Honor.

12:43:47   8            MR. RIOPELLE:  Legal fees don't go to damages.  Not for

12:43:49   9    the jury.

12:43:52  10            THE COURT:  True.  I'll sustain the objection as to

12:43:55  11    legal fees.

12:44:04  12            MR. SCHWARTZ:  I don't have any further questions, Your

12:44:05  13    Honor.

12:44:07  14            THE COURT:  Cross-examination?

12:44:14  15                           CROSS-EXAMINATION

12:44:14  16        BY MR. RIOPELLE:

12:44:19  17    Q.  Mr. Kaplan.

12:44:19  18    A.  Yes, sir.

12:44:23  19    Q.  You said that you -- in your experience you had seen that

12:44:28  20    companies had parked trademarks at the USPTO, right?

12:44:30  21    A.  Yes, very common.

12:44:33  22    Q.  And that they weren't using them, right?

12:44:35  23    A.  Through my due diligence, correct.

12:44:41  24    Q.  Right.  But you know that the Nextel mark, as the issue in

12:44:43  25    this case, was renewed in 2015, right?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
12:44:44   1    A.  Yes.
12:44:49   2    Q.  And you know that that was after the date that you claim
12:44:53   3    that Nextel and Sprint abandoned the mark, right?
12:44:54   4    A.  Yes.
12:44:54   5    Q.  So --
12:44:55   6    A.  Two years afterwards.
12:44:58   7    Q.  So they renewed the mark after you claim it was abandoned?
12:45:00   8    A.  Correct.
12:45:04   9    Q.  And you also said -- I think when on the renewal process you
12:45:10  10    said it had to be put on the packaging in a prominent manner,
12:45:10  11    right?
12:45:14  12    A.  Yes.  Very prominent to show the examiner.
12:45:19  13    Q.  Right.  You know that prominent -- the term prominent is not
12:45:22  14    in the statute, right?
12:45:24  15    A.  You're asking me a legal question?
12:45:27  16    Q.  You used the term prominent.
12:45:30  17    A.  It is in the Lanham Act.
12:45:36  18    Q.  In fact, doesn't the statute, when it's talking about use,
12:45:39  19    say can be placed in any manner?
12:45:41  20    A.  In a prominent manner.
12:45:50  21    Q.  Okay.  We'll see if that bears out.  Now, but the fact of
12:45:51  22    the matter is, right --
12:45:52  23    A.  Yes, sir.
12:45:56  24    Q.  Is that the examiners at the trademark office, they review
12:46:00  25    the specimens sent to them, right?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
12:46:06    1    A.  From my experience, they hardly review them, they just --
12:46:07    2    Q.  Wait, wait.
12:46:09    3         MR. SCHWARTZ:  Objection, Your Honor.  Can the witness
12:46:13    4    finish his answer?
12:46:28    5         THE COURT:  Hold on.  Let him answer it and then you
12:46:35    6    can ask him.  The question was the examiners at the trademark
12:46:42    7    office, they review the specimens sent to them, right?
12:46:43    8         THE WITNESS:  Yes, that's correct.
12:46:46    9         THE COURT:  You say yeah, but they don't really.
12:46:49   10         THE WITNESS:  Yes.  From my experience, and I've read
12:46:52   11    articles and blogs about these examiners that most of them are
12:46:55   12    right out of law school first year, and from my experience,
12:46:58   13    these examinations -- there's piles, and they do cursory reviews
12:47:05   14    and just move on.  They don't really examine every one properly.
12:47:08   15         THE COURT:  I'm going to strike that answer.  There is
12:47:11   16    absolutely no basis for that answer.  You know, it sounds like
12:47:14   17    you were looking over their shoulders.  You can't look at
12:47:17   18    Wikipedia or an article and decide that.  I'll strike the
12:47:24   19    answer.  The jury has to disregard that.  You may proceed.  Ask
12:47:28   20    another question.  Or ask a question, any question.
12:47:28   21         BY MR. RIOPELLE:
12:47:30   22    Q.  You've never worked as the Patent and Trademark Office,
12:47:31   23    correct?
12:47:32   24    A.  That's correct.
12:47:35   25    Q.  And you know that the Patent and Trademark Office examiners
```

114

