1              **UNITED STATES DISTRICT COURT**
               **SOUTHERN DISTRICT OF FLORIDA**
2                      **MIAMI DIVISION**
               **CASE NO.  18-cv-60788-JEM**

3

4    **SPRINT COMMUNICATIONS, INC.,**

5          Plaintiff/Counterclaim Defendant,

6          vs.

7                                              Miami, Florida
                                               April 14, 2022
8    **STEPHEN CALABRESE,** as an individual,    Pages 1-51
     **NEXTEL, INC.,** d/b/a **NEXTEL WORLDWIDE,**   2:04 p.m. - 3:27 p.m.
9    **RETROBRANDS USA LLC,**
     **JEFFREY KAPLAN,** as an individual, and
10   **NEXTEL WORLDWIDE MOBILE, INC.,**

11         Defendants/Counterclaimants.
     _____

12
                   **TRANSCRIPT OF JURY TRIAL**
13                         **VOLUME 6**
               **BEFORE THE HONORABLE JOSE E. MARTINEZ**
14                **UNITED STATES DISTRICT JUDGE**

15   **APPEARANCES:**

16   **FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:**
                         *McGuireWoods, LLP*
17                       BY:  **BRIAN C. RIOPELLE, ESQ.**
                         BY:  **LUCY J. WHEATLEY, ESQ.**
18                       BY:  **AMANDA L. DeFORD, ESQ.**
                         800 East Canal Street
19                       Richmond, Virginia 23219

20   **FOR THE DEFENDANTS/COUNTERCLAIMANTS:**
                         *Erickson Kernell IP*
21                       BY:  **JAMES J. KERNELL, ESQ.**
                         8900 State Line Road
22                       Suite 500
                         Leawood, Kansas 66206
23
                         *Lee & Amtzis, PL*
24                       BY:  **WAYNE SCHWARTZ, ESQ.**
                         5550 Glades Road
25                       Boca Raton, Florida 33431

                **PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
                     **TRANSCRIPT PRODUCED BY COMPUTER**

2

| | | |
|---|---|---|
| | 1 | **REPORTED BY:**      **DAWN M. SAVINO, R.P.R., C.R.R.** |
| | | **Official Federal Court Stenographer** |
| | 2 | **400 N. Miami Avenue, 10S03** |
| | | **Miami, Florida  33128** |
| | 3 | **Telephone:  305-523-5598** |

2:04:53  4              (Jury in at 2:04 p.m.)

2:06:59  5              (Court called to order)

2:07:05  6              THE COURT:  You may be seated.  All right.  Next?

2:07:08  7              MR. SCHWARTZ:  At this time Your Honor, the Defendants

2:07:09  8  rest their case.

2:07:14  9              THE COURT:  All right.  What's next?  Do you have a

2:07:15  10  rebuttal case?

2:07:17  11              MR. RIOPELLE:  We would have a motion at this point,

2:07:17  12  Your Honor.

2:07:23  13              THE COURT:  Okay.  Guess what?  Go back into the jury

2:07:26  14  room because this is going to be a legal argument that's going

2:07:29  15  to take a while.

2:07:37  16              (Jury out at 2:07 a.m.)

2:07:39  17              THE COURT:  But they've got to do that in front of you.

2:07:43  18  That's why I had to call you back.

2:07:56  19              You may be seated.  Okay.  Door's closed.  You may

2:07:59  20  proceed.

2:08:12  21              MS. WHEATLEY:  Your Honor, pursuant to Rule 5082,

2:08:16  22  Plaintiff Sprint moves for judgment as a matter of law on the

2:08:19  23  following issues and claims.  I'd like to start with Defendants'

2:08:23  24  claim for reverse domain name hijacking, that is Count 10 Of

2:08:27  25  Defendants's amended counterclaims.  An essential element of

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 2:08:33  | 1  | reverse domain name hijacking is that the Defendants had a             |
| 2:08:33  | 2  | domain name that was suspended, disabled or transferred away           |
| 2:08:37  | 3  | from Defendants. Defendants did not put forth any evidence             |
| 2:08:42  | 4  | whatsoever that any domain name belonging to Defendants was            |
| 2:08:46  | 5  | suspended, disabled or transferred away.  That is a requirement        |
| 2:08:51  | 6  | to maintain that claim under statute under 15 USC Section 1114         |
| 2:08:58  | 7  | subsection two, subsection D, subsection little I, subsection          |
| 2:09:03  | 8  | Roman numeral two, subsection V.                                       |
| 2:09:07  | 9  | THE COURT:  All right.  Response, please?  Why don't                   |
| 2:09:11  | 10 | you do it from your table.                                             |
| 2:09:12  | 11 | MS. WHEATLEY:  Do you want me to --                                    |
| 2:09:15  | 12 | THE COURT:  I don't care.  You're there, it's your                     |
| 2:09:15  | 13 | motion.                                                                |
| 2:09:17  | 14 | MR. SCHWARTZ:  We have no opposition to that motion.                   |
| 2:09:20  | 15 | THE COURT:  All right.  So that's granted.                            |
| 2:09:24  | 16 | MS. WHEATLEY:  Next, Your Honor, Defendants alleged two                |
| 2:09:28  | 17 | claims for tortious interference.  One for tortious interference       |
| 2:09:34  | 18 | with contract which is Count 5, and one for tortious                   |
| 2:09:39  | 19 | interference with an advantageous relationship with Count 6.          |
| 2:09:43  | 20 | Defendants put on no evidence of any contracts, and they put on        |
| 2:09:47  | 21 | no evidence of any specific business relationships.  They also         |
| 2:09:49  | 22 | obviously put on no evidence of breach since they put on no            |
| 2:09:53  | 23 | evidence of any contracts.  Breach of contract is an essential         |
| 2:09:57  | 24 | element for tortious interference with contract.                       |
| 2:10:01  | 25 | With respect to the advantageous business relationship                 |

| | |
|---|---|
| 2:10:04 1 | expectancy, they did not put in evidence of any specific |
| 2:10:09 2 | business relationships were interfered with.  Instead, at most, |
| 2:10:14 3 | they generally alleged possible future lost relationships.  But |
| 2:10:18 4 | there was no specific testimony whatsoever and certainly no |
| 2:10:20 5 | specific testimony as to damages. |
| 2:10:21 6 | THE COURT:  Response? |
| 2:10:23 7 | MR. SCHWARTZ:  Your Honor, the Court has already ruled |
| 2:10:27 8 | on summary judgment on Counts 5 and 6 in our favor, and |
| 2:10:30 9 | indicated that the only issue for the jury was to determine the |
| 2:10:33 10 | Plaintiff's defense as to whether or not the interference was |
| 2:10:38 11 | unjustified.  That was dated 1-10-2022. |
| 2:10:40 12 | THE COURT:  Yeah, but you still have to present |
| 2:10:42 13 | evidence in front of the jury. |
| 2:10:45 14 | MR. SCHWARTZ:  In light of that, we -- our position is |
| 2:10:50 15 | that we presented evidence sufficient to support the claim of |
| 2:10:56 16 | the interference.  There was testimony by a number of witnesses |
| 2:11:02 17 | as to the cease and desist, the damages caused by Mr. Kaplan, he |
| 2:11:06 18 | mentioned the lost of distributors.  I believe we've put forth |
| 2:11:13 19 | sufficient evidence to support our prima facie case to send to |
| 2:11:15 20 | it the jury. |
| 2:11:19 21 | MS. WHEATLEY:  Your Honor, as you said, at summary |
| 2:11:22 22 | judgment the standards are not the same but they still have to |
| 2:11:24 23 | put forward evidence at trial.  There were no contracts put on |
| 2:11:28 24 | the record for the tortious interference with contract claim. |
| 2:11:31 25 | THE COURT:  What contract are we talking about? |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

2:11:35   1              MS. WHEATLEY:  There were none put on the record.

2:11:37   2              THE COURT:  I'm asking.  What contract are we talking

2:11:37   3      about.

2:11:40   4              MR. SCHWARTZ:  The contracts between Nextel and its

2:11:43   5      distributors, and you have the contract between RetroBrands and

2:11:49   6      Nextel and that certainly was interfered with.

2:11:52   7              MS. WHEATLEY:  Your Honor, they have never alleged

2:11:58   8      interference between Nextel, Inc. and RetroBrands, nor can they

2:12:04   9      since they were acting as licensor/licensee.

2:12:11  10              THE COURT:  Well, I don't see any evidence that they've

2:12:15  11      proven that any third parties entered into business or

2:12:18  12      contractual relationship, or that Sprint intentionally

2:12:22  13      interfered with those relationships, nor that the Defendant

2:12:27  14      suffered damages as a result of Sprint's interference.  The only

2:12:31  15      thing that Defendants proved was that Sprint knew that

2:12:36  16      Defendants had relationships with third parties, and there's no

2:12:40  17      evidence through testimony, or otherwise, that would support a

2:12:44  18      jury finding that the Defendants had business or contractual

2:12:49  19      relationships that were interfered with.  Therefore, I find that

2:12:53  20      there is a lack of total evidentiary support for any of the

2:12:56  21      three elements that are necessary for that claim, so I'll

2:12:58  22      dismiss that claim.

2:12:59  23              Next?

2:13:01  24              MS. WHEATLEY:  Next Your Honor, Defendants alleged a

2:13:07  25      common law unfair competition claim as Count 9.  There are

6

2:13:11    1    several concerns with this claim.  First, in the joint pretrial
2:13:17    2    order, they characterized the claim on Page 20 of the joint
2:13:21    3    pretrial order, disputed issue 17, as being based on falsely
2:13:25    4    informing the public and Defendants' distributors and customers
2:13:28    5    that Defendants are counterfeiters and thieves of the Nextel
2:13:29    6    mark.
2:13:32    7            First, we would argue this is simply restating the
2:13:37    8    defamation claim that was dismissed at summary judgment.
2:13:39    9            Next, we would point out that this does not in any way
2:13:43   10    meet the elements of a claim for common law unfair competition
2:13:48   11    under Florida law, which must allege deceptive or fraudulent
2:13:52   12    conduct of a competitor and a likelihood of consumer confusion.
2:13:56   13            And finally, we would note that their claim really
2:13:59   14    seems to be a claim of trademark misuse to the extent it is
2:14:03   15    based on cease and desist letters.  And again, those cease and
2:14:08   16    desist letters are not in evidence.  And this court, in Gapardis
2:14:11   17    Health and Beauty v Nouvelle Parfumerie Gandour, 2008 Westlaw,
2:14:19   18    1333426, found that there is no independent cause of action as
2:14:23   19    an unfair competition claim for trademark misuse.  The Middle
2:14:27   20    District of Florida found the same thing in Whitney Information
2:14:35   21    Network V Gagnon, 553 F Supp 2d, 1208, 1212 Middle District of
2:14:37   22    Florida, 2005.
2:14:46   23            THE COURT:  Counsel?  Response?
2:15:12   24            MR. SCHWARTZ:  Our response would be that we believe we
2:15:15   25    put forth sufficient evidence to send that issue to the jury,

