```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF FLORIDA
 2                            MIAMI DIVISION
                        CASE NO.  18-cv-60788-JEM
 3

 4    SPRINT COMMUNICATIONS, INC.,

 5         Plaintiff/Counterclaim Defendant,

 6         vs.

 7                                         Miami, Florida
                                           April 18, 2022
 8    STEPHEN CALABRESE, as an individual, Pages 1-100
      NEXTEL, INC., d/b/a NEXTEL WORLDWIDE, 12:07 p.m. - 2:35 p.m.
 9    RETROBRANDS USA LLC,                  and
      JEFFREY KAPLAN, as an individual, and 4:18 p.m. - 4:58 p.m.
10    NEXTEL WORLDWIDE MOBILE, INC.,

11         Defendants/Counterclaimants.
      _____
12
                       TRANSCRIPT OF JURY TRIAL
13                           VOLUME 8
                 BEFORE THE HONORABLE JOSE E. MARTINEZ
14                   UNITED STATES DISTRICT JUDGE

15    APPEARANCES:

16    FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:
                          McGuireWoods, LLP
17                        BY:  BRIAN C. RIOPELLE, ESQ.
                          BY:  LUCY J. WHEATLEY, ESQ.
18                        BY:  AMANDA L. DeFORD, ESQ.
                          800 East Canal Street
19                        Richmond, Virginia 23219

20    FOR THE DEFENDANTS/COUNTERCLAIMANTS:
                          Erickson Kernell IP
21                        BY:  JAMES J. KERNELL, ESQ.
                          8900 State Line Road
22                        Suite 500
                          Leawood, Kansas 66206
23
                          Lee & Amtzis, PL
24                        BY:  WAYNE SCHWARTZ, ESQ.
                          5550 Glades Road
25                        Boca Raton, Florida 33431
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1    REPORTED BY:          DAWN M. SAVINO, R.P.R., C.R.R.
                            Official Federal Court Stenographer
 2                          400 N. Miami Avenue, 10S03
                            Miami, Florida  33128
 3                          Telephone:  305-523-5598
```

 4

 5              (Court called to order).

 6              THE COURT:  Be seated, please.  All right.  I sent out

 7    what my proposed final instructions will be and verdict form.

 8    And I -- does anyone -- did you want to put some objections on

 9    the record?

10              MR. SCHWARTZ:  Yes, Your Honor.  On behalf of the

11    defense, the easy one on Page 8, the very last question, we

12    simply wanted to remove the number to the trademark and so it

13    should just say "abandoned the Nextel trademark."  And the basis

14    -- that covers the registration of that particular mark and any

15    common law issues related to that mark.  So having the number

16    there is confusing.

17              THE COURT:  I think it's restrictive, but I don't think

18    it's confusing.  Go ahead.

19              MR. RIOPELLE:  No, and I think the jury instructions

20    are done based on what rights come with the registration, the

21    evidence that's gone in about the registration including the

22    number, it differentiates it from the other number they've heard

23    during the trial and there was no objection to this during the

24    jury charge conference, so we think it should still have the

25    number.

3

```
1              THE COURT:  I'll overrule your objection.

2              What else you got?

3              MR. SCHWARTZ:  Final objection, Your Honor.  It was

4    raised at the charging conference.  We just feel like the last

5    question is out of order, and it's confusing in terms of not

6    having a direction and that it should probably come first and

7    then if they answer yes or no, it can direct them to the balance

8    of the --

9              THE COURT:  It's your job.  Your brilliant lawyers are

10   supposed to unconfuse them.

11             MR. SCHWARTZ:  I'm just addressing it for the record.

12             THE COURT:  All right.  Your objection is noted.

13             MR. SCHWARTZ:  Thank you, Your Honor.

14             THE COURT:  All right.  Can we bring the jury in then?

15             How much are you going to want for your opening

16   closing, Plaintiff?

17             MR. RIOPELLE:  I thought -- I think the other day you

18   told you 45 minutes.

19             THE COURT:  Total.  But I want to know how much you

20   want to use in the beginning so you can have a little warning.

21             MR. RIOPELLE:  I will be --

22             THE COURT:  You just set it up because like I said, I'm

23   not going to stop you when that time is up until your 45 is up

24   and then you don't have any rebuttal.

25             MR. RIOPELLE:  Why don't you do it for 35 minutes, I
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    confess I've not timed it.

2            THE COURT:  35 it is.  And yours will be set for 45.

3            MR. SCHWARTZ:  Thank you, Your Honor.

4            One other housekeeping question.  Are we permitted to

5    show on the ELMO a section of the -- not the verdict form, the

6    jury instruction, for instance?

7            THE COURT:  Yes, you're allowed to show them the jury

8    instructions.

9            MR. SCHWARTZ:  Thank you.

10           THE COURT:  All right.  Are we ready?  All the jurors

11   showed up, so let's get them in here.

12           COURT SECURITY OFFICER:  All rise for the jury.

13           (Jury in at 12:10 p.m.)

14           THE COURT:  Be seated, please.

15           Welcome back, ladies and gentlemen of the jury.  It's a

16   pleasure to have you here.

17           In case you might not notice, Jose has gotten taller

18   and thinner and much better looking because I know misery loves

19   company, so I'm sure you'll be happy to hear Jose got jury duty

20   today.  And he is over in the state court system and they

21   actually called him.  I used to go over all the time to the

22   state.  I'm not eligible for federal court jury duty, but I'd go

23   over to the state all the time, and I'd never get called.  And

24   finally like the fourth or fifth time that I got over there, I'd

25   see a big hullabaloo at the front, and the guy that usually runs

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   the jury panel over there is Ed Newman, and I don't know if you

2   older folks would remember Ed Newman was an offensive lineman

3   for the Miami Dolphins.  Very nice man, very smart.  Graduated

4   Duke undergraduate school and the University of Miami Law

5   School, and he's a very bright guy, and a good judge, and he

6   could come in and we would shoot the breeze a little bit while

7   we were waiting.  But this time it was the chief judge came in.

8   And I know her very well also, Berti Soto.  And she said what

9   are you doing here?  And I said well, I think it's my duty and I

10  don't want to shirk it.  And she said you're not eligible to sit

11  on this, and she showed me a Florida Statute that exempts

12  federal judges from state court jury duty.  And I said well, why

13  didn't somebody tell me?  I've been over here five years in a

14  row, nobody ever told me.  They just never selected me.  And so

15  I would end up sitting there watching a -- you know, some old

16  movie on the video screen that they have in the jury room.  And

17  I finally found out that I wasn't eligible.  But Jose is

18  eligible, and he's over there and he actually apparently got

19  called for a trial so it's good for him, good experience for

20  him.

21          Anyway, as we told you at the beginning, what the

22  lawyers say to you isn't evidence.  The only evidence is from

23  the jury -- from the witness box, or from the exhibits, or from

24  stipulations of the parties, or other evidence that is brought

25  in one way or another.  But the bottom line is that it's very

6

1    important for you to listen to them so that they can try to tell

2    you what they believe the evidence has been.

3          After they're finished, I will read you the

4    instructions.  You will then go back, and I'll give you a copy

5    of the instructions, a copy of the verdict form, we'll start

6    gathering the evidence to bring it in to you.  You don't have to

7    wait for the evidence, you don't have to actually have it in

8    front of you, you've seen it all.  The bottom line is that you

9    will then go in and start voting.  You'll select a foreperson,

10   then you'll start talking about it.

11         It's very important that all of you participate.  Some

12   of you might have better notes than others, some of you might

13   have no notes, it doesn't matter.  What some person might say

14   might just flash your memory in your mind.  It's very important.

15   Just because this case took a few days doesn't mean that you

16   need to take a few hours.

17         We're going to break this afternoon a little bit before

18   5 again.  If you're not finished, then we'll come back tomorrow

19   and we'll continue the deliberations until you reach a verdict.

20         But  I want you to please pay close attention to the

21   lawyers as I recognize them in turn for them to give you their

22   closing statements.

23         You may proceed, sir.

24         MR. RIOPELLE:  Thank you, Your Honor.

25         Can we put the slide up please?

 1          Good morning.  I hope everyone had a good Easter and
 2   good holiday weekend.
 3          When I first had an opportunity to speak to you last
 4   Monday, I raised a question.  I said why are we here.  But now
 5   that you've seen all the evidence, I'd like to pose a different
 6   question to you.  What's really going on here?  You know, if you
 7   listened to the Defendants last Monday, what they said is this
 8   is about the big guys squashing the little guy, about David
 9   versus Goliath, that these are two guys just minding their own
10   business and trying to make a living, that Sprint is trying to
11   stand in their way, stifle competition and squash the little
12   guy.  That we're just suing them for the sake of suing them.
13   Sprint didn't want to do this.  Sprint has to protect its
14   trademarks, but it certainly didn't want to spend all the time
15   and the money to go through this trial.  In fact, as you saw,
16   Sprint tried to get this taken care of long before there was any
17   lawsuit.
18          And Sprint thought it had been taken care of.  When
19   Sprint showed Mr. Calabrese in October of 2017 that Sprint was
20   using the Nextel mark and was using the Nextel mark to sell
21   goods and services, Mr. Calabrese's lawyer told us that
22   Mr. Calabrese had stopped.  And you've seen this.  This is the
23   October 2017 e-mail saying that they've stopped, ceased all
24   offers for sale of telecommunication services and equipment
25   using the Nextel mark.  And then three months later, in February

1   of 2018, Mr. Calabrese's lawyer sends us another e-mail and says

2   my client has stopped using the mark.  This should allow you to

3   close your file on this matter.  But of course, as you know now,

4   Sprint couldn't close its file because despite what

5   Mr. Calabrese was saying, and despite what Mr. Kaplan knew

6   Mr. Calabrese was saying, the Defendants weren't stopping use of

7   the Nextel mark.

8           This case is not about Sprint trying to make money off

9   the Defendants.  This case is about the Defendants trying to

10  make money off of Sprint and the Nextel trademark.  That's

11  what's going on here.  In fact, every part of the Defendants'

12  case is built, and I hate to say it, but built on lies and

13  theft.  And to remind you, when you consider Mr. Calabrese's

14  testimony, you may take into account the fact that he is a

15  convicted felon.

16          As I just showed you, Defendants told Sprint that they

17  had stopped using the Nextel trademark and that Sprint could

18  close its file on the matter.  They told Sprint that on February

19  8, 2018.  But they knew that Mr. Kaplan, just one week before on

20  January 30, 2018, had filed a trademark application for the

21  Nextel mark.  And they knew that just one day after that,

22  Mr. Calabrese and Mr. Kaplan had signed an agreement to try to

23  use the Nextel mark.  And they knew, just two days before that,

24  on February 6, 2018, Mr. Kaplan had issued a press release

25  saying that we're bringing back the Nextel brand.  But then they

1 told us on February 18th, oh no, we're not using this.  You can

2 close your file.

3        But it goes beyond this.  For example, Mr. Calabrese

4 names his phones after the old Motorola phones like the i305.

5 He does this because Nextel and Sprint used to sell the old

6 Motorola phones that were named after being used on the iDEN

7 network.  Mr. Calabrese wants people to think that he's selling

8 later versions of these same phones.

9        Mr. Kaplan filed trademark applications and he filed

10 those under penalty of perjury, but he knew that Sprint owned

11 the trademarks.  He knew Sprint had asked Mr. Calabrese to stop.

12 He knew Mr. Calabrese's lawyer had told Sprint to close its

13 file, yet he swore under penalty of perjury that the following

14 was true:  He swore that to the best of his knowledge and

15 belief, no other persons have the right to use the mark in

16 commerce, either in identical form or in such near resemblance

17 as to be likely, when used or in connection with the goods or

18 services of such other persons.  He signed that.  He said that

19 nobody else had the right to it when he knew that Sprint owned

20 the trademarks and Sprint had the right to it.

21        And furthermore, he signed that when he admitted, on

22 the stand here, that when he filed the application for the

23 chirp, he copied Sprint's registration right into his

24 application form, and yet he said that nobody else had the right

25 to use it.

1          And he did this -- and then there's even the

2     misrepresentations on their website.  He puts this on their

3     website saying that this is their coverage area.  This is their

4     coverage map, but this coverage map is not the Defendants'

5     coverage map and he admitted on the stand that he just copied

6     that coverage map off the internet.

7          He puts this building on his website.  He's trying to

8     make people believe that this is Defendants' building but again,

9     he admitted on the stand, under oath here, that this building

10    was not associated with any of the Defendants.  He just copied

11    that image on the internet.

12         He even goes so far that he puts up our ads, my

13    client's ads on his website trying to make people think that

14    he's the original Nextel.

15         They made a video, which we showed you, and I think

16    it's Exhibit 108, saying that they have a nationwide network,

17    but they don't have a nationwide network.  In fact, you heard

18    Mr. Calabrese say, when we played you the video of his

19    deposition, he just buys SIM cards from the Walmart.

20         But it doesn't even stop there.  Mr. Kaplan has now put

21    up a page where he's trying to get people to invest in his

22    company.  But many of those things he's telling those potential

23    investors, people whose money he wants, many of those people

24    he's telling -- many of those things he's saying just aren't

25    true.  So here's an example.  Off of this Start Engine page

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    where he's trying to raise money, he says as a Mobile Virtual

2    Network Operator, MVNO, Nextel obtains bulk access to network

3    services at wholesale rates.  Now, you heard about MVNO.  What

4    that is is when somebody has a contract with one of the big

5    carriers whether it's Sprint or T-Mobile or Verizon or AT&T, and

6    they buy time on there and they get better service because of

7    that.  Some of the best-known MVNOs in this country are people

8    like Cricket and Infiniti, Xfinity uses it, but they're not MVNO

9    and he admitted that on the stand, it's just not true.

10          He also says on this website where he's trying to raise

11   money, Nextel Mobile Worldwide, Inc. is a holding company that

12   owns the intellectual property rights to the Nextel and the

13   Nextel chirp trademarks.  But he admitted on the stand that

14   that's not true.  He knows Sprint owns those, and those two

15   numbers up there, both that start with eight, those aren't even

16   trademark numbers.  They are the trademark application numbers

17   that the United States Patent and Trademark Office rejected, and

18   he admitted that that's not true.

19          What does is he not telling people.  Well, he's trying

20   to raise money from people; but he's not telling them that he

21   doesn't own the trademarks; he's not telling them that Sprint

22   owns the trademarks; he's not telling them that Sprint

23   challenges Nextel Mobile Worldwide's right to use the Nextel and

24   the chirp sound marks, and he doesn't even tell them about this

25   lawsuit.  If you're trying to raise money from people, wouldn't

1   you tell them there's a chance that it's going to be shut down

2   and you're not going to have anything, and they're going to be

3   investing in nothing?  He doesn't tell them that.

4           And even when they were trying to put on the evidence

5   in this case, they were trying to mislead you.  They tried to

6   show you that Sprint somehow abandoned the Nextel trademarks

7   because it stopped listing the Nextel trademark in their

8   Sprint's annual 10-K financial reports.  But these aren't

9   reports for a company that lists all of its trademarks.  These

10  financial filings are, not surprisingly, focused on financial

11  matters.  And if you want to know what trademarks a company

12  owns, you go to the United States Patent and Trademark Office

13  website and you do a search on it.  And if you do that search,

14  you'll see that Sprint owns lots of trademarks, including these

15  two trademarks that are at issue in this case.  And you heard

16  Mr. Kaplan say that he did that search, and that he saw that

17  there were live trademarks that were owned by Sprint and despite

18  seeing that, he decided to proceed and try to use and steal the

19  trademarks.

20          They also tried to make a big deal about Sprint

21  allowing other marks to be cancelled, but as you heard

22  Mr. Shaughnessy say, trademarks are cancelled all the time when

23  the marketing plans change.  And any of these other marks that

24  were cancelled, they're irrelevant.  I mean, it's just a red

25  herring.  The only marks that matter are the two at issue in

1   this trial, the two that are live and valid and still owned by

2   Sprint.

3        Another way they tried to mislead you was by claiming

4   that by shutting down the iDEN network in 2013 somehow meant the

5   end of the Nextel brand.  But as Mr. Kohman said when he

6   testified, there is a difference between a network and a brand.

7   This is Mr. Kohman's testimony.  When Sprint turned off the iDEN

8   Mr. Kohman, did it stop using Nextel?  No, they did not.  Why

9   not?  The Nextel name is a brand, it's not a network.  We shut

10  down the iDEN network, but we were going to continue to use

11  Nextel.  A brand runs on a network.  Here, the Nextel brand was

12  used on the iDEN network and then when they shut down the iDEN

13  network in 2013, it continued to be used on Sprint's CDMA

14  network and is now used on Sprint's later generation networks.

15       And why are they doing all these things?  Why are they

16  using Sprint's Nextel and chirp trademarks?  Because they're

17  trying to make a lot of money using Sprint's property.  They are

18  trying to make a lot of money stealing the Nextel trademark.

19  And that's not me saying that, they said it in the agreement

20  they signed.  You can see here they talk about the famous and

21  iconic trademark Nextel, and they go on to say our goal which is

22  to sell the company for tens of millions of dollars or possibly

23  hundreds of millions of dollars within the next five years.

24  That's what they're trying to do.  They're trying to steal it

25  and make money off it.