```
12:47:38   1    make the determination whether the specimen submitted is
12:47:39   2    sufficient; is that correct?
12:47:40   3    A.  That's correct.
12:47:45   4    Q.  And you know that in this case, the patent and trademark
12:47:49   5    examiners reviewed the specimens and renewed the Nextel
12:47:49   6    trademark.
12:47:51   7    A.  Correct.
12:47:57   8    Q.  And you were talking about how you went and looked at the US
12:48:01   9    patent and trademark database and you searched for Nextel,
12:48:01  10    right?
12:48:02  11    A.  Yes, sir.
12:48:05  12    Q.  And you saw that the two trademarks that are at issue in
12:48:08  13    this case were both live and valid, correct?
12:48:12  14    A.  No.  I only found -- I didn't know about the sound mark at
12:48:17  15    that time.  I was only looking at Nextel.  The sound mark has no
12:48:23  16    trademark.  But there's no words, so I found -- I found, again,
12:48:29  17    that was three of them per the lawsuit and the one today is the
12:48:32  18    one left on the trademark office.
12:48:33  19    Q.  But to answer my question --
12:48:34  20    A.  Yes, sir.
12:48:37  21    Q.  -- you saw that the Nextel trademark, when you went and
12:48:40  22    looked at the database, was alive and valid, right?
12:48:44  23    A.  Yes, the one for devices, correct.
12:48:57  24        MR. RIOPELLE:  And can we call up Exhibit 5019, Carl?
12:48:57  25        BY MR. RIOPELLE:
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

12:49:02   1    Q.   This is the article you were talking about, correct?

12:49:03   2    A.   Yes, sir.

12:49:06   3    Q.   And this is one of the articles you said that you looked at

12:49:10   4    this and you said this led to your conclusion that they had

12:49:13   5    abandoned the Nextel trademark, right?

12:49:14   6         MR. SCHWARTZ:   Objection, Your Honor.   He never

12:49:18   7    testified to that.   He never even used that word.

12:49:22   8         THE COURT:   Well, now that you've told him, I bet he

12:49:25   9    could probably say that in response to the question.

12:49:25  10    BY MR. RIOPELLE:

12:49:26  11    Q.   Is this one of the articles you reviewed?

12:49:29  12    A.   This is one of the articles I reviewed, yes.

12:49:33  13    Q.   And you reviewed this, I believe you testified, in early

12:49:34  14    2018?

12:49:35  15    A.   Correct.

12:49:39  16    Q.   And this is an article from 2012, right?

12:49:39  17    A.   Correct.

12:49:44  18    Q.   So you made a decision in 2018 based on an article in 2012.

12:49:47  19    A.   Yes, among many other articles, yes sir.

12:49:52  20    Q.   And this article refers to the company as Sprint Nextel,

12:49:53  21    correct?

12:49:58  22    A.   Well, starts off just says Sprint.

12:50:00  23         MR. RIOPELLE:   Can we page down?

12:50:05  24    BY MR. RIOPELLE:

12:50:07  25    Q.   See where it says about Sprint Nextel?

12:50:10  1   A.  Yes, way at the bottom.  Yes, sir.

12:50:15  2   Q.  Now, you've been sitting in this courtroom all week, right?

12:50:16  3   A.  Yes, sir.

12:50:26  4   Q.  And, you know, you applied for the trademark on January 29,

12:50:28  5   2018, right?

12:50:29  6   A.  I believe so.

12:50:34  7   Q.  And when you did that, you knew that Sprint had challenged

12:50:37  8   Mr. Calabrese's right to use the mark, right?

12:50:38  9   A.  At that point, yes.

12:50:44  10   Q.  And you know that Sprint had sent to Mr. Calabrese and his

12:50:48  11   lawyer examples of how Sprint was using the Nextel trademark,

12:50:50  12   right?

12:50:55  13   A.  Examples, no.  I just saw cease and desist letters.