7

| | | |
|---|---|---|
| 2:15:17 | 1 | Your Honor. |
| 2:15:23 | 2 | THE COURT:  I do not believe that there's sufficient |
| 2:15:26 | 3 | evidence for this claim to go to the jury.  I'll grant the |
| 2:15:28 | 4 | motion. |
| 2:15:30 | 5 | Next. |
| 2:15:33 | 6 | MS. WHEATLEY:  Your Honor, since Defendants' tortious |
| 2:15:39 | 7 | interference claims and common law unfair competition claims |
| 2:15:42 | 8 | have been dismissed, we would also say that there are no damages |
| 2:15:44 | 9 | claims left for Defendants that can go to the jury, including |
| 2:15:48 | 10 | their claim for punitive damages which would have to be based on |
| 2:15:53 | 11 | some underlying tort, and those are now gone. |
| 2:15:56 | 12 | THE COURT:  Given my rulings, what is the basis for any |
| 2:16:02 | 13 | money damages claim to go to the jury for the Defendants?  I |
| 2:16:05 | 14 | know you disagree with my rulings, but based on my rulings, what |
| 2:16:12 | 15 | is it?  I don't think you've got anything left. |
| 2:16:13 | 16 | MR. SCHWARTZ:  We're stuck with your rulings, Your |
| 2:16:14 | 17 | Honor. |
| 2:16:17 | 18 | THE COURT:  Okay.  I'll grant that.  I don't think |
| 2:16:21 | 19 | there's money damages to go.  That will be dealt with in the |
| 2:16:28 | 20 | instructions and the judgment or the verdict form. |
| 2:16:32 | 21 | MS. WHEATLEY:  Next Your Honor, we come to Defendants' |
| 2:16:37 | 22 | fraud on the USPTO claim with respect to the 1,884,244 |
| 2:16:46 | 23 | registration.  So the elements for fraud, the first thing to |
| 2:16:49 | 24 | note is that Defendants had to prove fraud by clear and |
| 2:16:52 | 25 | convincing evidence, and any doubts as to the evidence must be |

2:16:56   1    resolved against Defendants.  Elements are that the challenged

2:17:01   2    statement was a false representation regarding a material fact,

2:17:03   3    the person making the representation knew that the

2:17:08   4    representation was false, and intent to deceive the USPTO

2:17:14   5    reasonable reliance on the misrepresentation and damage

2:17:16   6    proximately resulting from such reliance.

2:17:23   7            So there has -- as an initial matter, Your Honor, the

2:17:29   8    challenged renewal, the 2015 renewal, the 244 registration is

2:17:34   9    not an evidence.  Ms. Jobe's testimony regarding that renewal

2:17:39   10   was consistent that she did not commit fraud, she submitted what

2:17:45   11   she believed to be a genuine box.  That testimony has been

2:17:49   12   supported by production of that box into evidence as Exhibit 38

2:17:53   13   at trial, and Mr. Shaughnessy's unrebutted testimony that that

2:17:59   14   precise product was sold between 2013 and 2019.  So there's

2:18:03   15   simply no record evidence here to support that anyone

2:18:07   16   intentionally deceived the USPTO with respect to the specimen of

2:18:11   17   use that was submitted.

2:18:13   18            THE COURT:  Counsel?

2:18:16   19            MR. KERNELL:  Your Honor, with the respect to fraud on

2:18:20   20   the trademark office, there was sufficient evidence produced in

2:18:27   21   Ms. Jobe's deposition testimony.  She said that this was a box

2:18:32   22   with a 2013 date.  The box was empty when she got it.  She did

2:18:37   23   not verify that that particular device was, in fact, being sold

2:18:43   24   at the time.  She just said Sonim Strikes are, in general, being

2:18:48   25   sold, but not that particular one, nor with the Nextel trademark

2:18:51  1   on it.  The same thing with Mr. Shaughnessy's deposition

2:18:57  2   testimony.  Or his testimony.  He did not establish that any of

2:19:01  3   those devices that had that label on it, the Nextel on it were

2:19:06  4   in fact being sold in that time frame.  There is no other

2:19:11  5   evidence other than a box that is dated 2013 that Ms. Jobe said

2:19:16  6   was empty.  So I think that does raise and it does -- there is a

2:19:21  7   question of fact there that the jury needs to decide.

2:19:23  8           MS. WHEATLEY:  Your Honor, Ms. Jobe's testimony, which

2:19:29  9   Defendants played, was when they asked her do you know why a

2:19:33  10  specimen from 2013 was being used for Section 8 and 9 in the

2:19:39  11  declaration in 2015?  She responded it was not a 2013 box, it

2:19:43  12  was a current box in 2015 when I filed it.  The copyright notice

2:19:47  13  just hadn't been changed since 2013 and I didn't catch it, but

2:19:50  14  this box was directly from our, you know, product team of what

2:19:52  15  was currently being offered in 2015.

2:19:55  16          Did you verify this box or this phone with the 2013 box

2:19:59  17  was actually being sold was in retail stores?  It was not in

2:20:00  18  retail stores.

2:20:02  19          Where was it?  It was available for purchase by

2:20:04  20  businesses.

2:20:10  21          THE COURT:  Strangely enough among all of this stuff,

2:20:12  22  that's the one bit of testimony that I remember hearing or

2:20:17  23  reading or being read to.  I think that she did say that, but

2:20:23  24  how does that resolve the matter?  If they don't believe her, I

2:20:28  25  mean, it looks awfully weak to me, but it does seem to me that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | |
|---|---|
| 2:20:30 | 1 |
| 2:20:31 | 2 |
| 2:20:33 | 3 |
| 2:20:38 | 4 |
| 2:20:42 | 5 |
| 2:20:46 | 6 |
| 2:20:51 | 7 |
| 2:20:59 | 8 |
| 2:21:04 | 9 |
| 2:21:08 | 10 |
| 2:21:10 | 11 |
| 2:21:11 | 12 |
| 2:21:13 | 13 |
| 2:21:18 | 14 |
| 2:21:19 | 15 |
| 2:21:20 | 16 |
| 2:21:23 | 17 |
| 2:21:26 | 18 |
| 2:21:30 | 19 |
| 2:21:33 | 20 |
| 2:21:35 | 21 |
| 2:21:37 | 22 |
| 2:21:43 | 23 |
| 2:21:44 | 24 |
| 2:21:45 | 25 |

they have something there.  You don't have anything there at all?

          MS. WHEATLEY:  No, Your Honor, because they base burden to prove by clear and convincing evidence that Ms. Jobe had an intent to deceive the USPTO and that the representation was false.  They have not put forth any evidence whatsoever as to Ms. Jobe's intent to deceive the US USPTO.  In fact, Mr. Kernell just argued that at most she asked for a box, it didn't have a phone in it, and she didn't disbelieve her product team that it was in fact a genuine box.  That could no case arise to an intent to deceive.

          THE COURT:  Counsel?

          MR. KERNELL:  Your Honor, that's exactly the intent to deceive.  She knew the box was empty.  She knew it didn't have a phone in it.

          THE COURT:  So what?

          MR. KERNELL:  That is the intent, and now she's using that as a specimen making the representation under declaration that that product was in fact being sold at the time.

          THE COURT:  The product that was in that box?

          MR. KERNELL:  There was no product in the box.

          THE COURT:  She had to send them the product itself.  The product that goes into that box was being sold at that time.

          MR. KERNELL:  Well --

          THE COURT:  Isn't that enough?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

2:21:46  1          MR. KERNELL:  No, that's not enough.

2:21:47  2          THE COURT:  Why.

2:21:49  3          MR. KERNELL:  Because she did not verify that there was

2:21:54  4   in fact a product.  Anybody can print a box.  You can have a box

2:21:57  5   sitting around, but to show that that is actually being sold --

2:22:03  6          THE COURT:  Anybody can send a nonexistent or an old

2:22:08  7   instrument to them too, but she said this box represents the

2:22:13  8   stuff that was in it and we were selling it at that time.  The

2:22:16  9   fact that it says 2013 doesn't mean anything, because some of

2:22:22  10  the boxes had that, some of them had 2014, some of them had

2:22:24  11  whatever the current date was.

2:22:25  12         MR. KERNELL:  Your Honor, she also testified that the

2:22:32  13  shelf life of those phones are less than one year typically and

2:22:34  14  that she --

2:22:35  15         THE COURT:  Absolutely not.

2:22:36  16         MR. KERNELL:  She did.

2:22:39  17         THE COURT:  You guys misstate that evidence really

2:22:44  18  easily.  What she said was that cellphones are -- have a shelf

2:22:48  19  life of one year.  These phones have a shelf life that is

2:22:52  20  substantially longer.  That's what she said.

2:22:54  21         MS. WHEATLEY:  Precisely, Your Honor.  Ms. Jobe did not

2:22:58  22  testify these only had a shelf life of one year, and

2:23:02  23  Mr. Shaughnessy testified that these phones actually had a quite

2:23:02  24  --

2:23:04  25         THE COURT:  What color is the sky in the world that

2:23:08  1    you're quoting from, because that's clearly not what she said.

2:23:12  2    I mean, I don't remember a lot of stuff like what I had for

2:23:15  3    breakfast, but I certainly remember the testimony that was read

2:23:19  4    not all that long ago and you were reading it.  Or you were

2:23:22  5    reading the questions.  She did not say that the shelf life of

2:23:28  6    the equipment that was represented by this box was one year.

2:23:30  7    Absolutely not.

2:23:33  8          MR. KERNELL:  It was in the context of when we were

2:23:37  9    talking about the box.  I asked her what was -- what's the shelf

2:23:42  10   life, the typical shelf life and it's in that same -- it's

2:23:47  11   within that same page I believe, if I can get the testimony back

2:23:50  12   up.

2:23:54  13         THE COURT:  All right.  Let's find that.  I'm curious.

2:23:57  14   What page are we talking about?

2:23:58  15         MR. KERNELL:  I believe it's --

2:24:00  16         THE COURT:  I don't believe that.

2:24:04  17         MS. WHEATLEY:  Yes, Your Honor.  I can read starting at

2:24:11  18   Page 80 where it's talking about shelf life.  Takes a little

2:24:12  19   bit, but copyright notice on the Sonim devices, is that

2:24:14  20   something that Sprint directs Sonim to change or --

2:24:14  21         THE COURT REPORTER:  Can you slow down?

2:24:18  22         THE COURT:  Slow down, yes.  No nervous breakdown for

2:24:19  23   my court stenographer.