```
 1              So let's talk about the claims that Sprint is actually
 2     asserting here, because that's what you're going to have to
 3     decide when you go back into the jury room.  The first one I
 4     want to talk about is infringement.  Now, there's no issue that
 5     they are using the Nextel mark.  I mean, they're not even trying
 6     to hide it.  They're intentionally using it.  But again, here's
 7     another place where they're trying to mislead you.  This
 8     trademark is for the word Nextel and because it's for the word,
 9     it prevents anyone else from using that word Nextel from trying
10     to sell goods and services.  So it doesn't matter what font the
11     word is in, it doesn't matter what color the word is in, it
12     doesn't matter if Nextel is capitalized or all small letters,
13     it's using the word Nextel that is the infringement.  But the
14     Defendants have tried to argue that their banners in black and
15     yellow don't infringe because Sprint allegedly abandoned the
16     black and yellow design years ago.  But even if that's true, it
17     just doesn't matter.  All that matters is that they're using
18     Nextel, and using Nextel to sell goods and services, because
19     using the word is what infringes.
20              There's also no question that they're using the chirp
21     mark.  They tried to say no, we don't use the chirp mark, but
22     Mr. Kaplan admitted on the stand they're using it.  Now, you
23     agree that even though this was rejected, you and the Defendants
24     were using the Nextel chirp, right?  We're using -- yes, we're
25     using the Nextel chirp.  That was Mr. Kaplan.
```

1          So then after he admitted this on the stand, they tried

2     to change it a little bit and say well, the Nextel chirp is not

3     that distinctive.  And, you know, we may not be using exactly

4     that.  Well, Mr. Kaplan admitted contrary to that also.  You

5     agree, right, that the Nextel chirp is a distinct sound.  Yes.

6     And that sound is associated with Nextel.  Yes.

7          But on top of that, we showed you other evidence of

8     them using the chirp.  We showed you that Mr. Kaplan's Nextel Is

9     Back video, and I think it's Exhibit 113, I'm not going to play

10    the video for you but if you want to you can see it later, that

11    use the chirp sound.  And we also showed you the video of one of

12    Mr. Calabrese's dealers who was talking about the products that

13    Mr. Calabrese and Nextel, Inc. are selling.  If you remember,

14    that dealer played the chirp on his phone on the video.

15         Now, you're going to hear in the jury instructions when

16    the judge reads you the jury instructions, that the test, the

17    standard for infringement is called likelihood of confusion.

18    Well, in this point, in addition to all the evidence you've

19    seen, there's two things you can focus on when you think about

20    likelihood of confusion.  The first one is, as you saw, when the

21    United States Patent and Trademark Office rejected Mr. Kaplan's

22    and Mr. Calabrese's applications, they rejected them because the

23    experts at the trademark office found they would cause a

24    likelihood of confusion.  The other thing you can focus on is

25    there's even something, a type of proof that's stronger than the

1    likelihood of confusion, it's called actual confusion.  And the

2    Judge will read to you and instruct you on actual confusion when

3    you hear the jury instructions.

4         And you heard in this case from Mr. Kohman, from Mr.

5    Wiley, from Mr. Mancuso and from Mr. Shaughnessy about how

6    people were confused when they went to the IWCE trade show in

7    2017 and saw the Defendants' booth.  And in fact, if you were

8    listening hard, when they read Mr. Calabrese's deposition, you

9    heard actual confusion there because Mr. Calabrese said that

10   people came up to him and asked him was he associated with

11   Sprint, what was going on here.  So on infringement, there's

12   really no question that they're infringing here.

13        The next thing we're going to ask you, you're going to

14   have to make a decision on is what's called counterfeiting.

15   Now, counterfeiting means that the Defendants' use of the Nextel

16   trademark and the sound mark are copies, and the law says that

17   copies have to be identical or substantially indistinguishable

18   from Sprint's trademarks.  And, you know, the classic example of

19   this is when you're walking down the street and somebody tries

20   to sell you a Rolex watch or a Gucci bag.  Well, it says Rolex

21   or Gucci on it, and it kind of looks like a product that Rolex

22   or Gucci may sell, but in fact it's not.  That's what

23   counterfeiting is.  And there's really no question in this case

24   the Defendants are counterfeiting the Nextel trademark.  They're

25   not using a word that sounds like Nextel, they're using Nextel

1    and they're putting Nextel on devices to make it look like it

2    came from us.  That's counterfeiting.

3          The same is true for the Nextel chirp.  They're using a

4    chirp, or a sound, that is substantially indistinguishable from

5    the Nextel chirp.  Now, they seemed to suggest that you couldn't

6    tell the difference unless you were an audiologist, an expert in

7    sound.  But that's not the standard.  The question is how

8    ordinary consumers like you and me would hear, and it is

9    actually the Nextel chirp.  But even if it is not the Nextel

10   chirp, it is indistinguishable.  So they're using and

11   counterfeiting the Nextel chirp also.

12         The third thing you're going to have to address is

13   something that's called dilution.  Now, that's where the

14   Defendants are diluting the value of the Nextel and chirp

15   trademarks.  So as the Judge is going to tell you when he reads

16   the instructions, we had to show that the Nextel mark is famous

17   and distinctive, and the Defendants' use is likely to cause

18   blurring or tarnishing of that mark, of that famous trademark.

19   And you can see from the slide that's still on the screen that

20   Defendants admitted the Nextel chirp sound is distinct, and they

21   also admitted that the Nextel mark is famous.  In fact, the

22   Nextel trademark, there was a pronoun there first, was famous

23   and iconic because my clients, Nextel and Sprint, had made it

24   famous and iconic, right?  And Mr. Kaplan said correct.  In

25   fact, because it's famous and because it's distinct and because

1    it's iconic, that's why they're trying to steal it.  That's why

2    they're using it.

3          We also showed you why it's likely to tarnish the

4    Nextel brand.  And I'll talk a little bit more about quality in

5    a minute, but the fact that the Defendants -- the fact is the

6    Defendants are selling inferior products and inferior service,

7    and they're selling it to people like first responders who need

8    a reliable product.

9          Now, the last claim you'll need to make a decision on

10   is called cybersquatting.  Cybersquatting is just using our

11   trademark in their website domain names.  Well, there's no

12   question that they're using Nextel in their website domain names

13   and I'll show you those domain names in a minute.

14         And so what's the danger of the confusion that results

15   from infringement and counterfeiting and unfair competition and

16   dilution and cybersquatting.  The danger is that consumers will

17   buy a product or service but not get what they think they're

18   getting.  And in this case, a lot of those consumers are first

19   responders, people who respond to emergencies.  And why did you

20   hear so much about the IWCE trade show?  It's because that trade

21   show is geared towards people like first responders and others

22   who are looking for and need reliable communications.

23         And you heard Mr. Kohman and Mr. Shaughnessy explain

24   why the Nextel push-to-talk service is more reliable.  It's

25   because it's integrated into the network, and because Sprint

owns that network and it's integrated into the network, Sprint
can prioritize the communications of first responders and others
when it's necessary.  And you heard Mr. Calabrese, he just buys
SIM cards from the Walmart.  And you heard when I asked Mr.
Kaplan, he admitted that they can't prioritize the
communications with the services they're trying to sell.

I don't know if you remember this, but last Monday I
used an analogy about an incident at a University of Miami
football game.  And the reason I used that analogy was because I
wanted to explain how Sprint could prioritize the communications
so the first responders could then deal with that incident.
Well, what if those first responders at the University of Miami
football game bought the infringing and counterfeited products
from the Defendants instead, but thought they bought real Nextel
products.  They might not find out until the incident because
the service could not be prioritized above the other 90,000 fans
that are at that game.  The first responders' communications
would be jammed just like those 90,000 fans.  It wouldn't work
and they wouldn't be able to deal with the incident, and that's
what Sprint is trying to prevent.  That's what's going on here.

Now, I need a drink of water.

Now, as you know, the Defendants' argument for why they
think they get to use Nextel is because they claim Sprint
somehow abandoned the Nextel trademark.  Now, a couple notes on
this.  This theory only goes to the Nextel mark.  There's no

1    claim that the chirp has been abandoned, so you don't even have

2    to decide whether the chirp's been abandoned.  And there's also

3    no claim anymore that Sprint somehow defrauded the US Trademark

4    Office.

5            So here's what they have to show for abandonment.  They

6    have to show that Sprint discontinued the bonafide use of

7    Sprint's trademark and Sprint did so with the intent not to

8    resume its use in the reasonably foreseeable future.  And listen

9    when the Judge reads you the instructions, because he's going to

10   explain that the presumption of abandonment is three consecutive

11   years of nonuse.  So based on that standard, what evidence would

12   you have expected from Defendants to show abandonment?  Well,

13   you would have expected abandonment for at least a three-year

14   consecutive period, and you would have expected evidence that

15   Sprint had no intention of ever continuing to use the Nextel

16   trademark.  But you didn't see that.  And as I said in my

17   opening statement a week ago, the reality is exactly the

18   opposite.

19           And before I show you the use, let's talk about what

20   constitutes use.  This is actually the trademark statute and

21   this is where it says use, and you can see it says a mark shall

22   be deemed to be in use in commerce on goods when it's placed in

23   any manner on their containers or on the tags or labels affixed

24   thereto, on documents associated with the goods, and on services

25   when it is used or displayed in the sale or advertising of

1    services.  This is how Sprint's using the trademark.  It's

2    placed on any manner, they're putting it on the containers, you

3    saw it on the boxes; it's on tags or labels affixed to the

4    boxes, you saw that, it's on the tags and on the labels they're

5    putting on them; on documents associated with the goods, that's

6    in the manuals that came in some of those with those phones,

7    Nextel was on those; and on services when it's used or displayed

8    in the sale or advertising, that's on those PowerPoint

9    presentations that they're making to business customers, they

10   had Nextel on there.  So that's how Sprint's using it.  And you

11   may remember when I got into a little disagreement with Mr.

12   Kaplan last Thursday where he said no, the statute says

13   prominent, has to be prominent use.  And I said well, we'll see,

14   won't we?  Well, there's the statute and it says it is placed in

15   any manner.  It does not say prominent and there's no prominent

16   in there at all, and that's not what's required.

17          So what did you see?  Well, you saw boxes from as early

18   as 2012 using the Nextel trademark, and you heard

19   Mr. Shaughnessy testify that Sprint sold those products from

20   2012 to 2019, and if you were listening carefully when they read

21   Ms. Jobe's testimony, you heard her say the same thing, that

22   Sprint sold these products from 2012 up through 2019.  And the

23   reason they said 2019 at that point is because that's when their

24   depositions were taken.  And you saw Mr. Wiley up there

25   demonstrate current products that Sprint has been selling in

22

```
 1    2021 and is selling right now.  You saw marketing PowerPoints
 2    that were used directly with businesses to sell the Nextel push
 3    devices and services.  You saw the PowerPoint that ran on a
 4    continuous loop at the 2017 IWCE trade show.  You saw the banner
 5    that was used at the 2018 IWCE trade show.  You saw the placards
 6    that were used at the 2019 IWCE trade show.  And all you saw
 7    evidence that Sprint has been continuously using the Nextel
 8    trademark since not only 2013, but, in fact, all the way back to
 9    1993 when they first got the Nextel trademark.
10         So what about the second prong?  What about intent to
11    keep using?  Well, Mr. Kohman testified about this.  Here's what
12    he said.  And were you personally involved in any discussions
13    with Sprint about what it would do with the Nextel brand after
14    the iDEN network shutdown?  Yes, I was.  What decisions were
15    reached?  We recommended that the name and decided that the name
16    was going to be used and assigned to specifically push-to-talk
17    devices, specifically an intrinsically safe device.  And he went
18    on.  At any point in the planning meetings was there any
19    discussion or consideration by Sprint of stopping use of Nextel
20    altogether?  No, there was not.  Why not?  Because the brand had
21    value and they were still using it.
22         You also heard Mr. Shaughnessy testify the other day,
23    explain how T-Mobile, right now, is considering the best use of
24    the Nextel mark going forward.  The fact is the Nextel trademark
25    has not been abandoned.  It's been used since 1993.  And Sprint
```

1    and T-Mobile still have plans to continue to use it.

2           So the next thing that you're going to need to think

3    about is damages.  And damages are a little tricky in this case

4    because there's different kind of damages for different kinds of

5    claims, so you may want to take notes on this, but maybe not.

6    The first type of damages are what's called statutory damages

7    which I talked about last week.  These are damages that are

8    essentially fines that are in the statute.  And in fact, here's

9    -- and this for counterfeiting, you can see not less than $1,000

10   or more than $200,000 per counterfeit mark per types of good or

11   services.  But if it's willful, if they're intentionally using

12   the mark, then it can be up to $2 million per counterfeit mark.

13          So here's what it is.  On the Nextel mark itself,

14   they've admitted they used it on mobile telephones, mobile

15   radios, dispatch radios.  So if you find it's not willful, then

16   it's up to $200,000 per use.  But if you find that they're

17   willfully doing this and they're intentionally doing this, and

18   they are intentionally doing this, then it's 2 million for each

19   use.  So for the Nextel mark itself, that's $6 million.  And

20   then for the Nextel chirp, it's another 2 million.  So the total

21   on counterfeiting is $8 million.

22          Now there's also statutory damages for the

23   cybersquatting.  And it's different.  You get not less than

24   1,000, but not more than 100,000 per domain name.  And these are

25   the domain names that have come into evidence, those five.  So