12:51:02  14   Q.  You know that Sprint's lawyers sent to Mr. Calabrese and his

12:51:09  15   lawyer in October of 2017 examples of Sprint using the Nextel

12:51:10  16   mark, don't you?

12:51:14  17   A.  That is not true.  I saw a letter from -- a cease and desist

12:51:16  18   letter.  That's all I saw when I went to Nextel, Inc.

12:51:24  19   Q.  And you know that Mr. Calabrese's lawyer reviewed that, and

12:51:32  20   then sent an e-mail in October of 2017 to Sprint telling them

12:51:36  21   that he, Mr. Calabrese, was stopping to use the mark, right?

12:51:40  22   A.  Yes, Mr. Calabrese was stopped using the mark.

12:51:43  23   Q.  And you know that, so you filed your trademark application

12:51:47  24   on January 29, 2018, right?

12:51:50  25   A.  Yes, under RetroBrands USA.

12:51:56  1    Q.   And you entered into an agreement with Mr. Calabrese on

12:51:58  2    January 30, 2018.

12:52:00  3    A.   Again, I don't have it in front of me, but it's probably

12:52:01  4    right.

12:52:05  5    Q.   And you issued a press release on February 6, 2018, correct?

12:52:06  6    A.   Yes, correct.

12:52:12  7    Q.   And then on February 8, 2018, Mr. Calabrese and his lawyer,

12:52:17  8    working with you, sent an e-mail to my client saying you can

12:52:20  9    close your file on this, we've stopped.

12:52:23  10   A.   Yes, because I took over the trademark application.

12:52:31  11   Q.   At the very beginning of your testimony you talked about how

12:52:33  12   the industry has changed, right?

12:52:34  13   A.   The cellular industry?

12:52:37  14   Q.   No, no.  You were talking about the trademark industry.

12:52:40  15   A.   Yes.  In regards to its many changes with e-commerce and so

12:52:41  16   forth.

12:52:47  17   Q.   Right.  But no matter how much the trademark industry has

12:52:51  18   changed, right, it hasn't changed in such a way that allows you

12:52:55  19   to infringe somebody else's trademarks, does it?

12:53:00  20   A.   No you cannot infringe a trademark that's in use.  Correct.

12:53:01  21        MR. RIOPELLE:  Thank you, Your Honor.

12:53:04  22        THE COURT:  Redirect.

12:53:06  23        MR. SCHWARTZ:  Real brief Your Honor

12:53:06  24                   REDIRECT EXAMINATION

12:53:06  25   BY MR. SCHWARTZ:

| | | |
|---|---|---|
| 12:53:10 | 1 | Q.  Just because a company has a trademark doesn't prevent you |
| 12:53:13 | 2 | from filing an application to challenge it, correct? |
| 12:53:15 | 3 | A.  No.  That's what it's there for. |
| 12:53:17 | 4 | Q.  And that's done every day? |
| 12:53:18 | 5 | A.  That's done every day. |
| 12:53:22 | 6 | Q.  And with regard to Mr. Calabrese, he filed that on his own? |
| 12:53:23 | 7 | A.  Individually, yes. |
| 12:53:25 | 8 | Q.  What was his experience in dealing with the trademark |
| 12:53:26 | 9 | office? |
| 12:53:28 | 10 | A.  In my opinion, none whatsoever. |
| 12:53:30 | 11 | Q.  How many years did you have dealing with the trademark |
| 12:53:31 | 12 | office? |
| 12:53:32 | 13 | A.  Over 25. |
| 12:53:34 | 14 | Q.  And his application was filed back in 2016? |
| 12:53:36 | 15 | A.  Yes. |
| 12:53:39 | 16 | Q.  And I think I heard you say that he abandoned his |
| 12:53:42 | 17 | application and RetroBrands filed their own application, |
| 12:53:42 | 18 | correct? |
| 12:53:45 | 19 | A.  Yes, he withdrew his application. |
| 12:53:46 | 20 |          MR. SCHWARTZ:  No further questions. |
| 12:53:49 | 21 |          THE COURT:  All right.  Thank you, sir.  You are |
| 12:53:50 | 22 | excused. |
| 12:53:50 | 23 |          THE WITNESS:  Thank you, Your Honor. |
| 12:53:52 | 24 |          THE COURT:  All right.  Ladies and gentlemen, as I told |
| 12:53:56 | 25 | you, I have a sentencing at 1:15.  It's probably going to take |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
12:53:59   1   me 30, 45 minutes, so we'll resume at 2:00.