2:24:22  24         MS. WHEATLEY:  I apologize.  Is that something that

2:24:26  25   Sprint directs Sonim to change or is that something Sonim

| | | |
|---|---|---|
| 2:24:30 | 1 | changes on its own?  Package is done collaboratively with the |
| 2:24:34 | 2 | Sonim.  Both teams would have reviewed it.  So this is a device |
| 2:24:38 | 3 | that is now -- it's not a 2014 device, it's not a 2015 device, |
| 2:24:43 | 4 | or it doesn't have a 2014 copyright.  It doesn't have a 2015 |
| 2:24:44 | 5 | copyright. |
| 2:24:48 | 6 | How often does Sprint and Sonim team review these |
| 2:24:52 | 7 | labels, and that's Mr. Kernell's question.  It says typically |
| 2:24:53 | 8 | the lifespan of a device does not span multiple years.  We |
| 2:24:57 | 9 | typically review the packaging when a device first comes out and |
| 2:25:01 | 10 | it pretty much stays that way until the end of life.  So it will |
| 2:25:05 | 11 | remain 2013 copyright notice on it until the end -- to the end |
| 2:25:07 | 12 | of life. |
| 2:25:10 | 13 | So Ms. Jobe was talking about do they change the |
| 2:25:15 | 14 | copyright date.  And it's important to note that Ms. Jobe was |
| 2:25:17 | 15 | mistaken as to the meaning of the copyright date here.  The |
| 2:25:22 | 16 | copyright date is required to be the date of publication.  So if |
| 2:25:27 | 17 | the text on the box does not change, it will not change. |
| 2:25:29 | 18 | MR. KERNELL:  Your Honor, there's no testimony as to |
| 2:25:34 | 19 | what Ms. Jobe's understanding of copyright law is and she is an |
| 2:25:37 | 20 | intellectual property attorney, I'm sure she is very well-versed |
| 2:25:41 | 21 | in copyright law.  This is very specifically talking about the |
| 2:25:45 | 22 | Sonim XP Strike box and when did they change.  And we asked, you |
| 2:25:49 | 23 | know, that she reviews these boxes, and that -- in that same |
| 2:25:53 | 24 | context it's saying that they have less than a year of shelf |
| 2:25:56 | 25 | life. |

2:25:57  1          THE COURT:  Well --

2:25:59  2          MS. WHEATLEY:  She was clearly talking -- the question

2:26:03  3   was about the copyright notice which has to do with the text on

2:26:06  4   the box.  When that is changed.

2:26:10  5          MR. KERNELL:  It's talking about a date that is printed

2:26:18  6   on these boxes.  I believe that is sufficient evidence to bring

2:26:20  7   this forward to the jury.

2:26:21  8          THE COURT:  What she said was the devices don't

2:26:26  9   typically last multiple years.  These are rare devices.  Typical

2:26:30  10  life span for a device is less than a year.

2:26:32  11         And do you know if this is still being sold?  We have

2:26:36  12  Sonim devices that are currently for sale.  There are multiple

2:26:39  13  models, and it's very specific and she's not sure that it's

2:26:43  14  still currently for sale.

2:26:45  15         MR. KERNELL:  Your Honor, I believe the Court is

2:26:49  16  supposed to consider all evidence in light or favorable in light

2:26:52  17  of the nonmoving party, and I believe that there is an inference

2:26:55  18  here, these are factual issues for the jury to decide whether or

2:26:56  19  not she was --

2:26:58  20         THE COURT:  All right.  I'll deny the motion on that

2:26:59  21  basis.

2:27:01  22         MS. WHEATLEY:  Well Your Honor, may I address --

2:27:05  23         THE COURT:  Sure.  You can address whatever you'd like.

2:27:08  24  That's what you're up there -- you got the podium or the

2:27:08  25  lectern.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

2:27:10   1              MS. WHEATLEY:  They do give all references to the

2:27:13   2      nonmoving party, but they still bear the burden of proof on

2:27:16   3      fraud to show by clear and convincing evidence and intent to

2:27:17   4      deceive.

2:27:19   5              THE COURT:  Isn't that up to the jury to decide whether

2:27:23   6      it's clear and convincing?  Am I the one to decide that?

2:27:25   7              MS. WHEATLEY:  They have not identified any evidence of

2:27:30   8      an intent to deceive.  The question about if the box had a 2013

2:27:35   9      copyright date, which is frankly not disputed, how does that

2:27:37  10      connect to an intent to deceive?

2:27:41  11              THE COURT:  Explain how that shows fraud.

2:27:45  12              MR. KERNELL:  I'm sorry?

2:27:47  13              THE COURT:  Explain how the date, the copyright date

2:27:51  14      proves fraud or moves the ball on fraud.

2:27:54  15              MR. KERNELL:  The copyright date in and of itself does

2:27:58  16      not.  It is a date.  There is a date on a box that is two years

2:28:01  17      prior to when she made the declaration to the trademark office.

2:28:04  18      The intent -- and I asked her that very directly, that we have

2:28:11  19      alleged fraud in this case and that if someone committed fraud

2:28:12  20      it would be her.

2:28:13  21              THE COURT:  And she said no.

2:28:16  22              MR. KERNELL:  Well, of course she's going to say no.

2:28:18  23              THE COURT:  The question is not evidence.  The question

2:28:22  24      isn't evidence, what is the evidence of the fraud?

2:28:25  25              MR. KERNELL:  The evidence of the fraud is that she

| | | |
|---|---|---|
| 2:28:31 | 1 | submitted a box from 2013, an empty box with no device in it and |
| 2:28:36 | 2 | it's the device, it's not the box, that is what's going to |
| 2:28:42 | 3 | verify that these products are being sold under the trademark, |
| 2:28:46 | 4 | that she submitted that to the trademark office without |
| 2:28:50 | 5 | verifying that that product itself was indeed being sold.  I |
| 2:28:53 | 6 | also went through -- there are a number of other -- |
| 2:28:55 | 7 | THE COURT:  I thought she said that it was being sold, |
| 2:28:59 | 8 | that Sonim XP, whatever in the world it is, was being sold. |
| 2:29:04 | 9 | That they had Sonim XP models that were still being sold. |
| 2:29:06 | 10 | MR. KERNELL:  She did not tie that back -- |
| 2:29:08 | 11 | MS. WHEATLEY:  Yes, Your Honor, she did -- |
| 2:29:10 | 12 | MR. KERNELL:  Your Honor, if I may address and let me |
| 2:29:11 | 13 | -- I believe that question was to me. |
| 2:29:16 | 14 | THE COURT:  Yeah, it was to you.  Go ahead answer it. |
| 2:29:20 | 15 | MR. KERNELL:  Yes in general Sonim XP were being sold |
| 2:29:24 | 16 | by Sprint.  She did not tie any of those statements back to |
| 2:29:29 | 17 | Nextel.  Plus I went through all the different devices that are |
| 2:29:32 | 18 | on this registration, and repeatedly she said no, that's not |
| 2:29:35 | 19 | sold; no, that's not sold. |
| 2:29:38 | 20 | MS. WHEATLEY:  Your Honor, that is completely |
| 2:29:40 | 21 | incorrect. |
| 2:29:42 | 22 | THE COURT:  It's irrelevant because you asked her a |
| 2:29:45 | 23 | question if it was being sold in 2019. |
| 2:29:47 | 24 | MR. KERNELL:  I did ask that question at one time, but |
| 2:29:49 | 25 | I went also back to the earlier date. |

2:29:51  1          THE COURT:  The ones right here, it says do you know if

2:29:59  2   the Sonim XP is currently being sold by Sprint.  We have Sonim

2:30:08  3   devices that are currently on sale.  There are multiple models.

2:30:10  4          MS. WHEATLEY:  Your Honor, Ms. Jobe confirmed very

2:30:18  5   clearly Page 190 of her transcript the Defendants read, Mr.

2:30:21  6   Kernell asked, I believe you testified earlier today that you

2:30:24  7   weren't sure whether or not Sprint had current sales of the

2:30:29  8   Sonim XP Strike IS.  What did you mean by current?  What time

2:30:30  9   period were you referring to?

2:30:31  10         THE COURT:  2019.

2:30:33  11         MS. WHEATLEY:  2019.  She said the sales numbers were

2:30:36  12  not available.  And then he asked are you aware of whether

2:30:41  13  Sprint has had sales of the Sonim XP Strike IS from 2013 every

2:30:46  14  year from 2013 to 2018.  Yes.  They've had sales of Sonim Strike

2:30:51  15  IS every year from 2013 to 2018.  Yes.

2:30:52  16         THE COURT:  Was that read to the jury?  I don't

2:30:53  17  remember that.

2:30:56  18         MS. WHEATLEY:  That was read to the jury, Your Honor.

2:30:57  19         MR. KERNELL:  Your Honor, but that does not tie it back

2:31:02  20  to the trademark registration of Nextel.  That says Sprint has

2:31:06  21  sold these.  It doesn't say that they have sold them under the

2:31:06  22  Nextel brand.

2:31:09  23         MS. WHEATLEY:  Your Honor, his decision not to phrase

2:31:13  24  the question is asking about Nextel does not provide evidence of

2:31:17  25  fraud.  The box in question, which was talked about throughout

2:31:22  1   the deposition, was the Sonim XP Strike IS.  And I note that

2:31:26  2   Defendants have not produced evidence of any Sonim XP Strike IS

2:31:33  3   that does not say Nextel.  All of those boxes say Nextel.  There

2:31:38  4   has been no version of that that does not say Nextel.

2:31:41  5          MR. KERNELL:  There's absolutely no evidence in the

2:31:46  6   record that shows that all these boxes include Nextel on them.

2:31:51  7   In fact, there is evidence in the record of other demonstratives

2:31:54  8   where there is not Nextel on the box.

2:31:58  9          MS. WHEATLEY:  A lack of evidence does not -- sorry.

2:32:00 10          MR. KERNELL:  Your Honor, again, I go back to there is

2:32:05 11   testimony throughout these 200 pages of deposition, the

2:32:09 12   transcript, that there are -- you know, we're grabbing certain

2:32:13 13   words and saying well, they sold this Sonim phone in 2019.  But

2:32:19 14   that wasn't the question as to what she did in 2015, and I again

2:32:22 15   reiterate that the Court must consider all evidence favorable --

2:32:25 16          THE COURT:  Wait, wait.  They read the part, the other

2:32:29 17   part at the end where she said that it was sold 2013, 2014,

2:32:34 18   2015, through 2018 I believe it was.

2:32:36 19          MR. KERNELL:  Yes.  And the jury can consider all that

2:32:41 20   evidence because she does have an overarching interest in that.

2:32:44 21          THE COURT:  Where does it say that it wasn't sold in

2:32:51 22   2015?  Where is there any evidence that this box was fraudulent?

2:32:52 23          MR. KERNELL:  It's not -- we're not saying that the box

2:32:54 24   is fraudulent.

2:32:57 25          THE COURT:  Where are we saying that she committed

2:33:02  1    fraud upon the company?  I mean upon the governmental agency by

2:33:03  2    doing what?

2:33:08  3        MR. KERNELL:  She submitted a specimen with a 2013 date

2:33:15  4    to the US Patent and Trademark Office without verifying that the

2:33:21  5    device was in fact being sold that goes with that box.  The box

2:33:26  6    was empty.  This could be a box out of their art room.