```
 1   at a minimum it has to be $5,000, but we believe it should be
 2   $100,000 for each one, up to a total of $500,000 because again,
 3   they're obviously using the Nextel mark intentionally in their
 4   domain names.
 5          Now, the last part for infringement, for dilution and
 6   for unfair competition, they aren't statutory.  So what you're
 7   allowed to do there is you're allowed to -- it's called
 8   disgorging the profits.  You're allowed to have them turn over
 9   their profits on -- for using, for infringing, for diluting and
10   for unfairly competing.  Well, so the question is what are the
11   profits?  Well, Mr. Kaplan told us the other day.  He was
12   talking about the royalty fee on that -- on his agreement with
13   Mr. Calabrese.  And how is that royalty fee calculated?  It's
14   based on the quarterly report.  Every quarter they'll send me
15   their profit and loss statement, and I would get 10% of the net,
16   the net revenue.  And since the beginning of 2018 to the
17   present, how much has RetroBrands been paid in a royalty fee
18   from Nextel, Inc?  Approximately 40 to 50,000.  So you can set
19   approximately.  We'll take the low one, 40.  Well if 40,000 is
20   10%, it's 10% of 400,000, so Defendants' profits are 400,000.
21   So that's what you can award on those.
22          So what I'd like to do now is show you the verdict
23   form.  Your Honor, may I approach the ELMO?
24          THE COURT:  Yes, you may.  ELMO.
25          MR. RIOPELLE:  So this is a copy of the verdict form
```

1   the Court is going to give you, and let me just explain how this

2   is organized.  The Court, has wisely, the first series of

3   questions are all in the Nextel mark.  Then you're going to get

4   a series of questions on the Sprint chirp mark.  And intertwined

5   in those are going to be the damage questions.

6          So let me just go through this with you.  You'll see

7   the first question here is did Sprint prove, did Plaintiffs

8   prove, on trademark counterfeiting.  Now, we think the evidence

9   has clearly shown that yes, they've been counterfeiting on the

10  Nextel mark.  So then you turn it over, and let me pull this

11  down, and you can see the Court has put in there the amounts,

12  the 1,000, 200,000, for the maximum of 2 million, and we believe

13  here on Question 2, as I just showed you there, they've done it

14  on three different times so this should be $6 million.

15  Hopefully your handwriting is a little better than mine.

16         So the next question is the trademark infringement.

17  Again, we think the evidence clearly shows that they're

18  infringing the trademark.  So what do you put here?  Well, this

19  one is about the damages.  The disgorgement of the profits.  So

20  here we believe this should be 400,000.

21         The next one, the next question is on the unfair

22  competition.  Again, we believe you should say yes on all of

23  those and again here, this would be 400,000 because this only

24  goes to the profits.

25         The next question you're going to see, again, this is

26

1    all still with the Nextel trademark, is the dilution.  Again, I

2    think it should be yes all the way there and again, the dilution

3    is 400,000.

4         And then the last one here is the cybersquatting on the

5    Nextel trademark.  Again, they're using all of that, and this is

6    the one, because they're using five of them, and it's $100,000

7    per one, this should be 500,000.

8         Now, you can see now that on Question 11, you'll see

9    it's now switching to the sound mark.  So we're going to ask

10   some of the same questions.  So first going to ask about the

11   counterfeiting on the sound mark, we believe that that should be

12   yes all the way across.  And then here this should be 2 million.

13        And then on Question 13, again, now still on the sound

14   mark, this is trademark infringement.  Again, we think it should

15   be yes, and this should be 400,000.

16        And then on unfair competition on the sound mark should

17   be yes, and again there should be 400,000.

18        Now, you'll see there's no cybersquatting on the sound

19   mark because you can't use the sound in a domain name, so you

20   don't have a question for that.

21        And the last question on here is do you find that

22   Defendants proved by a preponderance of the evidence that the

23   Plaintiff has abandoned Nextel Trademark Number 244 by stopping

24   all use with an intent not to resume use, and obviously we

25   believe here you should say no.  So hopefully that gives you an

1      idea of what you'll be seeing when you see the thing.

2            So just to wrap this up, we ask that you find

3      Defendants liable for their numerous violations involving the

4      trademarks in this case.  And as I said at the end of my opening

5      statement last Monday by finding Defendants liable, you will be

6      able to make Defendants stop using Sprint's property and

7      intentionally trying to confuse consumers.

8            Thank you for your patience, thank you for your

9      understanding in this case, and thank you for all the attention

10     you've paid.

11           THE COURT:  You have eight minutes left.

12           MR. RIOPELLE:  Thank you, Your Honor.

13           THE COURT:  You may proceed, sir.

14           MR. SCHWARTZ:  Thank you, Your Honor.

15           Members of the jury, again my name is Wayne Schwartz

16     and I represent the Defendants here.

17           Counsel said to you what is really going on here.

18     Well, this is about a big corporation that parked the one and

19     only trademark they had left, and then when someone came,

20     rightfully, and asked for it, they were caught by surprise and

21     then they acted.  Then they sent out cease and desist letters,

22     and then they filed this lawsuit, and they basically put us

23     through this entire process, four years to get to this point,

24     where we finally have an opportunity to present the case to a

25     jury, yourselves, and then you'll look at the evidence and

28

```
 1    you'll decide whether or not there was abandonment because
 2    that's what this case is about.  Simply abandonment of the one
 3    and only trademark Nextel -- the Nextel trademark that was left.
 4            Sprint, as I said, abandoned -- we call it the 244
 5    trademark.  You'll hear me say that a lot.  It's the trademark
 6    that talks about the -- using the name Nextel on equipment.
 7    Actually on devices.
 8            If I may approach, Your Honor?
 9            THE COURT:  You may.
10            MR. SCHWARTZ:  You'll see here, you're going to see the
11    evidence, it's going to be tagged.  Some will have Plaintiff's
12    tags, some will have Defendants' tags, it won't matter as to
13    what tag is on here.  This is 165, and this is the one we're
14    talking about.  You'll see here, here's the number, it ends in
15    the 244.  You'll see here this is the Nextel.  All it is is this
16    typed bold name.  You see it was registered originally by Fleet
17    Call.  And here where I've highlighted, it's for equipment used
18    in providing telecommunications services.
19            The issue of abandonment is both our defense and also
20    our counterclaim.  So we have a counterclaim to cancel this
21    particular trademark.  You heard about Mr. Kaplan has filed a
22    petition with the trademark office that wasn't rejected and
23    thrown out.  You heard him testify that his proceedings are
24    suspended pending this proceeding.  So whatever the jury here
25    determines will be reported back to the trademark office and
```

1    they'll proceed with whatever the decision you reach.

2           The burden, as Plaintiff's counsel said, they have the

3    burden on their claims and we have the simple burden on our

4    claims.  The preponderance of the evidence.  It's the same

5    burden, just past 50/50, you've got to scales, everyone talks

6    about the scales of justice, tipping it to one side.  So when

7    you look at the evidence, all you need to do is determine

8    whether or not you believe that we've proved our defense of

9    abandonment or, it's the same exact standard, whether or not

10   that trademark should be cancelled.

11          The second trademark is the sound mark.  And I submit

12   to you, here it is, again it's 166, you'll get to look at it.

13   It's assigned a number.  What's interesting about the sound mark

14   is it's not called the Nextel sound mark.  It's not called the

15   Nextel chirp, it's not called the Sprint chirp, it's simply

16   called a sound mark.  It has a number, and this one was

17   registered in 2016.  So this was way past when Nextel came and

18   went.  They finally, after years and years and years, got this

19   one registered.  And you see here first use, 1997.  So for over

20   20 years they've been trying to get this sound registered.  Took

21   them that long.  The sound has very -- it's a very specific

22   frequency.  Why?  Because if people are going to use it, it's

23   important to know does that sound -- is that the sound?  Or is

24   this the sound?  Or is this the tone?  Or is this the frequency?

25   They have it very specific here.  It's three beeps, on-off,

on-off.  It's a total of 144 milliseconds and 1,000 milliseconds

is one second.  So it's a split second sound, right?  Again, the

burden of proof that we've committed an infringement of this

particular mark rests with the Plaintiff.  I submit to you that

they threw this into the lawsuit in order to distract you, the

jury.  Distract you away from the issue of the abandonment.

Clearly, I'm -- and I'll go through the evidence concerning the

sound mark, we don't want the sound mark, we never asked for the

sound mark.  I'll walk you through it.  They didn't play one

phone of ours in this courtroom with the sound mark.  They had

four years.

The Judge will instruct you on the law.  And ours is

really simple for you, the jury, to understand.  It says that

abandonment of a trademark is ground for the cancellation of a

trademark registration.  To prove abandonment, the Defendants

must prove the following:  Sprint discontinued the bonafide use

of its trademark, and did so with the intent to not resume its

use in the reasonable foreseeable future.  If you find that

Sprint has not used the trademark for three consecutive years,

you may presume that Sprint did not intend to resume use of the

trademark.  But Sprint can rebut the presumption by producing

evidence that it intended to resume use.  As for that three-year

period, that's for the jury, that's for you to decide.  We went

from 2013 to today, we're sitting here today, that's nine years.

You were shown this 2004 Super Bowl ad.  The fancy ad.

1   18 years ago they played that ad, and the only one whose

2   attention it got was Sprint because they decided to buy them.

3   That's 2005 is when the merger took place, and with the merger

4   Sprint got themselves 20 million subscribers.  They wanted to

5   integrate them into their system.  They changed their name to

6   make Nextel happy, so they called it Sprint Nextel Corporation.

7   Except when push comes to shove, push, this was a walkie-talkie

8   company with 20 million subscribers.  Yeah, it had the fancy

9   Super Bowl ad, but it had its Motorola 2G network.  Sprint was

10  already on to 3G and the other cell companies were also on to 3G

11  and moving forward.

12          You heard Mr. Wiley come here and testify that after

13  the merger they weren't going to do any more national

14  advertising for Nextel.  They didn't want to spend the money

15  because they realized, the people at Sprint, that it wasn't

16  worth spending the money on because it was such a niche

17  sub-market.  I mean, we're talking walkie-talkies.  Other than

18  the old Nextel ads, which were only on my client's website with

19  a disclaimer, hey, these are the old ads, everyone knows You

20  Tube, the ads are out there, you can look them up, they're

21  there, there was no other current advertising for Nextel.  The

22  ads were just legacy ads.  And why?  Because Sprint has nothing

23  to advertise.  They're not using these phones.  And now after

24  the T-Mobile merger and purchase of Sprint, we're not going to

25  see any ads for Sprint anymore.  You don't see any ads for

1   Sprint.  The yellow Sprint is gone. All the stores, everybody

2   gone.  So when Mr. Riopelle tells you what is this really about?

3   Well, it's about Nextel being kicked to the curb and now Sprint

4   being kicked to the curb and now it's T-Mobile.  They have no

5   use for Nextel.

6          There's one trademark left, and we were the ones that

7   asked to use it.  And we didn't come in here like bank robbers

8   trying to take the Nextel.  You're going to see all the

9   evidence.  You're going to see how much time and effort was

10  spent by the Defendants in order to make this another beautiful

11  brand again.  This wasn't just -- you know, there's phones,

12  there's marketing, there's all kinds of stuff and time and

13  effort that they put in to getting this up.  They went out and

14  got distributors.  You'll look at their websites.  They each

15  have one independent because Mr. Kaplan, he's not in the

16  business of selling phones.  He was just in the business of

17  making sure the -- he was supporting the manufacturing and

18  Nextel, and Mr. Calabrese, Mr. Rivera and their company going to

19  the trade shows, dealing with the manufacturers, things of that

20  nature.

21         By 2010 Sprint realized that merger was a complete

22  bust.  We all know it, we all heard it in here.  Sprint had to

23  take -- or they took a $29 billion goodwill write-down.  Meaning

24  they overpaid, and instead of amortizing that goodwill out over

25  time, they advanced it and wrote off $29 billion.

```
 1            You heard Mr. Kaplan talk about the things he did at

 2     the time he was asked to investigate.  This is one of the

 3     documents that he came across which was on Sprint's own website.

 4     I want to make that clear.  Not the New York Times, not some

 5     other article, this is what they put on their own website to

 6     advise their customers and the world what was happening.  Sprint

 7     to cease service on its iDEN network as of June 30, 2013.

 8     It's a poor quality here, but you're going to have it back in

 9     the jury room so you can see it, but I'm going to read it to

10     you.  This is the highlight down here.  And it says the company

11     has already discontinued selling iDEN devices in certain

12     channels.  It will discontinue selling iDEN devices in all

13     channels and all brands carrying iDEN Nextel products over the

14     next several months.  And this announcement was May 2012.  So

15     think about that.  They basically told all of their customers

16     and the world that in May of 2012 we are going to be done with

17     all brands.  And when I say all brands, everything that had the

18     Nextel logo, label, everything was going to be gone.  And if

19     that was a true statement by Sprint, then they no longer needed

20     the 244 trademark, The one Nextel trademark.  They didn't need

21     it.