12:54:02   2        Remember, don't talk to anybody, don't look at anybody,

12:54:06   3   don't let anybody look at you.  Go to eat lunch, don't get sick,

12:54:09   4   don't cross traffic in the middle of the block.  Be careful.

12:54:11   5   See you at 2:00.

12:54:18   6        COURT SECURITY OFFICER:  All rise.

12:54:20   7        THE COURT:  If you all could please wait in here and

12:54:23   8   give the jury a few minutes to clear the floor, and I want to

12:54:24   9   ask a question.

12:54:29  10        (Jury out at 12:54 p.m.)

12:54:53  11        THE COURT:  You all can be seated.  Is that door

12:54:55  12   closed, Madame Security Officer?  Now, it is.

12:54:58  13        Okay.  How many more witnesses?

12:54:59  14        MR. SCHWARTZ:  One, Your Honor.

12:55:00  15        THE COURT:  How long, who is it?

12:55:03  16        MR. SCHWARTZ:  It's Mr. Rivera, rebuttal witness.

12:55:05  17        THE COURT:  Okay.

12:55:06  18        MR. SCHWARTZ:  Did you ask how long?

12:55:08  19        THE COURT:  Yeah, I did ask how long.

12:55:10  20        MR. SCHWARTZ:  Under 30 minutes I would think.  Maybe

12:55:11  21   even less.

12:55:12  22        THE COURT:  Didn't we have this discussion as to

12:55:17  23   whether Mr. Rivera was disclosed?  Have we ruled?  Did I rule on

12:55:17  24   that?