2:33:29  7        THE COURT:  But she said that device was being sold at

2:33:33  8    the time that it was submitted.  Right?  That's what they just

2:33:37  9    read into the record on Page 190 something.  And it was read to

2:33:42  10   the jury.  The only evidence that we have at this point is that

2:33:48  11   in 20, whatever it was, 15, when was it submitted --

2:33:49  12       MS. WHEATLEY:  2015, Your Honor.

2:33:51  13       THE COURT:  2015, she submitted this box as an example

2:33:57  14   of what they were using, which had label on it of Nextel and

2:34:01  15   that it was in fact being sold.  When you initially asked the

2:34:06  16   question, you asked her if she checked to see if that -- I don't

2:34:10  17   remember exactly what it was that you were asking, but I don't

2:34:15  18   think it proves fraud.  It doesn't prove anything.  It doesn't

2:34:21  19   move it at all.  It doesn't move the case one way or the other.

2:34:25  20   But then later she comes in and before it's also it's submitted

2:34:29  21   to them, that she -- that it was definitely being sold at the

2:34:34  22   time 2015.  So I don't see the fraud at all.  What's the fraud?

2:34:39  23   That she submitted a box that had 2013 on it in 2015?

2:34:45  24       MR. KERNELL:  Her testimony did not state that a Sonim

2:34:51  25   XP phone or radio was being sold with the Nextel brand, I don't

2:34:54  1   believe, at that time.  She's saying yes, those devices were

2:34:55  2   being sold.

2:34:57  3          THE COURT:  And this box had --

2:35:00  4          MR. KERNELL:  This is a Nextel branded from 2013.  We

2:35:05  5   had testimony from Mr. Shaughnessy that hey, there were --

2:35:10  6   everything was transitioning over to the Sprint network, which

2:35:14  7   in 2013 that box would have still been -- or the phone would

2:35:20  8   still be allowed to be on or could be on an iDEN network and

2:35:26  9   Nextel device, but not after June 30, 2013.

2:35:28  10         MS. WHEATLEY:  Your Honor --

2:35:31  11         MR. KERNELL:  So you couldn't use that on an iDEN

2:35:32  12  network at this time.

2:35:33  13         MS. WHEATLEY:  Your Honor, Defendants bear the burden

2:35:38  14  of showing fraud.  Saying that there is a lack of evidence in

2:35:39  15  their own --

2:35:41  16         THE COURT:  Fraud has a very high standard.

2:35:42  17         MR. KERNELL:  I understand, Your Honor.

2:35:44  18         THE COURT:  And I don't believe you've met that

2:35:46  19  standard.  I'm going to grant the motion.

2:35:48  20         Next.

2:35:52  21         MS. WHEATLEY:  Thank you, Your Honor.  So that brings

2:35:59  22  us to Defendants' abandonment claim.  Now their abandonment

2:36:03  23  claim is their declaratory judgment for abandonment of Nextel

2:36:08  24  Count 1, their cancellation Count 2, and their chirp

2:36:10  25  cancellation and abandonment Count 8.

2:36:13  1          Now, I'd like to start with the chirp, because I don't
2:36:16  2    even think we need to get into the elements because there was no
2:36:19  3    evidence introduced whatsoever that Sprint has ever stopped
2:36:24  4    using the chirp mark.  No witness testified to that, and many
2:36:28  5    witnesses testified that the chirp has been used continuously.
2:36:29  6          THE COURT:  All right.  Tell me what evidence there is
2:36:32  7    that the chirp has been abandoned.
2:36:33  8          MR. SCHWARTZ:  There was no evidence that they put
2:36:36  9    forth that they actually were using the chirp, Your Honor.  In
2:36:40  10   any device.  They didn't present one device that played that
2:36:42  11   chirp, not one.
2:36:45  12          MS. WHEATLEY:  Your Honor, Mr. Wiley demonstrated the
2:36:50  13   chirp with a device here in front of the jury.  Those devices
2:36:52  14   were submitted into evidence.
2:36:54  15          THE COURT:  I heard the chirp and I didn't really want
2:37:04  16   to hear the chirp.  What evidence is there that the chirp has
2:37:07  17   been abandoned?
2:37:09  18          MR. SCHWARTZ:  That's the evidence, Your Honor.  We're
2:37:12  19   disputing that that is a Nextel branded device.  That device was
2:37:16  20   just created, just labeled right in the middle of this lawsuit,
2:37:20  21   the one and only phone that they walked in and slapped a label
2:37:24  22   on and said oh, that's a Nextel phone.  That's it.  That was
2:37:27  23   their sum and substance.
2:37:29  24          MS. WHEATLEY:  No, Your Honor.  We had testimony from
2:37:32  25   multiple witnesses, including Mr. Wiley and Mr. Shaughnessy,

2:37:36  1    that devices with the Nextel chirp have been sold continuously

2:37:43  2    since I believe the late 90s.  There was no suggestion that

2:37:46  3    there was any gap.  They testified to millions of dollars of

2:37:52  4    sales in devices with the Nextel chirp, and because we have a

2:37:57  5    registered trademark, we have a presumption of ownership and

2:38:01  6    exclusive right to use.  Defendants bear the burden to come

2:38:01  7    forth --

2:38:04  8         THE COURT:  I find that there is no evidence that -- no

2:38:06  9    evidence indicating that the chirp has been abandoned in any

2:38:07  10   way.

2:38:09  11        Next?

2:38:11  12        MS. WHEATLEY:  Thank you.  So that brings us --

2:38:13  13        THE COURT:  You don't have to thank me.  I get paid to

2:38:15  14   do this.

2:38:19  15        MS. WHEATLEY:  That brings us to Defendants'

2:38:23  16   abandonment claim with respect to Nextel.  Now, I'd like to go

2:38:27  17   through the burden of proof here, because I believe it is very

2:38:31  18   important in this case.  I'm setting aside the issue of whether

2:38:35  19   it is preponderance or a strict burden.  We do believe it is a

2:38:38  20   strict burden, but under either burden, I believe there's not

2:38:43  21   enough evidence of abandonment here to go to the jury.

2:38:49  22        Now, to prove abandonment, there are two elements.  The

2:38:53  23   Plaintiff has ceased using the mark in dispute, and that he has

2:38:57  24   done so with the intent not to resume use.  Because Sprint has

2:39:03  25   an incontestable registration for Nextel, and they put certified

2:39:07  1    copy of that registration in, Sprint has met its first initial

2:39:13  2    burden as the Plaintiff to prove rights in the mark.  In a

2:39:16  3    normal infringement suit, this could be entirely sufficient to

2:39:19  4    establish Sprint's rights in the mark without putting forward

2:39:20  5    any evidence of use.

2:39:25  6          So now the burden shifts to Defendants to overcome the

2:39:29  7    presume created by the registration.  Defendants have to start

2:39:35  8    by making a prima facie case for abandonment.  If they make that

2:39:39  9    prima facie case, and only if they make that prima facie case,

2:39:44  10   Sprint then bears the burden of production to prove use and the

2:39:48  11   Defendants bear the final burden of persuasion.

2:39:54  12         So we're starting here with Defendants having to make

2:40:02  13   their prima facie case.  Now, in order to do that, they have to

2:40:05  14   make a prima facie case of both that Sprint is not using the

2:40:11  15   mark and has entirely stopped using the mark, and then also that

2:40:15  16   Sprint has no intent to resume use, that they intended to

2:40:17  17   abandon the mark.

2:40:21  18         Now, for the first prong, they have not met it.  They

2:40:26  19   have not shown that Sprint stopped using Nextel.  Sprint has put

2:40:30  20   forward unrebutted evidence of continuous use of Nextel and

2:40:34  21   testimony from both third parties, Mr. Kohman from Motorola who

2:40:38  22   is not a Sprint employee, and Sprint employees that the use of

2:40:42  23   Nextel has been continuous and was going on during the years in

2:40:44  24   question.

2:40:50  25         They also have to make their even prima facie case,

| | | |
|---|---|---|
| 2:40:55 | 1 | they have to put forward evidence of no intent.  The way they |
| 2:41:00 | 2 | can do that is either they can show no use for three consecutive |
| 2:41:05 | 3 | years, or they can prove circumstances that allow you to infer |
| 2:41:09 | 4 | an intent not to resume use.  So we are still at their prima |
| 2:41:14 | 5 | facie burden.  There is no evidence on the record that gets them |
| 2:41:21 | 6 | to either of these points.  They have not shown a three-year |
| 2:41:24 | 7 | gap.  Sprint's witness's testimony, Mr. Kohman's testimony as a |
| 2:41:28 | 8 | third-party of continuous use, is unrebutted.  Mr. Kohman |
| 2:41:34 | 9 | testified that in 2014 when Defendants are claiming that Sprint |
| 2:41:38 | 10 | intended to abandon Nextel, that Sprint did not intend to |
| 2:41:42 | 11 | abandon Nextel and instead developed plans to use it with its |
| 2:41:46 | 12 | businesses services which is B-to-B marketing on sales |
| 2:41:50 | 13 | presentations and at trade shows and pitches and to use it on |
| 2:41:55 | 14 | its rugged devices.  So Mr. Kohman established that when |
| 2:41:57 | 15 | Defendant said there was an intent to abandon, there was no |
| 2:41:58 | 16 | intent to abandon. |
| 2:42:02 | 17 | Next we had multiple Sprint witnesses and documentary |
| 2:42:08 | 18 | evidence of the Nextel shown on sales presentations, Nextel |
| 2:42:13 | 19 | shown on boxes.  This was unrebutted.  Now, Defendants, and we |
| 2:42:16 | 20 | didn't even have to show use, Defendants were required to show |
| 2:42:21 | 21 | that gap.  They showed no gap.  Defendants were required to show |
| 2:42:24 | 22 | intent.  They showed no intent. |
| 2:42:26 | 23 | And on the question of circumstantial evidence they've |
| 2:42:31 | 24 | put forward nothing.  The only evidence in the record that I can |
| 2:42:39 | 25 | see is the 10-Ks, which are not in any way evidence of Sprint's |

2:42:43  1   intent to use a trademark, and they establish no link between

2:42:48  2   the 10-Ks and Sprint's subjective intent to use or not use a

2:42:49  3   trademark.

2:42:53  4          The only other evidence was testimony that the iDEN

2:42:58  5   network was shut down.  That again establishes nothing about

2:43:01  6   Sprint's intent with respect to the Nextel trademark.  And I

2:43:06  7   believe we stop there because they have not met that prima facie

2:43:06  8   burden.

2:43:10  9          At the summary judgment stage, Defendants put in a

2:43:13  10  great deal of hearsay evidence which was appropriate to consider

2:43:18  11  then because at summary judgment, you can make the assumption

2:43:21  12  that they will admit it at trial.  But they did not do so.  They

2:43:26  13  were unable to authenticate any of that evidence, none of it

2:43:31  14  came in, so there is really nothing here that would allow a jury

2:43:36  15  to infer an intent not to resume use.  The only testimony is Mr.