22            In Counsel's opening statement he promised that you

23     would see during this trial that Nextel appears on a lot of

24     devices.  That's his quote.  On a lot of devices.  Sprint didn't

25     come in here and show you a single Nextel-branded phone, and
```

what I mean by that is, and we all know it, you look at the
phone and the name of the company is right there on it.  It
would say Nextel.  The only ones that came in here with a phone
that said Nextel was my client.  Ask yourself where, where were
the phones he promised he was going to show you?  There were
none.  He broke his promise to you.

    Turns out the only phone that got walked into here with
the Nextel logo on it came from Sprint's private investigator
Ryan Rabenold, and I think you remember Mr. Rabenold.  He's the
one who decided involuntarily to just say that the label was
crooked on the phone.  No one asked him, he just decided, you
know, he was going to have his moment, you know, on the stand
and disparage, you know, our product, the phone.  But you're
going you can see the evidence, you can see all the brochures,
you can see all the phones, you can see how nice the phones look
that they made.  This wasn't a fly-by-night situation.  They
took time and effort in order to make these particular phones,
they had all the different models.

    Mr. Rabenold testified that he was to get his hands on
the product and determine authenticity.  Right?  He said that.
But then on cross-examination, he said he was actually not asked
to authenticate the product.

    Here's Exhibit 93, you'll get to see this.  This is
Mr. Rabenold's report.  He bought two phones from Northeast Two
Way Radio in November of 2018.  That is a distributor.  You can

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    see that company on Nextel's website, they list all their

2    distributors.  He said -- and it's in here, both distributors he

3    spoke to, because he called not just Northeast but he also

4    called this other company, let's see where it is, Seacoast, it's

5    on the second page.  Both of those individuals who he spoke to

6    gave honest answers back to him when he asked them oh, do these

7    phones have the Nextel chirp?  They both said to him no, they

8    don't have the Nextel chirp.  Okay.  Great.  I'll take two from

9    Northeast and they shipped him down the phones.  And he powered

10   it up and lo and behold, took a little to get it out of him if

11   you recall.  He wrote a report, written report, all the details,

12   sent it on to Sprint, on Page 4, you'll see.  When you turn the

13   radios on, a noise is emitted, but it doesn't appear to be the

14   Nextel chirp.

15           Then in a surprise twist he testifies that he learned

16   about a You Tube video, follow me on this.  He learned about a

17   You Tube video only days before the trial, and that he was

18   watching it and he heard that -- remember, that split second

19   chirp sound over You Tube video.  Oh, there it is, that's the

20   Nextel chirp on the phone.  And he wanted to get that across to

21   you.  I asked him if he had any -- if he even knew the radio

22   frequency specs, he said no.  I asked him if he had any

23   background in audio engineering, he said no.  Then I asked him

24   well, did you purchase the phone?  Oh, no.  I didn't have enough

25   time to purchase the phone or he said they never asked me to

1    purchase the phone.  Well, if you discovered this counterfeit

2    phone with the chirp, just order the phone, FedEx, he would have

3    had it the next day.  Would have had it to them the day after

4    that, or they could have gone.  They could have up Sprint and

5    said hey, lucky us, four years, we didn't see a single phone but

6    now we see a phone, so let's go ahead and get it.  No, they

7    don't do that.  They just have him come in here and tell us oh,

8    I can magically hear the phone.  I submit to you that

9    Mr. Rabenold's testimony is just simply not credible.  Just

10   simply not credible.  You can watch and listen to the video

11   yourself.  It's going to be in evidence.  He made it clear when

12   I asked him that he was never asked to buy another phone in the

13   four year period.

14        If they cared so much about this chirp and our phones,

15   why wouldn't they have been looking for our phones and testing

16   on them?  Bringing in an expert saying here's the phone with the

17   chirp.  No.  They didn't do any of that.  Not a single device

18   came in and played for you that was ours that had this chirp.  I

19   submit to you that is absolutely detrimental to their claim.

20   They say that they are concerned about the chirp, they didn't

21   even come in here and produce a single Sprint phone and play

22   that for you.  Because they don't have Nextel phones, they don't

23   have Sprint phones.  Nobody is playing the chirp.

24        Mr. Riopelle showed you the verdict form.  I don't have

25   to belabor it, you're going to see it.  Questions on here, it's

1    a bunch of questions.  11, 13 and 15.  You're going to see it,

2    they all mention the sound mark.  The answer is just no when

3    they ask you the questions did we infringe the sound mark.  It's

4    real simple.  Strike through it as to no.

5         There were other events that happened post-merger after

6    Sprint realized they had to get rid of Nextel.  They changed

7    their name back just to Sprint.  They got rid of the Nextel.

8    The marriage was over.  They wanted to change their name back.

9    And we had 50 trademarks or so abandoned, leaving the one.

10        Now, I showed you this during my opening.  That's the

11   only thing crooked in here, the easel.

12        Ms. Jobe, and this is important, she's Sprint's senior

13   trademark lawyer.  She's -- you're going to see her name on a

14   bunch of documents.  She testified through deposition transcript

15   in this particular proceeding.  She testified that the yellow

16   and black design with the black stripe was abandoned.  It's

17   right there.  Abandoned.  This is the letter you heard about,

18   the cease and desist letter, April 26, 2017 when Mr. Calabrese,

19   on his own, with no experience, had sought to file his own

20   application.  And he was, I guess, in over his head as they say.

21   And so, but what's important here is that she sent this cease

22   and desist letter and in here, in the -- buried in the language

23   is she wants him to stop using the Nextel including design marks

24   we abandoned long ago.  So she's even telling him we've

25   abandoned marks, we want you to stop, you know, with regard to

1    using those as well.

2         Mr. Shaughnessy, he came in here and testified, he's

3    the marketing guy.  He testified well, we didn't really need all

4    those trademarks.  That's what his testimony was.  96% of the

5    trademarks?  You want to argue that they want to resume use,

6    they want to use Nextel, I guess T-Mobile, but yet they got rid

7    of all the trademarks, all of them except for just this one.  It

8    doesn't -- it belies the credibility and the veracity of what

9    he's saying doesn't really make any sense.

10        Part of that abandonment defense is the intent to

11   resume use.  I submit to you why would they abandon the one

12   design mark that most consumers actually can recall, this one?

13   Instead they just kept the word mark, they parked it.  You heard

14   me say in the beginning why?  Because they parked it, they never

15   thought anyone would come around looking for this one particular

16   mark.

17        Brent Kohman, he came here to testify.  He left Sprint.

18   Curiously, he left Sprint in 2014 right after they shut down the

19   network and probably handed out a bunch of pink slips.  He was

20   working there for 17 years on the push-to-talk platform.  That

21   was his life, his baby.  He talked about it, he started right

22   out of school.  He was on Kodiak, Motorola, Sprint, Nextel.  He

23   was like a lifer.  He was passionate but the push-to-talk.  But

24   I'm sure he was upset when -- just like the rest of the 20

25   million people, that his company that he was working for all

1    those years said we don't need Nextel anymore.  So what did he

2    do?  He quit, he left.  But they brought him in here to testify

3    and at first he said he recalls seeing Nextel-branded devices.

4    Then he changed his testimony and he said he actually hadn't

5    seen the Nextel on the device, but it was on the packaging.  And

6    then he actually testified, which seemed to be true, that he was

7    not familiar with Sprint's portfolio of devices.  Why?  Because

8    he hasn't been there since 2014.

9         So I'm not sure the purpose of his testimony, but he

10   did come in here, curiously, and parrot the same testimony as

11   the other witnesses, Mr. Wiley and Mr. Shaughnessy.  They all

12   use that same catchy buzz word, gold standard.  You heard Kohman

13   say it, Wiley said it, Shaughnessy said it.  They all used the

14   same term, gold standard.  Again, if it was the gold standard,

15   the gold standard, then why wasn't the Nextel prominently

16   displayed on the phones that they were going to sell,

17   prominently displayed on the boxes.  You're going to see the

18   boxes back there.  When you see the boxes, all you're going to

19   see is Sprint, Sprint on the phone, Sprint, Sprint Direct

20   Connect, Sonim, that was one manufacturer that made that

21   particular device.  Nextel's nowhere to be found, except they're

22   going to say well, it's buried in fine print on the back where

23   they say oh, Nextel mobile device.  That to me, the jury, you'll

24   decide whether or not that is sufficient use for purposes of

25   defeating an abandonment claim.

1          These same three witnesses, their connection is they

2     all were at the 2017 trade show where all the dust-up happened,

3     you know, because there was a Nextel booth, and they were

4     surprised.  Yeah, of course they were surprised because their

5     own bosses at Sprint, any time they probably asked hey, are we

6     ever going to bring back Nextel?  And they probably said no,

7     never.  Why would we ever do that.  Costs us billions of

8     dollars.  So they see a Nextel booth, and of course they're a

9     little surprised and of course they're going to be a little

10    confused.

11         But a few people at a trade show among thousands and

12    thousands of people coming up to them, people they knew, couple

13    of people they said, that is not -- that doesn't rise to the

14    level of actual confusion which should be reasonably

15    significant.  I'll say it again.  Confusion.  Actual confusion

16    has to be reasonably significant, and they didn't put on any

17    evidence to suggest that the consumers were confused about our

18    appearance at the IWCE trade show.  Why?  Because consumers had

19    long forgotten about Nextel and the phones and the service and

20    the devices that they were selling at those trade shows.  They

21    were not Nextel phones, they were Sprint Direct Connect phones.

22    And the only reason -- they showed you a banner, and it had in

23    fine print, you know, this old slogan from 2007 and they were

24    giving away, I think, an iPad or something, they were selling

25    Sprint Direct Connect phones.  It's obvious.  There was no

41

 1    Nextel phones on the table.  Where the Nextel phones were were
 2    at the Defendants' booth wherever it was in the room.  That's
 3    where you could go and see the nice phones in the yellow boxes
 4    and people were excited.  There was a buzz.  There should be a
 5    buzz, right?  You know, the brand had been, again, kicked aside.
 6    And now somebody, whether it was Sprint or my clients, someone
 7    at least was deciding to hey, we love this brand and we would
 8    like to bring it back.
 9            What didn't they show you?  Well, they didn't show you
10    a single document evidencing any sales.  If they had, then there
11    would be an issue about hey, are we in the same sales channels?
12    Because that's one of the tests for infringement.  But they
13    didn't produce here a single document showing any sales of any
14    Nextel phones at all.  So what does that say to you?
15            While at the show, Mr. Wiley, he saw the phones, he
16    testified he didn't operate a single phone.  Mr. Mancuso, he
17    also testified, another gentleman who was at the show, he
18    testified he didn't test the Nextel device either.  They brought
19    in all the guys from the show, all these guys that were Sprint
20    lifers, that were dealing with push-to-talk, these were the only
21    ones they could find to bring in to talk about the gold standard
22    and the Nextel and the Nextel brand.
23            To renew the trademark for the one that's at issue
24    here, Ms. Jobe submitted a used box from 2013 called the Sonim
25    Strike XP IS device, it's Number 10 exhibit.  You're going to

1    see the real box when you get back there.  Here's what it looks

2    like.  I'll just cover it real quick, like I talked about

3    earlier.  This is the box she submitted to the trademark office.

4    It's a phone.  By the way, she testified she couldn't find the

5    phone or she didn't have the phone.  They dug a box out from

6    somewhere, it says Sprint on it.  So it's not a Nextel phone,

7    right?  It's a Sprint phone.  And it says Sprint Direct Connect.

8    Sprint with its new fan logo and Sonim, who makes the phone.

9    Everyone's got their trademarks and everything on the front

10   here.  And so -- and this is what -- this box was from 2013,

11   that's when the box was manufactured, and it says here, parked

12   at the very bottom, other marks are the property of respective

13   owners.  Nextel mobile phone, that's, I guess, a mark that they

14   just wanted to put on there.  But it says here this device will

15   not operate on any iDEN or 4G network.  Well, if they were so

16   concerned about the critical issues and all that stuff with the

17   phones, and they shut down the network, and then they tell the

18   trademark office well, we're still selling Nextel phones in that

19   box but it doesn't work on the iDEN network and it says Sprint,

20   but don't look because it's so small, maybe they just didn't

21   think anyone was going to pay attention.

22        Mr. Kaplan you heard, you know, he's an expert or so

23   that's what Mr. Calabrese thought, you know, after talking to

24   him, 25 years of doing this type of work.  You heard that Mr.

25   Kaplan had also put in an application because that's what you're

1    required to do.  And even if someone like, a company like Sprint

2    has a registered trademark, you've heard about this, just

3    because it's registered doesn't mean it's off limits, that's not

4    the test.  The test is hey, are they using it in commerce on

5    goods in the public.  And if they're not, if someone believes,

6    like Mr. Kaplan, or anyone, believes that they're not, then can

7    you file an application.  And he did file that application, and

8    yes, here it is, January 29, 2018, for Nextel.  Here's his

9    company.  He did it under RetroBrands USA.  He explained why

10   there was a switch from Mr. Calabrese individually to him for

11   his company.

12        And I want you to see the difference, and you can

13   compare, of his submission and specimen.  Here's the name that

14   he's looking for, and here's the product in use that he's

15   telling the trademark office this is the product that is being

16   sold.  It's got the yellow box and very prominently the Nextel

17   is on the phone, here it is and this is what he submitted to the

18   trademark office.  And you can compare his picture and his phone

19   with the box that I pointed out to you.

20        Ms. Jobe testified that that same Sprint Sonim phone is

21   not sold in a retail store.  Think about that.  It's not sold in

22   a retail store.  They claim, you may have heard it already, that

23   well, it's in fine print on a manual that goes along with the

24   phone inside, and I submit to you and you can decide, that that

25   is not trademark use when it's buried inside the box, not on the

1    outside of the box that no one can actually see.

2          And again, this is all rendered moot because if you

3    have no sales, then you have no sales.  Sprint's witnesses came

4    in, and even though they didn't have any document to back them

5    up, Mr. Shaughnessy, he said well, we've sold lots and lots,

6    millions of Nextel-branded phones since 2013.  And they made a

7    specific point to rattle off all the years trying to cover all

8    the period from 2013 to today.  So they just had him say it,

9    2013, '14, '15, yes, yes, yes, but yet nothing to corroborate

10   what he's saying.  Not a single document.  Not a single piece of

11   paper.  Oh, we sold, you know, a thousand phones, 500 phones, a

12   million phones, nothing.  Nothing comes in.

13         Sprint's counsel in his opening last Monday, one week

14   ago, he made another promise to you.  He said in his opening

15   that you, the jury, would see evidence of Sprint's sales using

16   the Nextel trademark.  He said you would see those sales since

17   2013.  And again, they didn't produce a single document, so he

18   broke both of those promises.  That's twice now.

19         Mr. Kaplan testified about meeting Mr. Calabrese in the

20   beginning of 2018.  He testified about his experience, excuse

21   me.  And then all the research.  And not to bore you again, you

22   heard him testify and he went through all the things, but I'm

23   just going to hit just the highlights.  He checked both Nextel

24   and Sprint.  He checked the SEC.  He checked the form 10-Ks

25   which are going to be back there.  You can take a look at them,

1    you don't have to go too far, the good stuff's right in the

2    beginning pages one through ten.  He went to the trademark

3    office, he did his research there.  He went to the Nextel.com

4    website, it was dead.  The actual website for a gigantic former

5    brand was nonexistent.  No website.  He searched Sprint's

6    website and he testified he could not find a single

7    Nextel-branded phone on the website.

8            And Ms. Jobe, her testimony actually supports Mr.

9    Kaplan's testimony because she testified that the Sonim phone,

10   the one phone that they're saying they were selling was not

11   available to the public on the website.  So what does that tell

12   you?  They weren't -- that phone wasn't even on the website,

13   assuming that they were actually selling it.  So when he went to

14   the website to look for it, it wasn't there.  That's from Ms.

15   Jobe.

16           Mr. Kaplan said he went to several Sprint stores and

17   locally here and inquired about can I get a Nextel phone, and

18   you heard him testify that the staff didn't even know what he

19   was talking about.

20           Mr. Calabrese testified he visited the Sprint store in

21   Las Vegas when they were out there for the show, and he was told

22   you can't buy that, you can't buy Nextel anymore.

23           Counsel made a to-do about Mr. Calabrese.  You saw his

24   video.  You heard his testimony.  You'll decide whether his

25   personal problems have anything to do with this particular case

1    or his veracity.

2          Ms. Jobe, she was the one that said the phones are not

3    sold in a retail store.  And he testified truthfully, yeah, I

4    went to a store and I asked and there was no -- they said no, we

5    don't sell those phones anymore.  So you'll decide his veracity.

6    The visit to those stores was in 2017 and 2018, just so you can

7    have that time period in your mind as to this gap that I talked

8    about in my opening where Mr. Riopelle wanted to leap over a

9    whole series of events and dates and times.

10         Then we fast forward six years from the 2015 renewal.

11   And what does Sprint do?  They bring in this CAT S22 phone and

12   this CAT S62 phone.

13         THE COURT:  Microphone.

14         MR. SCHWARTZ:  Sorry, Your Honor.

15         THE COURT:  I don't care, but if you want them to hear

16   you, you better use the microphone.

17         MR. SCHWARTZ:  Appreciate that.  So they walk in these

18   two phones.  Again, curiously, 2021 is the date on the phones,

19   it says 22.  This is a -- you can see it, it's Caterpillar.

20   Caterpillar.  They have their registered trademark, it's their

21   phone.  In the sticker to keep the box closed it talks about

22   T-Mobile, Metro by Mobile.  Down here on the box T-Mobile, Metro

23   by Mobile, Sprint.com.  Nowhere on the box, the physical box,

24   does it say Nextel.  But what they do want you to believe, they

25   want you to believe that miraculously the label that gets placed

1    on to the box by the manufacturer in China, just now has this

2    Nextel name planted on it right next to the recycle bin here.

3    Here's the date.  This is what they walked into court to try to

4    show proof that they were still selling some sort of

5    Nextel-branded phone.  You'll decide if you think this is a

6    Nextel-branded phone.

7          One important point.  Mr. Shaughnessy testified that

8    Sprint and Sonim collaborated on the label for their box, that's

9    the 2015 box, which makes sense.  I don't think CAT or Sonim is

10   going to do anything without talking to their -- talking to

11   Sprint, right?

12         All their witnesses with the gold standard.  The other

13   thing they kept talking about was the Nextel brand.  We're

14   concerned about the Nextel brand.  This isn't about the Nextel

15   brand.  This is about one trademark, for devices using the word

16   Nextel.  That's what this is about.  It's not the brand.

17         This is Exhibit 59, it's Plaintiff's Exhibit.  It's the

18   annual report for Sprint for 2014 filed March 2015.  And right

19   here on Page 10 under patents, trademarks and licenses, this is

20   2014.  We own numerous patents, et cetera, et cetera, and

21   trademarks and other intellectual property in the US and other

22   places, countries, including Sprint Nextel Direct Connect, Boost

23   Mobile, Assurance Wireless.  This is what they told the public

24   in their annual report to shareholders, and anyone else that

25   wanted to invest in that particular company.

1          Fast-forward one year to 2015.  Defense 5231, you'll

2    see it back there, it's the annual report for 2015 filed March

3    2016.  The form is basically the same and you're changing

4    things, you're editing it, and here now what do we see.  Now

5    they're announcing, under their patent trademark section, we own

6    -- it's the same language -- trademarks and intellectual

7    property including Sprint, Boost Mobile and Assurance Wireless.

8    And what is missing?  Nextel.  You can see the two, I did it for

9    you.  So they were telling everyone we do not care about the

10   Nextel brand anymore.

11          Ms. Jobe testified that the -- that Nextel was

12   advertised on the Sprint website as a former brand, and this is

13   kind of important.  Again, she's their trademark lawyer.  She

14   testified, and I'm quoting her, a brand is not a trademark.

15   Those are her words.  That's Sprint's trademark lawyer.  I'm

16   going to say it one more time.  A brand is not a trademark.

17   Ours is very specific.

18          Now fast-forward, we have this lawsuit, and we get to

19   the end of the road, and there's the issue of damages.  And I

20   was kind of surprised because Mr. Riopelle in his closing

21   argument, one of the first things he said is we don't care about

22   damages, we're not asking for damages, we just want them to

23   stop, right?  I think I heard it, it was 40 minutes ago.  And

24   then he goes through this wild exercise showing you the verdict

25   form, filling it out.  And what is he doing?  He's filling in

```
1   numbers that -- well, millions, millions of dollars.  How, on

2   one side, is he saying this isn't about damages, it's not about

3   that, and then he fills out this form expecting you to fill it

4   out the way he fills it out because that's what he would like?

5   And I added it up, it's over $10 million.  How can he say --

6              THE COURT:  Your time is up.  You'll wrap it up.

7              MR. SCHWARTZ:  I'll wrap it up, Your Honor.

8              THE COURT:  Quickly.

9              MR. SCHWARTZ:  The questions on the form for

10  infringement 13, 5, 7 they're no's.  Number 9, that has to do

11  with the cybersquatting, if they don't have a domain name,

12  they're not on anything and we do, I would submit to you the

13  answer to that question is no.  Every Question 1 through 16

14  should be no.  The final question is Number 17, it's real

15  simple, Court has made it real simple for the jury.  Do you

16  think they abandoned the trademark.  Yes or no.  You check yes,

17  the foreman signs the form and hands to it the bailiff.

18              Thank you.

19              THE COURT:  Thank you, sir.

20              MR. SCHWARTZ:  Thank you, Your Honor.  Would you like

21  me to clean this up now or later?

22              THE COURT:  You can clean it up now.  He might need the

23  space.