12:55:18  25        MR. SCHWARTZ:  You did.
```

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 12:55:20 | 1  | THE COURT:  What did I say?  I don't remember what I      |
| 12:55:24 | 2  | had for breakfast, but I can look it up because Madame court |
| 12:55:26 | 3  | Reporter can tell me.                                     |
| 12:55:27 | 4  | MR. SCHWARTZ:  Yes, Your Honor.  Your ruling was that     |
| 12:55:30 | 5  | he could not be called in our direct case, he can be called as a |
| 12:55:31 | 6  | rebuttal witness.                                         |
| 12:55:33 | 7  | THE COURT:  All right.  What are you rebutting?           |
| 12:55:36 | 8  | MR. SCHWARTZ:  He's rebutting testimony of Ryan          |
| 12:55:40 | 9  | Rabenold concerning the chirp sounds.  He's rebutting the issues |
| 12:55:55 | 10 | of quality of their phones.  He's rebutting issues related to |
| 12:56:00 | 11 | that video that was played by the Boston Nextel people that |
| 12:56:03 | 12 | claim certain things concerning the phones.  I'm sticking simply |
| 12:56:08 | 13 | to rebuttal, Your Honor.                                  |
| 12:56:11 | 14 | MR. RIOPELLE:  That's not rebuttal.                       |
| 12:56:12 | 15 | MR. SCHWARTZ:  Your Honor --                              |
| 12:56:15 | 16 | MR. RIOPELLE:  They had that information.                 |
| 12:56:17 | 17 | THE COURT:  Doesn't fit to me the rebuttal --            |
| 12:56:19 | 18 | MR. RIOPELLE:  I will just remind Your Honor, as a        |
| 12:56:25 | 19 | noted jurist said in the Lips versus City of Hollywood case -- |
| 12:56:26 | 20 | THE COURT:  Did I say that?                               |
| 12:56:26 | 21 | MR. RIOPELLE:  Yes, you did.                              |
| 12:56:28 | 22 | THE COURT:  Okay.                                         |
| 12:56:30 | 23 | MR. RIOPELLE:  You said --                                |
| 12:56:33 | 24 | THE COURT:  Usually where it says noted very handsome     |
| 12:56:36 | 25 | jurist it would have been better.  Go ahead.              |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
12:56:37   1          MR. RIOPELLE:  I didn't want to be pandering, Your
12:56:38   2   Honor.
12:56:41   3          THE COURT:  This trial has driven me over the edge.  I
12:56:46   4   told my clerk yesterday that I was going to quit being a judge
12:56:48   5   and become a male model.  Go ahead.
12:56:51   6          MR. RIOPELLE:  It says a nondisclosed witness could not
12:56:55   7   be considered a rebuttal witness that would offer testimony that
12:56:58   8   could have been presented in case in chief.
12:56:59   9          THE COURT:  Yeah.  I mean, this stuff that you're
12:57:01  10   rebutting him on is stuff that you had.  There isn't anything
12:57:03  11   new in that.
12:57:04  12          MR. SCHWARTZ:  Your Honor, the witnesses testified as
12:57:08  13   to the lack of quality of the phones.  This one witness that was
12:57:12  14   in the box, Mr. Rabenold, said he heard the phone emitting the
12:57:18  15   actual Nextel chirp.  We intend to rebut that particular issue.
12:57:19  16   If you'd like me to keep --
12:57:23  17          THE COURT:  You got him that says that he didn't hear
12:57:25  18   the chirp?
12:57:27  19          MR. SCHWARTZ:  We have the phone, Your Honor, that was
12:57:29  20   on that video and --
12:57:31  21          THE COURT:  You can introduce it with somebody else.
12:57:34  22   You can do whatever you want with it, but this man is not a
12:57:37  23   witness unless he's a rebuttal witness, and rebuttal is
12:57:41  24   something that you didn't know about that came up that he can --
12:57:44  25   that he's the only one that can rebut.
```

```
12:57:45   1              MR. SCHWARTZ:  Your Honor, I didn't know that this
12:57:50   2     investigator from three years earlier, who came out of the blue,
12:57:54   3     his report was from 2018, and then in front of this jury he says
12:57:57   4     he watched a You Tube video and he believes that the sound
12:58:01   5     played on the You Tube video as the gentlemen were reviewing the
12:58:08   6     new Nextel phones emitted the chirp Nextel.  I think I'm
12:58:10   7     entitled to rebut that issue.
12:58:12   8              THE COURT:  It seems to me like you could play the
12:58:14   9     thing and the jury's the one that decides that.  That's not
12:58:15  10     rebuttal.
12:58:17  11              What else you got?
12:58:19  12              MR. SCHWARTZ:  Your Honor, he's my final witness and if
12:58:20  13     I'm --
12:58:22  14              THE COURT:  Well, he might have been -- the one you
12:58:26  15     just had might have been your final witness, because from what
12:58:31  16     you've told me so far, I'm not letting him testify to that.
12:58:43  17              MR. SCHWARTZ:  My co-counsel believes that the video
12:58:48  18     that was shown and played for Mr. Rabenold was produced outside
12:58:50  19     the scope of the discovery period, and so I think we should have
12:58:53  20     an opportunity to rebut that.
12:58:55  21              THE COURT:  Are you sure about that?  I mean, I don't
12:58:58  22     know.  It seems to me that if it had been, somebody would have
12:59:04  23     objected to it.  I have no idea.  I don't know what was
12:59:05  24     disclosed.
12:59:15  25              MR. RIOPELLE:  If I recall, Your Honor, first of all,
```

12:59:18  1   the chirp was discussed in Mr. Rabenold's report which was given

12:59:22  2   to them three years ago.  The video is made by one of their

12:59:29  3   dealers, and Mr. Rabenold testified on the stand that that video

12:59:34  4   had come out in February of 2022, there was no objection to it.

12:59:35  5        THE COURT:  That's right.  I remember the video you're

12:59:36  6   talking about.