2:43:42  16  Kaplan's subjective research that he believed they were not

2:43:45  17  using.  Mr. Kaplan had no personal knowledge of Sprint's

2:43:50  18  activities.  Mr. Calabrese, our other witness, admitted both

2:43:55  19  that he had no knowledge of whether Sprint was using Nextel, and

2:44:00  20  he also admitted that in the time period where he said it was

2:44:04  21  abandoned, that it was in fact probable that Sprint was still

2:44:06  22  using Nextel.

2:44:09  23         We've also got evidence on the record that in the same

2:44:13  24  years that Mr. Kaplan was claiming he was searching the internet

2:44:17  25  and not finding any evidence of Nextel, we've got evidence that

| | |
|---|---|
| 2:44:22 | 1 |
| 2:44:27 | 2 |
| 2:44:33 | 3 |
| 2:44:39 | 4 |
| 2:44:45 | 5 |
| 2:44:50 | 6 |
| 2:44:54 | 7 |
| 2:44:57 | 8 |
| 2:44:58 | 9 |
| 2:45:02 | 10 |
| 2:45:08 | 11 |
| 2:45:14 | 12 |
| 2:45:19 | 13 |
| 2:45:23 | 14 |
| 2:45:29 | 15 |
| 2:45:32 | 16 |
| 2:45:37 | 17 |
| 2:45:40 | 18 |
| 2:45:42 | 19 |
| 2:45:50 | 20 |
| 2:45:52 | 21 |
| 2:45:54 | 22 |
| 2:45:58 | 23 |
| 2:46:03 | 24 |
| 2:46:08 | 25 |

there were web pages that on Sprint's website that said Nextel.

     We also have the use at trade shows.  Each year from 2017 to 2019, including the year the Defendants first intended and infringed.  Again, Defendants bear this prima facie burden. They've got to put forward some evidence of abandonment.  They can't just create an inference and demand that Sprint prove use. They've put forward nothing, so they haven't met their prima facie burden and so we can't proceed on even to the next question.

     THE COURT:  All right.  Counsel?

     MR. KERNELL:  Yes, Your Honor.  On evidence of or unrebutted evidence of continuous use, that's simply not the case.  We did have testimony that showed that they searched for it, they looked.  Mr. Calabrese, Mr. Kaplan testified that they did not find any use in the market at that time.  That since the shutdown of the iDEN network, that there may have been devices floating around but it was already shut down.  They were not on the Nextel network anymore.

     Sprint produced not a single device to show.  The only device that they produced was in a device dated 2013, there's no devices in between.

     THE COURT:  Between where and where?

     MR. KERNELL:  Between 2013 and when the lawsuit or -- in this lawsuit, that they produced, there was a CAT device that was produced that has, I believe, a 2022 date on it.  All you

2:46:15  1    have to do is show an intent to abandon for three years.  There

2:46:20  2    was -- Mr. Kaplan testified at length that he did research, he

2:46:22  3    looked, he went to various places.

2:46:30  4            The website that Ms. Wheatley talks about, the Sprint

2:46:32  5    website, that was from the Wayback Machine.  That wasn't even

2:46:37  6    from the Sprint website.  And the testimony from --

2:46:40  7            THE COURT:  It was the Wayback Machine of the Sprint

2:46:42  8    website, right?

2:46:44  9            MR. KERNELL:  Yes, it was of the Sprint website.

2:46:45  10           THE COURT:  Isn't that the relevant -- I mean, what

2:46:49  11   they're doing now is, you know, is interesting, but if you're

2:46:53  12   talking about three years, they need to go back, don't they?

2:46:57  13           MR. KERNELL:  Right.  But Mr. Kaplan testified that he,

2:47:00  14   in fact, went to those same spots and it was dead.  There was

2:47:05  15   nothing there.  These were old, there was products -- when he

2:47:09  16   clicked on the product that said Nextel, it brought you to a

2:47:15  17   smartphone page.  The same thing with Mr. Kaplan.  He testified

2:47:24  18   the same or with the same testimony, I think Mr. Kaplan went to

2:47:27  19   stores, they said there were no products there.

2:47:30  20           The documents that they're talking about using were

2:47:36  21   these -- were some legacy documents, some legacy PowerPoint

2:47:42  22   presentations that Judge Snow in her recommendations to the

2:47:49  23   Court, it was actually filed, I believe in her report having to

2:47:58  24   do with the Rule 11 motion, stated that she had found that sales

2:48:02  25   presentations and PowerPoints are not trademark use.  That's not

2:48:05   1   evidence of trademark use.

2:48:11   2           I believe Ms. Wheatley said that Nextel showed sales

2:48:14   3   documents.  I don't believe any sales documents -- there's no

2:48:18   4   sales numbers or things that are in this case.  There are none

2:48:23   5   in this case.  They didn't show any Nextel on -- again, on any

2:48:31   6   boxes from a date of 2013 all the way up to 2022.  That is

2:48:35   7   sufficient evidence to show an intent to abandon.  There's more

2:48:37   8   than three years there.

2:48:39   9           MS. WHEATLEY:  Your Honor, Mr. Shaughnessy's testimony

2:48:45   10  was unrebutted.  That precise box that said Nextel had been sold

2:48:52   11  from 2013 through 2019.  That was never controverted.  He

2:48:54   12  testified that he knew the sales, they were in the millions of

2:48:57   13  dollars.  So that is simply not true that Defendants put forth

2:49:00   14  evidence of the gap.

2:49:03   15          But even setting aside the boxes, Defendants have

2:49:07   16  provided no rebuttal as to the evidence that was regularly in

2:49:11   17  use in trade shows, which is trademark use, its use in

2:49:14   18  connection with the sale of goods and services.

2:49:17   19          But most importantly, this evidence that Sprint was

2:49:21   20  using Nextel, the key is not whether or not it is trademark use;

2:49:26   21  the key is can you use it to support an intent not to resume

2:49:31   22  use, an intent to abandon the mark, the intent to throw it on

2:49:36   23  the trash heap.  Defendants have not put forward any admissible

2:49:41   24  evidence as to that intent.  There's simply nothing there.  The

2:49:44   25  10-Ks do not show it, and we don't even get to questions of

2:49:48   1   whether Sprint's use is good enough until they have met their

2:49:52   2   prima facie burden.  They've either got to show a three-year gap

2:49:57   3   and we can infer intent for that, or they have to show

2:49:59   4   circumstantial evidence of an intent not to resume use.  And

2:50:01   5   there is simply nothing.

2:50:03   6            Every single witness, including a third-party witness

2:50:08   7   who had direct knowledge of the time period at issue, when

2:50:12   8   Defendants say Sprint made the decision to abandon the mark,

2:50:17   9   testified that the intent was always to continue using Nextel.

2:50:21   10   Defendants are the one who have to make at least a prima facie

2:50:25   11   case before we even get into all the use evidence that there was

2:50:29   12   an intent to abandon Nextel, not to use Nextel.  They put in

2:50:33   13   nothing.  There is nothing on the record.

2:50:35   14            THE COURT:  All right.  I'll reserve on this one.

2:50:37   15            Next?

2:50:49   16            MS. WHEATLEY:  All right.  Sorry, Your Honor.  Got to

2:50:50   17   gather my notes.

2:50:53   18            Next Your Honor, I'd like to go through some of

2:50:57   19   Defendants' affirmative defenses where I don't think they have

2:51:03   20   put forward any evidence.  Defendants alleged an affirmative

2:51:08   21   defense of estoppel.  There has been no evidence of any

2:51:13   22   statement by Sprint on which Defendants reasonably relied to

2:51:19   23   their -- that is contrary to a later-asserted position that

2:51:23   24   Defendants relied on.  So I would say estoppel, it's still in

2:51:24   25   the joint pretrial order.

| | | |
|---|---|---|
| 2:51:29 | 1 | THE COURT:  Where is there any evidence of that? |
| 2:51:33 | 2 | MR. KERNELL:  We concede that, Your Honor. |
| 2:51:35 | 3 | THE COURT:  All right.  Estoppel is out. |
| 2:51:37 | 4 | Next. |
| 2:51:39 | 5 | MS. WHEATLEY:  Defendants also alleged an affirmative |
| 2:51:42 | 6 | defense of laches, that remains in the joint pretrial order. |
| 2:51:48 | 7 | There has been no evidence whatsoever of any delay by Sprint in |
| 2:51:51 | 8 | taking action and certainly not outside of the. |
| 2:51:54 | 9 | THE COURT:  What evidence is there on laches?  I always |
| 2:51:56 | 10 | wanted to have a laches case. |
| 2:51:58 | 11 | MR. KERNELL:  Well, you're welcome to take this on. |
| 2:51:59 | 12 | THE COURT:  No. |
| 2:52:00 | 13 | MR. KERNELL:  No, Your Honor that's fine. |
| 2:52:03 | 14 | THE COURT:  Okay.  Laches is out. |
| 2:52:06 | 15 | MS. WHEATLEY:  Defendants also allege an affirmative |
| 2:52:09 | 16 | defense of preemption.  I would say there is nothing in the |
| 2:52:10 | 17 | record regarding preemption. |
| 2:52:14 | 18 | THE COURT:  What preemption are we talking about? |
| 2:52:17 | 19 | MS. WHEATLEY:  I'm not sure, Your Honor. |
| 2:52:19 | 20 | THE COURT:  I'm asking them.  I tilted my head |
| 2:52:19 | 21 | slightly. |
| 2:52:21 | 22 | MR. KERNELL:  We concede, Your Honor. |
| 2:52:23 | 23 | THE COURT:  Conceded.  Preemption is out. |
| 2:52:24 | 24 | Next? |
| 2:52:27 | 25 | MS. WHEATLEY:  Defendants also allege an affirmative |

2:52:34  1   defense of innocent infringement.  Defendants are not an

2:52:38  2   innocent publisher, and there is no mens rea for trademark

2:52:42  3   infringement, so I'm not sure what that is an affirmative

2:52:43  4   defense to.

2:52:45  5           THE COURT:  What does this mean and are you pursuing

2:52:46  6   this?

2:52:50  7           MR. KERNELL:  That would go to willfulness.

2:52:52  8           THE COURT:  Okay.  So are you saying that you still

2:53:00  9   have an affirmative defense of innocence?  Innocent, what is it?

2:53:03  10          MR. KERNELL:  Infringement.  Innocent infringement.

2:53:05  11  Yes, if we had a --

2:53:07  12          THE COURT:  Doesn't that mean that yes I did it, but I

2:53:08  13  didn't know that I was doing it?

2:53:10  14          MR. KERNELL:  Or that we didn't have the right to do

2:53:13  15  it.

2:53:16  16          MS. WHEATLEY:  Your Honor, innocent infringement is not

2:53:22  17  an affirmative defense to trademark infringement.  While they

2:53:24  18  can assert that they're not willful --

2:53:31  19          THE COURT:  It's a different matter.  I'll strike the

2:53:33  20  innocent infringement or whatever it's called.

2:53:34  21          Next.