24              MR. RIOPELLE:  Wow, I could go on for another 45

25  minutes, but you don't want that, and he won't allow me to do
```

```
1    that.

2              THE COURT:  I won't allow it.

3              MR. RIOPELLE:  You won't let me do it.

4              A couple quick things.  This case is about the

5    evidence.  He was talking about stuff that's not even in

6    evidence.  He talked about pink slips.  There is no evidence.

7    There was no pink slips handed out.  He talks about the managers

8    talking were telling them about oh, we're not going to bring

9    back Nextel.  There's no evidence of that, he made that up.

10             The other thing, he showed you the box that he said

11   that Ms. Jobe put on the -- when she renewed it 2016.  That

12   wasn't the box she on there.  He put up Exhibit 10.  If you want

13   to look at that time real box, that is Exhibit 38.  That was the

14   box she took pictures of and sent when they renewed the mark.

15             He talked about the chirp.  He showed you the report

16   from the private investigator back in 2018 saying it says there

17   was no chirp.  What he didn't do is go and read the next

18   sentence and tell that you it says but we're trying to get the

19   chirp.  And then what happened is is that same guy they talked

20   to did a video, posted it in February of 2022, and now they have

21   the chirp.  That's why we showed you that evidence because they

22   were using the chirp.

23             He made a big deal about Ms. Jobe says you can't find

24   it in retail stores.  Well, you can't find in it retail stores

25   anymore.  We told you that, Mr. Shaughnessy told you that,
```

1    everybody told you that.  What he didn't tell you is that the

2    next thing Ms. Jobe said in that deposition is you can get it

3    from your business partners.  The business partners who have

4    accounts with us can get on there and they can buy it on the

5    website.  So it's still it was still there.

6          He shows you the 10-K which, again, is where you list

7    your trademarks for purposes of how many trademarks you own, but

8    focus on the language that it was saying.  It says we own the

9    following trademarks including.  So if it says including, that

10   means there are other trademarks that aren't just the ones

11   listed there.

12         Couple more points.  He talked about how oh, we just

13   parked the trademark out there in the Patent and Trademark

14   Office.  You don't park something and then renew it in 2015.

15   That's not parking it.  We renewed it because we were using it

16   and we showed the United States Patent and Trademark Office how

17   we were using it.

18         He also showed you the chirp mark that, as he made a

19   big deal about this, wasn't registered until 2016.  Do you think

20   we had abandoned the Nextel brand if we're still seeking

21   registrations on stuff that's used with the Nextel brand?  No.

22   It's not abandonment.  I mean, it actually is a better argument

23   for us using it than I had made on some things.

24         He also talked -- said that I made a bunch of promises

25   apparently last Monday.  He says I promised you I would show you

1   Nextel being used on devices.  No, I didn't.  I didn't promise

2   you you would see it used on devices because I knew that my

3   client didn't use it on devices.  Instead what I just showed you

4   was the statute and I went through it, to be placed in any

5   manner on the containers, I showed you that it's on the boxes,

6   on tags or labels affixed thereto.

7          He showed you the CAT 22 and showed you that we put a

8   label on there with Nextel, that's what we did.  On documents

9   associated with the goods, that's on the manuals, it's how we're

10  using it, and on services when it is used or displayed in the

11  sale or advertising, on the PowerPoints.  That's what the United

12  States statute says.  That's what Congress has said.

13         Their argument is now -- I now realize it has boiled

14  down to well, it's not on the devices so it doesn't count.

15  That's not what the law says.  He's not arguing the law.  He's

16  asking you to ignore the law and that's not what you're supposed

17  to do.

18         Last two things.  He talked about how you didn't see us

19  coming in here with any other products and testing the products.

20  We didn't have their products.  They had all their products,

21  they certainly could have tested them, they certainly could have

22  displayed those products and show how they allegedly did not

23  have the chirp.  Maybe they didn't show you the products because

24  they, in fact, do have the chirp.

25         Mr. Wiley up there said the only version of a product

1   we got from them didn't work.  He tried and it didn't work.  He

2   also said that we never showed you a Nextel phone or a device --

3   we showed you the CAT device which is being sold under the

4   Nextel brand for Nextel push-to-talk that had the chirp.  He

5   said we never showed you one.  Mr. Wiley sat there on the stand,

6   you remember, and he had the chirp.

7          The last thing I want to touch on is he says they did

8   the investigation, they wanted to use it, they thought they were

9   abandoned, and then he said and they asked to use it.  You may

10  remember last Tuesday, I asked Mr. Kaplan on the stand, did you

11  ask Sprint if you could use the Nextel mark?  He said no, I did

12  not.  They did not ask.  Instead, they tried to steal it,

13  they're infringing it and you need to make them stop.

14         Thank you.

15         THE COURT:  Members of the jury, it's now my duty to

16  instruct you on the rules of law that you must use in deciding

17  this case.  When I finish you'll go to the jury room and begin

18  your discussions, which we call deliberations.

19         Your decision must be based only on the evidence

20  presented here.  You must not be influenced in any way by either

21  sympathy for or prejudice against anyone.

22         You must follow the law as I explain it, even if you

23  don't agree with it, and you must follow all of my instructions

24  as a whole.  You must not single out any or disregard any of my

25  instructions on the law.

1            The fact that a corporation is involved as a party must

2     not affect your decision in any way.  A corporation, and all

3     other persons, stand equal before the law and must be dealt with

4     as equals in a court of justice.  When a corporation is

5     involved, of course, it may act only through people as its

6     employees; and in general, a corporation is responsible under

7     the law for the acts and statements of its employees that are

8     made within the scope of their duties as employees of the

9     company.

10           As I said before, you must consider only the evidence

11     that I have admitted in the case.  Evidence includes the

12     testimony of witnesses, stipulations of the parties, admissions

13     of the parties presented in court and the exhibits admitted.

14     But anything the lawyers say is not evidence and isn't binding

15     on you.

16           You should not assume from anything I've said that I

17     have any opinion about any factual issue in this case.  Except

18     for my instructions to you on the law, you should disregard

19     anything I may have said during the trial in arriving at your

20     own decision about the facts.  Your own recollection and

21     interpretation of the evidence is what matters.

22           In considering the evidence, you may use reasoning and

23     common sense to make deductions and reach conclusions.  You

24     should not be concerned about whether the evidence is direct or

25     circumstantial.  Direct evidence is the testimony of a person

1    who asserts that he or she has actual knowledge of a fact such

2    as an eyewitness.  Circumstantial evidence is proof of a chain

3    of facts and circumstances that tend to prove or disprove a

4    fact.  There is no legal difference in the weight you may give

5    to either direct or circumstantial evidence.

6            When I say you must consider all the evidence, I don't

7    mean that you must accept all the evidence as true or accurate.

8    You should decide whether you believe what each witness had to

9    say and how important that testimony was.  In making that

10   decision you may believe or disbelieve any witness in whole or

11   in part.  The number of witnesses testifying concerning a

12   particular point does not necessarily matter.

13           To decide whether you believe any witness, I suggest

14   you ask yourself a few questions:

15           Did the witness impress you as one who was telling the

16   truth?

17           Did the witness have any particular reason not to tell

18   the truth?

19           Did the witness have a personal interest in the outcome

20   of the case?

21           Did the witness seem to have a good memory?

22           Did the witness have the opportunity and ability to

23   accurately observe the things he or she testified about?

24           Did the witness appear to understand the questions

25   clearly and answer them directly?

1           Did the witness's testimony differ from other testimony

2     or other evidence?

3           You should also ask yourself whether there was evidence

4     that a witness testified falsely about an important fact and ask

5     whether there was evidence that at some other time a witness

6     said or did something, or didn't say or do something that was

7     different from the testimony the witness gave during this trial.

8           To decide whether you believe a witness, you may

9     consider the fact that the witness has been convicted of a

10    felony, but keep in mind that a simple mistake doesn't mean a

11    witness wasn't telling the truth as he or she remembers it.

12    People naturally tend to forget some things or remember them

13    inaccurately.  So if a witness misstated something, you must

14    decide whether it was because of an innocent lapse in memory or

15    an intentional deception.  The significance of your decision may

16    depend on whether the misstatement is about an important fact or

17    about an unimportant detail.

18          In this case it is the responsibility of the party

19    bringing any claim to prove every essential part of their claims

20    by a preponderance of the evidence.  This is sometimes called

21    the burden of proof or the burden of persuasion.  A

22    preponderance of the evidence simply means an amount of evidence

23    that is enough to persuade you that the party's claim is more

24    likely true than not true.  If the proof fails to establish any

25    essential part of a claim or contention by the relevant burden

1    of proof, you should find against the party making that claim or
2    contention.  When more than one claim is involved, you should
3    consider each claim separately.
4            In deciding whether any fact has been proved, you may
5    consider the testimony of all the witnesses, regardless of who
6    may have called them, and all of the exhibits received in
7    evidence, regardless of who may have produced them.  If the
8    proof fails to establish any essential part of a party's claim
9    by the relevant burden of proof, you should find for the other
10   party as to that claim.
11           In this case, the Defendants assert the affirmative
12   defense of abandonment.  Even if Plaintiff proves its claims by
13   a preponderance of the evidence, Defendants can prevail in this
14   case if they prove their affirmative defense by a preponderance
15   of the evidence.  Also in this case, the counterDefendant Sprint
16   asserts the affirmative defense of use and bonafide intent to
17   continue use the Nextel trademark.  Even if counterPlaintiffs
18   prove their counterclaim by a preponderance of the evidence,
19   counterDefendant can prevail in this case if it proves an
20   affirmative defense by a preponderance of the evidence.
21           When more than one affirmative defense is involved, you
22   should consider each one separately.
23           I caution you that the Defendants and counterDefendants
24   do not have to disprove the other party's claims.  But if the
25   Defendant or counterDefendant raise an affirmative defense, the