12:59:39  7        MR. RIOPELLE:  There was no objection, no comment about

12:59:40  8   it at all.

12:59:41  9        THE COURT:  Yeah.  No.

12:59:42  10        MR. SCHWARTZ:  But Your Honor, the report stated that

12:59:47  11   the phone did not make the chirp sound.  What the Plaintiff did

12:59:50  12   is they brought him back three years later simply to offer him

12:59:54  13   to listen to a You Tube video which we had no idea what he was

12:59:58  14   going to say, and then in order to prejudice the jury, he says

1:00:02  15   oh, I think I heard the Nextel phone emit the chirp sound.

1:00:06  16        THE COURT:  I thought that his testimony was that the

1:00:11  17   representative at the show told him it did not emit the chirp.

1:00:14  18        MR. SCHWARTZ:  No, what he said, Your Honor, is on the

1:00:19  19   very first purchase in 2018 he called up Northeast radio, asked

1:00:23  20   them about the phones, and he asked them about oh, does it play

1:00:27  21   the Nextel chirp and the gentleman said no, it doesn't play the

1:00:28  22   Nextel chirp and that's --

1:00:30  23        THE COURT:  That's what I just said.

1:00:33  24        MR. SCHWARTZ:  That was in his report.  Then three

1:00:37  25   years later, having nothing to do with his investigation or

1:00:41  1    anything he's done, he comes into this court and he says oh, I

1:00:46  2    watched this You Tube video and I think I heard the --

1:00:49  3            THE COURT:  Oh okay, the You Tube video.  But what he

1:00:53  4    said was that he didn't try to listen to it, he didn't even turn

1:00:56  5    it on if I remember correctly.  That he asked the person and

1:00:59  6    that the person said it did not have the chirp.

1:01:02  7            MR. SCHWARTZ:  That was his first part of his testimony

1:01:07  8    concerning his written report from 2018.  Then fast forward

1:01:11  9    three years or four years -- actually to only you said a month

1:01:16  10   ago, he's, I guess, on his couch watching a You Tube video, or

1:01:20  11   he was told to watch it by counsel from the Plaintiff, and then

1:01:24  12   he miraculously -- he's not an audio expert, he says oh, they

1:01:27  13   were reviewing the phones and I think it emitted the Nextel

1:01:28  14   chirp and I think --

1:01:30  15           THE COURT:  You want to put Mr. Garcia (sic) on to say

1:01:33  16   that's not the Nextel chirp?

1:01:36  17           MR. SCHWARTZ:  I have the phone, the model that's in

1:01:39  18   the video and he can play the phone.

1:01:41  19           THE COURT:  Anybody can do that.  Any of your witnesses

1:01:45  20   that you've listed could do that.  He's not going to do it, no.

1:01:49  21   That's a backwards way of getting him on the stand, and I said

1:01:53  22   no, that he can't, unless he's a rebuttal witness.  But he's got

1:01:56  23   to have something that he can rebut that isn't -- I mean, you

1:01:59  24   can play it for the jury, let them decide whether it's the

1:02:00  25   Nextel chirp.

125

1:02:03   1          MR. KERNELL:  Your Honor, if I could point out in the

1:02:07   2     Exhibit 93 which is Mr. Rabenold's report?

1:02:07   3          THE COURT:  Yeah.

1:02:13   4          MR. KERNELL:  This is on -- it starts on Page 3 of his

1:02:17   5     report and goes into Page 4, and he states that during the

1:02:20   6     evidence-handling process, I noted the following details.  This

1:02:26   7     is after he received the phones, and now he's putting in his own

1:02:30   8     details, not opinions of others, nothing else.  He says there's

1:02:36   9     a packing slip, a radio clip, there's a black and yellow Nextel

1:02:41  10     sticker.  Then at the top of Page 4, the first bullet point, he

1:02:45  11     states when you turn the radios on a noise is emitted, but it

1:02:49  12     doesn't appear to be the Nextel chirp.

1:02:51  13          THE COURT:  That's what I said.