2:53:35  22          MS. WHEATLEY:  Defendants also have an affirmative

2:53:41  23  defense of no damages.  Damages are not an element of Sprint's

2:53:45  24  claim and a showing of no damages since the primary relief is --

2:53:47  25          THE COURT:  Are you pursuing the no damages?

| | | |
|---|---|---|
| 2:53:50 | 1 | MR. KERNELL:  Yes, Your Honor.  That is an element of |
| 2:53:55 | 2 | the claim for common law trademark infringement. |
| 2:53:58 | 3 | MS. WHEATLEY:  Your Honor -- |
| 2:54:00 | 4 | MR. KERNELL:  There have been absolutely no damages |
| 2:54:05 | 5 | that Sprint has put forth in this case. |
| 2:54:07 | 6 | THE COURT:  Well, go ahead. |
| 2:54:09 | 7 | MS. WHEATLEY:  Your Honor, common law trademark |
| 2:54:14 | 8 | infringement has the same elements as federal trademark |
| 2:54:18 | 9 | infringement under Florida law. |
| 2:54:22 | 10 | THE COURT:  I believe that it does have the same.  I |
| 2:54:27 | 11 | think Plaintiff is right on this one.  Strike it. |
| 2:54:29 | 12 | Next. |
| 2:54:31 | 13 | MS. WHEATLEY:  Defendants also have an affirmative |
| 2:54:34 | 14 | defense of unclean hands in the joint pretrial order.  We would |
| 2:54:38 | 15 | submit that there has been no evidence of unclean hands put |
| 2:54:39 | 16 | forward. |
| 2:54:40 | 17 | THE COURT:  What is your position on unclean hands |
| 2:54:44 | 18 | other than COVID requirements? |
| 2:54:47 | 19 | MR. KERNELL:  That's fine, Your Honor. |
| 2:54:48 | 20 | THE COURT:  Strike. |
| 2:54:54 | 21 | MS. WHEATLEY:  Okay.  Defendants also put forth an |
| 2:54:58 | 22 | affirmative defense of lack of irreparable harm.  Irreparable |
| 2:55:02 | 23 | harm is -- lack of irreparable harm is not an affirmative |
| 2:55:05 | 24 | defense to trademark infringement, so we would submit this |
| 2:55:07 | 25 | should be stricken. |

2:55:10  1          THE COURT:  What is your position on lack of

2:55:11  2      irreparable harm.

2:55:13  3          MR. KERNELL:  That actually does go to -- you have to

2:55:19  4      show irreparable harm to be granted an injunction from use of a

2:55:23  5      trademark or for an injunction.  And that's what they are

2:55:24  6      seeking, an injunction.

2:55:28  7          MS. WHEATLEY:  Your Honor --

2:55:29  8          THE COURT:  It's an affirmative defense.  Just because

2:55:32  9      it has an element that they have to prove, that doesn't mean

2:55:38  10      that it's an affirmative defense.  I don't know.  Let me hear

2:55:40  11      from the Plaintiff.

2:55:44  12          MS. WHEATLEY:  Yes.  Precisely that.  It's not a proper

2:55:46  13      affirmative defense.

2:55:50  14          THE COURT:  I don't think there is -- that it is a

2:55:52  15      proper affirmative defense.  I could easily be wrong, and the

2:55:54  16      Eleventh Circuit would not be shy about telling me that I'm

2:55:59  17      wrong.  But I'll strike that also.

2:56:04  18          MS. WHEATLEY:  Defendants also raise an affirmative

2:56:12  19      defense of duplicative claims.  Again, I'm not sure how that's a

2:56:14  20      proper affirmative defense.

2:56:34  21          THE COURT:  What does that mean?  What is duplicative

2:56:36  22      about their claim?

2:56:37  23          MR. KERNELL:  Well, there are several --

2:56:38  24          THE COURT:  Get closer to the microphone.

2:56:42  25          MR. KERNELL:  I'm sorry.  Several of the trademark

2:56:47  1    infringement counts, they are within the same statute, within

2:56:51  2    the same section of the code and so there are overlapping

2:56:53  3    counts.

2:56:56  4            MS. WHEATLEY:  Your Honor, they're distinct claims,

2:57:00  5    Sprint is entitled to maintain distinct claims that can be

2:57:04  6    proven using the same evidence.

2:57:12  7            THE COURT:  I'll strike duplicative claims as an

2:57:14  8    affirmative defense.

2:57:19  9            MS. WHEATLEY:  Your Honor, Affirmative Defense Number

2:57:23  10   10 we already dealt with, which is fraud on the USPTO so I would

2:57:29  11   say that should be stricken.  And I should add we would move for

2:57:31  12   judgment as a matter of law on their affirmative defense of

2:57:38  13   abandonment on the same ground as we moved for judgment as a

2:57:42  14   matter of law for their claims for abandonment and their

2:57:46  15   counterclaims.  They also allege failure to state a claim, but I

2:57:54  16   think that should not still be alleged, so I assume they are

2:57:56  17   dropping that.

2:58:01  18           THE COURT:  Are you pursuing failure to assert a claim?

2:58:01  19           MR. KERNELL:  No, Your Honor.

2:58:05  20           THE COURT:  Okay.  Next?

2:58:08  21           MS. WHEATLEY:  Finally Your Honor, they put forward

2:58:14  22   registration invalidity.  There has been no evidence of

2:58:20  23   registration invalidity in this matter.  And with the fraud

2:58:23  24   claim stricken, that could not be a basis for registration

2:58:24  25   invalidity.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 2:58:25 | 1 | THE COURT:  What do you mean by a registration |
| 2:58:28 | 2 | invalidity? |
| 2:58:30 | 3 | MR. KERNELL:  That would be fraud. |
| 2:58:31 | 4 | THE COURT:  Okay.  Same ruling. |
| 2:58:38 | 5 | Are we done? |
| 2:58:43 | 6 | MS. WHEATLEY:  Your Honor, we would also move for |
| 2:58:48 | 7 | judgment as a matter of law on our affirmative claims. |
| 2:58:51 | 8 | THE COURT:  Tell me what you're talking about. |
| 2:58:54 | 9 | MS. WHEATLEY:  Our claims for counterfeiting, trademark |
| 2:58:58 | 10 | infringement, unfair competition, dilution and cybersquatting. |
| 2:59:00 | 11 | THE COURT:  You're asking for a directed verdict, is |
| 2:59:02 | 12 | that what it is? |
| 2:59:02 | 13 | MS. WHEATLEY:  Yes, Your Honor. |
| 2:59:04 | 14 | THE COURT:  Let me hear from the defense. |
| 2:59:06 | 15 | MR. SCHWARTZ:  Your Honor, defense would move under |
| 2:59:10 | 16 | Rule 50 for motion for judgment on those claims as to the lack |
| 2:59:16 | 17 | of evidence against us with regard to these particular claims |
| 2:59:22 | 18 | for counterfeiting.  They have not put forth any evidence that |
| 2:59:26 | 19 | they're actually using this product.  There's been no evidence |
| 2:59:32 | 20 | whatsoever that we competed with them.  They didn't put forth |
| 2:59:35 | 21 | any sales, there's no sales in the 10-K, they didn't put forth |
| 2:59:40 | 22 | any evidence of sales, and they're actually not seeking any |
| 2:59:43 | 23 | actual damages.  They're seeking statutory damages. |
| 2:59:46 | 24 | THE COURT:  They're seeking statutory damages and |
| 2:59:49 | 25 | they're telling you to stop.  They don't want you to do it |

2:59:54  1   anymore.  And their damages, I suspect -- well, I don't know.

3:00:03  2   That's their business.  I'm not going to give either side a

3:00:04  3   directed verdict at this point.

3:00:06  4         MS. WHEATLEY:  Okay, Your Honor.

3:00:17  5         Your Honor, I guess I would also move on the

3:00:21  6   counterfeiting and infringement of the chirp since they have no

3:00:24  7   abandonment defense with respect to those claims.

3:00:27  8         THE COURT:  So you're asking for what?

3:00:28  9         MS. WHEATLEY:  Moving for a directed verdict as to

3:00:33  10  counterfeiting of the chirp which is Count 8 of our claim.

3:00:36  11        THE COURT:  I think that's a jury question for them to

3:00:39  12  determine whether it's been counterfeited or not.  I'll deny

3:00:42  13  that motion.  You just bring up, play it for them and let them

3:00:45  14  decide if that's a counterfeit or if it's maybe a different

3:00:51  15  chirp.  I don't know.  But don't play it a lot.  Or if you do,

3:00:54  16  don't play it as loud as you did because I'll get scared and

3:00:58  17  fall off my chair.  I'll hold you responsible.

3:00:58  18        MS. WHEATLEY:  Thank you, Your Honor.

3:01:00  19        THE COURT:  Thank you.  All right.

3:01:02  20        So where are we now?

3:01:04  21        MR. SCHWARTZ:  Well, the defense, even though you were

3:01:08  22  addressing the Plaintiff's motion, the defense was going to move

3:01:13  23  for a motion for judgment as a matter of law on Counts 8 and 9

3:01:17  24  as to the chirp, because they have not put forth not even a

3:01:21  25  scintilla of evidence that any of our products use the chirp at

| | | |
|---|---|---|
| 3:01:25 | 1 | all.  Nothing.  Nothing came into this courtroom to suggest that |
| 3:01:27 | 2 | we -- our products use that chirp. |
| 3:01:29 | 3 | THE COURT:  I thought there was testimony that they |
| 3:01:37 | 4 | heard it in a commercial for one of the parties that is an agent |
| 3:01:41 | 5 | of the Defendants.  I thought that's what I heard. |
| 3:01:44 | 6 | MR. SCHWARTZ:  Your Honor, that was -- if you recall, |
| 3:01:48 | 7 | that private investigator, three and a half years after the fact |
| 3:01:53 | 8 | watching a You Tube video, claiming that he thought he heard the |
| 3:01:58 | 9 | chirp that lasted I think a second.  When you watch that video |
| 3:01:58 | 10 | -- |
| 3:02:00 | 11 | THE COURT:  I don't think that chirp is going to last |
| 3:02:04 | 12 | more than a split second because that's all it is.  But there |
| 3:02:08 | 13 | was testimony, I'll deny your motion. |
| 3:02:09 | 14 | MS. WHEATLEY:  Your Honor -- okay.  Thank you, Your |
| 3:02:09 | 15 | Honor. |
| 3:02:11 | 16 | THE COURT:  Yes. |
| 3:02:15 | 17 | MS. WHEATLEY:  Mr. Kaplan did admit in his testimony: |
| 3:02:18 | 18 | Now, you agree that even though this was rejected, you and the |
| 3:02:22 | 19 | Defendants are using the Nextel chirp, right?  We're using, yes, |
| 3:02:24 | 20 | we're using the Nextel chirp. |
| 3:02:29 | 21 | MR. KERNELL:  If I could address that, Plaintiff has |
| 3:02:36 | 22 | been very good about using that term "Nextel chirp" to refer to |
| 3:02:40 | 23 | both -- there was a trademark application called the Nextel |
| 3:02:48 | 24 | chirp.  A word mark Nextel chirp.  And yes, Mr. Kaplan had the |
| 3:02:52 | 25 | word Nextel chirp on his website, but then they also use it to |

3:02:59   1   refer to the sound mark.  So it's very confusing when they ask

3:03:04   2   that.  Mr. Kaplan was testifying to the word mark Nextel chirp,

3:03:05   3   there's no sound associated.