```
1    only way either can prevail on a specific defense is if it
2    proves that defense by a preponderance of the evidence.
3         Sprint claims that the Defendants have infringed its
4    registered Nextel trademark and sound mark under federal law,
5    common law and the Florida Deceptive and Unfair Trade Practices
6    Act.  Sprint also claims that Defendants have engaged in acts of
7    unfair competition and false designation of origin under federal
8    law.  The analysis for liability under each of these claims is
9    the same.  To prove its claims, Sprint must prove the following
10   facts by a preponderance of the evidence:
11        First, Sprint owns the Nextel trademark and the sound
12   mark that are entitled to protection, and second the Defendants
13   are using marks that infringe on Sprint's trademark or sound
14   mark.
15        You are instructed and must accept as a fact that
16   Sprint owns a federal registration for the Nextel trademark and
17   a federal registration of the sound mark it seeks to protect in
18   this action.
19        It is the Defendants' burden to prove that Sprint's
20   trademarks are invalid.  I will instruct you in a little while
21   on what the Defendants must prove to invalidate Sprint's
22   registers.
23        Because Sprint owns federal registrations for the
24   Nextel trademark, US Registration Number 18,843,244 and the
25   sound mark, US Registration Number 5,047,282, the Defendants are
```

1   deemed to have knowledge of the registrations and of the rights

2   claimed in the registrations.  This is known as constructive

3   notice, and the Defendants cannot claim that they adopted their

4   trademarks without knowledge of Sprint's trademarks.  In this

5   case, Sprint enjoys nationwide constructive notice of rights

6   dating back to the filing date of the applications which is May

7   26, 1993 for Sprint's Nextel registration for devices and

8   February 25, 2005 for Sprint's registration for the sound mark.

9           you must next consider whether the Defendant infringed

10  Sprint's Nextel trademark and the sound mark.  The test for

11  infringement is whether the Defendants trademarks are likely to

12  cause confusion with Sprint's Nextel trademark and the sound

13  mark.  That is you must determine if the Defendants, without

14  Sprint's consent, used the same or similar Nextel trademark and

15  sound mark in connection with the sale of or the offer to sell

16  goods in a manner that is likely to cause confusion among

17  consumers as to the source, affiliation, approval or sponsorship

18  of the goods.

19          Source, origin, affiliation, approval or sponsorship

20  means that the public believes that the Defendants' goods or

21  services come from, are affiliated with, are approved by or are

22  sponsored by Sprint.

23          It is not necessary that the trademark used by the

24  Defendant be exact copies of Sprint's Nextel trademark or sound

25  mark.  Instead, Sprint must demonstrate, by a preponderance of

1    the evidence, that the Defendants use of their trademarks are,

2    when viewed in their entirety, likely to cause confusion as to

3    the source, origin, affiliation, approval or sponsorship of the

4    goods in question.

5         Infringement.  Sprint claims that the Defendants have

6    infringed its Nextel trademark and the sound mark.  For Sprint

7    to succeed on these claims, you must find by a preponderance of

8    the evidence that the Defendants:  one, used the Nextel

9    trademark and the sound mark in connection with the sale or an

10   offer to sell goods; two, used the Nextel trademark and the

11   sound mark in commerce and three, used the Nextel trademark and

12   the sound mark in a manner that is likely to A, cause confusion

13   mistake or deception as to B, the source, origin, affiliation,

14   approval or sponsorship of the Defendants' goods.

15        Infringement, likelihood of confusion.  This is a seven

16   factor test.  There are seven factors you can use to determine

17   whether a likelihood of confusion exists.  No single factor or

18   consideration controls, and Sprint is not required to prove all

19   or even most of the factors are present in any particular case.

20   You may also use factors other than these seven.  You should

21   weigh all of the relevant evidence in determining whether a

22   likelihood of confusion exists.

23        One, type and strength of Sprint's trademarks.  The

24   first factor is the type and strength of the trademarks.

25   Trademark comes in different types or categories namely generic,

descriptive, suggestive, arbitrary and fanciful or coined.  The type of a claimed trademark is relevant to the trademark strength.  Some trademarks are stronger than others.  The stronger the trademark, the more protection should be given to it.

I will now describe each type of trademark in the order of the general relative strength.

Generic, a claimed trademark is generic if it is the word, name, symbol, device or any combination thereof by which the good commonly is known.  An example of generic trademark is escalator for moving stairs.  Whether a claimed trademark is generic does not depend on the term itself, but on the use of the term.  A word may be generic of some thing but not others.  For example, Ivory is generic for elephant tusks, but it is not generic for soap.  Whether a claimed trademark is a generic term is viewed from the perspective of a member of the public evaluating the trademark.  Claimed generic trademarks are not protectable as marks.  They cannot be registered with the US Patent and Trademark Office.

Descriptive.  A descriptive trademark only describes an ingredient, quality, characteristic, function, feature, purpose or use of the good provided under it.  An example of a descriptive trademark would be vision center for an eyeglass store.  Descriptive trademarks are eligible for registration with the US Patent and Trademark Office if the trademark has

1    acquired secondary meaning.  A trademark has acquired secondary

2    meaning if the primary significance of the trademark in the

3    minds of the consuming public is not the associated good itself,

4    but instead the source or producer of the good.

5         There are four factors you may use in determining

6    whether the secondary meaning exists.  One, the length and

7    nature of the trademark's use; two, the nature and extent of

8    advertising and promotion of the trademark; three, the efforts

9    of the trademark owner to promote a conscious connection between

10   the trademark and its business, and four, the degree to which

11   the public recognizes Sprint's good by the trademark.

12        In this case, I have determined that Sprint's Nextel

13   trademark is covered by an incontestable registration on the

14   principle register.  I have also determined that Sprint's sound

15   mark is registered on the principle register.  The effect of

16   these determinations is that the registration is conclusive

17   evidence that the trademark and sound mark are at least

18   descriptive with secondary meaning.  You must accept that

19   Sprint's Nextel trademark and Sprint's sound mark were at least

20   descriptive and possess secondary meaning at the time Sprint

21   applied for their respective registrations.

22        Suggestive.  A suggestive trademark suggests, rather

23   than describes, qualities of the underlying good.  If a

24   consumer's imagination is necessary to make the connection

25   between the trademark and the goods, then the trademark suggests

1   the features of the good.  An example of a suggestive trademark

2   is iceberg for a refrigerator.  Suggestive trademarks are

3   eligible to be registered in the US Patent and Trademark Office

4   without proof of secondary meaning.

5          Arbitrary and fanciful or coined.  An arbitrary

6   trademark is a real word but has no logical relationship to the

7   underlying goods.  An example of an arbitrary trademark is

8   Domino for sugar.  A fanciful or coined trademark is a trademark

9   created solely to function as a trademark, but which has no

10  meaning beyond the trademark itself.  An example of a fanciful

11  or coined trademark is Exxon for gasoline.  Arbitrary and

12  fanciful or coined trademarks are eligible to be registered in

13  the US Patent and Trademark Office without proof of secondary

14  meaning.

15         Additional considerations relating to trademark

16  strength.  While evaluating the strength of Sprint's trademarks,

17  you may also consider the extent of any use by third parties of

18  similar trademarks or sound marks.  Sprint's promotional

19  expenditures, the volume of Sprint's sales under its Nextel

20  trademark and the sound mark, and whether Sprint's registrations

21  have achieved incontestable status.

22         The similarity of parties and trademarks.  In

23  evaluating whether trademarks are similar, you may consider the

24  overall impression that Sprint and Defendants' trademarks create

25  including the sound, appearance and manner in which they are

1    used.  You may look at the trademarks as a whole rather than

2    simply comparing their individual features.

3          Similarity of the parties' goods.  This factor

4    considers not only the -- I'm sorry.  This factor considers not

5    only whether the consuming public can readily distinguish

6    between this parties' goods, but also whether the goods at issue

7    are of a kind that the public attributes to a single source.

8          Similarity of the parties' sales channels, distribution

9    and customers.  This factor considers where, how and to who the

10   parties' goods are sold.  Similarities increase the possibility

11   of consumer confusion, mistake or deception.

12         Similarity of the parties' advertising media.  This

13   factor looks to each parties' method of advertising.  It is not

14   a requirement that Sprint and the Defendants advertise in the

15   same magazines, publications or other advertising outlet.  The

16   issue is whether the parties use the same forums and media

17   outlets to advertise leading to possible confusion.

18         The Defendants' intent.  You may also consider whether

19   the Defendants intended to infringe on Sprint's Nextel trademark

20   and sound mark.  That is, did the Defendants adopt their

21   trademarks with the intention of deriving a benefit from

22   Sprint's reputation.  Additionally, if you determine that the

23   Defendants intentionally ignored the potential for infringement,

24   you may impute to the Defendants an intent to infringe.

25         Actual confusion.  Because the presence of actual

1    confusion usually is difficult to show, a finding of actual

2    confusion is not required to find trademark infringement.

3    Alternatively, the absence of actual confusion does not

4    necessarily mean the Defendants are not liable for trademark

5    infringement.

6         The evidence of actual confusion of trademarks should

7    be reasonably significant.  You should weigh the alleged actual

8    confusion using the following factors:  One, the amount and

9    duration of the confusion; two, the degree of familiarity the

10   confused party has with the goods; three, the type of person

11   complaining of the alleged actual confusion.  For example,

12   whether that person is a customer or a noncustomer.  And four,

13   the alleged number of people who are actually confused; for

14   example, whether the confused person is an actual customer or

15   someone else.

16        If you find the Defendants have infringed Plaintiff's

17   trademark or sound mark, you must next consider Defendants'

18   affirmative defenses.

19        If you find that -- trademarks remedies.  If you find

20   that Sprint owns a valid trademark, that Defendants infringed it

21   and they do not have a defense, you must consider whether and to

22   what extent monetary relief should be awarded.

23        Defendants' profits and calculations of profits.  You

24   may make an award based on an accounting of Defendants' profits

25   if you find that Defendants' conduct was willful and deliberate;

1   two, Defendants were unjustly enriched, or an ward of

2   Defendants' profits is necessary to defer -- to deter

3   Defendants' future conduct.

4        A Defendant commits a willful violation of a trademark

5   when that Defendant knowingly and purposefully capitalizes on

6   and appropriates the goodwill of a Plaintiff.  Unjust enrichment

7   occurs if the Defendant receives a benefit to which they are not

8   entitled.  In determining Defendants profits, Sprint only is

9   required to prove Defendants' gross sales.  Defendants may then

10  prove the amount of sales made for reasons other than the

11  infringement.  Defendants may also prove that their costs or

12  other deductions, which they claim should be subtracted from the

13  amount of their sales to determine their profits on such sales.

14  Any costs or deductions the Defendants prove by a preponderance

15  of the evidence are required to be subtracted from the sales

16  attributable to the infringement and the difference is the

17  amount that may be awarded to Sprint.

18       Nominal damages.  If you find that Defendant infringed

19  Sprint's trademark but you do not find that Sprint sustained any

20  actual damages or damages based on Defendants' profits, you may

21  return a verdict for Sprint and award what are called nominal

22  damages.  By nominal, I mean a small amount of damages that you,

23  in your discretion, determine.

24       Sprint also claims that Defendants have committed

25  counterfeiting by unlawfully using Sprint's Nextel trademark and

1    the sound mark in the sale, offer to sell, distribution or

2    advertising of goods without Sprint's authorization.  To prove a

3    claim for counterfeiting, Sprint must prove the following facts

4    by a preponderance of the evidence:  one, the Nextel trademark

5    and the sound mark used by the Defendants are copies that are

6    identical or substantially indistinguishable from Sprint's

7    Nextel trademark and the sound mark that are registered on the

8    principle register of the United States Patent and Trademark

9    Office; two, the Defendants' Nextel trademark and the sound mark

10   were affixed without Sprint's permission; and three, the

11   Defendants used Sprint's Nextel trademark and the sound mark in

12   the sale, offering for sale, distribution or advertising of

13   goods that are covered by Sprint's trademark registration.  If

14   you find that Sprint proved that Defendants violated Sprint's

15   trademark by counterfeiting, you must consider whether and to

16   what extent money damages should be awarded.

17          Sprint seeks what is known as an award of statutory

18   damage.  Statutory damages are damages established by Congress

19   in the Lanham Act.  The purpose of statutory damages is to

20   compensate the trademark owner, penalize the counterfeiter and

21   deter future trademark counterfeiting.  You may award statutory

22   damages between 1,000 and 200,000 for each Nextel trademark and

23   the sound mark that Sprint proves the Defendants used for each

24   type of goods sold, offered for sale or distributed.  If you

25   find that Sprint proved that the Defendants knew that the Nextel

1    trademark and sound mark they used were counterfeits, you may

2    award additional statutory damages.

3            It is not necessary that the Defendants knew that the

4    marks were registered by Sprint, only that the Defendants knew

5    that the Nextel trademark and the sound mark were the same or

6    substantially indistinguishable from Sprint's Nextel trademark

7    and the sound mark.  If Sprint proves that the Defendants' use

8    of the counterfeit Nextel trademark and the sound mark was

9    willful, then you may, but are not required, to increase the

10   statutory damage award to a maximum of $2 million per type of

11   goods sold, offered for sale or distributed.

12           Sprint also claims the Defendants' use of Nextel is

13   likely to dilute the distinctiveness of Sprint's Nextel

14   trademark.  To prove the claim of dilution -- of likely

15   dilution, Sprint must prove the following facts preponderance of

16   the evidence:  One, Sprint's Nextel trademark is famous and

17   distinctive, either inherently or through acquired

18   distinctiveness; two, the Defendants' use of their Nextel

19   trademark began after Sprint's trademark became famous and

20   three, the Defendants' use of their trademark is likely to cause

21   dilution by blurring and/or dilution by tarnishment of Sprint's

22   famous trademark.

23           To prevail on a claim for likely dilution of its

24   trademark, Sprint must prove by a preponderance of the evidence

25   that its Nextel trademark was famous at the time of the

1    Defendants' first use of the Defendants' trademarks.

2            A claimed trademark is famous if its widely recognized

3    by the general consuming public of the United States as the

4    designation of the source of the owner's goods. In considering

5    whether Sprint's Nextel trademark is famous, you may consider

6    all relevant factors including the following:  One, the

7    duration, extent and geographical reach of advertising and

8    publicity of the trademark, whether advertised or publicized by

9    Sprint or third parties; two, the amount, volume and geographic

10   extent of sales of goods offered under Sprint's trademark;

11   three, the extent of actual recognition of Sprint's trademark

12   and four, whether Sprint's trademark was registered on the

13   principal register of the United States Patent and Trademark

14   Office.

15           Sprint claims that the Defendants' use of the Nextel

16   trademark is likely to blur Sprint's trademark.  Likelihood of

17   dilution by blurring occurs when the similarity between the

18   Defendants' Nextel trademark and Sprint's famous Nextel

19   trademark impairs the distinctiveness of the famous trademark.

20   In determining whether Defendants' Nextel trademark is likely to

21   blur the distinctiveness of Sprint's Nextel trademark, you may

22   consider all the relevant factors including the following:  One,

23   the degree of similarity between the Defendant Nextel trademark

24   and Sprint's Nextel trademark; two, the degree of the inherent

25   or acquired distinctiveness of Sprint's Nextel trademark; three,

1   the extent to which Sprint is engaging in substantially

2   exclusive use of its Nextel trademark; four, the degree of

3   recognition of Sprint's Nextel trademark; five, whether the

4   Defendant intended to create an association with Sprint's Nextel

5   trademark and six, any actual association between the

6   Defendants' Nextel trademark and Sprint's Nextel trademark.

7           Sprint is not required to prove actual or likely

8   confusion or actual economic injury to prove that blurring is

9   likely.

10          Sprint also claims the Defendants' use of its Nextel

11  trademark is likely to tarnish Sprint's Nextel trademark.

12  Dilution by tarnishment occurs when a claimed trademark harms

13  the reputation of a famous trademark.  Sprint is not required to

14  prove actual or likely confusion or actual economic injury to

15  prove that tarnishment is likely.  Sprint only needs to prove

16  likely dilution by tarnishment to recover on its dilution claim.

17          If you find the Defendants' use is likely to dilute

18  Sprint's Nextel trademark and the Defendants do not have a

19  defense to the likely dilution, you must consider whether and to

20  what extent monetary relief should be awarded.  You may award

21  Sprint monetary relief if:  One, the Defendants' marks were

22  first used after October 6, 2006 and two, the Defendants'

23  conduct was willful.

24          Defendants profits and calculation of profits.  You may

25  make an award based on an accounting of Defendants' profits as a

1    result of Defendants' willful violation of Sprint's trademark

2    rights.   A Defendant commits a willful violation of a trademark

3    when the Defendant knowingly and purposefully capitalizes on and

4    appropriates the goodwill of a Plaintiff.

5         You can only imagine how punchy I get reading all of

6    these things at the same time.  I apologize.  Get a drink of

7    water.  Excuse me.  But we only have a few pages to go.

8         In determining the Defendants' profits -- I don't

9    remember if I read this little paragraph.   A Defendant commits a

10   willful violation of a trademark when that Defendant knowingly

11   and purposely capitalizes and appropriates the goodwill of a

12   Plaintiff.  In determining the Defendants' profits, Sprint only

13   is required to prove the Defendants' gross sales.  The Defendant

14   then may prove the amount of sales made for reasons other than

15   the infringement.

16        The Defendants also may prove their costs or other

17   deductions which they claim should be subtracted from the amount

18   of their sales to determine their profits on such sales.  Any

19   cost or deductions that the Defendants prove by a preponderance

20   of the evidence are required to be subtracted from the sales

21   attributable to the infringement and the difference is the

22   amount that may be awarded to Sprint.

23        Sprint also claims that the Defendants violated the

24   federal law known as the Anti Cybersquatting Consumer Protection

25   Act, which will be referred to as the ACPA.  Thank goodness.

1    Through the Defendants' registration of domains including the

2    elements Nextel including nextelworldwide.com, nextelisback.com,

3    nextelmobileworldwide.com, getnextel.com and nextelmobile.com.

4         To prove a violation of the ACPA, Sprint must prove the

5    following facts by a preponderance of the evidence:  One, the

6    Defendants have registered, trafficked in or used the subject

7    domain matter -- domain name; two, Sprint's Nextel trademark was

8    distinctiveness at the time of the Defendants' registrations of

9    their domain names, and that those domain names are identical or

10   confusingly similar to Sprint's trademark or Sprint's Nextel

11   trademark, was famous at the time of the Defendants'

12   registration of their domain names, and their domain names are

13   identical to, confusingly similar to, or likely to dilute

14   Sprint's trademark; and three, the Defendants have committed

15   such acts with a bad faith intent to profit from Sprint's

16   trademark.

17        Dilution is the decrease in the power of a famous

18   trademark to identify its goods.  Dilution does not require

19   competition between the owner of a famous trademark and other

20   parties, or a likelihood of confusion.  Sprint's trademark is

21   famous if it is widely recognized by the general public as

22   identifying its goods.

23        The purpose of the ACPA is to protect trademarks

24   against certain confusing uses of those trademarks in internet

25   domain names.  A domain name is a designation that forms at

1    least part of an address on the internet such as www.CNN.com,

2    CNN for the CNN Television Network, and has been registered with

3    or assigned by a domain name authority.

4           The term "traffics in" means to engage in a transaction

5    including, but not limited to sales, purchases, loans, pledges,

6    licenses, exchange of currency and any other transfer for

7    consideration or receipt in exchange for consideration.  For

8    example, selling a domain name constitutes trafficking in that

9    domain name.

10          The Defendants are not liable for use of

11   nextelworldwide.com, nextelisback.com,

12   nextelmobileworldwide.com, getnextel.com or nextelmobile.com

13   unless you find that the Defendants are the registrants or the

14   registrant's authorized licensees.

15          In determining whether the Defendants had a bad faith

16   intent to profit from Sprint's trademarks, you may consider the

17   following nine factors.  No single factor controls, and Sprint

18   is not required to prove that all or even most of the factors

19   are present in any particular case.  You may also use factors

20   other than these nine to determine the Defendants' intent.

21          One, whether the Defendant had trademark or other

22   intellectual property rights in their domain names; two, the

23   extent to which the Defendants' domain names consist of the

24   Defendants' legal name or a name that is otherwise commonly used

25   to identify the Defendants; three, the extent of the Defendants'

74

prior use, if any, of their domain names in connection with the
bonafide offering of any goods; four, the extent to which the
Defendants used Sprint's trademark noncommercially or as a fair
use in a site accessible under the domain names.  Fair use is
the good faith descriptive use by the Defendants or term only to
describe its goods and services and not a trademark.  Five,
whether the Defendants intended to divert consumers from
Sprint's online location to a site that is accessible under the
Defendants domain name and could harm the goodwill represented
by Sprint's trademark.  A site could harm the goodwill
represented by Sprint's trademark if it A, is for commercial
gain; B, intends to tarnish or disparage Sprint's trademark, or
C, creates a likelihood of confusion as to the source,
sponsorship, affiliation or endorsement of the site.  Six,
whether Defendants offered to transfer, sell or otherwise assign
their domain name to Plaintiff or any other third-party for
financial gain without using or having an intent to use
Defendants' domain name in the bonafide offerings of any goods,
or whether Defendants prior conduct indicates a pattern of such
conduct.  Seven, whether the Defendants provided material in
misleading false contact information.  When applying for
registration of their domain name, whether Defendants
intentionally failed to maintain accurate contact information or
whether Defendants' prior conduct indicates a pattern of such
conduct.  Eight, whether Defendants registered or acquired

1  multiple domain names which they know are identical or

2  confusingly similar to trademarks of others that are distinctive

3  at the time of registration of such domain names, or dilutive of

4  famous trademarks of others that are famous at the time of

5  registration of such domain names, without regard to the goods

6  of the parties, and nine, the extent to which Sprint's trademark

7  is distinctive and famous.

8       Defenses.  The Defendants are not liable for -- I've

9  only got four pages to go.  Bear with me.

10       The Defendants are not liable for a violation of the

11  ACPA if you find the Defendants have proven by a preponderance

12  of the evidence that at the time the Defendants registered or

13  otherwise obtained their domain names:  One, the Defendants had

14  reasonable grounds to believe that the use of their domain names

15  was a fair use or otherwise lawful, and two, the Defendants

16  actually believed that the use of their domain name was fair use

17  or otherwise lawful.

18       Remedies.  If you find the Defendants violated the ACPA

19  with respect to the domains nextelworldwide.com,

20  nextelisback.com, nextelmobileworldwide.com, getnextel.com or

21  nextelmobile.com, you should consider what damages to award to

22  Sprint.  Sprint's remedies available under the ACPA are in

23  addition to any other remedy otherwise applicable, even if they

24  are duplicative of those made in other of Sprint's claims

25  against the Defendants.