1:02:53  14          MR. KERNELL:  No.  So he said that is Mr. Rabenold

1:02:57  15     saying that in his report.  We had no idea that he was going to

1:03:03  16     be up here testifying as an expert now that says oh, a month in

1:03:08  17     -- a video that came out a month or two ago there's now a Nextel

1:03:14  18     chirp in that video.  We had no way of knowing that.  That he

1:03:19  19     was going to testify to something that he directly contradicted.

1:03:22  20          THE COURT:  This is about the third version of what he

1:03:25  21     has said that I'm listening to now, and I'm getting a little

1:03:27  22     tired of it.

1:03:28  23          MR. KERNELL:  This is directly out of his report.

1:03:31  24          THE COURT:  I understand that.  I was told -- no, the

1:03:34  25     record will be the record.  No.  Not for that.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 1:03:40 | 1 | What else you got?  All right.  Tell me at 2:00.  I got |
| 1:03:47 | 2 | to get ready for my sentencing. |
| 1:03:52 | 3 | And I want to tell you that I really don't think I'm |
| 1:03:55 | 4 | going to have court tomorrow.  Sorry.  You're going to have to |
| 1:04:01 | 5 | fly home and appease your wife somehow.  Buy her a Bentley |
| 1:04:07 | 6 | convertible.  Partners in big firms always have many.  You can |
| 1:04:10 | 7 | do that.  No, I just don't think I can do it.  For my reasons. |
| 1:04:16 | 8 | It is Good Friday, and I'm going to be doing other things than |
| 1:04:18 | 9 | this.  Sorry. |
| 1:04:20 | 10 | MR. SCHWARTZ:  Just for the Court's scheduling and |
| 1:04:24 | 11 | everything, and we can announce when we get back, but we're |
| 1:04:28 | 12 | leaning -- you know, that would have been our last witness so we |
| 1:04:29 | 13 | can come back at lunch -- |
| 1:04:32 | 14 | THE COURT:  And if so, then we'll let the jury go until |
| 1:04:35 | 15 | Monday and we'll spend the afternoon talking about instructions |
| 1:04:41 | 16 | and closing out the final arguments, and bring them back because |
| 1:04:43 | 17 | otherwise, even if we do, I don't want them to have the pressure |
| 1:04:47 | 18 | of wanting to go home on a holiday weekend if they feel like |
| 1:04:51 | 19 | they want to keep deliberating.  I don't want to put the |
| 1:04:55 | 20 | pressure on them.  It's a Christian and Jewish holiday coming |
| 1:04:58 | 21 | up, and I don't really feel like I want to put that kind of |
| 1:05:02 | 22 | pressure on them.  All right?  Tell your wife I'm sorry.  I'm |
| 1:05:05 | 23 | not that sorry, but I'm sorry. |
| 1:05:07 | 24 | All right.  We'll be in recess. |
| 1:05:07 | 25 | (Lunch recess) |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1:05:07   1              (See Volume 6 for continuation)

1:05:07   2                    C E R T I F I C A T E
1:05:07   3    I certify that the foregoing is a correct transcript from the
               record of proceedings in the above-entitled matter.

1:05:07   4    4/14/2022              /s/ Dawn M. Savino, R.P.R., C.R.R.
1:05:07   5    Date                   DAWN M. SAVINO, R.P.R., C.R.R.

1:05:07   6                         I N D E X

1:05:07   7                         WITNESSES

1:05:07   8    ALL WITNESSES:                               PAGE:

1:05:07   9    For Defense:

1:05:07  10      Stephen Calabrese:
                   Deposition read into the record by       17:2

1:05:07  11      Melissa Jobe:
1:05:07  12        Deposition read into the record by       61:17

1:05:07  13      Jeffrey Kaplan:
                   Direct Examination by Mr. Schwartz       92:21
1:05:07  14        Cross-Examination by Mr. Riopelle        111:15
                   Redirect Examination by Mr. Schwartz     117:24

1:05:07  15                         EXHIBITS

1:05:07  16    None

1:05:07  17

         18

         19

         20

         21

         22

         23

         24

         25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**