3:03:09   4           THE COURT:  Argue that to the jury and see if they buy

3:03:10   5   it.

3:03:14   6           What else do you have?

3:03:22   7           MR. SCHWARTZ:  The final point, Your Honor, Defendants

3:03:25   8   move for judgment as a matter of law on Count 4 as to the

3:03:30   9   trademark dilution and trademark tarnishment claims.  They've

3:03:37   10   not met their threshold burden, they've not put forth any

3:03:39   11   evidence that this is a household famous mark.  No evidence that

3:03:43   12   we diluted the mark.  No evidence to support that particular

3:03:45   13   subset of that particular claim.

3:03:47   14           THE COURT:  I heard people say that.  The jury may not

3:03:51   15   believe them, but I heard people say that that testified here.

3:03:54   16   Yes, ma'am.

3:03:57   17           MS. WHEATLEY:  Your Honor, in fact Mr. Kaplan directly

3:04:02   18   admitted the chirp mark was distinctive and famous, and

3:04:06   19   Mr. Calabrese in his testimony also admitted the chirp mark was

3:04:07   20   well known.

3:04:08   21           MR. SCHWARTZ:  We're talking about the Nextel

3:04:13   22   trademark.  Not the chirp mark.  This is in Count 4.  These

3:04:15   23   chirps are covered by Counts 8 and 9.

3:04:19   24           THE COURT:  Okay.  So you're talking about the Nextel

3:04:27   25   -- I'll deny that motion.  Next.

3:04:28  1          MR. KERNELL:  I'm sorry, Your Honor.  May I address --

3:04:29  2          THE COURT:  Yes, you may.

3:04:32  3          MR. KERNELL:  So with the dilution claim, in

3:04:38  4  determining whether a mark is famous, a famous mark is -- and

3:04:47  5  this is from Brain Pharma versus Scalini, this is 858 F Supp 2d

3:04:58  6  1349, this is from the -- I believe the Southern District of

3:05:07  7  Florida.  And it says that a mark is famous if it is widely

3:05:12  8  recognized by the general consuming public of the United States

3:05:16  9  as a designation of source of the goods or services of the

3:05:25  10  owners mark.  And this is 15 USC 125 C 2 A.  And so to determine

3:05:29  11  whether a mark is recognized by the public, courts consider

3:05:33  12  factors such as the duration, extent and geographic reach of

3:05:35  13  advertising and publicity of the mark.

3:05:41  14          The testimony was that since the Nextel -- those Nextel

3:05:45  15  videos that we watched, I believe the latest one was 2008,

3:05:50  16  testimony from Mr. Shaughnessy that there was no -- any

3:05:57  17  advertising campaigns that were nationwide for Nextel.  Both

3:06:04  18  Mr. Wiley testified that it is a sub-brand, Nextel is a

3:06:08  19  sub-brand.  It is only in their business center.  They don't --

3:06:13  20  and the vast majority of their consumers do not use

3:06:16  21  push-to-talk, they don't use any Nextel services.  And that is

3:06:22  22  just of Sprint.  If you talk about all the customers across the

3:06:25  23  United States that use cellphones, that we are talking about a

3:06:30  24  very, very thin market of individuals that use this mark.

3:06:35  25          The second factor is the amount, volume and geographic

extent of sales of goods or services offered under the mark.
There is absolutely no evidence of the amount, volume and
geographic extent.  There was nothing to say where any of these
devices were sold, or the amount that they've -- the amount of
the goods sold.

The extent of actual recognition of the mark.  Every
single -- the testimony that came from Plaintiff was from their
employees and an ex-employee.  None of them -- I mean, typically
to prove that point, you do a customer survey, you do the
general public.  It has to be of the general public, the
consuming public.  It's not consuming public of push-to-talk
devices.  It is has to be a household name whether you're here
or in Kansas City.

The extent of whether the mark was registered under the
Act, and it was, and so trademark dilution claims are limited to
truly famous marks such as Budweiser, Camel Cigarettes and
Barbie dolls.  This doesn't even come close to being a famous
mark.

So Your Honor -- and I have a copy for the Court if I
may?

THE COURT:  Of course.

Your turn.  Go ahead.

MS. WHEATLEY:  Your Honor, Mr. Kaplan admitted, and
here's his testimony:  It's your opinion, right, that the Nextel
brand is worth a minimum of 100 million?  Conservatively, yes.

3:08:34  1          And you agree that the Nextel, the Nextel is a very
3:08:37  2  strong, strong trademark.  Yes.
3:08:39  3          And in fact, you agree it's iconic.
3:08:45  4          He also admitted earlier in his testimony, in fact it
3:08:48  5  was famous and iconic because my clients, Nextel and Sprint, had
3:08:52  6  made it famous and iconic, right?  Correct.
3:08:56  7          Mr. Kaplan has admitted fame.
3:09:00  8          THE COURT:  I'll deny your motion on that.
3:09:06  9          Next?  Anything further?
3:09:07  10         MR. SCHWARTZ:  Nothing further at this time.
3:09:09  11         THE COURT:  All right.  What's next?
3:09:12  12         MR. RIOPELLE:  So Your Honor, we would move to our
3:09:17  13  rebuttal case.  I think we're probably thinking next Wednesday,
3:09:18  14  next Thursday.
3:09:20  15         THE COURT:  Yeah, when we get around to it.
3:09:24  16         MR. RIOPELLE:  Just one issue, Your Honor, before we
3:09:35  17  bring the jury in.  We have a certified copy of Mr. Calabrese's
3:09:37  18  conviction.
3:09:39  19         THE COURT:  Give me the instruction on felony
3:11:00  20  conviction.  Okay.  Yeah.  Do you want this to come in or do you
3:11:03  21  want to stipulate that he's convicted of a felony?  I know you
3:11:05  22  don't agree, but I think it is.
3:11:07  23         MR. SCHWARTZ:  On that point we don't think it belongs
3:11:11  24  in.  He was asked the questions and he answered truthfully.
3:11:14  25         Second, they closed their case.  There's no issue of

```
3:11:15   1    impeachment --
3:11:16   2             THE COURT:  This is rebuttal.
3:11:21   3             MR. SCHWARTZ:  -- in connection with the issue.  There
3:11:24   4    was nothing to rebut or impeach.
3:11:27   5             THE COURT:  Well, you put his testimony on and they are
3:11:31   6    permitted to impeach his testimony by showing that he was
3:11:34   7    convicted of a felony.
3:11:36   8             MR. SCHWARTZ:  This is an unusual situation, Your
3:11:40   9    Honor, and I just -- I disagree with the issue as to how they're
3:11:46   10   trying to do it.  I think the Court was inclined to, you know,
3:11:49   11   give him an opportunity, but I don't think they've met their
3:11:53   12   burden in order -- I think it's highly prejudicial, I think it
3:11:56   13   creates issues that could --
3:11:58   14            THE COURT:  They now have a certified copy of the
3:12:03   15   conviction from wherever it is, Northern District of, I forget,
3:12:09   16   and question is I believe it's admissible.  Do you want it to
3:12:12   17   come in and do you want to just stipulate to the fact that there
3:12:16   18   was -- over objection.  I know you don't think it should come in
3:12:18   19   at all, but I'm giving you the opportunity.  You can stipulate
3:12:25   20   to the felony, or we'll let him introduce this.  It's your call.
3:12:29   21   It would seem to me that there's more damaging stuff in this
3:12:31   22   than you'd want in.
3:12:32   23            MR. SCHWARTZ:  Of course, Your Honor.  So subject to
3:12:37   24   our objections, we'll stipulate that he's a convicted felon.
3:12:40   25            THE COURT:  Okay.  That he was convicted of a felony on
```

3:12:44   1   such and such a date in the Northern District of whatever.  Is

3:12:46   2   that acceptable to the Plaintiff?

3:12:50   3           MR. RIOPELLE:  Yes.  I just want to know, do we tell

3:12:53   4   them what he's convicted of or just say convicted of a felony?

3:12:54   5           THE COURT:  I don't think it matters what he's

3:12:55   6   convicted of.

3:12:58   7           MR. RIOPELLE:  That may be -- and I just want to make

3:13:00   8   sure we're on the same page.

3:13:03   9           THE COURT:  Let me look and see exactly what the rule

3:13:05   10  says.

3:13:51   11          What was the date of his conviction?  2015, wasn't it?

3:13:54   12  2016.  2016.

3:14:00   13          MR. RIOPELLE:  June 28, 2016, Your Honor.

3:14:08   14          THE COURT:  I suggest that the cleanest way of doing it

3:14:16   15  is that counsel stand up and indicate that we would like to put

3:14:23   16  into the record that Stephen Calabrese, the Steven Calabrese,

3:14:29   17  who testified earlier, was convicted of a felony on June 28,

3:14:32   18  2016 in the United States District Court in the Northern

3:14:35   19  District of Illinois.  That's really about the extent of it.

3:14:38   20  Then you can -- there is an instruction that will be given to

3:14:41   21  the jury concerning things that they can consider as to

3:14:45   22  credibility, and you can make whatever argument you find is

3:14:51   23  appropriate on that.  Okay?

3:14:51   24          MR. SCHWARTZ:  Yes, Your Honor.

3:14:52   25          THE COURT:  All right.

```
3:14:53   1              MR. RIOPELLE:  Can you just --
3:14:55   2              THE COURT:  You're not agreeing that it should come in,
3:14:58   3    but if it comes in, you want it to come in this way rather than
3:15:03   4    by putting in the 10 or 12 pages from the Northern District of
3:15:04   5    Illinois.
3:15:06   6              MR. SCHWARTZ:  You've given us the best opportunity
3:15:06   7    under the circumstances.
3:15:08   8              THE COURT:  Yes.  I'm sorry.  Yes, sir.
3:15:09   9              MR. RIOPELLE:  I want to make sure -- I don't have
3:15:14  10    real-time, I want to make sure I say exactly what the Court has
3:15:14  11    --
3:15:16  12              THE COURT:  You'll be the first one in this case that
3:15:19  13    did that, but I would be happy to have you do so.
3:15:22  14              What do you want me to say?
3:15:25  15              MR. RIOPELLE:  Well no, you had just said it.  The
3:15:31  16    parties stipulate that the Defendant, Mr. Stephen Calabrese, who
3:15:35  17    testified in this case --
3:15:37  18              THE COURT:  Earlier had been convicted of a felony on
3:15:42  19    June 28, 2016 in the United States District Court in the
3:15:44  20    Northern District of Illinois.
3:15:47  21              MR. RIOPELLE:  Okay.
3:15:49  22              THE COURT:  Got it?
3:15:50  23              MR. RIOPELLE:  Got it.
3:15:53  24              THE COURT:  Okay.  Then what then, are you through?
3:15:55  25              MR. RIOPELLE:  And then we're through.
```

3:15:58  1          THE COURT:  Then I suggest that we send the jury home

3:16:03  2     and that we give them -- we spend the rest of the afternoon

3:16:06  3     talking about jury instructions, or if you want to, it makes

3:16:10  4     more sense, unless you feel like you want to get out of town and

3:16:15  5     go home and take your wife out to dinner, is to give you the

3:16:19  6     instructions that we've -- in a little bit, because we have to

3:16:23  7     change them based on my rulings earlier.  And then you take them

3:16:26  8     home, work on them tonight and then tomorrow we can meet and

3:16:31  9     discuss it for hour, hour and a half in the morning.  I think

3:16:35  10    that should be plenty to go through all of the instructions.  Or

3:16:38  11    we could do it Monday morning and bring the jury back in at

3:16:39  12    10:30.