```
1              In this case, Sprint seeks an award of statutory

2     damages.  Under the ACPA, statutory damages are punitive in

3     nature, meaning they are designed to sanction or punish the

4     Defendants for the Defendants' bad faith conduct, and to deter

5     future violations of the ACPA.  You may award statutory damages

6     between 1,000 and $100,000 for each domain name that Sprint

7     proves the Defendants used.

8              If you find that Plaintiff has shown a likelihood of

9     confusion, you must consider the Defendants' defense of

10    abandonment.  Defendants claim that they're not liable because

11    Sprint abandoned the Nextel trademark for devices.  Defendants

12    have the burden of proving their defense to trademark

13    infringement.

14             Abandonment of a trademark is a defense to a claim of

15    infringement.  To prove abandonment, the Defendants must prove

16    the following preponderance of the evidence:  Sprint

17    discontinued the bonafide use of its trademark, and did so with

18    the intent to not resume its use in the reasonably foreseeable

19    future.  If you find that Sprint has not used the trademark for

20    three consecutive years, you may presume that Sprint did not

21    intend to resume use of the trademark, but Sprint can rebut that

22    presumption by producing evidence that it intended to resume

23    use.

24             I have instructed you that Sprint has registered

25    trademarks that are presumed to be valid, and that Sprint enjoys
```

1   nationwide priority of rights and nationwide constructive notice

2   of its rights.  Therefore, you must consider Defendants' claims

3   that Sprint's registration for the Nextel trademark, US

4   Registration Number 1,884,244 is invalid because Sprint has

5   abandoned this trademark.

6           Abandonment of a trademark is a ground for the

7   cancellation of a trademark registration.  To prove abandonment,

8   the Defendant must prove the following by a preponderance of the

9   evidence:  One, Sprint discontinued the bonafide use of its

10   trademark and did so with the intent to not resume its use in

11   the reasonably foreseeable future.  If you find that Sprint has

12   not used the trademark for three years, consecutive years, you

13   may presume that Sprint did not intend to resume use of the

14   trademark, but Sprint can rebut that presumption by producing

15   evidence that it intended to resume the use.

16           Your verdict must be unanimous. In other words, you

17   must all agree.

18           Your deliberations are secret and you'll never have to

19   explain your verdict to anyone.

20           Each of you must decide the case for yourself, but only

21   after fully considering the evidence with all the other jurors,

22   so you must discuss the case with one another and try to reach

23   an agreement.  While you're discussing the case, don't hesitate

24   to reexamine your own opinion and change your mind if you become

25   convinced that you were wrong, but don't give up your honest

1    beliefs just because others think differently or because you

2    simply want to get the case over with.

3            Remember that in a very real way, you are the judges,

4    judges of the facts.  Your only interest is to seek the truth

5    from the evidence in the case.

6            When you get to the jury room, choose one of your

7    members to act as foreperson.  The foreperson will direct your

8    deliberations and speak for you in court.

9        A verdict form has been prepared for your convenience.  This

10   is the verdict form.  It is styled in the case.  United States

11   District Court for the Southern District of Florida, Sprint

12   Communications, LLC versus Stephen Calabrese, Nextel, Inc. doing

13   business as Nextel Worldwide, RetroBrands USA LLC, Jeffrey

14   Kaplan and Nextel Mobile Worldwide, Inc.

15   Defendants/counterclaimants.  Verdict form.  Again, a reminder

16   we, the jury, unanimously -- shows you have to be unanimous --

17   find the answers to the question propounded by the Court as

18   follows:  One, did Plaintiff prove by a preponderance of the

19   evidence that the Defendants are liable on Plaintiff's trademark

20   counterfeiting claim with respect to the Nextel trademark ending

21   in 244.  Defendants Stephen Calabrese, and a place to put an X

22   or a checkmark, yes or no.  Defendant Nextel, Inc., yes or no.

23   Defendant RetroBrands USA LLC, yes or no.  Defendant Jeffrey

24   Kaplan, yes or no.  Defendant Nextel Mobile Worldwide, Inc., yes

25   or no.

1          This is important.  Right after that it says if you

2     answered yes to any Defendant in Question 1, proceed to Question

3     2.  If you answered no as to all of the Defendants in Question

4     1, go to Question 3.

5          So we'll go to Question 2.  Based on your finding that

6     the Defendant is or multiple Defendants are liable on

7     Plaintiff's claim for trademark counterfeiting of the Nextel

8     trademark ending in 244, you shall award statutory damages.  If

9     you find that at the time of the counterfeiting activity the

10    Defendants did not know the trademarks used were counterfeits

11    then you shall award statutory damages between 1,000 and 200,000

12    per type of goods sold, offered for sale or distributed.  If you

13    find that at the time of the counterfeiting, a Defendant or

14    multiple Defendants knew that the trademarks they used were

15    counterfeits, then you may award statutory damages to a maximum

16    of $2 million per type of goods sold, offered for sale, or

17    distributed.  What is the total amount of statutory damages that

18    you award the Plaintiff.  Answer in the blank after a dollar

19    sign.  You fill in the blank.

20         Proceed to Question 3.  Did the Plaintiff prove by a

21    preponderance of the evidence the Defendants are liable on

22    Plaintiff's claims for trademark infringement under the Lanham

23    Act, Florida Common Law or Florida Deceptive or Unfair Trade

24    Practices Act with respect to the same trademark ending in 244.

25    Same Defendants.  If you answered yes to any Defendant, proceed

1     to Question 4.  If you answered no to all Defendants, proceed to

2     Question 5.

3           Question 4.  Based on your finding that the Defendant

4     is or multiple Defendants are liable on Plaintiff's claims for

5     trademark infringement under the Lanham Act, Florida Common Law

6     or Florida Deceptive and Unfair Trade Practices Act with respect

7     to that same trademark Number 244, what is the monetary amount

8     you find should be awarded to Plaintiff.

9           Proceed to Question 5.  Did the Plaintiff prove by a

10     preponderance of the evidence that Defendants are liable on

11     Sprint's claim for federal unfair competition and false

12     designation of origin with respect to trademark 244.  Same five

13     Defendants.  If you answered yes to any Defendant in Question 5,

14     proceed to Question 6.  If you answered no, go to seven.

15           Six, based on your finding that a Defendant is or

16     multiple Defendants are liable on Plaintiff's claims for unfair

17     competition, false designation, what is the monetary amount.

18     A blank following a dollar sign.

19           Number 7.  If you find that based on a preponderance of

20     the evidence the Defendants' use of Nextel trademark is likely

21     to dilute Plaintiff's Nextel Trademark 244.  Five Defendants.

22     If you answered yes to any Defendant go to Question 8.

23           Based on your finding that a Defendant is or multiple

24     Defendants are liable on Plaintiff's claim for trademark

25     dilution as to Nextel Trademark 244, what is the monetary

1    amount.

2              Proceed to Question 9.  Do you find based on a

3    preponderance of the evidence that Defendants are liable to

4    Plaintiff on the claim of cybersquatting with respect to

5    Trademark 244.  And then there's the five Defendants; Calabrese,

6    Nextel, RetroBrands, Jeffrey Kaplan, Nextel Mobile Worldwide.

7    If you answered yes to any Defendant, proceed to Question 10.

8    If not, you go to 11.

9              Ten.  Based on your finding that the Defendant is or

10   multiple Defendants are liable on the claim for cybersquatting,

11   you shall award statutory damages within the range of minimum

12   of 1,000 to maximum of 100,000 per domain.  What is the monetary

13   amount you find should be awarded.

14             Proceed to Question 11.  Did the Plaintiff prove by a

15   preponderance of the evidence that Defendants are liable on

16   Plaintiff's trademark counterfeiting claim with respect to sound

17   mark 282.  Same five Defendants.  If you answered yes to any

18   Defendant, go to Question 12.  If not, you go to 13.

19             Question 12.  Based on your finding that the Defendant

20   is or multiple Defendants are liable, shall award statutory

21   damages.  If you find that at the time the Defendants did not

22   know the trademarks they used were counterfeits, shall award

23   statutory damages between 1,000 and 200,000.  If you find that

24   they did know that the trademarks were counterfeits, then you

25   may award statutory damages to a maximum of 2 million per type

1    of goods sold.

2              Proceed to Question 13.  Did Sprint prove by a

3    preponderance of the evidence Defendants are liable on

4    Plaintiff's claim for trademark infringement under that 282, the

5    sound mark.  Same five Defendants.  If you answered yes, based

6    on your finding that a Defendant is or multiple Defendants are

7    liable on Plaintiff's claim, what is the monetary amount you

8    find should be awarded to Plaintiff.

9              Proceed to Question 15.  Did Plaintiffs prove by a

10   preponderance of the evidence Defendants liable on Plaintiff's

11   claim for unfair competition and false designation of origin

12   with respect to sound mark.  If you answered yes, based on your

13   finding the Defendant is liable on Plaintiff's claim for unfair

14   competition, what is the monetary amount.

15             Then the last question is do you find that Defendant

16   proved by a preponderance of the evidence that Plaintiff has

17   abandoned trademark 244 by stopping all use with the intent not

18   to resume use.  The answer yes or no.

19             This ends your deliberations.  The foreperson must sign

20   and date this verdict form.  Another reminder, so say we all,

21   this blank day of April, today is the 18th day of April.

22   Foreperson and date.

23             You must take the verdict form with you to the jury

24   room.  When you've all agreed on the verdict, your foreperson

25   must fill in the form, sign it and date it.  Then you'll return

1    to it the courtroom.

2            Very important.  If you wish to communicate with me at

3    any time, please write down your message or question, knock on

4    the door and give it to the court security officer.  The court

5    security officer will bring it to me, and I'll respond as

6    promptly as possible either in writing or by talking to you in

7    the courtroom.  Please understand I might have talk to the

8    lawyers and the parties before I respond to your question or

9    message, so I hope you're patient as you await my response.

10           I don't want to get a note saying we're five to four or

11   eight to one or whatever.  That's your business.  I don't want

12   to know at any point how you stand.  Don't tell me how you voted

13   at any time.  That type of information should remain in the jury

14   room, not be shared by anyone, including me in your note or

15   question.

16           Now I'm going to give this to the court security

17   officer and I'm going to ask him to give it to one of you.

18   That's not electing you as foreperson.  That's your business to

19   do the election.  It is simply the way to get it into the jury

20   room.

21           All right?  We'll be in recess until you call us back.

22   Tell us you've reached a decision.  As I said, if you haven't

23   reached a decision by quarter to 5 we're knocking off for the

24   day all right?

25           (Jury out at 2:33 p.m.)

```
1              THE COURT:  Thank you for your patience.
2              Okay.  We'll be in recess.  I would ask you to hang
3    around for at least a half hour because sometimes you get
4    questions real quickly.  After that, make sure that we can reach
5    you, find you.  And we'll go from there and we'll see.  There is
6    an attorney lounge on the 14th floor in that corner of the
7    courthouse, it has a television and whatever else, but I don't
8    know, just hang around in the attorney rooms or out in the
9    lobby.  I'm not going to buy them anything to drink or -- it's
10   their business, they got water in there.
11             All right?  I'll be in my office.  Call me if you need
12   me.
13             MR. RIOPELLE:  Thank you, Your Honor.
14             THE COURT:  Thank you.  I thought I was going to run
15   out of voice before I ran out of instructions.
16             (Recess at 2:35 p.m.)
17             (Court called to order at 4:18 p.m.)
18             THE COURT:  Please be seated.  All right.  We've
19   received a note with a question, who understands it?
20             MR. RIOPELLE:  I believe I understand it, Your Honor.
21             THE COURT:  All right.  Then what's the answer?
22             MR. RIOPELLE:  The answer is under the Nextel mark.
23   Under the Nextel mark, there are three types of goods sold.
24   Under the Nextel chirp, there's one type of good sold.
25             THE COURT:  Do you agree?
```

1          MR. SCHWARTZ:  No, we don't.

2          THE COURT:  All right.  Explain to me why you don't

3    agree and what you think the answer is.

4          MR. SCHWARTZ:  We think it's just one type of good

5    sold, cellular or two-way radio devices, one type.

6          THE COURT:  All right.  What's the three?

7          MR. RIOPELLE:  The three are mobile telephones, mobile

8    radios and dispatch radios.  This is in evidence.  When I asked

9    Mr. Kaplan do you agree that they sell mobile telephones, do you

10   believe that they sell mobile radios, do you agree that they

11   sell dispatch radios.  And if you want me to find in it the

12   transcript --

13         THE COURT:  No, I remember that.  Why isn't that the

14   answer then?

15         MR. SCHWARTZ:  Ms. Jobe testified that a device could

16   be all of those things in one.  There's no -- that would be our

17   answer.

18         MR. RIOPELLE:  No, but -- so what we're talking about

19   here are -- what he's talking about what Ms. Jobe was testifying

20   about was what the goods listed on the trademark.  What we're

21   talking about here on this question is the goods the Defendant

22   was selling.  And the Defendant, if you remember, they put up in

23   the video, they showed that they had the three different types

24   of products and that's what matters there.  It's the three

25   different types of products that the Defendant is selling for

1    purposes of the damages here.

2            THE COURT:  Offered for sale or distributed.  I think

3    that is different.  I think Ms. Jobe was testifying about

4    something totally different.  Why isn't that three?  I believe

5    it is three.  My recollection of the evidence.

6            MR. SCHWARTZ:  All I would say, Your Honor, is what I

7    previously said is that a device could do all of those things.

8    So it's one device, it's one handheld radio, it's a phone.

9            THE COURT:  That's not what your client testified to.

10   What your client testified --

11           MR. SCHWARTZ:  Which client?  Which client, Your Honor?

12   Because --

13           THE COURT:  Kaplan, wasn't it?

14           MR. SCHWARTZ:  Well, he has nothing to do with phones.

15   He's just the licensor for RetroBrands.  Mr. Rivera and

16   Mr. Calabrese are the ones who handle the sale of the mobile

17   phones.

18           THE COURT:  But he testified that -- the only evidence

19   that we have is what he testified to, which is that there were

20   three types of devices.

21           MR. SCHWARTZ:  I would need to see that transcript.

22           THE COURT:  I'm not going to pull a transcript up.

23           MR. RIOPELLE:  I'm sorry.  I didn't mean to interrupt

24   you.

25           THE COURT:  Go ahead.

```
1          MR. RIOPELLE:  In addition to the evidence of Mr.

2     Kaplan testifying, we also have the video of the dealer in which

3     the dealer had three different types of devices when he was

4     explaining the kinds of devices the Defendant sells.  So there's

5     -- it's evidence there in two different ways.

6          MR. SCHWARTZ:  Your Honor, a You Tube video that's

7     unauthenticated showing the demo of some cellular phones is

8     hardly enough evidence to support where he's suggesting that

9     it's three versus one or two.  That's -- you cannot go by that.

10         THE COURT:  The evidence that's unrefuted, and it's in.

11         MR. SCHWARTZ:  But who's to say that the device that

12    they're showing -- they all look like cellular devices, and

13    that's what the testimony is here.

14         THE COURT:  I know, but in his effort to show what a

15    big shot he was, he said three.  He said --

16         MR. SCHWARTZ:  I think if it's important, you know, I

17    would need to look at the transcript.

18         THE COURT:  Well, we're not going to go look at

19    transcripts.

20         MR. SCHWARTZ:  Can I just confer with my clients for

21    two minutes since --

22         THE COURT:  Sure.  But not more than two minutes

23    because I got to answer this now.