3:16:42  13         MR. RIOPELLE:  Let's not do that.  Can I consult with

3:16:43  14    my brain trust?

3:16:45  15         THE COURT:  Yes, of course.  And how long do you think

3:16:47  16    you might need for closing arguments?

3:16:52  17         MR. RIOPELLE:  I personally think the same as openings.

3:16:54  18    45 minutes each.

3:16:58  19         MR. SCHWARTZ:  Maybe do a little less, no more than

3:16:58  20    that.

3:17:00  21         THE COURT:  45 minutes is fine.  And the Plaintiff

3:17:03  22    would have -- can split it however you want to split it.  But

3:17:07  23    you have to have a full opening on it.

3:17:09  24         MR. RIOPELLE:  I get 45 minutes total, so I need to

3:17:11  25    tell you at the beginning what I'm reserving?

|  |  |  |
|---|---|---|

3:17:13  1          THE COURT:  You don't have to tell me, whatever you

3:17:19  2     don't use you save.  Whatever you use is gone.  I thought -- I

3:17:22  3     had a lawyer that thought that when he told me he had 15 minutes

3:17:26  4     he would save at the end, when I told him your 30 minute are up

3:17:29  5     and he kept talking, he thought that he still had 15 minutes at

3:17:32  6     the end.  I tried to explain to him that didn't work that way,

3:17:34  7     that he had two minute left.

3:17:36  8          Yes, sir.

3:17:37  9          MR. SCHWARTZ:  One other point on behalf of my

3:17:41  10    colleague, Mr. Kernell.  You know, he was lives in Kansas and is

3:17:46  11    also devout, and is planning to celebrate this holiday weekend

3:17:50  12    and Easter Sunday.  Is there a chance we could have the jury

3:17:55  13    come in and, let's say, Monday right after lunch so that he can

3:17:57  14    get a flight on Monday morning versus trying --

3:18:00  15         THE COURT:  Yeah, we can do that.  I don't care.  Does

3:18:05  16    anybody really care about that?  I'm not feeling particularly

3:18:10  17    well, but that's not anything serious.  I've just got general

3:18:15  18    malaise for having sat through this trial for several days.  A

3:18:17  19    couple days' recovery time would be helpful to me.

3:18:30  20         No actually, off the record.

3:18:49  21         (Discussion off the record)

3:19:06  22         THE COURT:  Anyway, I don't care about starting at noon

3:19:10  23    on Monday.  Does the Plaintiff -- do you want to talk to the

3:19:12  24    brain trust again?

3:19:14  25         MR. RIOPELLE:  Yeah.  I mean, if it's so Mr. Kernell

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

3:19:28   1   can get back, I'm not -- so I just want to see if --

3:19:32   2         (Counsel conferring)

3:19:59   3         MR. RIOPELLE:  My brain trust tells me that I should

3:20:02   4   defer.  Would the Court prefer to do it this afternoon or would

3:20:04   5   the Court prefer to do it tomorrow morning?

3:20:06   6         THE COURT:  I would prefer to do it tomorrow morning,

3:20:09   7   honestly.  But I don't really feel all that strongly about it.

3:20:14   8   I can zip through instructions as fast as you can imagine, but I

3:20:17   9   don't think you'd have a chance to have --

3:20:19   10        MR. SCHWARTZ:  Do you have a preference?  I haven't

3:20:22   11   asked Mr. Kernell.  Do you have a preference?

3:20:29   12        (Counsel conferring)

3:20:34   13        MR. SCHWARTZ:  Let's just do it tomorrow morning.

3:20:36   14        THE COURT:  All right.  We'll give you the instructions

3:20:40   15   in a little while.  Won't be long, and then we'll meet whatever

3:20:48   16   time you want.  I do not have any plans tomorrow morning so --

3:20:50   17        MR. SCHWARTZ:  Probably would like to do it like 9 if

3:20:54   18   possible, because I assume what we'll do after this is rush back

3:20:57   19   and see if we can get at least plane flights for tomorrow,

3:20:59   20   noon-ish, or a little --

3:21:02   21        THE COURT:  Correct.  And we should be finished before

3:21:05   22   lunch.  Before noon.

3:21:06   23        MR. SCHWARTZ:  So 9 a.m., Your Honor?

3:21:09   24        THE COURT:  Yeah, we can start at 9 a.m.

3:21:11   25        MR. RIOPELLE:  I assume you'll tell the jury they've

3:21:12  1    got tomorrow off.

3:21:16  2             THE COURT:  I'll bring them in and have tomorrow off.

3:21:18  3    Yes, we need to do that as soon as you're done.

3:21:21  4             All right.  Please bring the jury back in

3:21:24  5             COURT SECURITY OFFICER:  All rise for the jury.

3:21:29  6             (Jury in at 3:21 p.m.)

3:22:40  7             THE COURT:  Please be seated.

3:22:46  8             All right.  Ladies and gentlemen, we really haven't

3:22:49  9    been playing cards or anything, we've been doing the legal

3:22:53  10   issues that are raised at the end of one part of the case and

3:22:59  11   then the other part of the case, and now the Defendant has

3:22:59  12   rested.

3:23:04  13            Back to the Plaintiff for any rebuttal that you may

3:23:06  14   have.

3:23:11  15            MR. RIOPELLE:  Yes, Your Honor.  Very short.  The

3:23:17  16   parties stipulate that the Defendant, Stephen Calabrese, who

3:23:29  17   testified earlier today, was convicted of a felony on June 28,

3:23:31  18   2016 in the United States District Court for the Northern

3:23:32  19   District of Illinois.

3:23:34  20            THE COURT:  Okay.  Ladies and gentlemen, the reason

3:23:37  21   that that's brought up is that you may consider that fact as one

3:23:42  22   of the things that I tell you about later when you consider the

3:23:44  23   believability of a witness.  One of the factors that you may

3:23:49  24   consider is whether a witness has been convicted of a felony,

3:23:54  25   and I'm instructing you that Mr. Calabrese was, in fact,

|        |    |
|--------|----|
| 3:23:57 | 1 |
| 3:24:02 | 2 |
| 3:24:05 | 3 |
| 3:24:07 | 4 |
| 3:24:14 | 5 |
| 3:24:20 | 6 |
| 3:24:24 | 7 |
| 3:24:28 | 8 |
| 3:24:34 | 9 |
| 3:24:41 | 10 |
| 3:24:43 | 11 |
| 3:24:48 | 12 |
| 3:24:51 | 13 |
| 3:24:55 | 14 |
| 3:24:58 | 15 |
| 3:25:03 | 16 |
| 3:25:07 | 17 |
| 3:25:11 | 18 |
| 3:25:16 | 19 |
| 3:25:18 | 20 |
| 3:25:24 | 21 |
| 3:25:27 | 22 |
| 3:25:30 | 23 |
| 3:25:33 | 24 |
| 3:25:37 | 25 |

convicted of a felony, and you may consider that fact, not to decide he's a bad guy or a good guy or whatever, but only to determine whether you believe that witness's testimony.  It's one of the factors that you may consider.

Now, here's what we're going to do.  We've got probably several hours more of legal discussion that we have to do. We're going to do that this afternoon and tomorrow morning.  I'm not going to bring you back tomorrow after lunch to mess up your Easter weekend or Passover weekend, so I'm going to let you go until Monday at noon.  Monday at noon, come back.  Hey, you're going to get off another week, you're not going to have the responsibility to other juries to sit in a two-week period. Anyway, we'll be done Monday and you'll make -- you'll have the case in your hands before Monday afternoon, and at that point you make your determination how long it takes you, what you're going to be deciding.  And we'll hang around as long as you need us to, or you can come back Tuesday.  There's no reason that says this case took five days, therefore you need to take five hours or ten hours or two hours or ten minutes.  It's your call. What happens in the jury room stays in the jury room.

But just remember not to discuss the case with anyone, even among yourselves.  Don't read or listen to anything touching on the case.  Don't do any research or make any investigation about the case on your own.  I know it would be tempting to go on the computer and Google something.  Don't.

```
3:25:39    1    Remember you must not have any contact with the attorneys,
3:25:44    2    parties or witnesses.  Finally remember you must not form any
3:25:47    3    opinion about this case on your own until all the evidence is
3:25:47    4    in.
3:25:50    5             All right?  I thank you, and Monday at noon we're going
3:25:56    6    to start then.  So eat a late breakfast or early lunch, be
3:25:59    7    seated so we can just go forward with the arguments and the
3:26:00    8    instructions at that point.
3:26:05    9             Have a great weekend.  Enjoy yourselves and we'll see
3:26:06   10    you Monday at noon.
3:26:08   11             COURT SECURITY OFFICER:  All rise for the jury.
3:26:11   12             (Jury out at 3:26 p.m.)
3:26:27   13             THE COURT:  All right.  We'll be back out with the
3:26:30   14    instructions -- I don't think all of you have to wait -- 20, 30
3:26:33   15    minutes, so you can either wait or leave somebody behind that
3:26:36   16    will bring them to you, and then you can look at them at your
3:26:39   17    leisure and we'll talk about them Monday morning, 9:00.  I'm
3:26:45   18    sorry, that's what I meant.  Tomorrow morning, 9:00.  I keep
3:26:50   19    thinking tomorrow is Monday.  I'm punchy from being up most of
3:26:51   20    the night, so I apologize.
3:26:55   21             All right?  We'll be in recess until 9:00 tomorrow
3:27:07   22    morning.  Tomorrow, you may want to get the exhibits in order so
3:27:13   23    that Monday we can give them to the jury if we need to.
3:27:13   24             (See Volume 7 for continuation)
3:27:13   25
```

3:27:13    1
3:27:13    2
3:27:13    3
3:27:13    4
3:27:13    5
3:27:13    6
           7
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25

# C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

4/14/2022                    /s/ Dawn M. Savino, R.P.R., C.R.R.
Date                         DAWN M. SAVINO, R.P.R., C.R.R.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**