24         (In-place recess)

25         MR. SCHWARTZ:  Your Honor, Mr. Kaplan recollects that
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
1    question and answer having to do with Sprint's phones and he
2    believes that the models of these phones are all the same,
3    push-to-talk.  And his understanding is there's just one kind,
4    it just may look a little different model-wise, but they're just
5    all push-to-talk and they all work on the SIM cards and they are
6    all the same.
7                   (Knock from within jury room)
8                   THE COURT:  If they got another note, save the trip.
9    Ask them if they have a note.  Yeah.  And tell them we'll get
10   back to them as soon as we can.
11                  COURT SECURITY OFFICER:  They want to know the answer,
12   Your Honor.
13                  THE COURT:  Okay.
14                  COURT SECURITY OFFICER:  To the note.
15                  THE COURT:  I want a verdict, so how does it work?
16                  What was the third thing that you said that Mr. Kaplan
17   said?  The push-to-talk, cellular phone and --
18                  MR. SCHWARTZ:  They're all push-to-talk, and they all
19   work off the SIM card.
20                  THE COURT:  I know that.  I'm asking him what the third
21   item was.
22                  MR. RIOPELLE:  The three things, Your Honor, were
23   mobile telephones, mobile radios, dispatch radios for the Nextel
24   mark.  And then for the Nextel chirp, it was telecommunications
25   services.
```

1        THE COURT:  Okay.  Mobile telephones, dispatch radios

2   and what was the third one?

3        MR. RIOPELLE:  Mobile radios.

4        THE COURT:  Okay.  I propose to respond you must rely

5   on your best recollection of the evidence.  The Plaintiff

6   contends that Mr. Kaplan said that they sold mobile telephones,

7   mobile radios and dispatch radios, and that a video was

8   presented which said basically the same thing.  The Plaintiff

9   says that the evidence was that there was one device that did

10  all of these services.

11       MR. RIOPELLE:  The only change I would have is the very

12  last phrase is the Defendant says that it was only one type.

13       THE COURT:  I thought I said the Defendant says that.

14       MR. RIOPELLE:  I thought I heard Plaintiff, so I may

15  have misheard.

16       THE COURT:  The Defendant says that the evidence was

17  that there was only one device that did all of these services.

18       MR. RIOPELLE:  And then should we also say there's no

19  dispute as to the chirp being one type?

20       MR. SCHWARTZ:  There a dispute.

21       MR. RIOPELLE:  Do you think there are more than the one

22  I've said?

23       MR. SCHWARTZ:  None of our stuff uses the chirp.

24  That's our position.

25       THE COURT:  Say again?

1          MR. SCHWARTZ:  None of our products use the chirp.

2          THE COURT:  Okay.

3          MR. SCHWARTZ:  So I'm not sure, you know --

4          THE COURT:  I don't think they asked about the chirp.

5    Okay.  You got that, Allie?  Let me look at it when you type it

6    up.  Tell them we're working on it.  No, don't tell them

7    anything.  I propose to let them go in 15 minutes anyway.  I

8    don't ordinarily call them in to release them.  I just let them

9    go.  I would prepare another note to send in to them and tell

10   them that at 4:45 they are to leave, and nobody will be here to

11   supervise them, and that they are to return at 9:30 and they are

12   reminded that they're not to begin deliberations until all of

13   the jurors are present since they must do things together.  And

14   that they should be back here at 9:30 so that all of them can

15   start deliberating.

16          Got to get a faster typist here.  I'm just teasing you.

17   Did you get the second one that I said?

18          LAW CLERK:  Uh-huh.  The Defendant says that the

19   evidence --

20          THE COURT:  No, that they're to leave at 4:45.  They're

21   to cease deliberating at 4:45 and return in the morning.

22   They're reminded of all of the instructions concerning -- not

23   discussing the case with anyone or doing any research on their

24   own, and that they cannot begin deliberating until all members

25   are present.  Also please give us the courtesy of printing the

1    foreman's name under the scribbled signature so we can know who

2    it is.

3              LAW CLERK:  I have to add some stuff

4              COURTROOM DEPUTY:  It came out on two pages.

5              THE COURT:  All right.  We'll fix it.  Show it to the

6    parties before you type it up in final form.  Take a look at it

7    and pass it over to the Plaintiff also.  That's the only copy we

8    have.  Oh, you have another copy?

9              COURTROOM DEPUTY:  It came out on two pages.

10             MR. SCHWARTZ:  Looks good to the defense.

11             THE COURT:  Okay.  All right.  Type it up so it comes

12   out on one page please, and then give them the other note at the

13   same time.  Let me read the other note to the lawyers.  Well,

14   type it and then we'll see.  I wouldn't mind staying until 5:30,

15   but after 5 it costs a tremendous amount of money to keep court

16   security officers and everybody else in the courtroom.  So we

17   don't stay after 5 if we don't absolutely have to, and I have to

18   make arrangements ahead of time for that.

19             LAW CLERK:  The last sentence I changed Defendant to

20   Defendants plural.

21             THE COURT:  We'll show them before we send it in, we'll

22   show it to them.  If there's any typos, fix them.

23             (In-place recess)

24             THE COURT:  Show them this.

25             LAW CLERK:  Okay.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1              MR. SCHWARTZ:  Defense is fine with the revised.

 2              MR. RIOPELLE:  Good for Plaintiffs, Your Honor.

 3              THE COURT:  Well I made an addition, return at 9:30

 4    a.m. in the morning, otherwise we just told them sometime

 5    tomorrow.  But I interlineated between "return" and "in at 9:30

 6    a.m."  Here you go.  Give it to them right there.  Might as well

 7    wait and see what they do.  Here you go, Diane.  Put this in the

 8    file.  Make a copy of that other with the interlineation.  Make

 9    a Xerox if it comes out.  They may use it for toilet paper or

10    something.

11              LAW CLERK:  Okay.  Hopefully not.

12              THE COURT:  Give me another copy of it so I can do the

13    same interlineation.  Make nine copies of this and give it to

14    them too.  Show them what we're going to give just so that they

15    have them.

16              LAW CLERK:  Okay.

17              THE COURT:  Show them first.  Orlando, when she gets

18    that done, there are going to be nine copies to give one to each

19    of them.

20              (Knock from within jury room)

21              THE COURT:  Hold on.  They just knocked.

22              (In-place recess)

23              THE COURT:  The jury says they've reached a verdict.

24    Any reason we can't bring them in to receive the verdict?

25              MR. SCHWARTZ:  Can we just get our clients, Your Honor?
```

```
 1              THE COURT:  Yes.  Hurry.  If you don't, we'll be done.

 2              MR. SCHWARTZ:  They should get to hear it.

 3              THE COURT:  Bring in the jury please.

 4              COURT SECURITY OFFICER:  All rise for the jury.

 5              (Jury in at 4:44 p.m.)

 6              THE COURT:  All right.  Please be seated.  Mr. Foreman,

 7    I understand you've reached a verdict; is that correct?

 8              JUROR:  Yes.

 9              THE COURT:  Would you please give it to the court

10    security officer so he can give it to the courtroom deputy who

11    disappeared.  Okay.  Thank you.

12              All right.  Ms. Quinn, would you please publish the

13    verdict.

14              COURTROOM DEPUTY:  Case number 18-60788-civil-Martinez,

15    Sprint Communications, LLC versus Stephen Calabrese, Nextel,

16    Incorporated, doing business as Nextel Worldwide, RetroBrands

17    USA LLC, Jeffrey Kaplan and Nextel Mobile Worldwide,

18    Incorporated.

19              Verdict form.  We, the jury, unanimously find the

20    answer to the question propounded by the Court as follows:

21              Did Plaintiff prove by a preponderance of the evidence

22    that Defendants are liable on Plaintiff's trademark

23    counterfeiting claim and respect to Nextel Trademark Number

24    1,884,224.  Stephen Calabrese, yes.  Nextel, yes.  Defendant

25    RetroBrands USA LLC, yes.  Defendant Jeffrey Kaplan, yes.  And
```

1    Defendant Nextel Mobile Worldwide Incorporated, yes.  Based on

2    your finding that the Defendant is or multiple Defendants are

3    liable on Plaintiff's claim for trademark counterfeiting of

4    Nextel Trademark Number 1,884,244, you should award statutory

5    damages.  If you find that at the time of counterfeiting

6    activity the Defendants did not know that the trademarks they

7    used were counterfeits, then you shall award statutory damages

8    between 1,000 and 200,000 per type of goods sold, offered for

9    sale or distributed.  If you find that at the time of

10   counterfeiting activity a Defendant or multiple Defendants knew

11   that the trademarks they used were counterfeits, then you may

12   award statutory damages to the maximum of $2 million per type of

13   goods sold, offered for sale or distributed.  What is the total

14   amount of statutory damages you award to Plaintiff.  $2 million.

15          Question 3.  Did Plaintiff prove by a preponderance of

16   the evidence that Defendants are liable on Plaintiff's claims

17   for trademark infringement under the Lanham Act, Florida Common

18   Law or Florida Deceptive and Unfair Trade Practices Act with

19   respect to Nextel trademark Number 1,884,244? Defendants Steve

20   Calabrese, yes.  Defendant Nextel, Incorporated, yes.  Defendant

21   RetroBrands USA LLC yes, Defendant Jeffrey Kaplan yes and

22   Defendant Nextel Mobile Worldwide, Incorporated, yes.  Based on

23   your findings that a Defendant is or multiple Defendants are

24   liable on Plaintiff's claim for trademark infringement under the

25   Lanham Act, Florida Common Law or Florida Deceptive and Unfair

1    Trade Practices Act with respect to Nextel Trademark Number

2    1,884,244, what is the monetary amount you should -- you find

3    should be awarded to Plaintiff?  $2 million.

4            Did Plaintiff prove by a preponderance of the evidence

5    that the Defendants are liable on Sprint's claim for federal

6    unfair compensation and false designation of origin with respect

7    to Nextel Trademark Number 1,884,244?  Defendants Stephen

8    Calabrese, yes.  Defendant Nextel, Incorporated, yes.  Defendant

9    RetroBrands USA LLC, yes.  Defendant Jeffrey Kaplan, yes.

10   Defendant Nextel Mobile Worldwide, Incorporated, yes.  Based on

11   your findings that Defendant is or multiple Defendants are

12   liable on Plaintiff's claim for unfair compensation and false

13   designation of origin with respect to Nextel Trademark Number

14   1,884,244, what is the monetary amount you find should be

15   awarded to Sprint?  $2 million.

16           Did you find that based on the preponderance of the

17   evidence that Defendants' use of Nextel's trademark is likely to

18   dilute Plaintiff Nextel Trademark number 1,884,244, Defendant

19   Stephen Calabrese, yes.  Defendant Nextel, Incorporated, yes.

20   Defendant RetroBrands USA LLC, yes.  Defendant Jeffrey Kaplan,

21   yes.  Defendant Nextel Mobile Worldwide, Incorporated, yes.

22   Based on your finding that a Defendant is or multiple Defendants

23   are liable on Plaintiff's claim for trademark dilution under

24   Nextel trademark 1,884,244, what is the monetary amount you

25   should -- you find should be awarded to Plaintiff?  $400,000.

1          Did you find, based on the preponderance of the

2    evidence, that Defendants are liable to Plaintiff on the claim

3    of cybersquatting with respect to Nextel Trademark Number

4    1,884,244, Stephen Calabrese, yes.  Nextel -- Defendant Nextel,

5    Incorporated, yes.  Defendant RetroBrands USA LLC, yes.

6    Defendant Jeffrey Kaplan, yes.  Defendant Nextel Mobile

7    Worldwide Incorporated, yes.  Based on your findings that

8    Defendant --

9          THE COURT:  How about shortcutting it.  Is there any

10   objection to saying based on those findings what is the amount

11   rather than having to read each line?

12         MR. RIOPELLE:  No objection, Your Honor.

13         MR. SCHWARTZ:  No objection.

14         COURTROOM DEPUTY:  Question Number 10.  What is the

15   monetary amount you find should be awarded to Plaintiff,

16   $500,000.

17         Question Number 11.  Did Plaintiff prove by a

18   preponderance of the evidence that Defendants are liable on

19   Plaintiff's trademark counterfeiting claim with respect to Sound

20   Mark Number 5,037,282.  All Defendants, yes.

21         Question Number 12.  What is the amount of statutory

22   damages you award to Plaintiff?  $2 million.

23         Question Number 13.  Did Sprint prove by a

24   preponderance of the evidence that Defendants are liable on

25   Plaintiff's claim for trademark infringement under the Lanham

1    Act, Florida Common Law or Florida Deceptive and Unfair Trade

2    Practices Act with respect to Sound Mark Number 5,037,282.  Yes

3    to all Defendants.

4           Question Number 14, based on your finding that a

5    Defendant is or multiple Defendants are liable or Plaintiff's

6    claim for trademark infringement under the Lanham Act, Florida

7    Common Law or Florida Deceptive and Unfair Trade Practices Act

8    with respect to Sound Mark Number 5037282, what is the monetary

9    amount you find should be awarded to Plaintiff?  $400,000.

10          Did Plaintiff prove by a preponderance of the evidence

11   Defendants are liable on Plaintiff's claim for unfair

12   compensation and false designation of origin with respect to

13   Sound Mark Number 5,037,282.  All Defendants, yes.  Based on

14   your findings --

15          THE COURT:  Based on that finding, what is the amount?

16          COURTROOM DEPUTY:  $400,000.

17          Did you find that Defendants have proved by a

18   preponderance of the evidence that Plaintiff had abandoned

19   Nextel Trademark Number 1,884,244 by stopping all use with its

20   intent not to resume use?  No.

21          So say we all, this 18th day of April, 2022.

22   Foreperson Lino Alvarez Sanoja.

23          THE COURT:  You got the names.  Please poll the jury.

24   This will only take a second.

25          COURTROOM DEPUTY:  Pedro Perez, is the verdict as read

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    your verdict?

2            THE COURT:  You have to answer audibly.

3            JUROR:  Yes.

4            COURTROOM DEPUTY:  Jacqueline Whyte, is the verdict as

5    read your verdict?

6            JUROR:  Yes.

7            COURTROOM DEPUTY:  Lino Alvarez Sanoja, is the verdict

8    as read your verdict?

9            JUROR:  Yes.

10           COURTROOM DEPUTY:  Daniel Acevedo, is the verdict as

11   read your verdict?

12           JUROR:  Yes.

13           COURTROOM DEPUTY:  St. Philet Desilus, is the verdict

14   as read your verdict?

15           JUROR:  Yes.

16           COURTROOM DEPUTY:  Alex Castano, is the verdict as read

17   your verdict?

18           JUROR:  Yes.

19           COURTROOM DEPUTY:  Nache Miller-Thomas, is the verdict

20   as read your verdict?

21           JUROR:  Yes.

22           COURTROOM DEPUTY:  Alexander Allen, is the verdict as

23   read your verdict?

24           JUROR:  Yes.

25           COURTROOM DEPUTY:  And Maria Ruiz, is the verdict as

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    read your verdict?

2         JUROR:  Yes.

3         COURTROOM DEPUTY:  The jurors ascede in the verdict,

4    Judge.

5         THE COURT:  All right.  I want to thank you very much.

6    If you'll go back in the jury room and give me about one minute,

7    I will be in to thank you personally.  Thank you very much.

8         COURT SECURITY OFFICER:  All rise for the jury.

9         (Jury dismissed at 4:56 p.m.)

10        THE COURT:  Is there anything we need to do at this

11   moment?

12        MR. RIOPELLE:  Yes, Your Honor.  We would move for a

13   permanent injunction at this point, and then I would like to be

14   able to talk to you in chambers just for a minute afterwards.

15        THE COURT:  Okay.  I got to go in and thank them first.

16   And as for your injunction, file something and I'll sign it in a

17   day or so.  I'll sign it tomorrow.  All right?

18        Is there anything else we need to talk about right now?

19        MR. KERNELL:  Yes, Your Honor.  We're going to move to

20   set aside the verdict.  There's not substantial evidence in

21   support of the verdict that the jury found.  We're also, again,

22   objecting to the verdict form as read as we previously objected

23   to it because it was unfairly prejudicial to the Defendants.

24        THE COURT:  Okay.

25        MR. KERNELL:  And then we're moving for judgment

1    notwithstanding the verdict.

2            THE COURT:  I understand.  You have time.  You can do

3    that.  Well, I will deny your motion at this point.  If you want

4    to file something in writing, how long do you need?  Couple

5    days?

6            MR. SCHWARTZ:  I would say seven days, Your Honor.

7            THE COURT:  I'll give you until the end of the week.

8    All right?  I'll give you three or four days to respond to it.

9    All right?  And any other motions file them, let me know and

10   I'll be in my chambers in five minutes, maybe.

11           MR. RIOPELLE:  Thank you, Your Honor.

12           THE COURT:  All right.

13           (PROCEEDINGS CONCLUDED AT 4:58 P.M.)

14                     **C E R T I F I C A T E**
     I certify that the foregoing is a correct transcript from the
15   record of proceedings in the above-entitled matter.

16   4/18/2022_____          /s/ Dawn M. Savino, R.P.R., C.R.R.
     Date                          DAWN M. SAVINO, R.P.R., C.R.R.
17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**